FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

# Island of Impunity

## PUERTO RICO'S OUTLAW POLICE FORCE





FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

# Island of Impunity

PUERTO RICO'S OUTLAW POLICE FORCE

JUNE 2012



FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

**Island of Impunity:**

Puerto Rico's Outlaw Police Force

June 2012



**American Civil Liberties Union**
125 Broad Street, 18th Floor
New York, NY 10004
www.aclu.org

Cover Image:
Betty Peña Peña and her 17-year-old daughter Eliza Ramos Peña were attacked by
Riot Squad officers while they peacefully protested outside the Capitol Building.
Police beat the mother and daughter with batons and pepper-sprayed them.
Photo Credit: Ricardo Arduengo / AP (2010)

# Table of Contents

**Glossary of Abbreviations** ...................................................................... 7

**I.  Executive Summary** ........................................................................... 11

**II.  Background:  The Puerto Rico Police Department** ................................. 25

**III.  Shooting to Kill:  Unjustified Use of Lethal Force** ................................ 31

    a. Reported Killings of Civilians by the PRPD between 2007 and 2011 ..................... 33

    b. Case Study:  Miguel Cáceres Cruz .............................................................. 43

    c. Case Study:  Jorge Luis Polaco Jiménez ...................................................... 45

**IV.  Police Brutality against Low-Income, Black, and Dominican Communities** ........... 49

    a. Excessive Force against Low-Income Communities ............................................. 50

    b. Excessive Force against Afro-Puerto Rican Communities ...................................... 52

    c. Excessive Force and Other Police Abuse against Dominican Immigrants
and Puerto Ricans of Dominican Descent ...................................................... 54

**V.  Billy Clubs versus Speech:  Excessive Force against Protesters to
Suppress Speech and Expression** ................................................................ 59

    a. Chilling Effect on Constitutionally Protected Speech and Expression .................. 61

    b. Indiscriminate Use of Toxic CN Tear Gas .................................................. 62

    c. Indiscriminate Use of Pepper Spray ......................................................... 63

    d. Indiscriminate Use of Batons .................................................................. 64

    e. Uncontrolled and Unregulated Use of Carotid Holds and Pressure Point
Techniques ............................................................................................. 64

    f. Inadequately Regulated Use of "Less-Lethal" Ammunition:  Rubber Bullets,
Sting Ball Grenades, and Bean Bag Bullets .................................................. 65

    g. Inadequately Regulated Use of Tasers ....................................................... 66

    h. Groping and Sexual Harassment of Female Protesters ...................................... 67

    i. Psychological Trauma Caused by Police Abuse against Protesters ...................... 68

**VI.  Documented Cases of Police Abuse against Protesters** ......................................... 71

    a. Background Causes that Prompted the Wave of Protests ...................................... 71

    b. Documented Incidents of Police Abuse against Protesters at the
Capitol Building ...................................................................................... 73

        i. First Protest at the Capitol .............................................................. 73

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

    ii. Second Protest at the Capitol ........................................................... 80

  c. Police Abuse against Protesting Students and Union Leaders and Members
at the Sheraton Hotel.......................................................................... 83

  d. Documented Incidents of Police Abuse against Protesting Union Leaders
and Members at Other Locations ....................................................... 86

    i. The Governor's Mansion ................................................................ 86

    ii. Government Development Bank for Puerto Rico ............................. 88

    iii. The Supreme Court of Puerto Rico................................................. 88

  e. Documented Incidents of Police Abuse against Protesting Students at the
University of Puerto Rico ..................................................................... 89

    i. Avenida Universitaria ..................................................................... 89

    ii. April to June 2010 Student Strike .................................................. 90

    iii. December 2010 to February 2011 Student Strike ........................... 91

**VII. Failure to Police Crimes of Domestic Violence and Sexual Assault.................... 103**

  a. Failure to Prevent Intimate Partner Homicides ................................... 103

  b. Failure to Address Domestic Violence ................................................ 113

  c. Failure to Address Rape..................................................................... 116

  d. Domestic Violence by PRPD Officers .................................................. 116

**VIII. Total Impunity: Failure to Investigate or Punish Police Brutality...................... 119**

  a. Seriously Flawed Investigation Process: Failure to Register Civilian
Complaints and Investigate Reported Police Abuses ............................... 121

  b. Breakdown of the Police Disciplinary System: Failure to Hold Officers
 Accountable........................................................................................ 125

  c. Failure to Adequately Record, Report and Review Use of Force,
Officer-Involved Shootings and Other Critical Incidents............................ 130

  d. Failure to Prosecute Incidents of Excessive Use of Force.................... 130

  e. Anonymous Abusers: Failure to Ensure Abusive Officers Can be Identified
by Victims .......................................................................................... 131

**IX. A Lawless Police Force: Lack of Guidance Governing the Use of Force,
and Lack of Oversight, Training and Transparency ...................................... 133**

  a. Lack of Guidance Governing the Use of Force .................................... 134

  b. Failure to Fully Implement a Standard Trigger Weight......................... 136

  c. Lack of Independent Oversight.......................................................... 137

d.  Lack of Training and Supervision ....................................................... 138

e.  Lack of Transparency:  Failure to Maintain and Make Public Statistics on
Police Brutality ........................................................................................ 139

**X.   Relevant Constitutional and Human Rights Law ................................. 141**

a.  Constitutional Standards on the Use of Force ..................................... 141

b.  Human Rights Standards on the Use of Force ..................................... 142

c.  Constitutional Standards on Freedom of Speech, Expression, and Assembly ..... 144

d.  Human Rights Standards on Freedom of Speech, Expression, and Assembly..... 147

**XI.   Recommendations ................................................................................ 151**

**XII.   Methodology and Acknowledgements ................................................ 163**

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

# Glossary of Abbreviations

| | |
|---|---|
| **ACLU** | American Civil Liberties Union |
| **AFL-CIO** | American Federation of Labor and Congress of Industrial Organizations |
| **APPU** | *Asociación de Profesores Universitarios de Puerto Rico* / Puerto Rico University Professors' Association |
| **ASPRO** | *Asociación de Periodistas de Puerto Rico* / Puerto Rico Association of Journalists |
| **ATF** | United States Bureau of Alcohol, Tobacco, Firearms and Explosives |
| **CAT** | Convention against Torture and Cruel, Inhuman or Degrading Treatment |
| **CED** | Conducted-Energy Device |
| **CERD** | International Convention on the Elimination of All Forms of Racial Discrimination |
| **CIC** | *Cuerpo de Investigaciones Criminales* / Criminal Investigation Corps |
| **CIPA** | *Comisión de Investigación, Procesamiento y Apelación* / Commission on Investigations, Processing, and Appeals |
| **DOE** | *División de Operaciones Especiales* / Special Operations Division |
| **DOJ** | United States Department of Justice |
| **DOT** | *División de Operaciones Tácticas* / Tactical Operations Division |
| **DTE** | *División de Tácticas Especializadas* / Specialized Tactical Division |
| **FBI** | Federal Bureau of Investigations |
| **FCT** | *Federación Central de Trabajadores* / Central Workers Federation |
| **FTPR** | *Federación de Trabajadores de Puerto Rico* / Puerto Rican Labor Federation |
| **FURA** | *División de Fuerzas Unidas de Rápida Acción* / Joint Rapid Action Force Unit |
| **ICCPR** | International Covenant on Civil and Political Rights |
| **LAPD** | Los Angeles Police Department |
| **MOU** | Memorandum of Understanding |

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

| | |
|---|---|
| **NIE** | *Negociado de Investigationes Especiales* / <br> Special Investigations Bureau of the Puerto Rico Department of Justice |
| **NDNV** | *Negociado de Drogas, Narcóticos y Control de Vicios y Armas Ilegales* / <br> Drug, Narcotics, Vice, and Illegal Weapons Bureau |
| **NYPD** | New York City Police Department |
| **OPEIU** | Office and Professional Employees International Union |
| **PNP** | *Partido Nuevo Progresista* / New Progressive Party |
| **PPD** | *Partido Popular Democrático* / Popular Democratic Party |
| **PRPD** | Puerto Rico Police Department |
| **PRDOJ** | Puerto Rico Department of Justice |
| **SARP** | *Superintendencia Auxiliar de Responsabilidad Profesional* / <br> Auxiliary Superintendency for Professional Responsibility |
| **SEIU** | Service Employees International Union |
| **UDHR** | Universal Declaration of Human Rights |
| **UFCW** | United Food and Commercial Workers International Union |
| **UGT** | *Unión General de Trabajadores de Puerto Rico* / <br> General Union of Workers |
| **UOE** | *Unidad de Operaciones Especiales* / Special Operations Unit |
| **UOT** | *Unidad de Operaciones Tácticas* / Tactical Operations Unit |
| **UTE** | *Unidad de Tácticas Especializadas* / Specialized Tactical Unit |
| **UPR** | *Universidad de Puerto Rico* / University of Puerto Rico |

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

The Puerto Rico Police Department is a dysfunctional and recalcitrant police force that has run amok for years. Use of excessive or lethal force is routine, and civil and human rights violations are rampant. Years of unchecked abuses have resulted in the avoidable and unjustifiable loss of civilians' lives, and severe and lasting injury to countless others.



Betty Peña Peña and her 17-year-old daughter Eliza Ramos Peña were attacked by Riot Squad officers while they peacefully protested outside the Capitol Building.  Police beat the mother and daughter with batons and pepper-sprayed them. Photo Credit: Ricardo Arduengo / AP (2010)

# I. Executive Summary

The Puerto Rico Police Department (PRPD), charged with policing the Commonwealth of Puerto Rico, is the second-largest police department in the United States, second only to the New York City Police Department. The PRPD's over 17,000 police officers police the island's approximately 3.7 million residents. With about 4.6 PRPD officers for every 1,000 residents, the ratio of active PRPD officers to residents in Puerto Rico is more than twice the U.S. national average.

The PRPD performs an essential public safety function, yet the police force is plagued by a culture of violence and corruption. It is a dysfunctional and recalcitrant police department that has run amok for years. Use of excessive or lethal force is routine, and civil and human rights violations are rampant. Years of unchecked abuses have resulted in the avoidable and unjustifiable loss of civilians' lives, and severe and lasting injury to countless others. While police abuse historically has primarily affected low-income Puerto Ricans, Puerto Ricans of African descent, and Dominican immigrants, in the past three years nonviolent political protesters have also been targeted.

Puerto Rico, and its police force, currently confronts a public safety crisis of skyrocketing crime and a record-breaking murder rate. With 1,130 murders in 2011—nearly three violent deaths per day—the number of murders in 2011 was the highest in Puerto Rico's history, while the previous year saw the second-highest number of murders in Puerto Rico's history. Puerto Rico ranks 19th in the world based on its per capita murder rate, and in 2009, Puerto Rico's murder rate was higher than each of the 50 states, and nearly double the rate of the next highest, the state of Louisiana.

Reducing violent crime represents a daunting and at times dangerous challenge for the PRPD. Too often, rather than curbing the violence, the PRPD instead contributes to it through the unwarranted use of lethal and excessive force.

After a comprehensive six-month investigation of policing practices in Puerto Rico, building on eight years of work by the ACLU of Puerto Rico documenting cases of police brutality, the ACLU has concluded that the PRPD commits serious and rampant abuses in violation of the United States Constitution, the Puerto Rico Constitution, and the United States' human rights commitments. The PRPD routinely commits abuses including the unjustified use of lethal force against unresisting, restrained, or unarmed civilians; beatings and other violence against unarmed Black, poor, and Dominican men that left some near death and others paralyzed or with traumatic brain injury; and excessive force against peaceful protesters including the indiscriminate use of tear gas, pepper spray, batons, rubber bullets and sting ball grenades, bean bag bullets, Tasers, carotid holds, and pressure point techniques. The PRPD also fails to police crimes of domestic violence and rape and to protect women from violence by their intimate partners.

These abuses do not represent isolated incidents or aberrant behavior by a few rogue officers. Such police brutality is pervasive and systemic, island-wide and ongoing. The PRPD is steeped in a culture of unrestrained abuse and near-total impunity. The issues plaguing the PRPD predate the administration of the current Governor, Luis Fortuño, and without far-reaching reforms, the abuses will continue.

Evidence drawn from interviews conducted by the ACLU between March and September 2011 in Puerto Rico, as well as careful review of case documents and publicly reported case information from incidents that took place as recently as May 2012, and government quantitative data, form the basis of the following findings.

## Background:  Pervasive Corruption, Domestic Violence, and other Crime by PRPD Officers

There is pervasive corruption and other crime within the police force, including domestic violence committed by PRPD officers. The PRPD's failure to address criminal conduct among its ranks is symptomatic of a larger institutional dysfunction of the police department's policing and disciplinary systems.

Over a five-year period from 2005 to 2010, over 1,700 police officers were arrested for criminal activity including assault, theft, domestic violence, drug trafficking, and murder. This figure amounts to 10 percent of the police force, and is nearly three times the number of New York City Police Department (NYPD) officers arrested in a comparable five-year period, although the NYPD is about twice the size of the PRPD. In October 2010, the Federal Bureau of Investigation (FBI) arrested 61 PRPD officers as part of the largest police corruption operation in FBI history, and additional PRPD officers have since been arrested by the FBI. Officers have been convicted of planting drugs and fabricating drug-related charges against residents of a housing project, as well as other drug and firearm violations.

Moreover, the PRPD has recorded an appalling number of complaints of domestic violence by PRPD officers. The PRPD recorded nearly 1,500 domestic violence complaints against police officers from 2005 to 2010. At least 84 still-active officers have been arrested two or more times for domestic violence. There have been multiple highly publicized cases in which PRPD officers shot their wives with their service firearms, in some cases killing their spouses.

## Shooting to Kill: Unjustified Use of Lethal Force

Since 2007, PRPD officers have fatally shot, beaten, or Tasered unarmed men, the mentally ill, individuals who posed no threat to officers or bystanders, and individuals who could have been restrained with less force. A series of widely reported police killings over a nine-month period in 2007, one of which was captured on film, brought to light an ongoing problem

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

of PRPD officers' use of deadly force, but did not result in reforms that would curb these abuses.

According to statistics provided by the Puerto Rico Department of Justice (PRDOJ), PRPD officers killed 21 people in 2010 and 2011. The ACLU documented 28 cases in which PRPD officers are reported to have killed civilians from 2007 and 2011. In most of these cases, the deaths were unjustified, avoidable, and/or not necessary to protect the life of an officer or civilian. We know of at least eight additional cases in which PRPD officers shot and killed civilians within that timeframe, but the ACLU was unable to document the circumstances of those killings.

The ACLU documented recent cases in which police shot and killed an unarmed boy as young as 14, and a man as old as 77, who was shot when police entered his home to serve and execute a search warrant. Because it is difficult to obtain case information except where there was a public scandal or related litigation, the ACLU's research on use of lethal force relies heavily on cases that have been exposed by local news media. For each of these cases that emerged in newspaper headlines, there are doubtless many others.

## Excessive Force against Low-Income, Black, and Dominican Communities

PRPD officers assigned to tactical units regularly use excessive force while on routine patrols and checkpoints in low-income, Black, and Dominican communities. During encounters with civilians in these communities, officers routinely use excessive force or resort to force unnecessarily and inappropriately, and they disproportionately target racial minorities and the poor. The PRPD is using excessive force as a substitute for community policing.

Police use excessive force including beating with batons, kicking, punching, throwing on the ground or against walls and objects, chokeholds, and shooting with firearms. In the cases documented by the ACLU, police inflicted injuries including:  a broken jaw, cracked or lost teeth, bone fractures, internal bleeding, severe contusions, abrasions, lacerations, organ damage, organ failure, traumatic brain injury, paralysis, brain death, and death. In the cases documented by the ACLU, victims were not resisting arrest or were already restrained, unarmed, and posed little or no risk to officers or bystanders at the time of officers' use of force. The ACLU documented cases in which police severely beat individuals already restrained in handcuffs, and in some cases police did not arrest victims after injuring them, merely leaving them broken and bleeding on the street or in their homes.

Excessive use of force is rampant. According to data provided by the PRPD's Auxiliary Superintendency for Professional Responsibility (*Superintendencia Auxiliar de Responsabilidad Profesional*, or SARP), which oversees the internal administrative investigations of PRPD officers, civilians filed at least 1,768 complaints against officers for excessive or unjustified force and assault from 2004 to August 2010. These numbers

are most surely low and do not accurately represent the extent of the problem: the ACLU's research shows that civilians regularly elect not to report police abuse because of a lack of faith in the investigatory and disciplinary system; because of widely-known impunity for police abuse; and because of fear of retribution for filing complaints of civil rights and human rights violations.

Excessive force is routine among police officers in multiple tactical units of the PRPD. We have determined that particularly problematic units include the Tactical Operations Unit (*Unidad de Operaciones Tácticas*, or UOT), whose work is carried out by a Tactical Operations Division in each of the 13 police regions (*División de Operaciones Tácticas*, or DOT), colloquially known as the Riot Squad (*Fuerza de Choque*); and the Drug, Narcotics, Vice, and Illegal Weapons Bureau (*Negociado de Drogas, Narcóticos y Control de Vicios y Armas Ilegales*, or NDNV), which is represented in each of the 13 police regions across the island by a Division of Drug, Narcotics, and Vice (*División de Drogas, Narcóticos y Control de Vicios*), commonly known as the Drug Division (*División de Drogas*). Also problematic is the Specialized Tactical Unit (*Unidad de Tácticas Especializadas*, or UTE), commonly known as the Group of 100 (*Grupo de Cien*), an elite unit of officers grouped into multidisciplinary teams drawn from several different police units including drug, traffic, stolen vehicles and the UOT, to combat the drug trade. In addition to its anti-drug operations, the UTE has worked closely with the UOT in responding to protests.

### Billy Clubs versus Speech:  Excessive Force against Protesters to Suppress Speech and Expression

Since 2009, the PRPD also has used excessive force against nonviolent protesters. Even as police crackdowns on the Occupy movement have brought attention to the problem of police abuse against protesters in the United States, the PRPD has failed to address its frequent and systematic use of force against protesters. Officers use excessive force to suppress constitutionally protected speech and expression, indiscriminately using chemical agents including a toxic form of tear gas and pepper spray, batons, rubber bullets and rubber stinger rounds, sting ball grenades, bean bag bullets, Tasers, carotid holds, and pressure point techniques on protesters.  Police have regularly used excessive force in violation of protesters' First Amendment right to freedom of speech, expression, and assembly, as well as their Fourth Amendment right to be free from unreasonable searches and seizures.

The ACLU documented numerous instances of police abuse against protesters at locations that are traditionally the site of public demonstrations in Puerto Rico, including outside the Capitol Building, the Supreme Court of Puerto Rico, the Governor's mansion, and the Government Development Bank for Puerto Rico, and on the campus of the University of Puerto Rico (UPR). The PRPD has regularly responded to peaceful protests by deploying scores of Riot Squad officers in full riot gear, including padded body armor, helmets with visors, combat boots, and plastic shields. They are customarily armed with long crowd-control batons; aerosol pepper spray canisters; tear gas riot guns, rubber bullet guns, and/or pepper-ball guns; and firearms with live ammunition.

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

In responding to entirely peaceful or largely peaceful political demonstrations, police routinely fired aluminum tear gas canisters at protesters from riot guns or "less-lethal launchers," a firearm that physically resembles a rifle grenade launcher. Police also launched tear gas from helicopters, and video footage and photographs show thick clouds of tear gas engulfing protesters. Police doused protesters with pepper spray at point-blank range just inches from protesters' faces, directly into protesters' eyes, noses, and mouths. Protesters told the ACLU that police sprayed them so thickly with pepper spray that they were covered in the orange liquid, which poured down their faces and bodies, temporarily blinding them and causing excruciating pain that in some cases lasted for days.

Police have also routinely struck, jabbed, and beat protesters with 36" straight-stick batons, used as blunt impact weapons specifically for riot control. Riot squad officers struck protesters with two-handed jabs and single-handed strikes in which officers raised the batons over their heads to hit protesters with maximum impact. In numerous cases riot squad officers even chased after fleeing protesters and struck them in the head, back and shoulders from behind. Officers also used painful carotid holds and pressure point techniques intended to cause passively resisting protesters pain by targeting pressure points under protesters' jaws, near their necks, or directly on their eyes and eye sockets. Pressure point tactics not only cause excruciating pain, but they also block normal blood flow to the brain and can be potentially fatal if misapplied. In some cases these pressure point techniques have caused student protesters to lose consciousness.

In the cases documented by the ACLU, as a result of the PRPD's excessive use of force numerous protesters required and received medical treatment for blunt and penetrating trauma, contusions, head injuries, torn ligaments and sprains, respiratory distress, and second-degree burns from chemical agents.

Despite the PRPD's widespread use of violence on protesters during several of the incidents documented by the ACLU, including a protest at the Capitol on June 30, 2010 and a demonstration outside a political fundraiser at the Sheraton Hotel on May 20, 2010, few protesters were arrested during these incidents. The dearth of arrests following these incidents indicates that protesters were not threatening public safety and the use of force was neither necessary nor justified.

In other instances involving UPR student protesters, particularly during the April to June 2010 and December 2010 to February 2011 student strikes, we documented baseless mass arrests of UPR students to put an end to their protests, thereby suppressing their speech and expression. A very small fraction of these arrests of student protesters were supported by probable cause. Of approximately 200 UPR student protesters who have been arrested, some of whom have been arrested multiple times, prosecutors have pursued charges against only approximately 17 students. In case after case, student protesters were arrested and held for hours in a police cell, only to have a court find no probable cause to support the arrest.

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

These abuses have had a chilling effect on First Amendment-protected protest, and numerous university students and labor union leaders and members reported to the ACLU that they have ceased protesting, or significantly scaled back their protest activity, because of fear that they will again be subjected to police violence and baseless arrest. A number of these self-described activists, who have participated in past protests on numerous occasions, told the ACLU they no longer feel safe participating in demonstrations. They said they fear that the PRPD will again use excessive and unnecessary force to suppress their demonstrations, and they are reluctant to express their political beliefs in public and risk retaliation by the PRPD.

All of the protesters interviewed by the ACLU told us that they believe the PRPD's use of force against them is designed to suppress their speech and expression, and is specifically directed at those with viewpoints that are critical of the current administration and its policies. Without exception, all of the concerned citizens, community leaders, university student activists, and labor union leaders and members we interviewed told us that they feel the police have targeted them because of the viewpoints they have sought to express.

## Failure to Police Crimes of Domestic Violence and Sexual Assault

The PRPD systematically fails to protect victims of domestic violence and to investigate reported crimes of domestic violence, sexual assault, and even murders of women and girls by their partners or spouses. The PRPD is failing to protect women and girls from abusive intimate partners and ex-partners, and the PRPD is not policing those crimes when they are committed.

Puerto Rico has the highest per capita rate in the world of women over 14 killed by their partners. The numbers are disturbing, and climbing: 107 women were killed by their intimate partners in a five-year period from 2007 to 2011. The number of women killed by their intimate partners jumped significantly in 2011, to 30 women killed, up from 19 in 2010. In 2006, the PRPD reported 23 murders of women at the hands of their partners or spouses, placing Puerto Rico first on an international list comparing the number of women killed in each country/territory by their partners per million women over the age of 14.

Of the women killed by their intimate partners from 1991 to 1999, only 17 percent had orders of protection, a scant 2 percent had orders of arrest against their murderer, and 4 percent had expired orders of protection. In 2007, 25 percent of the women killed by their partners had previously reported incidents of domestic violence to the PRPD. Few women are seeking protection from their abusive partners, in part because they lack faith in a system that is failing to provide adequate protection to victims.

In addition, the PRPD is failing to ensure that women confronting domestic violence utilize the legal options available to them, and it is failing to enforce existing protective orders by arresting abusers who violate orders that are in place.

In July 2011, during his confirmation hearing before the committee on Public Safety and Judicial Affairs, the recently-replaced Superintendent of Police, Díaz Colón, was asked about deaths from domestic violence that have occurred on the island, and he replied that domestic violence is a private matter and is outside the purview of the PRPD.

Moreover, the PRPD is not adequately responding to or investigating rape crimes, and it is significantly underreporting these crimes. The PRPD reported that only 39 forcible rapes were committed in 2010, while the department also reported 1,000 homicides during the same year. Based on data from police departments around the U.S., we would expect the rape statistics to be 100 times the figure reported by the PRPD, as other jurisdictions in the U.S. report about four times as many rapes than homicides.

The number of reported forcible rapes has declined exponentially; from 426 in 1990 to 39 in 2010. While the reported rape rate has declined sharply in the last ten years, from 228 forcible rapes in 2000 to 39 in 2010, the murder rate has seen a sharp increase during the same time period, indicating that reduced crime is not the cause of the recent suspiciously low rape statistics.

The remarkable data spread between reported forcible rape and murder is the result of the PRPD's failure to follow protocols to respond to, record, or investigate crimes of rape. Official sources estimate that, in the case of sexual violence, only about 16 percent of rapes are reported. In their latest study, issued in 2007, the Puerto Rico Department of Health's Center for Assistance to Rape Victims estimated that 18,000 people in Puerto Rico, mostly women and girls, are victims of sexual violence each year.

## Total Impunity: Failure to Investigate or Punish Police Brutality

There are numerous contributing factors that are responsible for these deeply-rooted, wide-ranging, and long-standing human rights abuses—abuses which are both preventable and predictable. Our research has found that the investigatory, disciplinary, and reporting systems in place utterly fail to address, and therefore prevent, police abuses. In particular, we have documented the failure of the following systems:  the disciplinary and other accountability systems, which fail to meaningfully punish officers for misconduct; the investigatory system, which fails to effectively examine use of force and allegations of police misconduct; and the reporting system, which fails to collect and track data that could be used to correct these grave issues.

These systems virtually guarantee impunity: instead of deterring abuses by holding abusive officers accountable, the PRPD allows officers to escape punishment or any other consequences, rearming them and returning them to active duty, often to repeat their offenses.  Citizen complaints of brutality, lethal force, and excessive force languish for years without resolution. Abusive officers rarely are administratively punished or criminally prosecuted. The PRPD fails to track repetitive conduct by officers who violate the law or have significant records of complaints from the public. The failure to implement effective

early warning systems to identify abusive officers and flag high-risk officers likely to commit abuses has resulted in the avoidable loss of numerous lives.

The investigatory, disciplinary, and reporting systems of the PRPD rubber-stamp the use of force, cover up abuse by its officers, and encourage a code of silence. We documented a disciplinary system that retains, protects, and even promotes officers who use lethal and excessive force. It is a disciplinary system that retained an abusive officer even after he was labeled a "ticking time bomb" by a police psychologist, to see him later execute an unarmed man in the street; awards medals of valor to officers involved in a deadly shooting of a mentally ill man even while the official investigation into their use of force was ongoing; and reinstated an officer who held the local police chief hostage at gunpoint, rearmed him after he was arrested eight times, and returned him to foot patrol in a housing project where he shot and killed an unarmed 18-year-old boy.

We also documented an investigatory system that fails to interview witnesses and ignores eyewitness accounts that contradict the officers', as in one case in which an investigation of the fatal shooting of an unarmed man reported only the involved officers' account of events and summarily stated that bystanders were interviewed at the scene, "but they said adverse things about the officers."

## A Lawless Police Force:  Lack of Guidance Governing the Use of Force and Lack of Oversight, Training and Transparency

The ACLU has identified a number of additional problematic PRPD policies and practices that contribute to the pattern of police abuse, including lack of guidance governing the use of force; lack of effective oversight, supervision, and training; failure to collect and track data that could be used to correct these grave issues; and failure to fully implement a standard trigger weight that meets U.S. national standards.

PRPD officers perform an essential public safety function, and the ACLU recognizes the important work performed every day by the department's officers. However, the PRPD fails to provide even basic guidance to its personnel on how to discharge their duties in compliance with constitutional and human rights standards. Until January 31, 2012, the PRPD had no comprehensive policy on the use of force. Such a policy is standard for police departments across the United States, and is standard policing practice around the world. To date, the PRPD has not fully implemented the new policy, and it has not yet trained all of its personnel in the policy.

The PRPD continues to lack standard protocols governing the use of force that officers are authorized to use, including guidance on the use of chemical agents, impact weapons, and "less-lethal" ammunition such as rubber bullets or sting ball grenades. The PRPD also lacks any protocols on policing protests and large-scale demonstrations, interactions with people with mental illness, and handling complaints of domestic and sexual violence.

18

Existing PRPD policies fall short of constitutional legal standards and U.S. police practices. For example, PRPD policies on the use of firearms, Tasers, and batons do not incorporate current legal requirements governing officers' use of force, do not emphasize alternatives to physical force, and do not require the use of measures to avoid or minimize the use of force. The existing policies fail to establish a clear protocol on the levels of force that are permitted in response to different levels of resistance from suspects. The existing policies also fail to provide any guidance on types of force other than firearms that may constitute lethal or deadly force, such as chokeholds, carotid holds, and strikes to the head with batons or other impact weapons. The existing policies do not even acknowledge that such types of force can be lethal, a serious omission. In addition, the PRPD's orders regulating police practices are not easily comprehensible or accessible to officers, who are not provided with copies of the policies.

Officers also receive patently inadequate training, insufficient supervision, and minimal guidance on the legal boundaries of their use of force and other conduct. The PRPD fails to enforce even the protocols and laws in place to regulate officers' conduct. Moreover, there is minimal public oversight and transparency of the PRPD's policies and practices, including no effective independent review.

Until February 2011, the PRPD lacked any standard trigger weight, instead leaving all service weapons at their factory settings of 5.5 and 6.5 pounds, which are substantially lighter than the standard trigger weights of U.S. metropolitan police departments such as the NYPD, which requires a trigger weight of 12 pounds on all service weapons. The PRPD had not paid any attention to the trigger weights of its service weapons until the September 2010 fatal shooting of an unarmed 22-year-old witness to a robbery who had remained at the scene to provide police with a statement. In that case, after the gun of one of five officers at the scene accidentally discharged, another officer began shooting and fired 10 bullets, one of which fatally struck the young man in the back of his head.

In February 2011, the Superintendent of the PRPD issued an order setting the standard trigger weight of all PRPD service weapons at 8.5 pounds. However, the Superintendent ordered that trigger weight springs on service weapons would be changed gradually, and as of June 2011, the PRPD still had over 9,000 service weapons in use that had not been altered to the higher standard trigger weight. Sensitive triggers lead to unintentional shootings during police interactions with civilians and overfiring in which officers shoot more rounds than they would with firearms with heavier trigger weights. In the mid-1990s the NYPD increased the mandatory trigger weight for service weapons from 8 pounds to 12 pounds in order to minimize unintentional shootings. It is essential that the PRPD modify all of its service firearms to the 8.5-pound trigger weight at a minimum, and ideally increase its standard trigger weight to bring it in line with police department policy in cities such as New York and Los Angeles.

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

## The Path Ahead

The United States Department of Justice (DOJ) opened an investigation into the PRPD in July 2008, and in September 2011 issued its findings in a scathing report, technically termed a "findings letter." The DOJ's investigation focused on the four-year period from 2004 to 2008, and was expanded to include police response to protests in 2009 and 2010. The DOJ found a pattern and practice of constitutional violations by the PRPD, including excessive force in violation of the Fourth Amendment and unreasonable force and other misconduct designed to suppress the exercise of First Amendment rights, concluding that the PRPD "is broken in a number of critical and fundamental respects."[1] The superintendent at the time, Emilio Díaz Colón, who had been in the post for only three months when the DOJ published its report, responded by rejecting the DOJ's findings and denying any constitutional violations by the PRPD. In a court filing, Puerto Rico's Justice Department subsequently denounced the DOJ report as unreliable, flawed, and biased.[2] On March 29, 2012 Governor Luis Fortuño named Héctor Pesquera as Superintendent of the PRPD following Díaz Colón's resignation. Pesquera, who is the PRPD's eighth superintendent in 11 years, told journalists in April 2012 that the PRPD does not violate human rights; when pressed he acknowledged that some individual officers may do so.[3]

The PRPD has demonstrated it is both unwilling and unable to police itself, and the political leadership in Puerto Rico has failed to step into the breach. The PRPD has long promised reforms and publicly stated its commitment to reforming some of its policies, but for the most part it has not delivered on these promises. Immediately following the publication of the DOJ's investigation findings, Governor Fortuño issued a plan outlining a series of planned reforms, which are superficial at best, and most of which have not yet been enacted in the nine months since. To its credit, the PRPD has retained a qualified team of experts to assist them with formulating new policies, which resulted in the issuance of a new general use of force policy at the end of January 2012. However, Puerto Rico's new use of force policy falls short of constitutional and U.S. national standards and is vague and lacks objective criteria on the use of lethal force by PRPD officers. In addition, most of Governor Fortuño's and the PRPD's promised reforms have not materialized. Moreover, while the issuance of the new use of force protocol is a necessary first step, the new policy is meaningless without effective accountability measures on the use of force and adequate training and enforcement.

Since the new use of force policy went into effect, there have been at least five recent incidents in April and May 2012 of potentially excessive force by PRPD officers that left one 19-year-old dead, four young men seriously injured with gunshot wounds inflicted by officers, and one young man with injuries from a beating he sustained from an officer. These incidents include a police shooting on April 27, 2012 in the parking lot of a shopping center in Manatí, in which PRPD officer Alfredo Delgado shot two brothers, killing 19-year-old Saúl Medina Figueroa and critically wounding 21-year-old Adrián Medina Figueroa. The officer allegedly stopped the young men's sister for running a red light outside the taco restaurant where the siblings worked, after which her unarmed brothers and mother became involved in a verbal altercation with the officer. The officer reported that he tried to use his nightstick

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

on the family, but one of the brothers took his nightstick and hit him with it and the other brother struck him with a pipe from his car. The officer shot 14 times, fatally shooting Saúl in the abdomen and leg and critically wounding Adrián with three gunshots, including a shot to his chest. In another recent incident, on May 7, 2012 in Puerta de Tierra, PRPD officer Juan Nieves Martínez shot unarmed 21-year-old Jovanny Héctor Núñez Morla, allegedly after the young man punched him in the face. The officer reportedly had stopped the young man for a suspected traffic violation and shot the young man twice, in his arm and his right side. Both incidents raise serious questions about the reasonableness of the force used by the officers. Following these recent incidents, Superintendent Pesquera made troubling remarks to the press, seemingly justifying the use of deadly force against unarmed assailants who assault police officers, in which he stated that, "'Any attack against a police officer has to be repelled with force, and whatever consequence that occurs is going to be the attacker's responsibility.'"[4]

The PRPD requires an overhaul, not merely reform, and certainly not the empty promises of reform that the PRPD has offered to date. The PRPD needs to address the structural issues identified in the ACLU's and DOJ's reports, and these wide-ranging reforms should be supervised by a federal court. While the DOJ's findings are a critical first step, with no enforcement mechanism to ensure the PRPD adopts the essential reforms recommended by the DOJ and the ACLU, there will not be change on the ground and lives will continue to be lost and destroyed by abusive police officers. In order to stop the ongoing police abuse and translate planned reforms into real change, a court-enforceable and monitored agreement between the DOJ and the government of Puerto Rico that includes a comprehensive reform plan is necessary.

Since 2004, the ACLU of Puerto Rico has been documenting numerous cases of police brutality in Puerto Rico. Between March and September 2011, the national office of the ACLU conducted fact-finding human rights research in Puerto Rico to further document allegations of police brutality. This report is based on a comprehensive six-month investigation, during which the ACLU conducted interviews in Puerto Rico with government officials and victims of police brutality or their surviving family members or lawyers in March, April, May, and September 2011. We focused on incidents over a five-year period from 2007 through 2011, and have continued monitoring incidents, policies, and practices. We issued a preliminary report of our research findings in June 2011;[5] this expanded report contains our complete findings based on additional field research and documentation of ongoing police abuse in Puerto Rico, including excessive force incidents that took place as recently as May 2012.

The scope of this report does not include several additional categories of police misconduct that are pervasive within the PRPD and raise serious concern, including unlawful searches and seizures, racial profiling, and unconstitutional stop-and-frisks. In its report, the DOJ found that the PRPD engages in a pattern and practice of unconstitutional searches and seizures, an issue that has long been raised by community activists in Puerto Rico. Additional categories of police abuse that are not documented here, but that warrant further

research based on cases documented by the ACLU of Puerto Rico and the news media, include police abuse against the homeless in urban areas (particularly in Aguadilla, San Juan, and Bayamón) and police abuse against the LGBT community.

Based on our research, including our findings identifying a number of problematic policies and practices that contribute to the pattern of police abuse, we have formulated clear recommendations for much-needed reforms. These reforms will not only help to bring the PRPD into compliance with the constitutions of the United States and Puerto Rico and human rights laws, but will also help it to combat the public safety crisis it currently confronts. Constitutional policing is a central component of public safety. Policing practices that respect Puerto Ricans' civil and human rights are critical to achieve public confidence in the police department, an essential element to improving public safety.

The ACLU makes the following key recommendations. A complete list of recommendations is set forth at the end of this report.

- Develop, revise, and implement comprehensive policies on the use of lethal and less-lethal force and encounters with civilians that meet national, constitutional, and human rights standards. This should include policies on the discharge of firearms, chemical irritants, carotid holds and chokeholds, pressure point techniques, stinger or other "less-lethal" rounds, bean bag guns, canines, batons, use of Tasers and other conducted electronic devices, physical restraints, and the unholstering and brandishing of firearms. This also should include policies on the treatment of protesters and the handling of public demonstrations, as well as the treatment of persons with medical conditions, persons with mental illness, and juveniles.

- Develop and fully implement comprehensive procedures for investigating allegations of police abuse and other civilian complaints. This should include procedures requiring that investigators identify, interview, and record statements from all involved officers and eyewitnesses. This should also include protocols on the intake of civilian complaints to ensure that all civilians wishing to report instances of abusive conduct by officers are able to do so.

- Create and fully implement reporting systems adequate to document *all* uses of force by the PRPD, as is standard in mainland U.S. metropolitan police departments. Develop and fully implement a use of force reporting policy that includes detailed protocols for officer-involved shooting reporting and the preparing and filing of field incident reports. Develop and fully implement a policy for reviewing use of force and critical incident reports.

- Create and implement fair and expeditious disciplinary procedures to impose effective disciplinary sanctions on officers when they fail to follow protocols, including disarming officers, removing police officers from duty, and permanently suspending them when called for. Reform the internal disciplinary system to periodically review officers' disciplinary files to flag repetitive conduct and assess risk of future unlawful conduct.

- Effectively implement policies by training PRPD officers to follow all applicable policies and laws on the use of force, and provide adequate supervision to be sure that use of force policies are followed.

- Take measures to address the grave problems with policing of domestic and sexual violence. Such measures should include adoption of clear and improved policies on law enforcement response, investigation and evidence collection, classification of offenses and charging decisions, training of officers, oversight and accountability for police misconduct relating to domestic or sexual violence, and response to officer-committed domestic or sexual violence.

- Gather and publicly report statistics on the use of force by the PRPD, internal investigations initiated and completed, and disciplinary measures taken against police officers.

- The legislature of Puerto Rico should create an effective and independent oversight body to monitor the PRPD's compliance with all applicable laws. The oversight body should be fully empowered and adequately funded to discharge its mandate, and it should be fully independent of the PRPD and the office of the Governor of Puerto Rico.

- The DOJ should enter into a court-enforceable and court-monitored agreement with the PRPD. The agreement should include a detailed and court-enforceable plan for comprehensive reforms that addresses all of the findings and the recommendations contained in the DOJ findings letter and this report.

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

The Puerto Rico Police Department is the second-largest police department in the United States.  It has been plagued by pervasive corruption, domestic violence, and other crime within the police force.  The high incidence of criminal conduct among the PRPD's ranks is symptomatic of a larger institutional dysfunction of the police department's policing and disciplinary systems.



Riot Squad officers in formation while protesting students march on the University of Puerto Rico campus during the December 2010 student strike. Photo Credit: Andre Kang / Primera Hora (2010)

## II. Background:  The Puerto Rico Police Department

The PRPD is the second-largest police department in the country, second only to the New York City Police Department (NYPD). The PRPD's over 17,000 police officers police the island's approximately 3.7 million residents. With about 4.6 PRPD officers for every 1,000 residents, the ratio of active PRPD officers to residents in Puerto Rico is more than twice the U.S. national average for police departments policing populations of 250,000 or more.[6] The PRPD is divided into 13 police regions: Aguadilla, Aibonito, Arecibo, Bayamón, Caguas, Carolina, Fajardo, Guayama, Humacao, Mayagüez, Ponce, San Juan, and Utuado.[7]  Various tactical units are represented in each region by a division of the unit. There are 80 precincts island-wide.[8]

The Governor of Puerto Rico has ultimate authority over the PRPD; he appoints a Superintendent to administer the PRPD, subject to confirmation by the Puerto Rico Senate. The Governor approves appointments to senior positions in the PRPD, from inspectors to colonels.

The PRPD has seen a rotating roster of superintendents over the past decade, with the police force led by eight different superintendents in 11 years. On March 29, 2012 Governor Luis Fortuño named Héctor Pesquera as Superintendent of the PRPD following the resignation of Emilio Díaz Colón. Superintendent Pesquera, who was confirmed to the post on April 9, 2012, is on extended temporary leave from his position as Assistant Director of Security for the Port of Miami, and previously worked for the FBI for 27 years, including as chief of the FBI Miami field office and Special-Agent-in-Charge of the FBI office in Puerto Rico. Díaz Colón, former Adjutant General of the Puerto Rico National Guard, served as Superintendent for less than nine months following his appointment on July 6, 2011. Díaz Colón replaced Superintendent José Figueroa Sancha, a former Assistant Special-Agent-in-Charge of the FBI's San Juan Division, who resigned on July 2, 2011. Figueroa Sancha was preceded by Pedro Toledo Dávila, who served as Superintendent from 1993 to 2001, and again from 2005 to 2009 following four different Superintendents who served from 2001 to 2005.

The PRPD, originally known as the Insular Police, was created less than a year after the United States invaded Puerto Rico and took possession of the island as a U.S. territory at the conclusion of the Spanish-American War in 1898. The Insular Police was officially created on February 21, 1899, under the command of Colonel Frank Thacher, a U.S. Marine officer during the Spanish-American War. The police department served as a tool to assert U.S. colonial power, and during the first decades after its creation, its police chiefs were Americans appointed by the colonial governors.

Historically, the police department has been implicated in violence and other actions to suppress dissent. In 1935, the Insular Police killed nearly two dozen nationalists in two

incidents known as the Ponce Massacre and the Río Piedras Massacre.[9] In 1978, the police intelligence division ambushed and killed two young pro-independence activists on a hilltop in Cerro Maravilla. In 1987, it was confirmed that for three decades, the police intelligence division had kept dossiers on at least 135,000 independence supporters; these files, known as *carpetas*, revealed a systematic pattern of surveillance and harassment of pro-independence groups and suspected supporters of Puerto Rican independence from U.S. rule.

The PRPD has long been known for its abusive tactics against independence supporters, labor unions, university students, anti-military and environmental activists, and residents of housing projects. The Civil Rights Commission of the Commonwealth of Puerto Rico issued a special report in 1967 regarding civil rights violations by the PRPD, in which it concluded that police violence was common in Puerto Rico.[10]

**More Puerto Rico Police Department officers are involved in criminal activity than in any other major law enforcement agency in the United States.**

In recent years, the PRPD has been plagued by pervasive corruption, domestic violence, and other crime within the police force. According to the DOJ, more PRPD officers are involved in criminal activity than in any other major law enforcement agency in the United States.[11] The high incidence of criminal conduct among the PRPD's ranks is symptomatic of a larger institutional dysfunction of the police department's policing and disciplinary systems. Over a five-year period from 2005 to 2010, over 1,700 police officers were arrested for criminal activity including assault, theft, domestic violence, drug trafficking, and murder.[12] This figure amounts to 10 percent of the police force, or one arrest of a police officer every 30 hours. According to the DOJ, these arrest rates are significantly higher than comparable jurisdictions in the United States.[13] For example, the number of PRPD officers arrested between 2005 and 2010 is nearly three times the number of NYPD officers arrested in a comparable five-year period (the NYPD reported arrests of only 607 officers between 2001 and 2006), of a police force about twice the size of the PRPD.[14]

In October 2010, the FBI arrested 61 PRPD officers as part of the largest police corruption operation in FBI history, and additional PRPD officers have since been arrested by the FBI. Officers have been convicted of numerous drug and firearm violations. For example, nearly a dozen officers of the Mayagüez Drug Division were convicted of planting drugs and fabricating drug-related charges against residents of a housing project in 2008. The convictions have prompted the review of hundreds of convictions, and it is believed that over 100 people are still incarcerated and serving sentences as a result of these fabricated cases.

Moreover, the PRPD has recorded an appalling number of complaints of domestic violence by PRPD officers. The PRPD recorded nearly 1,500 domestic violence complaints against police officers from 2005 to 2010.[15] The actual number of crimes of domestic violence committed by officers is likely significantly higher due to underreporting, because survivors

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

are unlikely to file and pursue complaints with the same police department that employs their abusive partner or ex-partner. At least 84 still-active officers have been arrested two or more times for domestic violence.[16] Recently there have been multiple highly publicized cases in which PRPD officers shot their wives with their service firearms, in some cases killing their spouses.

The PRPD currently confronts a public safety crisis that includes skyrocketing crime and a record-breaking murder rate.[17] With 1,130 murders in 2011—nearly three violent deaths per day—the number of murders in 2011 was the highest in Puerto Rico's history, while the previous year saw the second-highest number of murders in Puerto Rico's history. With 22.5 murders per 100,000 people in 2009, Puerto Rico's murder rate was higher than each of the 50 states, and nearly double the rate of the next highest, the state of Louisiana.[18] Based on the 2010 statistics, Puerto Rico ranks 19th in the world based on the number of murders per 100,000 inhabitants.[19]

Reducing violent crime represents a daunting and at times dangerous challenge for the PRPD. Too often, rather than curbing the violence, the PRPD instead contributes to it through the unwarranted and unjustified use of lethal and excessive force.

Following a series of widely reported police killings over a period of months in 2007 and sustained public outcry from affected communities and advocates, including the ACLU of Puerto Rico, condemning the pervasive police violence in Puerto Rico, the Civil Rights Division of the United States DOJ opened an investigation into the PRPD in July 2008. In September 2011, the DOJ issued its findings in a scathing report, technically termed a "findings letter." The DOJ found a pattern and practice of constitutional violations by the PRPD, including excessive force in violation of the Fourth Amendment and unreasonable force and other misconduct designed to suppress the exercise of protected First Amendment rights, concluding that the PRPD "is broken in a number of critical and fundamental respects."[20]

The superintendent at the time, Díaz Colón, who had been in the post for only three months when the DOJ published its report, responded by rejecting the DOJ's findings and denying any constitutional violations by the PRPD. In a court filing, Puerto Rico's Justice Department subsequently denounced the DOJ report as unreliable, flawed, and biased.[21] Superintendent Pesquera told journalists in April 2012 that the PRPD does not violate human rights; when pressed he acknowledged that some individual officers may do so.[22]

Immediately following the publication of the DOJ's investigation findings, Governor Fortuño issued a plan outlining a series of planned reforms, which are superficial at best, and most of which have not yet been enacted in the nine months since. To its credit, the PRPD has retained a qualified team of experts to assist them with formulating new policies, which resulted in the issuance of a new general use of force policy at the end of January 2012. However, Puerto Rico's new use of force policy falls short of constitutional and U.S. national standards and has been criticized by civil rights and human rights advocates and policing experts as vague and lacking objective criteria on the use of lethal force by PRPD

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

officers. In addition, most of Governor Fortuño's and the PRPD's promised reforms have not materialized. Moreover, while the issuance of the new use of force protocol is a positive first step, without effective accountability measures on the use of force, the issuance of the new policy does not guarantee that officers will follow it or that officers will be held accountable when constitutional and human rights violations occur.

If the PRPD is serious about instituting reforms, it faces a significant budgetary challenge, as the PRPD currently devotes the lion's share of its resources to the salaries of officers rather than to the systems required to ensure those officers obey the law. Former Superintendent José Figueroa Sancha told the ACLU that 93 percent of the PRPD's $700 million annual budget is dedicated to wages and salary, with only seven percent of its budget allocated for all other operations including equipment, technology, and training.[23] This budget allocation leaves a small fraction of the force's annual budget available to fund much-needed reforms such as training on protocols governing the use of force and computer technology to record civilian complaints and track repetitive conduct by abusive officers. The ratio of active PRPD officers to residents in Puerto Rico is more than twice the U.S. national average, suggesting that the department may be devoting a disproportionate amount of its resources to hiring and maintaining a too-large police force rather than putting money into much-needed reforms. One policing expert who analyzed the PRPD suggested that the department could effectively function with 13,000 officers instead of the 17,000 officers they currently employ.[24]

Recent years have seen the increasing federalization of the PRPD. Shortly after the publication of the DOJ's report, on September 20, 2011 Governor Fortuño announced a cooperation agreement between the PRPD, Puerto Rico Department of Justice (PRDOJ), and federal law enforcement agencies including the FBI and Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) expanding the categories of crimes over which federal law enforcement has jurisdiction. The agreement also included the creation of a joint state and federal Illegal Firearms and Violent Crimes Strike Force. The cooperation agreement was widely viewed in Puerto Rico to be part of a recent trend of federalization of the PRPD. One aspect of the federalization of the PRPD has been the appointment of former FBI officials to the position of Superintendent; in 14 of the last 18 years, the PRPD has been run by a former FBI official.

The September agreement implemented a February 2010 Memorandum of Understanding (MOU) between the PRPD, PRDOJ, and DOJ granting federal law enforcement agencies and the U.S. Attorney's Office primary prosecutorial and investigatory jurisdiction over certain categories of cases of possession or trafficking of controlled substances at points of entry to the island, carjacking theft of motor vehicles, bank robberies utilizing a firearm or resulting in death or serious bodily harm, and interference with interstate commerce by robbery or extortion of over $50,000.[25] The MOU also significantly expanded federal jurisdiction over firearms and weapons cases, granting federal authorities primary jurisdiction over cases involving any drug trafficking crime or drive-by shooting resulting in death, as well as any cases when the defendant is a convicted felon or known member of a gang or terrorist group; when the offense involved an illegally obtained firearm, semiautomatic assault

weapon, or firearm modified to operate differently than designed (i.e., machine guns or silencers); and when the offense involved the transporting or receiving of seven or more firearms.[26] The MOU updated and superseded a previous agreement signed in 1993.

Many in Puerto Rico have objected to the recent federalization of the PRPD, pointing to abuses committed by the FBI in Puerto Rico, including the 2005 extrajudicial killing of Filiberto Ojeda Ríos, leader of the militant pro-independence group *Los Macheteros*; and the February 2006 pepper-spraying and beating of more than 20 journalists trying to cover a high-profile FBI raid on the home of Liliana Laboy, a prominent political activist associated with the movement for Puerto Rican independence.[27] Prior to becoming Superintendent of the PRPD, during his career with the FBI José Figueroa Sancha participated in the Filiberto Ojeda Ríos operation and directed the operation outside Liliana Laboy's apartment building (because of the use of pepper spray on the journalists, the operation, known in Puerto Rico as *444 De Diego*, earned him the nickname "Pepper").

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

Puerto Rico Police Department officers have fatally shot, beaten, or Tasered unarmed men, teenagers, the mentally ill, individuals who posed no threat to officers or bystanders, and individuals who could have been restrained with less force. Police killed at least 21 people in 2010 and 2011, including an unarmed boy as young as 14 and a man as old as 77.



The funeral of Luis Alberto Santos Figueroa, a 14-year-old fatally shot in the back of the head by Drug Division officers about two blocks from his home. Photo Credit: Nelson Reyes Faría / Primera Hora (2011)

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

# III.  Shooting to Kill: Unjustified Use of Lethal Force

A series of widely reported police killings over a nine-month period in 2007, one of which was captured on film, brought to light the ongoing but partially hidden problem of PRPD officers' unjustified use of lethal force. Unfortunately, PRPD officers continue to use lethal force against unarmed civilians[28] or civilians who do not pose a risk to the life of an officer or other civilian, and against civilians who could have been restrained through non-lethal means.

According to statistics provided by the Puerto Rico Department of Justice (PRDOJ), PRPD officers killed 21 people in 2010 and 2011. The PRDOJ reported that PRPD officers killed 27 people from 2009 to 2011; more than double the number the PRDOJ recorded in the four previous years, from 2005 to 2008.[29] According to statistics provided by the Special Investigations Bureau of the PRDOJ, officers shot and killed 12 people in 2010 alone.[30]

**Puerto Rico Police Department officers killed 21 people in 2010 and 2011.**

The ACLU documented 28 cases in which PRPD officers are reported to have killed civilians between 2007 and 2011 (this figure includes shooting deaths, as well as deaths from beatings, Tasers, and other force). Based on statistics provided by the PRPD, and on additional cases documented by the ACLU and the DOJ, we have deduced that at a minimum, PRPD officers killed at least 36 people between 2007 and 2011. Community activists have pegged the number of civilians killed by police even higher. UPR student researchers identified 50 people killed by the police between 2006 and 2010, including 17 cases in 2010 alone.[31]

In a significant number of the cases documented by the ACLU, the facts as reported in the press or in related criminal or civil litigation suggest that the PRPD's use of force was unjustified, avoidable, and/or not necessary to protect the life of an officer or civilian. In some of the cases, journalists located eyewitnesses who disputed the involved PRPD officers' account of events, suggesting that the victims in these cases were actually unarmed, or had not fired a weapon.

Three of the cases we documented involved the use of lethal force against individuals with mental illness who perhaps could have been restrained through the use of non-lethal force. Four of the cases we documented involved the killing of teenagers ranging in age from 14 to 19. Several of the cases include killings by off-duty officers using their service weapons, in which the off-duty officers were reportedly attempting to effectuate an arrest for presumed criminal activity. These statistics do not include murders by off-duty officers of their partners and spouses, an issue that is addressed briefly in section VII of this report, which addresses the PRPD's failure to address domestic violence crimes by PRPD officers.

The most recent police killing documented by the ACLU took place on April 27, 2012 in the parking lot of a shopping center in Manatí. In that case, PRPD officer Alfredo Delgado shot two brothers, killing 19-year-old Saúl Medina Figueroa and critically wounding 21-year-old Adrián Medina Figueroa. The officer allegedly stopped the young men's sister for running a red light outside the taco restaurant where the siblings worked, after which her unarmed brothers and mother became involved in a verbal altercation with the officer.[32] The officer reported that he tried to use his nightstick on the family, but one of the brothers took his nightstick and hit him with it and the other brother struck him with a pipe from his car.[33] The officer shot 14 times, fatally shooting Saúl in the abdomen and leg and critically wounding Adrián with three gunshots, including a shot to his chest.[34] The brothers' sister has disputed the officer's account that he acted in self-defense.[35] The incident raises serious questions about the reasonableness of the force used by the officer, and the circumstances as reported in the press suggest that the officer's use of deadly force could have been avoided.

**Table 1:  Civilians Killed by the PRPD, Cases Documented by the ACLU, 2007–2011**

|  | 2007 | 2008 | 2009 | 2010 | 2011 | Total |
|---|---|---|---|---|---|---|
| Cases documented by the ACLU | 5 | 7 | 4 | 7 | 5 | **28** |

**Table 2:  Civilians Killed by the PRPD, 2005–2011**

| Category of Cases | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | Total |
|---|---|---|---|---|---|---|---|---|
| Cases of civilians shot and killed by the PRPD, as reported by the PRDOJ Special Investigations Bureau[36] | 3 | 2 | 6 | 1 | 3 | 12 | N/A | **27** |
| Additional cases of civilians shot and killed by the PRPD, documented by the DOJ[37] | 0 | 0 | 2 | 4 | 1 | 0 | N/A | **7** |
| Additional cases of civilians killed by the PRPD, documented by the ACLU[38] | N/A | N/A | 0 | 2 | 0 | 0 | 5 | **7** |
| **Total** | **3** | **2** | **8** | **7** | **4** | **12** | **5** | **41** |



*The mother of José Alberto Vega Jorge (inset), the unarmed 22-year-old witness to a robbery at a Burger King who was fatally shot by police.  He had remained at the scene to provide police with a statement and after the gun of one of five officers at the scene accidentally discharged, another officer began shooting and fired 10 bullets, one of which fatally struck the young man in the back of his head. Photo Credit: Teresa Canino Rivera / Primera Hora (2010)*

### a.  Reported Killings of Civilians by the PRPD between 2007 and 2011

The following chart details the circumstances of 28 police killings of civilians between 2007 and 2011. Information in some of the following cases is based on publically available information and news media reports; there are not yet final adjudications of guilt or innocence in a number of these cases, and in some of these cases criminal and/or civil litigation is pending. The ACLU is presenting these cases not to accuse or assign guilt to particular officers, but rather to describe the types of abuses reported by civilians and the barriers to fully investigate these allegations and hold officers accountable for unjustified killings. These cases raise serious questions about the lack of transparent, independent, and accountable mechanisms to investigate police officers who use deadly force.

Because it is difficult to obtain case information except where there was a public scandal or related litigation, this research relies heavily on cases that have been exposed by local news media. For each of these cases that emerged in newspaper headlines, there are doubtless many others. In cases that have not attracted public attention or become scandals in the media, disciplinary action and criminal prosecution is even less common.

This chart includes two cases of killings by municipal police officers.  While these officers are not officially a part of the PRPD, they are trained with PRPD officers at the University College of Criminal Justice of Puerto Rico (Puerto Rico's police academy), and their alleged crimes are subject to the same investigatory procedure. These two cases are included here because the municipal police departments of Puerto Rico are plagued by the same problems of inadequate guidance on their officers' use of force, impunity for abuses, and inadequate training that are systemic in the PRPD.

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

**Table 3:  Reported Killings of Civilians by Police, 2007–2011**

| Reported Victim | Age | Date | Description of Incident |
|---|---|---|---|
| Luis Alberto "Beto" Santos Figueroa | 14 | December 9, 2011 | An officer assigned to the Drug Division of Vega Baja shot 14-year-old Santos Figueroa in the back of the head about two blocks from his home. According to the PRPD's account of the incident, approximately seven police agents were conducting an operation at a suspected drug point in the Brisas de Tortuguero neighborhood when the boy began to run away and pointed a gun at them. Drug Division agent Iván Robles Varela shot the ninth-grade student in the back of the head. Police reported that they recovered a firearm and drugs on or near Santos Figueroa's body. The boy's family disputed the agents' account of the incident, alleging that officer Robles Varela emerged from an unmarked car dressed in civilian clothing and carrying a gun, and shot the boy while he ran away in fear as neighbors shouted at the agent not to shoot. They also maintain that the boy did not possess a firearm and was not involved with drugs. Santos Figueroa was pronounced brain dead before dying of his injuries. Following the opening of an investigation by the Criminal Investigation Corps (CIC) of the PRPD, the Special Investigations Bureau (NIE) of the Puerto Rico Department of Justice assumed jurisdiction over the investigation into the incident. The ACLU was unable to obtain any further information about the status of the investigation.[39] |
| John Doe | 30s | December 4, 2011 | Off-duty PRPD officer Orlando Abreu Flores shot and killed a man whom he said tried to rob the sandwich truck he operated on Avenida Luis Muñoz Marín in Caguas. Officer Abreu Flores used his service weapon, shooting the alleged assailant multiple times on various parts of his body. Officer Abreu Flores reported that the presumed assailant was armed and shot at him after he identified himself as a police officer. Five bullet casings were reportedly found at the scene, all belonging to a .40-caliber firearm consistent with the officer's service weapon.[40] Press reports have not disclosed the victim's name. |

34

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

| | | | |
|---|---|---|---|
| Jaime Amell Ilaraza Ruíz[41] | 24 | November 13, 2011 | Municipal police officer Roberto Rodríguez Rodríguez shot the 24-year-old motorcyclist in the back, killing him, after pursuing him when he failed to comply with an order to stop. Rodríguez Rodríguez and another Guaynabo municipal police officer had attempted to stop Ilaraza Ruíz for speeding, and based on bullet casings recovered from the scene, it appears that Officer Rodríguez Rodríguez fired three bullets at Ilaraza Ruíz. The officers claimed Ilaraza Ruíz was armed and shot at them three times while driving away on his motorcycle, but the victim's girlfriend, Jamelyn González, who was on the motorcycle with him and witnessed the shooting, reported that he was unarmed and did nothing to provoke the officers. González told journalists that she had dropped her helmet on the road and after they stopped and dismounted, police suddenly started shooting without provocation. She said they did not hear any order to stop and did not realize they were being pursued by the police. According to press reports, no evidence the young man was armed ever came to light, and all of the weapons and bullet casings recovered at the scene belonged to the police officers. Police later publicly claimed that the reason they did not recover Ilaraza Ruíz's gun is because it was stolen from the scene. The municipal police of Guaynabo declined to investigate the killing. The NIE reportedly opened an investigation into the incident. The ACLU was unable to obtain any further information about the status of the investigation.[42] |
| Alexander Roja Rivera | 27 | September 13, 2011 | Off-duty PRPD officer Oscar Cortés Santiago, assigned to the Domestic Violence Division of Caguas, shot and killed a young man, presumed to be one of two men who attempted to rob a Pepe Gangas store in Caguas. According to the officer, he ordered the young men to stop, and pursued Roja Rivera when he did not obey his order. According to news reports, Officer Cortés Santiago, who pursued Roja Rivera on foot, alleges that he shot Roja Rivera with his service weapon after the hammer of Roja Rivera's gun jammed.  Roja Rivera reportedly died instantly.[43] |
| Rafael Estrada Berrios | 42 | March 9, 2011 | An off-duty PRPD officer shot Estrada Berrios three times with his service revolver after Estrada Berrios reportedly tried to rob a pharmacy in Guaynabo with a toy gun.[44] |

| George Edil Vega Mangual | 32 | September 30, 2010 | Vega Mangual, a FURA officer assigned to the Maritime Unit in Fajardo, was shot by a fellow police officer. The officer fatally shot Vega Mangual in the back with his Glock service revolver. The officer claimed afterwards that the incident was an accident, and that he had pulled out his gun when Vega Mangual asked him to hand over a tool known as a *pistola de tiempo* while the two were doing mechanic work together on a car outside a residence in Luquillo. Eyewitness accounts reportedly contradicted the shooting officer's account. News reports indicate that the officer had repeatedly been disarmed in the past because of multiple violations, but had been rearmed with a service firearm following a psychiatric evaluation. The officer was subsequently charged with second-degree murder, and convicted of fourth-degree negligent homicide.[45] |
| --- | --- | --- | --- |
| William Malaret Pagán | 77 | September 29, 2010 | The elderly Malaret Pagán was shot when Drug Division officers entered his house in Ponce to serve and execute a search warrant to look for drugs. When a knock on the family's door at 6:15 a.m. was not answered, police entered the home with force and Malaret Pagán reportedly shot at them once. Police then shot back at the elderly man four times, hitting him in the face and chest. After searching the home, no drugs were found.  Neighbors suggested that the police confused Malaret Pagán's house with the house next door, where neighbors believed a drug dealer lived. Local press reported that the confidential information that led to the issuing of the warrant indicates a "large" man, in his late 30s, was using the residence to sell illegal narcotics, a description that does not match the 77-year-old elderly man. The police had executed a search at a neighboring home before entering Malaret Pagán's. According to that neighbor, the police had not presented him with a search warrant prior to searching his home, and when questioned about Malaret Pagán's house, he had explained that an elderly man lived there and it was not a drug point.[46] |
| José Alberto Vega Jorge | 22 | September 25, 2010 | PRPD officer Abimalet Natal Rosado shot the unarmed 22-year-old bystander in the back of his head. As the witness to a robbery at a Burger King in Altamira, Vega Jorge had remained at the scene to provide police with information and was not a suspect. Natal Rosado, one of five officers at the scene, reportedly began shooting after hearing another officer's gun accidentally fire. According to a forensic ballistics expert, Officer Natal Rosado fired 10 bullets, one of which struck Vega Jorge in the head. Police at the scene did not call an ambulance to provide emergency medical services. Vega Jorge was brought to a hospital over an hour after the shooting; ambulance response time in the area would have been under 10 minutes. Natal Rosado, a rookie officer who reportedly had been on active duty for only a month following 8-10 months of training in the police academy according to the then-Superintendent, was subsequently charged with second-degree murder.[47] |

| Jirón Suero Pinales | 19 | August 21, 2010 | Three agents of the Special Operations Division of San Juan shot and killed the teenage Dominican immigrant. The agents were responding to an early-morning shooting during a party at El Coquí, a cafetería/bar in Río Piedras. Suero Pinales was leaving the establishment and heading towards a bus stop when police arrived and ordered him to stop. According to the police officers, the teenager pointed a gun at them, and they fired at him. Four civilians were wounded from the gunfire inside El Coquí, one of whom suffered a punctured lung and was in critical condition after the incident. Over 20 bullet casings were recovered inside the cafetería/bar, and a revolver and a pistol were reportedly recovered on the street outside.[48] |
|---|---|---|---|
| Luis Mártir Chévere[49] | 36 | July 30, 2010 | Two Carolina municipal police officers responded to a call from Mártir Chévere's daughter, who requested their assistance with her mentally ill father, who she said was threatening her and her mother. When police arrived at the family's home, the schizophrenic man wielded two machetes, demanding that they leave. The family reportedly told the officers that Mártir Chévere was schizophrenic and begged them not to hurt him. According to press reports, when Mártir Chévere hit the officers' patrol car with a machete, the officers exited their vehicle and he then cut one of the officers on her arm and head. Both officers responded by firing their firearms simultaneously, fatally striking Mártir Chévere seven times in front of his family. Mártir Chévere's sister, Wanda Mártir, criticized the police's actions in a letter to the newspaper *Primera Hora*, challenging why the officers did not seek reinforcement when they learned that they would have to intervene with a person with mental illness. She pointed out that the officers shot her brother in the chest and jaw, but not in the legs, and asked why they shot to kill rather than immobilize him. She also questioned why the Carolina municipal police department did not provide its officers with Tasers for use in situations when officers have to immobilize people without killing them. Charges were not brought against the officers.[50] |
| Michael Martínez Travieso | 24 | May 8, 2010 | Martínez Travieso was shot in the back by an officer assigned to the Drug Division of Humacao. The officer, who was off-duty at the time, reportedly chased the victim in his pick-up truck and shot him with his service weapon.[51] |

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

| Luis L. Pérez Feliciano | 56 | March 26, 2010 | Pérez Feliciano, a Vietnam Veteran with schizophrenia and paranoia, was shot multiple times by one of three police officers responding to a call from his wife, who reportedly sought assistance getting her husband committed to a psychiatric institution because she believed he was experiencing a psychotic break. According to the officers' account of events, Pérez Feliciano was armed when they arrived, and a struggle over his gun ensued, during which Pérez Feliciano discharged his gun, hitting agent José Romero Quiñones in the forearm. The officer's partner, Sergeant Heriberto Acevedo Olavarría, shot at the victim four times in various parts of his body, killing him. Pérez Feliciano's wife and two daughters disputed the police officers' version of events, which they said was false. According to his wife, there was no struggle over the gun and both policemen drew and fired their guns before her husband fired a shot; she also reported that police disallowed her to approach her husband and try to calm him. One year after the killing, Romero Quiñones and Acevedo Olavarría were awarded the Gold Medal of Valor by Governor Fortuño and then-Superintendent Figueroa Sancha, although the NIE investigation into their use of lethal force had not yet concluded.[52] |
|---|---|---|---|
| Franklin Cáceres Osorio | 31 | October 2009 | Cáceres Osorio, an undocumented immigrant from the Dominican Republic and father of three, was reported to have fallen from a second story window to the ground after police entered his home in Santurce. His family alleges that the police threw him to the ground after beating him. Police reportedly delayed calling for emergency medical assistance, and as a result an ambulance did not arrive until after he had died.  Police also reportedly neglected to call the Homicide Division or the department of forensics, as is the police practice when dealing with a dead body. Instead, his family reported that they had to call a funeral home to have the body removed. No forensic investigation ever took place at the crime scene. While the autopsy report provided by Puerto Rican authorities to Cáceres Osorio's widow claimed his death was caused by cocaine, an autopsy performed upon repatriation of his body to the Dominican Republic concluded that the cause of his death was beating and blunt force trauma. The Dominican Committee of Civil Rights (*Comité Dominicano de Derechos Civiles*) has labeled his death a hate crime. According to the Dominican Committee of Civil Rights, which conducted an investigation into the case and worked closely with Cáceres Osorio's widow, the organization located a witness not interviewed by police who says he saw police beat Cáceres Osorio. According to the Dominican Committee of Civil Rights, there are no records of the incident in police department files.[53] |
| Alvin Delgado Camacho | 27 | December 27, 2009 | Delgado Camacho reportedly was killed by Tactical Operations Division officer Rigollot Colón. Colón shot the 27-year-old 15 times in the billiards hall El Terrible. Colón reportedly continued to fire at Delgado Camacho after he was already on the floor. Witnesses reported that the officer did not like something that the victim said while playing pool. |

| | | | |
|---|---|---|---|
| Heriberto Marcial Hernández | 44 | August 17, 2009 | A PRPD transit officer shot and killed Marcial Hernández after stopping him for a traffic violation in Mayagüez. According to a Puerto Rico Department of Justice press release, Marcial Hernández reached for a weapon as he was being handcuffed and shot at the officer, who shot and killed him. According to press reports, Marcial Hernández had shot and killed a man in front of a bakery earlier in the day, but the transit officer who subsequently shot Marcial Hernández did not know of the earlier incident at the time he stopped the man for speeding.[54] |
| Ramón Luis Martínez Rodríguez | 23 | July 25, 2009 | According to the officers involved, two armed and masked men entered a sports bar in Villalba and announced a robbery. Three armed PRPD officers assigned to various police divisions, including the Tactical Operations Division (DOT) of San Juan and the Homicide Division of San Juan, happened to be in the café at the time. According to the officers, they identified themselves as police and unholstered their service weapons. The officers say that Martínez Rodríguez then pointed a gun at one of the officers, who shot him in his head, chest, and hand.  Martínez Rodríguez did not discharge his weapon, which reportedly was found at the scene. The other presumed assailant fled, and one of the officers reportedly shot at him as he was fleeing but did not strike him.[55] |
| José Luis "Goldo" Irizarry Pérez | 19 | November 4, 2008 | On election night, in response to noise complaints from neighbors in the Colinas neighborhood of Yauco, five PRPD officers arrived at a party where revelers were celebrating the election results. Irizarry Pérez attempted to intervene when the police officers harassed and clubbed his father. According to Irizarry Pérez's relatives who witnessed the attack, some of the officers, including Ángel Torres Quiñones, clubbed the unarmed teenager to death with a nightstick, beating him repeatedly in his head, face, and thorax. Also according to Irizarry Pérez's family, at least one of the officers allegedly stood by and watched. The teenager was pronounced dead on arrival at the hospital. The police officers reportedly claimed that the family was throwing bottles or rocks, but witnesses present at the party dispute this. According to Irizarry Pérez's family, the PRPD refused to identify the officers involved in the teenager's killing, and the family only learned the names of the officers when the NIE and FBI subsequently initiated an investigation. Also according to the family, the PRPD failed to provide them with information about the disciplinary status of the officers involved. Only one of the officers, Ángel Torres Quiñones, was charged for his role in the killing; he was subsequently acquitted of second-degree murder. A judge found cause to arrest another of the officers for presentation of false documents, because of redactions he allegedly made to the complaints filed concerning the incident, and the other officers involved were not charged.  Irizarry Pérez's family filed a civil suit against the officers in April 2011.[56] |

| Diego Alberto Delgado Ferré | 35 | August 31, 2008 | Delgado Ferré was shot and killed by police at a gas station in Saint Just, where he was washing his wife's car. Two officers assigned to the Drug Division of Carolina reportedly were preparing for an anti-drug operation in the area when, according to them, they saw two suspicious-looking men. According to the officers, when they approached Delgado Ferré he pulled out a gun, and they shot and killed him.[57] |
|---|---|---|---|
| Víctor Manuel Sanabria Martínez | 29 | August 5, 2008 | In Las Piedras, a PRPD officer assigned to the DOT of Humacao shot and killed Sanabria Martínez, who was suspected of committing a robbery. PRPD officers reportedly ordered Sanabria Martínez to stop, but the 29-year-old man fled on foot. One of the officers reportedly shot him in the back of his head as he ran away. A senior PRPD officer publicly defended the officers' actions, telling the press that "'A person that is going to assault is going to kill and is going to do whatever. The policeman did his job.'" The shooting officer was subsequently charged with first-degree murder.[58] |
| Antonio Rodríguez Bonet | 31 | June 29, 2008 | PRPD officers in Río Piedras Tasered Rodríguez Bonet, a homeless man, who died as a result of the Tasering. Officers assigned to the Special Operations Division (DOE) had arrested Rodríguez Bonet for a suspected robbery, and applied a Taser to him while taking him into custody. Rodríguez Bonet was transferred to a jail cell, where he began convulsing and died an hour-and-a-half later. |
| Carlos Alberto Santiago Berríos | 41 | June 6, 2008 | In Bayamón, PRPD officers shot and killed Santiago Berríos, who was suspected of committing a robbery. |
| Marcos Montes Muñiz | 38 | April 28, 2008 | Officers shot and killed Montes Muñiz, who was suspected of committing a robbery and reportedly had a blade or similar knife-like weapon. The officers were responding to a call from a homeowner in Mayagüez who believed an intruder was trying to gain access to his home. The officers shot Montes Muñiz in the heart, killing him.[59] |
| Carlos William Carrasquillo Rodríguez | 55 | April 1, 2008 | In San Lorenzo, a PRPD officer shot and killed Carrasquillo Rodríguez, who was known to have mental illness. He was reportedly holding a knife. Carrasquillo Rodríguez's family had called the authorities, seeking assistance controlling the schizophrenic man. According to his family, when police arrived they approached him in the outdoor gated area where he was sitting, and instead of attempting to calm him, they beat him with a baton. The family also stated that Carrasquillo Rodríguez did not pose a threat to public safety when police arrived, as he was in an enclosed area. Carrasquillo Rodríguez reportedly pulled out a knife after the beating, and one of the officers shot him 13 times. According to the family, the PRPD never informed them of the results of the investigation into Carrasquillo Rodríguez's killing. Ten months after the killing, a municipal judge in Caguas found there was no cause to charge the shooting officer with second-degree murder.[60] |

| | | | |
|---|---|---|---|
| Jorge Luis Polaco Jiménez | 28 | October 4, 2007 | PRPD officers shot the unarmed 28-year-old eight times, seven in the back while he was in police custody. Polaco had smashed his car against the building where his ex-girlfriend worked in Carolina when Drug Division police officers reportedly shot him once in his front left shoulder and took him into custody. Polaco was taken away by PRPD officers, ostensibly to get the young man immediate medical assistance at a hospital located 10 minutes away. He arrived at the hospital dead-on-arrival one-and-a-half hours later, with seven bullet wounds to the back in addition to the single gunshot wound to his front shoulder. Police later claimed they acted in self-defense, but a private investigator hired by Polaco's mother found that he was unarmed and only had a dollar and his house keys in his pocket. As described in more detail in the case study below, the police investigation of Polaco's killing was perfunctory and wholly inadequate: police did not interview eyewitnesses to the incident and did not provide a report of their investigation to Polaco's mother, who filed multiple complaints with the PRPD but received no response other than to be told that the investigation was closed. To date, the officers have not been charged with a crime or subject to disciplinary measures for their role in the shooting.[61] |
| Luis Andrés Rodríguez Maya | 25 | August 15, 2007 | PRPD officer Adrián Cardoza Cardoza shot and killed Rodríguez Maya during the execution of a search warrant in Cabo Rojo. Police were conducting a raid related to the search for illegal arms when Rodríguez Maya reportedly resisted the entry of four PRPD officers who sought to search his home. According to the officers, Rodríguez Maya fired a shot that hit the ceiling of his home, and one of the officers responded by shooting Rodríguez Maya twice, killing him. Witnesses reported that upon their arrival, the police officers did not identify themselves and did not knock on the door. An investigation by the NIE found that Rodríguez Maya fired the first shot, and that he did so under the influence of cocaine.[62] |
| Miguel Cáceres Cruz | 43 | August 11, 2007 | On August 11, 2007, Cáceres Cruz, a 43-year-old father of three, was helping to direct traffic in Humacao as part of a scooter club that was providing vehicular escort for a party. Tactical Operations officer Javier Pagán Cruz shot the unarmed man four times, the fourth to his head when he was face down on the ground, bleeding from the shots to his arms and chest. The three involved PRPD officers, their superiors, and the PRPD homicide investigator attempted to cover-up the murder and claimed that the officers had acted in self-defense, alleging that Cáceres Cruz had attempted to grab officer Pagán Cruz's gun. A video filmed by a bystander clearly showing the murder was subsequently released. The case, described in more detail in the case study below, prompted a massive public outcry and exposed a number of the long-term problems that have plagued the PRPD. |

| Nelson Santiago Rivera | 21 | August 4, 2007 | A PRPD officer shot and killed 21-year-old Santiago Rivera, the son of a PRPD officer, following a fight involving several civilians at a youth festival in Las Piedras. After supposedly becoming involved in a scuffle with police, a PRPD officer reportedly shot him six times when he was lying on the ground. When Santiago's father arrived at the scene, police originally refused to allow him to approach his son, on the grounds that the area was closed for investigation. Santiago's father eventually gained access and found his son bleeding from multiple bullet wounds, and discovered officers had closed the area without providing Santiago with medical assistance. Another officer present, Javier Pagán, who would go on to shoot and kill Miguel Cáceres Cruz a week later, reportedly told Santiago's father not to bother assisting the boy, as there was "'one less criminal on the streets.'" The shooting was witnessed by Javier Pagán and another PRPD officer, neither of whom informed their supervisor or any other government officials of what they had seen.[63] |
| --- | --- | --- | --- |
| Christopher Rojas Miranda | N/A | April 10, 2007 | Police stopped Rojas Miranda for speeding in Toa Baja. He reportedly appeared to be disoriented and hallucinating, and the officers allegedly beat him before arresting and detaining him. Rojas Miranda subsequently died in a jail cell. According to news reports, an independently performed autopsy found that his death was caused by the beating, not a cocaine overdose as the officers had alleged.[64] |

Not included in the figures and chart above are cases of lethal force by law enforcement agents assigned to the Special Investigations Bureau (NIE) of the Puerto Rico Department of Justice. Like PRPD officers, NIE agents are trained at the University College of Criminal Justice of Puerto Rico (Puerto Rico's police academy), and their alleged crimes, including allegations of unjustified use of lethal force, are subject to investigation by the PRPD. The July 2011 killing of three young men by a NIE agent raises concerns about the training provided to NIE agents concerning the boundaries of lawful use of force and the PRPD's handling of cases of use of lethal force by agents assigned to the NIE.

On July 17, 2011, Ángel Fontánez Torres, a NIE agent and bodyguard for the Attorney General of Puerto Rico, shot and killed 24-year-old Jesús Emanuel González Cardona and brothers Jean Carlos Palomares and Víctor Manuel Palomares, age 25 and 28 respectively.[65] Fontánez Torres reportedly shot at the young men 14 times with his service weapon while he was off-duty; a ballistics examination reportedly determined that the young men's guns had not been fired.[66] One of the men died of bullet wounds to the head and chest, another of six bullet wounds on different parts of his body, and the third of four bullet wounds to his pelvis, back, chest, and shoulder.[67] According to the agent's account of the incident, he was outside a business in Santurce with his wife when the three armed young men attempted

to rob them at gunpoint; the agent reported that the young men had taken some of their possessions when he unholstered and fired his service weapon. According to a neighbor who told reporters he witnessed the incident, Fontánez Torres shot one of the men in the head after he was already shot in the chest and lying on the ground, and dragged another of the men on the ground before shooting him in the neck.[68] Family members reported that the young men had injuries consistent with blows to the face.[69] The mother of González Cardona, who did not die at the scene, told press that she was not notified of the incident until the next day, and that her son had a black eye, injuries on his nose, and lacerations on his arms and elbows, consistent with the dragging account.[70] The Homicide Division of the CIC conducted an investigation, which included a reenactment of the shootings but no interviews with eyewitnesses, and concluded that the agent acted in legitimate self-defense.[71] The San Juan prosecutor's office declined to bring criminal charges against the agent.[72]

### b. Case Study:  Miguel Cáceres Cruz

The police shooting of Miguel Cáceres Cruz exposed a number of the many problems that have plagued the PRPD for years, and which continue to plague the police department. Because the shooting was caught on video by a bystander, the involved officers' cover-up of the execution-style killing was exposed and the incident provoked a public outcry against police abuse in Puerto Rico. The tragic killing of Miguel Cáceres clearly demonstrates several of the institutional failings of the PRPD that contribute to the systemic abuses committed by its officers. These failings include the failure to effectively investigate incidents including officers' lethal use of force, the failure to track repetitive conduct and flag officers at high risk of committing abuses, the failure to discipline officers who commit abuses, and the general culture of impunity that pervades the police force.

On August 11, 2007, Cáceres, a 43-year-old father of three, was helping to direct traffic in Humacao as part of a scooter club that was providing vehicular escort for a *quinceañera* party, a Latino rite of passage similar to a sweet sixteen.[73] PRPD officers Javier Pagán Cruz, Carlos Sustache Sustache, and Zulma Díaz de León were driving by, stopped, and ordered Cáceres to move his motorbike because he was allegedly obstructing traffic. Tactical Operations officer Pagán exited the police vehicle, put on his bulletproof vest, and approached Cáceres.[74] The two had a verbal exchange, and officer Díaz told Cáceres he was under arrest. Cáceres walked backwards, with his hands up, and officer Pagán grabbed him, punched him, and wrestled him to the ground.[75] Officer Pagán continued to punch Cáceres, who was on the ground and tried to protect himself by grabbing onto Pagán's leg.[76] Cáceres accidentally touched Pagán's holster as he was trying unsuccessfully to get up, and Pagán continued to punch him.[77] As they struggled, Pagán accidentally shot himself in the leg; he then unholstered his gun and shot Cáceres at close range.[78] A crowd had formed and was yelling and screaming at the police agents, but officers Sustache and Díaz prevented them from coming to Cáceres's aid.[79]

After the first shot, Cáceres's body fell to the side. Officer Pagán then fired at Cáceres three or four more times while the man was lying on the ground, shooting him in the back and the

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

head at very close range.[80] The last shot was fired execution-style in the back of his head, when Cáceres was lying motionless face-down on the ground and bleeding from the shots to his arms and chest.[81] The officers left Cáceres bleeding on the sidewalk and drove away without notifying central command that a civilian had been shot.[82]

Another set of officers later arrived at the scene and found Cáceres dying on the sidewalk; they transported him to the hospital, where he was pronounced dead.[83] Two eyewitnesses to the shooting told one of these officers, Lieutenant Luis Rodríguez, what had happened. Lieutenant Rodríguez subsequently prepared a report of what he had been told.[84]

**At the time he shot and killed Miguel Cáceres, officer Pagán was the subject of seven disciplinary complaints, five of which remained unresolved at the time of the killing and dated back as far as nine years earlier.**

The three involved PRPD officers, their superiors, and the PRPD homicide investigator attempted to cover-up the murder.[85] The three involved officers' initial report claimed that the officers had acted in self-defense, and that Cáceres had resisted arrest and attempted to grab officer Pagán's gun.[86] In their reports, the line supervisors relied on the account of events provided by the involved officers.[87] A PRPD homicide investigator appointed to investigate the killing did not record the names of witnesses present at the killing who related a version of events different than the version told by the involved officers.[88] The PRPD homicide investigator's preliminary report consisted only of statements from officer Sustache, officer Díaz, and the single witness who corroborated the involved officers' account of the incident.[89] The homicide investigator wrote, "Also, various persons at the scene were interviewed, but they said adverse things about the officers."[90]

However, unbeknownst to the officers, a bystander had surreptitiously filmed the incident and released the video, which exposed the PRPD officers' and supervisors' cover-up.[91] The video clearly showed officer Pagán standing over Cáceres and shooting him in the head while he was lying face-down, and it was widely disseminated by the media, provoking massive public outrage. If there had not been a video, there most likely would have been no accountability for Cáceres's murder.

On August 14, 2007, Pagán was charged with murder. Pagán was convicted of first-degree murder and weapons violations, and was sentenced to 109 years in prison; Sustache and Díaz were acquitted on all charges.[92] A civil suit filed by Cáceres's widow, Evelyn Ramírez Lluveras, and their three children against the PRPD Superintendent and supervisors was dismissed in December 2011 on the ground that their negligent actions did not rise to the level of deliberate indifference, while the family's suit against Pagán was allowed to proceed.[93]  They intend to appeal the decision.

At the time he shot and killed Cáceres, officer Pagán was the subject of seven disciplinary complaints, five of which remained unresolved at the time of the killing and dated back

as far as nine years earlier.[94] These complaints included multiple complaints of assaults against civilians, a 1999 complaint filed by a supervisor for insubordination, a complaint for falsifying a police report, and a complaint for refusing to attend to a citizen attempting to file a complaint.[95] Also among the complaints against him was a 1999 complaint for domestic violence in which Pagán allegedly physically attacked and threatened his intimate partner with a firearm.[96]

Pagán's disciplinary file revealed that he had been assessed by police psychologists as a "ticking time bomb," and he had two recommendations of expulsion from two different police superintendents.[97] Notwithstanding his disciplinary history, when the second recommended expulsion was pending, Pagán was promoted to the Tactical Operations Division of Humacao, to work in a specialized and elite group within the division, called the Special Response Team.[98] The two expulsion recommendations were lowered to suspensions as a result of an internal disciplinary hearing by the Commission on Investigations, Processing, and Appeals (*Comisión de Investigación, Procesamiento y Apelación*, or CIPA).[99] Pagán served his suspension from the PRPD from August 23, 2006 to October 22, 2006, returning to work about nine-and-a-half months before killing Cáceres.[100] Pagán's 44-officer unit was supervised by only two sergeants, one of whom had been on leave for weeks at the time of Cáceres's murder.[101] When Pagán was finally expelled he had two civilian complaints against him pending, both of which had been filed eight years earlier.[102]

Moreover, both officers Pagán and Sustache had witnessed the police killing of a young man, Nelson Santiago, one week earlier and had not been interviewed about the killing they witnessed.[103] They also were aware that the officers involved in that unjustified killing had enjoyed complete impunity, and in fact had not even had their service weapons taken after the killing.  In that case, Nelson Santiago, son of a PRPD officer, was shot and killed during a youth festival in Las Piedras. When Santiago's father arrived at the scene, police officers originally refused to allow him to approach his son, on the grounds that the area was closed for investigation. Santiago's father eventually gained access and found his son bleeding from multiple bullet wounds, and discovered officers had closed the area without providing Santiago with medical assistance. Officer Pagán, who would go on to shoot Cáceres one week later, reportedly told Santiago's father not to bother assisting the boy, as there was "'one less criminal on the streets.'"[104] Niether Pagán nor Sustache informed their supervisor or any other government officials of what they had witnessed.[105]

### c. Case Study:  Jorge Luis Polaco Jiménez

The police killing of **Jorge Luis Polaco Jiménez**, a 28-year-old Black man extrajudicially executed by police assigned to the Carolina Division of Drug, Narcotics, and Vice on October 4, 2007, similarly exposes several systemic problems that plague the PRPD: the failure to adequately investigate police shootings of civilians, the failure to hold responsible officers accountable for unlawful use of lethal force even in cases where force was obviously unjustified, and the failure of the PRPD's internal disciplinary system to flag officers at risk for abusive conduct.

*FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT*



A hospital record of Jorge Luis Polaco Jiménez showing the location of his gunshot wounds. PRPD officers shot the unarmed 28-year-old eight times, seven in the back while he was in police custody. The investigation into his killing was closed without interviewing witnesses or examining forensic evidence, and the responsible police officers were never brought to justice. Photo Credit: Courtesy of Ruth Jiménez de Jesús

Polaco had smashed his car against the building where his ex-girlfriend worked on Avenida Campo Rico in Carolina when Drug Division police shot him once in his front left shoulder and took him into custody.[106] Polaco was taken away by PRPD officers, ostensibly to get the young man immediate assistance at a hospital located a 10-minute drive away. He arrived at the hospital dead-on-arrival one-and-a-half hours later, with seven bullet wounds to the back in addition to the single gunshot wound in his front shoulder.[107]

Since that day, Polaco's mother, Ruth Jiménez de Jesús, has been tirelessly seeking both justice and the truth of what happened to her son. The police investigation of Polaco's killing was perfunctory and wholly inadequate: police did not interview eyewitnesses to the incident and did not provide a report of their investigation to Polaco's mother.[108] Jiménez de Jesús filed multiple complaints with the PRPD, but received no response other than to be told that the investigation was closed.[109] After perseverance she eventually obtained autopsy documents, including a drawing indicating the locations of the gunshot wounds on her son's body.

Polaco's mother continued to seek out the details of her son's killing, and returned to the scene where her son was initially shot and taken into custody in the hope of finding

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

a witness. She told the ACLU, "I went every day, every afternoon, so I could shed some light on what happened because the investigation was closed."[110] She hired a private investigator, who found that her son was first shot in his front left shoulder at about 7:00 p.m., shortly after which Jiménez de Jesús received a call from police stating that her son had been brought to the local police station.[111] The investigator located an eyewitness never interviewed by the PRPD who saw officers shoot her son in the shoulder and subsequently load him into a patrol car.[112]

According to the private investigator's findings, the other seven gunshot wounds to Polaco's back were later inflicted after he had been loaded onto the agents' patrol car. Although the Carolina hospital was located only a 10-minute drive from the location where police took Polaco into custody, police agents delivered Polaco to the hospital one to one-and-a-half hours later, at 8:35 p.m., dead on arrival.[113] Police had claimed they acted in self-defense, but the private investigator found that Polaco was unarmed and only had a dollar and his house keys in his pocket; the officers were wearing bulletproof vests and carried firearms.[114]

> **"If my son broke the law he belongs in a jail cell, not a cemetery."**

The police officers involved in Polaco's arrest and killing were never subjected to any disciplinary measures, and the ACLU has documented the involvement of one of the two involved officers in a recent police beating of 62-year-old Julio Cirino in his home that left him unconscious and hospitalized for a blood clot in his brain and other injuries. The officer, Isaac Joel Pizarro Pizarro, was later shot and killed in an unrelated incident in December 2011. The other officer is now reportedly working for U.S. Border Patrol.

Moreover, the ACLU of Puerto Rico recently obtained a memo on PRPD letterhead by a police psychologist, dated one year before the officer shot Polaco, stating that one of the officers implicated in Polaco's shooting should not be rearmed. This suggests that the PRPD failed to disarm the high-risk officer, a pervasive problem that we documented in other cases, as detailed in Section VIII of this report.

Jorge Polaco's mother Ruth told the ACLU, "My wish is that the guilty pay, that those responsible pay their due, that they end up in jail. If I killed someone, I would be in jail," adding, "If my son broke the law he belongs in a jail cell, not a cemetery."[115] She says she is still seeking justice, and cannot rest until she knows the truth of what happened to her son. She told the ACLU,

> "I have never had any peace or tranquility. I have continued searching and searching to learn what happened to my son that day.... This pain that I have, it is so enormous. And my pain and misery is worse because the police never did an investigation.... I've always wondered where they took him and what they did to him during that hour-and-a-half. What I need to know is: what happened?"[116]

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

Puerto Rico Police Department officers assigned to tactical units regularly use excessive force while on routine patrols and at checkpoints in predominantly low-income, Black, and Dominican communities.  During encounters with civilians in these communities, officers routinely use excessive force or resort to force unnecessarily and inappropriately.



Dominican immigrant Joel Félix was brutally beaten by police while he was walking home alone one night. The officers left him dying on the sidewalk. He required emergency life-saving surgery because of internal bleeding and organ damage to his spleen and liver caused by the police beating. Photo Credit: ACLU (2011)

# IV. Police Brutality against Low-Income, Black, and Dominican Communities

PRPD officers assigned to tactical units regularly use excessive force while on routine patrols and checkpoints in predominantly low-income, Black, and Dominican communities. During encounters with civilians in these communities, officers routinely use excessive force or resort to force when it is unnecessary and inappropriate. PRPD officers routinely use aggressive tactics that disproportionately target racial minorities and the poor. Young men who live in predominantly low-income, Black or Dominican communities reported to the ACLU that PRPD officers subject them to constant harassment and intimidation. Instead of using de-escalation techniques, officers use force as a substitute for community policing.

Police use excessive force including beating with batons, kicking, punching, throwing on the ground or against walls and objects, chokeholds, and shooting with firearms. In the cases documented by the ACLU, police inflicted injuries including: a broken jaw, cracked or lost teeth, bone fractures, internal bleeding, severe contusions, abrasions, lacerations, organ damage, organ failure, traumatic brain injury, paralysis, brain death, and death. At the time of officers' use of force in the cases documented by the ACLU, victims were not resisting arrest or were already restrained, unarmed, and posed little or no risk of harm to officers or bystanders. The ACLU documented cases in which police severely beat individuals already restrained in handcuffs, and in some cases police did not arrest victims after injuring them, merely leaving  them broken and bleeding on the street or in their homes.

Excessive use of force is rampant. According to data provided by the PRPD's Auxiliary Superintendency for Professional Responsibility (*Superintendencia Auxiliar de Responsabilidad Profesional*, or SARP), which oversees the internal administrative investigations of PRPD officers, civilians filed at least 1,768 complaints against officers for excessive or unjustified force and assault from 2004 to August 2010.[117] These numbers are most surely low and do not accurately represent the extent of the problem: as detailed in Section VIII of this report, the ACLU's research shows that civilians regularly elect not to report police abuse because of a lack of faith in the investigatory and disciplinary system; because of widely-known impunity for police abuse; and because of fear of retribution for filing complaints of civil rights and human rights violations.

Excessive force is routine among police officers in multiple tactical units of the PRPD. Based on the ACLU's research, we have determined that particularly problematic units include the Tactical Operations Unit (*Unidad de Operaciones Tácticas*, or UOT), whose work is carried out by a Tactical Operations Division in each of the 13 police regions (*División de Operaciones Tácticas*, or DOT), colloquially known as the Riot Squad (*Fuerza de Choque*); and the Drug, Narcotics, Vice, and Illegal Weapons Bureau (*Negociado de Drogas, Narcóticos y Control de Vicios y Armas Ilegales*, or NDNV), which is represented in each of the 13 police regions across the island by a Division of Drug, Narcotics, and Vice (*División de Drogas,*

*Narcóticos y Control de Vicios*), commonly known as the Drug Division (*División de Drogas*). Also problematic is the Specialized Tactical Unit (*Unidad de Tácticas Especializadas*, or UTE), commonly known as the Group of 100 (*Grupo de Cien*), an elite unit of officers grouped into multidisciplinary teams drawn from several different police units including drug, traffic, stolen vehicles and the UOT, to combat the drug trade in Puerto Rico. Other specialized tactical units also routinely use extreme force.

### a. Excessive Force against Low-Income Communities

PRPD officers assigned to tactical units frequently commit abuses during raids in public housing projects (*caseríos* or *residenciales públicos*) in urban neighborhoods and other low-income communities. For years low-income community leaders and members have decried the PRPD's frequent harassment and intimidation of residents at check-points set up by PRPD officers in their communities, as well as raids in which PRPD officers ostensibly searching for weapons and drugs conduct warrantless searches of multiple homes and verbally threaten residents, in some cases physically attacking residents, destroying their belongings, or arresting them without cause.

For example, on October 25, 2010, PRPD officers, including officers assigned to the Joint Rapid Action Force Unit (*División de Fuerzas Unidas de Rápida Acción*, or FURA), raided the Villa Esperanza public housing complex in San Juan with police cruisers and helicopters.[118] Residents of the public housing complex later reported that PRPD officers verbally threatened and harassed residents, and arrested some residents without cause. On April 18, 2009, according to residents of the Candelaria public housing project in San Juan, PRPD officers entered the public housing complex and pushed, hit, and insulted residents indiscriminately.[119] Similarly, residents of the Las Gladiolas public housing complex in San Juan reported that PRPD officers conducted an abusive drug raid on the complex that did not yield any arrests, after which they carried out what residents called a police occupation of the area.[120]

PRPD officers assigned to the Division of Drug, Narcotics, and Vice frequently commit abuses during so-called anti-drug operations. In one case documented by the ACLU, Drug Division officers savagely beat unarmed 28-year-old Mauricio Alejandro Castillo Shaw. On April 29, 2010, PRPD Drug Division officers pounded on the door of Castillo Shaw's home, and when he opened the door, approximately 20 Drug Division officers entered and informed him they had an order to enter, although they did not show him a warrant at any time.[121] The officers immediately handcuffed him before searching his house. According to Castillo Shaw, after he was handcuffed with his arms behind his back, four of the officers pushed him against the wall, threw him against the ground, and hit his face against the ground, breaking his two front teeth and breaking his jawbone.[122] The officers then lifted him by his handcuffed wrists and began punching him and striking him with batons while he was still handcuffed.[123] Castillo Shaw told the ACLU, "They lifted my head, and I could feel that my mouth was full, and I realized it was full of blood.  Blood was running down my face and pouring out of my mouth."[124]

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT




"They lifted my head, and I could feel that my mouth was full, and I realized it was full of blood. Blood was running down my face and pouring out of my mouth."

Drug Division officers savagely beat unarmed Mauricio Castillo Shaw in his home. After handcuffing him, they smashed his face against the ground, breaking his jawbone and shattering his two front teeth. They then punched him and struck him with batons while he was still handcuffed. Photo Credit: ACLU (2011)

The officers then searched the house. Castillo Shaw says that he was subsequently released without charge or citation, and police did not find any drugs or weapons, but he reports that police did find a firearm, marijuana, and drug paraphernalia at a home located five houses away from his.[125] That day Drug Division officers arrested 18 people from different residences in the community. As part of the same operation, Drug Division officers reportedly beat at least two other young men in their homes in a manner similar to the attack on Castillo Shaw. Castillo Shaw required emergency medical treatment for his injuries, and he saw these two men at the hospital being treated for their injuries.[126]

Castillo Shaw filed a complaint with the PRPD that same day, in which he verbally provided detailed information about the incident and provided photos taken of his substantial injuries while he was in the hospital. He did not know the name of the officer who had beaten him, who had not identified himself. He says that the written complaint prepared by the officer who attended him did not contain any of the detailed information that he had provided, and failed to mention that the officers had broken his jawbone.  He told the ACLU, "The complaint didn't include anything that I said. It just said 'Report of Incident,' but it didn't say how they broke my face. It simply wasn't the version of events that I told them."[127] One week later, on May 7, 2010, PRPD officers entered Castillo Shaw's home and told him he was under arrest. He was retroactively charged with two counts of possessing controlled substances and one count of possessing illegal weapons, based on the operation conducted one week earlier. He told the ACLU, "I think personally that they brought charges against me because I made the complaint. The only other people who had charges brought against them were the other two men who were beaten. They were charged on the same day as me."[128] Castillo Shaw has heard nothing about the status of his complaint.

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

Castillo Shaw believes the criminal case against him may not proceed because the PRPD officers involved in the operation claim that all videos and photos taken by police during the operation have been erased. Castillo Shaw told the ACLU, "All the photos of that operation taken by police have been erased because they prove the police are lying. I am sure there must be photos of the police beating me."[129]

In another incident, on February 23, 2011, police officers conducted an operation in the community of Sector Miñi-Miñi in Loíza, during which 10 armed PRPD officers entered the home of 62-year-old Julio Cirino and brutally battered and kicked him in the head and ribs in front of his daughter, rendering him unconscious.[130] The officers claimed to be looking for weapons and drugs but never presented a warrant to search their home.[131] Cirino, who was unarmed and had merely been talking with a neighbor when police arrived, lost consciousness as a result of the beating and had to be transported from the scene by ambulance.[132] According to his daughter, he subsequently had to be hospitalized for a blood clot in his brain and other injuries inflicted by the police officers.[133] The ACLU of Puerto Rico interviewed Cirino's daughter, who witnessed the incident and says her father did not resist or struggle with the police in any way.[134] Cirino's daughter initially filed a civilian complaint with the PRPD denouncing the attack on her father, but the family subsequently decided not to continue with the complaint.[135]

More recently, the ACLU of Puerto Rico has documented numerous cases of police abuse in La Perla, one of Puerto Rico's oldest and largest low-income communities, built in the World War II-era in San Juan. In June 2011, PRPD officers conducted an abusive and violent raid on residents of La Perla. In August 2011, the ACLU of Puerto Rico conducted public hearings in which community residents denounced assaults, illegal searches, baseless arrests, and harassment by PRPD officers. La Perla resident Rafael Ortíz told the ACLU, "Nowadays [the police] break down doors and windows and conduct illegal searches, claiming they are looking for a suspect."[136] Ortíz reported that after the June 2011 raid, police officers inspected baby carriages and students' book bags without warrants or legal authority.[137] Tania Amigón, another resident, told the ACLU that on June 24, 2011, several officers entered the community and clubbed people on the street. She said, "At least five women and two children were injured then."[138] Amigón added, "I don't feel any safer when [the police] are around. As a matter of fact, I feel safer when they are not."[139]

### b. Excessive Force against Afro-Puerto Rican Communities

The ACLU documented multiple cases of unjustified police violence against residents of Loíza, a predominantly Afro-Puerto Rican municipality. According to Census statistics from 2010, the municipality is predominantly Afro-Puerto Rican, with nearly 65 percent of residents identifying as Black. The municipality also is predominantly low-income, with 67 percent of the population living below the poverty line and a median household income of $8,962, according to 2006 Census statistics.

The ACLU interviewed 20-year-old Luis Ayala Rivera, a young Black man living in Villa Cañona, an Afro-Puerto Rican community in the municipality of Loíza. He witnessed police assigned to the Tactical Operations Division shoot his unarmed 22-year-old brother, José Amaury Ayala Rivera, in the head on a Saturday night in September 2010 while the two were returning home from a party.[140] Ayala told the ACLU, "I saw it all. They told him to stop and he began to run, and they shot at him. The officer fired two shots. The first missed its mark and the second struck my brother in the head. Then the officers made a barrier and would not let anyone pass to get to my brother and help him. They said he was dead and wouldn't let me approach him, but I could see he was moving and still alive."[141] The brain injuries Ayala's brother sustained from the gunshot wound have left him paraplegic and confined to a wheelchair for the rest of his life.[142]

According to Ayala, his family filed an administrative complaint with the PRPD but received no response.[143] The family later filed a civil lawsuit against the PRPD for monetary damages, and accepted a $90,000 settlement offer. He said, "We didn't have any other witnesses. They offered $90,000 and we accepted it because we are poor. They took advantage of the fact that we didn't have witnesses. It's just too sad."[144] Ayala says no criminal charges were brought against the officer, who is still on active duty with the PRPD. Ayala told the ACLU, "The abuse will repeat itself—in nine months, one year, the police will do it again, and our tears will be someone else's tears."[145]

> "The abuse will repeat itself—in nine months, one year, the police will do it again, and our tears will be someone else's tears."

Ayala told the ACLU that PRPD officers are a near-constant presence in his community, and they frequently harass young men. He said, "You can't walk around on the streets in peace; almost no one dares to go around. Some of my friends have been victimized by the police recently. No one can be at peace in my neighborhood."[146] He added,

> "The [police's] racism is very, very, very bad against our community. It's terrible what is happening to us. The police do their work, but they don't do their job as they should. If people are gathered at a business or a party in our neighborhood, everyone minding their own business and not breaking the law, the police will come and injure people without any reason. It's police brutality without any reason or justification. Where I live, the police think everyone is a drug trafficker, but that's not how it is. The police come in with violence, guns drawn, shooting and beating everyone. The police need to think differently, not to just assume that everyone in my community is bad."[147]

Other Black residents of Villa Cañona reported ongoing police aggression, harassment, and intimidation. Evelyn Rivera, a single parent of two, one of whom is afflicted with severe cognitive deficiency, told the ACLU that PRPD officers have repeatedly beaten and pepper-sprayed her severely developmentally disabled 27-year-old son, Edgar Pizarro Rivera.[148]

According to Evelyn Rivera, police have seized and beaten her son with nightsticks while he rides around the neighborhood on his bicycle on numerous occasions between 2007 and 2008, and again in 2011. He suffered bruising from these attacks, including bruising around his genitals, and is now terrified to play outside. During the attacks on her son, who has a mental capacity of a five-year-old, police have repeatedly used racist language that suggests that the attacks are at least partially racially motivated.[149] Evelyn Rivera witnessed one police attack on her son during which PRPD officers called her son "a dirty negro," and she has witnessed officers use the same language against other residents of her community.[150] Rivera filed three complaints concerning police abuse against her son, and received no response to her first two complaints, and merely received a letter stating that the complaint had been "archived" without any explanation.[151] Rivera told the ACLU, "I don't believe in the police complaint system. They wouldn't take any of my complaints seriously. I have never had confidence in the police, and every day I trust them even less."[152]

### c.  Excessive Force and Other Police Abuse against Dominican Immigrants and Puerto Ricans of Dominican Descent

Dominican community leaders, the ACLU of Puerto Rico, and other civil rights advocates have for many years denounced discriminatory policing practices including incidents of extreme police abuse motivated by national origin in several communities known to be predominantly inhabited by Dominican immigrants and people of Dominican descent, including the Santurce sector of San Juan, Puerto Rico. According to Dominican community leaders, PRPD officers target communities that are known to be predominantly Dominican, and officers also target individuals who physically appear to be Dominican or who are identifiable by their accent when they speak. In these cases, officers often use racial epithets and xenophobic slurs relating to their Dominican origin, indicating that these PRPD officers are motivated by racial or ethnic bias.

The spokesperson of the Dominican Committee of Civil Rights (*Comité Dominicano de Derechos Civiles*), José Rodríguez, told the ACLU that he has been documenting cases of police brutality against Dominican immigrants and Puerto Ricans of Dominican descent over the past 15 years.[153] According to Rodríguez, the Dominican Committee of Civil Rights has documented 26 police killings of Dominican immigrants between 2000 and 2011.[154] He also reported that PRPD officers routinely search the homes of Dominican immigrants without warrant or permission, and ask individuals who appear to be Dominican for identity documents and proof of immigration status without reasonable suspicion or legitimate law enforcement purpose.[155]

Puerto Rico press reports have similarly reported that the PRPD discriminatorily targets Dominican immigrants and routinely subjects them to warrantless searches of their homes without permission.[156] According to these press reports, PRPD officers routinely demand identity documents and proof of immigration status from Dominican immigrants, and when these civilians refuse to provide evidence of citizenship or lawful permanent residency, PRPD officers arrest them without cause or issue baseless citations that carry heavy fines.[157]

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

One of the cases documented by the Dominican Committee of Civil Rights is the October 2009 police killing of Franklin Cáceres Osorio, an undocumented immigrant from the Dominican Republic and father of three.[158] Cáceres Osorio was reported to have fallen from a second story window to the ground after police entered his home in a predominantly Dominican community of Santurce.[159] His family alleges that the police threw him to the ground, and that he did not fall by accident. Police delayed calling for emergency medical assistance, and as a result an ambulance did not arrive until after he had died. Police neglected to call the department of homicides or the department of forensics, as is the custom when dealing with a dead body. Instead, his family had to call a funeral home to have the body removed. No forensic investigation ever took place at the crime scene. While the autopsy report provided by Puerto Rican authorities to Cáceres Osorio's widow claimed his death was caused by cocaine, an autopsy performed upon repatriation of his body to the Dominican Republic concluded that the cause of his death was beating.[160] The Dominican Committee of Civil Rights has labeled his death a hate crime. According to the Dominican Committee of Civil Rights, which conducted an investigation into the case and worked closely with Cáceres Osorio's widow, located a witness not interviewed by police who says he saw police beat Cáceres Osorio.[161] According to Rodríguez, there are no records of the incident in police department files.[162]

Another incident documented by the Dominican Committee of Civil Rights is the September 12, 2010 assault and mass arrest of about 75 Dominican immigrants who were participating in or watching a cockfight in Río Piedras.[163] According to the Dominican Committee of Civil Rights, a group of about 10 police officers assigned to the Drug Division entered the building without a warrant and began shooting in the air "like cowboys."[164] The officers reportedly demanded to see the spectators' immigration documents and arrested all of the young Dominican men present at the cockfight.[165] According to Rodríguez, when family members came to the police station to look for the men who had been arrested, PRPD officers demanded as much as $300 from each family in exchange for releasing and not deporting them.[166] According to the Dominican Committee of Civil Rights, PRPD officers beat and handcuffed one young woman named Stefany Bello, and told her, "Shut up, you damned Dominican."[167] Bello later told journalists that police slapped her and claimed her immigration documents were false when she asserted that she is a documented immigrant.[168]

The ACLU documented numerous cases of police brutality committed by PRPD officers in the course of an August 2009 government attempt to forcefully evict the residents of Villas del Sol, a squatter community comprised mostly of indigent families of Dominican origin. Police officers violently attacked members of the community, which mainly consisted of female heads of households and children, by beating, pepper-spraying, and Tasering them, and in some cases tossing women over concrete barriers. One former resident of the community, Laura Mota, told the ACLU that during the first attempted forced eviction on August 4, 2009, Riot Squad officers doused her face with pepper spray, then pulled her by her hair, threw her over a chest-high cement barrier, punched her, dragged her, and kicked her with their boots.[169] Mota says that she had merely shouted at police that they should

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT



**Riot Squad officers doused Laura Mota's face with pepper spray, pulled her by her hair, threw her over a chest-high cement barrier, punched her, dragged her, and kicked her.**

During the attempted forceful eviction of a predominantly Dominican squatter community, police violently attacked residents, including Laura Mota. Photo Credit: ACLU (2011)

leave and denounced them for the violence they were using against other members of the predominantly Dominican community, and that she was not resisting or threatening police in any way, and indeed was so weakened by the initial pepper spraying that she was incapable of taking any action against the police.[170]

Mota also witnessed police drag, kick, punch, and pepper-spray her eight-months-pregnant friend Maritza de la Cruz, rendering her unconscious, and she saw police pepper-spray and beat Maritza's five-year-old son with nightsticks.[171] Mota also witnessed police kick a man in the back and Taser him eight times while he screamed, "They're going to kill me!"[172] Mota says, "That screaming still haunts me to this day. He had foaming coming out of his mouth and blood all over his face."[173]

Mota told the ACLU that the police used racial and ethnic epithets throughout the violent attempted eviction operation and during the subsequent police occupation of the community over the next year-and-a-half, until the final eviction of the community in December 2010.[174] According to Mota, police repeatedly told residents, "Goddamned Dominicans," "Go back to your country," "We should have killed you," and when a 20-year-old Dominican woman required medical treatment for an epileptic seizure, an officer who refused to call an ambulance said, "One Dominican less."[175] Mota told the ACLU, "It was hard listening to those racist remarks all the time."[176] Between August 4, 2009 and December 31, 2010, PRPD officers also frequently pulled people over as they were driving out of the community and demanded to see their green cards, not their licenses, as a form of baseless harassment targeting Dominican immigrants living in Villas del Sol.[177]

The ACLU also documented the cases of two young Dominican men brutally beaten by police in separate incidents in Santurce. In both cases the young men were unarmed and required lifesaving surgery for their injuries.  In late May 2009, when Dominican immigrant Joel

Félix was 24 years old, he was walking home alone just after midnight following a Saturday evening out with friends.[178] As he walked under a bridge he saw about six to eight PRPD officers, who exited their patrol car and shined flashlights in his eyes.  One of the officers immediately told him to put his arms around his back, and they handcuffed him without telling him the reason for stopping and handcuffing him. The officers then savagely beat him with their fists and gloves and kicked him with their boots. He fell to the ground and lost consciousness. Félix says that the officers surely knew that he is a Dominican immigrant, as he has an identifiable Dominican accent.[179]

Félix woke up in a hospital bed, flat on his back and in extreme pain. The police officers had apparently abandoned him on the side of the road, and had used his cell phone to call his sister and tell her that he was lying on the ground. It took his sister an hour to find him, and he initially did not want to seek treatment at the hospital because he was terrified that the police officers would come looking for him.[180] However, he was in such severe pain that he could not sleep or eat, and he allowed his mother to take him back to the hospital.[181] There, a doctor told him that he needed emergency surgery immediately because of internal bleeding and organ damage to his spleen and liver caused by the police beating.[182] The doctor told him that he would die without surgery, and would have died if he had delayed seeking medical assistance any longer. Félix was hospitalized for a full month, and had to pay for all of his medical expenses.[183]

Félix filed a complaint with the PRPD while in the hospital, but he was so terrified of police retribution if he proceeded with the complaint that he dropped it after PRPD officers stopped by his home. Because the officers had not identified themselves during the attack, had not filed an incident or arrest report, and had shone their flashlights directly into his eyes, making it impossible for him to see their faces, Félix was unable to identify any of the responsible officers.[184] Félix wanted to file a civil lawsuit against the PRPD for monetary damages, but he says that he was unable to afford to pay a lawyer for the legal fees, which cost a minimum of $5,000 to commence work on the case.[185]

Félix told the ACLU, "Now, when I see a group of police I feel nervous and leave the area. When one police officer comes while you're alone on a corner and he hears that you're a Dominican, they use brutal force, thinking that we can't do anything against them. When they're in a group, that's when they are even more abusive."[186] He added, "There is substantial racism against Dominicans, because there have been many cases of police abuse against Dominicans. Many times the police stop Dominicans for something simple, like not wearing a seatbelt, and they intimidate and harass us."[187]

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

The Puerto Rico Police Department frequently and systematically uses excessive force against protesters.  Officers indiscriminately used a toxic form of tear gas, pepper spray, batons, rubber bullets, sting ball grenades, Tasers, carotid holds, and painful pressure point techniques on protesters.



Riot Squad officers in formation on the University of Puerto Rico campus while students march in protest. An officer in the foreground holds a riot gun that fires aluminum canisters of tear gas. Photo Credit: Gerald López-Cepero / Primera Hora (2010)

# V.  Billy Clubs versus Speech: Excessive Force against Protesters to Suppress Speech and Expression

Since 2009, the PRPD also has regularly used excessive force against protesters. Even as police crackdowns on the Occupy movement have brought attention to the problem of police abuse against protesters elsewhere in the United States, the PRPD has failed to address its systematic use of force against protesters. Officers have routinely used excessive force to suppress First Amendment-protected activity, indiscriminately using chemical agents such as pepper spray and a toxic form of tear gas, batons, rubber bullets and rubber stinger rounds, sting ball grenades, bean bag bullets, Tasers, carotid holds, and pressure point techniques on protesters. Police have regularly used excessive force in violation of protesters' First Amendment right to freedom of speech, expression, and assembly, as well as their Fourth Amendment right to be free from unreasonable searches and seizures. These police practices also violate protesters' human rights to free speech, expression, and peaceful assembly, and the strict prohibition on torture and cruel, inhuman, or degrading treatment under international law.

The PRPD has regularly responded to largely peaceful protests by deploying scores of officers assigned to Tactical Operations Units (*Unidad de Operaciones Tácticas*, or UOT), colloquially known as the *Fuerza de Choque* (literally translated as Strike Force) or Riot Squad. When responding to protests, Riot Squad officers typically wear full riot gear, including padded body armor, helmets with visors, combat boots, and plastic shields. They are customarily armed with long crowd-control batons; aerosol pepper spray canisters; tear gas riot guns, rubber bullet guns, and/or pepper-ball guns; and firearms with live ammunition. Riot Squad officers are visually threatening and imposing; tall and muscled, Riot Squad officers are a minimum height of 5'10" according to PRPD regulations. The Riot Squad frequently works closely with the Specialized Tactical Unit (*Unidad de Tácticas Especializadas*, or UTE), commonly known as the Group of 100 (*Grupo de Cien*), an elite unit of officers grouped into multidisciplinary teams drawn from several different police units including drug, traffic, stolen vehicles, and the UOT. Officers assigned to the Criminal Investigation Corps (*Cuerpo de Investigaciones Criminales*, or CIC) also were frequently deployed to protests.

The ACLU documented numerous instances of police abuse against protesters at locations that are traditionally the site of public protest in Puerto Rico, including outside the Capitol Building, the Supreme Court of Puerto Rico, the Governor's mansion, and the Government Development Bank for Puerto Rico, and on the campus of the University of Puerto Rico (UPR). Many of these incidents were captured on video and camera. In the cases documented by the ACLU, as a result of the PRPD's excessive use of force, numerous protesters required and received medical treatment for blunt and penetrating trauma, contusions, head injuries, torn ligaments and sprains, respiratory distress, and second-degree burns from chemical agents.

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

In remarks on the House floor in February 2011, Representative Luis V. Gutierrez addressed the U.S. House of Representatives to draw attention to the PRPD's attacks on peaceful protesters:

> "I want to talk to you today about a part of the world where the rights of citizens of all walks of life to protest and speak their minds is being denied, with clubs and pepper spray. A part of the world where a student strike led the university to ban student protests anywhere, anytime on campus, and where, when the students protested the crackdown on free speech, they were violently attacked by heavily armed riot police.... What faraway land has seen student protests banned, union protesters beaten, and free speech advocates jailed? The United States of America's colony of Puerto Rico."[188]

Despite the widespread use of violence on protesters during several of the incidents documented by the ACLU, including the June 30, 2010 incident at the Capitol and the May 20, 2010 incident at the Sheraton Hotel fundraiser, few protesters were arrested during these incidents. The dearth of arrests following these incidents, and the scant number of arrests during other incidents that were supported by probable cause, indicates that protesters were not threatening public safety and the **use of force was excessive and neither necessary nor justified**.

In other instances involving UPR student protesters, particularly during the April to June 2010 and December 2010 to February 2011 student strikes, the ACLU documented **baseless mass arrests** of UPR students to put an end to their protests, thereby suppressing their speech and expression. A very small fraction of these arrests of student protesters was supported by probable cause. Student activists report that about 200 UPR student protesters have been arrested, some of whom have been arrested multiple times, but prosecutors have pursued charges in only approximately 17 of these cases. In case after case, student protesters were arrested and held for hours in a police cell, only to have a court find no probable cause to support the arrest. Ironically, in some of the isolated instances in which students did apparently break the law by breaking windows of cars on campus, the students were not arrested despite police presence at the scene.

The ACLU has identified several categories of excessive force that were utilized by police in the incidents we documented: indiscriminate use of chemical agents including tear gas and pepper spray; indiscriminate use of batons; uncontrolled and unregulated use of carotid holds and pressure point techniques; inadequately regulated use of "less-lethal" ammunition such as rubber bullets, plastic bullets, rubber stinger rounds, sting ball grenades, and bean bag bullets; and inadequately regulated use of conducted-energy devices such as Tasers. These tactics were unnecessary, unreasonable, and unconstitutional. In addition, the ACLU documented several instances in which police groped and sexually harassed female student protesters.

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

### a. Chilling Effect on Constitutionally Protected Speech and Expression

PRPD's excessive use of force and baseless mass arrests of protesters has had a **chilling effect on First Amendment-protected protest**. Numerous university students and labor union leaders and members reported to the ACLU that they have ceased protesting, or significantly reduced their protesting, because of fear that they will again be subjected to police violence and baseless arrest. A number of these self-described activists, who have participated in past protests on numerous occasions, told the ACLU they no longer feel safe participating in demonstrations. They said they fear that the PRPD will again use excessive and unnecessary force to suppress their demonstrations, and they are reluctant to express their political beliefs in public and risk retaliation by the PRPD. The PRPD has also openly recorded student protesters with video cameras, and PRPD officers have made clear to students that their activities are personally being tracked by the PRPD. Indeed, PRPD officers often will address student activists by name, instilling in the students a fear of retribution. Students reported that these tactics intimidate them, and have led some to abandon or significantly scale back their attempts to engage in protected First Amendment activities.

> "If we bring our posters outside the Capitol and they pepper-spray and beat us, then what can we do?  We don't have a freedom of expression. What do I do with the papers that say we have a right to freedom of expression?"

All of the protesters interviewed by the ACLU told us that they believe the PRPD's use of force against them is **designed to suppress their speech and expression**, and is specifically directed at those with viewpoints that are critical of the current administration and its policies. Without exception, all of the concerned citizens, community leaders, university student activists, and labor union leaders and members we interviewed told us that they feel the police have targeted them because of the viewpoints they have sought to express, suggesting that the police are **unconstitutionally discriminating against protesters based on their viewpoints**. Labor union leader Luisa Acevedo Zambrano, who was subjected to excessive force by police on numerous occasions when she was lawfully protesting, told the ACLU that she views the police crackdown on protesters as a "strategic violence against those who confront the government." She explained,

> "In our opinion, the reality is that the civil rights for the men and women workers in Puerto Rico have declined tremendously in the recent years. They don't actually allow public expression, and not just of the men and women workers, but students, women, journalists—in general terms, all sectors that could present some kind of dissent. This has eroded our rights and we have been pressured into not talking or to make public statements saying the reality of what's happening in Puerto Rico."[189]

UPR student Shariana Ferrer Nuñez told the ACLU, "The message of the beatings and repression is that you can't talk to the press and you can't demonstrate, because you are critical of us, because you will criticize the government. Where is the real space for us? If we bring our posters outside the Capitol and they pepper-spray and beat us, then what can we do? We don't have a freedom of expression. What do I do with the papers that say we have a right to freedom of expression?"[190]

In the DOJ's report of the findings of its investigation into the PRPD, the DOJ found that the force and other misconduct used against protesters was explicitly "designed to suppress the exercise of protected First Amendment rights."[191] The DOJ concluded, "The frequency and severity of excessive force by PRPD against individuals engaging in protected speech is designed to chill speech in violation of the First Amendment."[192]

### b.  Indiscriminate Use of Toxic CN Tear Gas

In responding to entirely peaceful or largely peaceful protests, police routinely and indiscriminately fired aluminum tear gas canisters at protesters from riot guns or "less-lethal launchers," a type of firearm that physically resembles a rifle grenade launcher and is used to fire less-lethal ammunition. Police also launched tear gas from helicopters, and video footage and photographs show thick clouds of tear gas engulfing protesters. Tear gas causes intense pain, burning and irritation to the eyes, mouth, throat, lungs and skin. Protesters reported experiencing temporary blindness, difficulty breathing, chest tightness, shortness of breath, wheezing, coughing, and/or a choking sensation from tear gas exposure. Some protesters told the ACLU that they suffered eye, nose and throat pain for days; others reported suffering wheezing, throat irritation and coughing for weeks after they were tear gassed.

UPR student protester Roberto Morales described the effects of tear gas: "You can't get a full breath of air, you can't fill your lungs completely. And at the same time your lungs hurt a lot...Your skin is on fire, and you're coughing, mucus flows everywhere and tears are all over your face. You can't open your eyes because of the pain."[193]

The ACLU learned that the PRPD used substantial amounts of Chloroacetophenone, or CN tear gas, on protesters.[194] CN tear gas is a toxic form of tear gas that is not used by most law enforcement agencies because of its toxicity.  Law enforcement agencies in the United States generally stopped using CN tear gas in the late 1950s and early 1960s, and replaced it with other less toxic chemical agents. A former PRPD Auxiliary Superintendent reported to the ACLU that the PRPD prohibited the use of CN tear gas as of January 31, 2011, and the department intended to destroy the 1,000 cans of CN tear gas still in its inventory.[195] The PRPD now uses Chlorophenyl-methylenepropanedinitrile, or CS tear gas, a more potent but less toxic form of tear gas.

Exposure to large doses of tear gas or exposure for periods of over an hour can cause blindness, glaucoma, long-term breathing problems, serious chemical burns to the throat

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

and lungs that can lead to death, and respiratory failure that can result in death. Individuals with asthma or other lung conditions are at higher risk of death from tear gas exposure. Tear gas can be fatal to healthy individuals who inhale higher doses, particularly in enclosed spaces. Many cities in the United Kingdom and continental Europe no longer use tear gas in protests because of the risk they pose.

CN tear gas can be lethal, and the primary cause of death following CN inhalation is from pulmonary damage. U.S. Army medical research reported multiple deaths from CN inhalation, including the death of a prison inmate exposed to CN gas in his cell; the death of a man who locked himself in a room of his house during an altercation with police, who launched a CN grenade in his room; and three other cases in which CN inhalation—in one case exposure for only 10 minutes—was found to be the cause of death.[196] Medical studies conducted on rats, guinea pigs, and dogs have discovered that the animals that died from CN inhalation suffered pulmonary congestion, edema, emphysema, tracheitis, bronchitis, and bronchopneumonia.[197] The animals that died because of CN inhalation suffered congestion of alveolar capillaries, alveolar hemorrhage, excessive secretions in the bronchi and bronchioles, and acute inflammatory cell infiltration of the trachea, bronchi, and bronchioles.

According to U.S. Army medical research, CS tear gas can cause prolonged airway dysfunction and is associated with the development of reactive airways disease syndrome in some individuals. Although no deaths attributed to CS gas have been reported, medical researchers have concluded that exposure to the agent could result in death by inflicting pulmonary damage leading to pulmonary edema.[198]


### c.  Indiscriminate Use of Pepper Spray

Police have also routinely and indiscriminately doused protesters with pepper spray from aerosol canisters, at point-blank range just inches from protesters' faces, directly into protesters' eyes, noses, and mouths. Protesters told the ACLU that police sprayed them so thickly with pepper spray that they were covered in the orange liquid, which poured down their faces and bodies, temporarily blinding them and causing excruciating pain that in some cases lasted for days.

Pepper spray is a potent inflammatory agent, and it causes temporary blindness and an excruciating burning sensation in the eyes, face, and skin that can persist for days; irritates and damages eyes, membranes, bronchial airways, and the stomach lining; amplifies allergic sensitivities; and inflames the airways, causing swelling and restriction.[199] Pepper spray is banned for military use overseas by the Chemical Weapons Convention, which prohibits the use of "any chemical which through its chemical action on life processes can cause death, temporary incapacitation or permanent harm to humans or animals."[200]

Pepper spray also can cause death. A 1995 ACLU of Southern California report found that pepper spray was associated with multiple deaths in California, finding that about one in every 600 people sprayed with pepper spray by California police officers died.[201] Most who

died had pre-existing conditions like asthma, but "these findings suggest that pepper spray may be a serious complicating factor when it is used on people with cardiovascular or cardiorespiratory disease—individuals police might not be able to recognize readily in an emergency situation."[202] Pepper spray use has been suspected of contributing to a number of deaths that occurred in police custody, and in the mid-1990s, the DOJ cited nearly 70 fatalities linked to pepper-spray use.[203]

Pepper spray poses a risk to people with asthma and other respiratory conditions, and can cause respiratory failure.[204] With repeated exposures, studies have also found there can be permanent damage to the cornea.[205] A 1993 U.S. Army study found that pepper spray's active ingredient "is capable of producing mutagenic and carcinogenic effects, sensitization, cardiovascular and pulmonary toxicity, neurotoxicity, as well as possible human fatalities."[206] A 2004 paper on the health hazards of pepper spray, written by health researchers at the University of North Carolina and Duke University, reported that pepper spray could "produce adverse cardiac, respiratory, and neurologic effects, including arrhythmias and sudden death."[207]

#### d. Indiscriminate Use of Batons

Police have also routinely struck, jabbed, and beat protesters with 36" straight-stick metal-tipped batons, used as a blunt impact weapon specifically for riot control. Riot squad officers struck protesters with two-handed jabs and single-handed strikes in which officers raised the batons over their heads to hit protesters with maximum impact. In numerous cases riot squad officers even chased after fleeing protesters and struck them in the head, back, and shoulders from behind. These baton jabs and strikes caused head injuries and multiple contusions to countless protesters, many of whom bore clear marks of the size and shape of batons on their backs and chests.

In September 2007, the then-Superintendent of the PRPD created a committee to conduct an external evaluation of the problems of police violence and corruption in Puerto Rico. Called the External Evaluating Committee on the Police of Puerto Rico (*Comité Evaluador Externo de la Policía de Puerto Rico*), it released reports of its findings in December 2007 and May 2008. The External Evaluating Committee found that "[t]he indiscriminate use of batons in total disregard of existing regulation...has occasioned totally unjustified, multiple, and serious injuries to citizens."[208]

#### e. Uncontrolled and Unregulated Use of Carotid Holds and Pressure Point Techniques

Officers have also used painful carotid holds and pressure point techniques intended to cause pain to passively resisting protesters by targeting pressure points on protesters' carotid arteries, under their jaws, near their necks, their ears, or directly on their eyeballs and eye sockets. Officers also dug their fingers deep underneath students' ears and above their jaws, forcibly lifting and dragging them by exerting extreme pressure on these sensitive

 

Left, police pepper-spray student protesters on the University of Puerto Rico campus during the April 2010 student strike.  Right, a PRPD officer shoots rubber bullets at student protesters. Photo Credit: Cubadebate (2010)

points. Pressure point tactics not only cause excruciating pain, but they also block normal blood flow to the brain and can be potentially fatal if misapplied. In some cases these pressure point techniques have caused student protesters to lose consciousness.

The PRPD used these techniques on students passively resisting arrest. In the cases documented by the ACLU, police used these tactics on students engaged in sit-ins who did nothing more to resist arrest than to link arms and cross their legs. Police officers also used these cruel, painful techniques on some students even after they had already been securely handcuffed or otherwise restrained by the PRPD. In the cases documented by the ACLU these pressure point techniques were utilized exclusively by PRPD officers assigned to the CIC.

### f. Inadequately Regulated Use of "Less-Lethal" Ammunition: Rubber Bullets, Sting Ball Grenades, and Bean Bag Bullets

On multiple occasions the PRPD has fired rubber bullets and other "less-lethal" ammunition such as sting ball grenades and rubber stinger rounds at protesters. Rubber bullets typically consist of a metal bullet shell coated in rubber; other variations that have been used by the PRPD include plastic bullets, rubber buckshot rounds commonly known as sting ball grenades or stinger rounds, and bean bag bullets that consist of a cloth pouch containing about 40 grams of lead shot. These projectiles are designed to deliver a painful blow that incapacitates; they are launched from guns at high velocity to induce severe pain by blunt trauma.

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

Rubber bullets and related types of "less-lethal" ammunition can cause severe blunt and penetrating injuries, and can be lethal if shot in the head or at close range.[209] In October 2004, a 21-year-old college student was killed when Boston Police shot a plastic bullet loaded with pepper spray in her eye while attempting to disperse a crowd after the Red Sox World Series victory. Rubber bullets have been linked to numerous deaths and serious injuries of protesters in Northern Ireland and Israel and the Occupied Palestinian Territories.[210]

In a seminal 2002 study of the Israeli military's use of rubber bullets published by *The Lancet*, medical researchers concluded, "Inaccuracy of rubber bullets and improper aiming and range of use resulted in severe injury and death in a substantial number of people. This ammunition should therefore not be considered a safe method of crowd control."[211] Because of documented deaths and severe injuries, the South African police banned the use of rubber bullets on protesters in January 2012, and the European Commission issued a directive banning the use of rubber bullets in all European Union countries by the end of 2012.[212]

### g. Inadequately Regulated Use of Tasers

In at least one incident involving a peacefully protesting and unarmed UPR student who was already restrained and face-down on the ground, the PRPD gratuitously and unnecessarily used a conducted-energy device (CED) on a protester. CEDs, also known as electronic control devices or Tasers, discharge a high-voltage, low-amperage jolt of electricity. They work by firing twin metal barbs that emit a 50,000-volt charge into an individual, causing the individual to collapse from loss of muscular control. Tasers can inflict serious, and even fatal, injury. Risks of CED use to the human body include cardiac arrhythmia, changes to blood chemistry, impaired respiration, disruption of the central nervous system, burns and increased risk of accidental injury.[213]

In the case documented by the ACLU, detailed below in the subsection covering police abuse against protesters at the political fundraiser at the Sheraton Hotel, a PRPD officer applied the Taser to the protesting student, José "Osito" Pérez Reisler, multiple times. According to Pérez Reisler's lawyer, Enrique G. Juliá Ramos, the officer shocked Pérez Reisler six or seven times with the Taser, on the young man's hips and back. Juliá Ramos told the ACLU that Pérez Reisler had to be hospitalized for days, during which he was evaluated by a doctor who concluded that he could have died as a result of the Taser, because he suffers from a medical condition that could be exacerbated by the Taser.[214]

The PRPD does not provide adequate guidance to its officers on the use of CEDs.  According to the DOJ's report of its investigation findings, the PRPD's order governing use of CEDs, GO 2008-2, is seriously deficient.[215]  The order does not specify any legal standard for the use of CEDs, and it does not specify any factors that should be considered when determining when it is appropriate to use CEDs, such as the subject's level of resistance or the severity of their suspected crime.

Most problematic, the PRPD's order governing use of CEDs does not acknowledge that CEDs can be lethal, instead mischaracterizing them as "non-lethal" weapons. According to Amnesty International, 334 people in the United States died after being shocked by a CED in 2001-2008.[216] Medical examiners and coroners in the United States cited CED exposure as the cause or contributing factor in over 50 of these deaths.[217] The two most likely predictors of whether a subject will die after CED shock are if the person is shocked multiple times or for an extended duration, and if the person's heart is unusually stressed, either by recreational drug use, a preexisting heart condition, or the placement of the CED barbs across or near the heart. In Amnesty International's review of autopsy reports from post-CED deaths, they found that 43 percent of decedents were shocked in the chest, and 52 percent had cardiovascular disease.[218]

Tasers can cause a fatal heart arrhythmia, especially in vulnerable populations, such as those with preexisting heart conditions, those whose hearts are already compromised by drug use, and thinner people who have a lower skin-to-heart distance. Likewise, situational factors such as dart placement near or across the heart, and multiple Taser exposures, can increase the risk of arrhythmia. Further, at least one study, in a peer-reviewed forensic engineering journal, found that CEDs actually discharged far more powerful current than Taser International has acknowledged, and that a Taser shock is powerful enough to cause fatal heart disrhythmias.[219]

### h. Groping and Sexual Harassment of Female Protesters

Several female university students reported to the ACLU that police officers had groped their breasts and genitals while arresting them. At least two of these incidents have been caught on camera. UPR student Victoria Carro Robledo told the ACLU that when she was arrested outside the Capitol Building on January 27, 2011, after she was handcuffed with her arms pinned behind her back in plastic straps, a PRPD officer grabbed her by her breasts as he moved her from one police van to another.[220] Another UPR student told the ACLU that a police officer groped her around her breasts, thighs, and pubic area while he arrested her.[221]

UPR Master's student Adriana Mulero publicly denounced the PRPD officer who grabbed her breasts and thighs while arresting her on campus on January 19, 2011. Eyewitnesses reported that although it was apparent that the PRPD officer could have easily carried her by her waist, he carried her with one hand on her breast and one hand on her crotch. Mulero told *The Nation* magazine that when she was arrested on a subsequent occasion, "[S]everal of them attacked me by squeezing my neck, saying, 'This is the one who complained about grabbing her breast!' and they called me a whore. That hurt even more than when they hit me."[222] Another UPR student, Yaritza Figueroa, told the ACLU that on February 9, 2011, she witnessed 10 to 12 Riot Squad officers surround a female student, throw her on the ground, and call her "whore."[223] When Figueroa tried to assist the young woman, an officer said, "'She's just a bitch, a whore, arrest her,'" after which the officers arrested Figueroa.[224] The officers beat Figueroa and threatened her that she "would have to suffer the

consequences because I was going to be in their territory," meaning a jail cell.[225] Figueroa was subsequently released without charge.

Several female UPR students also told the ACLU that PRPD officers sexually harassed them while they were going about their daily lives on campus, including while walking to and from classes, during the period when police occupied the campus from December 2010 to February 2011. Yaritza Figueroa reported that police blew a kiss at her and other female students in early February 2011.[226] Other students reported that PRPD officers made flirtatious remarks and sexual comments (*piropos*) to female students, who found those remarks to be intimidating. At least one student reportedly was followed by a PRPD officer into a women's bathroom in a school building.

Carro Robledo told the ACLU that she and two other students filed a complaint with the Women's Advocate Office (*Oficina de la Procuradora de las Mujeres*), and returned to follow up on the complaint a month later, but never heard another word from the office. In Carro Robledo's case, she was able to identify the officer who grabbed her breasts, but to her knowledge no action was taken to discipline the officer. She said, "There is no repercussion for them, no change" in their behavior.[227] Carro Robledo says that the PRPD must take action to ensure PRPD officers handle female arrestees appropriately, explaining, "If the police know that they are intervening with female students, then they need a protocol on how to arrest women. There are ways to prevent certain situations, with proper training and protocols."[228]

### i.  Psychological Trauma Caused by Police Abuse against Protesters

Numerous UPR students told the ACLU that they are suffering psychological trauma caused by police abuse against them. Students described experiencing recurring nightmares of police abuse, intrusive thoughts, uncontrolled crying, fear of police and other men in uniform, general distrust of men, and other signs of significant psychological trauma. Several students also reported that they required and received psychological counseling, therapy, or psychiatric treatment for trauma caused by police abuse they suffered while protesting.

For example, UPR student Rachel Hiskes, who was pepper-sprayed and beaten by police at the Capitol Building on June 30, 2010, said that what happened to her changed her life and robbed her of her piece of mind.  She added,

> "What are my damages? Nothing that wears a visible pricetag. How does one quantify how gender and institutional violence by government officials and political repression by the intelligence community affect the psyche? How can I explain how seeing big men in uniform makes me afraid? How getting pulled over by the cops in a state and continent far away from Puerto Rico almost makes me break down? How can it be that I relate to men differently

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

now, because one has laid his hands on me in a way that had never happened before. Now I have a hard time trusting the good intentions of those in government and uniform, because I know from first-hand experience the violence and criminal behavior they are capable of, I don't want to even be around them…. To this day I can't think or talk about the 30th of June without getting choked up."[229]

UPR law student Gamelyn Oduardo, who was beaten and arrested by police on January 13, 2011 while he peacefully marched said, "At times when I go to sleep, I see a mob of about 300 police officers, running towards me and on top of me."[230] UPR student Mariana López Rosado described suffering "nightmares of torture" and "nightsticks in my dreams," adding, "There is no way to forget what has happened to us."[231]

During a public town hall meeting convened by the ACLU at the UPR School of Law, the ACLU heard testimony from numerous students who came forward to describe the police abuse they had suffered. Throughout the event, many of the students who were gathered in the lecture hall, which was packed to capacity, cried or otherwise were visibly upset by the events being recounted by their classmates, and some students told the ACLU that there is a need for further study into the psychological trauma caused by the systematic police violence on their campus.

Other protesters abused by police at locations other than the UPR campus also described suffering psychological effects of the police violence they suffered. High school student Elisa Ramos, a 17-year-old protester attacked by police when she peacefully protested outside the Capitol Building with her mother on June 30, 2010, told the ACLU, "I have had many nightmares of the police beating my mom. Sadly, I will live my whole life with the memory of this horrible experience."[232]

> **"Now I have a hard time trusting the good intentions of those in government and uniform, because I know from first-hand experience the violence and criminal behavior they are capable of."**

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

In responding to entirely peaceful or largely peaceful political demonstrations at locations that are traditionally the site of public protest in Puerto Rico, police have systematically used excessive force to suppress constitutionally protected speech and expression. The PRPD has regularly responded to protests by deploying scores of Riot Squad officers in full riot gear, who routinely struck protesters with batons, sprayed protesters with pepper spray at close range, fired tear gas indiscriminately, and used painful pressure point techniques on passively resisting students.



Riot Squad officers on the steps of the Capitol Building pepper-spray protesters during the June 30, 2010 mass public protest. Photo Credit: Andre Kang / Primera Hora (2010)

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

# VI.  Documented Cases of Police Abuse against Protesters

The following is a detailed description of the incidents of police abuse against protesters documented by the ACLU, including documented incidents of police violence against protesters at the Capitol Building on June 30, 2010 and January 27, 2011; against protesting students and union leaders and members outside a political fundraiser at the Sheraton Hotel; against protesting union leaders and members at other locations, including outside the Governor's Mansion, the Supreme Court of Puerto Rico, and the Government Development Bank for Puerto Rico; and against protesting students at the UPR, including an incident on Avenida Universitaria, and numerous incidents during the April to June 2010 and December 2010 to February 2011 student strikes.

To document the following incidents, the ACLU interviewed victims of police violence, eyewitnesses, and lawyers representing victims; and reviewed complaints and other legal documents filed by victims, television and print news reports of the incidents, and video footage and photographs that captured these events as they occurred.

Immediately following is a brief explanation of the background causes of the wave of protests that engulfed the island, including recently imposed fiscal austerity measures and the closure of legislative sessions to the press and public while bills concerning those controversial measures were under debate by Puerto Rico's legislature.

## a. Background Causes that Prompted the Wave of Protests

In a nationally televised address, on March 3, 2009 Governor Fortuño unveiled his Fiscal and Economic Recovery Plan, the centerpiece of which was the Governor's promise to reduce Puerto Rico's annual public expenditures by more than two-billion dollars in fiscal year 2010. In order to do so, the government of Puerto Rico decided to fire roughly 30,000 government employees at a time when Puerto Rico was already battling a surging unemployment rate that until then had hovered around 15 percent. More conservative estimates pegged the number of layoffs at almost 19,000—roughly 14 percent of Puerto Rico's public workforce.

To cut expenditures, the Declaration of Fiscal Emergency and Omnibus Plan for Economic Stabilization and Restoration of the Puerto Rican Credit Act, which in Puerto Rico is more popularly known as *La Ley Pública 7* or Law 7, relied on a series of proposals that allowed the government to suspend collective bargaining and other labor laws that had previously barred the unjustified firing of public employees.[233] Another important measure of Law 7 included legalizing public-private alliances, which authorized the government to outsource public services to private corporations. In addition, Law 7 stipulated a redirection of tax revenues that previously contributed to the General Fund, 9.6 percent of which are earmarked for the UPR's annual budget, in effect resulting in a budget cut for the university.

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

Just days after the Governor appeared on television, the Puerto Rican Congress approved the Fiscal and Economic Recovery Plan, paving the way for Governor Fortuño to sign it into law on March 9, 2009. From the time of its first announcement, Law 7 engendered considerable opposition, especially from union leaders and members, and ultimately also from university students, setting off a series of protests across the island that lasted more than two years.

In April 2010, after the University of Puerto Rico (UPR) announced that it planned to impose an $800 "stabilization fee," popularly known as the *cuota* (quota), to make up for Law 7-related budget cuts, opposition to Law 7 intensified on UPR campuses. The fee increase, which was in effect a tuition increase, came on the heels of Certification 98, a Board of Trustee's resolution limiting the university's tuition waiver program to students who did not benefit from government funded programs such as Pell Grants.

Because the so-called "stabilization fee" represented a 50 percent increase in tuition for the public university over the previous school year, it meant that a significant portion of the student body could no longer afford to go to college. The tuition increase and Certification 98 were both wildly unpopular among students, a significant portion of whom immediately rallied against these and other measures enacted by the administration. Students' opposition to these policies and the university administration's ongoing refusal to meet with the Negotiating Committee elected to represent the students before the UPR's administration prompted students to launch a series of protests on the Río Piedras campus. The Río Piedras campus is UPR's main campus, and serves about 20,000 of the public university's 65,000 students.

UPR students' protests included a 48-hour walk-out in April 2010, a 62-day student strike from April to June 2010, a student strike from December 2010 to January 2011, and protests outside the Capitol Building in June 2010 and January 2011. These protests included peaceful sit-ins, actions of civil disobedience in which students sat with their arms linked, chanting and holding placards, marching through the campus, distributing leaflets outlining the students' grievances and demands, and painting political messages on campus sidewalks and streets.

On June 21, 2010, an accord reached between students and the UPR administration to end the students' April to June 2010 strike was ratified by all campuses of the UPR. Immediately after, Puerto Rico's legislature approved a number of measures that were unpopular with many students, including an increase in the number of members of the Board of Trustees of the UPR, which many student activists opposed because they perceived it as a move to pack the Board of Trustees for politically-motivated reasons. Students viewed this and other measures as being contrary to the accord.

On June 24, 2010, a photojournalist was expelled from the legislative chambers, and the following day, the President of Puerto Rico's Senate, Thomas Rivera Schatz, ordered the complete closure of legislative sessions to the press corps and the public. The closure of the legislative sessions provoked a massive public outcry, and prompted a series of lawsuits, including one brought by members of the press and another brought by a Senator from

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

an opposition party.[234] The closure of the legislative session was particularly unpopular because at the time the Puerto Rico legislature was debating controversial budget changes of intense interest to public workers and UPR students who would be affected by the bills under discussion. Because of the public outcry, on June 29, 2010, the day before the end of the legislative session, Senator Schatz issued a notification permitting access to the Senate chambers, but limiting press access to the Senate to only press who had secured advance permission to interview members of the Puerto Rico legislature and possessed verified credentials. The Capitol Building itself remained open to the public.

### b. Documented Incidents of Police Abuse against Protesters at the Capitol Building

#### i. First Protest at the Capitol

Various concerned citizens and groups, including UPR students and labor union leaders and members, planned protests at the Capitol Building (*Capitolio*) on June 30, 2010 to protest the final day of the controversial legislative session, during which Puerto Rico's legislature was to conduct final arguments on legislation to carry out the proposed budget cuts. Protesters planned to gather outside the Capitol Building to protest the legislation under debate, the public's and press's expulsion from the legislative session in the previous days, the mass lay-offs of public workers under Law 7, the decision to expand the UPR Board of Trustees, and UPR policies that would threaten the ability of many students to financially afford and attend the public university. A group of UPR students also planned to read a proclamation inside the Capitol Building outlining their grievances, which included police abuse against student protesters at the university.

Officers assigned to the UOT (Riot Squad) and UOE (Group of 100) gathered inside the Capitol Building before any citizens had attempted to protest. Colonel Leovigildo Vázquez, Auxiliary Superintendent for Field Operations for the PRPD, was also observed inside the Capitol Building before protesters gathered. The Superintendent of the PRPD at the time, José Figueroa Sancha, was also present inside the Capitol throughout the operation, but negotiators and legal observers of the Puerto Rico Bar Association report that the Superintendent remained inaccessible to them.[235]

Student and independent journalists from alternative media, including IndyMedia, Rumbo Alterno, Onda Alterna, and Radio Huelga arrived at the Capitol Building at approximately 3:00 p.m. These journalists intended to observe the final day of the controversial legislative session, and planned to report on the session afterwards by preparing print and radio media reports.

As the student and independent journalists attempted to enter the Capitol Building, they were able to enter only as far as the portico before they were stopped by an un-uniformed guard who denied them entry. The student and independent journalists identified themselves as members of the press, but they did not have the opportunity to show their press credentials, which some of the journalists carried with them. At that time, there was no

PRPD perimeter or other indication that access to the Capitol was prohibited or restricted in any way. The student and independent journalists observed members of the traditional press inside the Capitol, and perceived that they were being denied entry because of their viewpoints as members of the alternative media.

Their efforts thwarted, four of the student and independent journalists improvised a peaceful sit-in at the interior entryway vestibule of the Capitol Building. Riot Squad officers who were already in formation in the rotunda of the Capitol then swarmed the student and independent journalists. Without warning, and without giving the student and independent journalists an opportunity to leave on their own volition, Riot Squad officers began to pummel, strike, and push the journalists with batons.

The Riot Squad officers pepper-sprayed the student journalists at close range, and kicked, pushed, and beat them with batons before throwing them out onto the Capitol's concrete exterior stairs. Among these journalists was **Rachel Hiskes**, then a UPR graduate student in social work who also worked as a journalist for Rumbo Alterno, a digital newspaper. Riot Squad officers pepper-sprayed Hiskes in her eyes, ears, neck, face and on her back, burning her skin, eyes and throat. As Hiskes attempted to get up off the floor, a Riot Squad officer struck her back with the full length of a baton, striking her so forcefully that she was propelled across the room. The Riot Squad officer then struck her across her side and arm, striking her so violently that she lost both of her shoes.

> **"I was in shock, and couldn't believe what I was witnessing and experiencing in such violence."**

The officer continued to strike Hiskes with a baton, striking her across her neck and throwing her down the marble steps at the entrance to the Capitol, even as she was still blinded and unable to breathe because of the pepper spray. She told the ACLU, "I was hurled down the stairs of the Capital building at a literal breakneck speed. I was barefoot, blinded by pepper spray, and my feet splayed out in front of me, barely able to keep up with the tumbling force of my body as it lurched precariously forward. I knew if I fell, these marble stairs would crack my bones or head…. I was in shock, and couldn't believe what I was witnessing and experiencing in such violence."[236] Hiskes suffered extreme pain and bruising on several parts of her body. She experienced a persistent stinging and burning from the pepper spray, and her attempts to wash off the pepper spray only intensified the burning.  Hiskes was never arrested or charged with any crime.

Also among the student journalists was **Shariana Ferrer Nuñez**, also a correspondent for Rumbo Alterno who was present to document the legislative session.[237] As she was sitting with her hands in the air, Riot Squad officers approached her from behind and began kneeing her in the back and pepper-sprayed her directly in her face. She told the ACLU, "I couldn't breathe. I couldn't stand it. I wanted to leave, but they had surrounded us."[238]

Riot Squad officers also pepper-sprayed **Reverend Juan Ángel Gutiérrez Rodríguez**, an observer for Amnesty International, directly into his eyes and on other parts of his body, causing him to curl up in a fetal position, roll around on the floor, and cry out in excruciating pain. As Reverend Gutiérrez Rodríguez lay on the ground wailing in pain, covering his face with his hands and jacket, Riot Squad officers proceeded to kick him and brutally beat him with batons.

**Representative Carmen Yulín Cruz Soto**, a legislator in the House of Representatives belonging to the minority Popular Democratic Party (*Partido Popular Democrático*, or PPD), attempted to intervene and was also attacked by a Riot Squad officer, who hit her so hard with his baton that he tore a ligament in her arm. Representative Yulín told the ACLU that she witnessed two Riot Squad officers hitting and pepper spraying the student journalists, hitting one woman so hard "that her chest was bouncing up and down." Appalled, she tried to intervene: "I said 'don't touch her,' I pulled my ID card out and said, 'I am an elected member of Congress.'"[239] She remembers that one of the Riot Squad officers then turned to her and said, "'Carmen Yulín, this is for you.'"[240] At that, one group of Riot Squad officers circled Representative Yulín and the independent and student journalists from behind, and another group of Riot Squad officers circled them from the front, leaving them surrounded by a circle of officers inside the vestibule.

Two members of the security of the House of Representatives tried to assist Representative Yulín by dragging her away from the Riot Squad officers as they struck her with batons across her arms and back. The Riot Squad officers then sprayed Representative Yulín and the student and independent journalists with pepper spray, spraying the students directly in the face mere inches from their eyes, nose, and mouth. Because most of the doors of the vestibule were closed at that point, the clouds of noxious pepper spray filled the air.  Representative Yulín, who suffers from severe asthma, felt her throat close and had difficulty breathing because of the pepper spray, and notes that if the PRPD officers had pepper-sprayed her as heavily as they did the students, "I could have died."[241] Representative Yulín recalls that throughout the attack on her and the journalists, the Riot Squad officers kept shouting, "Formation! Formation!"[242] She received emergency medical treatment at the Capitol infirmary, including injectable cortisone and oxygen because the pepper spray had caused her trachea to close. Doctors also concluded that the baton blows had torn a ligament in her left arm and caused multiple bruises on her legs, right ankle, and right ribcage. While she was in the Capitol Building infirmary, she witnessed bloodied students and journalists receiving emergency medical treatment.

Outside the Capitol, the group of students who planned to deliver the proclamation to the legislature also tried to peacefully enter the Capitol Building, and the students were forcibly repelled by the Riot Squad. Riot Squad officers hit several of these students with batons on their faces, heads, arms, backs, and other parts of their bodies. Several of the students tumbled down the marble stairs as a result of the Riot Squad using their batons to push, strike, and jab them indiscriminately. Several of the students required medical treatment as a result of the assault.

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

As news spread about the protest at the Capitol Building and the media began to broadcast images of police beating demonstrators as well as images of bloodied protesters being assisted by paramedics, the size of the protest swelled. Thousands of citizens gathered near the Capitol Building to join in the protest. Many of these protesters gathered in the public plaza (*plazoleta*) across from the steps of the Capitol and other areas adjacent to the Capitol Building.

After kicking and shoving the protesters off the Capitol Building's steps, the Riot Squad created a perimeter around the public plaza that leads to the front steps of the Capitol, blocking off the only clear area for demonstrators to gather, and forcing demonstrators to spill over into the side parking lots. The public plaza is a traditional public forum where demonstrations take place frequently without incident, and has been used for years by people seeking to exercise their First Amendment rights.

Once in the parking lots, the demonstrators continued their peaceful protest, holding placards and chanting. After approximately two hours of peaceful protest, a police officer approached the crowd and, using a megaphone, asked them to cooperate in moving cars out of one of the parking lots. The police officer did not order the crowd to disperse, nor give them instructions about where to move, or even give them warning about the consequences of not "cooperating." At this point, the PRPD had also mobilized the mounted police units and the Group of 100.

Protesters remained in place and continued peacefully chanting, at which point the Riot Squad began to move towards them. After a small number of protesters threw small objects, such as water bottles, the Riot Squad and Group of 100 charged the crowd, striking, pushing, pepper-spraying and jabbing students, union members, and other citizens indiscriminately. Officers fired tear gas canisters from riot guns, in some cases aiming the aluminum projectiles at protesters. A low-flying police helicopter sprayed tear gas from above, blanketing protesters in noxious fumes. The majority of students, union members, journalists, and other citizens were attempting to disperse and did not pose a threat to the police or the public. Student **Shariana Ferrer Nuñez** described the tear gas that engulfed her and other protesters: "It began with a really big, toxic cloud. It entered my lungs and I felt that I was going to die—it's grabbing your lungs and you can't breathe. That is the most horrible sensation I've ever felt. I started spitting, including spitting blood, and my eyes were watering. I had a panic attack, freaking out that I couldn't breathe."[243]

Among those attacked by police were **Betty Peña Peña**, a ninth-grade schoolteacher and community activist, and her 17-year-old daughter **Elisa Ramos Peña**, a high school student. Betty had brought her daughter to the protest as a lesson in democracy; she explained, "As a mother, I feel this responsibility to teach my children that when something is wrong in our country, we must raise our voice."[244] Elisa explained, "It is an honor for us, the value of standing up and using our voices to defend our Puerto Rico, and the feeling of saying, 'No, I will not let you destroy my Puerto Rico; I will not allow anyone to walk all over me, walk all over my neighbor, walk all over my colleagues.'"[245]

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT



**"I never, I never thought I'd live through such an experience, and that my daughter would live through an experience like this— so, so horrible."**

Betty Peña Peña and her 17-year-old daughter Eliza Ramos Peña were attacked by Riot Squad officers while they peacefully protested outside the Capitol Building. Police beat the mother and daughter with batons and pepper-sprayed them.

Betty and Elisa arrived at about 4:45 p.m. and joined protesting professors from the University Professors' Association (*Asociación de Profesores Universitarios de Puerto Rico*, or APPU).  The crowd around them was singing and chanting slogans.  They saw a number of UPR students bleeding from injuries inflicted by police earlier, and witnessed a line of Riot Squad officers push the students from the public plaza and into an adjacent parking lot. Betty and Elisa had been protesting for about one hour and 45 minutes when they saw a low-flying helicopter approach and douse them with tear gas. Betty, who has a respiratory condition, could not breathe and looked for a place not choked with tear gas, but was blocked by the line of Riot Squad officers.

They heard an officer with a megaphone order the crowd to move, but he gave no orders about where they should stand instead and he did not order them to disperse. Within seconds, without giving the crowd time to respond, a wall of Riot Squad officers began to attack the protesters with batons and pepper spray. Betty explained what happened next:

> "Without waiting for an answer or nothing, they started. We were all surprised because then came the pushing, the batons, and Elisa received a blow, and she falls under a car, and then I receive another blow... I was trying to lift her up and they continued their onslaught, beatings, trampling, pulling... when all of a sudden, they drag Elisa. They were saying, 'Grab her, grab her, you're going to jail.' I lose my flip flops, I drop everything, I try to go to her, to throw myself on top of her to prevent the police from harming her. Then I see that the police keep hitting, giving blows, raising the batons at her, and then at that moment, they come and they spray me with pepper spray on my face. For a few minutes, I fainted, because I couldn't breathe. I felt my whole being was burning and it was a feeling like everything, everywhere inside me was burning... I had lost sight of Elisa...it may have been 20, 25 minutes,

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

> when I later found her. I really couldn't breathe; it was something that was
> truly unbearable. I never, I never thought I'd live through such an experience,
> and that my daughter would live through an experience like this—so, so
> horrible."[246]

They fell below a vehicle, and police continued to beat them even while they were lying on the ground. Betty threw herself on top of Elisa in an attempt to protect her from the Riot Squad's blows, and police continued to strike the mother and daughter with batons. Elisa explained, "I wasn't feeling well, I was dizzy, suffocating, and...I felt so bad and I thought I was going to die. At that moment, I thought...that she was already dead, and all I could think of was getting out of there to go and get my mom. All I could think of was getting away, and I said, 'Oh my God, Lord, help me.'"[247]

Betty and Elisa were badly affected by the tear gas and pepper spray. Elisa suffered a hematoma on the right side of her head, and Betty suffered a contusion from one of the blows. Betty was unable to speak for a week because of the chemical agents police used on her, and experienced difficulty speaking for a full year afterwards.

Betty told the ACLU, "Living in the United States with the right to free expression, I never thought this would happen when we try to protest. The Capitol Building is the house of the people. It is an open house, and to close it is a blow to democracy."[248] Elisa said, "At no point in my life did I think that this would happen. In years of going to marches and strikes with my mom nothing like this has ever happened. The government wants people to stay quiet, and to stop protesting. I was raised by someone who knows her rights, so I know my rights, and I will continue to express myself because this is my country, and it is important to do so for the next generation, to carry Puerto Rico into the future."[249]

Police also pepper-sprayed and pushed a legal observer for the Puerto Rico Bar Association, lawyer and Bar Association president **Osvaldo Toledo**.[250] Toledo was one of nine legal observers, identified by yellow jackets. Toledo witnessed Riot Squad officers throwing students down the stairs of the Capitol and pushing protesters across the public square.  He subsequently observed police beating protesters with batons, and witnessed one officer hit a student directly in the head with a baton. When Toledo went to assist an injured student, officers sprayed pepper spray in his face and pushed him. According to Toledo, the Riot Squad's actions seemed planned, and despite his and other legal observers' efforts to speak with the police, PRPD officers refused to talk or negotiate with the legal observers and protesters. Although police later claimed students were throwing rocks at police, Toledo reports that he did not see a single rock.[251]

Lieutenant Juan D. Vargas unholstered his firearm and pointed it at protesters; a photograph captured the lieutenant with his gun unholstered. Some protesters reported that they heard gunfire and believed the lieutenant had fired his gun; then-Superintendent Figueroa Sancha later stated that the PRPD was unable to determine whether the gun had been fired because ballistics tests were inconclusive. Lieutenant Vargas had recently been promoted to the rank of Lieutenant despite a proven history of past violence against citizens, and his disciplinary

file reportedly revealed he had more than two dozen complaints filed against him during his career with the PRPD.

At this point, the Riot Squad, Group of 100, and mounted police split the crowd into three groups and began to herd one group toward the ocean, while chasing another group on horseback into Old San Juan, and forcing a third group of protesters to flee toward the El Condado area of San Juan. Meanwhile, helicopters were shooting tear gas at the terrified protesters who were attempting to escape. The terrified citizens, many of whom were blinded by pepper spray and tear gas, were forced to run into oncoming traffic and pell-mell through the streets in an attempt to escape the police violence. Many of the incidents that day were captured on video and camera.[252]

Lawyer Hans Perl-Matanzo, who was present because some of the student activists had asked for attorneys to be on hand, told the ACLU, "There were points where I seriously considered that I might die. And I am not exaggerating. The Riot Squad police pushed me back so hard that I fell 10 to 15 feet back. I lost my shoe. They imposed a perimeter and pushed us away. The Riot Squad risk more lives than they are supposed to be protecting."[253]

The protesters were so scared that they would be subjected to further police violence that many contacted friends or relatives who lived within walking distance and took refuge in their homes. Even several hours after they had been forcefully expelled from the Capitol complex, many of them were still afraid to go home. One student, **Xiomara Caro**, hid at a friend's home in Old San Juan, terrified to be caught by the Riot Squad. She remained there late into the night, unable to leave out of fear that the Riot Squad or other PRPD officers, who were still roaming the streets, would target her for her role as a student leader and beat her or arrest her for no reason.

Dozens of citizens were injured by police that day, a number of whom required treatment for injuries at local hospitals. Those injured included university and high school students, journalists, attorneys, legal observers, professors, and tourists. According to Rachel Hiskes, who sought medical attention for injuries caused by the PRPD, "Burned in my brain is the image of one of the students from the National Students Negotiating Committee with his shirt bloodied from a head wound that was still spouting blood. It felt like we were walking through a battleground with all the wounded there, people with black eyes, everyone coughing, bloodied faces and limbs that seemed unreal. We went looking for an ambulance, and there really was none."[254]

> **"It felt like we were walking through a battleground with all the wounded there, people with black eyes, everyone coughing, bloodied faces and limbs that seemed unreal."**

Afterwards, then-Superintendent Figueroa Sancha, who had been present at the Capitol Building during the incident, publicly defended and justified the officers' use of force. Figueroa Sancha stated that he was directly responsible and "assumed full responsibility"

for the use of chemical agents against protesters, stated that he "gave all of the instructions personally today," and he warned citizens that if faced with similar protests, his response would be the same, "today, tomorrow…and next month."[255] Lieutenant Vargas, the officer who unholstered and brandished his service firearm, was temporarily suspended with pay following the June 30, 2010 incident; it is believed he is the only PRPD officer to have been suspended as a result of the events of that day.

Student Rachel Hiskes told the ACLU that the police attack on her at the Capitol changed her life and robbed her of her piece of mind, and she found the Superintendent's public statements particularly disturbing:

> "I was so affected I could not resume my normal activities….. And long after the burn from the pepper that lasted several days was the anguish of being a victim. I went to a psychiatrist, went to the doctor, took steps that made me feel better. But seeing the Police Superintendent on TV saying that he was responsible for all the orders, and that his response would be the same today, tomorrow, next month and next year shook me. His pointing finger and piercing eyes seemed to burrow under my skin, and I felt like he was after me, or people like me, the political dissidents and civil protesters as well as the alternative media that covered them."[256]

Despite the widespread use of force, only two individuals were arrested for alleged damage to a police vehicle; they were released after a judge found no probable cause.[257] A Special Commission of the Puerto Rico Bar Association (*Comisión Especial Sobre Fiscalización del Estado Actual de los Derechos Constitutionales*) was created to investigate the events at the Capitol. On July 8-9, 2010, the Special Commission conducted public hearings, during which it recorded declarations from 48 people involved in the incident. The Special Commission issued a preliminary report on July 12, 2010, concluding that the PRPD committed numerous civil rights violations.[258] The DOJ concluded in its report on the PRPD, "[I]t is evident that the use of excessive force against protesters was directed at chilling speech and intimidating protesters, rather than protecting public safety or restoring order."[259]

### ii.  Second Protest at the Capitol

On January 27, 2011, UPR students organized a second demonstration outside the Capitol Building. The Riot Squad was already in formation, blocking the steps to the Capitol, when the student protesters arrived. The peaceful demonstration began with student leaders reading a proposed bill that would create a scholarship fund for students unable to afford the $800 tuition increase. After reading the bill, the students conducted a protest in the public plaza adjacent to the north steps of the Capitol, where students chanted and held placards. Notwithstanding the fact that the protest was peaceful and taking place in a location that is traditionally a site of public protest in Puerto Rico, PRPD officers forcibly removed the students after allowing them to protest for some period of time.

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

 

PRPD officers used painful pressure point techniques on passively resisting student protesters, in which officers targeted protesters' carotid arteries, under their jaws, near their necks, their ears, or directly on their eyeballs.
Photo Credit: left, Indymedia (2011); right, Desde Adentro (2011)

The students then moved onto Avenida Constitución, directly behind the Capitol complex, and some students began a sit-in on the public street, partially blocking traffic, while others continued to chant and hold placards. As soon as the smaller group of students began their sit-in at the Avenida Constitución, police officers began arresting those engaging in the sit-in one by one. The police never advised the students where they should move, and never told them they could protest in another location, but rather merely ordered them to "get out."[260]

PRPD officers assigned to the CIC used painful pressure point techniques to carry out the arrests on the passively resisting students, who were merely peacefully resisting by linking arms and crossing their legs. As police officers disbanded one group of students, other students would start a new peaceful sit-in a different part of the street. Using the same harsh pressure point techniques as they had employed in earlier protests, the PRPD painfully targeted the students' most sensitive body parts—their eyes and eye sockets, their necks including the area beneath their jaw and their carotid arteries, and their ears—to move the students and then arrest them. In some cases, the police continued to apply the pressure point techniques after students were handcuffed.
Police officers used these pressure point techniques on dozens of students that day, many of whom were severely injured as a result. Some of the students experienced such a significant loss of blood flow to the brain that they lost consciousness. Police arrested 36 students.

Among the student subjected to the pressure point techniques was UPR student **Zulee Aguilar**, who was passively resisting arrest. CIC officers pressed on her neck, jaw, and eyeballs, causing an "indescribable pain."[261] She briefly lost consciousness. She explained, "It was a torture tactic. They would put pressure on our neck and our jaws,

> "**It was a torture tactic. They would put pressure on our neck and our jaws, stopping the blood flow to our heads...  It is a pain that is so terrible— I couldn't stand it.**"

stopping the blood flow to our heads... It is a pain that is so terrible—I couldn't stand it. He kept pressing farther and farther up my face, then he started pressing against my eyes. I started to lose conscience. He was huge, and he never even tried to put on the handcuffs, but it would have been easy. I felt both a tremendous pain and a terrible fear, and indignation that they are doing all this because I am defending education in my country."[262] She felt pain for days after she was removed from the civil disobedience line.[263] Student **Shariana Ferrer Nuñez** said, "I heard the screams of pain and torture of my comrades and I knew I was next. The two CIC agents had their hands on my neck and their fingers behind my ears. I started screaming because I couldn't breathe—it is an asphyxiation technique. One officer was on my back, then he twisted my arms and cuffed me, but backwards so my wrist was bent back painfully."[264]

Police officers also used batons on the students participating in the sit-in and stepped on their ankles while arresting the students. One student was not only arrested using painful pressure point techniques that cut off his circulation, but he was also choked and dragged several feet with a baton used by a police officer as a neck restraint. A PRPD officer grabbed UPR student **Victoria Carro Robledo**'s breasts while moving her from one police van to another after her arrest; her arms were handcuffed behind her back with plastic straps when the officer grabbed her by her breasts.[265]

After the police had arrested and removed the students participating in the sit-in, the Riot Squad then formed long chains and advanced on the larger group of students who were peacefully chanting, waving flags, and holding up placards in support of their cause. Police pushed these students with large plastic body shields, indiscriminately sprayed them with pepper spray, indiscriminately launched tear gas canisters from tear gas guns, fired rubber bullets and sting ball grenades at them, and beat them with batons. Some students reported that PRPD officers fired rubber bullets directly at them, in some cases shooting students in the back as they ran away. Some students suffered identifiable blunt impact wounds on their chests and backs from the rubber bullets. UPR law student **Ricardo Olivero** said, "There was a huge chain of Riot Squad officers in a line, barricading the area by shooting rubber bullets and tear gas."[266]

UPR student **Amada Garcia** told the ACLU, "They wouldn't let us go. We were looking for a way to leave, but they kept pushing us, and shooting, shooting, shooting tear gas...We were 20 students, with 40 Riot Squad officers behind us and 20 Riot Squad officers in front of us.  We kept running, all the way to the park, and they pursued us. We continued running because we didn't feel safe."[267] She added, "I felt that if they saw me they could kill me."[268] Garcia fled with some students to a public park, and about 10 mounted police on horses and 40 to 60 Riot Squad officers chased the students away, even though they had long abandoned their protest and were merely sitting in the park.[269]

Police indiscriminately fired so many tear gas canisters that a nun exited a nearby parochial school and chastised the officers for firing tear gas "with no warning or precaution" near the school's classrooms and basketball court, where children were playing.[270] Multiple students required medical treatment for tear gas inhalation and other injuries. Riot Squad officers chased students as far as Puerta de Tierra, a substantial distance from the Capitol Building.

### c. Police Abuse against Protesting Students and Union Leaders and Members at the Sheraton Hotel

On May 20, 2010, as the student strike at the UPR approached its fourth week, about 200 UPR students and labor union leaders and members gathered at the Sheraton Hotel to protest a fundraising event at which Governor Fortuño was a guest. As the demonstrators peacefully formed a picket line and chanted slogans on the other side of the street from the side entrance of the hotel, the UOT (Riot Squad) and UOE (Group of 100) arrived but later unexpectedly dispersed.

Soon thereafter, and as PRPD officers stood by and watched, a group of students entered the hotel lobby, which was open to the public. The officers did not attempt to prevent the students from entering the hotel lobby or tell the students that they were not allowed to do so. The students entered the lobby because they wanted the Governor to see their picket line. Inside the lobby the students again peacefully formed a picket line, held signs, and began to chant. Suddenly, and with no advance warning, the Riot Squad burst into the lobby and indiscriminately began to beat, push, kick, and pepper-spray students and other protesters. Outside, standing near each of the hotel's doors, PRPD officers blocked the exits and struck students with their batons as they attempted to exit the lobby, in some cases using their baton as bats to strike the students.

Police pepper-sprayed and clubbed a leader of the Office and Professional Employees International Union, AFL-CIO, CLC of Puerto Rico (OPEIU), **Iram Ramírez**, who had entered the hotel lobby in order to help students escape safely. An officer struck him in the back with a baton. He witnessed police drag students by their feet, back into the lobby when they attempted to leave.

Several police officers tackled UPR student **José "Osito" Pérez Reisler**, forcing him to the floor, and at least two officers climbed on top of him and forced his face to the ground. One of the officers then repeatedly Tasered him after he was restrained and incapacitated. According to Pérez Reisler's lawyer, Enrique G. Juliá Ramos, the officer shocked Pérez Reisler six or seven times with the Taser, on the young man's hips and back. When police tackled him, Pérez Reisler was unarmed and had merely been peacefully holding a poster stating "I am a graduate student and I support the strike." Video footage capturing the incident clearly shows that Pérez Reisler posed no threat and was already lying on the floor face-down when he was Tasered.[271] Juliá Ramos told the ACLU that Pérez Reisler required hospitalization for days, during which he was evaluated by a doctor who concluded that he could have died as a result of the Taser, because he suffers from a medical condition that could be exacerbated by Tasering.[272] Pérez Reisler was not charged with a crime.

Col. José A. Rosa-Carrasquillo, then Associate Superintendent of the PRPD and second-in-command of the police department, kicked Pérez Reisler in the genitals while he was incapacitated on the ground and being held down by at least two PRPD officers. Photographs published by news media captured this unwarranted assault.

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT







Left, injuries inflicted by police on student protesters at the Sheraton Hotel political fundraiser, including a student with a bloody wound caused by a beating with a baton and a student with bruising from baton blows on his back. Right, the police Tasering of student José Pérez Reisler, who was unarmed and had merely been peacefully holding a poster. Source: Indymedia (2010)

Outside the hotel, other protesters, including many labor union leaders and members, were still picketing on the public street. Suddenly, PRPD officers corralled these protesters and started to forcefully push them away from the hotel. As they did so, the police indiscriminately pepper-sprayed, jabbed, hit, and shoved protesters with their batons even as the demonstrators were trying to peacefully and quickly leave the area.

Video footage captured the officers using excessive force against numerous protesters who had already been dispersed from the lobby and posed no threat or danger to the PRPD or bystanders. The video footage clearly shows Riot Squad officers striking fleeing students in the back with long riot-control batons, raising the batons over their heads and bringing them down on students' shoulders and backs, and in some cases chasing the dispersing students and striking them repeatedly.[273] Riot Squad officers also pushed the student protesters, threw them to the ground, kicked them, punched them, and pepper-sprayed them at close range. Officers also indiscriminately fired aluminum canisters of tear gas from riot guns at the crowd of protesters, and video footage captures the canisters arcing through the air and exploding around the protesters.

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

The Riot Squad officers then attacked the union leaders and members who were peacefully picketing outside the hotel, on a little-trafficked side street and on the sidewalk across the street from the hotel. A Riot Squad officer pepper-sprayed and used a baton to hit **Luisa Acevedo Zambrano**, President of the Central Workers Federation (*Federación Central de Trabajadores*, or FCT), Local 481 of the United Food and Commercial Workers International Union (UFCW). Acevedo Zambrano had been peacefully picketing with other union leaders and members outside the Sheraton Hotel when she witnessed the Riot Squad attack the student protesters inside the hotel. The Riot Squad officers then exited the hotel and started beating, pepper-spraying, and tear-gassing the peacefully protesting union leaders and members. Acevedo Zambrano explained, "When the police and the strike force came out…we were on the street, and the strike force simply jumped on us…This entire force went towards those who were participating in the picket line."[274]

Acevedo Zambrano tried to ask the officers what was happening and why they were being attacked, and Riot Squad officers sprayed pepper spray directly into her eyes and face and struck her with a baton on the neck. The blow caused Acevedo to fall on the street, smacking her skull on the ground. While she was on the ground a PRPD officer kicked her in the shoulder. Other labor union leaders and members tried to rush to her aid, to prevent police from trampling and pepper-spraying her as she lay helplessly on the ground.  She explained,

> "Immediately, the police Riot Squad sprayed pepper spray on my face, directly into my face and eyes, just steps away from me. My face was completely bathed in pepper spray—I was completely blind, it is such a horrible thing. When I turned around they hit me on the neck with a baton on the neck, and I fell to the ground. They did not allow any of my comrades, who were with me at the time, to help me up or give me first aid, and anyone who approached would get sprayed with in their face so they could not do it. I was being kicked while on the ground… They threw blows indiscriminately, used their batons, tear gas and pepper spray to all of the participants who were on the street, and we didn't have anything to do with what was happening inside the lobby of the hotel."[275]

Acevedo's throat swelled and she had trouble breathing because of the pepper spray, and required emergency medical treatment at a hospital. She had a swollen bump on her head, a bruise on her arm and elsewhere on her body, and cuts to her knees and elbows. Her glasses were cracked. At the hospital doctors removed her clothes and cleaned off the pepper spray, provided first aid to assist her to breathe, and took x-rays. Because the baton blows were so severe, she had to remain hospitalized until nearly midnight. Acevedo continued to have trouble speaking for some time as a result of being pepper-sprayed at such close range. One year later, she required an MRI and a CT scan of her neck and cervical vertebrae because she had ongoing problems caused by the baton blows.[276]

**José Rodríguez Báez**, President of the Puerto Rican Labor Federation (*Federación de Trabajadores de Puerto Rico*, or FTPR) of the AFL-CIO, was pepper-sprayed and injured so badly that he required emergency medical treatment at a hospital. Rodríguez Báez told

the ACLU, "When we tried to help our fallen comrades, we were pepper sprayed at short distance."[277] Likewise, **Manuel Perfecto**, President of the General Union of Workers (*Unión General de Trabajadores de Puerto Rico*, or UGT), Local 1199 of the Service Employees International Union (SEIU); **Eric Sevilla**, another leader of the UGT Local 1199; and **John Vigueras**, a leader of the the of the FTPR, also were beaten and pepper-sprayed by police.

The PRPD detained only four individuals at the Sheraton Hotel; two were released without charge and prosecutors declined to prosecute the other two.[278] One student, for example, was held for at least nine hours, but was never charged. Although video footage and photographs of the incident were widely reported in the Puerto Rico press and clearly depicted PRPD officers using excessive force, then-Superintendent of police Figueroa Sancha called the police officers "heroes" in subsequent public remarks.

### d.  Documented Incidents of Police Abuse against Protesting Union Leaders and Members at Other Locations

Law 7 was so unpopular among labor unions that on May 1, 2009, an estimated 20,000 protesters joined the *Frente Amplio de Solidaridad y Lucha*'s call for a work stoppage and marched outside Puerto Rico's Labor Department to protest the law's passage. Subsequently, labor union leaders and members participated in multiple protests advocating Law 7's repeal.

According to Luisa Acevedo, President of the FCT Local 481, the PRPD's forcible suppression of labor unionists' protests began in earnest in September 2009. She explained, "From around the month of September, which is when the largest layoffs began, the police deployed the Riot Squad against the workers, and there were many activities where we were assaulted by the Riot Squad...The police practice was to always be present and try to intimidate and punish all of those on the picket lines or protesting...At all of the activities, the Riot Squad was there trying to intimidate us and to try to prevent us from making public announcements about the injustices that were being committed. The police were very consistently doing this at all of our activities."[279]

#### i. The Governor's Mansion

On September 29, 2009, four days after Carlos Garcia, the chairman of the Reorganization and Fiscal Stabilization Board, announced that the government planned to fire 16,970 government employees, in addition to the over 8,000 workers who had been fired earlier in the year, labor union leaders and members participated in a public demonstration outside the Governor's Mansion, known as *La Fortaleza*. Labor union leaders and other groups have conducted demonstrations and acts of civil disobedience at the same location in the past, without incident.

At approximately 8:00 a.m. that morning, about 30 labor union leaders and members gathered near one of *La Fortaleza*'s side entrances and set up a "protest camp" on pedestrian-only Calle Fortaleza, a small side street located outside the Governor's Mansion. The protesters chanted and held placards. At no point did the protesters block car traffic or interfere with pedestrian traffic; in fact, early morning commuters were able to use the sidewalk to walk around the protesters. In a show of resolve, a group of four demonstrators chained themselves to two small posts flanking the cobblestoned street, while the remaining union members continued to hold placards and chant. When the PRPD arrived, a group of union leaders explained to the officers that the four protesters who had chained themselves together would not resist if the police tried to arrest them.

Within minutes the PRPD mobilized the Riot Squad. As was customary when responding to public protests, the Riot Squad officers wore full riot gear, including padded body armor, helmets with visors, crowd-control batons, and plastic shields. Upon their arrival, without adequately giving the protesters an opportunity to move out of the way, the Riot Squad immediately began to shove, strike, and jab the protesters with their batons, aiming for the chest, head, stomach, arms, and legs, until they wedged the protesters up against a concrete barrier that separates *La Fortaleza* from the main street. Those who fell back against the barrier were unable to move and were trampled on by the Riot Squad.

Even as the protesters tried to move back, they were pushed and beaten by the Riot Squad wielding their batons. Although the officers had been notified that four protesters were chained to each other and to the posts were thus unable to move, the Riot Squad officers hit these protesters repeatedly with their batons and kicked them with their boots.

Several protesters sustained serious injuries, including bruises and contusions, as a result of the Riot Squad's use of force. One police officer, for example, hit **Iram Ramirez**, a leader of the OPEIU of Puerto Rico, over the head with his baton as Ramirez tried in vain to plead with police officers to let a reporter who had fallen to the ground regain her footing and avoid being trampled by the Riot Squad. Another police officer struck **Luisa Acevedo Zambrano**, President of the FCT Local 481, in the breast with a baton.

None of the protesters was arrested. **José Rodríguez Báez**, President of the FTPR, told the ACLU, "There was no reason to send in the Riot Squad," adding, "[Our protest] was completely nonviolent and our plan was to offer no resistance. We wanted to call attention [to our demands] without committing any illegal act...We tried to find a place where we wouldn't impede the flow of traffic and we could show ourselves in front of the government, to express ourselves to the seat of government, and for those reasons we chose that place."[280] He explained, "The Riot Squad was very aggressive.... They kept pushing and hitting us with their batons, cleaning the area of us."

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT



"There hasn't been any bridge of communication with the government in the last two years. No communication of any kind; not in the streets, not in the courts, and not in the legislature."

Union leaders Luisa Acevedo and José Rodríguez Báez, who suffered baton blows and pepper-spraying at close range while peacefully protesting outside the Governor's Mansion and a political fundraiser at the Sheraton Hotel. Photo Credit: ACLU (2011)

### ii. Government Development Bank for Puerto Rico

On September 25, 2009, union leaders organized a lunchtime protest attended by hundreds of union members and government employees on the day that the second round of Law 7-related layoffs of public workers was expected to be announced. The protest took place outside the Government Development Bank for Puerto Rico (*Banco Gubernamental de Fomento para Puerto Rico*) in Minillas, at a time when the Board of Economic and Fiscal Reconstruction (*Junta de Reconstrucción Económica y Fiscal*) was meeting to approve the layoffs of 16,970 public workers. The group peacefully protested and chanted slogans including "Workers united will never be defeated" and "Struggle yes, surrender no." A smaller group of union leaders also sought an interview with the president of the Government Development Bank.

PRPD officers, including members of the Riot Squad, surrounded the protesting unionists and pushed them with batons. Police formed a barricade around the public building, and forcibly prevented the protesters from entering the government complex. No protesters were arrested.

### iii. The Supreme Court of Puerto Rico

On February 12, 2010, approximately 100 labor union leaders and members protested outside the Supreme Court of Puerto Rico, which had declared Law 7 constitutional. The labor union leaders and members were demonstrating against the ruling, as well as the recent packing of the Supreme Court with three additional justices appointed by Governor Fortuño. The unionists and workers picketed and marched in front of the entrance to the Supreme Court complex, about 50 or 60 meters from the building itself. They did not approach the stairs or the lobby of the courthouse.

Police intercepted the picket line, refused to allow them to enter the exterior gates of the Supreme Court complex, and ordered them to leave and "get out of here."[281] Police pushed the protesters with batons and forcibly prevented the protesters from approaching the exterior gates.[282] Union leader Federico Torres Montalvo later told the press, "The only path that remains to us is this one, the street, and we had advised the police not to provoke us, to allow us to do our peaceful protests, because we were going to reach the doors to the Capitol Building, to the Governor's Mansion, and wherever necessary."[283] Luisa FCT Local 481 leader Acevedo Zambrano told the ACLU that after the police forced them to abandon their protest outside the Supreme Court, "More than indignation, I felt frustration. The police, they don't let us express ourselves. You feel impotence that you can't even express yourself about what is happening, because they won't let you. There hasn't been any bridge of communication with the government in the last two years. No communication of any kind; not in the streets, not in the courts, and not in the legislature."[284]

### e.  Documented Incidents of Police Abuse against Protesting Students at the University of Puerto Rico

#### i.  Avenida Universitaria

In the early morning hours of August 21, 2009, the first weekend after the semester began, police attempted to arrest a man, reportedly for drinking an alcoholic beverage on Avenida Universitaria, a street near the UPR campus where university students frequent bars, cafes and restaurants. When students gathered to verbally protest the police's actions, more than 100 UOT agents belonging to the Division of San Juan arrived at the scene. They were armed with batons, pepper spray, and tear gas, and indiscriminately attacked the students. Police beat the students with nightsticks, fired tear gas canisters at them, and pepper-sprayed them. Officers arrested five people, but dropped most of the cases because there was no probable cause to support the arrests.[285]

Later, students gathered inside the fenced courtyard of a UPR college dormitory, Torre Norte, and began to chant, "Abusers!" ("¡Abusadores!") at the police nearby. The students were not throwing objects or posing any threat. Suddenly and without warning, the officers pointed a riot gun directly at the protesting students and fired a tear gas canister, striking student bystander **Michelle Padrón Gauthier**, who was peacefully standing in the courtyard of the residence hall where she lived. The canister severely injured her leg, slicing through her pants and inflicting a deep wound in her thigh. She was wounded so severely that she fell to the ground and was unable to walk. Officers continued to shoot tear gas canisters at the group of protesting students, preventing other students from assisting her. Police also blocked emergency vehicles from approaching the area, including an ambulance that was called to assist her. Padrón Gauthier, a college athlete who had a sports scholarship to attend the UPR, was confined to a wheelchair for about a month because of the injury, after which she required a cane to walk, and was unable to complete the semester and graduate as planned. She required emergency medical treatment and ongoing physical and psychological therapy, and she has a four-centimeter-deep hole in her thigh. Padrón

Gauthier filed a lawsuit against the PRPD for damages, and her lawyer said, "She is trying to continue on with her life, but it is not easy."[286]


### ii.  April to June 2010 Student Strike

On April 13, 2010, as a response to students' call for action, the UPR General Student Council held a General Assembly of Students at the UPR's Río Piedras campus. The student General Assembly approved a motion to create a Negotiating Committee to represent the students before the UPR's administration and also resolved to enact a 48-hour walk-out if the administration did not heed their concerns. After numerous attempts to negotiate with administration officials, on April 21, 2010 the General Student Council announced the beginning of the 48-hour walk-out.

UPR administrators and officials continued to refuse to meet with the Negotiating Committee. As a result, on April 23, 2010, the General Student Council announced the beginning of an indefinite student strike. The strike grew in size and support, and by early May, 10 of the 11 UPR campuses had joined the strike. Almost three weeks later, the student General Assembly rejected a proposal introduced by university administrators, voting instead to continue the strike.

Students set up a temporary camp at the center of the Río Piedras campus. Students gathered to chant and hold placards against Law 7, the tuition increases, and various UPR administration policies. Almost immediately after the second vote extended the strike, the Riot Squad seized control of the main campus gates, limiting any means of ingress or egress to the UPR campus. The Riot Squad blocked parents, professors, students, and other supporters gathered outside the campus from passing anything—even food and water—to students who the police had barricaded inside.

The strike lasted 62 days on the Río Piedras campus. Throughout the strike, police surrounded and guarded the gates at the Rio Piedras campus. During that period, on multiple occasions the Riot Squad used force and chemical irritants against student demonstrators, student bystanders, and supporters including parents of students. PRPD officers repeatedly struck with batons, hit, shoved, and pepper-sprayed students protesting near the university gates and students who tried to enter the Río Piedras campus via campus gates.

On **April 23, 2010**, recent law school graduate **Hans Perl-Matanzo** was beaten by Riot Squad officers at the principal gate leading to the campus museum and library. The Riot Squad officers were blocking the gate and not permitting students to enter the campus. Perl-Matanzo, who was acting as a legal representative for the students, approached the officers to say that a group of law students wished to enter the campus to protest and exercise their right to speech and assembly.[287] Perl-Matanzo told the Riot Squad officers that he would enter the campus, and they could arrest him if they thought he was breaking a law. He took only a single step toward the university gate, and two Riot Squad officers threw

him to the ground and hit him with batons with six or eight strong dagger-type blows to his chest and ribs.[288] They kicked him once or twice once he was on the ground, and a third Riot Squad officer pushed him with his baton. The blows caused Perl-Matanzo's lung to partially collapse and left him with painful bruises and inflammation on his chest and ribs; he subsequently lost consciousness and required emergency medical treatment.[289]

On **May 14, 2010**, when student **José "Osito" Pérez Reisler** attempted to enter the UPR gates, officers grabbed him, threw him to the ground, kicked him, beat him with fists and nightsticks, handcuffed him, and pepper-sprayed his face at close range. At no time did Pérez Reisler resist arrest. Officers held him for around nine hours but did not charge him with a crime. At the time the police stopped and detained him, Pérez Reisler was carrying a laptop containing the electronic version of his draft Master's thesis; police confiscated his bag and laptop upon taking him into custody and claimed no knowledge of the laptop when Pérez Reisler was released. Pérez Reisler never recovered his laptop or his thesis from police.

Also on May 14, 2010, one or more PRPD officers beat one student's father, parole officer **Luis Torrez**, in the face with a nightstick when he attempted to bring food to his son and other students to show his support for the strike. Torrez customarily brought food to the students while on his way to work, and although he saw police officers during each visit to the perimeter of the Río Piedras campus, no officer ever informed him he could not bring food to the protesting students. When he arrived to the campus gates on the morning of May 14 at about 7:30 a.m., he saw approximately 30 PRPD officers, led by a Sergeant of the UOT. The Sergeant grabbed Torrez by his sweater and threw him to the ground, and while he was on the ground he felt the officer or officers hit him in the face twice, breaking his glasses. Officers then lifted Torrez and threw him to the ground before handcuffing and arresting him. Torrez sustained a head wound that bled down his face, scratches on his wrist, and a foot-long contusion of the shape and size of a police baton. He was detained in a cell for an hour-and-a-half before police transported him to the emergency room of the Río Piedras hospital, where he received emergency medical care, including a cranial X-ray. Police returned Torrez to a cell until 6:00 p.m., when they permitted him to leave. He was never charged with any crime, nor did police inform him of the reason for his arrest and detention. Torrez missed 15 days of work because of his injuries.[290]

Incidents such as these were common throughout the student strike. Indeed, UPR students reported that they read postings by several self-identified PRPD officers on Facebook stating that they were excited to have an opportunity to beat students and put an end to the student demonstrations.

### iii.  December 2010 to February 2011 Student Strike

In December 2010, just as the second semester was getting underway at UPR, students continued their campaign against the $800 fee increase, which was due to come into effect in January 2011. That same month, Governor Fortuño declared in a televised appearance that

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT



Police arrest a student on the University of Puerto Rico campus. The ACLU has documented baseless mass arrests of UPR student to put an end to their protests. A very small fraction of these arrests of student protesters was supported by probable cause. Photo Credit: Andre Kang / Primera Hora (2011)

protests by extreme leftists would no longer be tolerated on the campus. His Chief of Staff, Marcos Rodríguez Ema, declared in a televised interview that students and professors who dare protest will be removed and get their asses kicked ("*vamos a sacarlos a patadas*").

On December 13, 2010, the Chancellor of the UPR Río Piedras campus, Ana Guadalupe, issued a 30-day ban on all First Amendment activity, including protests and group activities anywhere on the university campus and asked Commonwealth government for assistance in enforcing the ban. Chancellor Guadalupe extended the resolution banning protests on the university campus, set to expire on January 13, 2010, for an additional 30-day period, ending on February 13, 2010.  After the second protest ban expired, Chancellor Guadalupe reactivated the resolution on February 25, 2010 for a third 30-day period. The university administration also limited any protest to small designated areas located outside the campus, called "free speech zones" (áreas de libre e*xpresión*). A group of four students filed suit for injunctive relief, challenging the ban on protest and other expressive activities as an unconstitutional restriction on freedom of speech and expression, but both the lower court (*Tribunal de Primera Instancia*) and the Court of Appeals (*Tribunal de Apelaciones*) denied injunctive relief.[291]

Students told the ACLU that the designated "free speech zones" outside the campus made it impossible for them to communicate their message. Students said that the "free speech zones" were too small and completely surrounded by police. Until the Chancellor's protest ban and the recent police crackdowns, protesting UPR students have customarily marched through the campus, within earshot of fellow students, alerting students to their message and thereby gathering supporters along the way. Student Zulee Agular explained, "That area

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

is not near the students who would hear us and would participate with us. We can't raise the consciousness of students inside the campus if you are outside. Also, no professors or university administration officials—the people we wanted to direct our message to—could hear or see us from that area."[292]

Student protesters planned and executed a peaceful two-day walkout on **December 7 and 8, 2010**, during which private security contractors used violence against students. Guards recruited by Capitol Security, a private security firm contracted by the university, patrolled the campus, some bearing knives, sticks, pieces of wood, pipes and other objects they had picked up around the campus. These hired guards had little or no training and bore no identification badges. One student told the ACLU he witnessed about five of the security officers savagely beat one student with sticks and kick him, injuring him so badly he had to be hospitalized.[293] A line of police outside the perimeter of the campus reportedly witnessed the security officers savagely beat the student, but did not intervene.[294] A video purportedly of students breaking the windows of a security van was aired by local television news channels.

Prior to the student walk-out, during the early morning hours of December 6, 2010, the UPR administration had the various gates to the Río Piedras campus dismantled, removed, or welded open, in an attempt to prevent student strikers from blocking other students' access to the campus. After the student walk-out, the PRPD took over the campus, actually occupying the inside of the campus itself. Some students estimated the number of police officers who entered the campus that day at more than 300. This marked the first time in over 31 years that the PRPD had entered and occupied the UPR Río Piedras campus, which has been a traditional forum for student protest. The police presence on the campus ended a longstanding Non-Confrontation Policy promulgated by the Academic Senate, which banned PRPD police presence inside the campus, and was enacted following incidents of police abuse against protesters including the fatal shooting of a UPR student by police over three decades earlier.

On December 14, 2010, student leaders announced the beginning of another indefinite student strike, passed by a majority of students at a General Assembly of Students held by the General Student Council. Police were constantly present on the campus during the strike: officers patrolled all around the university on foot, in police cars and SUVs, on police motorcycles, and in golf cart-type vehicles; multiple mobile police units were stationed in each of the parking lots on campus; and approximately twenty PRPD officers were stationed at each gate to the campus. Some students estimated that there were 200 to 400 police on the campus at any given time during the strike. Students told the ACLU that they felt constantly threatened by the officers, who often harassed them. Student **Gabriela Camacho** reported that one officer warned, "'The streets are dark and one day the press won't be there.'"[295]

Throughout the strike, the students organized peaceful marches and demonstrations both on and off the campus. The locations of students' protests included the gates of the UPR Río Piedras campus, on side roads inside the campus, inside and outside the buildings of the

> **"In effect, it was a prohibition of expression anywhere, by students specifically. There was nowhere we could express ourselves. If we were inside the campus, we couldn't protest. And once they chased us outside they would prevent us from protesting. So we couldn't."**

various schools (*facultades*) and administrative buildings of the campus, and on the streets and sidewalks outside the campus. On some occasions the students would enter the buildings of the various departments to peacefully march and chant, as student protesters have historically done for years on the campus. Starting on January 19, 2011 they also began to stage sit-ins, in addition to their usual marches. Despite the fact that the vast majority of these marches and demonstrations were entirely peaceful and lawful, Riot Squad officers would attack the student demonstrators almost daily with tear gas, pepper spray, batons, sting ball grenades, and rubber bullets. Furthermore, during the second student strike, the PRPD used mass arrests without cause to intimidate students and prevent them from engaging in protected speech.

The student protesters started the strike with a march on **December 14, 2010**, during which they sang and chanted slogans, and carried posters with messages such as "No to the quota!" ("*¡No a la cuota!*") and "Get out police!" ("*¡Fuera policía!*"). While the students peacefully marched, Riot Squad officers would form a solid wall, advance on the students, and use batons, plastic riot shields, tear gas guns, and pepper spray to forcibly drive the students out of the university campus and into the "free speech zone" outside the campus.  Student leader **Xiomara Caro Díaz** explained, "We would march through the university, and the police would say we can't protest—they had a megaphone with an amplifier and would say you can't protest in the university. Then the lines of Riot Squad officers would physically push us out of the campus, but then when we got out they would continue to prevent us from protesting, even outside the gates."[296] She added, "In effect, it was a prohibition of expression anywhere, by students specifically. There was nowhere we could express ourselves. If we were inside the campus, we couldn't protest. And once they chased us outside they would prevent us from protesting. So we couldn't."[297]

Thereafter, throughout the strike, whenever the students tried to protest on the campus, the Riot Squad would forcibly drive them off campus. The Riot Squad officers would fire aluminum tear gas canisters from tear gas guns that looked like grenade launchers, firing indiscriminately at the crowd of protesting students, and they would jab and strike at students with batons and spray them with aerosol cans of pepper spray. UPR student Roberto Morales explained, "It was really, really frustrating. You are in your university and you're not doing anything illegal at all, and the police are threateningly and violently forcing you out of your university...Every single time we marched, they would form their lines and drive us out of the university. We never were able to continue protesting."[298]

Students organized a large, peaceful march on **December 15, 2010**, from the university campus to the *Jardín Botánico*, a building where the UPR President's office and other central

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

administration for the university is located, and which commonly has been the site of student protests in the past. Outside the *Jardín Botánico*, the students organized a picket on the Carretera Número Uno street, which blocked traffic. More than 100 Riot Squad officers arrived and less than five minutes later, the students abandoned their picket and marched back toward the campus to avoid being attacked by the police. As the student protesters approached the campus, they turned onto the Avenida Universidad street, where they saw a huge wall of hundreds of Riot Squad officers advancing toward them. Terrified, the students started walking backwards toward the university gates with their arms linked, and a group of UPR professors ran out and formed a human chain to protect the students from harm.

On **December 20, 2010**, the sixth day of the strike, students began a peaceful march at the Natural Sciences building, where they chanted, sang, and held posters. Riot Squad officers again attacked the student protesters, jabbing and striking them with long metal-tipped batons, fired tear gas canisters at the students, and arrested students who were peacefully marching and chanting slogans. One Riot Squad officer threw student **Amada Garcia** against a wall, breaking her camera and causing a bloody wound on her finger, and told her, "If you're not quiet, I'll throw you outside [of the university]."[299] Garcia was unable to bend two of her fingers for two months and has a scar on her finger from the injury she sustained that day.[300]

PRPD officers told the students they had to leave because they were violating the regulation banning protests on campus, and then violently forced the student protesters off campus. Students trying to flee the police violence ran into the *Plaza Universitaria* building located across from the entrance to the campus. There, Riot Squad officers corralled the student protesters, beat them with batons, violently grabbed them and threw them to the ground, and launched tear gas canisters that created a dense cloud of tear gas that engulfed them.[301] A number of students suffered injuries. Seventeen students were arrested during the incident, and a judge found cause for arrest in only eight of these cases.

On the morning of **January 12, 2011**, a group of 15 students entered the Humanities building to hand out flyers stating "There is no reason to maintain the quota; we demand real dialogue" ("*No hay razones para mantener la cuota; exigimos diálogo real*"). The students knocked on the door of classrooms and asked professors for permission to address their classes for three minutes and distribute the flyers. Approximately 30 PRPD officers, including CIC officers, arrived. The CIC officers gave the students a one-minute warning to leave the building. The students immediately started to walk downstairs to exit the building, and 30 seconds after the warning, the officers violently arrested the students. Student **Roberto Morales** told the ACLU that while he was walking down the stairs to exit, two officers grabbed him, one grabbing his back and the other grabbing his shirt, violently threw him to the floor face-down, and handcuffed him tightly and painfully with plastic restraining straps.[302] The officers then pulled him to his feet by yanking him by his arms, which were pinned behind his back. Student **Manuel Ortiz** told the ACLU that the officers arrested him in a similarly violent manner, and PRPD officers continued hitting him even after he raised his hands to show he was not resisting.[303] Officers jabbed one student with the metal tip of his baton, and beat another with a baton.

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

The officers arrested nine of the student leafleters and one student who was merely going to the bathroom during class and sobbed while the officers arrested her. At the Hato Rey Oeste police station, officers did not know the names of the arresting officers nor the basis for the arrest. The students were held in a cell for eight hours before being released without explanation. The students were not given any food while in the cell, and when one of the female students complained she was hungry, an officer grabbed his crotch and told her, "'You can eat this.'" One of the students required treatment at a hospital and had to wear a sling on his arm because of the baton blows he received. None of the students received any citation, and none was charged with any crime.

On **January 13, 2011**, the date the university began to process the $800 fee increase, a large group of students protested outside *Plaza Universitaria*, the administrative building housing the offices to process payments. The students held banners stating "No to the quota!" *("¡No a la cuota!")*, posters with slogans such as "Get out police" *("Fuera policía")*, and homemade





Injuries inflicted by police on UPR students during the February 9, 2011 student paint-in.  Below left, police use excessive force to arrest a student during the peaceful protest. Photo Credit: Lower left, Indymedia (2011); right and upper left, ACLU (2011)

shields of wood and plastic, some stenciled with "To defend the UPR" ("*A defender la UPR*").
Riot Squad police violently dislodged the students with tear gas, pepper spray, and batons.
Students suffered injuries, including one female student who suffered a split brow from a
baton blow.

The students then tried to peacefully march through the Río Piedras campus while chanting
slogans. Riot Squad officers continued to pursue them, and one officer announced through
a megaphone that their protest was illegal and ordered the students to move their protest
off campus. Riot Squad officers then forced the students off the campus, onto the Avenida
Barbosa, one of the streets that borders the campus. There, the police violently arrested
students. PRPD officers grabbed students in chokeholds, used their batons to choke
students around their neck, and threw students to the ground.

That day, the police arrested six students, five of whom were
later released without charges. Among those arrested was
law student **Gamelyn Oduardo**, who was peacefully marching
on a sidewalk when police beat him with batons and arrested
him. Oduardo said, "I still see it in my sleep. I saw hundreds
of members of the Riot Squad running towards us. Our
exit was blocked. A Riot Squad officer attacked me with
a baton, and other officers screamed, 'Catch him! Catch
him!'"[304] He said, "Instead of putting me under arrest, they
repeatedly beat me...They weren't arresting me, they were
beating me. I didn't see the handcuffs; what I saw were
the batons.  It wasn't until after they had me in a wrestling
headlock (*me hicieron una llave*) that they arrested me."[305]
Oduardo added, "Instead of police officers they seemed like
a gang of delinquents."[306] During his arrest, officers painfully
tightened plastic handcuffs on his wrists and repeatedly told
him his protest was worthless; he experienced pain from
the baton blows for three weeks afterwards. Oduardo also
witnessed PRPD officers throw another student "like a sack

> "I still see it in my sleep.
> I saw hundreds of
> members of the Riot
> Squad running towards
> us.  Our exit was blocked.
> A Riot Squad officer
> attacked me with a
> baton, and other officers
> screamed, 'Catch him!
> Catch him!'"

of potatoes" who began convulsing upon crashing to the ground. Nonetheless, PRPD officers
arrested the convulsing student, who began to vomit in the police bus; the officers asked
Oduardo and other arrested students whether any of them were paramedics.[307] A judge
found no probable cause to support Oduardo's arrest.

On **January 19, 2011**, the students staged the first sit-in of the strike. The students sat
linking arms and sitting cross-legged side-by-side at the gates of the university while
other students stood nearby chanting and holding placards. As students sat and chanted
along with fellow supporters, the Riot Squad surrounded them on all sides, forming a wall
between them and their supporters. CIC officers then used harsh and violent pressure point
compliance techniques on the students engaged in the sit-in. These painful techniques
included the PRPD digging their fingers deep underneath the students' ears and above their
jaws, and forcibly lifting and dragging them by exerting extreme pressure on these points.

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

Other pressure point techniques involved causing the students pain by targeting pressure points under the students' jaws, near their necks or ears, or directly on their eyes and eye sockets. The students were merely passively resisting arrest, doing nothing more to resist arrest than to link arms and cross their legs. In some cases, police used these techniques on the students even after they had already been securely handcuffed or otherwise restrained by the PRPD. For example, students witnessed police continue pressing on **Ian Camilo Cintrón**'s jugular and neck after he already was handcuffed with his arms behind his back and restrained by four officers.

Among the students involved in the sit-in was **Rafael Ojeda**, who told the ACLU that PRPD officers applied pressure to his neck and on his carotid artery, then threw him to the ground and kneed him in his back and neck while he was face-down with his arms behind his back. An officer twisted his wrist back, causing wrist pain that persisted for two weeks, and his knees hurt for months.

Forty-nine students were arrested at the sit-in. The arrested students received citations for obstruction of a public thoroughfare, but judges reportedly found no probable cause to support the arrests and none of the arrestees was charged with a crime.

On **January 20, 2011**, the students staged the second sit-in of the strike. About 20 to 25 students protested at each gate to the campus. PRPD officers, including Riot Squad, applied press point techniques on the peacefully resisting students, who were sitting with their arms linked. UPR student **Zulee Aguilar** explained, "It was really easy to put my hands behind my back [and handcuff me], but instead they treated me as if I was a criminal," adding, "The torture techniques—because in reality that's what they are—caused an indescribable pain, and they affected my circulation and left a mark on my neck."[308]

On **January 25, 2011**, students carried out another sit-in at the university gates. PRPD officers, including Riot Squad officers, arrested the students one-by-one, again applying pressure point techniques to each passively resisting student. Among those arrested was law student and founder of the Radio Huelga student radio station **Ricardo Olivero**, who was transmitting live from the event and not participating in the sit-in. PRPD officers grabbed him and after they had immobilized him with his arms behind his back, they began to apply the pressure point techniques, pressing on his carotid artery. Olivero explained, "It hurt a ton—there's a nerve at the spot where they press—and it made me dizzy and completely lose balance."[309] According to Olivero, when he tried to speak to journalists while the PRPD officers dragged him away, an officer forcefully grabbed him by his waist and told him "Shut up, don't talk to the press."[310]

Also on January 25, 2011, students tried to carry out a picket outside the university gates, in the street, and mounted police officers pursued them. UPR student **Zulee Aguilar** told the ACLU, "We were running; we ran to protect ourselves, and they kept pursuing us. There were many [police] horses. We were protesting without any violence, and we weren't even paralyzing traffic or interfering with anything."[311]

On the first and second day of classes for the semester, **February 7 and 8, 2011**, Riot Squad officers forcibly prevented students from protesting at various locations, breaking up peaceful marches and a protest that involved reading poetry.[312]

On **February 9, 2011**, police violently attacked students participating in peaceful paint-in (*pintada*) in front of the library, *Biblioteca Lázaro*. Paint-ins, in which students paint the sidewalk and road in front of the campus's main library with political messages of all types, are a tradition on the UPR campus. The road is named Consciousness Street (*Calle Consiencia*) in honor of this tradition. Students gathered to peacefully paint messages such as "No police," "No quota," and "Defend your freedom, express what you feel." CIC officers arrived and began filming the students, and more police arrived. The students began chanting "Get out, get out, get out police." The Riot Squad then arrived and heavily sprayed the students with pepper spray. Riot Squad officers began to strike the students with nightsticks, chasing them down. Students ran into the library in an attempt to escape the beatings; Riot Squad officers tried to chase them inside, but library employees assisted the students to hold the doors shut. Students estimate that around 100 police officers, including Riot Squad and CIC officers, were involved in the incident.

Student Shariana Ferrer Nuñez said that the PRPD were so violent that she thought that a student may be killed by police. She said, "The police pepper-sprayed us as we were leaving, with our backs turned. From there we ran and ran throughout the campus. But we were on the campus—a bubble—so there's nowhere to run. The police were at every gate, every department building. You could try to run to a classroom, but there would be police there. There was nowhere to hide. This is the incident that most marked me. You could be crying on the floor and bleeding from your head, and the police wouldn't stop."[313] Student **Roberto Morales** told the ACLU, "We were quietly painting and talking amongst ourselves, but the police were savage that day. They were hitting and pushing people for no reason. It was really bad, really unfair, and totally unjustified. Obviously they don't agree with us, and they have the physical power to stop us. Since it's political, it's personal. The Superintendent of Police, the Chancellor, and the Governor are against what we believe and what we do to express our beliefs."[314]

Twenty-eight students were arrested, including some who were merely on their way to class. All of the students arrested were subsequently released without being charged. **Zulee Aguilar** reported that she was arrested after Riot Squad officers swarmed one of the departmental buildings where she happened to be walking, threatened students with nightsticks, and ordered them to exit the lobby even though many students were in class or studying inside the building at the time.[315] **Guillermo Torres Grajales**, an accounting student who was not a part of the protest but merely had come in early to make a change to his class schedule, was beaten and arrested.[316] About four Riot Squad officers beat Torres Grajales with nightsticks so severely that he bled from his head and arm. He explained that because of the PRPD's actions, he feels less able to participate in protests: "You have to stay quiet or else they will arrest you."[317]

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT



**Guillermo Torres Grajales, an accounting student who was not a part of the protest but merely had come in early to make a change to his class schedule, was beaten and arrested.**

Guillermo Torres Grajales, a University of Puerto Rico accounting student. About four Riot Squad officers beat him with nightsticks so severely that he bled from his head and arm. Photo Credit: ACLU (2011)

Many students, parents and other relatives of students, professors, and other non-teaching university employees were furious about the police violence, and they marched together with students toward the Chancellor's office. The large crowd peacefully chanted inside the vestibule of the clock tower building housing Chancellor Guadalupe's office.

UPR president José Ramón de la Torre resigned on February 11, 2011. In a letter dated February 10, President de la Torre requested that the Superintendent at the time, José Figueroa Sancha, remove the police. On February 14, 2011, the majority of the police were ordered off campus, but some remained.

On some isolated occasions, some students did engage in unlawful activity. However, these incidents do not justify the PRPD's consistent use of excessive force on protesters who posed no threat on other occasions. On **January 11, 2011**, people who were alleged to be members of a small militant wing of the student movement, called "*encapuchados*" for the masks they wear, set off smoke bombs to disrupt classes being held despite the strike, and smashed windows and overturned tables in the Student Center's fast food court. No arrests were made, although police were present throughout the incident. The coordinating committees of the student movement issued statements repudiating the vandalism. On **March 7, 2011,** students surrounded the department of Architecture building, where Chancellor Guadalupe attended a meeting, and some of the students attacked her as she tried to leave the building. These students pulled her hair and sprayed her with water, despite the cordon of security guards surrounding her. Students also smashed the windows of her car.

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

The Puerto Rico Police Department systematically fails to protect women and girls from abusive partners and ex-partners, and it is not policing crimes of domestic violence and sexual assault.  Puerto Rico has the highest per capita rate in the world of women over 14 killed by their partners.



Family members cry at the crime scene where Sandra Villafañe Silva's estranged husband of 20 years fatally stabbed her 50 times before taking his own life. Source: Andre Kang / Primera Hora (2011)

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

# VII. Failure to Police Crimes of Domestic Violence and Sexual Assault

The PRPD systematically fails to protect victims of domestic violence and to investigate reported crimes of domestic violence, sexual assault, and even murders of women and girls by their partners or spouses. The PRPD is failing to protect women from abusive partners and spouses, and the PRPD is not policing those crimes when they are committed. The PRPD is not doing enough to ensure that women confronting domestic violence utilize the legal options available to them, and it is not adequately enforcing existing protective orders by arresting abusers who violate orders that are in place. The PRPD also is not adequately responding to or investigating rape crimes, and it is significantly underreporting these crimes. Moreover, the PRPD has recorded an appalling number of complaints of domestic violence by PRPD officers, and the PRPD's failure to address domestic violence among its ranks is symptomatic of a larger institutional dysfunction of the police department's policing of domestic violence and other sexual and gender-based crimes.

## a. Failure to Prevent Intimate Partner Homicides

The PRPD is failing to prevent murders of women and girls by their spouse, partners, and ex-partners. Puerto Rico has the highest per capita rate in the world of women over 14 killed by their partners. The numbers are disturbing, and climbing: 107 women were killed by their intimate partners in the five-year period from 2007 to 2011. The number of women killed by their intimate partners jumped significantly in 2011, to 30 women killed, up from 19 in 2010. According to news reports, 21 women were murdered by intimate partners in the first six months of 2011 alone.[318] In 2006, the PRPD reported 23 murders of women at the hands of their partners or spouses, placing Puerto Rico first on an international list comparing the number of women killed in each country/territory by their partners per million women over the age of 14.[319]

To put the incredibly high rates of domestic violence homicides in Puerto Rico into perspective, the ACLU examined the number of women killed by intimate partners in Los Angeles, which has a population close to that of Puerto Rico (according to the 2010 Census, Puerto Rico's population was 3.726 million, while Los Angeles's was 3.793 million). Thirty women were killed by their intimate partner in Puerto Rico in 2011; in Los Angeles, five women were killed by their partners that year.[320] While 107 women were killed by their intimate partners over the five-year period from 2007 to 2011, 42 women were killed over the same period in Los Angeles.[321]

Thirty women killed by their partners in a single year, 2011, not only is a huge increase in Puerto Rico, but is significantly higher than the rate that would be expected based on U.S. national numbers. The DOJ estimates that the rate of intimate partner homicides with

female victims is 1.07 per 100,000 female residents in a year (this is a 2007 figure, the most recent statistics available).[322] Census figures show that there were 2,063,918 women in Puerto Rico in 2009. Based on the U.S. national intimate partner homicide rate and Puerto Rico's population, one would expect the number of women killed by their intimate partners over the course of a year to be about 27 percent lower (22 women).

**Table 4: Intimate Partner Homicides of Women in Puerto Rico versus Los Angeles, 2006-2011**[323]

|  | 2011 | 2010 | 2009 | 2008 | 2007 | 2006 |
|---|---|---|---|---|---|---|
| Women killed by intimate partners in Puerto Rico | 30[324] | 19 | 16 | 26 | 16 | 23 |
| Women killed by intimate partners in Los Angeles[325] | 5 | 8 | 5 | 10 | 14 | N/A |

Unfortunately, appropriate PRPD response and intervention could have prevented some of these tragic killings. The recent killing of 44-year-old nurse Wanda I. Camacho Meléndez is emblematic of the PRPD's systematic failure to protect women from violent partners and ex-partners. Camacho Meléndez was stabbed to death, allegedly by her ex-partner, Alexander Rodríguez Vélez, on February 14, 2012.[326] Camacho Meléndez had repeatedly gone to the police seeking protection from her partner, who had threatened her with death and beat her on multiple occasions.[327] On November 12, 2011 she sought assistance from the PRPD domestic violence division in Fajardo, and reported that her ex-partner had stabbed her one week earlier, on November 5, 2011.[328] The police did not initiate any investigation into her allegations, and did not process the attack as an assault or a domestic violence crime.[329] Instead, the police processed the case as a stalking case and a request for a protective order, which was granted to Camacho Meléndez.[330]

On November 16, 2011, Camacho Meléndez returned to the police to report that Rodríguez Vélez had violated the protective order.[331] According to press reports, she reported that he had vandalized a gas line and called her at the hospital where she worked, telling her that he was going to "see her dead."[332] A PRPD officer says he consulted with the district attorney's office, which did not find probable cause to charge Rodríguez Vélez with violating the order of protection, because a call log at the hospital did not document the call.[333] The district attorney's office has since told journalists that the PRPD never informed them of the previous stabbing incident.[334]

On December 14, 2011, Rodríguez Vélez again violated the protective order by going to Camacho Meléndez's house; a neighbor was there at the time. Charges were brought against him for violating the order, but he was not taken into custody.[335]

On February 14, 2012, Rodríguez Vélez again violated the protective order by approaching Camacho Meléndez.[336] He was wearing an electronic GPS-tracking device, which alerted

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

 

Nurse Wanda Camacho, in a family photo with her brothers and father (left), was stabbed to death, allegedly by her ex-partner.  She had repeatedly gone to the police seeking protection from her partner, but police did not investigate her allegations and failed to enforce a protective order. Photo Credit: Angel Luis García / El Nuevo Día (2012)

police that he had violated the protective order. Police did not follow protocols, which require them to immediately contact the domestic violence victim to alert her that her abuser had violated the order and was nearby.[337] Rodríguez Vélez stabbed Camacho Meléndez in her back, face, and abdomen, and she died of her injuries.[338] Rodríguez Vélez has been charged with murder, attempted murder, and weapons violations, and is currently being held on $6.5 million bail.[339]

In other cases the PRPD's failures have not been as starkly revealed, but the following cases raise serious concern that the PRPD is failing to protect women from their abusers. Information on the following cases of women reportedly killed by their partners and spouses in 2011 is based on public reports and news media reports. There are not final adjudications of guilt or innocence in a number of these cases, and in some of these cases criminal litigation is pending. Because it is difficult to obtain case information except where the case emerged in newspaper headlines, this research relies heavily on cases that have been exposed by local news media.

### Table 5:  Women Killed by their Partners and Spouses in Puerto Rico in 2011

| Name | Age | Date | Description |
|------|-----|------|-------------|
| María Margarita Ramos García | 56 | January 8, 2011 | María Margarita Ramos García, 56, was the first victim of an intimate partner homicide in 2011. According to press reports, she was killed by her husband of over 30 years, José Cruz Martínez, 58, while she slept. After shooting his wife in the head he took his own life. Both bodies were found in their bed after police responded to a call from their daughter, Yaska Cruz Ramos, who reportedly became concerned after her mother was not answering her phone.[340] |

| Elisa Rosa ("Elirosa") Figueroa Pagán | 29 | January 9, 2011 | Elirosa Figueroa Pagán, a 29-year-old mother of a seven-year-old daughter, was allegedly fatally stabbed 15 times with a machete by her ex-partner, Víctor Amaro Texidor, in the town of Patillas. Amaro also allegedly wounded Figueroa Pagán's ex-husband in the attack. According to press reports, Figueroa Pagán had left Amaro days earlier to reconcile with her ex-husband, who was also the father of her daughter.  Amaro reportedly had been criminally charged in 2007 for violation of the Domestic Violence Prevention and Intervention Law (Law 54), stemming from complaints of domestic violence filed against him by a previous girlfriend. Amaro also reportedly had an outstanding warrant for his arrest issued one month before the attack, for failing to appear at a hearing for charges of aggression against Figueroa Pagán's ex-husband. Amaro was charged with first degree murder, two counts of attempted murder, and weapons violations.[341] |
| Moraima Muñiz Muñiz | 39 | January 15, 2011 | Moraima Muñiz Muñiz, a 39-year-old mother of four and nursing student, was allegedly stabbed to death by her ex-boyfriend, Modesto Tosado Nieves, 56, in the Túnel de Guajataca, a beachside railroad tunnel. Muñiz was killed shortly after she ended their three-year relationship. Tosado Nieves reportedly killed her in front of her 18-year-old son, who called for emergency assistance. When police later took Tosado Nieves into custody he reportedly had wounds consistent with a suicide attempt. According to Muñiz's sister, María, prior to her murder Tosado Nieves had threatened her sister with harm if she did not return to him. Tosado Nieves was charged with first degree murder and weapons violations.[342] |

| Sasha Hernández Alemar | 30 | January 22, 2011 | Sasha Hernández Alemar, 30, was allegedly killed by her ex-boyfriend, Abed Nego González Vélez, 35. According to press reports, he stabbed her 26 times in the ballpark of the housing complex Río Cristal in the urban center of Mayagüez, where she lived with her grandmother and her 6-year-old and 12-year-old daughters. Hernández Alemar reportedly had previously lived for some time in a shelter for abused women in Ponce, where González Vélez had found her and resumed their relationship. According to press reports, she had moved in with her grandmother after they split a second time. González Vélez reportedly confessed to Puerto Rico newspaper *Primera Hora* that he killed Hernández Alemar when she told him she had a new boyfriend. González Vélez was charged with first degree murder and weapons violations.[343] |
|---|---|---|---|
| Iris Nidia Lugo Garcia | 23 | January 28, 2011 | Iris Nidia Lugo Garcia, 23, was killed by her ex-partner, 45-year-old Francisco Mercedes, who shot her twice in the face while she sat in her car. They had separated several months earlier.  Mercedes then took his own life in the same vehicle.[344] |
| Wilmary Vázquez Hernández | 24 | February 4, 2011 | Wilmary Vázquez Hernández, 24, was allegedly stabbed to death by her ex-husband, José Ramón Maldonado Bones, 34, in Villa Kennedy, in the town of Loíza. Maldonado Bones allegedly beat her and stabbed her in the abdomen, back, arms, and hands with two knives because of a dispute over child support payments. Their three-year-old son reportedly witnessed part of the murder; a friend who was with her fled with the child during the attack. Maldonado Bones's stepmother told a Wapa television broadcast journalist that he had a history of domestic violence against other women. Maldonado Bones was charged with first degree murder, attempted third degree murder, and weapons charges.[345] |

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

| | | | |
|---|---|---|---|
| Claribel Rivera Wilson | 38 | March 9, 2011 | Claribel Rivera Wilson, a 38-year-old mother of four, died on March 9, 2011 at the Medical Center in Río Piedras, seven days after her partner, Reinaldo Díaz Alvarado, 40, shot her in the head. Rivera Wilson's 15-year-old son reportedly witnessed the killing. Díaz later committed suicide, reportedly with the same weapon he used to kill Rivera Wilson.[346] |
| Marina Guiador Díaz | 37 | March 5, 2011 | Marina Guiador Díaz, 37, was beaten to death by her partner. Alongside her body, her partner José Manuel Ventura, 38, was also found dead by hanging.[347] |
| Sandra Villafañe Silva | 39 | March 16, 2011 | Sandra Villafañe Silva, a mother of two, was stabbed 50 times by her husband of 20 years, Alberto Bracero Morales, at the gas station that they operated together. They had been separated for three months at the time of the killing. Bracero Morales reportedly committed suicide after killing his wife.[348] |
| Helen Pérez Darnet | 32 | March 27, 2011 | Helen Pérez Darnet, 32, was fatally shot by her partner in her apartment in the Puerto Nuevo sector of San Juan, where they had lived together for 10 months prior to the murder. The murder took place in the presence of at least six witnesses, including her three children ages 5, 14, and 16.[349] |
| María de Lourdes Cortés Rosado | 45 | March 29, 2011 | María de Lourdes Cortés Rosado, 45, and a friend were allegedly shot and killed by her ex-husband of 15 years, Héctor Manuel Rivera Cruz, 39, in the town of Añasco. Cortés Rosado's husband reportedly fired five shots at her male friend and three shots at her after he saw them kissing. Rivera Cruz, who reportedly confessed to the killings, was charged with two counts of first degree murder.[350] |
| Gloria Hernández Orsini | 47 | March 30, 2011 | Gloria Hernández Orsini, a 47-year-old mother of four, was found by her daughter stabbed to death in a parked car in a parking lot of a shopping center in Ponce.  Her intimate partner of five years, Madeline Gonzáles Torres, allegedly stabbed her 10 times. Gonzáles Torres was charged with murder.[351] |

| | | | |
|---|---|---|---|
| Frances Feliciano Cappas | 17 | April 7, 2011 | 17-year-old high school student Frances Feliciano Cappas was allegedly shot in the head by her 17-year-old boyfriend, Kevin William Díaz Olán, in Yauco. The teenage girl's friend reportedly witnessed the shooting.  Olán drove his already brain-dead girlfriend to the hospital, where he reportedly provided conflicting stories. The girl's parents ultimately made the decision to remove life support and donate her organs. Díaz Olán was subsequently charged with first-degree murder.[352] |
| Aida Cruz Ivette Ortiz | 47 | April 23, 2011 | Aida Cruz Ivette Ortiz, 47, a mother of two who worked as a secretary at a hospital clinic for children and adolescents, reportedly was stabbed to death by her partner Hipólito Sevilla Sevilla, 63, in the town of Gurabo. According to relatives of Ivette Ortiz, she had filed complaints with the PRPD against Sevilla for domestic violence in the past. Sevilla, who worked as a security guard, reportedly had previously threatened her on multiple occasions, and had chased her with a gun during an earlier incident. Sevilla was charged with first degree murder, weapons violations, and domestic violence.[353] |
| Rosaura Sánchez Cruz | 28 | May 6, 2011 | According to press reports, Eduardo Feliciano Alvarez, 32, scaled eight stories of his ex-partner's condominium building, climbing up the balconies, to break into the Aguadilla apartment where his ex-partner Sánchez Cruz, 28, slept with their two children, ages two and six. They reportedly had been partners since she was 12 years old. He reportedly shot and killed Sánchez Cruz in front of their children as she tried to flee down a hallway, injuring their two-year-old son, who was in her arms. Feliciano Alvarez subsequently committed suicide with the same gun he used to kill his ex-partner. Feliciano Alvarez reportedly had been charged with domestic violence in 2010, stemming from a complaint filed by a previous partner.[354] |

**FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT**



The funeral of María Margarita Ramos García, who was fatally shot in the head by her husband of over 30 years. Photo Credit: El Nuevo Día (2011)

| Linda Rivera Cruz | 44 | June 8, 2011 | Linda Rivera Cruz, a 44-year-old mother of four, was found dead by her 12-year-old daughter in the apartment of her boyfriend of approximately one year, Rocaford Carrero Morales, 56. She had reportedly been stabbed eight times. Neighbors told journalists that they had witnessed Carrero Morales threaten to kill Rivera Cruz on previous occasions. Carrero Morales reportedly had been convicted of domestic violence as a result of a complaint filed by his ex-wife in 2007.[355] |
|---|---|---|---|
| Josmarie Serrano Fonseca | 20 | June 18, 2011 | 20-year-old Yosmarie Serrano Fonseca was shot to death by her estranged husband and father of her three children, Alvin Hermina Vélez. The couple, whose three children ranged in age from eight months to five years, had reportedly separated several weeks before the murder. Hermina Vélez was charged with first degree murder and weapons violations. As part of a plea deal, Hermina Vélez pled guilty to second-degree murder and weapons violations, and was sentenced to 65 years in prison.[356] |

| | | | |
|---|---|---|---|
| Brunilda Torres Sánchez | 62 | July 11, 2011 | Brunilda Torres Sánchez, 62, was killed with a machete by her partner of 10 years, Modesto Pérez Román, who subsequently buried her in the backyard of the home they shared in Lajas. Pérez Román, who confessed to police, was charged with first degree murder, weapons violations, and destruction of evidence. In December 2011, Pérez Román pled guilty to first degree murder and destruction of evidence.[357] |
| Eulalia Texidor Ortiz | 54 | July 17, 2011 | Eulalia Texidor Ortiz, a mother of three and an English teacher who was on the verge of retiring, was killed by her estranged husband of 30 years, Teddy Lugo Almodóvar, 55, from whom she had been separated for two years. Lugo Almodóvar shot her 10 times while their four-year-old grandchild watched television in the next room, then took his own life. Lugo Almodóvar had reportedly threatened and physically abused Texidor Ortiz on previous occasions, and their daughter had reportedly filed a complaint with the PRPD against him for abuse of their mother, but later withdrew the complaint.[358] |
| Marta Iris Marrero Estrada | 44 | August 15, 2011 | Marta Iris Marrero Estrada was slayed with a machete by her husband, José Mélendez Marrero, who reportedly had been suffering paranoia in the days leading up to the killing. The couple had four children, ranging in age from six to 24. According to their children, Mélendez Marrero locked himself in a bedroom with his wife of 25 years, Marrero Estrada. The couple's 18-year-old daughter tried to open the door when she heard her mother screaming; she reported that her father walked out of the room with a machete in hand while her mother lay on the floor holding a bleeding neck wound. Méndez Marrero subsequently hanged himself on the terrace as their daughter tried to help her mother, who died of her wounds. The couple's 20-year-old daughter reportedly left the house the night before and tried to convince her mother to leave with her.[359] |

| Jennifer Toro Hurtado | 26 | November 11, 2011 | Jennifer Toro Hurtado, a 26-year-old mother of three, was shot in the head by her estranged husband, Nelson Crespo Feliciano, in front of her three daughters at a grocery store in Aguadilla. Crespo Feliciano subsequently shot himself in the head and died days later. Toro Hurtado had obtained a temporary order of protection against Crespo Feliciano in July 2011. On September 22, 2011, Judge Rafael Ramos charged Crespo Feliciano with violating the protective order on account of his continued stalking of his estranged wife, released him on $5,000 bail, and ordered him to be placed under electronic surveillance by means of an ankle monitor. However, Crespo Feliciano failed to comply with the order and he was not outfitted with the ankle monitoring system. Six days later, Toro Hurtado sought an extension of the protective order, which was set to expire that day, testifying that her husband had violated the previous order and continued to threaten to kill her. Judge Diomedes González delayed the case to October 20, and again to November 8, to allow Crespo Feliciano time to find a lawyer. Wanda Vázquez Garced, the Women's Advocate of the Commonwealth of Puerto Rico, has called Judge Gonzalez' ruling "negligent" for failing to take into account Toro Hurtado's credible testimony, corroborated by Crespo Feliciano's previous history of domestic violence and recent death threats. According to the Women's Advocate, the day before the November 8, 2011 hearing concerning Toro Hurtado's requested extension of the protective order, Crespo Feliciano was arrested for failure to comply with the order to submit to electronic monitoring, but on November 10 Judge Rafael Ramos again released him on an additional $5,000 bond. Toro Hurtado was not notified of her husband's release, and he shot her the day after his release.[360] |
|---|---|---|---|

In addition to the cases detailed above, there are eight additional cases under investigation, in which the victims' partner is suspected of her murder: Julia García Cruz, age 21; Raisa González González, 28; Lorenis Karen Mejías Contreras, 30; Tayra Linnette Torres, 22; Tatiana Delgado Flores, 23; Marisol Rivera Rivera, 49; Lizyeisha Reyes Marrero, 25; and Eneida Montañez Beltrán, 25.[361] Women's rights advocates in Puerto Rico have called for

a full investigation into these and other cases, citing evidence uncovered by journalists suggesting that the murdered women's partner or ex-partner committed the homicide.

### b. Failure to Address Domestic Violence

The PRPD is not doing enough to ensure that women confronting domestic violence utilize the legal options available to them, and it is failing to enforce existing protective orders by arresting abusers who violate orders that are in place. Women's rights advocates have described domestic violence in Puerto Rico as "a state of national emergency," and the police are failing to effectively address crimes of domestic violence.[362] According to the DOJ, the "PRPD's longstanding failure to effectively address domestic violence and rape in Puerto Rico is clear and, in conjunction with its institutional deficiencies, may rise to the level of a pattern and practice of violations of the Fourteenth Amendment and the Safe Streets Act."[363]

In July 2011, during his confirmation hearing before the committee on Public Safety and Judicial Affairs, the recently-replaced PRPD Superintendent, Díaz Colón, was asked about deaths from domestic violence and child abuse that have occurred on the island, and he replied that domestic violence is a private matter and outside the purview of the PRPD. He told reporters, "Well, those two issues you pointed out to me are activities that are not directly part of the functions of the police of Puerto Rico. Possibly they may be directed at other agencies that can work on them."[364]

Of the women killed by their intimate partners from 1991 to 1999, only 17 percent had orders of protection, a scant 2 percent had orders of arrest against their murderer, and 4 percent had expired orders of protection.[365] In 2007, 25 percent of the women killed by their partners had previously reported incidents of domestic violence to the PRPD.[366] Few women are seeking protection from their abusive partners, in part because they distrust or lack faith in a system that is failing to provide adequate protection to victims.

Advocates in Puerto Rico report that arrests are not occurring and that police are not carrying out other statutory responsibilities. Police are failing to enforce the Domestic Violence Prevention and Intervention Law, known as Law 54 (*Ley 54*), enacted in 1989. Law 54 is a comprehensive domestic violence law that outlines criminal, civil, and preventive measures. With respect to criminal penalties, the law restricts police discretion and requires arrest when a domestic abuse offense has occurred.[367] It also provides a right to immediate medical care as necessary; the right to file a report with law enforcement; and the right to a restraining order, among other provisions.

A 2006 study of Puerto Rico's practices in handling domestic violence cases identified significant gaps in the response of both the civil and criminal justice system, including the PRPD, to domestic violence. The report found that there are significant delays in the adjudication of protection orders, due in part to confusion over the PRPD's responsibility for service of ex parte orders and summons to appear at the hearings on final orders of

protection, which result in delays in service; dramatic under-enforcement of violations of protection orders; inadequate staffing of both specialized domestic violence PRPD units and specialized domestic violence prosecution units, making it impossible to provide coverage of all domestic violence cases; lack of adeqate evidence collection and case investigation by the PRPD; and lack of consistent coordination between police and prosecutors in domestic violence case development.[368] Moreover, arrests are usually not made for violations of protective orders issued by the courts.

A significantly high percentage of domestic violence incidents reported to the PRPD do not result in convictions, in part because of lack of sufficient cooperation between police and prosecutors in case development.[369] According to data provided by the Women's Advocate Office (*Oficina de la Procuradora de las Mujeres*), around 20,000 protective orders are issued annually and a comparable number of domestic violence incidents are reported to the police, while fewer than 500 convictions for domestic violence are made annually.[370] According to a study commissioned by the PRDOJ and conducted by UPR researchers, domestic violence is the highest volume crime in Puerto Rico, but it has the lowest conviction rate, measured by the percent of incidents reported to police which result in convictions.[371] The study found that of approximately 20,000 domestic violence incidents reported to the police each year, only 17 percent resulted in convictions.[372] PRDOJ statistics for Fiscal Year 2003 to 2004 (in Puerto Rico, running from July 1 to June 30) indicate that of the approximately 21,000 domestic violence incidents reported by the PRPD that year, 19 percent (4,072) resulted in criminal complaints filed by the PRDOJ, and only 12.3 percent (2,586) resulted in convictions.[373]

These figures for domestic violence-related convictions are lower than U.S. national averages. A report by the National Institute of Justice examining intimate partner prosecutions between 1973 and 2006 in 120 mostly urban jurisdictions in 44 states and the District of Columbia of found the average arrest prosecution rate was 63.8 percent, and the average offense prosecution rate was 27.4 percent.[374]

The 2006 study of response to domestic violence in Puerto Rico found that to address the dearth of domestic violence arrests and convictions, police and prosecutors need to better collaborate in the processing of cases and develop consistent procedures in the development of cases. This includes creating and implementing consistent procedures for comprehensive incident report-writing, crime scene photos and photos of all injuries, body diagrams indicating location of injuries, and medical documentation, in order to collect adequate evidence to sustain criminal charges and successfully prosecute a case.[375]

In addition, victim reporting rates of domestic violence incidents are low, given Puerto Rico's population and U.S. national rates of domestic violence. As a performance measure of police departments' response to domestic violence, the National Institute of Justice has found that on the basis of actual rates of domestic violence as determined by victim surveys, law enforcement officers should be responding annually to 8 to 9 incidents per 1,000 females, and 2 to 3 per 1,000 males.[376] Based on this figure, and 2010 census statistics pegging the population of Puerto Rico at 1,785,171 men and 1,940,618 women, the PRPD should be

receiving about 15,525-17,466 complaints from women and 3,570-5,356 complaints from men, or a total of 19,095-22,822 complaints, which is higher than the 16,952 complaints the PRPD reported receiving in 2010. The National Institute of Justice noted that "if the incidence of domestic violence reported in victim surveys is significantly above the level that victims actually report to law enforcement, greater community outreach and barriers to reporting must be addressed. Law enforcement officers must encourage the rest of the community to do its part, and prosecutors must work with law enforcement if incidents are not making it into the courts."[377]

**Table 6: Domestic Violence Incidents Reported by the Puerto Rico Police Department**[378]



**Table 7: Orders of Protection Requested and Issued by the Court of First Instance (Tribunal de Primera Instancia) versus Domestic Violence Incidents Reported by the Puerto Rico Police Department**[379]

|  | **2011** | **2010** | **2009** | **2008** | **2007** |
|---|---|---|---|---|---|
| Number of orders of protection requested | 27,934 | 29,089 | 28,971 | 30,552 | 30,620 |
| Number of orders of protection issued | 18,391 | 19,260 | 19,504 | 20,293 | 20,258 |
| Domestic violence incidents reported by the PRPD | N/A | 16,952 | 19,124 | 20,389 | 19,222 |

### c.  Failure to Address Rape

The PRPD is not adequately responding to or investigating rape crimes, and it is significantly underreporting these crimes.  The PRPD reported that only 39 forcible rapes were committed in 2010, while the department also reported 1,000 homicides during the same year. Based on data from police departments around the U.S., we would expect the rape statistics to be 100 times the figure reported by the PRPD, as other jurisdictions in the U.S. report about four times as many rapes than homicides.

The number of reported forcible rapes has declined exponentially; from 426 in 1990 to 39— less than one-tenth that number—in 2010. In the last ten years the reported rape rate has declined sharply, declining from 228 to 39 forcible rapes from 2000 to 2010, while murders have seen a sharp increase during the same time period, indicating that reduced crime is not the cause of the recent shockingly low rape statistics.

The unprecedented data spread between reported forcible rape and murder is most likely the result of the PRPD's failure to follow protocols to respond to, record, or investigate crimes of rape. Official sources estimate that, in the case of sexual violence, only about 16 percent of rapes are reported.[380] In their latest study, issued in 2007, the Puerto Rico Department of Health's Center for Assistance to Rape Victims estimated that 18,000 people in Puerto Rico, mostly women and girls, are victims of sexual violence each year.[381]

**Table 8:  Forcible Rapes Reported by the Puerto Rico Police Department**[382]

|  | 2010 | 2009 | 2008 | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Forcible Rapes | 39 | 65 | 95 | 97 | 118 | 169 | 199 | 204 | 241 | 187 | 228 |

|  | 1999 | 1998 | 1997 | 1996 | 1995 | 1994 | 1993 | 1992 | 1991 | 1990 | 1989 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Forcible Rapes | 223 | 243 | 178 | 316 | 324 | 396 | 401 | 433 | 424 | 426 | 509 |

### d.  Domestic Violence by PRPD Officers

The PRPD has recorded an appalling number of complaints of domestic violence by PRPD officers, and the PRPD's failure to address domestic violence among its ranks is symptomatic of a larger institutional dysfunction of the police department's policing of domestic violence and other sexual and gender-based crimes. The PRPD recorded nearly 1,500 domestic violence complaints against police officers from 2005 to 2010.[383] The actual number of crimes of domestic violence committed by officers is likely significantly higher due to underreporting, because survivors are unlikely to file and pursue complaints with

the same police department that employs their abusive partner or ex-partner. The DOJ has identified 84 still-active officers who have been arrested two or more times for domestic violence.[384] Recently there have been multiple highly publicized cases in which PRPD officers shot their wives with their service firearms, in some cases killing their spouses.

In the DOJ's report of its findings concerning the PRPD, the DOJ concluded that, "PRPD policies and practices are woefully inadequate to prevent and address domestic violence committed by PRPD officers. We find that these deficiencies will lead to constitutional violations unless they are addressed."[385] According to the DOJ, the PRPD's failure to address the commission of domestic violence by police officers "may qualify as evidence of discriminatory intent."[386]

Domestic violence by an officer at home often is a useful predictor of violence by the officer while on duty outside the home. Police officers' civilian complaint records, which have been disclosed through pre-trial discovery in a number of civil lawsuits seeking compensation for deaths and injuries caused by excessive police force, have revealed in numerous cases that there were previous complaints of domestic violence by the officer. Judith Berkan, a civil rights lawyer who has represented numerous victims of police brutality, told the ACLU that in most of the cases of excessive use of police force she has handled, there were previous domestic violence complaints against the officer; in one case, she says there were 24 civilian complaints of aggression against a single officer recorded in his disciplinary file.[387]

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

The investigatory, disciplinary, and reporting systems of the Puerto Rico Police Department rubber-stamp the use of force, cover up abuse by its officers, and encourage a code of silence. Instead of deterring abuses by holding abusive officers accountable, the PRPD allows officers to escape punishment or any other consequences, rearming them and returning them to active duty, often to repeat their offenses. Citizen complaints of police brutality languish for years without resolution. The disciplinary system retains, protects, and even promotes officers who use lethal and excessive force. The PRPD utterly fails to comprehensively investigate complaints of excessive force and other police abuses, often failing to interview witnesses or ignoring eyewitness accounts that contradict the officers'.



Ruth Jiménez de Jesús holding a photo of her 28-year-old son, Jorge Luis Polaco Jiménez, who was fatally shot by police eight times, seven in the back while he was in police custody. The investigation into his killing was closed without interviewing witnesses or examining forensic evidence, and the responsible police officers were never brought to justice. Photo Credit: Indymedia (2009)

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

# VIII.  Total Impunity:  Failure to Investigate or Punish Police Brutality

There are numerous contributing factors that are responsible for the deeply-rooted, wide-ranging, and long-standing human rights abuses the ACLU has documented. Our research has found that the systems in place utterly fail to address, and therefore prevent, abuses. In particular, we have documented the failure of the following systems:  the investigatory system, which fails to effectively examine use of force and allegations of police misconduct; the disciplinary and other accountability systems, which fail to meaningfully punish officers for misconduct; and the reporting system, which fails to require officers to report uses of force or critical incidents such as officer-involved shootings.

These systems virtually guarantee impunity:  instead of deterring abuses by holding abusive officers accountable, the PRPD allows officers to escape punishment or any other consequences, rearming them and returning them to active duty, often to repeat their offenses. Citizen complaints of brutality, lethal force, and excessive force languish for years without resolution. Abusive officers rarely are administratively punished or criminally prosecuted. The PRPD fails to track repetitive conduct by officers who violate the law or have significant records of complaints from the public. The failure to implement effective early warning systems to identify abusive officers and flag high-risk officers likely to commit abuses has resulted in the avoidable loss of numerous lives.

The investigatory, disciplinary, and reporting systems of the PRPD rubber-stamp the use of force, cover up abuse by its officers, and encourage a code of silence. We documented a disciplinary system that retains, protects, and even promotes officers who use lethal, disproportionate, and excessive force. It is a disciplinary system that retained an abusive officer even after he was labeled a "ticking time bomb" by a police psychologist, to see him later execute an unarmed man in the street; awards medals of valor to officers involved in a deadly shooting of a mentally ill man even while the official investigation into their use of force was still ongoing; and reinstated an officer who held the local police chief hostage at gunpoint, rearmed him after he was arrested eight times, and returned him to foot patrol in a housing project where he shot and killed an unarmed 18-year-old teen.

We also documented an investigatory system that fails to interview witnesses or ignores eyewitness accounts that contradict the officers'. We documented a systemic failure to comprehensively investigate and punish excessive use of police force, including lethal force. The PRPD fails to investigate or punish even cases in which unarmed and nonthreatening individuals were killed by police officers. Citizen complaints of brutality, lethal force, and excessive force languish for years without resolution. Administrative complaints filed by victims of police brutality often yield no results, the officers involved in the cases the ACLU documented generally were not sanctioned administratively, and criminal charges rarely are initiated against offending officers.

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

In 2007, in response to numerous outrageous instances of police violence including executions and other police misconduct, numerous organizations including the ACLU of Puerto Rico, Puerto Rico Bar Association, and other non-governmental groups demanded government action to address the crisis. In September 2007, the then-Superintendent of the PRPD created a committee to conduct an external evaluation of the problems of violence and corruption in Puerto Rico and render recommendations. The committee, called the External Evaluating Committee on the Police of Puerto Rico (*Comité Evaluador Externo de la Policía de Puerto Rico*), conducted a five-month investigation into PRPD's organization, structure, training, recruitment, supervision, discipline, and other policies. The committee released two reports of its findings in December 2007 and May 2008, concluding that there was a pattern of civil rights violations by members of the PRPD and recommending a number of reforms to prevent police violence and improve the investigatory and disciplinary systems.[388] To date, the PRPD has taken no actions to implement the External Evaluating Committee's recommendations to improve the investigatory and disciplinary mechanisms in place.

There are human consequences to impunity in the police department, including the avoidable loss of life. The ACLU documented the involvement of PRPD officers in multiple instances of lethal or excessive force. For example, one of the police officers involved in the shooting death of 28-year-old Jorge Luis Polaco Jiménez in October 2007, in which the unarmed Polaco was shot seven times in the back while he was in police custody, was also involved in the February 23, 2011 police beating of unarmed 62-year-old Julio Cirino in his home that left him unconscious and hospitalized for a blood clot in his brain and other injuries.  The police investigation of Polaco's killing had been perfunctory and wholly inadequate, and to date, the officers have not been charged with a crime or subject to disciplinary measures for their role in the shooting.[389]

In another instance of an officer implicated in two instances of lethal use of force, the same officer (Efraín Burgos Montes) was allegedly implicated in the shooting death of Erick Sánchez Vargas on September 4, 2003 and the beating death of 19-year-old José Luis "Goldo" Irizarry Pérez on November 4, 2008, both in Yauco.[390] In the August 2007 case of Miguel Cáceres Cruz, the 43-year-old unarmed father of three shot four times when he was face down on the ground, two of the three police officers involved had witnessed the police killing of 21-year-old Nelson Santiago at a youth festival one week earlier and had not been interviewed about the killing they witnessed. The two officers also were aware that the officers involved in that unjustified killing had enjoyed complete impunity, and in fact had not even had their service weapons taken after the killing.

### a. Seriously Flawed Investigation Process: Failure to Register Civilian Complaints and Investigate Reported Police Abuses

The ACLU documented numerous problems with the PRPD's complaint intake and investigatory process that lead to impunity for excessive use of force and other police abuse, including excessive delays, the systematic failure to comprehensively investigate cases, and the failure to accept and register complaints from citizens wishing to report abuses by PRPD officers.

PRPD administrative **complaints often take years to resolve**, due in part to the many steps required to complete the investigatory process and the tremendous backlogs among investigators and review officers assigned to the Auxiliary Superintendency for Professional Responsibility and the Legal Division (the lengthy process and multiple steps are detailed in subsection C below). A former Auxiliary Superintendent told the ACLU that when he began a review of PRPD policies following his appointment to the PRPD in November 2010, the PRPD had pending investigations from the 1990s, including investigations that had been pending for over eight years without resolution.[391] According to the DOJ's investigation findings, "Many officers and superintendents reported that investigations could take up to ten years or more to complete."[392] In its December 2007 report, the External Evaluating Committee on the Police of Puerto Rico found about there is a backlog of about 5,000 complaints at any given time, while about 3,000 to 4,000 complaints are filed a year.[393]

There also are excessive delays after complaints are referred for criminal investigation of alleged crimes by police officers. Where there is evidence of criminal conduct, the NIE of the Puerto Rico Department of Justice assumes jurisdiction over the investigation. According to a former Auxiliary Superintendent of the PRPD, the NIE is responsible for tremendous backlogs and its investigations drag on "forever."[394] The External Evaluating Committee on the Police of Puerto Rico similarly found that investigations conducted by the NIE can take years.[395]

The PRPD also **utterly fails to comprehensively investigate complaints** of excessive use of force and other police abuses. The ACLU documented numerous serious shortcomings of PRPD investigations of alleged misconduct and abuse, including failure to perform even basic investigatory tasks such as taking photos of civilian complainants' injuries inflicted by officers or interviewing witnesses to incidents of excessive use of force. The shortcomings documented by the ACLU include:

- Failure to interview all police officers involved in or witness to a killing or other incident of abuse, and failure to do so promptly or thoroughly;

- Failure to obtain detailed, non-conclusory written statements from all officers involved in or witness to a killing or other incident of abuse;

- Failure to consult non-police eyewitnesses or failure to record their statements;

- Failure to collect and preserve forensic evidence such as bullet shell casings and gunshot residue and blood from the victim's and officers' clothing;

- Failure to conduct forensic examinations on relevant evidence from the crime scene, involved officers, and the victim;

- Failure to document alleged injuries to the victim, and failure to obtain and evaluate evidence such as medical documentation of injuries caused by the use of force;

- Failure obtain and review photographic or video evidence;

- Failure to promptly conduct investigations; and

- Failure to ensure that police officers under investigation are taken off field duties or disarmed while investigations of serious abuse are pending.

The police killing of Jorge Luis Polaco Jiménez, a 28-year-old Black man extrajudicially executed by police on October 4, 2007, clearly demonstrates the PRPD's complete failure to conduct a competent investigation of a civilian complaint. Polaco was shot seven times in the back while in police custody, and the police investigation into his killing was perfunctory and wholly inadequate: police did not interview eyewitnesses to the incident and did not provide a report of their investigation to Polaco's mother.[396] Polaco's mother, Ruth Jiménez de Jesús, filed multiple complaints with the PRPD, but received no response other than to be told that the investigation was closed.[397] She hired a private investigator, who located an eyewitness to her son's arrest who had not been interviewed by police but reported witnessing the police shoot her son once in the front shoulder before taking him into custody one-and-a-half hours before they delivered him to the hospital dead-on-arrival with seven bullet wounds in his back.[398] Police later claimed they acted in self-defense, but the private investigator found that Polaco was unarmed and only had a dollar and his house keys in his pocket.[399] According to Polaco's mother, PRPD investigators failed to conduct any forensic testing on her son's or the officers' clothing.[400] Given the police officers' claim that they had acted in self-defense, Polaco's mother questions why the PRPD conducted no tests for gunpowder residue on the police uniforms, and failed to examine the officers for evidence of defensive injuries that would suggest that her son resisted the officers.[401]

The External Evaluating Committee on the Police of Puerto Rico evaluated the PRPD's complaint, investigatory, and disciplinary policies and practices, and issued two reports of its findings plus recommendations.[402] The committee identified serious flaws in the PRPD's complaint and investigatory processes. According to attorney Nora Vargas, a member of the External Evaluating Committee,

> "As a member of the Comité Evaluador I participated in reviewing the complaint process. We looked at statistics and other data provided by the Police Dept., and interviewed the head of the Division. It was apparent the number of complaints that either go unresolved, are never investigated, are poorly investigated, lack of training of those who are charged with the investigation, the lengthy process and time it takes to investigate and resolve

the complaint, the lack of notice and participation of the complainant. We are also aware of how citizens are discouraged by police officers from presenting a complaint against police officers."[403]

The ACLU also identified numerous problems with the intake of complaints and follow-up with complainants, including:

- Intimidation of would-be complainants and attempts to dissuade them from filing or proceeding with a complaint;

- Focusing on undermining complainants' case instead of documenting the reported officer misconduct;

- Refusing to process a complaint or conduct an investigation because the victim could not identify the name and badge number of the officer who abused them;

- Failure to inform complainants of the status of their complaint, the status or findings of the ensuing investigation, or any disciplinary action taken; and

- Refusal to accept or process complaints.

Victims, their family members, and their lawyers reported to the ACLU that when they sought to file a complaint of police misconduct, officers were intimidating and hostile, and plainly did not wish to receive a complaint about a colleague. In some cases, **officers threatened or attempted to dissuade would-be complainants**, or expressed disbelief about their allegations.

Lawyer Enrique G. Juliá Ramos, who represents at least 40 UPR students, has practiced both criminal defense and civil law for many years, and has represented numerous victims of police abuse in civil lawsuits against the PRPD and its officers, described the numerous obstacles he and his clients have faced when they have attempted to file complaints reporting police abuse. He told the ACLU, "First, [the police] derail the process. When you file a complaint, someone from the Legal Division takes a sworn statement, and in their questions they derail the process. For example, in a case of police abuse at a gas station, their first question is, 'How much alcohol did you drink that day?' The focus of the officer's investigation is undermining the complainant rather than finding out what actually happened." [404] Juliá Ramos added, "Second, the complaint doesn't go anywhere. The officer who shot at the Capitol Building [protest] had seven or eight complaints against him at the time; he was upgraded to a Lieutenant from Sergeant even after all those complaints. In all these cases of police brutality, those officers have multiple complaints against them."[405] He continued, "Third, if you get the complaint to pass the initial hearing, all the officers are members of a police union, and they start mobilizing the community."[406] Juliá Ramos reported that he is now hesitant to even bother filing complaints because of these obstacles.

In numerous cases documented by the ACLU, victims of police abuse reported that PRPD officers told them they were **unable to proceed with a complaint or an investigation**

*FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT*

**because they could not identify the name and badge number of the abusive officer**. Juliá Ramos described the case of one client of his, UPR student José "Osito" Pérez Reisler, who was Tasered multiple times by police while protesting at the Sheraton Hotel on May 20, 2010, and had been beaten and had his laptop taken by police days earlier on campus.[407] Juliá Ramos said that he and his client received no response after filing a complaint with the PRPD on May 14, 2010 and sending a follow-up letter on August 4, 2010 detailing both incidents.[408] He and his client returned to the police precinct on November 24, 2010 to follow-up on the complaint in person.

According to Juliá Ramos, the PRPD officer they met with at the station was "very negative" and "she said it was difficult because there are a lot of police from all over the island and you have to know who the arresting officer is" in order to launch an investigation.[409] Although the Tasering incident was captured on film, part of the officer's face was concealed in the vido footage and Pérez Reisler's booking sheet did not include the name of the arresting officer. Juliá Ramos says that when he asked about his client's laptop, the officer's response was to ask whether Pérez Reisler had gone to the pawn shops to check if his computer had been pawned.[410] In December 2010, Juliá Ramos sent a DVD of the Tasering video to the PRPD, and on April 5, 2011 he had his final communication with the PRPD concerning the complaint, during which a PRPD officer said they could not do anything about the complaint because "it was so hard to identify the officer" who Tasered Pérez Reisler.[411]

Several victims of police misconduct who did file complaints told the ACLU that they had traveled to the police station to file a complaint, which required them to provide their home address, and were terrified when police later arrived at their house. These men and women told the ACLU that they were unsure why officers visited them or attempted to visit them in their homes. In several of these cases, the complainant told the ACLU that they subsequently **dropped their complaint because they feared police retribution**, and they perceived the officers' visit as an intentional message that they were being watched or would be subject to retribution if they continued with their complaint.

We also documented numerous instances in which **officers refused to initiate and process complaints** by civilians who approached officers about filing a complaint (*presenter una querella* or *queja*) in the field or at a police station regarding excessive use of force or other police abuse. For example, as a result of the events at the Capitol Building on June 30, 2010, numerous protesters who had been subject to police abuse attempted to file complaints with the police, but police officials refused to accept or record the complaints. In its report of the incidents that took place at the Capitol on June 30, 2010, the Special Commission of the Puerto Rico Bar Association also found that "On various occasions the police refused to accept criminal complaints that citizens wished to file to denounce the criminal conduct of other law enforcement agents."[412] The Special Commission documented several specific cases from individuals who sought to file complaints and were denied, or who witnessed police officers turn away other would-be complainants empty-handed.[413]

Lawyer Hans Perl-Matanzo, who has represented several victims of police brutality, told the ACLU that he has witnessed PRPD officers refuse to accept complaints on three occasions. He explained, "There are countless people, including attorneys, who have been outright denied, by police officers with no legitimate reason to do so, of their right to file a complaint or press charges…This outright refusal to receive complaints has occurred in a systematic and wide-ranging manner, and occurs even after attempting to ask supervising officers, including high-ranking officials, to accept the complaints or order their subordinates to comply with their legal duty."[414]

Moreover, a significant number of victims of police abuse told the ACLU that they **did not file a complaint because they have no faith in the PRPD's investigatory or disciplinary systems**. One victim of police abuse told the ACLU, "A complaint wouldn't be worth the value of the paper it was written on." Another told the ACLU, "I did not file a complaint with the police because I felt it wouldn't do anything—I have no confidence in the police."[415] They correctly perceive that the officers who abused them are highly unlikely to be held accountable for their actions.

Numerous victims of police abuse told the ACLU that they **decided not to file a complaint because of fear of retribution** from the officers involved. UPR student Amada Garcia told the ACLU, "First, I couldn't file a complaint because I didn't have the number of the police officer, because he wasn't wearing his badge. Second, I would have had to put my contact information in the complaint, and I don't feel safe if the police have my name, address, and telephone numbers…We all have fear about what will happen if we file a complaint.  Really it is a collective fear, that we will be put under surveillance and persecuted, and what will happen to us in our professional future."[416] Others were concerned that filing a complaint would affect charges that may be pending as a result of the arrest that gave rise to the abusive incident.

Lastly, the PRPD **places the onus on victims to file a complaint**, and in practice generally has not launched investigations even when credible evidence of abuse has been exposed by the media, on the grounds that the victims did not come forward and initiate a complaint. Government officials repeatedly told the ACLU that they could not investigate alleged abuses, even well-known incidents in which the responsible police officers could be easily identified, because victims were not filing complaints. The PRPD is authorized to initiate an internal investigation into alleged police brutality without a formal complaint, and it ought to do so.

### b. Breakdown of the Police Disciplinary System: Failure to Hold Officers Accountable

The ACLU documented numerous problems with the PRPD's internal disciplinary sanction process that lead to impunity for excessive use of force and other police abuse. The serious deficiencies of the disciplinary system we identified include:

- Nonexistent or inappropriately minor or temporary sanctions for misconduct and abuse;

- The systematic overruling or downgrading of recommended disciplinary sanctions including temporary suspension or permanent dismissal, by the bodies that evaluate and institute potential disciplinary measures;

- Lack of attention to repetitive conduct by officers who repeatedly use excessive force or have multiple complaints filed against them indicating they are at high risk of committing abuse;

- Failure to disarm officers involved in excessive use of force, even lethal force, against unarmed suspects;

- Swift re-arming of officers following incidents;

- Excessive delays in the administrative disciplinary process, generally during which officers under investigation remain armed and are permitted to continue working in the field;

- *Pro forma* evaluations;

- Failure to follow policies regarding officers who return from suspensions for disciplinary reasons; and

- Officers are permitted to refuse to provide a statement during administrative disciplinary investigations.

Officers **rarely are held accountable for abuses**. According to PRPD records, from 2004 to 2010, 27,395 complaints were filed by civilians alleging misconduct by PRPD officers. During that period, only 884 officers received expulsion recommendations, a figure amounting to just over three percent of complaints filed; the number of officers actually expelled from the force is likely significantly lower because expulsion orders are frequently overturned.[417] During that period of time, no administrative complaints were referred to the final appellate body that reviews disciplinary measures, the Commission on Investigations, Processing, and Appeals (*Comisión de Investigación, Procesamiento y Apelación*, or CIPA).[418]

The PRPD's disciplinary system is virtually identical to the system that was in place in 1989, when in the leading case *Gutiérrez-Rodríguez v. Cartagena*, the United States Court of Appeals for the First Circuit found the PRPD's disciplinary system to be "grossly deficient" and upheld an award of punitive damages against the PRPD Superintendent and other supervisors.[419] In that case, the First Circuit concluded, "As the expert on police practices and procedures testified, it was a disciplinary system that was going through the procedural motions without any real objective of finding the truth."[420]

The police practices expert in that case, Lou Reiter, is the former Deputy Chief of Police of the Los Angeles Police Department and served as an active police officer for 20 years. He has served as a police practices expert witness in about 40 civil cases in Puerto Rico

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

and was appointed as the Federal Court Monitor for a consent decree in California. Most recently, as an expert in a civil suit brought by the widow and children of Miguel Cáceres Cruz (the unarmed father of three shot by a police officer on video), Reiter found in 2010 that the PRPD's disciplinary system continues to promote impunity and fails to hold officers accountable for abuses. Reiter concluded that the PRPD "has historically chosen to create a system and agency environment which is designed to not hold officers accountable for misconduct and abuse of citizens," and one which "can result in unreasonable uses of force and deadly force."[421] He found that supervisors were "deliberately indifferent in their supervision, control and monitoring of field officers' use of force, including use of deadly force."[422] He also found that officers should be aware of the general impunity for unreasonable uses of force and deadly force "and the failure to hold officers accountable for misconduct or improper, unreasonable and excessive uses of force."[423] Lastly, he found that systems to follow reasonable practices for administrative disciplinary investigations would be essential to establish "the environment within the...agency for field officers to know that they will be held accountable for their actions in the field."[424]

The ACLU also found that there is **no process for monitoring officers' disciplinary files to flag repetitive abusive conduct**, identify patterns of misconduct, or take action to remove repeat offenders from the police force. The PRPD does not automatically review or track the records of individual police officers in order to flag officers with multiple complaints filed against them or other indications they are at high risk of committing abuse so that supervisors can take appropriate measures to prevent further misconduct. In fact, the PRPD fails to conduct any periodic review of personnel disciplinary files, which include information on the number of complaints against an officer, the nature of the complaints, and their resolution. The PRPD has no automated, computerized database to identify officers with multiple complaints filed against them, and the PRPD keeps many disciplinary records on paper rather than in computerized files. The PRPD lacks such an early warning system despite its Special Order 90-5 on "repetitive conduct" requiring supervisors who observe conduct from which problems requiring retraining can be inferred to bring such conduct to the attention of the Superintendent.[425]

The administrative disciplinary process is plagued by **excessive delays**, generally during which officers under investigation remain armed and are permitted to continue working in the field. The investigatory process is delayed in part because after the Auxiliary Superintendency for Professional Responsibility completes its investigation into a complaint, it does not impose a disciplinary measure; instead, the file is then forwarded to the Legal Division, which decides on whether to recommend a disciplinary action.[426] There are **backlogs** at both of these levels.[427] From there, the file goes to the Superintendent, who has full discretion to decide whether to agree or disagree with the Legal Division regarding the recommended disciplinary action.[428] Because all complaints of misconduct are processed by the Auxiliary Superintendency for Professional Responsibility in the order in which they were received—including complaints of minor violations such as disobeying orders and ineptitude, as well as serious abuses such as illegal arrest and unjustified aggression—there is a backlog that fails to prioritize cases based on the severity of the alleged offense.[429] The PRPD has stated that it plans to change the investigatory process, which will include the creation

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

of an investigatory matrix that will create different investigatory procedures depending on the level of force used, but it has not introduced or implemented the new procedure.[430]

The administrative investigative process, which involves 14 discrete steps, provides officers with **many opportunities to contest proposed punishments** and in many cases officers accused of misconduct prevail. When the PRPD seeks to dismiss an officer, he or she may appeal the dismissal order to multiple bodies. Because the supervisors and bodies that evaluate and institute potential disciplinary measures heavily favor the officers, many abusive officers avoid temporary suspension, permanent dismissal, or other disciplinary sanctions. Even when a Superintendent proposes the suspension of an officer on the basis of a substantiated civilian complaint (called a Proposed Suspension on Sustained Complaint, or a *Me Propongo*), these expulsion proposals often are not acted upon or are overruled.

The 14 steps of the disciplinary process are:

- A citizen fills out an administrative complaint.

- The complaint is endorsed by the Auxiliary Superintendency for Professional Responsibility (*Superintendencia Auxiliar de Responsabilidad Profesional*, formerly the Superintendency of Public Integrity).

- The complaint goes to the Administrative Investigations Division (*División de Investigaciones Administrativas*, formerly the Office of Public Integrity) at the regional/area level, where it can be taken up at that office or referred to another region/area.

- Complaints are first investigated at the regional/area level. The investigator provides a report to the head of the Administrative Investigations Division at the regional/area level.

- The director of the Administrative Investigations Division at the regional/area level approves a report including findings concerning any violations, and may include a recommendation of an administrative sanction such as a warning, admonition, suspension, or expulsion.

- The report goes to the island-wide Auxiliary Superintendency for Professional Responsibility, which can accept or reject the recommendation.

- The determination by the Auxiliary Superintendency for Professional Responsibility is sent to the Legal Division, which has the power to modify the recommendation.

- The recommendation then goes to the Superintendent of the PRPD, who has full discretion to decide what punishment, if any, to impose.

- The Superintendent of the PRPD then drafts a letter (typically known as a *Me Propongo*) proposing a disciplinary sanction. The proposed sanction is not a final decision, even in the case of a proposed expulsion.

- The officer may file an internal appeal of any proposed sanction. The officer may appeal for an administrative hearing before hearing officers assigned to the Legal Division.

- The Legal Division hearing officer then issues a report, including a recommendation for disciplinary sanction, if any, to the Director of the Legal Division.

- The case then returns to the Legal Division, which then reviews the evidence and may make additional recommendations.

- The case then returns to the Superintendent of the PRPD or his Associate Superintendent, who can either accept or reject the recommendation of the hearing officer and/or the Legal Division.

- The decision by the Superintendent or Associate Superintendent is a final agency decision, which the officer can then appeal to the CIPA.

Any disciplinary measures that survive the 13 previous steps may be appealed to the final appellate body, the CIPA, where many suspension or expulsion orders are overturned and either downgraded or extinguished entirely. This body, which offers a process for officers wishing to appeal a disciplinary sanction imposed by the Police Superintendent or his Associate Superintendent, **usually overrules disciplinary sanctions**. In numerous cases, the CIPA has ordered the reinstatement of officers who have been ordered discharged from the police force due to unlawful use of force.

Illustrative of the unresolved problems that plague the PRPD disciplinary system still in place is the September 1993 case of PRPD Criminal Investigation Corps officer Miguel Díaz Martínez. Officer Díaz Martínez took the Acting Police Superintendent and another officer hostage with a shotgun at a police station after assaulting and threatening to kill his wife.[431] He had been arrested eight times in his first five years of service in the police force, and at the time of the hostage incident had nearly two dozen prior complaints of violent and/or threatening behavior filed against him. Díaz Martínez was initially suspended and ordered expelled from the police force following the hostage incident, but the CIPA reinstated him to the police force a short time later and his service revolver was returned.[432] On the day after his full return to active duty, while Díaz Martínez was on guard duty at a housing project in Bayamón, he shot and killed unarmed 18-year-old José Rivera and shot the teen's unarmed sister María Rosario Díaz in the leg.[433] Rivera had failed to stop quickly when the officer asked the teen for identification at the entrance to the housing project where he lived. Amazingly, Díaz Martínez remained on the force for several months, and received a psychiatric certification declaring him fit for active duty with no restrictions, until he assaulted, arrested and imprisoned Grancid Camilo, a court security guard who insisted the police officer was not permitted to park in a judge's parking area.[434]

The case of the officer who shot Miguel Cáceres Cruz in 2007, Javier Pagán, similarly illustrates the PRPD's utter failure to hold officers accountable for misconduct, flag high-risk officers, and take action to ensure they do not commit even more grave abuses. At the

time he shot the unarmed father of three, officer Pagán had many disciplinary complaints lodged against him, had been assessed by a police psychologist as a "ticking time bomb," and had two recommendations of expulsion from two different police superintendents on account of his past misconduct.[435] Officer Pagán had been promoted to a Tactical Operations Unit when the second recommended expulsion was pending.[436] Ultimately, the two expulsions were lowered to suspensions before he killed Cáceres.[437] When Pagán was finally expelled from the force, he had two civilian complaints against him pending, both of which had been filed eight years earlier.[438]

### c.  Failure to Adequately Record, Report and Review Use of Force, Officer-Involved Shootings and Other Critical Incidents

The PRPD fails to record, report, review, and analyze incidents including officers' use of force, officer-involved shootings, and other critical incidents such as discharge of a firearm. According to Max Pérez Bouret, former Auxiliary Superintendent of Administrative Services, there are no protocols requiring any specialized reporting of officers' use of force, officer-involved shootings, or other critical incidents. Instead, PRPD officers are only required to file ordinary incident reports following any use of force, even the use of lethal force against a civilian. He explained, "We have no way of knowing whether use of force was used, or how much force was used, because the report contains no line for reporting use of force, so officers are not obligated to report use of force."[439] He added, "We know that not everyone will report use of force, and we recognize this is a problem."[440] He said that the PRPD plans to issue a new order on the reporting of use of force, but the order has not gone into effect to date.

In his review of the PRPD as a police practices expert for the prosecution in a civil suit seeking damages for the killing of Miguel Cáceres, Lou Reiter found the "lack of any… protocol or administrative review" of officer-involved shootings "is most disturbing."[441] Reiter added, "[T]his is a vital issue for any police department and to control officers' uses of deadly force. These are essential agency protocols which have to be in place."[442] According to Reiter, "[T]he Department has elected to overlook any ability to learn from these tragic critical incidents and analyze its policies, training, tactics, equipment and supervision."[443] In his opinion, the lack of protocols and systems for monitoring officers involved in shootings is a "conscious choice to ignore this vital and necessary control" and as a result, the PRPD "have continued to place the public at serious risk."[444]

### d.  Failure to Prosecute Incidents of Excessive Use of Force

Criminal prosecutions of abusive officers are rare, and arise only in cases where the abuse has received substantial media attention and there is significant public outcry. As of December 6, 2010, of the 34 shooting deaths of civilians at the hands of PRPD officers between 2005 and 2010, only one PRPD officer was convicted for his involvement in the killing, in the Miguel Cáceres Cruz case.[445] (In that case, there was a video of the shooting

taken by a bystander; the involved officers and supervisors attempted to cover up the clearly unjustified killing, and the PRPD took no action against the three officers involved in the shooting until the video surfaced.) Of these 34 cases in which PRPD officers shot and killed civilians, charges were brought in only three cases.[446]

By means of their prosecutorial powers to hold officers accountable for violations of the law, prosecutors can and should play a critical role to remedy the problem of police killings and excessive use of force. Unfortunately, prosecutors often choose not to pursue cases against allegedly brutal officers. The lack of criminal indictments results in part because of the close relationship between district attorneys and police officers, who usually work together to prosecute alleged criminals.

There are additional significant obstacles to criminal accountability for civil rights violations and use of excessive or lethal force by police. Prosecutors often rely on investigations conducted by the NIE of the Puerto Rico Department of Justice, which assumes jurisdiction over the investigation where there are allegations of criminal conduct by the police. However, the NIE is not trained to conduct homicide investigations, and the PRPD Homicide Division currently does not conduct concurrent investigations of use of lethal force because the NIE has exclusive jurisdiction.

### e.  Anonymous Abusers:  Failure to Ensure Abusive Officers Can be Identified by Victims

We documented a systematic failure to ensure officers can be identified by civilians who wish to report complaints of excessive use of force. According to numerous protesters and legal observers, police dispatched to protests are purposefully not wearing identifying badges (*placas*), which are removable with Velcro, or are concealing identifying badges with the pocket flap of their uniform. These identification tags bearing each officer's name and badge number on the uniforms and caps used by the UOT are easily removed or hidden. The ACLU has also received reports that officers are exchanging badges with other officers to avoid identification and escape responsibility for their actions.

Moreover, in the majority of the cases the ACLU documented of protesters arrested by PRPD officers who used excessive force in the course of the arrest or prior to the arrest, the booking papers do not indicate name of arresting officer. As detailed in subsection A above, numerous victims of police abuse reported to the ACLU that they were told by officers at PRPD stations that they could not proceed with a complaint or an investigation because the victim could not identify the name and badge number of the abusive officer, or the name of the arresting officer was not included on the booking papers.

The Puerto Rico Police Department fails to provide even basic guidance to its personnel on how to discharge their duties in compliance with the Constitution.  The PRPD lacks standard protocols on the use of force and officers receive patently inadequate training, insufficient supervision, and minimal guidance on the legal boundaries of their use of force and other conduct.  There is minimal transparency and no effective independent review of the PRPD's policies and practices.



Riot Squad officers indiscriminately fire tear gas and rubber bullets at peacefully protesting students on the University of Puerto Rico campus in February 2011. Photo Credit: Andre Kang / Primera Hora (2011)

# IX.  A Lawless Police Force:  Lack of Guidance Governing the Use of Force, and Lack of Oversight, Training and Transparency

The ACLU has identified a number of additional problematic PRPD policies and practices that contribute to the pattern of police abuse, including lack of adequate guidance governing the use of force; failure to fully implement a standard trigger weight that meets U.S. national standards; lack of effective oversight, supervision, and training; and failure to collect and track data that could be used to correct these grave issues. The departure of former Superintendents Díaz Colón and Figueroa Sancha from their positions does not fix these ongoing structural issues that need to be addressed in order to bring an end to the ongoing police abuse.

PRPD officers perform an essential public safety function, and the ACLU recognizes the important work performed every day by the department's officers. However, the PRPD fails to provide even basic guidance to its personnel on how to discharge their duties in compliance with the Constitution and applicable human rights standards. Until January 31, 2012, the PRPD had no general protocol on the use of force, and the police department continues to lack standard specialized protocols governing the use of force, including guidance on the use of chemical agents, impact weapons, policing protests and large-scale demonstrations, and how to handle complaints of domestic and sexual violence.

Officers receive patently inadequate training, insufficient supervision, and minimal guidance on the legal boundaries of their use of force and other conduct. The PRPD fails to enforce even the protocols and laws in place to regulate officers' conduct. Moreover, there is minimal public oversight and transparency of the PRPD's policies and practices, including no effective independent review.

To its credit, the Puerto Rico Police Department (PRPD) has acknowledged that there is need for reform of police policies and practice, and it has initiated a process of reform that included the issuance of a new general use of force policy in January 2012 and is expected to include the issuance of additional new policies, training of cadets and officers on these new policies, and other much-needed reforms. However, most of Governor Fortuño's and the PRPD's promised reforms have not yet materialized. Moreover, while the issuance of the new use of force protocol is a positive first step, without effective accountability measures on the use of force, the issuance of the new policy does not guarantee that officers will follow it or that officers will be held accountable when constitutional and human rights violations occur.

### a.  Lack of Guidance Governing the Use of Force

Until January 31, 2012, the PRPD did not have any comprehensive use of force policy. Such a policy is standard for police departments across the United States, and is standard policing practice around the world. The PRPD continues to lack basic protocols governing the use of force that officers are authorized to use. For instance, the PRPD lacks any protocol on the use of impact weapons or "less-lethal" ammunition such as stinger rounds, sting ball grenades, rubber or plastic bullets, and bean bag bullets. It also lacks any protocol on the use of chemical agents, despite the PRPD's extensive use of tear gas and pepper spray against protesters and other civilians. The PRPD lacks any protocol on interactions with people with mental illness, despite numerous documented police killings of men with mental illness who could have been restrained through non-lethal means. It also lacks any protocol governing the treatment of protesters and the handling of public demonstrations, and in particular the use of force against demonstrators.

The PRPD also lacks a comprehensive policy for responding to and investigating reported crimes of domestic and sexual violence. The PRPD lacks any protocols that address 911 operators' receipt of domestic and sexual violence calls; initial and follow-up victim interviews, including how to safely communicate with victims; identification and documentation of victim injuries; forensic examination of victims; suspect interviews and forensic examinations; evidence preservation and crime scene management; enforcement of protective orders; follow-up investigations, including cases in which the suspect has left the scene; collaboration with victim advocates; and services and assistance to be offered to victims.

Existing PRPD policies fall short of constitutional legal standards and U.S. police practices. For example, PRPD policies do not incorporate current legal requirements governing officers' use of force, do not emphasize alternatives to physical force, and do not require the use of measures to avoid the use of force or minimize the use of force required. The existing policies fail to establish a clear protocol on the levels of force that are permitted in response to different levels of resistance from suspects. The existing policies also fail to provide any guidance on types of force other than firearms that may constitute lethal or deadly force, such as chokeholds, carotid holds, and strikes to the head with batons or other impact weapons. The existing policies do not even acknowledge that such types of force can be lethal, a serious omission.

The PRPD's firearms policy, OG 2004-3, is completely inconsistent with the relevant legal standard, which requires that an officer have probable cause to believe that a suspect poses a significant risk of death or serious physical injury to the officer or others. The policy is vague and fails to define critical terms. For example, it allows the amount of force "that is consistent with achieving the mission," without actually defining what is meant by "achieving the mission."[447] The policy also does not define the circumstances under which officers may or may not shoot at fleeing suspects, nor does it address the lawfulness of firing warning shots.

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

The PRPD's order governing the use of Tasers and other electronic control devices, OG 2008-2, is seriously deficient and also fails to meet constitutional standards.[448] The order does not provide adequate guidance to its officers on the use of CEDs: it does not specify any legal standard for the use of CEDs, and it does not specify any factors that should be considered when determining when it is appropriate to use CEDs, such as the subject's level of resistance or the severity of their suspected crime. Most problematic, the PRPD's order governing use of CEDs does not acknowledge that CEDs can be lethal, instead mischaracterizing them as "non-lethal" weapons. As detailed in section V above, Tasers and other CEDs can cause fatal injury.

To its credit, the PRPD has retained a qualified team of experts to assist them with formulating new policies, which resulted in the issuance of a new general use of force policy at the end of January 2012. However, Puerto Rico's new use of force policy falls short of constitutional and U.S. national standards and has been criticized by civil rights and human rights advocates and policing experts as vague and lacking objective criteria on the use of lethal force by PRPD officers. An early draft of the use of force policy included the constitutionally mandated objective reasonableness standard, which was removed from the final version. Instead, the use of force policy currently in effect uses a simple reasonableness standard that allows officers' subjective judgment to determine the level of force that is



Riot Squad officers in formation outside the Capitol Building during a university student protest on January 27, 2011. Photo Credit: Indymedia (2011)

lawfully permissible, and empowers officers to use deadly force based on their "perception" of danger, not on objective standards.

Moreover, the issuance of new policies does not mean that officers will follow them. Without adequate training and enforcement to hold officers accountable when violations occur, these new policies will remain meaningless. While the issuance of a general use of force policy is encouraging, the PRPD has not fully implemented the policy, and it has not yet trained all of its personnel in the new policy.

In addition, the PRPD's general and special orders regulating police practices are not easily comprehensible or accessible to officers, who are not provided with copies of the policies. The orders, which date back to 1969, are numbered consecutively by year and are not organized by topic or indexed in any way. The DOJ found that the PRPD does not provide officers with copies of the orders, and some supervisors were even unable to show the DOJ a complete set of these orders.[449] A former Auxiliary Superintendent told the ACLU that orders are a "mess," "dispersed and not collected in a single binder."[450] He said, "Now it is a hassle for agents to even find out what orders are in place," and he told the ACLU that the PRPD intends to create a new catalogue of orders that is organized and easier for agents to locate policies.[451] At this time, the PRPD's website contains links to policies issued through 2011, but merely lists them in the order that they were issued, starting back in 1969. The new use of force policy is not even on the PRPD's website for the public to access.

### b. Failure to Fully Implement a Standard Trigger Weight

Until February 2011, the PRPD lacked any standard trigger weight, instead leaving all service weapons at their factory settings of 5.5 and 6.5 pounds, which are substantially lighter than the standard trigger weights of U.S. metropolitan police departments such as the New York City Police Department (NYPD), which requires a trigger weight of 12 pounds on all service weapons. It was the September 2010 fatal shooting of 22-year-old José Alberto Vega Jorge by a PRPD officer that prompted the PRPD to evaluate the trigger weight of its weapons.[452] In that case, PRPD officer Abimalet Natal Rosado shot the unarmed 22-year-old bystander in the back of his head. As the witness to a robbery at a Burger King in Altamira, Vega Jorge had remained at the scene to provide police with a statement and was not a suspect. After the gun of one of five officers at the scene accidentally discharged, officer Natal Rosado began shooting and fired 10 bullets, one of which fatally struck the young man in the back of his head.[453]

On February 22, 2011, the Superintendent of the PRPD issued an order setting the standard trigger weight of all PRPD service weapons at 8.5 pounds. PRPD Glock service weapons (the .40-caliber Glock model) were previously set at their factory-set trigger weight of 5.5 pounds, while PRPD Smith & Wesson service weapons (the Smith & Wesson M&P40 model) were previously set at 6.5 pounds. The Superintendent ordered that trigger weight springs on service weapons would be changed slowly and gradually "so as not to affect the rendering

of services by members of the Police."[454] As of June 2011, the PRPD still had over 9,000 service weapons in use that had not been altered to the higher standard trigger weight.[455]

Sensitive triggers lead to unintentional shootings during police interactions with civilians, accidental firings, and overfiring in which officers shoot more rounds than they would with revolvers or pistols with heavier trigger weights. In fact, in 1988, the FBI predicted that the Glock's standard-issue sensitive trigger would "inevitably...lead to an unintentional shot at the worst moment."[456] It is essential that the PRPD modify all of its service firearms to the 8.5-pound trigger weight at a minimum, and ideally increase its standard trigger weight to bring it in line with police department practice in cities such as New York and Los Angeles. For example, all standard-issue pistols that are authorized for on-duty use by NYPD officers are required to have a 12-pound trigger pull; the triggers of the NYPD's Glock, Sig Sauer, and Smith & Wesson pistols are modified to this weight.[457] In the mid-1990s the NYPD increased the mandatory trigger weight for service weapons from 8 pounds (known as the NY-1 trigger) to 12 pounds (known as the NY-2 trigger) in order to minimize unintentional shootings.[458]

### c.  Lack of Independent Oversight

There is no effective independent, external oversight of the PRPD. The Governor of Puerto Rico has ultimate authority over the PRPD; he appoints a Superintendent to administer the PRPD, subject to confirmation by the Puerto Rico Senate. The Governor approves appointments to senior positions in the PRPD, from inspectors to colonels. Unlike 49 of the 50 U.S. states, Puerto Rico does not have a state-wide authority that sets minimum standards and training requirements.[459] The Superintendent has wide discretion to promulgate and change policies without any external review. For instance, the Superintendent has full discretion to reduce or modify the pre-service training program, set new standards for the use of force or specific weapons without any public comment or external legal review, or reject proposed disciplinary action against PRPD personnel.

The PRPD lacks any civilian review board, independent auditor to review the PRPD's operations and make public its findings, or other independent auditing mechanism. There are no oversight bodies that currently conduct any oversight role over the PRPD in practice. Only two bodies are authorized to investigate civilian complaints of police misconduct, but they do not do so in practice. These bodies are the Puerto Rico Civil Rights Commission, which in practice does not provide any external oversight over the PRPD, and the CIPA, which in practice only reviews the validity of disciplinary actions imposed against PRPD officers.

A third body was created by executive order to operate for a temporary period, but in practice failed to provide any meaningful oversight over the PRPD. The Governor of Puerto Rico created the Office of the Independent Monitor of the Police of Puerto Rico by Executive Order on October 19, 2010. In June 2011, nine months after the creation of the office, the Independent Police Monitor resigned, concluding that the objectives of his office had been met. The Monitor announced that the PRPD had announced a comprehensive plan

of reform to ensure civil rights are guaranteed in Puerto Rico, and optimistically reported that the PRPD was already implementing all of his recommendations. On June 30, 2011, the Independent Police Monitor, Efrain Rivera Pérez, concluded his mandate by issuing a superficial 21-page report that whitewashed the serious issues plaguing the PRPD and included no statistical data or information about specific cases.

The Independent Police Monitor lacked any authority to enforce recommendations for policy reforms or even existing policies. The Independent Monitor had a narrow and limited mandate that did not include the authority to accept complaints, forward complaints to the PRPD for further investigation, or the tracking of any statistics on excessive use of force or lethal use of force by the PRPD, investigations initiated or concluded, or any disciplinary actions taken. Indeed, in response to ACLU questions about the number of civilian complaints filed alleging excessive use of force, the Independent Police Monitor dismissively answered that while he did not know the precise statistics, he estimated that at most only 1 to 2 percent of the police have had complaints filed against them.[460] The Monitor's staff subsequently contacted the ACLU to clarify that in fact, the number is probably closer to 0.2 percent of the police force,[461] an absurdly low figure belied by the statistics reported by the PRPD to the DOJ and by the External Evaluating Committee that evaluated the PRPD in 2007.

### d.  Lack of Training and Supervision

We documented significant gaps in the training and supervision of officers. The PRPD provides inadequate pre-service training to cadets at the University College of Criminal Justice of Puerto Rico (Puerto Rico's police academy). For example, the PRDP provides no specialized training on the use of chemical agents such as tear gas and pepper spray.[462] In addition, the PRPD provides virtually no in-service follow-up training for field officers and supervisors after their pre-service training. A former Auxiliary Superintendent admitted, "We have a lack of training—once in service, some agents didn't go back the police academy after their initial training."[463]

There are serious gaps in the supervision of PRPD officers, and this lack of supervision contributes to the rampant constitutional and human rights violations documented in this report. According to the DOJ, there is a crisis in supervision in the PRPD. The supervisor-to-officer ration in the San Juan area is 1:30; it is generally accepted practice that the ratio for patrol units should not be more than 1:10, and 1:5 is recommended.[464] We also found that high-level supervisors fail to establish protocols to provide for adequate supervision of officers who have offended.

### e. Lack of Transparency:  Failure to Maintain and Make Public Statistics on Police Brutality

The PRPD fails to make public any data on the number of complaints of excessive or lethal use of force filed, investigations initiated or concluded, or disciplinary actions taken.[465] The PRPD also fails to collect and maintain comprehensive data on policing practices such as the number of domestic violence-related complaints filed or orders of protection issued. Puerto Rico lacks a public records law such as a freedom of information law that grants Puerto Ricans the right to obtain government records. As a result, data on police brutality, complaints filed against individual officers, and other information is rarely made public, and often can be obtained only by means of the discovery process attendant to litigation.

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

After a comprehensive six-month investigation of policing practices in Puerto Rico, building on eight years of work by the ACLU of Puerto Rico documenting cases of police brutality, the ACLU has concluded that the Puerto Rico Police Department commits serious and rampant abuses in violation of the United States Constitution, the Puerto Rico Constitution, and the United States' human rights commitments.



Riot Squad officers violently attacked protesters and independent and student journalists with pepper spray and batons on the steps of Capitol Building on June 30, 2010. Photo Credit: Andre Kang / Primera Hora (2010)

# X.  Relevant Constitutional and Human Rights Law

## a.  Constitutional Standards on the Use of Force

Excessive force is force that exceeds what is objectively reasonable and necessary to subdue a person, in the circumstances confronting the officer. The use of excessive force by police officers in the course of an arrest, investigatory stop, or other seizure violates the Fourth Amendment of the United States Constitution.[466] Force can be excessive in violation of the Fourth Amendment even when it causes only minor injury.[467]

The U.S. Supreme Court has established guidance on the use of force by police. In *Tennessee v. Garner* (1985), the U.S. Supreme Court held that police can use deadly force when pursuing a fleeing suspect only if the suspect poses a significant threat of death or serious physical injury to others.[468] The Court defined deadly force as "any use of force which creates a substantial likelihood of causing death or serious bodily injury."[469] In *Garner*, the Court also held that police may not seize an unarmed, non-dangerous suspect by shooting them, and in circumstances where deadly force against a fleeing suspect is justified, police should provide a warning before using deadly force.[470]

In *Graham v. Connor* (1989), the U.S. Supreme Court ruled that any use of force must be objectively reasonable; the "calculus of reasonableness" should take into account factors such as the severity of the crime, whether the suspect poses an immediate safety threat, and whether the suspect is actively resisting arrest or attempting to evade arrest.[471] The analysis of use of force requires a balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the governmental interest.[472] Determining the objective reasonableness of police officers' use of force is based on the totality of the circumstances.[473] In *Graham*, the Court also held that the Fourth Amendment's requirement of reasonableness on the part of the police applies to "all claims that law enforcement officials have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other seizure of a free person."[474]

Courts generally evaluate the constitutionality of the use of force by applying the objective reasonableness test established in *Graham*. For example, in *Scott v. Harris* (2004), the U.S. Supreme Court evaluated a claim of excessive force in violation of the Fourth Amendment (a police offer's ramming of a police cruiser into the vehicle of a fleeing suspect, rendering him quadriplegic) by using *Graham*'s objective reasonableness test.[475] In *Scott*, to determine the reasonableness of the force used by police, the U.S. Supreme Court evaluated the imminence of the actual threat the suspect posed to the lives of others.  The Court found that for the force to be justified, the suspect had to pose an actual, substantial, and imminent threat to the lives of others.

The shooting of a suspect with a firearm constitutes deadly force and requires the highest level of justification to be found reasonable. Courts find that deadly force is unreasonable

"unless it is necessary to prevent escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."[476] In addition, courts have found that while the initial shots fired at a suspect may be determined to be justified, subsequent shooting at a suspect may not be justifiable.[477]

The Constitution of the Commonwealth of Puerto Rico protects the right to life, liberty, and human dignity as fundamental rights.  Section seven of the Bill of Rights (Article II) provides that "The right to life, liberty and the enjoyment of property is recognized as a fundamental right of man," and section one declares that "The dignity of the human being is inviolable." Moreover, section 10 protects "the right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures."

### b.  Human Rights Standards on the Use of Force

International legal standards regulating the use of force by law enforcement officers are based on the "inherent dignity of the human person,"[478] "inherent right to life"[479] and "right to liberty and security of person,"[480] as elucidated in the International Covenant on Civil and Political Rights (ICCPR), which the United States ratified in 1992. These principles are also found in the Universal Declaration of Human Rights (UDHR), which deems that "All human beings are born free and equal in dignity and rights" and "Everyone has the right to life, liberty and security of person."[481] The American Declaration of the Rights and Duties of Man likewise holds that "Every human being has the right to life, liberty and security of his person."[482] The right to life is non-derogable, and applies to all persons under the authority or control of a country; the ICCPR specifically dictates that "no person under the authority or control of a State, regardless of his or her circumstances, is devoid of legal protection for fundamental non-derogable human rights."[483]

The ICCPR and Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), also ratified by the United States, strictly prohibit the use of torture,[484] cruel, inhuman or degrading treatment under all circumstances.[485] The U.N. Body of Principles for the Protection of All Persons under Any Form of Detention (Detention Principles) explicitly state that "no circumstance whatever may be invoked as a justification" for such acts.[486]

Moreover, international treaties ratified by the United States ensure that all persons are afforded equal protection under the law as well as protection from discrimination.[487] According to the ICCPR, "In this respect, the law shall prohibit any discrimination and guarantee to all persons equal and effective protection against discrimination on any ground such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status."[488] The International Convention on the Elimination of All Forms of Racial Discrimination (CERD) likewise prohibits any such "distinction, exclusion, restriction or preference," and mandates that governments undertake to prohibit and eliminate such discrimination as well as ensure all persons have access to effective

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

protection and remedies.[489] These protections are also enshrined in the Detention Principles and the American Declaration on the Rights and Duties of Man.[490]

In light of the importance international law places on the liberty and security of the person, international standards dictate that law enforcement officers may use force only under limited circumstances. Internationally agreed-upon standards regulate the use of force and firearms by police officers. These international standards include the U.N. Basic Principles on the Use of Force and Firearms by Law Enforcement Officials and the U.N. Code of Conduct for Law Enforcement Officials.

International standards are clear on the threshold required to legitimate the use of force. The U.N. Code of Conduct for Law Enforcement Officials provides that "law enforcement officials should use force only when strictly necessary and to the extent required for the performance of their duty."[491] The use of force and firearms is only allowed "if other means remain ineffective or without any promise of achieving the intended result."[492] In such situations, "law enforcement officials shall exercise restraint in such use and act in proportion to the seriousness of the offence and the legitimate objective to be achieved."[493]

The U.N. Basic Principles on the Use of Force and Firearms by Law Enforcement Officials sets minimum standards for the use of force, as well as recruitment and training. It calls for proportionality in the force used by officers when it is required and the adoption of reporting requirements when force or firearms are used. It stipulates that, "Whenever the use of force and firearms is unavoidable, law enforcement officials shall exercise restraint in such use and act in proportion to the seriousness of the offence and the legitimate objective to be achieved."[494] So as to minimize to the greatest extent possible "the application of means capable of causing death or injury to persons," the U.N. Basic Principles on the Use of Force also provide that law enforcement officers must "as far as possible, apply non-violent means before resorting to the use of force and firearms" and "may use force and firearms only if other means remain ineffective or without any promise of achieving the intended result."[495] Moreover, law enforcement officers must be armed with non-lethal as well as lethal weapons.[496]

Restrictions on the use of force remain in effect when persons are in custody.  Under the ICCPR and Detention Principles, persons in any form of detention "shall be treated with humanity and with respect for the inherent dignity of the human person."[497] Moreover, "There shall be no restriction upon or derogation from any of the human rights of persons under any form of detention or imprisonment recognized or existing in any State pursuant to law, conventions, regulations or custom."[498] Specifically, according to the U.N. Basic Principles on the Use of Force and Firearms by Law Enforcement Officials, when persons are in custody or detention, law enforcement officials "shall not use force, except when strictly necessary for the maintenance of security and order within the institution, or when personal safety is threatened" and "shall not use firearms, except in self-defense or in the defense of others against the immediate threat of death or serious injury, or when strictly necessary to prevent the escape of a person in custody or detention" who presents a serious danger.[499]

Victims are entitled to redress for use of excessive or lethal force by law enforcement. Under the CAT, governments must promptly and impartially investigate situations where torture, cruel, inhuman or degrading treatment may have occurred, and ensure victims have access to redress through its legal system.[500] Likewise, injuries or deaths resulting from the use of force and firearms by law enforcement officials must be promptly reported, and the U.N. Basic Principles on the Use of Force and Firearms by Law Enforcement Officials stipulates that governments must ensure that "arbitrary or abusive use of force and firearms by law enforcement officials is punished as a criminal offence under their law."[501]

International bodies tasked with monitoring compliance with human rights treaties have continually faulted the U.S. for its failure to comply with international standards regarding the use of force by law enforcement officers. In its 1995 report, the Human Rights Committee urged the United States to "take all necessary measures to prevent any excessive use of force by the police," and to ensure "that rules and regulations governing the use of weapons by the police and security forces be in full conformity with the United Nations Basic Principles on the Use of Force and Firearms by Law Enforcement Officials; that any violations of these rules be systematically investigated in order to bring those found to have committed such acts before the courts; and that those found guilty be punished and the victims be compensated." [502] The Committee reiterated these recommendations in its 2006 report.[503] Similar criticisms and recommendations were lodged by the Special Rapporteur on extrajudicial, summary or arbitrary executions[504] and the CAT Committee.[505] The CERD Committee expressed particular concern with the use of excessive and lethal force against minority groups and foreigners in both its 2001 and 2008 reports, and recommended the U.S. provide appropriate training for law enforcement to combat prejudices.[506] The volume of reports from different international bodies throughout a period of more than a decade highlights the continued failure of the U.S. to live up to international standards regarding the use of force.

### c. Constitutional Standards on Freedom of Speech, Expression, and Assembly

The First Amendment of the Constitution of the United States creates a fundamental right to protest. The First Amendment protects freedom of speech and expression, the right of peaceful assembly, and the right to petition government for a redress of grievances, all of which are manifestly part of a right to protest. The right to protest in public places includes large gatherings (such as parades in the streets and rallies in parks), small gatherings (such as pickets on sidewalks and vigils on government plazas), and solitary expression (such as one person holding a sign or distributing leaflets). The "freedom of the press" clause of the First Amendment protects the right of all people, professional journalists and others alike, to gather and publish information about protests. The U.S. Constitution also protects actions that symbolically express a viewpoint. Examples of these symbolic forms of speech include music, theater, film, dance, wearing masks and costumes, or holding a candlelight vigil.

Further, implicit in the First Amendment is a well-protected right to expressive association; that is, a right to join together with likeminded persons to collectively express a shared

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

message, by means of protest or otherwise.[507] According to the U.S. Supreme Court, "the practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process."[508]

The First Amendment is based in part upon the recognized importance of protecting protest concerning the performance of government officials and other matters of public concern,[509] and of protecting protest in public forums.[510] Generally, all types of speech and expression are constitutionally protected in "traditional public forums" such as streets, sidewalks and parks.[511] The steps of city hall and public plazas also constitute traditional public forums.[512] In addition, speech activity is permitted to take place at other locations that the government has opened up to be used for speech activities. Once the government treats a venue as available to some non-commercial speech, it must be made available to all.

Governments cannot limit protest because of the protest's viewpoint.  Rather, governments must be neutral among messages and messengers.[513] Protests can be controversial, unpopular, offensive, or even hateful.  Protesters can speak in support of illegal activity, violence, or even the overthrow of our government. The government cannot discriminate based on viewpoint even in a non-public forum.[514]

Governments can regulate the time, place, and manner of protest; for example, various government regulations of protest address disrupting vehicle and pedestrian traffic, blocking building entrances, harassment, and sound amplification and other loud noise. However, the governments may regulate the time, place, and manner of protest only if the regulations are reasonably related to an important government interest, narrowly tailored such that they do not prevent substantially more expression than is necessary to achieve the government's goals, and do not discriminate on the basis of the viewpoints protesters wish to express.[515] An ordinance regulating protest is invalid if it is unreasonably or unnecessarily burdensome, if it prevents protesters from communicating their message, if it has vague or no standards, or if it is selectively enforced.[516] The restrictions must also leave open ample alternative channels of communication and allow protesters a reasonable opportunity to effectively communicate their message to their intended audience.[517] Moreover, a protest should be allowed to take place within "sight and sound" of its intended audience.[518] If protesters are observing reasonable time, place, and manner restrictions, police may not break up a protest or demonstration unless there is a "clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety."[519]

The First Amendment also prohibits government officials from subjecting an individual to retaliatory actions for constitutionally protected speech. In *Hartman v. Moore*, the U.S. Supreme Court  held that official reprisal for protected speech offends the U.S. Constitution because it threatens to inhibit exercise of the protected right to free speech.[520] In addition, police officers may not use their powers in a way that has a "chilling effect" on people who wish to express their views.[521] In analyzing whether government actions violate the First Amendment, the United States Court of Appeals for the First Circuit considers whether the actions chill or intimidate speech, and whether the actions are motivated by an "intent or

desire to curb...expression."[522] Moreover, the First Circuit has held that the threat of arrest of protesters may constitute a chilling act in violation of the First Amendment.[523]

Only a few narrow categories of speech and expression are outside the scope of the protections of the First Amendment. The First Amendment does not protect "incitement," meaning speech intended and likely to cause imminent violence or law-breaking.[524] For example, the First Amendment does not protect a speaker who urges an angry crowd to immediately attack someone or destroy their property. In addition, the First Amendment does not protect "true threats" directed against a particular person who would reasonably perceive in the message a danger of violence.[525] The U.S. Supreme Court held in *Whitney v. California*, "Fear of serious injury cannot alone justify suppression of free speech and assembly.... To justify suppression of free speech there must be reasonable ground to fear that serious evil will result if free speech is practiced...that the danger apprehended is imminent...the evil to be prevented is a serious one."[526]

"Fighting words" are also unprotected. These are words directed at a particular person, face-to-face, which might provoke an ordinary reasonable person to violence.[527] This narrow category of unprotected speech and expression does not include political messages directed at a general audience, even if especially inflammatory, such as flag burning, or displaying a swastika at a neo-Nazi rally in a Jewish community, or wearing a jacket bearing the words "fuck the draft" in a courthouse, all of which courts have deemed to be constitutionally protected speech and expression.[528] Abusive words are less likely to be unprotected "fighting words" if they are directed at police officers, who are expected to exercise greater self-restraint, due to their office and training.[529] All three exceptions to the First Amendment— incitement, true threats, and fighting words—are very narrow and rarely upheld by courts when invoked as a basis for suppressing speech.

Civil disobedience is the active refusal to comply with certain laws as a form of protest. The First Amendment generally does not protect such acts when they involve illegal conduct. Police officers may arrest those engaged in civil disobedience, but may not arrest protesters who are in compliance with the law, bystanders, observers, or others in the vicinity. The best police practice is to give those engaged in civil disobedience the realistic opportunity to comply with the law, and to distinguish between those who are in violation of the law and bystanders and protesters engaged in protected First Amendment activity who are not disobeying the law. Moreover, civil disobedience never justifies the excessive use of force by police.

The Constitution of the Commonwealth of Puerto Rico also guarantees freedom of speech and assembly.  Section four of the Bill of Rights (Article II) provides that "No law shall be made abridging the freedom of speech or of the press, or the right of the people peaceably to assemble and to petition the government for a redress of grievances."

### d.  Human Rights Standards on Freedom of Speech, Expression, and Assembly

The human rights to free speech, expression, and peaceful assembly are universally recognized and enshrined in numerous treaties including the ICCPR,[530] which the United States has ratified, and the UDHR.[531] As expressed in the ICCPR and the CERD, these freedoms apply to *all persons* regardless of race, color, descent, national or ethnic origin or other such characteristics.[532] Freedom of speech and assembly are fundamental: indeed, the Human Rights Committee characterized them as "the foundation for every free and democratic society," providing "a basis for the full enjoyment of a wide range of other human rights."[533]

Considering the fundamental nature of these rights, they may only be curtailed in a strictly limited set of circumstances. Under the ICCPR, any restrictions on the right to freedom of speech and assembly must be in accordance with the law and strictly necessary to preserve national security or public safety, public order, public health or morals or protect the rights and freedoms of others.[534] Any such restrictions must be proportionate to a legitimate purpose and non-discriminatory, including on basis of political opinion.

In its General Comment 34 elucidating the right to freedom of speech and expression, the Human Rights Committee, the U.N. body empowered to interpret the ICCPR, specified that laws limiting free expression and assembly must be "formulated with sufficient precision to enable an individual to regulate his or her conduct accordingly"[535] and "accessible to the public."[536] Further, "A law may not confer unfettered discretion for the restriction of freedom of expression on those charged with its execution."[537] In addition, laws restricting these fundamental freedoms must comport with universal human rights norms. They must be "compatible with the provisions, aims and objectives of the [ICCPR]"[538] and may not "violate the non-discrimination provisions of the Covenant."[539] Any limitations based on morals must be "understood in the light of universality of human rights and the principle of non-discrimination."[540] Even where an aforementioned interest is at stake, limitations "may never be invoked as a justification for the muzzling of any advocacy of multi-party democracy, democratic tenets and human rights,"[541] as restrictions on free expression "may not put in jeopardy the right itself."[542]

In its General Comment 34, the Human Rights Committee also held that restrictions on the freedom of expression and assembly must be "proportional to the interest to be protected."[543] The principle of proportionality "has to be respected not only in the law that frames the restrictions but also by the administrative and judicial authorities in applying the law."[544] Restrictions must further be narrowly tailored and serve as "the least intrusive instrument amongst those which might achieve their protective function."[545] Indeed, a state party must "demonstrate in a specific and individualized fashion the precise nature of the threat, and the necessity and proportionality of the specific action taken, in particular by establishing a direct and immediate connection between the expression and the threat" when invoking a ground for restricting free expression.[546]

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

In those instances where restrictions on the right to assemble are justifiable under international law, the policing of demonstrations must be carried out in accordance with international standards. These standards prohibit the use of force by law enforcement officials unless strictly necessary and to the extent required for the performance of their duty, and permit the use of firearms only when strictly unavoidable in order to protect life.[547] The U.N. Basic Principles on the Use of Force and Firearms by Law Enforcement Officials expressly recognize that "everyone is allowed to participate in lawful and peaceful assemblies."[548] Accordingly, force is only permitted in the dispersal of *unlawful* and *violent* assemblies "when less dangerous means are not practicable and only to the minimum extent necessary."[549] During unlawful but non-violent assemblies, "law enforcement officials shall avoid the use of force or, where that is not practicable, shall restrict such force to the minimum extent necessary."[550]

As international treaty bodies have emphasized, the freedoms to speak one's mind and assemble peacefully are fundamental components of a democratic society. Any restrictions on these rights, and the implementation thereof, must comport with international law.

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

Based on our research, including our findings identifying a number of problematic policies and practices that contribute to the pattern of police abuse in Puerto Rico, we have formulated clear recommendations for much-needed reforms. These reforms will not only help to bring the Puerto Rico Police Department into compliance with the constitutions of the United States and Puerto Rico and human rights laws, but will also help it to combat the public safety crisis it currently confronts.



A protesting University of Puerto Rico student demanding the removal of police from the university campus. The tape on his mouth reads, "UPR Without Police." Photo Credit: Andre Kang / Primera Hora (2011)

# XI.  Recommendations

Based on the ACLU's research findings, including our findings identifying a number of problematic policies and practices that contribute to the pattern of police abuse, the ACLU has formulated clear recommendations for much-needed reforms. These reforms are essential to bring the PRPD into compliance with the constitutions of the United States and Puerto Rico and human rights laws. Moreover, these recommended reforms will assist the PRPD to combat the public safety crisis it currently confronts. Policing practices that respect and protect Puerto Ricans' constitutional and human rights are critical to achieve public confidence in the police department, an essential element to improving public safety.

**To the Puerto Rico Police Department:**

- Use of force policies:

  □ Develop, revise, and implement clear and comprehensive policies on the use of lethal and less-lethal force and encounters with civilians that meet national, constitutional, and human rights standards. In the case of force implements, ensure these policies also are in accordance with manufacturer specifications. These use of force policies should include detailed policies on the discharge, unholstering, and brandishing of firearms; the use of chemical agents such as pepper spray and tear gas; carotid holds and chokeholds; pressure point techniques; "less-lethal" ammunition such as stinger rounds, sting ball grenades, rubber or plastic bullets, and bean bag bullets; canines; batons; Tasers and other conducted electronic devices; and physical restraints.

  □ Revise the current use of force policy to authorize only *objectively* reasonable force (instead of the current language authorizing merely reasonable force), and ensure the revised policy clarifies precisely what objective reasonable force means. Revise the current use of force policy to clarify that officers may use deadly force only when there is an objectively reasonable and apparent imminent danger of death or grave bodily harm, instead of the current language allowing officers to act on their perception and belief of impending danger.

  □ Develop, revise, and implement policies that require the use of measures to avoid the use of force or minimize the use of force required. These measures should include dialogue, de-escalation of low-level encounters, disengagement, waiting out a subject, area containment, dialogue, warnings, verbal persuasion, advising suspects to halt and/or submit to arrest, dispersal orders, and calling for reinforcement, mental health experts, or other specialized personnel.

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

☐ Develop and implement policies on interactions with persons with mental illness, how to avoid the use of force in interactions with persons with mental illness, and other special considerations when using force against persons with mental illness.

☐ Use of force policies should make clear that even when force is initially justified, the continued use of force may become excessive and unreasonable in the course of an arrest, investigatory stop, or other seizure if the initial level of force is no longer necessary.

☐ Use of force policies also should make clear the level of force permitted when pursuing a fleeing suspect, and should provide detailed guidance on how to handle post-chase apprehensions. Policies should prohibit officers from firing at or from a moving vehicle unless the use of lethal force is justified.

☐ Use of force policies also should require officers to immediately secure any necessary medical care for civilians injured by officers' use of force.

☐ Develop and implement policies requiring off-duty officers to notify on-duty officers or supervisors before using force or taking any other police action, so that on-duty personnel may be dispatched to the scene to handle the incident, unless exigent circumstances require immediate action by the off-duty officer. Ensure policies make clear that when exigent circumstances require immediate action, off-duty officers may only use the level of force that is legally authorized and should use the minimum amount of force necessary, if any at all. Prohibit off-duty officers from using force or taking any other police action when their judgment is impaired such as by alcohol.

☐ Fully enforce the use of force policies throughout the PRPD.

■ Protest and demonstration policies, and other guidance for officers:

☐ Develop and implement an official policy governing the treatment of protesters and the handling of public demonstrations, and in particular the use of force against demonstrators, that meets national, constitutional, and human rights standards and which (i) allows demonstrations to take place safely; (ii) permits only reasonable time, place, and manner restrictions on demonstrations; (iii) prohibits the use of Tactical Operations Units, including the Riot Squad, to coerce people into not exercising their First Amendment rights; (iv) requires the PRPD to give clear warnings and directions to demonstrators if the police believe that the clearly-delineated time, place, and manner restrictions are being violated, and requires the PRPD to issue such warnings and provide a reasonable opportunity to comply before permitting officers to arrest any people; (v) permits arrests of demonstrators only where probable cause exists to believe that a crime is being or has been committed; and (vi) requires PRPD officers to use no more force than that which is necessary under the circumstances in the event that probable cause does exist that a crime is being or has been committed.

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

- ☐ Develop and implement clear and comprehensive policies on encounters with and the treatment of persons with medical conditions, persons with mental illness, and juveniles that meet national, constitutional, and human rights standards.

- ☐ Create a system to enable all current policies to be easily located and comprehended by the police and public. This should include a policy manual that is organized by subject matter and importance, and it should be indexed for ease of use. Ensure that all members of the PRPD receive a copy of the policy manual.

- ■ Policies for investigating domestic and sexual violence:

  - ☐ Adopt and implement clear, evidence-based policies for investigating domestic and sexual violence, including policies on violence perpetrated by officers. They should include protocols that address the following: 911 operators' receipt of domestic and sexual violence calls; initial and follow-up victim interviews, including how to safely communicate with victims; identification and documentation of victim injuries; forensic examination of victims; suspect interviews and forensic examinations; evidence preservation and crime scene management; enforcement of protective orders; follow-up investigations, including cases in which the suspect has left the scene; collaboration with victim advocates; and services and assistance to be offered to victims.

  - ☐ Ensure that police protocols accommodate barriers to responding to domestic and sexual violence in rural areas.

- ■ Civilian complaint procedure:

  - ☐ Eliminate barriers to the filing of civilian complaints by reforming the intake of civilian complaints. This should include protocols on the intake of civilian complaints to ensure that all civilians wishing to report instances of abusive conduct by officers are able to do so, and disciplinary procedures to punish officers when they fail to follow intake protocols such as attempting to dissuade or intimidate a complainant. Provide civilians wishing to report instances of police misconduct with clear instructions, forms that are easy to procure and complete, detailed information about the complaint and investigations process, and a telephone contact to follow up on the status of the investigation.

  - ☐ Accept anonymous and third-party complaints for the purpose of triggering further investigation.

  - ☐ Provide complainants with written and regular updates of the status of their complaints and the progress of the resulting investigation. This should include information about any hearings or disciplinary action taken, any final determination regarding the complaint and related investigation, and detailed explanations of the basis for the outcome.

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

- ☐ Create a process for civilians to appeal the decision to close an investigation of an officer's use of force, and create a procedure for civilians to obtain access to the investigation file in their case.

- ☐ Conduct outreach efforts with communities to provide information about filing complaints and to encourage civilians to file and pursue complaints when they have suffered police abuse or misconduct.

- ■ Investigations of alleged misconduct and abuse:

  - ☐ Develop and fully implement comprehensive procedures for investigating allegations of police abuse and other civilian complaints promptly, thoroughly, and impartially. This should include procedures requiring that investigators identify, interview, and record statements from all involved officers and eyewitnesses; account for all shots fired and all shell casings; preserve, and conduct forensic testing on all relevant evidence from the crime scene, involved officers, and the victim, including gunshot residue and bullet trajectory tests.

  - ☐ Ensure that officers who are witness to, or responsible for, the shooting of a civilian or use of deadly force against a civilian are required to provide statements immediately to investigators, in compliance with appropriate due process guarantees.

  - ☐ Initiate investigations even when complainants have not come forward, in instances where information has come to light—whether through media reports, civil lawsuits filed concerning police abuse, anonymous complaints, or other means—to suggest that abuse or other misconduct has been committed by an officer, both on- and off-duty.

  - ☐ Internal investigations should involve concurrent administrative and criminal processes, where possible, with due consideration of the rights of the accused officer.

  - ☐ In the case of use of lethal force or in-custody death, a concurrent investigation should be conducted by investigators from the PRPD Homicide Unit, PRPD Superintendency for Professional Responsibility, and PRDOJ.

  - ☐ When a civilian complaint filed with the PRPD or any independent oversight or fact-finding body alleges possibly criminal behavior, it should be forwarded to prosecutors for review.

- ■ Use of force and critical incident reporting and review:

  - ☐ Create and fully implement a use of force reporting system adequate to document *all* uses of force by the PRPD. The reporting system should include detailed protocols for reporting officer-involved shootings and firearm discharges both on- and off-duty, and the preparing and filing of critical incident reports in writing. The use of force reports should require officers to document all uses of

force and provide a detailed description of the events leading to the use of force and the circumstances of the use of force. The use of force reports also should require officers to document any injuries that were inflicted and whether medical care was provided.

☐   Develop and fully implement a policy for reviewing all use of force and critical incident reports in a timely manner. Require uninvolved supervisors or a command-level review team to review each use of force to determine whether the use of force was in compliance with constitutional and other applicable law, PRPD policies, and manufacturer specifications (in the case of the use of force implements). The reviewing supervisor or review team should interview witnesses to the use of force and the victim of the use of force, and should obtain and evaluate any relevant evidence including ballistics, medical evidence, photographic or video evidence, and other evidence of injuries caused by the use of force.

☐   The reviewing supervisor or review team should prepare a report that includes a description of the incident and all relevant evidence, findings, and determinations of (i) whether all uses of force were in compliance with applicable law and PRPD policy, (ii) whether the officers employed proper tactics, (iii) whether lesser force alternatives were reasonably available, (iv) whether the use of different tactics could or should have been employed, and (v) whether force could have been avoided entirely. Where the use of force is not in accordance with applicable law and PRPD policies, the reviewing supervisor or review team should recommend disciplinary action. The report and recommended disciplinary action should be sent up the chain of command, to the Superintendent, for review and action.

☐   Require that the identity of the arresting officer, shooting officer, all of the officers who were involved in the incident or who witnessed the incident, and any other witnesses are documented in the use of force report, arresting report, and other relevant documents, without exception.

■   Disciplinary procedures and sanctions:

☐   Create, implement, and enforce fair and expeditious disciplinary procedures to impose effective disciplinary sanctions on officers when they fail to follow protocols, including disarming officers, removing police officers from field duty, temporarily suspending officers, and permanently suspending them when called for. These disciplinary procedures should also ensure that disarmed officers are not rearmed before an investigatory or disciplinary body reviewing the predicate use of force incident has determined that rearming is appropriate.

☐   Disciplinary procedures should also clearly lay out when and how officers should be relieved of duty and of their weapons, as prescribed by agency policy and federal and state law. These procedures should be implemented and systematically enforced.

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

▢ Disciplinary procedures should clearly lay out protocols for officers who return from suspensions for disciplinary reasons. These procedures should be implemented and systematically enforced.

▢ Reform the internal disciplinary system to allow superintendents to dismiss officers who have committed serious abuses and have been deemed unsuitable for police work. Ensure that expulsions of abusive officers are upheld, with due consideration of the rights of the accused officer, and are not routinely overturned.

▢ Reform the internal disciplinary system to periodically review officers' disciplinary record to flag repetitive conduct by officers who repeatedly use excessive force or commit other abuses both on- and off-duty, and assess risk of future unlawful conduct. This early warning system should include flagging officers who are repeatedly the subject of complaints and/or civil lawsuits and taking appropriate remedial or disciplinary measures (such as requiring further training, disarming, suspending, or expelling them).

▢ Conduct a comprehensive review of the disciplinary record of all PRPD officers to determine which officers should be removed from the force due to misconduct. The review should be based on objective criteria, including recurrence of misconduct and severity of past abuse.

▢ Ensure supervisors are reporting and not tolerating persistent abusive behavior on the part of subordinate officers. Appropriately discipline superior officers who fail to act to curtail abuses on the part of any of the officers he or she supervises.

▢ Ensure supervisors conduct regular performance evaluations of subordinate officers under their command. Ensure these performance evaluations are meaningful and thorough rather than *pro forma*, and result in a written evaluation entered into the officers' disciplinary file.

▢ Ensure that officers are held fully accountable when they are alleged to have perpetrated domestic or sexual violence. Systems of recruiting, training, supervision, review of use of force, internal investigations, and disciplinary procedures should incorporate standards for evaluating officers who have been accused of sexual or domestic violence and for making criminal referrals where appropriate.

▢ Ensure that officers wear their name tags and badges while on duty, particularly during mass demonstrations. Consistently hold officers accountable when they fail to comply with this requirement.

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

- Data collection and transparency:

  □ Track and publicly report statistics on the use of force by the PRPD, investigations initiated and completed, and disciplinary measures taken.

- Training and supervision:

  □ Ensure all PRPD officers receive ongoing, periodic training on the use of force. Effectively implement use of force policies by training PRPD officers to follow all applicable policies and laws on the use of force. This should include training on the use of pepper spray, tear gas, and other chemical agents; batons; "less-lethal" ammunition such as rubber or plastic bullets, sting ball grenades, and bean bag bullets; carotid holds and pressure point techniques; physical restraints; Tasers and other conducted electronic devices; the discharge, unholstering, and brandishing of firearms; and how to handle post-chase apprehensions.

  □ Ensure trainings emphasize that the use of excessive force will subject officers to discipline, criminal prosecution, and/or civil liability.

  □ Develop and implement training curricula that stress constitutional and human rights standards, including relating to the use of force, searches and seizures, and responding to protests.

  □ Ensure that all officers receive ongoing, periodic training on civilian complaint protocols, investigatory protocols, reporting protocols, and the disciplinary system.

  □ Ensure that all officers receive ongoing, periodic training on responding to domestic and sexual violence. Training should include risk and lethality assessment and guidance to officers so that their actions (or inaction) do not increase the risk of exposing the complainant to further danger. Officers assigned to work on domestic and sexual violence cases should receive specialized training in such critical areas as interviewing victims, suspects, and child witnesses or victims; investigating non-stranger and drug and alcohol facilitated sexual assault; documenting sexual and domestic violence, including strangulation; and determining the primary aggressor.

  □ Ensure that all officers receive ongoing, periodic training on the treatment of persons with medical conditions, persons with mental illness, and juveniles.

  □ Ensure that all officers receive ongoing, periodic training on the treatment of protesters and the handling of public demonstrations, and in particular the use of force against demonstrators and determining probable cause for arrest of protesters.

  □ Ensure that all officers receive ongoing, periodic training on the prohibition of discrimination and constitutional requirements related to equal protection. This

should include training on combating racial and ethnic bias, stereotyping, and racial, ethnic, and national origin discrimination.

☐ Ensure supervisors receive ongoing, periodic training on promoting accountability, flagging repetitive conduct, identifying high-risk or abusive officers, and appropriate disciplinary measures to address abuse by subordinate officers or colleagues.

☐ Provide adequate supervision to be sure that use of force and other policies are followed.

■ Policing domestic and sexual violence:

☐ Ensure that officers accept and record all complaints and properly classify offenses. Sexual and domestic violence incidents should not be classified as miscellaneous or non-crimes or otherwise summarily disposed of at the outset where the elements of a crime appear to exist, or because the officer deems the victim uncooperative or unsure of what occurred or concludes that the evidence refutes the allegation.

☐ Ensure that officers investigate domestic and sexual violence with the same care and attention given to other similar offenses and that law enforcement responses are not based on stereotypes about victims or how violence is perpetrated. Staffing should be sufficient to allow for full and complete on-scene and follow-up investigations. Complaints should be recorded, preserving detailed statements from victims and witnesses and describing the appearance of the scene, victim injuries and need for medical assistance, and results of forensic exams or laboratory analysis. Evidence should be collected in accordance with standard guidelines, such as by interrogating suspects, interviewing witnesses, ascertaining history of violence, taking photographs and gathering other physical and forensic evidence. Collection should be performed to the fullest extent possible, even if time has passed since the crime. Investigative reports should include any reports prepared by patrol officers or other first responders.

☐ Ensure that the immigration status or sexual orientation of a victim does not impact law enforcement responses to domestic or sexual violence.

☐ Implement monitoring mechanisms to ensure that domestic or sexual violence investigations are being conducted in compliance with the law. Supervisors should be charged with reviewing whether domestic or sexual violence complaints are being classified, investigated, and charged or cleared appropriately. Supervisors should communicate early and effectively with prosecutors, and should promptly respond to concerns from complainants, advocates, prosecutors, and others that may be raised with respect to particular cases. The internal investigative process should identify clear avenues for adjudication, discipline, and criminal prosecution if necessary.

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

- Organizational culture and attitudes towards policing:

  □ Institutionalize reform by addressing the culture among supervisors and the rank-and-file, including by confronting police officers' behaviors, attitudes, and beliefs regarding policing. Adopt clear goals and effective communication with officers about reforms, revise training on reforms and transformation of the force's culture, revise promotion standards and performance evaluations that take into account officers' behaviors and attitudes toward reform and constitutional policing, and incorporate all levels of the PRPD into reform efforts.

  □ PRPD leadership must send a strong and clear message to officers through words and actions that constitutional and human rights violations will not be tolerated and that the law and PRPD policies will be strictly enforced.

**To the Governor of Puerto Rico:**

- Work with the United States Department of Justice to implement all reforms recommended in their findings letter by entering into a court-enforceable and court-monitored agreement to implement a detailed plan of reform.

**To the Legislature of Puerto Rico:**

- Create effective and independent oversight mechanisms that are fully empowered and adequately funded to discharge their mandate. These mechanisms should be transparent and fully independent of the PRPD and the office of the Governor of Puerto Rico:

  □ Create an effective and independent oversight body to monitor the PRPD's compliance with all applicable laws. The oversight body should identify problematic PRPD policies and practices, including those problematic policies and practices identified by the DOJ and ACLU as contributing to the pattern of police abuse. The oversight body also should review internal PRPD investigations, have the authority to order additional investigations into allegations of police misconduct where needed, recommend reforms, monitor the implementation of its recommendations, track civil lawsuits relating to police misconduct and identify patterns in abuse allegations and officers named in the lawsuits, and participate in disciplinary hearings and other disciplinary review procedures. The body should meet international standards of independence, competence, and effectiveness.

  □ The independent oversight body should work closely with relevant stakeholders, and it should provide periodic public reports on its activities and findings.

  □ The independent oversight body should ensure that domestic or sexual violence investigations are being conducted in compliance with the law. The oversight body should review whether domestic or sexual violence complaints are being

classified, investigated, and charged or cleared appropriately.

☐ Create an independent fact-finding body to receive and investigate civilian complaints of police misconduct. The independent fact-finding body should be granted sufficient and specific supporting investigatory powers to enable it to conduct full and effective investigations. For instance, the body should be entitled to issue summonses to witnesses, including the officials allegedly involved, and should have the power to subpoena documents, obtain search warrants, seize documents and other evidence, protect witnesses, and compel police cooperation. The body should have at its disposal all of the necessary technical resources to conduct effective investigations, including resources for evidence collection and forensic analysis.

☐ The independent fact-finding body should be granted the authority to ensure that the PRPD and prosecutors act on its findings.  It should be empowered to recommend disciplinary measures for officers who commit abuses, and it should be granted the authority to enforce its disciplinary recommendations.

☐ The independent fact-finding body should conduct outreach efforts with communities to provide information about filing complaints with the PRPD and the independent fact-finding body, and to encourage civilians to file and pursue complaints when they have suffered police abuse or misconduct.

☐ Provide the independent oversight body and independent fact-finding body with adequate resources to effectively execute their mandates.

■ Enact freedom of information legislation that guarantees public access to government records.

**To the Puerto Rico Department of Justice:**

■ Ensure that where there is evidence of criminal conduct by PRPD officers, including excessive use of force, the Special Investigations Bureau (NIE) promptly conducts a thorough and impartial investigation.

■ Initiate prosecutions where there is probable cause to indict a PRPD officer for a crime relating to excessive use of force.

**To the United States Department of Justice:**

■ Enter into a court-enforceable and court-monitored agreement with the PRPD. The agreement should include a detailed and court-enforceable plan for comprehensive reforms that addresses all of the findings and the recommendations contained in the DOJ findings letter, and to the extent possible, this report.

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

■ Ensure that any consent decree or other agreement with the PRPD includes measures that address the grave problems with current policing of domestic and sexual violence. Such measures should include adoption of clear and improved policies on law enforcement response, investigation and evidence collection, classification of offenses and charging decisions, training of officers, oversight and accountability for police misconduct relating to domestic or sexual violence, and response to officer-committed domestic or sexual violence.

■ Ensure that any consent decree or other agreement with the PRPD includes measures that address the treatment of protesters and the handling of public demonstrations, and in particular the use of force against demonstrators. Such measures should include the adoption of a specialized policy that (i) allows demonstrations to take place safely; (ii) permits only reasonable time, place, and manner restrictions on demonstrations; (iii) prohibits the use of Tactical Operations Units, including the Riot Squad, to coerce people into not exercising their First Amendment rights; (iv) requires the PRPD to give clear warnings and directions to demonstrators if the police believe that the clearly-delineated time, place, and manner restrictions are being violated, and requiring the PRPD to issue such warnings and providing a reasonable opportunity to comply before permitting officers to arrest any people; (v) permits arrests of demonstrators only where probable cause exists to believe that a crime is being or has been committed; and (vi) requires PRPD officers to use no more force than that which is necessary under the circumstances in the event that probable cause does exist that a crime is being or has been committed.

■ Ensure that any grantees and sub-grantees receiving federal funding comply with prohibitions on discrimination based on sex, race, and national origin and protections guaranteed under federal law.

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

This report is based on a comprehensive six-month investigation, during which the ACLU conducted interviews in Puerto Rico with government officials and victims of police brutality or their surviving family members or lawyers.



The ACLU convened a town hall meeting at the UPR School of Law, at which numerous UPR students provided testimony of the police abuse they have suffered. Photo Credit: ACLU (2011)

# XII.  Methodology and Acknowledgements

Since 2004, the ACLU of Puerto Rico has been documenting numerous cases of police brutality in Puerto Rico, and has been documenting PRPD suppression of First Amendment rights since 2009. Between March and September 2011, the national office of the ACLU conducted fact-finding human rights research in Puerto Rico to further document allegations of police brutality. In addition, in May 2011, an ACLU-led high-level delegation conducted a mission in Puerto Rico to draw attention to police abuse against protesters. The delegation included the actress Rosie Perez; baseball legend Carlos Delgado; Juan Cartagena, President of LatinoJustice PRLDF; Angelo Falcón, President of the National Institute for Latino Policy; and Anthony Romero, the Executive Director of the ACLU.

This report is based on a comprehensive six-month investigation, during which the ACLU conducted interviews in Puerto Rico with government officials and victims of police brutality or their surviving family members or lawyers in March, April, May, and September 2011. We focused on incidents over a five-year period from 2007 to 2011, and have continued monitoring incidents, policies, and practices. The ACLU issued a preliminary report of our research findings in June 2011;[551] this expanded report contains our complete findings based on additional field research and documentation of ongoing police abuse in Puerto Rico.

This report is based on 76 interviews conducted by the ACLU in Puerto Rico and 14 testimonies collected from students at a town hall meeting at the University of Puerto Rico. In most cases these interviews were conducted in Spanish; in the case of interviewees fluent in English, the interviews were conducted in English.

The ACLU interviewed university students, union leaders, and other citizens who experienced excessive force and police violence when they participated in peaceful protests over the past three years. The ACLU also interviewed professional journalists and student journalists who faced police violence and other restrictions when reporting on these incidents. The ACLU also interviewed people who had been victims of extreme police brutality since 2007, and lawyers who have represented victims of severe police brutality.  In the cases in which the police killed or caused serious brain damage to the victim, the ACLU interviewed the parents, widow, children or lawyer of the victim.

In addition, the ACLU met with and obtained information from eight representatives of the governor's office, including the governor's chief of staff, the Attorney General, and the Secretary of State; five representatives of the University of Puerto Rico, including the president and chancellor of the Río Piedras campus; five representatives of the Puerto Rico Police Department, including the superintendent of Police at the time and several auxiliary or deputy superintendents; and four senators and representatives of the majority and minority parties.

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

Jennifer Turner, ACLU Human Rights Researcher, researched and wrote this report. William Ramírez, Executive Director of the ACLU of Puerto Rico; Jamil Dakwar, Director of the Human Rights Program; and Chris Hansen, Senior Staff Attorney of the Speech, Privacy, and Technology Program, reviewed and edited drafts of this report. Legal Assistant Allison Frankel and intern Jonathan Sands provided research assistance.

For their invaluable assistance in providing endless information, assistance, and for making this project possible, the ACLU thanks William Ramírez, Josué González Ortiz, Milagros Benezario-Fuentes, and Virgenmina Rivera of the ACLU of Puerto Rico. We also thank the many community leaders, advocates, lawyers, union leaders, and student leaders who assisted us to identify people to interview and generally facilitated this research. In particular, we thank student leader Xiomara Caro Díaz for her tireless help in facilitating this research. The ACLU extends its deepest gratitude to the many individuals who agreed to be interviewed for this report.

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

# Endnotes

1    U.S. Dep't of Justice, Civil Rights Division, *Investigation of the Puerto Rico Police Department* (Sept. 5, 2011), *available at* http://www.justice.gov/crt/about/spl/documents/prpd_letter.pdf (hereinafter DOJ report).

2    *Rachel Hiskes and Omar Silva-Meléndez v. José Figueroa Sancha, José A. Rosa Carrasquillo et al.*, D.P.R., Case No. 10-2246-JAG, Opposition to Motion Requesting Leave to Amend; *see also* Danica Coto, *Puerto Rico Justice Departent Denounces Federal Report Criticizing Police Force*, Associated Press, Oct. 8, 2011.

3    Ricardo Cortés Chico, *Cuesta arriba para Chief Pesquera*, El Nuevo Día, April 22, 2012.

4    Javier Colón and Limarys Suárez, *Repelerán ataques con fuerza*, El Nuevo Día, May 8, 2012.

5    ACLU, *Preliminary Findings of the ACLU Human Rights Documentation Research in Puerto Rico* (June 13, 2011), *available at* http://www.aclu.org/human-rights/aclu-investigation-reveals-systematic-pattern-police-brutality-and-abuse-puerto-rico and http://www.aclu.org/files/assets/puerto_rico_preliminary_findings_6_13_11_final.pdf.

6    U.S. Dep't of Justice, Office of Justice Programs, Bureau of Justice Statistics, *Local Police Departments 2007*, Law Enforcement Management and Administrative Statistics at 9 (Dec. 2010); DOJ report at 12.

7    ACLU interview with Max Pérez Bouret, then Auxiliary Superintendent of Administrative Services of the PRPD, May 6, 2011, San Juan, Puerto Rico.

8    *Id.*

9    Arthur Garfield Hayes, a founder and general counsel of the ACLU, chaired an independent commission to investigate the incidents.  *See* Arthur Garfield Hays et al., *Report on the Commission of Inquiry on Civil Rights in Puerto Rico*, May 22, 1937.

10   Comisión de Derechos Civiles del Estado Libre Asociado de Puerto Rico, *Informe especial sobre los Derechos Civiles y las intervenciones de los policías con los ciudadanos* at 31-50 (San Juan:  1967).

11   DOJ report at 14.

12   According to data provided by the PRPD to the DOJ, 1,709 PRPD officers were arrested between January 2005 to November 2010.  Based on a review of press accounts and local and federal court dockets, the DOJ was able to document an additional 21 arrests of officers that were not included in the arrest data provided by the PRPD.  *See* DOJ report at 14-16.

13   DOJ report at 14.

14   NYPD Internal Affairs Bureau reports, including data on arrests of officers, were obtained by the New York Civil Liberties Union (NYCLU) through a Freedom of Information Law request, *available at* http://www.nyclu.org/news/nyclu-releases-16-years-of-nypd-corruption-reports.

15   DOJ report at 16.

16   *Id.* at 17.

17   Lizette Alvarez, *Murder Rate and Fear Rise in Puerto Rico*, N.Y. Times, June 20, 2011.

18   DOJ report at 13.

19   Lisa Evans, *Mapping Murder throughout the World*, Guardian (United Kingdom), Oct. 10, 2011; *PR Murder Rate Among Highest in World*, Puerto Rico Daily Sun, Oct. 14, 2011.

20   U.S. Dep't of Justice, Civil Rights Division, *Investigation of the Puerto Rico Police Department* (Sept. 5, 2011), *available at* http://www.justice.gov/crt/about/spl/documents/prpd_letter.pdf (hereinafter DOJ report).

21   *Rachel Hiskes and Omar Silva-Meléndez v. José Figueroa Sancha, José A. Rosa Carrasquillo et al.*, D.P.R., Case No. 10-2246-JAG, Opposition to Motion Requesting Leave to Amend; *see also* Danica Coto, *Puerto Rico Justice Departent Denounces Federal Report Criticizing Police Force*, Associated Press, Oct. 8, 2011.

22   Ricardo Cortés Chico, *Cuesta arriba para Chief Pesquera*, El Nuevo Día, April 22, 2012.

23   ACLU interview with José Figueroa Sancha, then Superintendent of the PRPD (now retired), May 3, 2011, San Juan, Puerto Rico.

24   ACLU interview with [name withheld at the request of interviewee], San Juan, Puerto Rico.

25   Memorandum of Understanding between the Department of Justice for the Commonwealth of Puerto Rico, the Puerto

Rico Police Department, and the United States Attorney's Office for the District of Puerto Rico for the Referral and Handling of Cases where there is Concurrent and State Federal Jurisdiction, Feb. 2, 2010.

26    *Id.*

27    *See, e.g.*, the lawsuit brought by the ACLU on behalf of the Puerto Rico Association of Journalists, *Asociación de Periodistas de Puerto Rico, Overseas Press Club of Puerto Rico, et al., v. Robert Mueller and Ten Unknown Agents of the Federal Bureau of Investigation, et al.*, all legal documents *available at* http://www.aclu.org/free-speech/puerto-rico-journalists-association-v-mueller.  A federal judge ruled against the reporters in June 2007, but a federal appeals court partially reversed that decision in 2008, holding that the lower court erred in dismissing the journalists' Fourth Amendment excessive-force claims.  In August 2009, the U.S. District Court again threw out the journalists' lawsuit. While acknowledging the FBI agents may have violated the reporters' rights, the judge still ruled the journalists could neither collect damages nor obtain a court order barring the FBI from attacking them again.  The ACLU appealed the ruling to the U.S. Court of Appeals for the First Circuit, which issued a decision on May 16, 2012 affirming the district court's grant of summary judgment.

28    This report uses the term "civilian" to refer to citizens and residents of Puerto Rico who are not part of the PRPD.

29    Eugenio Hopgood Dávila, *Peligrosa arma en la policía*, Eʟ Nᴜᴇᴠᴏ Dɪ́ᴀ, Jan. 30, 2012.

30    DOJ report at 40.  Figure cited is as of December 6, 2010.

31    Colegio de Abogados, *Vista Pública Sobre la Situación de Derechos Civiles en Puerto Rico*, March 30, 2011.

32    Javier Colón and Limarys Suárez, *Agente Delgado: "No deseaba que esas personas murieran"*, Eʟ Nᴜᴇᴠᴏ Dɪ́ᴀ, May 4, 2012; *Muere un joven baleado por un agente en Manatí*, Eʟ Nᴜᴇᴠᴏ Dɪ́ᴀ, April 30, 2012; *Dan de alta a policía golpeado ayer en Manatí*, Primera Hora, Aril 2, 2012.

33    *Id.*

34    *Id.*; Javier Colón Dávila, *Alegan que muerte de joven a manos de agente fue un abuso*, Eʟ Nᴜᴇᴠᴏ Dɪ́ᴀ, May 1, 2012.

35    Javier Colón Dávila, *Alegan que muerte de joven a manos de agente fue un abuso*, Eʟ Nᴜᴇᴠᴏ Dɪ́ᴀ, May 1, 2012.

36     DOJ report at 40-41.

37    *Id.*

38    The data on cases documented by the ACLU include non-shooting deaths caused by the PRPD.

39    Javier Colón Dávila, Con *muerte cerebral menor baleado por la Policía, El Nuevo Día, Dec. 9, 2011; Maribel Hernández Pérez, Vᴇᴄɪɴᴏs ᴄʟᴀᴍᴏʀᴀɴ ᴘᴏʀ ʟᴀ ᴠɪᴅᴀ ᴅᴇ ɴɪɴ̃ᴏ ǫᴜᴇ ʀᴇᴄɪʙɪᴏ́ ᴅɪsᴘᴀʀᴏ ᴇɴ ʟᴀ ᴄᴀʙᴇᴢᴀ, Primera Hora, Dᴇᴄ. 10, 2011; Jᴀᴠɪᴇʀ Cᴏʟᴏ́ɴ Dᴀ́ᴠɪʟᴀ, Cᴏɴ ᴍᴜᴇʀᴛᴇ ᴄᴇʀᴇʙʀᴀʟ ᴀʟ ᴀᴅᴏʟᴇsᴄᴇɴᴛᴇ, Eʟ Nᴜᴇᴠᴏ Dɪ́ᴀ, Dᴇᴄ. 10, 2011; Jᴏᴇʟ Oʀᴛɪᴢ Rɪᴠᴇʀᴀ, Aɴᴛᴇ ᴇʟ NIE ᴇʟ ᴄᴀsᴏ ᴅᴇʟ ᴍᴇɴᴏʀ ʙᴀʟᴇᴀᴅᴏ, Eʟ Nᴜᴇᴠᴏ Dɪ́ᴀ, Dᴇᴄ. 11, 2011; Eᴜɢᴇɴɪᴏ Hᴏᴘɢᴏᴏᴅ Dᴀ́ᴠɪʟᴀ, Sᴇᴘᴜʟᴛᴀɴ ᴀʟ ᴊᴏᴠᴇɴ ʙᴀʟᴇᴀᴅᴏ ᴘᴏʀ ʟᴀ Pᴏʟɪᴄɪ́ᴀ ᴇɴ Vᴇɢᴀ Bᴀᴊᴀ, Eʟ Nᴜᴇᴠᴏ Dɪ́ᴀ, Dᴇᴄ. 14, 2011; Wɪʟᴍᴀ Mᴀʟᴅᴏɴᴀᴅᴏ Aʀʀɪɢᴏɪᴛ́ɪᴀ, Fᴀᴍɪʟɪᴀ ᴅᴇsᴘɪᴅᴇ ᴀ Bᴇᴛᴏ ᴇxɪɢɪᴇɴᴅᴏ ɪɴᴠᴇsᴛɪɢᴀᴄɪᴏ́ɴ ᴘᴏʀ ᴀʙᴜsᴏ ᴘᴏʟɪᴄɪᴀᴄᴏ, Primera Hora, Dᴇᴄ. 14, 2011.

40    Daniel Rivera Vargas, P*olicía le dispara a asaltante en Caguas, El Nuevo Día, Dec. 5, 2011; Ariel Rɪᴠᴇʀᴀ Vᴀ́ᴢǫᴜᴇᴢ, Asᴀʟᴛᴀɴᴛᴇ ᴍᴜᴇʀᴇ ᴇɴ ᴍᴇᴅɪᴏ ᴅᴇ ʀᴏʙᴏ ᴇɴ Cᴀɢᴜᴀs, WAPA.TV, Dᴇᴄ. 4, 2011.*

41    This case is an instance of use of lethal force by municipal police officers.  As noted above, this case is included here because municipal police officers are trained with PRPD officers at the University College of Criminal Justice of Puerto Rico (Puerto Rico's police academy), and their alleged crimes are subject to the same investigatory procedure as suspected crimes by PRPD officers.  This case is included as a related and instructive case example because the municipal police departments of Puerto Rico are plagued by the same problems of inadequate guidance on their officers' use of force, impunity for abuses, and inadequate training that plague the PRPD.

42    Javier Colón Dávila, E*videncia apunta a que motociclista no disparó:  Policías lo balearon durante persecución, El Nuevo Día, Nov. 15, 2011; Eugenio Hopg*ood Dᴀ́ᴠɪʟᴀ, Tᴇsᴛɪɢᴏ ᴅᴇsᴍɪᴇɴᴛᴇ ᴠᴇʀsɪᴏ́ɴ ᴏғɪᴄɪᴀʟ:  Lᴀ ɴᴏᴠɪᴀ ᴅᴇʟ ᴊᴏᴠᴇɴ ᴍᴜᴇʀᴛᴏ ɴɪᴇɢᴀ ǫᴜᴇ ᴀᴘᴜɴᴛᴀʀᴀ ᴄᴏɴ ᴀʀᴍᴀ, Eʟ Nᴜᴇᴠᴏ Dɪ́ᴀ, Nᴏᴠ. 17, 2011; Eᴜɢᴇɴɪᴏ Hᴏᴘɢᴏᴏᴅ Dᴀ́ᴠɪʟᴀ, Pᴏʟɪᴄɪ́ᴀs ᴀʟᴇɢᴀɴ ǫᴜᴇ ᴇʟ ᴊᴏᴠᴇɴ ʟᴇs ᴀᴘᴜɴᴛᴏ́ ᴄᴏɴ ᴀʀᴍᴀ, Eʟ Nᴜᴇᴠᴏ Dɪ́ᴀ, Nᴏᴠ. 13, 2011; Vᴇʟᴏʀɪᴏ ᴅᴇ ᴊᴏᴠᴇɴ ᴍᴜᴇʀᴛᴏ ᴀ ᴍᴀɴᴏs ᴅᴇ ɢᴜᴀʀᴅɪᴀs ᴍᴜɴɪᴄɪᴘᴀʟs ᴅᴇ Gᴜᴀʏɴᴀʙᴏ, Eʟ Nᴜᴇᴠᴏ Dɪ́ᴀ, Nᴏᴠ. 16, 2011.

43    *Agente franco de servicio mata asaltante en Caguas, Primera Hora, Sept.* 13, 2011.

44    *Presunto asaltante muere a manos de policía en farmacia de Guaynabo, El Nuevo Dí*a, Mᴀʀᴄʜ 9, 2011; Mᴜᴇʀᴇ ᴀʟ ɪɴᴛᴇɴᴛᴀʀ ᴜɴ ᴀsᴀʟᴛᴏ ᴄᴏɴ ᴀʀᴍᴀ ғᴀʟsᴀ, Eʟ Nᴜᴇᴠᴏ Dɪ́ᴀ, Mᴀʀᴄʜ 10, 2011.

45    Maribel Hernández Pérez and Bárbara Figueroa, M*uere policía a manos de compañero policía en Luquillo, Primera Hora, Sept.* 30, 2010; Eᴜɢᴇɴɪᴏ Hᴏᴘɢᴏᴏᴅ Dᴀ́ᴠɪʟᴀ, Sᴀᴄᴜᴅɪᴅᴀ ʟᴀ ғᴜᴇʀᴢᴀ, Eʟ Nᴜᴇᴠᴏ Dɪ́ᴀ, Oᴄᴛ. 1, 2010; Mɪɢᴜᴇʟ Dɪ́ᴀᴢ Rᴏᴍᴀ́ɴ, "É́ʟ sᴀʙᴇ ʟᴏ ǫᴜᴇ ᴇs ᴜɴᴀ ᴘɪsᴛᴏʟᴀ ᴅᴇ ᴠᴇʀᴅᴀᴅ", Eʟ Nᴜᴇᴠᴏ Dɪ́ᴀ, Oᴄᴛ. 2, 2010; Bᴀ́ʀʙᴀʀᴀ J. Fɪɢᴜᴇʀᴏᴀ Rᴏsᴀ, Cᴏɴᴛɪɴᴜ́ᴀ ᴘᴇsǫᴜɪsᴀ sᴏʙʀᴇ ʟᴀ ᴍᴜᴇʀᴛᴇ ᴅᴇʟ ᴘᴏʟɪᴄɪ́ᴀ Gᴇᴏʀɢᴇ Eᴅɪʟʟ Vᴇɢᴀ, Pʀɪᴍᴇʀᴀ Hᴏʀᴀ, Oᴄᴛ. 4, 2010; Jᴀᴠɪᴇʀ Cᴏʟᴏ́ɴ Dᴀ́ᴠɪʟᴀ, Aᴄᴜsᴀʀᴀ́ɴ ᴀ ᴀɢᴇɴᴛᴇ ǫᴜᴇ ᴍᴀᴛᴏ́ ᴀ ᴄᴏʟᴇɢᴀ ᴇɴ Lᴜǫᴜɪʟʟᴏ, Eʟ Nᴜᴇᴠᴏ Dɪ́ᴀ, Oᴄᴛ. 25, 2010; Pᴇᴅʀᴏ Rᴏsᴀ Nᴀʟᴇs, Jᴜʀᴀᴅᴏ ᴇɴᴄᴜᴇɴᴛʀᴀ ᴄᴜʟᴘᴀʙʟᴇ ᴀ ᴘᴏʟɪᴄɪ́ᴀ, WAPA, Jᴜʟ. 29, 2011.

46    Raúl Colón, A*nother Citizen Killed by Police Officers, Puerto Rico Daily Sun, Sept. 30*, 2010; Dᴀɴɪᴄᴀ Cᴏᴛᴏ, Pᴜᴇʀᴛᴏ Rɪᴄᴀɴ Pᴏʟɪᴄᴇ

Under Intense Scrutiny After Second Killing in 1 Week; Feds Investigating, Associated Press, Sept. 29, 2010; Crímenes en PR Causan Polémica:  Ponen en duda la preparación policiaca, Univisión, Oct. 1, 2010.

47    Jorge Molina et al v. Natal Rivera et al, Compl., D.P.R., Case No. 3:2011cv01882, filed Sept. 7, 2011; Superintendente confirma se radicarán cargos por asesinato en segundo grado a policía que mató a joven deportista, El Nuevo Día, Sept. 28, 2010; Frances Rosario and Javier Colón, Súper pide espacio para pesquisa de incidente de joven baleado, El Nuevo Día, Sept. 23, 2010; Causa para juicio contra ex policía Abimalet Natal Rivera, Primera Hora, Mar. 17, 2011; Maribel Hernández Pérez, Joven baleado por la Policía pierde la batalla, Primera Hora, Sept. 25, 2010.

48    Juan Nadal Nolasco, Policías matan a tiros dominicano en Río Piedras Puerto Rico, El Nuevo Diario (Dominican Republic), Aug. 22, 2010; Sara M. Justicia Doll, Identifican hombre que murió en Río Piedras, Primera Hora, Aug. 22, 2010; Sara M. Justicia Doll, Agentes de la DOE dan muerte a un hombre en medio de incidente de violencia, Primera Hora, Aug. 22, 2010; Leysa Caro González, Velan a joven muerto en medio de incidente con agentes policiacos, Primera Hora, Aug. 26, 2010.

49    This case is an instance of use of lethal force by municipal police officers.  As noted above, this case is included here because municipal police officers are trained with PRPD officers at the University College of Criminal Justice of Puerto Rico (Puerto Rico's police academy), and their alleged crimes are subject to the same investigatory procedure as suspected crimes by PRPD officers.  This case is included as a related and instructive case example because the municipal police departments of Puerto Rico are plagued by the same problems of inadequate guidance on their officers' use of force, impunity for abuses, and inadequate training that plague the PRPD.

50    Sara M. Justicia Doll, Hermana de paciente mental que murió en manos de agentes municipales cuestiona la intervención, Primera Hora, Aug. 11, 2010; Respuesta mortal a ataque a machetazos, El Nuevo Día, July 31, 2010; Eugenio Hopgood Dávila, Sin protocolo para pacientes mentales, El Nuevo Día, Jan. 30, 212.

51    Osman Pérez Méndez, Sargento es acusado port res cargos y le imponen fianza de $70 mil, El Nuevo Día, Oct. 5, 2010; Mike Melia, Another Puerto Rico Police Charged with Murder, Associated Press, Oct. 6, 2010.

52    Maribel Hernández Pérez, Muerto a tiros paciente mental, Primera Hora, March 27, 2010; Miguel Díaz Román, Prematuro honor a dos agentes:  Son reconocidos sin que termine pesquisa sobre incidente mortal, El Nuevo Día, March 1, 2011.

53    ACLU interview with José Rodríguez, April 7, 2011, Santurce, Puerto Rico; Rosita Marrero, Denuncian abusos y persecución de la Policía contra dominicanos, Primera Hora, Oct. 4, 2010; Estado Libre Asociado de Puerto Rico, Instituto de Ciencias Forenses de Puerto Rico, Informe Médco – Forense, Autopsia Núm. 4402-9, Franklin Cáceres Ozorio, July 6, 2010 (autopsy report on file with the ACLU); Instituto Nacional de Ciencias Forenses, Procuraduria General de la República, Expediente #A-011-10, Franklin Cáceres Ozorio, Feb. 15, 2010 (autopsy report on file with the ACLU).

54    Puerto Rico Dep't of Justice, NIE asume jurisdicción en incidente en Mayaguez, Press Release, July 17, 2009; Muere sujeto a manos de la Policía, Associated Press, July 17, 2009; Maelo Vargas Saavedra, Dos muertos en complicada secuencia de hechos en el oeste, Primera Hora, July 17, 2009.

55    Aixa Vázquez, Asaltante muere a manos de policías, WAPA.TV, July 26, 2009; Darisabel Texidor Guadalupe, Policías matan asaltante durante robo en Villalba, Primera Hora, July 26, 2009; Justicia y el NIE investigan caso de muerte de asaltante en Villalba, Primera Hora, July 26, 2009.

56    José Luis Irizarry Muñiz, Betsy Jeannette Pérez Rivera et al. v. Eric Rivera Nazario, Jaime Rodriguez Vega et al., Compl, 11-01337 (April 13, 2011); Oscar J. Serrano and Melissa Solórzano García, Demanda por policías que mataron al joven en Yauco, NotiCel, April 19, 2011; Podrían demandar al agente, El Nuevo Día, Oct. 18, 2010; Objetan desaparición de vídeo en caso de brutalidad policiaca, El Nuevo Día, July 2, 2010; Keila López Alicea, Justicia no se rinde, El Nuevo Día, Feb. 4, 2009; Causa para juicio contra policía estatal, El Nuevo Día, June 26, 2009.

57    Sara M. Justicia Doll, Policía mata hombre armado, Primera Hora, Sept. 1, 2008; Muere hombre en medio de intervención policíaca, El Nuevo Día, Aug. 31, 2008.

58    Maribel Hernández Pérez, Un tiro en la espalda, Primera Hora, Aug. 7, 2008.

59    Jalibeth Rodríguez, Policía mata a escalador en Mayagüez, WAPA.TV, April 28, 2008.

60    Maribel Hernández Pérez, Reclamo de nueva investigación en caso de paciente mental asesinado por un policía, Primera Hora, April 4, 2011.

61    ACLU interview with Ruth Jiménez de Jesús, San Juan, Puerto Rico, March 28, 2011.

62    Maribel Hernández Pérez, Policía mata a un sospechoso, Primera Hora, March 16, 2007.

63    Carmen Enid Acevedo, Testigo del abusado y victimario de un ciudadano, Centro de Periodismo Investigativo, April 6, 2011; Evelyn Ramírez Lluveras et al. v. Javier Pagán Cruz et al., D.P.R., Case No. 3:08-cv-01486-FAB, Plaintiff's Statement of Facts in Opposition to Motion for Summary Judgment on Liability, Filed March 15, 2011.

64    Bárbara J. Figueroa Rosa, Julio Voltio y Residente desahogan su sufrimiento, Primera Hora, Aug. 20, 2007.

65    Rosita Marrero, Ponen en duda versión del NIE sobre muerte de tres jóvenes, Primera Hora, July 28, 2011; Rosita Marrero, Recrean escena del crimen en la Placita Bolívar en Santurce, Primera Hora, Aug. 16, 2011; Limarys Suárez Torres, Reviven

*incidente en detalle*, El Nuevo Día, Aug. 17, 2011; Rosita Marrero, *A madre le cuesta aceptar que no le notificaron muerte de su hijo a manos del NIE*, Primera Hora, Aug. 3, 2011; Rosita Marrero, *Vieron cuando arrastraron a joven por el pavimento y lo remataron*, Primera Hora, Aug. 5, 2011; Eugenio Hopgood Dávila, *Justicia exonora a agente del NIE que mató a tres*, El Nuevo Día, Dec. 28, 2011; *Culmina investigación sobre asesinato de tres jóvenes*, Primera Hora, Dec. 28, 2011; Eugenio Hopgood Dávila, *Espaldarazo de Justicia al agente que mató a tres*, El Nuevo Día, Dec. 29, 2011.

66    *Id.*

67    *Id.*

68    Rosita Marrero, *Vieron cuando arrastraron a joven por el pavimento y lo remataron*, Primera Hora, Aug. 5, 2011.

69    Rosita Marrero, *Ponen en duda versión del NIE sobre muerte de tres jóvenes*, Primera Hora, July 28, 2011; Rosita Marrero, *A madre le cuesta aceptar que no le notificaron muerte de su hijo a manos del NIE*, Primera Hora, Aug. 3, 2011.

70    *Id.*; Rosita Marrero, *Vieron cuando arrastraron a joven por el pavimento y lo remataron*, Primera Hora, Aug. 5, 2011.

71    Rosita Marrero, *Recrean escena del crimen en la Placita Bolívar en Santurce*, Primera Hora, Aug. 16, 2011; Limarys Suárez Torres, *Reviven incidente en detalle*, El Nuevo Día, Aug. 17, 2011; Eugenio Hopgood Dávila, *Justicia exonora a agente del NIE que mató a tres*, El Nuevo Día, Dec. 28, 2011; *Culmina investigación sobre asesinato de tres jóvenes*, Primera Hora, Dec. 28, 2011; Eugenio Hopgood Dávila, *Espaldarazo de Justicia al agente que mató a tres*, El Nuevo Día, Dec. 29, 2011.

72    Eugenio Hopgood Dávila, *Justicia exonora a agente del NIE que mató a tres*, El Nuevo Día, Dec. 28, 2011; *Culmina investigación sobre asesinato de tres jóvenes*, Primera Hora, Dec. 28, 2011; Eugenio Hopgood Dávila, *Espaldarazo de Justicia al agente que mató a tres*, El Nuevo Día, Dec. 29, 2011.

73    *Evelyn Ramírez Lluveras et al. v. Javier Pagán Cruz et al.*, D.P.R., Case No. 3:08-cv-01486-FAB, Plaintiff's Statement of Facts in Motion for Summary Judgment on Liability, Filed March 15, 2011; *Pueblo v. Pagán Cruz*, P.R., HSCR2007-1965-1966; DOJ report at 20-21; ACLU interview with Judith Berkan, April 5, 2011, San Juan, Puerto Rico.

74    *Id.*

75    *Id.*

76    *Id.*

77    *Evelyn Ramírez Lluveras et al. v. Javier Pagán Cruz et al.*, D.P.R., Case No. 3:08-cv-01486-FAB, Plaintiff's Statement of Facts in Opposition to Motion for Summary Judgment on Liability, Filed March 15, 2011.

78    *Evelyn Ramírez Lluveras et al. v. Javier Pagán Cruz et al.*, D.P.R., Case No. 3:08-cv-01486-FAB, Plaintiff's Statement of Facts in Opposition to Motion for Summary Judgment on Liability, Filed March 15, 2011; *Pueblo v. Pagán Cruz*, P.R., HSCR2007-1965-1966; DOJ report at 20-21; ACLU interview with Judith Berkan, April 5, 2011, San Juan, Puerto Rico.

79    *Id.*

80    *Id.*

81    *Id.*

82    *Id.*

83    *Id.*

84    *Id.*

85    *Evelyn Ramírez Lluveras et al. v. Javier Pagán Cruz et al.*, D.P.R., Case No. 3:08-cv-01486-FAB, Plaintiff's Statement of Facts in Opposition to Motion for Summary Judgment on Liability, Filed March 15, 2011; DOJ report at 20-21; ACLU interview with Judith Berkan, April 5, 2011, San Juan, Puerto Rico.

86    *Id.*

87    *Id.*

88    *Id.*

89    *Id.*

90    *Id.*

91    Video footage available at http://www.youtube.com/watch?v=OdTXUavJ_0A.

92    *Pueblo v. Pagán Cruz*, P.R., HSCR2007-1965-1966.

93    *Evelyn Ramírez Lluveras et al. v. Javier Pagán Cruz et al.*, D.P.R., Case No. 3:08-cv-01486-FAB, Opinion and Order, J. Besosa, Dec. 22, 2011.

94  *Evelyn Ramírez Lluveras et al. v. Javier Pagán Cruz et al.*, D.P.R., Case No. 3:08-cv-01486-FAB, Plaintiff's Statement of Facts in Opposition to Motion for Summary Judgment on Liability, Filed March 15, 2011; ACLU interview with Judith Berkan, April 5, 2011, San Juan, Puerto Rico.

95  *Id.*

96  *Id.*

97  *Id.*

98  *Id.*

99  *Id.*

100  *Id.*

101  *Id.*

102  *Id.*

103  *Id.*; Carmen Enid Acevedo, *Testigo del abusado y victimario de un ciudadano*, Centro de Periodismo Investigativo, April 6, 2011

104  *Evelyn Ramírez Lluveras et al. v. Javier Pagán Cruz et al.*, D.P.R., Case No. 3:08-cv-01486-FAB, Plaintiff's Statement of Facts in Opposition to Motion for Summary Judgment on Liability, Filed March 15, 2011.

105  *Id.*

106  ACLU interview with Ruth Jiménez de Jesús, San Juan, Puerto Rico, March 28, 2011.

107  *Id.*

108  *Id.*

109  *Id.*

110  ACLU interview with Ruth Jiménez de Jesús, San Juan, Puerto Rico, March 28, 2011.

111  *Id.*

112  *Id.*

113  *Id.*

114  *Id.*

115  *Id.*

116  *Id.*

117  DOJ report at 21.

118  *Puerto Rico: Más abuso en residencial Villa Esperanza*, Indymedia, Oct. 26, 2010.

119  Colectivo Candelaria Pa'lante, *Mayagüez: Denuncian Operativo Policial de Represión Contra Activista*, Indymedia, April 18, 2009.

120  Gabriel Rodríguez and Laura Moscoso Candelas, *Peligro de desalojo de La Perla se repite en otras comunidades pobres*, Prensa Comunitaria, July 13, 2011.

121  ACLU interview with Mauricio Alejandro Castillo Shaw, April 5, 2011, San Juan, Puerto Rico.

122  *Id.*

123  *Id.*

124  *Id.*

125  *Id.*

126  *Id.*

127  *Id.*

128  *Id.*

129  *Id.*

130  ACLU of Puerto Rico interview with Rossmaly Cirino, March 16, 2011, San Juan, Puerto Rico.

131    *Id.*

132    *Id.*

133    *Id.*

134    *Id.*

135    *Id.*

136    ACLU of Puerto Rico, *Vista Pública de la Unión Americana de Libertas Civiles sobre Incidentes de Abuso Policiaco en La Perla, Viejo San Juan, Puerto Rico*, Testimony of Rafael Ortíz, Aug. 4, 2011.

137    *Id.*

138    ACLU of Puerto Rico, *Vista Pública de la Unión Americana de Libertas Civiles sobre Incidentes de Abuso Policiaco en La Perla, Viejo San Juan, Puerto Rico*, Testimony of Tania Amigón, Aug. 4, 2011.

139    *Id.*

140    ACLU interview with Luis Ayala, March 31, 2011, San Juan, Puerto Rico.

141    *Id.*

142    *Id.*

143    *Id.*

144    *Id.*

145    *Id.*

146    *Id.*

147    *Id.*

148    ACLU interview with Evelyn M. Rivera, April 6, 2011, San Juan, Puerto Rico.

149    *Id.*

150    *Id.*

151    *Id.*

152    *Id.*

153    ACLU interview with José Rodríguez, April 7, 2011, Santurce, Puerto Rico.

154    *Id.*

155    *Id.*

156    *See, e.g.*, Rosita Marrero, *Discrimen y persecución bochornosa contra dominicanos*, Primera Hora, May 26, 2011; Eugenio Hopgood Dávila, *Dominicanos denuncian persecución de parte de la Policía*, El Nuevo Día, May 26, 2011; Claudio Matos, *Denuncian constante violación de los derechos de los inmigrantes dominicanos*, Primera Hora, April 27, 2011.

157    *Id.*

158    ACLU interview with José Rodríguez, April 7, 2011, Santurce, Puerto Rico.

159    *Id.*

160    *Id.*; Estado Libre Asociado de Puerto Rico, Instituto de Ciencias Forenses de Puerto Rico, *Informe Médco – Forense, Autopsia Núm. 4402-9, Franklin Cáceres Ozorio*, July 6, 2010 (autopsy report on file with the ACLU); Instituto Nacional de Ciencias Forenses, *Procuraduria General de la República, Expediente #A-011-10, Franklin Cáceres Ozorio*, Feb. 15, 2010 (autopsy report on file with the ACLU).

161    ACLU interview with José Rodríguez, April 7, 2011, Santurce, Puerto Rico

162    *Id.*

163    ACLU interview with José Rodríguez, April 7, 2011, Santurce, Puerto Rico; Rosita Marrero, *Denuncian abusos y persecución de la Policía contra dominicanos*, Primera Hora, Oct. 4, 2010.

164    *Id.*

165    *Id.*

166   ACLU interview with José Rodríguez, April 7, 2011, Santurce, Puerto Rico.

167   *Id.*

168   Rosita Marrero, *Denuncian abusos y persecución de la Policía contra dominicanos*, Primera Hora, Oct. 4, 2010.

169   ACLU interview with Laura Mota, April 6, 2011, San Juan, Puerto Rico.

170   *Id.*

171   *Id.*

172   *Id.*

173   *Id.*

174   *Id.*

175   *Id.*

176   *Id.*

177   *Id.*

178   ACLU interview with Joel Félix, April 7, 2011, Santurce, Puerto Rico.

179   *Id.*

180   *Id.*

181   *Id.*

182   *Id.*

183   *Id.*

184   *Id.*

185   *Id.*

186   *Id.*

187   *Id.*

188   Rep. Luis V. Gutierrez, U.S. House of Representatives, Remarks on House Floor, Feb. 16, 2011, *available at* http://
      www.gutierrez.house.gov/index.php?option=com_content&view=article&id=642%3Aremarks-by-rep-luis-v-
      gutierrez&catid=48&Itemid=72 and  http://www.youtube.com/watch?v=QJhmoV01xQI&feature=youtu.be (video).

189   ACLU interview with Luisa Acevedo Zambrano, May 2, 2011 and April 6, 2011, San Juan, Puerto Rico.

190   ACLU interview with Shariana Ferrer Nuñez, May 6, 2011, San Juan, Puerto Rico.

191   DOJ report at 19.

192   *Id.* at 25.

193   ACLU interview with Roberto Morales, April 1, 2011, San Juan, Puerto Rico.

194   ACLU interview with Max Pérez Bouret, then Auxiliary Superintendent of Administrative Services of the PRPD, May 6,
      2011, San Juan, Puerto Rico.

195   *Id.*

196   Office of the Surgeon General, U.S. Army and Borden Institute, Walter Reed Army Medical Center, ed. by Shirley D.
      Tuorinsky, *Riot Control Agents*, Medical Aspects of Chemical Warfare at 462 (2008), *available at* http://www.bordeninstitute.
      army.mil/published_volumes/chemwarfare/Ch13_Pg441_484.pdf.

197   *Id.* at 460.

198   *Id.* at 452.

199   Deborah Blum, *About Pepper Spray*, Scientific American Blog, Nov. 11, 2011, *available at* http://blogs.scientificamerican.
      com/guest-blog/2011/11/21/about-pepper-spray/.

200   Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on their
      Destruction, opened for signature January 13, 1993, 32 I.L.M. 800, entered into force April 29, 1997.

201   ACLU of Southern California, *Pepper Spray Update: More Fatalities, More Questions* (1995), *available* at http://www.aclu-sc.
      org/attach/p/Pepper_Spray_New_Questions.pdf.

202   *Id.*

203   Deborah Blum, *About Pepper Spray*, Scientific American Blog, Nov. 11, 2011.

204   Deborah F. Bilmire et al., *Pepper-Spray-induced Respiratory Failure Treated With Extracorporeal Membrane Oxygenation*, Pediatrics Vol. 98 No. 5 at 961-63 (Nov. 1, 1996), *available at* http://pediatrics.aappublications.org/content/98/5/961.short.

205   Minna Vesaluoma et al., *Effects of Oleoresin Capsicum Pepper Spray on Human Corneal Morphology and Sensitivity*, Invest. Ophthalmol. Vis. Sci. July 2000 vol. 41 no. 8 2138-2147, *available at* http://www.iovs.org/content/41/8/2138.full.

206   Harry Salem, E.J. Olajos et al., *Capsaicin Toxicology Review*, U.S. Army ERDEC, Life Sciences Department (1993).

207   C. Gregory Smith and Woodhall Stopford, *Health Hazards of Pepper Spray* (2004), *available at* http://web.archive.org/web/20000817004624/http://www.ncmedicaljournal.com/Smith-OK.htm.

208   Comité Evaluador Externo de la Policía de Puerto Rico, *Informe del Comité Evaluador Externo de la Policía de Puerto Rico* (Dec. 21, 2007), *available at* http://www.claridadpuertorico.com/documents/articles/02%20Informe%20Polic%C3%ADa%2021%20Dic%202007.pdf.

209   Khonsari RM, Fleuridas G, Arzul L, et al, *Severe Facial Rubber Bullet Injuries: Less Lethal but Extremely Harmful Weapons*, Injury Int'l J. of the Care of the Injured 41 at 73-76 (2010).  Charlier P, Alvarez J.D., Durigon M, et al., *Unusual Death by Rubber Bullet:  Should these Guns be Reclassified as Lethal Weapons?*, Am. J. Forens. Med. Pathol. 33(1) e4 (March 2012).

210   Cristen Conger, *Can Rubber Bullets Kill You?*, Discovery News (Aug. 15, 2011).

211   Ahmad Mahajna et al., *Blunt and Penetrating Injuries Caused by Rubber Bullets during the Israeli-Arab Conflict in October, 2000:  A Retrospective Study*, The Lancet Vol. 359, Issue 9320 at 1795-1800 (May 25, 2002) *available at* http://www.thelancet.com/journals/lancet/article/PIIS0140-6736(02)08708-1/fulltext.  *See also The Official Summation of the OR Commission Report*, Ha'retz (Israel), Sept. 2, 2003 (concluding that ¨The committee determined that rubber-coated bullets are not appropriate for use due to their risk. It was determined that the police should remove them from use.  It was emphasized that this does not prevent the police from deploying other kinetic means, including rubber ones.  Nonetheless, the guiding principle must be that a means with lethal potential can be used only in situations of real and immediate life-threatening danger, and only if its accuracy level enables it to hit the source of this life-threatening danger and no one else.  In other situations, the police must use non-lethal means.¨).

212   *Police Ban Use of Rubber Bullets on Protesters*, Mail & Guardian (South Africa), Jan. 14, 2012.

213   ACLU of Minnesota, *Shocking:  The Lack of Responsible Taser Policy in Minnesota* (Dec. 9, 2011), available at http://www.aclu.org/files/assets/aclu_report_on_taser_policy_12_2011.pdf.

214   ACLU interview with Enrique G. Juliá Ramos, May 5, 2011, Río Piedras, Puerto Rico.

215   DOJ report at 34.

216   Amnesty International, *¨Less than Lethal¨?  The Use of Stun Weapons in U.S. Law Enforcement* (2008), *available at* http://www.amnesty.org/en/library/asset/AMR51/010/2008/en/530be6d6-437e-4c77-851b-9e581197ccf6/amr510102008en.pdf; Amnesty International, *List of Deaths Following Use of Stun Weapons in U.S. Law Enforcement, June 2001 to 31 August 2008*, *available at* http://amnesty.org/en/library/asset/AMR51/146/2008/en/a4e3aa10-cb62-11dd-9ec2-e57da9519f8c/amr511462008en.pdf.

217   Amnesty International, *¨Less than Lethal¨?  The Use of Stun Weapons in U.S. Law Enforcement* (2008).

218   *Id.*

219   ACLU of Minnesota, *Shocking:  The Lack of Responsible Taser Policy in Minnesota* (Dec. 9, 2011).

220   ACLU interview with Victoria Carro Robledo, May 5, 2011, Río Piedras, Puerto Rico.

221   Testimony of [name withheld], May 2, 2011, Río Piedras, Puerto Rico.

222   Ed Morales, *Puerto Rico's Policing Crisis*, The Nation, Dec. 6, 2011.

223   Testimony of Yaritza Figueroa, May 2, 2011, Río Piedras, Puerto Rico.

224   *Id.*

225   *Id.*

226   *Id.*

227   ACLU interview with Victoria Carro Robledo, May 5, 2011, Río Piedras, Puerto Rico.

228   *Id.*

229   E-mail communication from Rachel Hiskes, May 4, 2011.

230   Testimony of Gamelyn Oduardo, May 2, 2011, Río Piedras, Puerto Rico.

231   Testimony of Mariana López Rosado, May 2, 2011, Río Piedras, Puerto Rico.

232   ACLU interview with Elisa Ramos, April 4, 2011, San Juan, Puerto Rico.

233   Declaration of Fiscal Emergency and Omnibus Plan for Economic Stabilization and Restoration of the Puerto Rican Credit Act (also known as the Special Act Declaring a State of Fiscal Emergency and Establishing a Comprehensive Fiscal Stabilization Plan to Salvage the Credit of Puerto Rico), Law No. 7, H.B. 13, approved January 8, 2010.

234   *See Asociación de Fotoperiodismo v. Rivera Schatz*, Compl., P.R. (2011); *Eduardo Bhatia Gautier et al. v. Rivera Schatz*, Comp., P.R. (2011).  Puerto Rico's Constitution mandates that all legislative sessions must be open to the public.

235   Colegio de Abogados de Puerto Rico, Comisión Especial Sobre Fiscalización del Estado Actual de los Derechos Constitucionales, *Informe Preliminar* at 16 (July 12, 2010), *available at* http://www.capr.org/dmdocuments/Informe_Comi_Fiscalizacion.pdf; Sara Justicia and Nydia Bauzá, *Macanazos y gases lacrimógenos a los estudiantes en el Capitolio*, Primera Hora, June 30, 2010.

236   E-mail communication from Rachel Hiskes, May 4, 2011.

237   ACLU interview with Shariana Ferrer Nuñez, May 6, 2011, San Juan, Puerto Rico.

238   *Id.*

239   ACLU telephone interview with Carmen Yulín Cruz Soto, April 26, 2011.

240   *Id.*

241   *Id.*

242   *Id.*

243   ACLU interview with Shariana Ferrer Nuñez, May 6, 2011, San Juan, Puerto Rico.

244   ACLU interview with Betty Peña Peña, April 4, 2011 and May 2, 2011, San Juan, Puerto Rico.

245   ACLU interview with Elisa Ramos Peña, April 4, 2011 and May 2, 2011, San Juan, Puerto Rico.

246   ACLU interview with Betty Peña Peña, April 4, 2011 and May 2, 2011, San Juan, Puerto Rico.

247   ACLU interview with Elisa Ramos Peña, April 4, 2011 and May 2, 2011, San Juan, Puerto Rico.

248   ACLU interview with Betty Peña Peña, April 4, 2011 and May 2, 2011, San Juan, Puerto Rico.

249   ACLU interview with Elisa Ramos Peña, April 4, 2011 and May 2, 2011, San Juan, Puerto Rico.

250   ACLU interview with Osvaldo Toledo, March 30, 2011, San Juan, Puerto Rico.

251   *Id.*

252   For video footage of the incident, *see, e.g.*, http://www.youtube.com/watch?v=AJoWElVF8vo ; http://www.youtube.com/watch?v=wkR14_xSM1I.

253   ACLU interview with Hans Perl-Matanzo, May 4, 2011, San Juan, Puerto Rico.

254   E-mail communication from Rachel Hiskes, May 4, 2011.

255   Sara Justicia and Nydia Bauzá, *Macanazos y gases lacrimógenos a los estudiantes en el Capitolio*, Primera Hora, June 30, 2010; *Figueroa Sancha defiende Violencia Policiaca y Advierte que lo hara de Nuevo*, Univisión, available at http://www.youtube.com/watch?v=67LyuNF7NCc (video); *Reacciona el superintendente*, WAPA.TV, June 30, 2010, *available at* http://www.wapa.tv/noticias/locales/reacciona-el-superintendente_20100630191454.html.

256   E-mail communication from Rachel Hiskes, May 4, 2011.

257   DOJ report at 31.

258   Comisión Especial Sobre Fiscalización del Estado Actual de los Derechos Constitucionales, Colegio de Abogados de Puerto Rico, *Informe Preliminar* (July 12, 2010).

259   DOJ report at 31.

260   ACLU interview with Roberto Morales, April 1, 2011, San Juan, Puerto Rico.

261   ACLU interview with Zulee Aguilar, April 5, 2011, San Juan, Puerto Rico.

262   *Id.*

263   *Id.*

264   ACLU interview with Shariana Ferrer Nuñez, May 6, 2011, San Juan, Puerto Rico.

265   ACLU interview with Victoria Carro Robledo, May 5, 2011, Río Piedras, Puerto Rico.

266   ACLU interview with Ricardo Olivero, April 7, 2011, San Juan, Puerto Rico.

267   ACLU interview with Amada Garcia, May 5, 2011, Río Piedras, Puerto Rico.

268   *Id.*

269   *Id.*

270   *See* video footage, *available at* http://www.youtube.com/watch?v=77xibyogluY.

271   Video footage available at http://www.youtube.com/watch?v=04TlgF6Cj_U&feature=related.

272   ACLU interview with Enrique G. Juliá Ramos, May 5, 2011, Río Piedras, Puerto Rico.

273   For video footage, *see, e.g.* http://www.youtube.com/watch?v=1RV8nzlyOFA and http://www.primerahora.com/vevideosdeestudiantesysindicatossacadosapalosdehotelsheraton-388880.html.

274   ACLU interview with Luisa Acevedo Zambrano, May 2, 2011 and April 6, 2011, San Juan, Puerto Rico.

275   *Id.*

276   *Id.*

277   ACLU interview with José Rodríguez Báez, April 6, 2011, San Juan, Puerto Rico.

278   DOJ report at 28.

279   ACLU interview with Luisa Acevedo Zambrano, May 2, 2011 and April 6, 2011, San Juan, Puerto Rico.

280   ACLU interview with José Rodríguez Báez, April 6, 2011, San Juan, Puerto Rico.

281   *Id.*

282   ACLU interview with Luisa Acevedo Zambrano, May 2, 2011 and April 6, 2011, San Juan, Puerto Rico.

283   Nydia Bauzá, *Obreros elevan protestas al Supremo*, Primera Hora, Feb. 12, 2010.

284   ACLU interview with Luisa Acevedo Zambrano, April 6, 2011, San Juan, Puerto Rico.

285   DOJ report at 27.

286   Testimony of attorney Linda Backiel, speaking on behalf of her client, Michelle Padrón Gaulthier, May 2, 2011, Río Piedras, Puerto Rico.

287   ACLU interview with Hans Perl-Matanzo, May 4, 2011, San Juan, Puerto Rico.

288   *Id.*

289   *Id.*

290   ACLU interview with Luis Torrez, March 29, 2011, San Juan, Puerto Rico; ACLU interview with Rocio Villela, March 29, 2011, San Juan, Puerto Rico.

291   E-mail communication from Aníbal J. Núñez González, May 2, 2011; *Luis M. Pellot Juliá, Aníbal J. Núñez González, et al v. Ana R. Guadalupe, José de la Torre, et al.*, Tribunal de Apelaciones, Sentencia, Case No. K PE2010-4829 (904) (Jan. 11, 2011).

292   ACLU interview with Zulee Aguilar, April 5, 2011, San Juan, Puerto Rico.

293   ACLU interview with Roberto Morales, April 1, 2011, San Juan, Puerto Rico.

294   *Id.*

295   Testimony of Gabriela Camacho, May 2, 2011, Río Piedras, Puerto Rico.

296   ACLU interview with Xiomara Caro Díaz, April 6, 2011, San Juan, Puerto Rico.

297   *Id.*

298   ACLU interview with Roberto Morales, April 1, 2011, San Juan, Puerto Rico.

299   ACLU interview with Amada Garcia, May 5, 2011, Río Piedras, Puerto Rico.

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

300   *Id.*

301   For video footage of the first part of the incident, at the Natural Sciences building, *see* http://www.youtube.com/watch?v= GtUxFD9eoEI&list=UUqXGwsxX5S9Dw8YGgSX8Kvg&index=149&feature=plcp.  For video footage of the second part of the incident, at the *Plaza Universitaria*, *see* http://www.youtube.com/watch?v=pp_CNqAWcXI.

302   ACLU interview with Roberto Morales, April 1, 2011, San Juan, Puerto Rico.

303   Testimony of Manuel Ortiz, May 2, 2011, Río Piedras, Puerto Rico.

304   Testimony of Gamelyn Oduardo, May 2, 2011, Río Piedras, Puerto Rico.

305   *Id.*

306   *Id.*

307   *Id.*

308   ACLU interview with Zulee Aguilar, April 5, 2011, San Juan, Puerto Rico.

309   ACLU interview with Ricardo Olivero, April 7, 2011, San Juan, Puerto Rico.

310   *Id.*

311   ACLU interview with Zulee Aguilar, April 5, 2011, San Juan, Puerto Rico.

312   ACLU interview with Shariana Ferrer Nuñez, May 6, 2011, San Juan, Puerto Rico; ACLU interview with Zulee Aguilar, April 5, 2011, San Juan, Puerto Rico.

313   ACLU interview with Shariana Ferrer Nuñez, May 6, 2011, San Juan, Puerto Rico.

314   ACLU interview with Roberto Morales, April 4, 2011, San Juan, Puerto Rico.

315   ACLU interview with Zulee Aguilar, April 5, 2011, San Juan, Puerto Rico.

316   ACLU interview with Guillermo Torres Grajales, April 4, 2011, San Juan, Puerto Rico.

317   *Id.*

318   Maria Miranda, *21 Women Killed This Year by Partners*, Puerto Rico Daily Sun, July 14, 2011.

319   Centro Reina Sofía, *Tercer Informe internacional:  Violencia contra la mujer en las relaciones de pareja, estadísticas y legeslación* at 89, 92 (2010).

320   *The Homicide Report, Circumstances – Domestic Violence*, Los Angeles Times.

321   *Id.*

322   U.S. Dep't of Justice Bureau of Justice Statistics, Shannan M. Catalano, Michael R. Rand, et al., *Female Victims of Violence* (Sept. 30, 2009).

323   Tendencias PR, *Compendio de Estadísticas: Violencia en Puerto Rico, 2009* (2010); El Nuevo Día, *Mujeres en Puerto Rico*; Oficina de la Procuradora de las Mujeres, *Cuando solo una es demasiado:  Informe de asesinatos de mujeres por el motivo de violencia doméstica, Puerto Rico 2007* (2008, revised 2009); Oficina de la Procuradora de las Mujeres, *Ni una más: Informe de asesinatos de mujeres por el motivo de violencia doméstica, Puerto Rico 2006* (2007, revised 2009); University of Puerto Rico, *De cara hacia el futuro*.

324   Official government statistics identified 26 intimate partner homicides for 2011, but civil society organizations reported five additional cases of women murdered by their partners during the final days of December 2011, bringing the figure up to 30 cases of women murdered by their partners.  See, e.g., Tania *Polanco, El 2011 tuvo alarmantes niveles de violencia en RD y Puerto Rico, Diario Libr*e, Jan. 2, 2011.

325   The *Homicide Report, Circumstances – Domestic Violence, Lo*s Angeles Times.

326   Bárbara Figueroa Rosa, *Clamor de justicia en sepelio de enfermera de Ceiba*, Primera Hora, Feb. 17, 2012; Eugenio Hopgood Dávila, *Llamado a evitar que otra mujer sea asesinada*, El Nuevo Día, Feb. 17, 2012; Eugenio Hopgood Dávila, *Familiares de mujer asesinada en Ceiba piden justicia*, El Nuevo Día, Feb. 16, 2012; Bárbara J. Figueroa Rosa, *Clamor de justicia en el entierro de Wandy Camacho*, Primera Hora, Feb. 18, 2012; *Procuradora de la Mujer exije investigación para fijar responsabilidades*, Telemundo, Feb. 15, 2012; *Procuradora investiga instalación de grillete a presunto asesino de mujer en Ceiba*, Primera Hora, Feb. 14, 2012; Eugenio Hopgood Dávila, *Fracasaron en proteger a mujer asesinada por su expareja*, El Nuevo Día, Feb. 15, 2012.

327   *Procuradora investiga instalación de grillete a presunto asesino de mujer en Ceiba*, Primera Hora, Feb. 14, 2012; Eugenio Hopgood Dávila, *Fracasaron en proteger a mujer asesinada por su expareja*, El Nuevo Día, Feb. 15, 2012.

328   *Id.*

329   *Id.*

330   *Id.*

331   *Id.*

332   *Id.*

333   *Id.*

334   *Id.*

335   *Id.*

336   *Id.*

337   *Id.*

338   Bárbara Figueroa Rosa, *Clamor de justicia en sepelio de enfermera de Ceiba*, Primera Hora, Feb. 17, 2012; Eugenio Hopgood Dávila, *Llamado a evitar que otra mujer sea asesinada*, El Nuevo Día, Feb. 17, 2012; Eugenio Hopgood Dávila, *Familiares de mujer asesinada en Ceiba piden justicia*, El Nuevo Día, Feb. 16, 2012; Bárbara J. Figueroa Rosa, *Clamor de justicia en el entierro de Wandy Camacho*, Primera Hora, Feb. 18, 2012.

339   *Preso el hombre imputado de matar ex pareja en Ceiba*, Primera Hora, Feb. 14, 2012.

340   Wilma Maldonado Arrigoitía and Sara M. Justicia Doll, *Juntos hasta la tumba, Primera Hora, Jan.* 12, 2011.

341   Barbara J. Figueroa Rosa, P*adre presintió que su hija moriría, Primera Hor*a, Jan. 11, 2011; Barbara J. Figueroa Rosa, Arrestan a hombre acusado de matar a compañera en Patillas, Primera Hora, Jan. 10, 2011; Darisabel Texidor Guadalupe, Despiden entre llantos y aplausos a mujer asesinada en Patillas, Primera Hora, Jan. 12, 2011; Darisabel Texidor Guadalupe, Declaran no procesable a hombre que asesinó a ex companera en Patillas, Primera Hora, Feb. 24, 2011; Acusan hombre por asesinato de ex pareja, El Nuevo Día, Jan. 11, 2011.

342   Javier Colón Dávila, De*gollada por ex pareja, El Nuevo Dí*a, Jan. 27, 2011; Wilma Maldonado Arrigoitía, Asesinada frente al hijo, Primera Hora, Jan. 27, 2011; Transportan al hospital al hombre que asesinó a su ex pareja en Túnel Guajataca, Primera Hora, Jan. 26, 2011.

343   Maelo Vargas Saavedra, *Víctima fatal por violencia doméstica en Mayagüez, Primera Hor*a, Jan. 23, 2011; Maelo Vargas Saavedra, Ingresan a prisión imputado por la muerte de su ex pareja, Sacha Hernández Alemar, Primera Hora, Jan. 24, 2011.

344   Luis Dalmau D., *Dominicano mata en PR a su ex mujer y se suicida, El Nacional (Dominican Republic), Jan.* 29, 2011.

345   Ivelisse Rivera Quiñones, A *la cárcel con fianza millonaria asesino de mujer en Loíza, Primera Hor*a, Feb. 5, 2011; Alberto Rullán, La asesinan frente a su hijo, WAPA.TV, Feb. 5, 2011;  Darisabel Texidor Guadalupe, Dan último adiós a mujer asesinada, Primera Hora, Feb. 9, 2011; Asesina a su ex pareja en disputa por pensión, El Nuevo Día, Feb. 5, 2011.

346   Frances Rosario, M*uere mujer que fue baleada en la cabeza por su esposo, El Nuevo Día*, March 10, 2011; Darisabel Texidor Guadalupe and Arys Rodríguez Andino, Asombrados por tragedia, Primera Hora, March 5, 201; Darisabel Texidor Guadalupe, Conmoción por la muerte de mujer, Primera Hora, March 5, 2011.

347   *Víctimas de violencia machista, El Vocero, July 13*, 2011.

348   Javier Colón Dávila, Des*piadado asesinato, El Nuevo Dí*a, March 17, 2011; Maribel Hernández Pérez and  Pedro Menéndez, No salen de su asombro familiares de pareja muerta en hecho de violencia doméstica, Primera Hora, March 17, 2011.

349   Daniel Rivera Vargas, Ot*ra mujer asesinada por su pareja, El Nuevo Dí*a, March 28, 2011.

350   Ricardo Cortés Chico, H*ombre confiesa que asesinó por celos a su pareja y a un acompañante, El Nuevo Día, Marc*h 30, 2011; Maelo Vargas Saavedra, Posponen vista contra hombre que confesó asesinato de su exposa y acompañante, Primera Hora, April 13, 2011.

351   Darisabel Texidor Guadalupe, D*uerme en la cárcel mujer acusada de asesinar a su novia, Primera Hora*, April 7, 2011; Javier Colón Dávila, Policía inspecciona auto y su posible relación con muerte de mujer, El Nuevo Día, April 4, 2011.

352   Darisabel Texidor Guadalupe, El *novio asesinó a Frances, Primera Hora*, April 9, 2011; Darisabel Texidor Guadalupe, Un duro golpe la muerte de Frances, Primera Hora, April 12, 2011.

353   Istra Pacheco, C*laman por castigo para el asesino de Aida, Primera Hora, April 27, 2011; Sara M. Justicia Doll, Sujeto cumplió amenaza al degollar a su pareja, Primera Hora, April 24, 2011; Alberto Rullán, Sexagenario asesina a su pareja, WAPA.TV, April 24, 2011.*

354   Javier Colón Dávila, T*rágico fin de convulsa relación, El Nuevo Dí*a, May 7, 2011; Ivelisse Rivera Quiñones, Escala ocho pisos y mata a su ex pareja frente a sus hijos en Aguadilla, Primera Hora, May 6, 2011; Maelo Vargas Saavedra, Reclaman cese a la violencia doméstica durante sepelio de mujer en Aguadilla, Primera Hora, May 10, 2011.

355   Yainary López Quintana, S*ospechan del novio en brutal crimen de mujer, El Nuevo Día*, June 9, 2011; Osman Pérez Méndez, Matan a cuchilladas a una madre de cuatro, El Nuevo Día, June 9, 2011; Maelo Vargas, Le roban la vida a puñaladas, Primera Hora, June 10, 2011; Yainary López Quintana, "Varias veces él dijo que la iba a matar", El Nuevo Día, June 10, 2011.

356   Wilma Maldonado Arrigoitía, S*entencian a 65 años de cárcel sujeto que mató a su esposa en Arecibo, Primera Hora*, Sept. 29, 2011; Wilma Maldonado Arrigoitía, Preso en Guerrero esposo de Josmarie Serrano Fonseca, Primera Hora, June 21, 2011;

357   Maelo Vargas, H*ombre que asesinó a su compañera se declara culpable, Primera Hora*, Dec. 7, 2011; Ivelisse Rivera Quiñones, Hombre mata a su pareja de un machetazo en Lajas, Primera Hora, Jul. 12, 2011; Ivelisse Rivera Quiñones, Degüella a pareja con machete, Primera Hora, Jul. 13, 2011.

358   Maribel Hernández Pérez, *Acribilla a pareja y se suicida, Primera Hora,* Jul. 19, 2011.

359   Alex Figueroa Cancel, H*ombre asesina a su pareja y luego se suicida en Toa Alta, Primera Hora*, Aug. 25, 2011; Javier Colón Dávila, Familiares y vecinos lamentan caso de violencia doméstica en Toa Alta, El Nuevo Día, Aug. 25, 2011; Francisco Rodríguez-Burns, Macabro crimen en comunidad remota de Toa Alta, Primera Hora, Aug. 25, 2011.

360   Eugenio Hopgood Dávila, G*rave denuncia a dos jueces, El* Nuevo Día, Nov. 26, 2011; Procuradora de las Mujeres acusa a juez de negligente, El Nuevo Día, Nov. 25, 2011; Procuradora de las Mujeres pide investigar posible violación a la ley en caso de ataque en Aguadilla, El Nuevo Día, Nov. 12, 2011.

361   Ivelisse Cortes Kercado, *Exigen esclarecer ocho asesinatos por violencia doméstica,* Telemundo, Dec. 30, 2011; *Comisión de la Mujer del Colegio de Abogados y Abogadas de Puerto Rico* and *Coalición Coordinadora Paz para la Mujer*, Press Release, *Organizaciones pro mujeres exigen esclarecer 8 asesinatos por violencia doméstica del 2011*, Dec. 29, 2011.

362   Maria Miranda, *21 Women Killed This Year by Partners*, Puerto Rico Daily Sun, July 14, 2011.

363   DOJ report at 58.

364   *Díaz Colón saca la Policía de diferentes asuntos*, WAPA.TV, Sept. 7, 2011.

365   World Health Organization, *World Report on Violence and Health* at 25 (2002).

366   *Cuando solo una es demasiado: Informe de asesinatos de mujeres por el motivo de violencia doméstica, Puerto Rico 2007* at 7 (2008, revised 2009).

367   "[E]very law enforcement officer shall make an arrest, even though there is no order to such effect, if he has grounds to believe that the person to be arrested has committed, even though not in his/her presence, or that is committing in his/ her presence, a violation to the criminal provisions of this chapter."  PR ST T. 8 § 638.

368   Emily J. Sack, *Report on Domestic Violence Practices and Services of the Puerto Rico Court System and its Partners: Assessment, Evaluation and Recommendations* at 6 (May 17, 2006).

369   *Id.* at 23, 27.

370   Jodie G. Roure, *Gender Justice in Puerto Rico: Domestic Violence, Legal Reform, and the Use of International Human Rights Principles*, 33 Human Rights Quarterly 790, 798-99 (2011).

371   Emily J. Sack, *Report on Domestic Violence Practices and Services of the Puerto Rico Court System and its Partners: Assessment, Evaluation and Recommendations* at 23 (May 17, 2006).

372   *Id.*

373   *Id.*

374   U.S. Dep't of Justice, National Institute of Justice, *Practical Implications of Current Domestic Violence Research: For Law Enforcement, Prosecutors and Judges* at 36 (June 2009).

375   *Id.* at 27.

376   *Id.* at 6.

377   *Id.*

378   Oficina de la Procuradora de las Mujeres, *Estadísticas de violencia doméstica, Incidentes de violencia doméstica*; Tendencias PR, *Compendio de Estadísticas: Violencia en Puerto Rico, 2009* (2010); Puerto Rico Police Department, División de Estadísticas, *Incidentes de violencia doméstica por área*; Entreparedes.org, *Datos que le harán actuar*.

379   Maricarmen Rivera, *Víctimas con las manos vacías: Procuradora de la Mujer denuncia inacción en muchas salas de justicia ante la violencia doméstica*, Vocero, April 8, 2012; Tendencias PR, *Compendio de Estadísticas: Violencia en Puerto Rico, 2009* (2010); Oficina de la Procuradora de las Mujeres, *Estadísticas de violencia doméstica, Incidentes de violencia doméstica*; Puerto Rico Police Department, División de Estadísticas, *Incidentes de violencia doméstica por área*.

380   Departamento de Salud, Centro de Ayuda a Víctimas de Violación, *Violencia Sexual en Puerto Rico* at 3 (2007).

381   *Id.*

382   Tendencias PR, *Compendio de Estadísticas: Violencia en Puerto Rico, 2009* at 106 (2010); DOJ report at 57.

383   DOJ report at 16.

384   *Id.* at 17.

385   *Id.* at 5.

386   *Id.* at 58.

387   ACLU interview with Judith Berkan, April 5, 2011, San Juan, Puerto Rico.

388   Comité Evaluador Externo de la Policía de Puerto Rico, *Informe del Comité Evaluador Externo de la Policía de Puerto Rico* (Dec. 21, 2007), *available at* http://www.claridadpuertorico.com/documents/articles/02%20Informe%20 Polic%C3%ADa%2021%20Dic%202007.pdf; Comité Evaluador Externo de la Policía de Puerto Rico, *Informe del Comité Evaluador Externo de la Policía de Puerto Rico:  La Corrupción en la Policía de Puerto Rico* (May 1, 2008), *available at* http:// pr.microjuris.com/ConnectorPanel/ImagenServlet?reference=/images/file/Informe%202008.pdf.

389   ACLU interview with Ruth Jiménez de Jesús, San Juan, Puerto Rico, March 28, 2011.  The officer implicated in both the Polaco and Cirino cases, Isaac Joel Pizarro Pizarro, was later shot and killed in an unrelated incident in December 2011.

390   *José Luis Irizarry Muñiz, Betsy Jeannette Pérez Rivera et al. v. Eric Rivera Nazario, Jaime Rodriguez Vega et al.*, Compl, 11-01337 (April 13, 2011); Oscar J. Serrano and Melissa Solórzano García, *Demanda por policías que mataron al joven en Yauco*, NOTICEL, April 19, 2011; *Podrían demandar al agente*, EL NUEVO DÍA, Oct. 18, 2010; *Objetan desaparición de vídeo en caso de brutalidad policiaca*, EL NUEVO DÍA, July 2, 2010; Keila López Alicea, *Justicia no se rinde*, EL NUEVO DÍA, Feb. 4, 2009; *Causa para juicio contra policía estatal*, EL NUEVO DÍA, June 26, 2009.

391   ACLU interview with Max Pérez Bouret, then Auxiliary Superintendent of Administrative Services of the PRPD, May 6, 2011, San Juan, Puerto Rico.

392   DOJ report at 70.

393   Comité Evaluador Externo de la Policía de Puerto Rico, *Informe del Comité Evaluador Externo de la Policía de Puerto Rico* (Dec. 21, 2007); Comité Evaluador Externo de la Policía de Puerto Rico, *Informe del Comité Evaluador Externo de la Policía de Puerto Rico:  La Corrupción en la Policía de Puerto Rico* (May 1, 2008).

394   ACLU interview with Max Pérez Bouret, then Auxiliary Superintendent of Administrative Services of the PRPD, May 6, 2011, San Juan, Puerto Rico.

395   Comité Evaluador Externo de la Policía de Puerto Rico, *Informe del Comité Evaluador Externo de la Policía de Puerto Rico* (Dec. 21, 2007).

396   ACLU interview with Ruth Jiménez de Jesús, San Juan, Puerto Rico, March 28, 2011.

397   *Id.*

398   *Id.*

399   *Id.*

400   *Id.*

401   *Id.*

402   Comité Evaluador Externo de la Policía de Puerto Rico, *Informe del Comité Evaluador Externo de la Policía de Puerto Rico* (Dec. 21, 2007); Comité Evaluador Externo de la Policía de Puerto Rico, *Informe del Comité Evaluador Externo de la Policía de Puerto Rico:  La Corrupción en la Policía de Puerto Rico* (May 1, 2008).

403   E-mail communication from Nora Vargas to the ACLU, May 5, 2011.

404   ACLU interview with Enrique G. Juliá Ramos, May 5, 2011, Río Piedras, Puerto Rico.

405   *Id.*

406   *Id.*

407   *Id.*

408   *Id.*

409   *Id.*

410   *Id.*

411   *Id.*

412     Colegio de Abogados de Puerto Rico, Comisión Especial Sobre Fiscalización del Estado Actual de los Derechos Constitucionales, *Informe Preliminar* at 20-21 (July 12, 2010), *available at* http://www.capr.org/dmdocuments/Informe_Comi_Fiscalizacion.pdf.

413     *E.g.*, *id.* at 76.

414     ACLU interview with Hans Perl-Matanzo, May 4, 2011, San Juan, Puerto Rico; e-mail communication from Hans Perl-Matanzo, May 3, 2011.

415     ACLU interview with Luis Torrez, March 29, 2011, San Juan, Puerto Rico.

416     ACLU interview with Amada Garcia, May 5, 2011, Río Piedras, Puerto Rico.

417     Policía de Puerto Rico, Superintendencia Auxiliar en Responsabilidad Profesional, *Relación Annual de Querellas Administrativas por Acciones Disciplinarias Recomendadas y Referidas a la Oficina de Asuntos Legales*.

418     *Id.*

419     *Gutiérrez-Rodríguez v. Cartagena*, 882 F.2nd 553, 581-82, 565-66 (1st Cir., 1989).

420     *Gutiérrez-Rodríguez*, 882 F.2nd at 582.

421     *Evelyn Ramírez Lluveras et al. v. Javier Pagán Cruz et al.*, D.P.R., Case No. 3:08-cv-01486-FAB, Plaintiff's Statement of Facts in Opposition to Motion for Summary Judgment on Liability, Exhibit JJJ, Lou Reiter Report under penalty of perjury, Filed March 15, 2011.

422     *Id.*

423     *Id.*

424     *Id.*

425     PRPD, *Orden Especial 90-5*.

426     ACLU interview with Max Pérez Bouret, then Auxiliary Superintendent of Administrative Services of the PRPD, May 6, 2011, San Juan, Puerto Rico.

427     *Id.*

428     *Id.*

429     *Id.*

430     *Id.*

431     ACLU interview with Judith Berkan, April 5, 2011, San Juan, Puerto Rico; *see*, *Camilo-Robles v. Zapata*, 175 F.3d 141 (1st Cir., 1999); *Camilo-Roblez v. Hoyos*, 151 F.3s 1 (1st Cir., 1998); *Rosario Díaz v. González*, 140 F.3d 312 (1st Cir., 1998); *Díaz v. Martínez*, 112 F.3d (1st Cir., 1998).

FINAL DRAFT - Embargoed until June 19, 2012 10 a.m. EDT

# ISLAND OF IMPUNITY: Puerto Rico's Outlaw Police Force

The Puerto Rico Police Department (PRPD), charged with policing the Commonwealth of Puerto Rico, is the second-largest police department in the United States. The PRPD performs an essential public safety function, yet the police force is plagued by a culture of unrestrained abuse and impunity. After a comprehensive six-month investigation of policing practices in Puerto Rico, building on eight years of work by the ACLU of Puerto Rico documenting cases of police brutality, the ACLU has concluded that the PRPD commits serious and rampant abuses in violation of the United States Constitution, the Puerto Rico Constitution, and the United States' human rights commitments.

The PRPD routinely commits abuses including the unjustified use of lethal force against unresisting, restrained, and unarmed civilians; beatings and other violence against unarmed low-income Puerto Ricans, Puerto Ricans of African descent, and Dominican immigrants that left some near-death and others paralyzed or with traumatic brain injury; and excessive force against peaceful protesters including the indiscriminate use of tear gas, pepper spray, batons, rubber bullets, sting ball grenades, Tasers, carotid holds, and pressure point techniques. The PRPD also systematically fails to police crimes of domestic violence and rape, and fails to protect women from violence by their intimate partners.

These abuses do not represent isolated incidents or aberrant behavior by a few rogue officers. Such police brutality is pervasive and systemic, island-wide and ongoing. The ACLU's research shows that there are numerous contributing factors that are responsible for this pattern of police abuse. Our research has found that the PRPD's disciplinary, investigatory, and reporting systems in place utterly fail to address, and therefore prevent, police abuses. These systems virtually guarantee impunity: instead of deterring abuses by holding abusive officers accountable, the PRPD allows officers to escape punishment or any other consequences, rearming and returning them to active duty, often to repeat their offenses. Citizen complaints of brutality languish for years without resolution, and the PRPD fails to adequately investigate allegations of police misconduct. The PRPD rubber-stamps the use of force, covers up abuse by its officers, and encourages a code of silence. Officers also receive patently inadequate training, insufficient supervision, and minimal guidance on the legal boundaries of their use of force and other conduct. The PRPD fails to provide critical guidance to its personnel on how to discharge their duties in compliance with constitutional and human rights standards. Moreover, there is no effective independent review of the PRPD's policies and practices.

The PRPD has demonstrated it is both unwilling and unable to police itself, and the political leadership in Puerto Rico has failed to step into the breach. The PRPD has long promised reforms and publicly stated its commitment to reforming some of its policies, but for the most part it has not delivered on these promises. Based on our research, the ACLU has formulated clear recommendations for much-needed reforms. These reforms will not only help to bring the PRPD into compliance with the Constitutions of the United States and Puerto Rico and human rights laws, but will also help it to combat the public safety crisis it currently confronts.

