# Investigation of the
# Puerto Rico Police Department



United States Department of Justice
Civil Rights Division

September 5, 2011

# TABLE OF CONTENTS

**ABBREVIATIONS** ................................................................................................. **3**

**GENERAL METHODOLOGY** .............................................................................. **4**

**I.  EXECUTIVE SUMMARY** ............................................................................... **5**

**II.  BACKGROUND** ............................................................................................. **12**

A.    Puerto Rico Police Department ...................................................................... 12
B.    University College of Criminal Justice (Police Academy) ............................. 13
C.    Public Safety .................................................................................................. 13
D.    Police Crime and Corruption ......................................................................... 14

**III.  PATTERN AND PRACTICE OF CONSTITUTIONAL VIOLATIONS** ...... **19**

A.    PRPD Engages in a Pattern and Practice of Use of Excessive Force ............... 20
    1.    Officers Use Excessive Force in Violation of the Fourth Amendment ............... 20
    2.    Officers Use Unreasonable Force to Suppress the Exercise of Protected
        First Amendment Rights ............................................................................... 25
    3.    Deficiencies Causing and Contributing to the Pattern and Practice of Excessive
        Force ......................................................................................................... 32

B.    PRPD Engages in a Pattern and Practice of Unconstitutional Searches and Seizures ...... 45
    1.    Officers Conduct Searches and Seizures in Violation of the
        Fourth Amendment ...................................................................................... 46
    2.    Systemic Deficiencies Causing and Contributing to the Pattern and Practice of
        Unlawful Searches and Seizures ................................................................... 50

C.    Additional Areas of Serious Concern ............................................................. 54
    1.    Allegations of Discriminatory Police Practices by PRPD .................................. 54
    2.    PRPD's Failure to Address Domestic Violence and Sexual Assault .................. 57

**IV.  ADDITIONAL DEFICIENCIES CAUSING THE PATTERN AND PRACTICE OF
CONSTITUTIONAL VIOLATIONS** ................................................................. **59**

A.    Inadequate Policies and Procedures ............................................................... 60

B.    Insufficient Training ...................................................................................... 61
    1.    The University College Lacks Accreditation and Independence ......................... 61
    2.    Pre-Service Training Is Insufficient ............................................................... 63
    3.    In-Service Training Is Virtually Non-Existent .................................................. 65

C.    Inadequate Supervision .................................................................................. 67

D.    Seriously Deficient Civilian Complaint Process .............................................. 68
    1.    The Complaint Intake Process Discourages Civilians from Filing Complaints ... 68

|  | 2. | Complaint Investigations Routinely Take Years To Complete | 70 |
|  | 3. | Procedures and Protocols Are Insufficient To Ensure Proper Investigations | 74 |
|  | 4. | Investigators Lack Training and Resources | 75 |

E. Ineffective Discipline ........................................................................................ 76
   1. The Police Personnel Regulation Is Sorely Outdated ............................ 77
   2. Supervisors Lack Authority and Training To Correct Even Minor Infractions of Their Subordinates ................................................................................ 78
   3. Administrative Investigations Take Too Long To Complete ................... 78
   4. Disciplinary Action Is Inconsistent and Ineffective in Deterring Misconduct ..... 78
   5. Protections Against Self-Incrimination Are Offered in Administrative Investigations ........................................................................................ 80

F. Limited Risk Management .................................................................................. 80

G. Lack of External Oversight and Accountability ................................................ 83
   1. CIPA .................................................................................................... 84
   2. Puerto Rico Civil Rights Commission ................................................. 84

**V. RECOMMENDED REMEDIAL MEASURES** .................................................. **85**

**VI. CONCLUSION** .............................................................................................. **110**

   Endnotes ........................................................................................................ 111

   Appendix A:   Additional Illustrative Incident ........................................... A-1
   Appendix B:   Relevant Correspondence .................................................. A-10

# ABBREVIATIONS

PRPD        Puerto Rico Police Department

DOJ        United States Department of Justice

CED        Conducted Energy Device

CIPA        Commission on Investigations, Processing, and Appeals of Puerto Rico

CRC        Civil Rights Commission of Puerto Rico

DNVW        Drugs, Narcotics, Vice, and Illegal Weapons Division

FBI        Federal Bureau of Investigation

FSI        Forensic Sciences Institute of Puerto Rico

FY        Fiscal Year (in Puerto Rico, running from July 1 to June 30)

GO        General Order of the Puerto Rico Police Department

IAD        Internal Affairs Division

IACP        International Association of Chiefs of Police

LEMAS        Law Enforcement Management and Administrative Statistics

PID        Public Integrity Division

POST        Peace Officer Standards and Training

PRD        Professional Responsibility Division

PRDOJ        Puerto Rico Department of Justice

SIB        Special Investigations Bureau of the Puerto Rico Department of Justice

SO        Special Order of the Puerto Rico Police Department

SOU        Special Operations Unit

STU        Specialized Tactical Unit

TOU        Tactical Operations Unit

UPR        University of Puerto Rico

## GENERAL METHODOLOGY

This report contains the findings of the Civil Rights Division's pattern and practice investigation[i] of the Puerto Rico Police Department ("PRPD").  The investigation was conducted pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, and the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d.  Section 14141 permits the Attorney General, acting on behalf of the United States, to initiate civil actions against state and local governments to remedy a pattern or practice of conduct that deprives persons of rights, privileges, or immunities secured or protected by the Constitution and federal law.  The Safe Streets Act, together with Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d-7, prohibit discrimination on the basis of race, color, sex, or national origin by state or local criminal justice agencies receiving federal funding.

Attorneys and staff from the Civil Rights Division's Special Litigation Section conducted the investigation alongside law enforcement professionals, whose expertise informed our understanding.  These professionals – former police chiefs and supervisors – provided us with in-depth knowledge about how to detect and respond to law enforcement challenges.

We gathered information through many interviews and meetings with PRPD officers, supervisors, and command staff, as well as members of the public, Commonwealth officials, and other community stakeholders.  We interviewed officers from all ranks at PRPD headquarters and ten police areas:  San Juan, Carolina, Bayamón, Fajardo, Humacao, Caguas, Ponce, Guayama, Mayagüez, and Aguadilla.  We also participated in ride-alongs with officers and supervisors.  Our investigation included on- and off-site review of documents, including policies and procedures, incident reports, internal investigation files, disciplinary index cards maintained by PRPD's Legal Affairs Office, external audit reports, and legislative materials.

# I.  EXECUTIVE SUMMARY

The Puerto Rico Police Department is Puerto Rico's primary law enforcement agency. Its mission is critical:  To protect and serve the residents of Puerto Rico by designing and implementing policies and practices that control crime, ensure respect for the Constitution and the rule of law, and enable the Department to enjoy the respect and confidence of the public.

Many hard working and dedicated PRPD officers serve the public with distinction under often challenging conditions.  Unfortunately, PRPD is broken in a number of critical and fundamental respects that are clearly actionable under the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 ("Section 14141").  Based on our extensive investigation, we find reasonable cause to believe that PRPD officers engage in a pattern and practice of:

- excessive force in violation of the Fourth Amendment;
- unreasonable force and other misconduct designed to suppress the exercise of protected First Amendment rights; and
- unlawful searches and seizures in violation of the Fourth Amendment.

In addition to these findings, our investigation uncovered other deficiencies of serious concern.  In particular, there is troubling evidence that PRPD frequently fails to police sex crimes and incidents of domestic violence, and engages in discriminatory policing practices that target individuals of Dominican descent in violation of the Fourteenth Amendment, the Safe Streets Act, and Title VI.  At this time, we do not make a formal finding of a pattern and practice violation in these areas, in part because PRPD does not adequately collect data to evaluate these issues.  However, we are quite concerned that PRPD lacks basic systems of accountability to ensure that all individuals are treated equally by PRPD officers, regardless of race, ethnicity, national origin, or sex as required by federal law.  Furthermore, our investigation raises serious concerns that PRPD policies and practices are woefully inadequate to prevent and address domestic violence committed by PRPD officers.  We find that these deficiencies will lead to constitutional violations unless they are addressed.  PRPD's continued failure to keep necessary data in light of our findings and despite knowledge of these indicators of a very serious problem, may constitute a pattern and practice that violates federal law.

We recognize that PRPD faces significant challenges as Puerto Rico's primary law enforcement agency.  The unconstitutional acts that we have identified arise at a time of crisis in public safety.  Contrary to national trends, violent crime increased overall in Puerto Rico by 17% from 2007 to 2009.  In 2010, Puerto Rico saw the second highest number of murders in its history, a trend that is escalating in 2011.  The clearance rate for murders remains below the national average.  Some Puerto Rico officials maintain that drug trafficking and social deterioration are fueling the wave of violent crime.  However, increasing crime cannot be used to justify continued civil rights violations or the failure to implement meaningful reforms. Constitutional policing and effective law enforcement are inextricably bound.  Public safety depends on the trust and cooperation of the community, which in turn depends on constitutional police practices that respect civil rights.  Our previous efforts in working with large police departments strongly suggest that by addressing the civil rights concerns we raise in this report,

the Commonwealth will not only meet its constitutional duty, but also reduce crime, improve public safety, and increase community confidence.[2]

For many years, victims' families, civic leaders, legislators, and civil rights advocates have voiced concerns over chronic mistreatment by police.  For example, over the past decade, various legislative measures have called for comprehensive investigations of police misconduct, greater education and training, and an accounting of public funds spent on civil rights lawsuits against the Commonwealth.  Other grass-roots and advocacy organizations have sent letters to Puerto Rico officials denouncing allegations of discrimination against people of Dominican descent, and civic and professional organizations have issued investigative reports detailing numerous civil rights violations at the hands of police.  PRPD officers have also called for agency reforms.  One police affinity group representing thousands of officers attributed widespread low morale among officers to verbal abuse from supervisors, indifference to officers' personal problems, lack of support and training, absence of motivational and educational activities, deficient equipment and materials, and late payment.

The public's demands for remedial action are fueled in part by the appalling number of officer arrests and convictions for serious misconduct and criminal activity.  Among these are: the killing of family members by two police officers in the "Massacre of Las Piedras" in 2007; the videotaped shooting of a civilian by a Tactical Operations Unit ("TOU") officer during a birthday celebration in Humacao in 2007; the shooting death of a PRPD lieutenant by a sergeant at a police station in Yabucoa in 2007; the conviction of multiple officers assigned to the Mayagüez Drug Unit for planting drugs in 2008; the conviction of the director of the Special Arrests and Extraditions Unit and several of his officers on drug-related charges in 2009; the conviction of a lieutenant directing the weapons registry at PRPD headquarters as part of an illegal gun licensing scheme in 2009; the indiscriminate use of batons and chemical irritants against protesters at the Capitol in June 2010; the shooting death of an unarmed young man who was reportedly aiding police following a robbery in September 2010; and the arrest of 61 PRPD officers as part of the largest police corruption operation in the Federal Bureau of Investigation's ("FBI") history in October 2010.

In the report that follows, we discuss the wide range of issues that were the focus of our investigation and the findings that result from our review.  In sum, our investigation reveals the following:

- **The constitutional violations we uncovered are pervasive and plague all levels of PRPD.**

Our investigation concluded that a longstanding pattern and practice exists of PRPD officers violating the Constitution by using force, including deadly force, when no force or lesser force was called for.  As a result, PRPD officers have unnecessarily injured hundreds of people and killed numerous others.  PRPD's overreliance on such tactics is evident in its regular deployment of heavily armed tactical units on routine patrols or "preventive rounds," usually in public housing complexes or low-income neighborhoods.  These units, relying almost exclusively on extreme displays of force and actual force, rather than on more contemporary problem-solving approaches, were neither intended nor trained to perform such patrol functions.

Indeed, the marked disconnect between residents and tactical officers, who routinely enter neighborhoods en masse with high-caliber rifles drawn amid children, seniors, and other bystanders, reveals PRPD's reliance on law enforcement strategies that run counter to widely accepted models of community-oriented policing.  Distressingly, an officer assigned to one of these units told us openly and without objection from his supervisors that officers *need* to violate civil rights to fight crime and meet the goals set by government officials.  This conduct deprives the people of Puerto Rico of their rights guaranteed by the Constitution and federal law.

Officers' use of excessive force also chills speech in violation of the First Amendment.  While some individuals may engage in unlawful activity during protests and civil demonstrations, only a fraction of the force used by PRPD is directed at specific threats or criminal behavior, as evidenced by the dearth of arrests supported by probable cause.  Instead, PRPD officers regularly rely on the indiscriminate use of force or threat of force well beyond what is necessary to protect public safety when engaging with crowds.  Specifically, PRPD indiscriminately used chemical agents, batons, and physical force against demonstrators and other individuals on University Avenue in August 2009, at the Sheraton Hotel in May 2010, and at the Capitol in June 2010.  PRPD officers also used choke holds and pressure techniques against protestors who were passively resisting or otherwise not posing any significant threat as recently as December 2010 and January 2011.  In February 2011, officers pushed, struck, and sprayed protestors at a university campus, and officers threw rocks and other objects at individuals who likewise posed no significant threat.  The use of excessive force by PRPD officers in these instances, along with other tactics aimed at intimidating demonstrators, has garnered significant public attention and discouraged residents of Puerto Rico from engaging in protected First Amendment activities.  While we recognize that prolonged strikes and civil demonstrations strain PRPD personnel and resources, Puerto Rico must not waver in its duty to uphold the fundamental rights of all residents, even when their viewpoints or affiliations may be disagreeable.

We also found a pattern and practice of illegal searches and seizures in violation of the Fourth Amendment.  Specifically, our investigation revealed a pattern and practice of PRPD officers conducting searches of civilians' homes without a warrant or consent and in the absence of any exigent circumstance or exception that would render such a search constitutional.  Too frequently, PRPD officers plant evidence during searches, rely on excessive force and intimidation as search aids or tools, and proceed with searches even when knowing that the address, identity of the individual, or other pertinent information is incorrect.  The evidence we uncovered further demonstrates that PRPD officers engage in a regular pattern of detaining, arresting, and searching individuals without reasonable suspicion or probable cause in violation of the Fourth Amendment, and that supervisors and members of specialized units are often involved in these unlawful acts.

- **The staggering level of crime and corruption involving PRPD officers must be addressed in systematic fashion.**

The amount of crime and corruption involving PRPD officers further illustrates that PRPD is an agency in profound disrepair.  From January 2005 to November 2010, there were more than 1,709 arrests of PRPD officers.  The charges varied widely, from theft and simple

assault to rape, drug trafficking, and murder.  Hundreds of officers have also engaged in domestic violence; many have been arrested multiple times for harming their partners.

- **There are many contributing factors to the constitutional violations.**

PRPD has failed to provide officers with the basic understanding and tools they need to safeguard the rights of the people they serve.  Basic systems of accountability are non-existent or profoundly broken, and have been for years.  Although our report focuses on recent constitutional violations, the systemic deficiencies that underlie the misconduct developed over a much longer period.  These systemic deficiencies include the following:

1. **Policies fail to guide officers on lawful policing practices.**  PRPD's policies and procedures on use of force and searches and seizures are out-dated, disorganized, and omit contemporary legal standards.  Officers are not provided with copies of PRPD's policies, or access to policies through other reliable means, to reference as they carry out their day-to-day duties.  As a result, officers develop their own informal practices, and the operations of similar units or components throughout PRPD vary widely.  Officers also expressed a fundamental misunderstanding of critical aspects of their duties.  For instance, officers in different areas and units routinely defined "force" differently.  Many other officers were unfamiliar with the parameters of temporary investigatory detentions, or *Terry* stops, which may, when performed unreasonably, constitute Fourth Amendment violations.  These and other essential concepts are not communicated effectively and consistently to officers on an ongoing basis through policy.

2. **Pre-service field training is insufficient.**  Cadets review PRPD's policies and procedures while attending pre-service training, but are not provided with post-academy field training to prepare them for real-life policing.  This training is particularly essential in developing the practical skills, judgment, and understanding necessary to lawfully employ force, effect arrests, treat all persons equally, and solve problems effectively as partners with the community.  Instead, new officers are simply armed and released into the streets and neighborhoods of Puerto Rico.  In many cases, they never return to the academy for regular in-service training.

3. **In-service training is virtually non-existent.**  Effective law enforcement agencies reinforce their expectations on use of force and searches and seizures through consistent and sufficient in-service training.  However, many PRPD officers reported that they do not return to the University College of Criminal Justice ("University College") for in-service training for years, or ever, after completing the pre-service program.  In 2010, the Puerto Rico Legislature confirmed these reports and passed legislation requiring PRPD to provide at least 12 hours of annual in-service training.  The Legislature found the training was "necessary and urgent" in light of domestic violence, corruption, and numerous instances in which officers failed to exercise self-control with civilians.  Even with the new legislation, PRPD still requires less than half the average number of annual training hours required by police departments across the country.

4. **No external oversight of officer standards and training.**  Unlike every state except Hawaii, Puerto Rico does not have a state-wide authority that establishes minimum law enforcement standards and training requirements, such as Peace Officer Standards and Training ("POST") boards, commissions, or academies.  Instead, Puerto Rico vests sole authority for officer recruitment, hiring, training, and development of core competencies on the discretion of the Superintendent.  PRPD Superintendents, subject to budget and political pressures, have reduced the length of pre-service training programs, authorized deployment of cadets on patrol duties before cadets completed critical training, and changed the criteria used to identify at-risk officers who engage in repetitive misconduct, without any accountability for outcome.

5. **Tactical units have been allowed to develop violent subcultures.**  PRPD has been on notice for years that officers assigned to tactical units routinely employ excessive force when interacting with civilians.  These units all too frequently rely on intimidation, fear, and extreme use of force to manage crowds and are often deployed to low-income and minority communities on routine patrols.  These units operate with insufficient training and guidance on the lawful exercise of police power.

6. **Supervision is lacking.**  PRPD has too few qualified supervisors to effectively supervise.  PRPD has not filled many of the 2,100 supervisor vacancies it reported in 2009.  In some instances, supervisors must supervise 18 or more officers, nearly double the generally accepted ratio of 1:10.  In the field, supervisors are not required to independently review the use of force of their subordinates.  As a result, officers engage in multiple incidents of misconduct over prolonged periods, without effective intervention from supervisors.

   Many officers expressed concern that PRPD's promotion practices are driven more by one's affiliations than talents.  For instance, although agency regulations indicate that objective examinations should be used to select candidates for promotion, we found that the vast majority of promotions were carried out as excepted "merit" promotions under special authority granted to the Superintendent.  Only five percent of officers were promoted by examination from January 2008 to September 2010.  Many officers reported that the prevalence of discretionary promotions reinforced their concerns about the quality of supervision.

7. **Internal investigations take years to complete.**  Profound deficiencies in the conduct of administrative investigations leave misconduct unaddressed, decimate officer morale, and foster the public's mistrust.  We found that administrative investigations routinely take years to complete – in some cases, 10 or more years – well beyond the 180-day timeframe required by existing Puerto Rico regulations.

8. **Discipline is seriously deficient.**  In 1989, the First Circuit upheld punitive damages against the Superintendent and other supervisors for federal civil rights violations, relying on evidence that PRPD's disciplinary system was "grossly deficient."  As evidence of the dysfunction in PRPD, many aspects of this seriously broken disciplinary system remain unchanged.  For example, immediate supervisors are not involved in the disciplinary process, disciplinary sanctions are too limited in scope, and officers are permitted to

refuse to testify or give a statement to internal investigators.  Discipline is also ineffective
because administrative investigations take years to complete, or are never resolved.  In
many instances, officers develop pronounced patterns of serious misconduct and face
removal only after they are charged with a crime.  Other problem officers, sometimes
referred to as "parachuters," are simply transferred from one component to another,
without any effort to address their underlying problems, because of the extreme delays in
completing internal investigations.

9. **Inoperable risk management system.**  Effective risk management systems help
commanders and supervisors take early corrective action when officers exhibit potential
problem behaviors.  Interventions typically include targeted training, education, and
counseling.  These systems are designed to protect the community and support officers
who may be experiencing difficulties.  PRPD developed a limited program in 1990
following a federal civil rights lawsuit that found PRPD supervisors liable for operating a
"grossly deficient" disciplinary system.  The program provided a one-size-fits-all
intervention, a multiple-day training course, which PRPD stopped offering in 2007.
PRPD did not resume the course until October 2010.

It would be an enormous mistake to continue attributing the widespread and ongoing
police misconduct that infects PRPD to an isolated group of individual officers or a seemingly
intractable crime problem.  Doing so not only forestalls the implementation of critical reforms,
but also prevents PRPD from regaining the credibility and respect it needs and deserves to fight
crime effectively and uphold the rule of law.

- **Prior efforts to reform PRPD have been sporadic and superficial, all too often
spawned by public outcry over the latest tragic event.**

The Government of Puerto Rico has recognized the public's diminishing confidence in
PRPD following tragic and violent incidents involving police corruption and misconduct.
However, the implementation of corrective action has been sporadic and superficial.  In 2007,
former Superintendent Pedro Toledo Dávila established an external evaluating committee to
assess violence, corruption, and misconduct within PRPD.  The committee issued reports finding
patterns of civil rights violations and corruption, and recommended dozens of remedial
measures.[3]  In its December 2007 report, the committee urged Puerto Rico to establish a fully
resourced commission to develop long-term solutions to PRPD's complex and institutional
deficiencies, an endeavor they projected would take up to two years.[4]  No such commission was
ever created, and many recommendations were not implemented.  Governor Luis Fortuño
acknowledged the need for reform in September 2010 when he called on the Civil Rights
Division to "expand its investigation to incidents of possible use of excessive force or other
possible violations of civil rights by the Police of Puerto Rico that may have occurred during
[his] administration . . ."[5]  Despite longstanding calls for external reviews and investigations,
basic reforms have not been implemented and the necessary effort to openly restore the public's
trust remains long overdue.

For too long, PRPD has failed to provide its officers with meaningful systems of support
and accountability to ensure that officers discharge their duties lawfully and effectively.  Policies

do not delineate the limits of lawful exercise of police power; training is insufficient; supervision is too unquestioning and sparse; and civilian complaints languish for years.  The lack of meaningful external oversight of PRPD policies and actions exacerbates these issues.  The problems outlined in this report are chronic and pervasive.  The public lacks confidence in PRPD at a time when Puerto Rico faces significant public safety challenges.  While Puerto Rico has taken some initial steps to detect, correct, and deter the problems we highlight in this report, it has failed to adequately address the institutional causes that contribute to both its unconstitutional law enforcement and ineffective policing.  It is imperative that Puerto Rico act decisively, openly, and transparently to restore the public's trust and ensure that PRPD becomes an institution that exemplifies the rule of law for all residents in Puerto Rico.

The path toward lasting reform will require nothing less than federal judicial intervention. We believe a court-enforceable agreement will provide the structure, transparency, and accountability that will be necessary to achieve sustainable reform.  Accordingly, we look forward to working with Puerto Rico, rather than engage in contested litigation, to craft a meaningful and collaborative reform plan with judicial oversight that will ensure constitutional policing, improve public safety, and restore the public's confidence.

The report that follows is an account of our findings.  Section II provides background information concerning PRPD, the University College (which serves as PRPD's training academy), public safety, and crime and corruption within PRPD.  Section III discusses the patterns and practices of civil rights violations involving use of excessive force, use of unreasonable force to suppress speech, and unconstitutional searches, detentions, and seizures. We also include illustrative cases demonstrating the deprivation of federal rights and discuss specific deficiencies that cause the pattern and practice for each type of violation.  Section IV evaluates additional systemic deficiencies that are common causes and contributing factors for all the violations we uncovered.  Finally, Section V provides recommendations for remedying PRPD's systemic deficiencies.

## II.  BACKGROUND

### A.    Puerto Rico Police Department

PRPD is the primary law enforcement agency in Puerto Rico, providing a wide array of basic and specialized policing services to its 3,726,000 residents.  PRPD is the second largest law enforcement agency in the country, with approximately 17,153 sworn officers.[6]  There are approximately 4.6 active PRPD officers for every 1,000 residents in Puerto Rico, which represents more than twice the national average for local police departments serving populations of 250,000 or more.[7]  PRPD's jurisdiction is divided into 13 police regions:  Aguadilla, Aibonito, Arecibo, Bayamón, Caguas, Carolina, Fajardo, Guayama, Humacao, Mayagüez, Ponce, San Juan, and Utuado.  Each police region is led by a commander who directly oversees field operations and criminal investigations.  Each regional commander reports to the Superintendent.  There are six divisions that are administered from PRPD headquarters, including the Professional Responsibility Division ("PRD"), which conducts internal and administrative investigations of PRPD personnel.  A Technology and Communications Bureau is responsible for operating PRPD's communication command centers throughout Puerto Rico.

Supreme authority over PRPD is vested in the Governor.  The Governor delegates the immediate administration of PRPD to a Superintendent, who is confirmed by the Puerto Rico Senate.  The Governor also approves appointments to PRPD's highest ranks, ranging from inspectors to colonels.  The Superintendent manages PRPD directly through general and special orders that operate as PRPD's policies and procedures.  The Superintendent is charged with the overall administration of PRPD, including recruiting, selecting, training, deploying, and disciplining officers and cadets.  There are no accrediting or regulatory agencies in Puerto Rico that promulgate law enforcement standards or training requirements beyond those established by the Superintendent.

On July 6, 2011, the Governor appointed Emilio Díaz Colón, a former Adjutant General of the Puerto Rico National Guard, as Superintendent of PRPD.  General Díaz Colón replaced Superintendent José Figueroa Sancha, who resigned on July 2, 2011.  Figueroa Sancha, a former Assistant Special-Agent-in-Charge of the FBI's San Juan Division, was preceded by Pedro Toledo Dávila, who also served with the FBI prior to joining PRPD.  Former Superintendent Toledo Dávila served as Superintendent from 1993 to 2001, and again from 2005 to 2009.  Four separate Superintendents served from 2001 to 2005.

PRPD provides basic law enforcement services through comprehensive enforcement of Puerto Rico's penal code.  PRPD also provides specialized security and protective services to airports, highways, coastal boundaries, seats of government, and dignitaries.  PRPD's enabling statute, Law Number 53 of June 10, 1996, known as the "Puerto Rico Police Act," sets forth PRPD's duties and responsibilities, including "pursuing and securing the most complete protection of civil rights of civilians." P.R. Laws Ann. tit. 25, § 3102 (2008) *et seq*.  PRPD's operating budget for FY 2012 is approximately $766 million, an increase of 3.3% from FY 2011.  Puerto Rico's Office of Management and Budget reports that PRPD received approximately $15.1 million in federal funding and an additional $43.6 million in American Recovery and Reinvestment Act funds from 2009 to 2011.[8]

**B.      University College of Criminal Justice (Police Academy)**

The University College, located in Gurabo, serves as the training institution for PRPD and other municipal law enforcement agencies.  The University College was established in 1999 after the Puerto Rico Legislature authorized former Superintendent Toledo Dávila to convert PRPD's police academy into an institution of higher education.  The University College is licensed by the Puerto Rico Council on Higher Education and confers associate's degrees in police sciences to cadets completing a pre-approved curriculum.  PRPD requires its officers to hold at least an associate's degree.

A Board of Directors governs University College.  The Board is composed of nine members, eight of whom are appointed by the Governor.  The Superintendent serves as the President and ex officio member of the Board.  The Superintendent also selects the chancellor and associate deans with the Board's approval.  The current chancellor is Dr. Zulma Méndez Ferrer.

**C.      Public Safety**

Public safety is a significant challenge in Puerto Rico.  As illustrated below, according to the FBI's Violent Crime Index, violent crime increased by 17% in Puerto Rico from 2007 to 2009. [9]  Violent crime is composed of murder and non-negligent manslaughter, forcible rape, robbery, and aggravated assault.  In contrast, over the same period, violent crime decreased across the United States.  Although violent crime decreased slightly in 2010, the number of murders and non-negligent manslaughters in Puerto Rico rose steeply from 901 to 983, almost supplanting 1994 (which registered 995 murders) as the year with the highest murders in Puerto Rico's history.  In 2009, Puerto Rico's murder rate was higher than each of the 50 states, at 22.5 per 100,000 persons, nearly double the next highest state, Louisiana, with 11.8 murders per 100,000 persons.  At the same time, PRPD's self-reported murder clearance rate of 43% – defined in the FBI's Uniform Crime Reporting ("UCR") program as offenses "closed" by arrest or exceptional means – was well below the national average of 66.6% in 2009.[10]  The trend continues to escalate, with 568 murders reported in the first six months of 2011, 98 more than in the same period last year.  The month of June 2011 proved to be among the most violent, with 101 murders reported.

A significant number of murders and violent crimes have involved Puerto Rico's lesbian, gay, bisexual, and transgender ("LGBT") communities.  Information we have obtained indicates that at least 18 LGBT Puerto Ricans have been murdered since 2010.  Three of those murders occurred in the span of 72 hours in early June 2011.  According to recent reports from the Puerto Rico Department of Justice ("PRDOJ"), no one has been convicted of a bias-motivated crime under Puerto Rico law.  PRPD acknowledges a need to improve its handling and investigation of hate crimes, particularly crimes against individuals in the LGBT community.  PRPD should continue to work collaboratively with other law enforcement agencies and the community to thoroughly and timely investigate potential hate crimes.  In this regard, on January 27, 2011, DOJ's Community Relations Service ("CRS") helped facilitate an agreement between PRPD, the University College, and the Puerto Rico Civil Rights Commission ("CRC") to improve officer training and community education on hate crimes.  While we have not completed our

investigation into these matters, available data strongly suggest that PRPD's efforts in addressing these deficiencies should be revisited and appropriately modified to ensure the safety of all Puerto Rico residents.



**Figure 1:  Violent Crime, by Type, 2007-2010**

|  | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|
| Forcible Rape | 97 | 95 | 65 | 39 |
| AggravatedAssault | 2983 | 3115 | 3440 | 2757 |
| Robbery | 5134 | 5467 | 6093 | 6590 |
| Murder | 731 | 807 | 894 | 983 |

## D.      Police Crime and Corruption

The degree of police corruption and criminal misconduct in Puerto Rico is high and contributes to the public safety and civil rights crisis.  More PRPD officers are involved in criminal activity than in any other major law enforcement agency in the country.  PRPD officers have been arrested for criminal activity ranging from simple assault and theft to domestic violence, drug trafficking, and murder.  From January 2005 to November 2010, there have been more than 1,709 arrests of PRPD officers.  These arrest rates are significantly higher than those of comparable jurisdictions.  According to the New York Police Department's Internal Affairs Bureau, authorities made approximately 607 arrests of uniformed officers between 2001 and 2006, out of a force roughly twice the size of PRPD.[11]

### 1.   Officers Arrested for Criminal Conduct

In October 2010, in the largest police corruption operation in the FBI's history, 89 law enforcement officers and other individuals were arrested for drug and firearm violations. Among the officers arrested, 61 were PRPD officers. As noted below, several of these officers have already pled guilty. PRPD officers, including supervisors and members of specialized units, were also convicted in other cases involving serious criminal activity in breach of the public's trust. The following examples illustrate the breadth and depth of the corruption in PRPD. We provide additional examples in Appendix A.

- In December 2010, Officers Raquel Delgado Marrero and Ángel Rivera Claudio were convicted of three counts each for drug and firearm-related charges for their participation in a July 2009 drug transaction in which they provided armed protection to a drug dealer during the sale of seven kilograms of cocaine.[12]

- On December 16, 2009, Officer Edwin Mercado Irizarry, assigned to the San Juan Stolen Vehicles Division, pled guilty to charges involving aggravated illegal appropriation, fraud, witnesses tampering, preparation and presentation of false documents, and ethics violations. According to the indictment, Mercado Irizarry stole multiple items from an evidence storage room at PRPD Headquarters and tried to cover-up the theft by falsifying documents and attempting to force witnesses to provide false statements.[13]

- On August 3, 2009, Lieutenant Flores Vázquez, Director of the Special Arrest and Extradition Division, pled guilty to conspiring to possess controlled substances with the intent to distribute when he and officers under his command transported cocaine in marked police vehicles and protected shipments of narcotics. Lieutenant Flores Vázquez also conspired to extort money in exchange for illegally obtaining temporary prisoner release orders. He was sentenced to 168 months of imprisonment.[14] Three other officers pled guilty to the conspiracy and other charges.

- In July 2009, Immigration and Custom Enforcement ("ICE") agents intercepted Sergeant Juan Quiñones Rosario in a marine vessel traveling toward the Dominican Republic. ICE agents discovered U.S. currency, totaling more than $1,600,000 hidden inside multiple compartments in the vessel. On August 5, 2010, Sergeant Quiñones Rosario pled guilty to charges that he failed to report the cash as required by federal law and for smuggling the money out of the United States.[15]

- On July 2, 2008, Arecibo Illegal Weapons Division Officer Carlos Ríos González pled guilty to government ethics charges for selling ammunition belonging to PRPD; the court fined him $1000.

- On December 22, 2008, Officer Wilden Semidey Rivera pled guilty to bribery charges for requesting and accepting $200 from a civilian who wanted to avoid DUI charges.[16]

As with much of PRPD's data collection, PRPD data related to police-involved criminal activity are inadequate and inaccurate. Based on our review of press accounts and local and

federal court dockets, we found an additional 21 arrests of officers that were not included in the 1,709 arrests reported by PRPD:

**Table 1:  Arrests of Officers Not Reported by PRPD**

| Approx. Date | Summary of Charges | Status* |
|---|---|---|
| 10/18/2010 | Weapons violation after allegedly shooting a municipal officer | Convicted |
| 7/18/2010 | Illegal appropriation of public funds and related charges for falsely claiming overtime hours | Pending |
| 7/18/2010 | Illegal appropriation of public funds and related charges for falsely claiming overtime hours | Pending |
| 6/13/2008 | Anti-piracy law violation for filming a movie at a theater | Convicted |
| 2/27/2008 | Conspiracy to provide false statements during the purchase of firearms | Convicted |
| 2/19/2008 | Importing narcotics | Convicted |
| 1/26/2008 | Illegal appropriation after stealing canisters of gasoline | Convicted |
| 12/1/2007 | Attempted murder | Convicted |
| 10/19/2007 | Conspiracy to possess with intent to distribute cocaine | Convicted |
| 9/20/2007 | Child abuse | Pending |
| 8/31/2007 | Interfering with commerce by threat or violence | Convicted |
| 7/21/2007 | Carjacking, conspiracy against civil rights, weapons violation, tampering with a witness | Convicted |
| 7/21/2007 | Carjacking, conspiracy against civil rights, weapons violations, and tampering with a witness | Convicted |
| 7/18/2007 | Conspiracy to commit murder, bribery, and government ethics violations | Pending |
| 7/18/2007 | Conspiracy to commit murder, bribery, and government ethics violations | Pending |
| 7/17/2007 | Fraud and aggravated theft | Convicted |
| 5/11/2007 | Controlled substances and government ethics violations | Convicted |
| 5/11/2007 | Controlled substances and government ethics violations | Pending |
| 5/11/2007 | Controlled substances and government ethics violations | Pending |
| 3/14/2007 | Government ethics violation | Convicted |
| 1/5/2007 | Burglary | Convicted |

*As of May 19, 2011.

## 2.    Officers Involved in Domestic Violence

Domestic violence infects the ranks of PRPD and interferes with the ability of PRPD to provide police services in a constitutional manner.  We found that hundreds of officers were also arrested or the subject of administrative complaints for domestic violence.  From 2005 to 2010, PRPD received 1,459 civilian complaints alleging domestic violence by officers.  Of the complaints resolved during this period, administrative investigators recommended disciplinary or corrective action in 1,018 cases in the form of orientation, admonishment, suspension,

16

separation, or expulsion.  We also identified 98 officers who have been arrested more than once on domestic violence charges between 2007 and 2010.  Many of these officers, including commanders, remain active on the force.  As the Puerto Rico Supreme Court has observed, it is "antagonistic to be a police officer while engaging in acts of domestic violence in all of its many forms:  physical or emotional abuse, spousal or child abuse."  *San Vicente Frau v. Policía,* 142 D.P.R. 1, 1 (1996).

**Table 2:  Officers with Two or More Domestic Violence Arrests (2007-2010)**

|  | Officers | Terminated | Leave | Active |
|---|---|---|---|---|
| Two arrests | 81 | 6 | 2 | 73 |
| Three arrests | 15 | 2* | 3 | 10 |
| Four arrests | 2 | 1 | 0 | 1 |
| **TOTAL** | **98** | **9** | **5** | **84** |

*One officer committed suicide, but was listed by PRPD as terminated.

We also identified several instances in which PRPD officers shot their spouses, including at least three in 2010 alone:

- On June 21, 2010, Officer Heriberto Rivera Hernández shot and killed his ex-wife, Marisel Arocho Soto, with a service firearm before killing himself.  At the time of the shooting, Officer Rivera Hernández was under electronic monitoring awaiting trial on domestic violence and weapons charges.  Following his March 2010 arrest, PRPD disarmed Officer Rivera Hernández and reportedly placed his service firearm in a safe deposit box at the stationhouse.

- On May 24, 2010, Sergeant José Manuel Rivera Ortiz shot at his wife six times and then turned the firearm on himself, committing suicide.  His wife was not struck.

- On March 24, 2010, Officer José Gómez González shot his wife, Verónica Martínez Vélez, hitting her eight times, before killing himself.

- On January 13, 2008, Officer Ramos Santiago killed his wife, Deborah Berrocal Lugo, in front of their then-four-year-old daughter.  A jury found him guilty of first-degree murder and a weapons charge.[17]

- On January 26, 2007, Officer López Martínez of the Aibonito Police Athletic League was convicted of first-degree murder when he killed his wife and mother-in-law with his service firearm.[18]

\*     \*     \*

As these incidents illustrate, an indefensible number of PRPD officers commit a wide range of crimes against the very citizens they are charged with serving.  We briefly highlight PRPD's issues with respect to internal crime because the widespread lack of respect for the rule of law affects both public safety and civil rights.  Many of the systemic deficiencies we detail in

Sections III and IV below hinder PRPD's efforts to address its internal crime problem just as they limit PRPD's effectiveness in addressing its pattern of civil rights violations and its failure to effectively address sexual assaults, domestic violence, and allegations of discriminatory policing.  It is thus our belief that by implementing the remedies we outline below, PRPD will gain tools essential for ridding itself of the crime and corruption that currently infect its ranks.

### III.  PATTERN AND PRACTICE OF CONSTITUTIONAL VIOLATIONS

Our investigation has revealed reasonable cause to find that PRPD engages in a pattern and practice of:

- Use of excessive physical force, including deadly force, in violation of the Fourth Amendment;

- Use of unreasonable force and other misconduct designed to suppress the exercise of protected First Amendment rights; and

- Unlawful searches and seizures in violation of the Fourth Amendment.

Contrary to generally accepted law enforcement practices, PRPD does not maintain reliable reports and data that document encounters with the public to permit supervisors to ensure constitutional law enforcement.  PRPD does not require officers to routinely report uses of force or require supervisors to conduct independent reviews of force.  PRPD records concerning police misconduct cases and incidents of police-involved shootings are inaccurate.  Incident reports describing the reason for an arrest are often incomplete.  Even with these problems, the deficiencies we uncovered are so clear that these additional data sets are unnecessary to conclude that civil rights violations constitute a repeated and routine practice, rather than isolated or sporadic instances of misconduct.  Our determination is based on a review of investigative files and other documents produced by PRPD, criminal and civil cases from local and federal courts, and interviews with officers and residents.

As illustrated below, misconduct within PRPD is not isolated to a particular unit or rank.  We found that supervisors and members of specialized tactical and investigation units contribute to the pattern and practice of civil rights violations, including officers assigned to TOU and the Drug, Narcotics, Vice, and Illegal Weapons Division ("DNVW").  The involvement of supervisors is particularly egregious in light of their added responsibility to uphold the agency's values and expectations.  In many instances, rather than correcting or reporting problem behavior, we found supervisors acting in concert with subordinates in cases where individuals were beaten or charged with fabricated evidence.  Supervisors and officers also failed to intervene on behalf of civilians to protect them from excessive force or unlawful searches or seizures by fellow officers.

We focused our review on the four-year period from 2004 to 2008.[19]  However, we found that the pattern of misconduct continued through the course of our investigation, as evidenced by PRPD's actions during protests and other civil demonstrations.  We discuss the legal standards governing our findings below and highlight several cases that illustrate the pattern and practice of use of excessive force, the use of unreasonable force to chill speech, and unconstitutional searches and seizures.  Many cases involve more than one type of violation.  We also discuss specific deficiencies that cause and contribute to each of these violations.

A.      **PRPD Engages in a Pattern and Practice of Use of Excessive Force**

1.      **Officers Use Excessive Force in Violation of the Fourth Amendment**

PRPD officers use force, including deadly force, that is unnecessary and unreasonable in the course of arresting or detaining individuals who pose little, if any, risk of harm, or who offer minimal resistance.  The use of excessive force includes punching or taking subjects to the ground, as well as striking and jabbing with batons, deploying chemical agents, using choke holds and other neck restraints, and discharging firearms.  Many subjects of excessive force were, at the time of the incident, carrying out ordinary activities or committing minor infractions.  Officers also use excessive physical force in response to perceived verbal slights or after an individual stops resisting.  These practices are the result of woefully inadequate or non-existent policies and accountability systems on officers' use of force, including PRPD's failure to provide effective training and discipline.  We discuss additional deficiencies causing and contributing to the pattern and practice of excessive force in Section IV.

Although complaints of excessive force by PRPD officers have existed for many years, the 2007 videotaped shooting of Miguel Cáceres Cruz exposed many of the deep-rooted deficiencies that continue to plague PRPD.  On August 11, 2007, Cáceres Cruz was directing traffic as part of a motorcade that had gathered for a birthday celebration in Humacao.  Officers Javier Pagán Cruz, Carlos Sustache Sustache, and Zulma Diaz de León drove by Cáceres Cruz and stopped after they heard him say something they believed was an insult.  Officer Pagán Cruz, a member of TOU, exited the vehicle, approached Cáceres Cruz, and engaged in a verbal exchange.  The officers then told Cáceres Cruz he was under arrest.  Officer Pagán Cruz grabbed Cáceres Cruz and wrestled him to the ground.  As they struggled, Officer Pagán Cruz discharged his firearm and shot himself in the leg.  Officer Pagán Cruz then unholstered his firearm and shot Cáceres Cruz multiple times at close range in the head and body.  Officers Sustache Sustache and Díaz de León left Cáceres Cruz lying on the sidewalk as they drove Officer Pagán Cruz to the hospital without notifying central command that anyone else had been shot.  Other officers arrived and found Cáceres Cruz bloodied and gasping for air.  With the assistance of bystanders, officers placed Cáceres Cruz in a patrol car and drove him to the hospital where he was pronounced dead.

The officers' initial report indicated that Officer Pagán Cruz acted in self-defense because Cáceres Cruz resisted arrest and tried to gain control of the officer's firearm.  The line supervisors' reports were based primarily on statements from the involved officers.  A preliminary report prepared by a PRPD homicide investigator consisted only of statements from Officers Sustache Sustache, Díaz de León, and an alleged eyewitness who corroborated the officers' version of the events.  The homicide investigator added summarily, "Also, various persons at the scene were interviewed, but they said adverse things about the officers."  Critically, a video recording taken by a civilian surfaced shortly after the incident and was distributed widely in the media.  The recording showed Officer Pagán Cruz standing over Cáceres Cruz and shooting him several times.  On August 14, 2007, local prosecutors filed murder charges against Officer Pagán Cruz.  He was found guilty of first-degree murder and weapon violations, and was sentenced to 109 years in prison on April 15, 2008.[20]

Officer Pagán Cruz was the subject of seven civilian and internal complaints at the time of the Cáceres Cruz shooting. As of November 2008, five of these complaints, dating as far back as 1999, remained unresolved. They included a 1999 complaint for domestic violence in which Officer Pagán Cruz allegedly beat and threatened his partner with a firearm, a 1999 complaint for insubordination, and a 2002 complaint for immoral conduct. A separate internal affairs report issued four days after the shooting found that Officer Pagán Cruz had a "bad attitude," "strange behavior," and a "tendency for being an aggressive person." However, his commanding supervisor indicated as part of yet another administrative investigation that Officer Pagán Cruz did not present a pattern of "repetitive conduct." Despite his complaint history, he was permitted to join, and remain in, the TOU in Humacao. The unit, consisting of 44 officers, was supervised by only two sergeants, one of whom had been on leave for weeks at the time of the incident.

The tragic events surrounding the Cáceres Cruz shooting served as a stark reminder of PRPD's institutional dysfunction: officers engaging in verbal altercations with civilians; officers needlessly arresting civilians; officers using excessive force; officers being deliberately indifferent to the well-being of the community; PRPD supervisors failing to supervise; and internal affairs officers failing to timely and objectively investigate matters, or at all. According to PRD, civilians filed over 1,500 complaints against officers for unjustified or excessive force and assault from 2004 to 2008. During the course of our investigation, from January 2009 to August 2010, PRD reported an additional 268 complaints based on similar allegations. Our review of a sample of these cases, as well as civil and criminal cases filed against officers, demonstrates that officers' use of excessive force constitutes a routine practice within PRPD. We also found that longstanding deficiencies cause the pattern and practice of excessive force.

Improper and unconstitutional uses of force are rampant throughout PRPD. Force is frequently used when it is unnecessary and gratuitous, and is often the first and last option considered by PRPD officers. The use of excessive force by police officers in the course of an arrest, investigatory stop, or other seizure violates the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989); *see also Jennings v. Jones*, 499 F.3d 2, 11 (1st Cir. 2007). Courts analyze claims of excessive force, deadly or otherwise, under an objective reasonableness standard. *Graham*, 490 U.S. at 394. The analysis requires a balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the governmental interests. *Id.* at 396. The criteria courts apply to assess the reasonableness of an officer's use of force include the severity of the crime at issue; whether the subject presents an immediate safety threat to the officers or others; and whether the subject is actively resisting or attempting to evade arrest. *Id.*; *see also Jennings*, 499 F.3d at 11; *Brenes Laroche v. Toledo Dávila*, 682 F. Supp. 2d 179, 189 (D.P.R. 2010).

Determining the reasonableness of an officer's use of force is a fact-dependent inquiry, based on the "totality of the circumstances." *Graham*, 490 U.S. at 394-96.

Whether the force used to effect a particular seizure is reasonable 'must be judged from the perspective of the reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' The reasonableness inquiry is objective, to be determined 'in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation.'

*Brenes Laroche*, 682 F. Supp. 2d at 189.  Our review of hundreds of force incidents revealed frequent violent reactions by officers that serve no public safety or law enforcement purpose.

Force can be excessive even when it results in only minor injury.  *Bastien v. Goddard*, 279 F.3d 10, 14 (1st Cir. 2002); *Alexis v. McDonalds Rests. of Mass., Inc.*, 67 F.3d 341, 353 & n.11 (1st Cir. 1995); *see also Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001); *Headwaters Forest Def. v. Cnty. of Humboldt*, 240 F.3d 1185, 1199 (9th Cir.), *vacated and remanded on other grounds sub. nom.*, *Cnty. of Humboldt v. Headwaters Forest Def.*, 534 U.S. 801 (2001) ("Whether the use of force poses a risk of permanent or significant injury is a factor to be considered in evaluating the need for the force used in a particular case – but it is certainly not dispositive.").  PRPD's reliance on batons and other less lethal force to suppress demonstrators is no less unconstitutional, despite the fact that demonstrators have not yet experienced life-threatening injury.

The propriety of the use of deadly force is measured by *Graham*'s objective reasonableness test.  *See Scott v. Harris*, 550 U.S. 372, 384 (2007).  Courts generally find that deadly force is unreasonable "unless it is necessary to prevent escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."  *Tennessee v. Garner*, 471 U.S. 1, 3 (1985); *see also Whitfield v. Meléndez-Rivera*, 431 F.3d 1 (1st Cir. 2005) (citing *Garner*, 471 U.S. at 11; *Jarret v. Town of Yarmouth*, 331 F.3d 140, 149 (1st Cir. 2003)).  Because it constitutes deadly force, the shooting of a suspect with a firearm requires the highest level of justification to be found reasonable.

A police officer may not seize an unarmed, non-dangerous suspect by shooting the subject.  *See Garner*, 471 U.S. at 11.  The Supreme Court indicated that it may, however, be reasonable for a police officer to use deadly force to prevent the escape of a suspect in cases in which there is probable cause to believe the suspect has committed a crime involving the infliction or threatened infliction of serious physical harm.  *Id.* at 11-12; *see also Scott*, 550 U.S. at 382 n.9.  Yet, even in those circumstances, police should provide a warning (if feasible) before using deadly force.  *Garner*, 471 U.S. at 11-12.  Moreover, while the initial shots fired at a suspect may be determined justifiable, continuous shooting at a suspect may not be.  *See Napier v. Town of Windham*, 187 F.3d 177, 185-87 (1st Cir. 1999); *Parker v. Town of Swansea*, 270 F. Supp. 2d 92, 99 (D. Mass. 2003).  As illustrated below, PRPD officers apply deadly force without necessary justification.

While many PRPD officers observe the Constitution while using force, few take steps to prevent other officers from improper conduct.  Officers may not just stand by and watch other officers use excessive force.  *See Calvi v. Knox County*, 470 F.3d 422, 428 (1st Cir. 2006) ("[A] bystander officer who has a realistic opportunity to prevent the use of excessive force by a fellow officer may in certain circumstances be held liable for failure to intervene."); *Davis v. Rennie*, 264 F.3d 86, 98 (1st Cir. 2001); *Hathaway v. Stone*, 687 F. Supp. 708, 712 (D. Mass. 1988).

In the following incidents, officers used unreasonable force to arrest or detain individuals who posed little, if any, threat of harm; used force in response to perceived insults or as retaliation to ensure later silence; or continued using force even after an initial threat or other resistance had dissipated.  In some instances, officers struck handcuffed subjects gratuitously. We focus primarily on matters in which criminal and civil litigation has concluded so as to not

interfere with ongoing judicial proceedings.  Our investigation reveals that the conditions that led to these incidents – lack of adequate training, poor supervision, grossly inadequate policies, and a lack of meaningful accountability – remain significantly unchanged to this day.  We provide additional examples in Appendix A.

- On June 21, 2007, Juan Carlos Pérez Liz was at home with his friends and family when he heard multiple gunshots.  While on the telephone with a police dispatcher, approximately 12 PRPD officers entered his home with their weapons drawn.  Officers handcuffed Pérez Liz and the other individuals while they searched the home.  Officers took Pérez Liz to a separate room and questioned him about weapons.  As they escorted Pérez Liz through the house, an officer hit Pérez Liz in the head and told him that if they found a weapon, the officers would kill him.  During the search, Officer José Sánchez Abraham struck Pérez Liz in the face and allowed other officers to beat him.  Officer Sánchez Abraham struck Pérez Liz in the face again as officers escorted him to a police vehicle.  The officers took him to the Bayamón TOU station, where they continued to punch and hit him.[21]  At all times while being beaten, Pérez Liz was restrained and posed no threat to the officers or other persons.  The force used against him served no legitimate law enforcement purpose.

  On March 25, 2010, after the conclusion of a federal civil trial, a jury found Officer Sánchez Abraham and Sergeant Luis Pacheco Albizu liable for using excessive force in violation of Pérez Liz's Fourth Amendment rights.[22]

- On March 17, 2007, Betzaida Cruz Santiago and her daughter, Luz Cecilia Esmuria Cruz, were on their way home when they noticed TOU officers deploying chemical agents in the area.  As they approached their home, an officer ordered them to stop and blocked their path.  When Cruz Santiago pleaded with the officer to let them go, the officer grabbed Esmuria Cruz and slammed her to the ground.  The officer then hit Cruz Santiago in the leg with his baton, breaking her leg.  As she tried to get up, the officer hit her again, causing a compound fracture.  Other officers observed the incident, but did not intervene to protect Cruz Santiago and Esmuria Cruz.  The two women lay on the pavement for over an hour awaiting an ambulance to take them to the hospital.  At the hospital, Cruz Santiago was treated for leg fractures and shoulder pain.[23]  At no time did Cruz Santiago pose a risk to the officers or others.  The force they used was unnecessary.

  On June 10, 2008, the district court entered default judgment against Ponce TOU Director Alvarez Boneta and Supervisor Rosario García.  After the default judgment was set aside, Cruz Santiago and Esmuria Cruz settled the case with PRPD.

- On March 3, 2007, Officer Pedro Cruz Sierra arrested Rafael Ortiz Bermúdez without probable cause as he panhandled by the side of a road.  Officer Cruz Sierra took Ortiz Bermúdez to the back of a shopping center and beat him until he lost consciousness.  The force used against him served no legitimate law enforcement purpose.  Instead of taking Ortiz Bermúdez to a police station for booking, Officer Cruz Sierra abandoned him behind the shopping mall with injuries to his face and body.  A passerby found Ortiz Bermúdez the next day and transported him to the hospital.

On March 13, 2009, Officer Cruz Sierra pled guilty to aggravated assault and aggravated restraint on liberty, and the court sentenced him to three years of probation.[24]

- On January 8, 2007, Harry Rodríguez Rivero drove his car out of a store parking lot when a group of officers in plainclothes wielding firearms surrounded his car and demanded that he get out.  Fearing for his safety, Rodríguez Rivero attempted to drive away, but struck the car behind him.  He continued a short way down the road and pulled over when he heard sirens.  Police then surrounded him with their weapons drawn.  The police pulled him out of the car, threatened to kill him, dropped him on the ground, hit his mouth, grabbed his legs, and dragged him face down on the pavement before handcuffing him.  During this time, Rodríguez Rivero was not resisting and posed no threat to the officers or other persons.  The show of force and force the officers used against him served no legitimate law enforcement purpose.

On November 10, 2009, at the conclusion of a federal civil trial, a jury found Officer Ramos Vélez liable for violating Rodríguez Rivero's Fourth Amendment rights and awarded Rodríguez Rivero $100,000 in damages.[25]

- On March 12, 2006, Jorge López Acosta was driving his vehicle with his brother when Officers José Alvarado Almódovar and Juan Meléndez Rivera stopped them.  With no legitimate law enforcement purpose, Officer Alvarado Almódovar drew his service weapon and shot López Acosta through the rear of his shoulder, breaking two ribs and injuring his lungs.

On April 4, 2007, the district court entered default judgment against Officer Alvarado Almódovar on the excessive force claims.  López Acosta ultimately settled the case with PRPD.

- On March 2, 2006, Carl Leyva Ramos drove to a gas station he owned after learning that PRPD officers were blocking the station's entrance and searching customers and their cars.  Leyva Ramos then began to photograph the officers' actions.  Sergeant Antonio Rodríguez Nieves ordered officers to seize Leyva Ramos' camera.[26]  Several officers restrained Leyva Ramos and Officer Angel Díaz Casiano hit him in the hand with a flashlight, although Leyva Ramos posed no threat and the force was unnecessary to restrain him.[27]

On March 3, 2010, the district court entered default judgment against Officer Díaz Casiano and Sergeant Rodríguez Nieves.  On March 26, 2010, a jury found that the officers unreasonably injured Leyva Ramos in violation of his federal civil rights and awarded him $4.7 million in damages.  On April 8, 2010, Leyva Ramos settled the case against other PRPD supervisors for an unspecified amount.

Sergeant Rodríguez Nieves has served as a defendant in other federal civil rights cases, including a case involving the 2004 shooting death of Luis Cepeda and the 2004 false arrest of David Rodríguez Román.  On June 24, 2011, Luis Cepeda's family members settled the case against Rodríguez Nieves for an unspecified amount.  On May 13, 2009,

at the conclusion of a civil trial, a jury found Rodríguez Nieves liable for violating Rodríguez Román's rights and awarded Rodríguez Román $120,000 in damages.

### 2. Officers Use Unreasonable Force to Suppress the Exercise of Protected First Amendment Rights

Demonstrators are frequently the target of PRPD's use of unreasonable force. Specifically, we found that officers use batons, chemical agents, and other physical force indiscriminately against individuals who are either participants or bystanders in protests and who pose little or no threat to officers or others. In many cases, the infliction of harm has no legitimate purpose, such as to effect an arrest or protect public safety. Instead, PRPD's repeated reliance on indiscriminate and unreasonable force instills fear in individuals and discourages future actions protected by the First Amendment. The actions of PRPD officers during demonstrations have been widely reported in the press and have prompted criticism within Puerto Rico and nationally.

The First Amendment prohibits government actors from "abridging the freedom of speech," U.S. Const. amend. I, and prohibits a government official from subjecting an individual to retaliatory actions for speech that falls under the protections of the First Amendment. *Hartman v. Moore*, 547 U.S. 250, 251 (2006) (holding that official reprisal for protected speech offends the Constitution because it threatens to inhibit exercise of the protected right) (internal citations omitted).

The frequency and severity of excessive force by PRPD against individuals engaging in protected speech is designed to chill speech in violation of the First Amendment. For years, individuals engaged in protests and other public demonstrations have been harmed and injured at the hands of PRPD officers. PRPD also has a long history of tolerating officers' clear disregard of Puerto Rican laws requiring officers to visibly display their badge numbers to allow the public to identify officers who may be engaging in misconduct.[28] In the following incidents, officers in TOU and other units used unreasonable force and inflicted pain and injury against civilians who were protesting government action. Many of these individuals were not posing a significant threat or violating the law, as evidenced by the paucity of arrests or findings of probable cause by the courts. PRPD reports following these incidents routinely fail to account for widespread civilian injuries and specific uses of force. In each instance, there is no evidence that officers issued effective dispersal orders, employed alternatives to force, or relied on adequate planning or tactics to prevent pervasive and arbitrary use of force. Many civilians complained that officers concealed their badge numbers to prevent civilians from identifying officers who engaged in misconduct. Supervisors who were on hand also failed to exert sufficient command and control to maintain discipline among the officers.

Government actions that threaten to chill protected activity can occur in a variety of situations. *See, e.g.*, *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996) (holding that First Amendment protections apply to government contractors as well as government employees, noting that in either case government efforts "may chill speech on matters of public concern"). Generally, the First Circuit has held that claims alleging violations of the First Amendment by law enforcement officers fall under the analysis used in the employment context. *Willoughby v. Town of Tisbury*, No. Civ. A. 09-11398-JLT, 2010 WL 4502290, at *6 (D. Mass. Nov. 10, 2010)

(quoting *Tatro v. Kervin*, 41 F.3d 9, 18 (1st Cir. 1994)) (applying a "but for" standard of proof used in the employment context to a First Amendment claim against a police officer).  The analysis considers whether government actions chill or intimidate speech, and whether such actions are motivated by an "intent or desire to curb . . . expression."  *Id.* (quotations omitted).  The government action must be such that it would curb the expression of a "reasonably hardy individual."  *Agosto de Feliciano v. Aponte Roque*, 889 F.2d 1209, 1217 (1st Cir. 1989) (informal harassment can support a retaliation claim if the "government's actions are sufficiently severe to cause reasonably hardy individuals to compromise their political beliefs and associations"), *abrogated on other grounds by Maldonado*, 568 F.3d 263; *see also Barton v. Clancy*, 632 F.3d 9, 30 (1st Cir. 2011) (even "relatively minor events" can give rise to liability for retaliation).  Furthermore, intent to discourage First Amendment rights can be inferred from an aggregation of "parallel or interrelated actions."  *Rosario Urdaz v. Velazco*, 433 F.3d 174, 179-180 (1st Cir. 2006) (noting that incidents can take color from, and accumulate with, other incidents to establish sufficient basis for supervisory liability in a First Amendment claim for harassment).  The First Circuit has also held that the threat of arrest may constitute a chilling act in the First Amendment context.  *McGuire v. Reilly*, 386 F.3d 45, 59 (1st Cir. 2004) (holding that protesters had standing to assert a First Amendment violation when they alleged that their speech rights had been chilled by fear of arrest when protesters had been threatened with arrest).

PRPD routinely deploys TOUs to engage with crowds and protesters without any meaningful effort to control or restrain the use of excessive force by these units.  PRPD has been on notice that TOUs frequently use violent force without justification.  For instance, in December 2007, an evaluating committee established by former Superintendent Toledo Dávila found numerous complaints against TOUs for abuse of authority.  The committee observed, "The indiscriminate use of batons in total disregard of existing regulation . . . has occasioned totally unjustified, multiple, and serious injuries to citizens."[29]  A TOU officer interviewed by the committee told members that unit officers "jump into action to resolve, not to dialogue," further evidencing the officers' propensity for using force, regardless of the circumstances.[30]

The committee's observations are consistent with our findings that TOU officers use extreme displays of force, and actual force, to gain respect through intimidation.  In this regard, a high-ranking PRPD official acknowledged in September 2010 that TOU officers do not view arrests, regardless of the force they use, as one of their responsibilities.  In response to the paucity of arrests during the June 30, 2010, demonstration at the Capitol, TOU officers reportedly explained that "arrests are someone else's job."  PRPD made only two arrests on June 30, despite the widespread use of force against hundreds of demonstrators.  Strikingly, during our December 2010 tour, another high-ranking PRPD official indicated that residents in Puerto Rico do not fear or respect PRPD officers, but they do fear and respect TOU officers.

### a.    University Avenue – August 21, 2009

On August 21, 2009, municipal officers attempted to arrest a man for drinking an alcoholic beverage on University Avenue in Río Piedras near the University of Puerto Rico ("UPR").  The man reportedly resisted arrest and ran into a nearby business establishment, but was eventually taken into custody.  Bystanders, many of whom were college students, criticized the arrest and some reportedly threw bottles and other objects at officers.  Officers from PRPD's tactical units arrived promptly on the scene.  They began to clear the street and disperse the

crowds using chemical agents, baton strikes, and other physical force.  Many individuals who were not throwing objects or engaging in other criminal activity were caught in the police action.

After the violence was quelled, officers continued to use batons to push and hit unresisting individuals who were attempting to leave the area.  The use of force against individuals who were not posing any immediate threat to the officers or attempting to evade arrest did not serve any valid law enforcement purpose.  Video recordings and statements from witnesses indicate that officers used their batons in a forceful, arbitrary, and unnecessary manner.  For instance, videos show officers striking a civilian wearing a backpack while he was walking by himself on the sidewalk.  Other videos show officers using batons to forcefully shove individuals who were walking in a single file as they left the area.

At approximately 3:00 a.m., after officers cleared University Avenue, college students gathered at a dormitory and began to criticize officers who were staged across the street.  The students were chanting, calling the officers "abusers," and yelling other insults.  The students remained inside the dormitory's fenced courtyard and were not throwing objects or posing any immediate threat to the officers.  Without warning, the officers then pointed a shotgun directly at the students and fired a gas canister, hitting Michelle Padrón Gauthier in the thigh above the knee while she stood peacefully in the courtyard.  Padrón Gauthier, who sustained an open wound, was unable to walk and fell to the ground.  As other students attempted to aid Padrón Gauthier, officers fired a second gas canister at the students, followed by a third canister.  The canisters emitted noxious chemicals, affecting both protesting students and others who were inside the dormitory and not involved in the demonstration.[31]  The intentional discharge of multiple canisters of chemical irritants directly at students who were expressing their criticism of police action on University Avenue served no legitimate purpose.  A special commission convened by the dean of the UPR campus also found that officers' use of force was directed at students' speech, observing that "the use of tear gas is not acceptably justified as a response to an insult."[32]

According to police reports, students injured officers and damaged police vehicles.  However, the reports do not explain or address the extent of civilian injuries.  Officers arrested five civilians in connection with the incident, but dropped most of the cases because of a lack of probable cause.  The man whose arrest precipitated the events was charged with inciting a riot, but the charges were also ultimately dismissed.

b.      **Sheraton Hotel – May 20, 2010**

On May 20, 2010, approximately 200 students, union leaders, and public employees gathered at the Sheraton Hotel to protest the Governor who was attending a fundraising event.  According to a PRPD report, PRPD deployed TOU and other officers to the area after the crowd began making threats and using obscene language.  However, a commander soon ordered these officers to leave because the police presence at the event appeared excessive.  After the officers left, some of the protesters entered the hotel lobby, chanting and marching, before another group of individuals began pushing security staff to gain access to the hotel's escalators.  As individuals were repelled away from the escalators, a contingency of reinforcing officers arrived and began clearing protesters from the hotel lobby using physical force and baton strikes.  Officers also deployed chemical agents against individuals.[33]

27

Videos of the incident depict officers using significant force against individuals who already had been dispersed from the hotel lobby.  While some of the force was directed at individuals who charged the officers, many were hit and sprayed indiscriminately as they stood by or tried to flee the area.  Officers swung batons like baseball bats and used overhead strikes against protesters posing no threat to the officers.  Strikes to the head with an impact weapon can cause serious harm or even death and should not be used against individuals who are passively resisting or exiting an area as directed by officers.  A union leader was sprayed with chemical irritants when she stepped toward the officers to admonish them, causing her to collapse on the ground.

Inside the lobby, several officers attempted to restrain José Pérez Reisler, who was marching while holding a sign.  According to video footage, officers wrestled him to the ground and at least two officers climbed on top of him.  One officer pressed his weight on the back of Pérez Reisler's neck, forcing his face to the ground.  While Pérez Reisler was face-down – still with officers on top of him – Officer Melvin Rosa Cortés applied a Conducted Energy Device ("CED") three separate times in the stun, or direct contact, mode.  We observed from video recordings that Officer Rosa Cortés applied the CED at various points of Pérez Reisler's body while telling him to "cooperate," but not offering other specific commands, such as ordering him to place his hands behind his back.  The officer's CED report falsely stated that he gave the proper commands and that the CED was deployed because Pérez Reisler was aggressively fighting.  Photographs also depict then-Associate Superintendent José Rosa Carrasquillo kicking Pérez Reisler while Pérez Reisler was restrained on the ground.  There was no legitimate law enforcement purpose for this use of force, as Pérez Reisler was not posing a safety threat or attempting to flee.  Rosa Carrasquillo resigned in December 2010, reportedly for unrelated reasons.

From our review, Pérez Reisler was not a flight risk or physically combative.  Rather, he appeared to be passively resisting the officers when he tucked his hands underneath his body.  There were also a sufficient number of officers on hand to control him and even physically lift him, if necessary.  The officers thus had no legitimate law enforcement purpose for the force.  Despite the officers' claim that Pérez Reisler was non-compliant and aggressively fighting them, the officers released him without any charges.  Officers had detained Pérez Reisler just days earlier, on May 14, when he attempted to enter UPR.  Officers threw him to the ground, handcuffed him, and sprayed him in the eyes at close range with chemical irritants.  Pérez Reisler was not resisting or attempting to evade arrest.  PRPD detained him for approximately nine hours but did not charge him with any crime.

Despite the substantial use of force, PRPD detained only four individuals at the Sheraton Hotel.  Two individuals were released without charges, and prosecutors declined to prosecute the other two arrestees.  Reports provided by PRPD described injuries sustained by officers and property damage, but failed to account for injuries to civilians, such as bruises and lacerations, or specific instances of use of force.  In conclusory fashion, a supervisor reported, "The TOU and SOU [Special Operations] units were then activated to contain and control the violent conduct of the students . . . using the necessary physical force."[34]

On December 14, 2010, CRC issued a resolution finding that multiple civilians, journalists, photojournalists, and officers were injured during the incident.[35]  CRC also expressed concern over video footage of individuals who were assaulted as they attempted to exercise their rights, finding that the police action may have resulted in "serious violations of constitutional guarantees, democratic processes, and freedom of expression of all people of Puerto Rico."[36]  Despite reliable video and the civilian complaints that served as the basis for the CRC resolution, the Superintendent reported during our December 2010 tour that no one had come forward with a sworn statement to complain about officers' actions and that PRPD had not identified any officer misconduct.

### c.  Capitol – June 30, 2010

On June 30, 2010, various groups, including labor organizations, journalists, and university students engaged in demonstrations at the Capitol over a series of escalating disputes that included press access to the Capitol.  PRPD was aware of the planned demonstrations and prepared an operational plan, dated the same day as the incident, June 30.  The incident began unfolding by mid-afternoon with two discrete encounters between protesters and police.  First, several individuals and student journalists entered the Capitol, but were denied access to areas traditionally open to the press and public.  When officers used physical force to stop them from entering further into the Capitol, they sat in a hallway in protest.  Security staff and officers acting together then forcibly removed them by spraying chemical irritants, kicking, pushing, and striking them with batons, and throwing them out onto the Capitol's concrete exterior stairs.  At the same time, students and their supporters gathered outside of the Capitol and tried to enter to read a proclamation, but tactical operations officers forcibly repelled them.

The second major encounter occurred approximately two hours later, after the crowd grew and engulfed areas around the Capitol.  Because officers used an open central plaza as a staging area, protesters were forced to spill into the adjacent parking lots.  At a pivotal moment, videos show a predominantly peaceful, but animated, crowd.  After commanders circulated orders among the staged officers, an officer approached the crowd.  Using a protester's megaphone, the officer announced that he needed the crowd's cooperation to move cars from the parking lot.  The officer did not order the crowd to disperse, nor did he impart instructions on where to move or advise the crowd of the consequences for noncompliance.  The announcement caused visible consternation among the protesters who stayed in place and continued chanting.  A group of tactical officers then moved toward the crowd.  The officers and protesters began pushing and shoving each other and some in the crowd began throwing objects at the officers.  Officers charged the crowd, hitting, striking, and pushing anyone in their path, including individuals who were attempting to disperse or had their backs to the officers in a non-threatening manner.  Officers also deployed tear gas and chemical irritants.  Several witnesses also reported seeing a lieutenant unholster and point his firearm at civilians.  One civilian reported that the lieutenant discharged his firearm without justification.  In December 2010, former Superintendent Figueroa Sancha indicated that he was unable to determine whether the lieutenant discharged his firearm because the ballistic tests were inconclusive.

As illustrated below, many individuals participating in the protest were not posing any threat to public safety, and none were arrested:

- A student journalist, Rachel Hiskes, entered the Capitol with other individuals and attempted to access the Senate chambers.  PRPD officers, who had been dispatched to the Capitol earlier in the day, stopped Hiskes and hit her.  She was not resisting or combative.  Hiskes then sat in the hallway with other visitors in protest.  A Capitol employee then sprayed Hiskes and others with chemical irritants.  As Hiskes tried to get up, an officer hit her across the back with a baton, causing her to fall.  An officer continued to push and strike her with his baton, driving her toward the doorway.  When she reached the door and had her back to the officer, the officer shoved her out onto the concrete stairs using his baton and hitting her in the neck.  Hiskes was not arrested or charged with any crime.

- Juan Ángel Gutiérrez also entered the Capitol and was denied entry to the galleries.  He then began photographing the officers hitting journalists.  Capitol staff tried to take away his camera and sprayed him with chemical irritants.  He fell to the ground covering his face and writhing in apparent pain.  While on the ground, officers kicked Gutiérrez several times.  Gutiérrez was not combative or resisting.  He was not arrested or charged with any crime.

- Omar Silva Meléndez reported that he arrived at the demonstration and observed an officer assaulting several female protesters.  As he assisted one of the protesters who had been hit by officers, police deployed a gas canister, hitting Silva Meléndez in the forehead.  The blow caused a second-degree burn and an injury requiring stitches.  Silva Meléndez was not engaged in criminal activity, resisting officers, or attempting to evade arrest.

- A legislator reported that she arrived at the Capitol vestibule and observed an officer kicking a woman as she sat on the ground.  The legislator told the officer to stop and showed her identification.  An officer then hit the legislator in the arm with a baton, causing significant bruising.

- An attorney who was serving as a legal observer reported that he saw an officer hit a student in the head and officers throwing students down the Capitol's exterior stairs.  He was sprayed with chemical irritants.  He later observed officers form a perimeter around the central plaza.  He reported that officers did not attempt to dialogue with the protesters or answer questions.  Many officers were also not wearing their name or identification badges, as required by Puerto Rico law.

- Betty Peña Peña arrived at the protest with her 17-year-old daughter and reported that about an hour and forty-five minutes after arriving, officers began to attack the crowds.  An officer hit Peña's daughter in the head with a baton, causing trauma and other injuries.  Officers continued kicking and hitting the daughter with batons.  Peña tried to cover her daughter to protect her from further injury.  Peña's daughter was then dragged away.  Both Peña and her daughter sustained injuries to the head.  Peña's daughter also sustained abrasions on various parts of her body.  Both also had difficulty breathing because of the tear gas and other chemical irritants used by police.  Neither Peña nor her daughter was combative or physically resisting.  Neither was arrested or detained.

- A university student reported that she arrived after other students were repelled from the Capitol stairs. Officers pushed her, hit her in the chest, and struck her ear with a baton. She fell to the ground. A Capitol employee assisted her to the Capitol health unit where she was given first aid.

- Without provocation, an officer forcefully shoved a photojournalist wearing credentials as he walked past a group of officers in the parking lot. The photojournalist fell to the asphalt, sustained an abrasion, and broke his camera. The photojournalist was not posing a threat to public safety or to the officers.

Following the incident, former Superintendent Figueroa Sancha stated publicly that he was responsible for all decisions involving the removal of individuals. He also publicly justified the officers' use of force. However, it is evident that the use of excessive force against protesters was directed at chilling speech and intimidating protesters, rather than protecting public safety or restoring order. First, Figueroa Sancha's claims of widespread lawlessness by protesters are not supported by the number of arrests. At the conclusion of the barrage, only two individuals were arrested for alleged damage to a police vehicle. They were released after a judge found no probable cause. Second, a PRPD committee evaluating the June 30 incident observed a total lack of control by officers. According to committee minutes dated July 23, 2010, members discussed how to undo the impact of the incident, including whether to make TOUs "disappear." Third, PRPD recognized the potential chilling effect of its tactics on protected First Amendment activities. An October 2010 memorandum issued by the Office of the Superintendent detailed the elimination of the Specialized Tactical Unit, a military-style crowd control unit, to secure First Amendment rights.[37] Finally, CRC has repeatedly warned that the manner in which PRPD engages with crowds who are exercising their First Amendment rights threatens to abridge those rights. For instance:

- On July 1, 2010, CRC publicly expressed its consternation about the government's intervention with protesters, journalists, and citizens who were attempting to exercise their First Amendment right to free speech at the Sheraton Hotel on May 20, 2010.[38]

- On July 2, 2010, CRC issued a resolution calling for an investigation into the actions of PRPD officers, based on images and news reports of injuries to individuals attempting to exercise their right to free expression.[39] CRC again expressed concern that the restrictions on individuals' rights by police may represent serious civil rights violations.[40]

- On February 14, 2011, CRC issued yet another resolution expressing concern over police interventions inside and around UPR.[41] CRC noted that the media continued to depict civil rights violations of civilians exercising their right to protest and that police were undermining these rights through "detentions, discrimination, threats, violence, harassment, persecution, intimidation, including against members of the press."[42] CRC reminded PRPD of its duty to safeguard civil rights and its responsibility to use proportional force when engaging with citizens.

Officers also began employing pressure point techniques on individuals who were passively resisting. We also observed the use of choke holds against individuals, including one instance in which an officer used his baton as a neck restraint. Carotid and choke holds have the

potential of causing death or serious injury and should only be used when subjects pose an immediate risk of death or serious bodily harm.  We also learned that PRPD maintained Chloroacetophenone (commonly referred to as "CN gas") in its inventory and that it continued using substantial amounts of chemical agents against crowds.  Many law enforcement agencies have replaced CN gas with other less toxic chemical agents for crowd control purposes.

The use of compliance techniques and offensive tactics that pose a significant likelihood of serious bodily harm without an apparent and substantial law enforcement purpose causes protesters, witnesses, and other observers to refrain from opposing PRPD and chills citizens' protected speech.  Additionally, we have reasonable cause to believe that the aforementioned instances of PRPD conduct in response to protests and civil demonstrations satisfy both the causal and negative impact requirements necessary for demonstrating a First Amendment violation.

### 3.      Deficiencies Causing and Contributing to the Pattern and Practice of Excessive Force

The use of excessive force by PRPD officers is a serious problem that has long been recognized by Puerto Rico officials.  For instance, an external evaluating committee convened by former Superintendent Toledo Dávila reported in December 2007 that the use of excessive force by PRPD constituted a "pattern of civil rights violations" that resulted in "nearly a total lack of confidence" in PRPD.[43]  Over two years ago, in April 2009, PRPD reported that it was establishing a policy committee to draft updated policies on use of force.  However, PRPD has yet to develop or revise all necessary use of force policies.  Even with the development of new written policies, without the implementation of effective accountability systems, such as meaningful force reporting and supervisory review processes, Puerto Rico residents will continue to be subjected to preventable harm at the hands of police.

The pattern and practice of excessive force by PRPD is rooted in agency and supervisory deficiencies that have resulted in a culture of indifference to the physical integrity and constitutional rights of Puerto Rico's residents.  In addition to other systemic problems discussed in Section IV, these deficiencies include:

> "No accountability in use of force system.   I can't be the police, judge, and jury.  We can't have that archaic vision."
>
> - PRPD Sergeant

- Non-existent, unclear, and contradictory policies on use of force;
- Lack of reporting requirements and objective supervisory review;
- Inadequate systems to review critical incidents, such as firearm discharges;
- Insufficient training on use of force; and
- Condoned fear and violence by tactical units

a. **Force policies are severely deficient**

PRPD deploys officers without sufficient guidance on the lawful use of force.  Contrary to contemporary policing practices, PRPD has not implemented a comprehensive use of force policy that instructs officers on current legal standards.  Although PRPD reports that it issued a written policy on use of force, it has yet to train officers on the new policy.  Other existing policies, as described below, fail to incorporate current legal requirements, do not define force uniformly, use ambiguous or conflicting terms, and do not emphasize appropriate alternatives to physical force.  PRPD has not implemented policies on force options authorized by PRPD, such as chemical irritants, impact weapons, and less lethal munitions.  PRPD policies also do not provide guidance on how officers should respond to individuals experiencing a mental health crisis or to civil disturbances and crowds.  The lack of basic policies points to PRPD's chronic failure to establish any meaningful or reliable system to manage officers' use of force.

More fundamentally, we found significant inconsistencies in officers' understanding of the meaning of "force."  For instance, some officers defined "force" as "lethal force," "excessive force," or "intervening with an individual."  Rarely did officers describe force in functional or operational terms, such as taking a subject to the ground, employing a choke hold, or punching, kicking, or striking with a baton.  In this regard, an officer who does not believe he is using "lethal force" or "excessive force" when he punches, hits, or otherwise injuries a person will simply not feel obligated to report or justify his actions.  Thus, it is not surprising that unjustified slaps, punches, kicks, choke holds, takedowns, baton strikes, chemical use, and more intrusive forms of force routinely go unnoticed by PRPD commanders and supervisors.  Given the magnitude of excessive force we uncovered from a sample of PRPD documents and the public record, it is extremely troubling that PRPD cannot account for the full scope of force its officers use against the people of Puerto Rico.  Simply put, the failure to instruct officers on the specific actions that they will be held accountable for in the course of their interactions with the public reflects a profound indifference to civil rights.

**Batons**

General Order 98-6, issued more than 12 years ago, governs PRPD officers' use of the baton, a standard-issue impact weapon.  The policy fails to articulate any legal standard on the use of the baton, including the objective reasonableness standard in *Graham* or the criteria that are to be considered in determining the reasonableness of force.  These criteria include the severity of the crime at issue, the extent to which the suspect poses an immediate threat to the safety of the officer or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight.  *Graham*, 490 U.S. at 396.  Instead, GO 98-6 indicates that the purpose of the policy is to "establish guides for the most effective use of the baton when submitting a civilian to obedience."  The policy does not specify when the government has a legitimate interest to submit an individual into "obedience."

General Order 98-6 also uses terms that are ambiguous and do not describe a subject's level of resistance.  Instead, GO 98-6 instructs officers that the baton *must* be used in eight enumerated circumstances, including to "stop or control riots or crowds," "facilitate movement of a person or persons," and "control individuals."  General Order 98-6, as worded, also does not

provide for any meaningful alternatives to the use of the baton, including using verbal persuasion or calling in reinforcements.

Other sections of GO 98-6 are internally inconsistent and place individuals at serious risk of harm.  For instance, Section E instructs officers to avoid striking certain parts of the body because they may be fatal, including areas above the shoulders, genitals, spine, or the *solar/celiac plexus* (the network of nerves situated in the *abdomen* behind the stomach and in front of the aorta and diaphragm).[44]  Section D, however, lists areas of the body that may be struck without causing serious injury, including the *chest* and *abdomen*.  This conflicting language is of particular concern given PRPD's practice of jabbing and ramming batons into individuals' bodies using the metallic ball on the ends of the batons.  Also, Section F merely "suggests" that officers avoid raising the baton above the head when striking an individual, using the baton to provoke a subject, and using the baton against a subject who has been neutralized, rather than clearly prohibiting or restricting these dangerous and unreasonable practices.  The improper use of batons by PRPD officers has contributed to serious injuries, specifically during the large demonstrations discussed above.

## Conducted Energy Devices

There are similar deficiencies in GO 2008-2, which governs PRPD's use of CEDs.  For instance, GO 2008-2 does not specify any legal standard for the use of CEDs, including the objective reasonableness standard in *Graham*, 490 U.S. at 396.  Instead, GO 2008-2 ambiguously references "public safety" as the basis for using CEDs in various sections of the Order.  Section C describes CEDs as "non-lethal" weapons that permit officers to "end violent situations, for security reasons" and states that the use of CEDs "shall be carried out in those circumstances where the officer believes the use of [the CED] is appropriate, based on public safety considerations."  Although Section G indicates that law enforcement officers are required to act "prudently" and "reasonably," GO 2008-2 does not specify the factors that should be considered when determining the reasonableness of CED deployment, such as the level of resistance of a subject or the severity of the crime at issue.

Most significantly, GO 2008-2 fails to acknowledge that CEDs can be lethal.  CEDs have been cited by medical authorities in recent studies as a cause of, or contributing factor in, certain deaths.[45]  In addition, GO 2008-2 does not address situational hazards that could result in serious injury or death.  These situations include using the device against an individual who is in an elevated location, such as a bridge or rooftop, or against individuals who are restrained or handcuffed.  GO 2008-2 also does not:

- require warnings or use of less intrusive alternatives, when feasible;
- require re-assessing the subject's threat or resistance level following each deployment cycle;
- address removal of CED probes that puncture the skin; or
- provide guidance on post-deployment medical attention.

## Firearms

PRPD's firearms policy, GO 2004-3, provides a legal standard for use of deadly force, but leaves critical terms undefined.  For instance, Section D.1 states that "when using a firearm, only the minimum amount of force that is consistent with achieving the mission shall be used."  GO 2004-3 does not define "achieving the mission" and fails to reinforce the actual legal standard, which requires that an officer have probable cause to believe that a subject poses a significant risk of death or serious physical injury to the officer or others.  *See Garner*, 471 U.S. at 3.  Other critical terms in GO 2004-3 are unclear and may cause confusion about the necessity or reasonableness of force.  Section D, "Guides for the Use of the Regulation Firearm," states that the firearm is considered a "defensive weapon and not a tool for arrests."  However, the provision does not address whether, and under what circumstances, officers may shoot at fleeing suspects.  Other important aspects that are critical to managing officers' use of deadly force are missing from GO 2004-3.  For example, GO 2004-3 does not cover the appropriateness of warning shots; the consequences of missing the three annual shooting practices required by GO 2004-3; and the reporting requirements when a firearm is discharged or another form of lethal force is used.

PRPD's firearms policy provides the only discussion of lethal or deadly force.  As a result, officers do not receive formal guidance on other types of force that may constitute lethal or deadly force, such as choke holds, carotid holds, and strikes to the head with impact weapons.  In addition, PRPD's firearm policy does not address many procedures that should apply to all forms of lethal force, including the use of verbal warnings prior to using force and the supervisor's role in reviewing uses of lethal force.  Indeed, the only post-shooting procedure that is mentioned in GO 2004-3 relates to maintenance of the firearm, rather than to any post-shooting review to determine the appropriateness of the shooting.  In this regard, GO 2004-3 states, "After shooting a firearm, the principle consideration that should be present is the prevention of rust."

## Other Force

On January 26, 2011, we notified Puerto Rico that we were concerned over news reports depicting PRPD officers using force against individuals who offered minimal or passive resistance during student protests.  Specifically, we urged PRPD to restrict the use of choke holds and other carotid pressure techniques to situations warranting lethal force and to require officers to report, at a minimum, when lethal force is used.  We also urged PRPD to prohibit the use of CN gas and to decommission any remaining stock in its inventory because most law enforcement agencies had replaced CN gas with other less toxic chemicals.  On February 10, 2011, Puerto Rico reported that PRPD had banned the use of CN gas, ordered its decommission, and restricted the use of choke holds, carotid holds, pressure point techniques, and rubber stinger ball cartridges.  Puerto Rico also reported that it was completing a new use of force policy, based on model policies and comments we provided.  Although these policy developments are encouraging, without effective accountability measures on use of force, discussed further below, the issuance of new policies or directives provides no guarantee that officers will follow them or that officers will be held accountable when violations occur.

35

In sum, PRPD's existing policies on use of force are inadequate and do not provide officers with necessary guidance to ensure that force is used in accordance with constitutional requirements and contemporary policing practices.

### b.      Reporting and review requirements fail to hold officers accountable

PRPD has not implemented basic reporting and review requirements to ensure officers use lawful and appropriate force during an arrest or detention, or in other interactions with civilians. Use of force reports allow supervisors and commanders to collect and analyze essential information about the factual circumstances surrounding a use of force. At the individual officer level, reliable and accurate information from these reports permits supervisors to formulate objective conclusions about an officer's conduct. More broadly, aggregate information on use of force allows agencies to improve policies, training, tactics, and management. Thus, a properly functioning system provides law enforcement agencies with the tools to hold officers and supervisors accountable when misconduct occurs, provides critical feedback to develop safer and more effective policing methods for officers and the community, and helps strengthen the public's confidence in the agency's ability to regulate itself.

As discussed above, PRPD does not provide a uniform definition of "force" that is commonly understood by officers throughout the agency. This omission prevents officers from consistently distinguishing between reportable uses of force and routine physical contact that does not require formal supervisory review, such as escorting a subject or routine handcuffing. The facts of every use of reportable force must be established and reviewed. For the lowest levels of force, such as "soft" control techniques where there is no complaint of injury, a report fully describing the force used may be sufficient. For intermediate levels of force, such as hand strikes, punches, and use of chemical agents, particularly where there is a complaint of injury or a discrepancy in the description of the force used, some level of investigation and review is required, even in the absence of a formal misconduct complaint.

We found three overarching problems concerning PRPD's policies and practices concerning use of force reporting and review. First, PRPD's general orders regarding use of force reports are wholly inadequate. As an initial matter, PRPD does not require officers to report all significant uses of force. For instance, GO 2004-3 on firearms does not require any notification or report following an intentional or unintentional discharge. There are no policies requiring written reports when officers use physical force, such as punches, kicks, or take downs, or when officers use chemical irritants or less lethal munitions. Even where reporting requirements exist, in the case of batons and CEDs, the procedures are vague and do not require supervisors to conduct independent reviews of officers' use of force. For example, GO 98-6 requires that PRPD officers submit a written report after using a baton that results in serious bodily harm. However, GO 98-6 neither defines "serious bodily harm," nor does it describe the information that should be included in the report. In our interviews, officers were unable to provide a clear and consistent operational definition of the type of injury that would require a use of baton report. For instance, supervisors of specialized units reported that they would not respond to the scene of an incident to review an officer's use of a baton that resulted in a broken arm. Thus, officers are allowed to escape review by their supervisors when they inflict significant injury, such as a broken bone.

In response to our initial document requests for use of force reports, PRPD first indicated that none existed.  Several months later, PRPD explained that officers *may* mention the use of force in incident reports that are prepared when an officer arrests an individual.  However, PRPD was unable to produce these documents.  PRPD explained that production would require already-extended staff to cull through thousands of pages of individual incident reports to glean from handwritten narrative descriptions whether any force was used.  We later learned that some supervisors maintain copies of documents with use of force information.  Based on our review, these records varied significantly by unit and region.  During our March 2009 tours, we requested all documents concerning use of force from the tactical and special operations units for the preceding six months.  These documents demonstrated a significant lack of uniformity in the reporting process, even down to officers' interpretations of the term "force."  For example:

- The SOU in San Juan produced a one-page memorandum indicating that its officers had not used *force* in the last six months.

- TOU in San Juan produced a one-page memorandum indicating that it had not received any *complaints of use of force*.

- TOU and SOU in Guayama produced memoranda regarding three incidents, prepared by supervisors within days of the incidents, informing higher-level commanders that officers had used *chemical agents, batons, and firearms*.  The memoranda were based on officers' accounts of the incidents and did not include any witness statements or information.

- TOU and SOU in Utuado produced memoranda indicating that only SOU had used force in the last six months.  Incident reports for three separate incidents were attached where individuals were arrested.  However, none of these reports described the type of force used by officers.

- TOU in Mayagüez produced a memorandum that referred specifically to our request (i.e., was not produced in the course of business), describing an incident that had taken place weeks before.  The memorandum, whose subject line read, "Interventions Conducted by the Tactical Operations Unit Where *Reasonable Force* Was Used," indicated that the subject "resisted arrest, struggled with the officers, and was injured in the intervention." It did not describe the specific actions taken by officers to subdue the subject, the extent of the subject's injuries, or whether the subject was provided with medical care.

- SOU in Aibonito produced a homicide investigation report concerning a complaint from the son of a PRPD officer who alleged that officers and a sergeant of SOU beat  him following a traffic stop on October 25, 2008.  Notably, there were no reports, memoranda, or any other written documents prepared by any of the officers involved in the incident describing the traffic stop or the circumstances surrounding the use of force.

- TOU and SOU in Arecibo reported jointly that no member assigned to these units had used *excessive force* in any intervention in the preceding six months.

- SOU in Caguas reported that it had not used *tasers or chemical agents* in the preceding six months.

Second, officers routinely reported that they are only expected to report force when a subject is arrested. This is a serious deficiency because it permits officers to evade supervisory review simply by allowing a subject of force to leave or flee. Officers should be required to report all uses of force, whether or not the subject of force is apprehended. For instance, in April 2011, we observed video of an officer openly spraying two boys with chemical irritants without justification, after former Superintendent Figueroa Sancha prohibited the use of chemical agents twice in January 2011. The boys were playing and were not arrested. The officer did not report the use of force. He was questioned about the incident only after a video taken by a bystander surfaced in the media. Criminal charges have since been filed against the officer for assault.

Third, PRPD supervisors are not required to conduct objective, thorough, and timely reviews of officers' use of force to ensure the force was consistent with constitutional standards and departmental policies. As written and in practice, PRPD's policies only require an officer to notify a supervisor for informational purposes. Once supervisors are notified, supervisors prepare written memoranda to alert higher-level officials about a use of force based on the officers' recitation of the incident. Supervisors simply take dictation. PRPD commanders confirmed this practice during our December 2010 tour.

When supervisors are notified of a use of force resulting in significant injury or complaint of injury, they should canvass the scene to obtain as much information as possible from a variety of sources. For instance, in addition to interviewing the officer involved, supervisors should note all injuries, identify and interview witnesses, and identify other physical evidence. The review should determine whether the use of force was within agency policy and objectively reasonable, and, if not, whether and what discipline should issue. The review should also indicate whether the involved officer needs additional training, counseling, or other assistance. Finally, the review should include an examination of the police tactics and precipitating events that led to the use of force, so that the agency can evaluate whether any revisions to training, policy, practices, or tactics are necessary. Use of force data should be incorporated into the agency's risk management system to detect potential patterns of at-risk conduct and improve performance.

PRPD's failure to uncover the extent of unjustified use of force during the August 2009 incident on University Avenue, the May 2010 incident at the Sheraton Hotel, and the June 2010 incident at the Capitol, *supra,* illustrates the multiple deficiencies plaguing PRPD's system of accountability on use of force. For instance, despite the use of significant force by hundreds of officers, including the use of batons, physical force, and chemical agents, only one written report was completed by an officer who deployed a CED at the Sheraton Hotel. No other officers were required to describe the force they used or the circumstances that led to their use of force. There is also no evidence that PRPD supervisors attempted to obtain information from subjects of force or other witnesses to evaluate officers' actions. Instead, PRPD officials indicated that they relied on civilians coming forward with sworn statements complaining about specific officers. Even if supervisors had attempted to interview subjects or witnesses of force, numerous officers concealed their badge numbers and name plates, preventing individuals from identifying specific officers. Further, post-incident reports prepared by supervisors included only generalized

references to use of force and failed to make any determination on the appropriateness of specific uses of force or account for specific injuries inflicted by officers. Therefore, it is not surprising that PRPD investigators identified only one instance of misconduct among the widespread use of force against non-violent civilians during all three incidents. The incident involved PRPD officers who fired three gas canisters at students who were merely yelling at police outside a dormitory in August 2009. Notably, PRPD's action came after video of the incident, disseminated widely on the Internet, showed a female student being carried by other students after one of the gas projectiles hit her in the leg, causing an open wound.

By failing to implement meaningful reporting and review requirements, PRPD abdicates its responsibility to ensure that officers use force in accordance with constitutional and agency requirements. Further, relying solely on civilian complaints to initiate use of force reviews is insufficient because victims or witnesses of excessive force may be inhibited from coming forward for a variety of reasons, including perceived or actual intimidation by officers or the inability to identify alleged aggressors.

### c.      Critical incident reviews are ineffective and improperly completed

While all reportable force should be reviewed and investigated, critical incidents, such as firearm discharges by officers (except those that occur in the regular course of training) and other force that results in serious injury or death, require more comprehensive independent review. To be complete, the critical incident review must be conducted from both the criminal and administrative perspectives. Neither investigation should depend on whether anyone has complained about the use of force. The investigations may be conducted at the same time or sequentially, depending on the circumstances.

PRPD's critical incident reviews are deficient. Specifically, we found that PRPD does not have uniform procedures that require notification and coordination among administrative and criminal investigators, resulting in incomplete tracking of critical incidents. A lack of coordination creates a serious risk of tainting or compromising a criminal prosecution or drawing conflicting conclusions regarding the circumstances surrounding a use of force. PRPD also does not routinely conduct critical incident reviews to identify operational deficiencies and implement corrective action.

Our investigation revealed that PRPD criminal investigators, including those assigned to the homicide units, lack investigative protocols that specifically address officer-involved incidents. In this regard, homicide investigators reported that they employ the same methods and techniques as any other civilian-involved homicide and do not take special precautions when the target or suspect is an officer. Criminal investigators reported that they do not ordinarily receive training on officer-involved shooting investigations and were unaware of any specific procedures. The head of one criminal investigative unit further indicated that existing GOs on criminal investigations were too broad to provide operational guidance and that he typically conducted both the criminal and administrative investigation.

The lack of consistent procedures impedes Puerto Rico's ability to track and analyze critical incidents involving PRPD officers. Currently, Puerto Rico is unable to track even police-involved shooting deaths accurately – a figure that nearly all law enforcement agencies account

for.  Puerto Rico's failure in this regard became evident when we requested information on investigations into officer-involved shootings from 2005 through 2010.  PRDOJ reported 27 incidents involving subjects who were shot and killed by PRPD officers from 2005 to 2010.  *See Table 3*.  However, we identified seven additional incidents from publicly-available sources, such as press releases and news clips, in which officers reportedly shot and killed a subject.  *See Table 4*.  Specifically, PRDOJ's report did not include a 2008 incident in which PRDOJ charged the shooting officer with first-degree murder and weapons violations.  PRDOJ also did not report a 2009 shooting that was the subject of a PRDOJ press release.  It is unclear why PRDOJ failed to include these shooting fatalities in the original report.  Because we did not have access to supplemental sources of information covering dates after the middle of 2009, it is possible that PRPD or PRDOJ failed to identify and track additional shooting fatalities between late 2009 and 2010.

**Table 3:  Subjects Shot and Killed by PRPD, As Reported by SIB, 2005-2010**

| Status* | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | Total |
|---|---|---|---|---|---|---|---|
| Open investigation | 1 | 2 | 2 | 0 | 2 | 7 | **14** |
| Open, charges filed | 0 | 0 | 0 | 0 | 0 | 3 | **3** |
| Closed, no charges | 1 | 0 | 3 | 1 | 1 | 2 | **8** |
| Closed, charges dismissed | 1 | 0 | 0 | 0 | 0 | 0 | **1** |
| Closed, conviction | 0 | 0 | 1 | 0 | 0 | 0 | **1** |
| **Total** | **3** | **2** | **6** | **1** | **3** | **12** | **27** |

\* as of December 6, 2010

**Table 4:  Seven Additional Subjects Shot and Killed by PRPD, 2005-2010**

| Date | Alleged Victim | Incident Summary |
|---|---|---|
| 8/4/2007 | Nelson Santiago Rivera | A PRPD officer shot and killed Santiago Rivera, the son of a PRPD officer, following a fight involving several civilians in Las Piedras. |
| 8/15/2007 | Luis Rodriguez Maya | PRPD officers shot and killed Rodriguez Maya during the execution of a search warrant in Cabo Rojo. |
| 4/1/2008 | Carlos Carrasquillo Rodriguez | PRPD officers shot and killed Carrasquillo Rodriguez in San Lorenzo.  Carrasquillo Rodriguez was known to have mental illness and was reportedly holding a knife. |
| 4/28/2008 | Marcos Montes Muñiz | PRPD officers shot and killed Montes Muñiz, who was suspected of committing a robbery and in possession of a weapon. |
| 6/6/2008 | Carlos Santiago Berrios | PRPD officers shot and killed Santiago Berrios, who was suspected of committing a robbery. |
| 8/5/2008 | Victor Sanabria Martinez | PRPD officers assigned to TOU in Humacao shot and killed Sanabria Martinez, who was suspected of committing a robbery.  The shooting officer was charged with first-degree murder and weapons violations. |

| 8/17/2009 | Heriberto Marcial Hernandez | According to a PRDOJ press release, a PRPD officer stopped Marcial Hernandez for a traffic violation. Marcial Hernandez allegedly reached for a weapon as he was being handcuffed and shot at the officer. The officer then shot and killed Marcial Hernandez. |
|-----------|------------------------------|-----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|

PRPD and PRDOJ recently established protocols to notify various components regarding police-involved deaths and serious injuries. While these are positive steps and should improve the tracking of critical incidents, they do not provide sufficient guidance on parallel criminal and administrative investigations. For instance, the interagency agreement recently entered into by PRPD, PRDOJ, and the Forensic Sciences Institute ("FSI") does not provide for communication or coordination with PRPD administrative investigators. The protocols are also limited to the most basic and immediate steps to be taken on the scene of a critical incident and do not require ongoing coordination.

Further, the "work plans" developed by PRD instruct administrative investigators to interview officers involved in shootings or other critical incidents without exception. While an officer may be ordered (or "compelled") to provide a statement to police department investigators, that statement, and any other evidence that derives from that statement, may not be used against the officer in any subsequent criminal prosecution of the officer. In this regard, officers cannot be forced to choose between losing their jobs because they disobeyed an order to answer questions, and exercising their Fifth Amendment right to avoid self-incrimination. *Garrity v. New Jersey*, 385 U.S. 493 (1967). Thus, a blanket rule requiring compelled statements is problematic because it may prevent prosecutors from using critical evidence in a criminal case involving police misconduct. Similarly, as discussed further below, PRPD's practice of providing blanket protections against self-incrimination in administrative investigations is also problematic because it unnecessarily hinders PRPD's ability to discipline officers. Rather than employing blanket rules, each internal investigation should be considered individually. Where it becomes apparent that an incident may involve criminal conduct, it may be prudent to delay compelling interviews of subject officers, and sometimes other interviews as well, to ensure that prosecutors are able to fully develop evidence that may be critical to a criminal prosecution.

In December 2010, PRPD reported that it was beginning to conduct comprehensive reviews of certain high-profile incidents. PRPD indicated that it was reviewing the August 2009 University Avenue incident, the May 2010 Sheraton Hotel incident, and the June 2010 Capitol incident. While these are positive developments, PRPD should conduct comprehensive reviews of all critical incidents. Without consistent critical incident reviews, PRPD misses crucial opportunities to improve the agency's performance through non-disciplinary, broad-based corrective action. Other agencies have used data collected from critical incident reviews to promote officer and civilian safety. For instance, NYPD adopted procedures in 1969 to collect in-depth information on firearm discharges by officers for the purpose of "[increasing] the safety potential of each member of the force."[46] In 2010, NYPD reported the lowest number of subjects *shot and injured* in 40 years (16 compared to the highest number of subjects shot and injured, 221, in 1971). NYPD also reported the lowest number of subjects *shot and killed*, eight, in 2010. In its 2009 Annual Report, NYPD cited information gleaned from its annual reports as an important tool in its efforts to tailor safer policies and practices.

### d.      Insufficient training on use of force

Insufficient training on use of force further exacerbates PRPD's policy deficiencies. Based on our review of the University College's training reports covering January 1 through November 30, 2010, only a small fraction of active PRPD officers received any training on use of force.  For instance, only 415 officers received training on the use of batons during this period, or fewer than 3% of active PRPD officers.  Even a smaller number of officers received training on chemical irritants.  In the same 11-month period, only 248 officers, or approximately 1.5% of active officers, received training on chemical irritants.  PRPD's performance in this regard is deeply troubling and underscores the need for fundamental reform.

All officers should receive in-service training on use of force on an annual basis that covers both current legal requirements and appropriate application of use of force.  Officers should also be offered contemporary, scenario-based training that reinforces current legal standards and practices.  Ongoing training on use of force should also include:

- use of force reporting requirements;
- examples of scenarios faced by PRPD officers and interactive exercises that illustrate proper use of force decision-making;
- de-escalation techniques that encourage officers to make arrests without using force, and instruction that disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, calling in specialized units, or delaying arrest may be the appropriate response to a situation, even when the use of force would be legally justified;
- threat assessment;
- crisis intervention and interacting with people with mental illnesses, including instruction by mental health practitioners and an emphasis on de-escalation strategies;
- factors to consider in initiating or continuing a pursuit; and
- training on conflict management.

PRPD also does not consistently train supervisors to independently review officers' use of force.  It is crucial that supervisors be taught the skills and judgment necessary to evaluate officers' use of force, not only for compliance with agency policy and appropriate legal standards, but also to identify specific operational, training, or policy needs.  In addition, effective law enforcement agencies ensure the lawful use of force by implementing training that reinforces the agency's policies and ongoing auditing that captures and analyzes information to allow for continuous improvement and external accountability.

### e.      Fear and violence by tactical units is condoned

As discussed above, PRPD has been on notice for years that officers assigned to tactical units routinely employ excessive force when interacting with civilians.  Members of these units are authorized to use a wide variety of force and special weapons, including chemical sprays, tear gas, CEDs, and less lethal munitions.  These units rely on intimidation, fear, and extreme use of force to manage crowds and are often deployed to low-income and minority communities on routine patrols.  These units operate with insufficient training and guidance on the lawful exercise of police power.

In 2007, an evaluating committee commissioned by a former Superintendent found that TOU officers use indiscriminate force that is "totally unjustified."[47]  Internal affairs investigators also found serious deficiencies in the operation of TOUs following the August 11, 2007 shooting death of Cáceres Cruz by TOU Officer Javier Pagán Cruz.  *Supra.*  Specifically, an internal affairs investigator found grossly inadequate supervision that contributed to instability and lack of discipline in TOU (two sergeants were assigned to supervise 44 officers in Humacao; one of the sergeants was on leave at the time of the shooting incident).  The investigator also found that sergeant-level supervisors were used to supervise TOUs, in violation of PRPD policies requiring, at least, a lieutenant-level supervisor.  Officers we interviewed in 2008 and 2009 also expressed serious concerns with the lack of supervision of TOUs.

Rather than take steps to manage the use of force by these units, or provide them with sufficient training and supervision in response to PRPD's own troubling reports, PRPD routinely deployed TOUs to engage with crowds and protesters, despite their propensity for using significant force.[48]  Our review of the University Avenue, Sheraton Hotel, and Capitol incidents in 2009 and 2010 confirms that serious deficiencies remain in the deployment of tactical units. For instance:

- PRPD appears to have engaged in little tactical coordination and planning in its responses to major disturbances and demonstrations; instead PRPD relies on physical confrontations by its tactical units.

- PRPD has not sufficiently explored methods that allow civilians to peacefully exercise their constitutional assembly and speech rights.

- Tactical units and other officers displayed a tendency to quickly deploy hand-held or weapon-based chemical agents on civilians without regard for their harmful effects, even upon officers themselves.

- Although the Superintendent (personally in the Capitol incident) and PRPD's high-level commanders claimed responsibility for the tactical decisions made during all three incidents, command and control vanished once tactical officers appeared, leaving the tactical officers unsupervised.

- Supervisors appeared more concerned about public perception than about the actions of their officers.  For example, after an officer inappropriately struck a demonstrator being ejected from the Capitol in June 2010, his commander seemed more concerned about warning the officer about video cameras than with reprimanding the officer for his use of force.

- Reports drafted after these incidents show a lack of concern for the basic facts needed to sustain criminal complaints, omissions that led to the dismissal of most charges against individuals due to lack of sufficient probable cause.

- PRPD failed to report its uses of force.  A significant number of officers used force indiscriminately, yet the only specific use of force report available was a report from an officer who deployed a CED during the Sheraton Hotel incident.

- Officers used force against civilians who were dispersing, even running away, thus not representing a danger to the officers or others.

Publicly, Puerto Rico officials and PRPD commanders have justified the level of force unleashed on protesters by TOU officers.  They have accused protesters of engaging in widespread vandalism and threatening the public safety.  Yet, few protesters were arrested and many that were arrested were released for lack of probable cause.  Shortly after the June 30, 2010 incident at the Capitol, the Governor requested that PRPD thoroughly review the operation of TOUs.  We have not been provided a copy of any final reports, but our review of the committee's minutes revealed that PRPD appeared focused on minimizing public condemnation over PRPD's response to protesters and concealing the committee's findings by assigning attorneys to sub-committees.  With respect to PRPD's actions on June 30, the committee observed that TOUs had not developed operational plans to manage the crowds; communication between the incident commander and TOU commanders was inadequate; TOUs failed to use proper formations when confronting crowds; supervisors did not adequately manage officers' stress; and supporting officers intervened without control or coordination.

The committee also found other serious deficiencies that have been known to PRPD for years but were ignored.  For instance, the committee found that:  there is no selection protocol for officers entering TOUs; five percent of TOU officers are unfit for tactical duty based only on the number and type of civilian complaints lodged against them (as of September 2010, there were 738 officers assigned to TOUs); and training is inadequate and the curricula do not comply with contemporary standards and constitutional protections against the use of excessive force.

In late 2010, PRPD announced that it was disbanding several tactical units and reducing the size of TOUs.  As of September 2010, PRPD reported that 53 officers were assigned to Special Operations Units in San Juan, 738 officers were assigned to TOUs, and 35 officers were assigned to the Specialized Tactical Unit.  Officers deemed unfit for tactical duties were to be re-deployed to patrol and other units within PRPD.  However, PRPD did not provide specific information about steps it would take to re-train, discipline, or remove unfit officers, before re-assigning them to patrol duties.  We have not obtained information that these units have, in fact, been disbanded or whether problem officers have been removed or re-trained before being transferred to other units.  Based on our review, PRPD continued to deploy tactical officers to engage students and other protesters in January and February 2011, and possibly later.  It is critical that PRPD re-structure its tactical units and re-train officers who are transferred from these units to protect civilians from unreasonable risk of harm.

*       *       *       *       *

In sum, PRPD's systems of accountability on use of force are profoundly broken and do not ensure the lawful and effective use of force.  PRPD continues to demonstrate a deliberate indifference to the public's safety and the civil rights of individuals engaging in protected speech

activities during protests, by failing to control the violence and fear exerted by TOUs.  A functioning system of accountability generally includes:  (1) clear guidance through written policies that are consistent with legal standards, provide for effective alternatives to force, and are accessible to all personnel authorized to use force; (2) ongoing training by qualified instructors that reinforces the agency's policies and guides officers' discretion on the application of force; (3) clear reporting requirements; (4) supervisory review, including collecting information regarding the circumstances of the use of force and an initial, objective assessment to determine whether the force used was within agency policy and legal standards; (5) thorough and timely force investigations by trained investigators to determine whether the use of force involved criminal or administrative violations; (6) critical incident reviews by commanders to identify and implement corrective action; and (7) ongoing auditing that captures and analyzes information to allow for continuous improvement and external accountability.

In addition, law enforcement agencies should develop external strategies to build and foster trust between the community and its officers.  These strategies include external oversight and accountability, public reporting on use of force, and safety surveys to measure the perceptions and needs of the community.[49]

**B.      PRPD Engages in a Pattern and Practice of Unconstitutional Searches and Seizures**

 PRPD regularly violates the constitutional rights of civilians through illegal searches, detentions, and arrests.  In particular, we found a pattern and practice of PRPD officers conducting searches of civilians' homes without warrants or consent and in the absence of any exigent circumstance or exception that would render such a search permissible under the Fourth Amendment.  Our findings also indicate that officers plant evidence during searches, rely on excessive force and intimidation as search aids, and proceed with searches even when knowing that the address, identity of the individual, or other pertinent information is incorrect.  The evidence we uncovered further demonstrates that PRPD officers engage in a regular pattern of detaining and arresting individuals without reasonable suspicion or probable cause in violation of the Fourth Amendment, and that supervisors and members of specialized units are often involved in these unlawful acts.

The Fourth Amendment's protection against unreasonable searches and seizures "requires that arrests be based on probable cause."  *Alexis*, 67 F.3d at 349 (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).  Courts analyze the existence of probable cause by "an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time and not [an assessment of] the officer's state of mind at the time the challenged action was taken." *Id.*  (citing *Maryland v. Macon*, 472 U.S. 463, 470-71 (1985)).  Courts will find probable cause to arrest existed where "the facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [suspect] had committed or was committing an offense."  *Id.* (citing *Rivera v. Murphy,* 979 F.2d 259, 263 (1st Cir. 1992)).  The probable cause requirement applies both to arrests and searches made pursuant to, and without, a warrant.  *Wilson v. City of Boston*, 421 F.3d 45, 54 (1st Cir. 2005).  While "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted," *Michigan v. Summers*, 452 U.S. 692, 705 (1981), this authority does not give law enforcement carte blanche to execute a search warrant in contravention of the

parameters of the Fourth Amendment.  *See Muehler v. Mena*, 544 U.S. 93,106 (2005) (Stevens, J. concurring).  Regardless of the situation, the ultimate question is whether the facts and circumstances confronting an officer at the time would lead a reasonable person to believe that the arrestee had committed or was committing a crime.  *Alexis*, 67 F.3d at 349.

Absent probable cause, the Fourth Amendment permits law enforcement officers to briefly detain individuals for investigative purposes if the officers possess reasonable suspicion that criminal activity is afoot.  *Terry v. Ohio*, 392 U.S. 1, 30 (1968).  Reasonable suspicion must be supported by specific and articulable facts particular to the detained individual, which, combined with "rational inferences from those facts, reasonably warrant an intrusion." *United States v. Young*, 105 F.3d 1, 7 (1st Cir. 1997) (citing *United States v. Kimball*, 25 F.3d 1, 6 (1st Cir. 1994)).  To justify a stop under *Terry*, officers must possess "more than a hunch" that an individual may engage in wrongdoing.  *United States v. Romain*, 393 F.3d 63, 71 (1st Cir. 2004).

## 1.     Officers Conduct Searches and Seizures in Violation of the Fourth Amendment

We found that unconstitutional searches and seizures are a widespread problem.  There is a pattern and practice of searches and seizures without probable cause, for illegal purposes and otherwise in violation of the Constitution.  The following are typical, but not exhaustive illustrations; we provide additional examples of unlawful searches and seizures in Appendix A.

As with the videotaped shooting of Cáceres Cruz in Humacao, described above, the arrest of ten officers assigned to the Mayagüez Drug Division reflects serious deficiencies in PRPD's management and oversight of officers' search and seizure practices.  On August 23, 2007, Lieutenant Dennis Muñiz Tirado, director of the Mayagüez Drug Division, was indicted for conspiring to deprive citizens of their right to be free from unreasonable searches and seizures; their right not to be detained and arrested based on fabricated evidence; and their right not to be deprived of liberty without due process of law.  As part of a three-year conspiracy, Muñiz Tirado and officers under his command stored drugs obtained during the course of ordinary police work in a strong-box in Muñiz Tirado's office and used the drugs to fabricate cases.  According to the plea agreement entered on July 15, 2008, Muñiz Tirado was also aware that officers assigned to his unit were swearing out false affidavits to justify arrests.

The other officers involved in the criminal conspiracy are:[50]

- *Pascual Santiago Méndez:*  found guilty on December 19, 2008, and sentenced to 108 months of imprisonment.
- *Anthony Domínguez Colón:*  found guilty on December 19, 2008, and sentenced to 118 months of imprisonment.
- *Víctor Cortés Pagán:*  found guilty on December 19, 2008, and sentenced to 70 months of imprisonment.  Officer Cortés Pagán was also found personally liable by a jury on October 28, 2009, in *Cruz Acevedo (see Appendix A).*
- *Luis Ruperto Torres:*  found guilty on December 19, 2008, as to the first count of the indictment and sentenced to 50 months of imprisonment.  Sergeant Torres was also found personally liable by a jury on October 28, 2009, in *Cruz Acevedo (see Appendix A).*

- *Luis Vélez Class*: pled guilty on November 5, 2008, and sentenced to three years of probation.
- *Michael Monsegur González:* pled guilty on November 5, 2008, and sentenced to six months of imprisonment.
- *Josué Bosques Muñiz:* pled guilty on November 7, 2008, and sentenced to three years of probation.
- *Ismael Chaparro Vélez:* pled guilty on November 10, 2008, and sentenced to twelve months and one day of imprisonment.

PRDOJ reviewed numerous cases involving the arrested officers and dismissed or closed 51 cases.  Tanairí Candelaria Cabán was among those arrested by the Mayagüez officers.  She was falsely imprisoned for 18 months after Officer Cortés Pagán and another officer, both working under the supervision of Sergeant Torres and Lieutenant Muñiz Tirado, planted cocaine and marijuana in her backpack on February 21, 2006.  She was released on October 11, 2007, after the Puerto Rico Justice Secretary found that Candelaria Cabán had been convicted based on fabricated evidence.[51]

Clear indications existed for years that some of these officers were engaging in unconstitutional conduct, yet no evidence exists that PRPD took the steps necessary to prevent their improper and illegal conduct.  For example, many of these officers also had numerous civilian complaints filed against them involving, among other things, illegal searches, assault, and malicious prosecution, including the following officers:

**Table 5:  Civilian Complaint History of a Convicted Mayagüez Officer**

| Type | Year | Disposition |
|------|------|-------------|
| Negligence | 2000 | Admonishment |
| Illegal search | 2001 | Archived[52] |
| Use of weapon | 2001 | Archived |
| Assault | 2004 | Archived |
| Assault | 2005 | Archived |
| Assault | 2006 | Orientation |
| Illegal search | 2006 | Unknown |
| Assault | 2006 | Archived |
| Disobeying order | 2007 | 30-day suspension |

**Table 6:  Civilian Complaint History of a Convicted Mayagüez Officer**

| Type | Year | Disposition |
|------|------|-------------|
| Illegal search | 2005 | Archived |
| Negligence, partiality, ineptitude | 2005 | Orientation |
| Assault | 2005 | Archived |
| Illegal search | 2006 | Unknown |
| Illegal search | 2006 | Expulsion |
| Malicious prosecution | 2007 | Archived |

| Illegal search | 2007 | Expulsion |
|---|---|---|
| Illegal search | 2007 | Expulsion |

According to PRD, civilians filed 1,302 complaints against PRPD officers for unreasonable or illegal searches and seizures from 2004 to 2008. During the course of our investigation, from January 2009 to August 2010, PRD reported an additional 221 complaints involving similar allegations. PRPD did not provide the outcome of these complaints. Despite PRPD's difficulties producing information, based on our review, we found that unconstitutional searches and seizures are not isolated or sporadic events, but part of a routine pattern of conduct by PRPD officers. As illustrated below and in Appendix A, PRPD officers conduct searches without probable cause, in violation of the Fourth Amendment. Officers also plant evidence during searches, rely on excessive force and intimidation as search aids, and engage in a regular pattern of detaining and arresting individuals without reasonable suspicion or probable cause in violation of the Fourth Amendment.

- According to the indictment in *United States v. Santos Soto*, No. 07-CR-400 (CCC), Officer José Rodríguez Vázquez arrived at the residence of Juan Carlos Aquino Méndez on July 5, 2007, accompanied by Officers Carlos Plaza Santiago, Bernie González Vélez, and Norma Santos Soto, as part of an undercover operation of the Arecibo Drug Division. The officers planned to arrest Aquino Méndez after the completion of a drug transaction initiated the day before. Aquino Méndez, however, refused to accept any money from Officer Rodríguez Vázquez. Despite Aquino Méndez's refusal, Officer Rodríguez Vázquez signaled to the other officers, who entered Aquino Méndez's home and arrested him.

  After the arrest, Officers Plaza Santiago and González Vélez removed 45 small bags of cocaine from Officer Rodríguez Vázquez's vehicle and planted them inside Aquino Méndez's home. After illegally searching the property and seizing $2,200, the officers charged Aquino Méndez with drug possession and agreed among themselves to provide false testimony during any future court proceedings.

  On April 2, 2009, Officer González Vélez pled guilty to conspiracy against the rights of civilians. Although a judgment of discharge was entered in favor of Officer Rodríguez Vázquez, he pled guilty to withholding information concerning the fabrication of cases on May 28, 2010, in *United States v. Rodríguez Vázquez*, No. 10-CR-202 (CCC). He was sentenced to three years of probation. On October 28, 2010, a jury found Officers Plaza Santiago and Santos Soto guilty.[53]

- On June 21, 2007, Robert González Ramírez was standing in front of a business with a neighbor when four officers detained González Ramírez and seized his car. The officers hit González Ramírez with their service weapons and repeatedly threatened him as they asked him about drugs. The officers took González Ramírez to his home, where they conducted a search but found nothing. González Ramírez's arrest and the search and seizure of his property were not based on probable cause.

48

Officers Pérez Rosado and Cano Díaz entered guilty pleas to federal criminal charges for carjacking, deprivation of civil rights, conspiracy against the rights of citizens, and use of weapons during the commission of a felony on March 4, 2008.[54]

- On June 12, 2007, officers from the Mayagüez Illegal Weapons Division conducted a search of the home of Corrections Officer Tetelo Vargas and discovered firearms. Although Vargas provided valid licenses for the firearms, Officers Randy Bayrón López and Juan Ortiz continued the search without showing Vargas a search warrant. Vargas' cousin, David Sepúlveda, arrived during the search and the officers asked Sepúlveda about weapons. Sepúlveda took the officers to his home, where he showed them his hunting guns and licenses. The officers took Vargas and Sepúlveda to the home of Jorge Vargas Torres, where they conducted a similar search. The officers then arrested and detained the three men. Although the officers had a search warrant, they lacked probable cause as it was based on false statements. The men sued PRPD and, on April 8, 2010, the court entered judgment after the parties reached a confidential settlement agreement.[55]

- On April 13, 2007, a group of PRPD officers detained Officer Juan Díaz Román and allegedly found drugs in his possession. Díaz Román was charged with drug offenses and summarily suspended from PRPD. An investigation later disclosed that he had been framed by his ex-girlfriend, who reported to PRPD commanders that Díaz Román was corrupt. Officer René Ortiz Correa swore out a false statement indicating that he had conducted surveillance, which served as the basis for the search warrant of Díaz Román's home.[56]

  Officer Ortiz Correa and Sergeant Rivera Padilla were suspended for fabricating the case against Díaz Román. Díaz Román filed a federal civil law suit and default judgments were entered against Officers Ortiz Correa and Sergeant Rivera Padilla. On November 4, 2010, the case was dismissed after Díaz Román settled with PRPD. Díaz Román was reinstated to PRPD. The warrant used to justify Díaz Román's arrest was not predicated on legitimate probable cause.

In addition to the unlawful searches and seizures illustrated above, we found that officers stop or arrest individuals to commit crimes, such as extortion and robbery. Some of the officers involved had significant complaint histories involving similar acts, which should have alerted their supervisors to potential problem behavior. For example:

- On April 11, 2007, Arecibo Transit Officer Héctor Cotto Rivera stopped Jorge Seiglie and two youths riding in a vehicle without cause. He searched the vehicle and showed the youths a marijuana cigarette. Officer Cotto Rivera arrested the driver and passengers and transported them to a precinct where he interviewed them separately, seeking $1,500 to drop the charges and return the vehicle. Each youth paid Officer Cotto Rivera $500.

- On May 8, 2006, Officer Cotto Rivera arrested Marcos Molina Rosario after he reportedly swallowed a bag with drugs during a traffic stop. Officer Cotto Rivera searched Molina Rosario's vehicle, and told him he had found drugs, but refused to show

them to Molina Rosario.  Officer Cotto Rivera offered to drop the drug charges and give him back his vehicle for $1,000.

• On June 3, 2009, Officer Cotto Rivera entered a guilty plea for extortion in *People v. Cotto Rivera*, CEG2008G002.  He was sentenced to six months and a day of imprisonment.

Officer Cotto Rivera had a lengthy history of civilian complaints, including allegations of illegal arrests and abuse.  Administrative investigators were unable to find the final disposition of two complaints, and two cases recommending discipline were closed without further action.  Information we obtained also indicates that Cotto Rivera had been terminated from prior employment for reportedly stealing money, information which had been communicated to PRPD investigators conducting his background check, yet he was still permitted to enter PRPD.

Examples of criminal behavior and misconduct by other PRPD officers abound and indicate a serious problem.  We provide further examples in Appendix A.

## 2.  Systemic Deficiencies Causing and Contributing to the Pattern and Practice of Unlawful Searches and Seizures

The pattern and practice of unlawful searches and seizures described above are primarily the result of widespread institutional deficiencies within PRPD that remain unabated.  PRPD lacks adequate controls to ensure lawful searches and seizures.  Specifically, PRPD's arrest policies are outdated and fail to provide guidance on conducting brief investigatory or *Terry* stops.  PRPD officers also fail to follow investigative protocols and procedures.  Until recently, PRPD lacked procedures to review related cases after an officer provided false testimony in support of an arrest warrant.  PRPD has not demonstrated that these procedures effectively root out unlawful conduct by officers.

The Fourth Amendment's protection against unreasonable searches and seizures "requires that arrests be based on probable cause." *Alexis*, 67 F.3d at 349.  Absent probable cause, the Fourth Amendment permits law enforcement officers to briefly detain individuals for investigative purposes if the officers possess reasonable suspicion that criminal activity is afoot. *Terry*, 392 U.S. at 30.  Reasonable suspicion must be supported by specific and articulable facts particular to the detained individual, which, combined with "rational inferences from those facts, reasonably warrant an intrusion." *United States v. Young*, 105 F.3d at 7 (citing *Kimball*, 25 F.3d at 6).  Law enforcement agencies should provide clear guidance on the meaning of probable cause, reasonable suspicion, and the legal parameters that govern an officer's authority to carry out searches and seizures.  The guidance should include officers' authority to conduct brief investigatory detentions or *Terry* stops.  The legal contours of searches and seizures constantly evolve as courts scrutinize various policing methods, tactics, and factual circumstances.  As a result, officers should receive continuous education and training on developments in the law.  Law enforcement agencies should also collect and analyze data on arrests to provide for ongoing improvement of the agency's policies and practices.

### a.    Policies are outdated and inaccessible

PRPD's policies concerning searches and arrests are outdated, inaccessible, and impractical.  General Order 98-16, "Internal Policies and Procedures for Handling and Executing Summonses, Arrest Warrants, Searches and Seizures," provides a lengthy, sometimes repetitive, explanation of legal concepts related to searches and seizures.  The 63-page policy covers a broad array of topics, including making warrantless arrests, obtaining search warrants, executing search and arrest warrants, transporting arrestees, detaining individuals for investigative purposes, vehicle stops, vehicle pursuits, suppression of illegally obtained evidence, vehicle searches, strip searches, body cavity searches, and a recitation of rules of criminal procedure. The structure of GO 98-16 provides limited operational guidance and is overly broad and impractical, focusing primarily on abstract legal concepts and holdings.  GO 98-16 should be written clearly, so as to be comprehensible to the most junior member of the force expected to carry out searches and arrests.  Having been issued more than 12 years ago, GO 98-16 is also outdated and does not reflect current developments in the law and policing techniques.

Searches and seizures are core duties of officers and should be reinforced periodically to optimize comprehension and compliance.  Although GO 98-16 appears to have been amended and documents we obtained demonstrate that unit heads reviewed recent court decisions at local academies – monthly meetings on new policies, procedures, and directives – local academies do not provide sufficient opportunity to discuss and understand this important material.  Supervisors are often required to inform subordinates of dozens of new general and special orders, administrative directives, and general agency announcements at a single meeting.  The agenda for one monthly local academy we reviewed contained approximately 190 items, including new general and special orders on monetary incentives for seized property, use of CEDs, and domestic violence investigations.  Many of the officers we interviewed indicated that supervisors simply read new policies and procedures to them, and provide little opportunity to discuss and understand the subjects presented.  Additionally, as we discuss in Section IV.A *infra*, many officers reported that they are not routinely given copies of new general or special orders for reference.

General Order 98-16 also does not address the consequences of violating laws or agency policies on searches and seizures, beyond explaining that criminal defendants can file motions to suppress evidence.  PRPD's policies should clearly advise officers that making false statements to obtain a search warrant, arresting an individual without probable cause, effecting an arrest based on discriminatory criteria such as race or national origin and fabricating evidence, among other search and seizure violations, could subject the officer to criminal prosecution, disciplinary action, and civil liability.

The lack of clear policy guidance and meaningful training and education on legal requirements for searches and seizures is a serious deficiency.  Officers we interviewed indicated that PRPD does not have standard operating procedures that describe the legal requirements or processes that are required for lawful searches, detentions, and arrests.  As a result, officers routinely improvise and often overlook critical steps, such as not establishing predicate cause for conducting more intrusive searches of an individual's person or property.  Significantly, an officer assigned to a specialized unit told us openly and without objection from his colleagues

and supervisors that officers need to violate people's civil rights to achieve the crime-fighting objectives of government officials.

PRPD has been aware of these serious deficiencies for years, but has failed to take corrective action to ensure the lawful exercise of police authority on searches and seizures. For instance, a 2009 report prepared by Total Quality, a consulting firm contracted by PRPD, found that PRPD fails to train and certify investigators in investigative techniques related to seizing illegal weapons; lacks operational plans for the seizure of illegal weapons; lacks uniform investigative protocols for the seizure of illegal weapons; and does not have sufficient resources and equipment to develop investigations. PRPD has failed to substantively address the problems highlighted by the 2009 Total Quality report in a comprehensive and effective manner.

**b.      Training on lawful searches and seizures is inadequate**

PRPD pre-service training related to lawful searches and seizures is inadequate and ill-suited to the needs of PRPD officers. While materials used in University College's course on civil rights cite the United States Constitution as a source of individual rights, they contain no discussion of specific rights, such as the Fourth Amendment's prohibition on searches and seizures without probable cause. The course also lacks any meaningful interaction between instructors and students or engagement using practical examples of lawful and unlawful conduct. Such meager training cannot prepare PRPD officers for the complex situations they will likely face as they carry out their duties.

Available in-service training for PRPD officers is sorely inadequate. A review of the University College's training from January 1 to November 30, 2010 demonstrates how few PRPD officers have received continuing education on searches and seizures and other important police functions.[57] According to the University College, approximately 1,000 officers, or 17%, completed a 16-hour continuing education curriculum during October and November 2010. The curriculum includes a two-hour course titled, "Criminal Procedure" and another four-hour course titled, "Fundamental Civil Rights and Hate Crimes." However, given PRPD's chronic failure to provide officers with legally sufficient policies and training for years and the pattern of pervasive constitutional violations, these general courses do not begin to capacitate PRPD's ranks with the theoretical and practical skills necessary to protect individuals from unlawful searches and seizures. Indeed, the number of officers receiving specific training on searches and seizures for nearly all of 2010 is woefully insufficient. According to the University College, only 60 officers, or less than 1% of active PRPD officers, were trained on arrest and search procedures from January 1 to November 30, 2010. Notably, PRPD trained more officers (197) on vehicle-related topics, such as detailing information on transportation licenses, operating motorcycles, and identifying vehicle parts, than on arrest and search procedures.

Equally troubling is PRPD's failure to implement corrective action, despite reports from its own contractors that officers who lack an understanding of criminal procedure or substantive laws violate individuals' civil rights related to searches and seizures. The 2009 study from Total Quality recommended that the University College provide at least 40 hours of continuous education annually to the Illegal Weapons Bureau on topics such as criminal procedure, civil rights, substantive weapons law, and GO 98-16 concerning searches and seizures. As discussed above, PRPD officers began receiving 16 hours, well below the 40 hours recommended, of in-

service training in October 2010.  Many of Total Quality's other recommendations have not been implemented.

### c.     Guidance on brief investigatory or *Terry* stops is lacking

PRPD provides insufficient guidance on conducting brief investigatory or *Terry* stops and related "pat downs."  Absent probable cause, officers may conduct brief investigatory stops or detentions, typically referred to as *Terry* stops, when they have reasonable suspicion to believe that an individual may be engaging in criminal activity.  Stops and attendant "pat downs" or "frisks" should be limited in focus to officer safety and the grounds giving rise to the officer's suspicion.  While we observed that PRPD officers regularly conduct investigatory stops and "pat downs," we found that PRPD's policies provide insufficient guidance on the legal limits of these temporary stops.  Indeed, many officers we interviewed were unfamiliar with the seminal Supreme Court case authorizing investigatory stops under the Fourth Amendment, *Terry v. Ohio*, *supra*.

General Order 98-16 states that officers do not have free rein to detain an individual without an arrest order or in the absence of probable cause.  Specifically, the Order adds, "[i]n the absence of probable cause to arrest, a person may only be 'detained' for the purpose of obtaining information or dissipating suspicions concerning whether the individual is committing or has committed a crime *when the detention is voluntarily accepted*."  This last clause appears to eviscerate an officer's ability to compel a brief detention to allay a reasonable suspicion that criminal activity is afoot.  However, the Order does not explicitly discuss *Terry v. Ohio* or the limits of temporary detentions and "pat downs."  PRPD officers are also not required to document when they conduct temporary stops or detentions, effectively immunizing such stops from any supervisory review or scrutiny.

Thus, the problems associated with PRPD's failure to address *Terry* stops through formal policy are two-fold.  First, PRPD fails to confer its officers with the full authority permissible under the Fourth Amendment to investigate potential criminal activity.  Second, because officers engage in temporary detentions in practice, PRPD fails to provide officers with sufficient guidance on the constitutional limits of temporary detentions and pat downs to ensure that such interactions do not become unreasonable and overly intrusive.

### d.     Accountability systems related to warrants are insufficient

Until recently, PRPD lacked procedures to review related cases after an officer provided false testimony in support of an arrest warrant.  Despite recent reforms, PRPD policies are still inadequate.  On September 27, 2010, PRPD added procedures that require investigators to review related cases when an officer is suspected of having provided a false statement in support of an arrest or search warrant.  General Order 2010-14 ("GO 2010-14"), which created PRD, requires that the internal affairs bureau conduct a priority investigation of the allegations and search for other warrants issued based on the subject officer's declaration.  The results of the investigation must then be forwarded to the head of PRD and to PRDOJ.  Before the implementation of GO 2010-14, PRPD did not routinely review related cases involving an officer who provided false testimony in support of an arrest or search warrant to identify potential patterns or prior misconduct.  PRPD typically conducted reviews only after high-profile

53

cases, such as the 2008 arrest of officers in the Mayagüez Drug Division who were convicted of planting drugs and other evidence over the course of several years.  Officers were also unaware of any agency protocols to periodically solicit information from prosecutors and other members of the criminal justice system concerning officers who may have engaged in questionable or unlawful searches or seizures.

General Order 2010-14 fails to create an adequate accountability system.  To provide for supervisory review and data analysis, law enforcement officers should report all searches and seizures in a thorough, factual, and objective manner.  The reports should be completed whether or not property was seized during the course of a search.  Searches completed during an arrest should be addressed in the arrest report.  Pat downs or "frisks" completed during a traffic stop or temporary detention should be documented in a "search and seizure" report.  Supervisors should promptly review and evaluate search and seizure reports to determine whether the search or seizure:  was within agency policy, should result in a misconduct investigation, indicates a need for additional training or other remedial non-disciplinary action for the involved officer, and/or indicates the need to revise policies, tactics, or training.

## C.      Additional Areas of Serious Concern

Although we do not make findings at this time, we uncovered troubling evidence that PRPD officers engage in discriminatory policing practices against individuals of Dominican descent in violation of the Fourteenth Amendment, the Safe Streets Act, and Title VI.  We also uncovered troubling evidence that PRPD officers fail to adequately police sex assault and domestic violence.  While PRPD's failure to adequately collect data regarding these issues makes it difficult to assess PRPD's practices, we believe that PRPD has not implemented sufficient accountability systems to ensure that all residents of Puerto Rico are treated impartially, regardless of race, ethnicity, national origin, sex, sexual orientation, or gender identity.  Furthermore, as previously discussed, PRPD has also failed to effectively address domestic violence when committed by PRPD officers.

The institutional deficiencies noted in the previous sections also contribute to the inability of PRPD to address longstanding concerns related to domestic violence and discriminatory policing practices.  Deficient policies, inadequate supervision, and dysfunctional accountability systems all hinder the ability of PRPD officers to fulfill their mission in a lawful manner.  Without addressing the flaws highlighted throughout this report, PRPD will be unable to effectively ensure that its officers are able to serve all members of the Puerto Rico community.

### 1.      Allegations of Discriminatory Police Practices by PRPD

Evidence suggests that PRPD officers violate the rights of individuals of Dominican descent or appearance through targeted and unjustified police actions, in violation of the Fourteenth Amendment, Title VI, and the Safe Streets Act.  PRPD has faced several complaints regarding its targeting of Dominicans for police actions, including allegations that PRPD officers routinely employ excessive force, unlawful searches and seizures, and intimidation.  Individual PRPD officers have also been accused of using racially charged and biased language in the course of their policing duties.  PRPD's institutional deficiencies, primarily including its failure

to adequately collect and analyze data, make it difficult to assess whether PRPD adequately responds to, and prevents, these incidents.

Discriminatory policing can take many forms, including reliance on bias-based profiling, in which an officer impermissibly decides whom to stop, search, or arrest based upon characteristics such as race, ethnicity, or national origin.  It can also include instances in which a law enforcement agency targets certain communities using particular enforcement and crime prevention tactics on the basis of stereotypes or biased decision-making.  The Equal Protection Clause of the Fourteenth Amendment prohibits selective or discriminatory enforcement of the law.  *Whren v. United States*, 517 U.S. 806, 813 (1996).  Discriminatory policing may arise from an explicit classification or a facially neutral law or policy.  *Id*.  The Equal Protection Clause is violated when the government's administration of a facially neutral law is motivated by a discriminatory purpose and results in a discriminatory effect.  *See Washington v. Davis*, 426 U.S. 229-40 (1976).  Evidence of discriminatory effect may include evidence of similarly situated individuals who were not subjected to the enforcement actions, statistical evidence, or both.  *United States v. Armstrong*, 517 U.S. 456, 467 (1996).

Discriminatory law enforcement activities are likewise prohibited by Title VI and the Safe Streets Act.  Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving [f]ederal financial assistance."  42 U.S.C. § 2000d.  PRPD is a program recipient under Title VI.  Title VI prohibits intentional discrimination. *See Alexander v. Sandoval*, 532 U.S. 275, 281 (2001), and Title VI implementing regulations proscribe law-enforcement activities that exert a discriminatory effect on the basis of race, color, or national origin. *Id.* at 281-82.  The Safe Streets Act, which provides that "[n]o person in any State shall on the ground of race, color, religion, national origin, or sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under or denied employment in connection with any programs or activity funded in whole or in part with funds made available under this title."  42 U.S.C. § 3789d(c)(1).  PRPD is a program recipient under the Safe Streets Act.  The Safe Streets Act's statutory text and implementing regulations make clear that it applies both to instances of intentional discrimination and to any law-enforcement practices that disparately impact a group falling under the statute's enumerated factors.

PRPD has recently faced numerous accusations of biased treatment of the Dominican population in Puerto Rico.  In 2010, a request was filed with the Inter-American Commission on Human Rights of the Organization of American States calling on it, among other things, to address the treatment of Dominican individuals by PRPD.[58]  The complaint alleges that residents of Villas del Sol, a predominantly Dominican community in the municipality of Toa Baja, have been the subject of intense police action resulting in the use of excessive force.  Incidents include the alleged use of pepper spray on children and passive individuals, the use of unjustified force on women, and an around-the-clock police presence contributing to intimidation.[59]  The Dominican Committee on Human Rights ("DCHR") has also publicly alleged that PRPD officers discriminate against Puerto Ricans of Dominican descent by targeting them in the enforcement of immigration-related laws.[60]  Specifically, DCHR alleges that PRPD officers in San Juan

routinely ask individuals who appear to be Dominican for identity documents without reasonable suspicion or legitimate law enforcement purpose.[61]

PRPD has a history of allegations concerning systematic discriminatory treatment of Dominican individuals. In *Herrera v. Davila*, 272 F.Supp.2d 154, (D.Puerto Rico 2003), the plaintiff alleged that PRPD unlawfully arrested individuals in the course of "zero tolerance" operations solely because of their Dominican heritage, in violation of the Equal Protection Clause of the Fourteenth Amendment. The court found that sufficient evidence was presented to establish that PRPD acted in common and mutual concert to deprive the concerned parties of the equal protection of the law based on national origin. The plaintiffs survived a motion for summary judgment in the First Circuit and ultimately settled the case for an award of $600,000.

We have also uncovered anecdotal evidence of discriminatory animus by PRPD officers in regards to the Dominican community of Puerto Rico. Incidents include:

- On December 28, 2006, Félix Escolástico Rodríguez was parking his vehicle at his home when a group of PRPD officers approached him, including Officers Griselle Cuesta Báez and Mario Montesino Rivera. The officers seized Escolástico Rodríguez and, without a legitimate law enforcement purpose, hit him in the head, chest, arms, and legs as they yelled derogatory and xenophobic slurs at him related to his Dominican origin. On March 27, 2010, the district court dismissed Escolástico Rodríguez's civil rights case after the parties entered into a confidential settlement agreement.[62]

- On August 18, 2006, Ignacio Santos Rosario was at a local bar in Río Piedras when PRPD Officer Gregorio Matías Rosario allegedly made derogatory and xenophobic slurs about Dominicans. Santos Rosario asked Officer Matías Rosario to show respect and stop making such comments. Officer Matías Rosario then pointed his service weapon at Santos Rosario and called for back-up. Santos Rosario left the area and, as he walked away, Officer Matías Rosario shot him twice in the leg. Additional PRPD officers arrived on the scene and began kicking and hitting Santos Rosario as he lay on the ground. There was no legitimate law enforcement purpose for Officer Matías Rosario's initial use of lethal force nor for the beating that followed. On March 19, 2009, the district court dismissed Santos Rosario's civil rights case after the parties entered into a confidential settlement agreement.[63]

PRPD's failure to adequately collect data regarding its law enforcement actions frustrates efforts to statistically establish whether or not discriminatory policing is occurring. PRPD's documentation related to arrests does not accurately reflect the racial and ethnic diversity of Puerto Rico. While incident reports allow PRPD officers to record whether an alleged subject or victim is of "Hawaiian" or "Arabic" descent, the forms do not permit PRPD officers to record whether relevant persons are of Dominican descent. Such forms hinder the ability of PRPD to assess whether individual officers are engaged in discriminatory policing practices. They also evince a disregard for the Dominican community in general, since they do not permit the kind of data analysis that allows law enforcement agencies to track crime patterns and determine whether a particular population is the subject of crime. Furthermore, as we discuss throughout this report, the lack of adequate accountability systems and supervision that contribute to the

perpetuation of officer misconduct, including discriminatory policing.  PRPD must address these deficiencies.

2.  **PRPD's Failure to Address Domestic Violence and Sexual Assault**

Based on our investigation, we have serious concerns that PRPD is failing to adequately address sexual assault in Puerto Rico and to prevent and address domestic violence committed by PRPD officers.  While we do not currently have sufficient evidence to find that PRPD systematically denies adequate policing services to women, we believe there are sufficient indicators of a problem to require immediate and sustained remedial efforts.

As an initial matter, we are concerned that PRPD is underreporting sex assaults. Strikingly, Puerto Rico has historically reported fewer forcible rapes than murders.  As illustrated below, the number of forcible rapes reported by PRPD has declined sharply over the last 10 years, from 228 to 39, while murders have seen a sharp increase recently.  Puerto Rico stands alone in these statistics, with virtually all other jurisdictions reporting far more forcible rapes than murders.  At the local level, only a small fraction of cities with populations of 100,000 or more report a significantly higher number of murders than rapes.  These cities include New Orleans and Baltimore, whose figures have been questioned or largely discredited.[64]  Serious concerns have also been raised publicly regarding the reliability of PRPD's crime reporting practices and the integrity of crime statistics.  It is imperative that Puerto Rico take steps to investigate allegations that superiors pressure officers to manipulate crime statistics, and remedy identified problems promptly and transparently.  Puerto Rico should also ensure that violent crimes and sexual assaults are reported, reported accurately, and that victims are provided with necessary support and services.



**Figure 2:  Forcible Rapes and Murders, 2000-2010**

|  | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Forcible Rapes | 228 | 187 | 241 | 204 | 199 | 169 | 118 | 97 | 95 | 65 | 39 |
| Murders | 695 | 747 | 781 | 787 | 797 | 771 | 748 | 731 | 807 | 894 | 983 |

A law enforcement agency that systematically fails to address the needs of discrete, recognized communities violates the Fourteenth Amendment.  "[T]he Fourteenth Amendment not only prohibits the making or enforcing of laws which shall abridge the privileges of the citizen, but prohibits the states from denying to all persons within its jurisdiction the equal protection of the laws.  Denying includes inaction as well as action, and denying the equal protection of the laws includes the omission to protect."  *Bell v. Maryland*, 378 U.S. 226, 311 (1964) (Goldberg, J. concurring); *see also Deschaney v. Winnebago County Dep't of Soc. Servs*., 489 U.S. 189, 197, n.3 (states may not "selectively deny its protective services" to certain protected groups without violating the Equal Protection Clause).  The Safe Streets Act, which explicitly bars discrimination on the basis of sex, similarly protects women from discriminatory treatment.

   In order to prevail on an equal protection claim based upon alleged selective denial of protection, "plaintiffs must adduce competent evidence of 'purposeful discrimination.'"  *Hayden v. Grayson*, 134 F.3d 449, 453 (1st Cir. 1998) (quoting *Washington v. Davis*, 426 U.S. 229, 243-44 (1976)).  A plaintiff must show that "'the decisionmaker . . . selected or reaffirmed a course of action at least in part 'because of,' not merely 'in spite of[,]' its adverse effects upon an identifiable group.'"  *Soto v. Flores*, 103 F.3d 1056, 1067 (1st Cir. 1997) (quoting *Pers. Adm'r v. Feeney*, 442 U.S. 256, 279 (1979)) (applying standard in context of allegedly discriminatory treatment of complaints regarding domestic violence against women).  In *Soto*, the First Circuit held that the evidence presented was insufficient to establish that discrimination against women was a motivating factor behind PRPD's alleged policy or custom of providing less protection to female victims of domestic abuse, as required to establish an equal protection violation.

   PRPD's longstanding failure to effectively address domestic violence and rape in Puerto Rico is clear and, in conjunction with its institutional deficiencies, may rise to the level of a pattern and practice of violations of the Fourteenth Amendment and the Safe Streets Act.  Of the women murdered by their partners between 1991 and 1999, only 17 percent had orders of protection, 2 percent had orders of arrest against their aggressors, and 4 percent had expired orders of protection.[65]  These statistics strongly suggest that PRPD is not doing enough to ensure that women living under the threat of domestic violence make use of the legal resources available to them.  In 2006, PRPD reported 23 murders of women at the hands of their domestic partners, placing Puerto Rico first on an international list comparing the number of women killed in each country/territory by their partners per million women over the age of fourteen.[66]  Recent data suggest 2006 was not an aberration – in 2008, 26 women were murdered by their partners.[67]

   PRPD's failure to address the commission of domestic violence by law enforcement officers reveals a lack of engagement with Puerto Rico's domestic violence crime crisis and may qualify as evidence of discriminatory intent.  As previously discussed, PRPD has repeatedly failed to appropriately discipline officers accused of domestic violence.  Because of its inefficient and faulty systems of accountability, PRPD has allowed officers accused of serious crimes to continue on active duty.  In tandem with the statistics highlighted above, such an institutional oversight evinces an unwillingness to address a very serious problem in Puerto Rico that may rise to the level of a constitutional violation.

# IV.   ADDITIONAL DEFICIENCIES CAUSING THE PATTERN AND PRACTICE OF CONSTITUTIONAL VIOLATIONS

The constitutional violations we uncovered are evidence of a police department that is in disarray.  These findings are hardly surprising since basic systems related to the hiring, training, supervision, accountability, promotion, and dismissal of PRPD officers are non-existent or broken.  PRPD lacks adequate policies and procedures, and existing operational structures are inconsistent and arbitrary.  Fundamental reforms of the most basic police practices are necessary.

The systemic deficiencies that follow, together with the deficiencies discussed above, cause and contribute to the pattern and practice of use of excessive force, use of unreasonable force to chill speech, and unconstitutional searches and seizures.  Specifically, PRPD's policies and procedures are inadequate and do not align with professional standards.  Beyond formulating new policies, Puerto Rico will need to build and maintain necessary organizational structures to ensure the success of new procedures.  Puerto Rico will also need to invest in building and maintaining effective systems of accountability, promote personnel with demonstrated competency and commitment to lawful policing, and instill organizational values at all levels of PRPD that foster meaningful respect for civil rights.[68]

Accountability is the hallmark of an effective and functional police department.  We found little evidence that sufficient systems of accountability are in place to safeguard the federally-protected rights of individuals in Puerto Rico.  For instance, in addition to deficiencies discussed above, we found that PRPD:

- fails to provide officers with policies consistent with constitutional requirements;
- fails to train cadets through a skills-based field training program;
- does not re-train existing officers on current methods and legal standards;
- provides ineffective field supervision;
- fails to complete timely administrative investigations;
- does not impose consistent or progressive discipline to address misconduct;
- lacks a comprehensive risk management system that identifies patterns of at-risk conduct by officers; and
- is not subject to effective external oversight to ensure constitutional policing and public trust in its law enforcement activities.

> "Police are not trained to handle people with rights.  People are mistreated and the police agency mistreats the officers."
>
> - PRPD Administrative Officer

In the sections that follow, we discuss additional systemic deficiencies that cause and contribute to the pattern and practice of civil rights violations.

A.      **Inadequate Policies and Procedures**

PRPD's policies, as set forth in general and special orders, are not comprehensive, comprehensible, up-to-date, or consistent with relevant legal standards and contemporary police practices.  In *Building Trust Between the Police and the Citizens They Serve*, IACP underscored the importance of communicating clear expectations:

> [T]he police executive must ensure that the agency's core "values and principles are expressed, communicated, and reinforced throughout all aspects of the departments' operations, administration, and service." . . . [D]epartmental policies and procedures must support the agency's mission, and must be written, clearly defined, and enforced.  These ethical standards and guiding principles should be set forth in a manual for all personnel and should not only define acceptable standards of conduct, but identify conduct that is unacceptable.  These values and principles must be understood and embraced by all executives, supervisors, officers, and civilian employees within the department.[69]

The Superintendent issues PRPD's general and special orders.  The orders are numbered consecutively by year and are not organized by topic.  The general orders date back to 1967.  The oldest general order in effect, GO 68-14, concerning photographs of officers, was issued in April 1968.  Many general orders have been repealed or revised; however, repeals and amendments are not readily identifiable.

Nearly all officers we interviewed indicated that although they reviewed the orders at the academy, PRPD does not provide them with copies of the orders to retain as guides.  In some cases, supervisors in various command areas were unable to show us a complete set of the orders.  One commander reported during our December 2010 tour that supervisors go over the list of newly issued orders and directives during monthly local academies and that officers may get copies of the orders, if they so request.  Otherwise, the orders are not distributed to each officer.

Several commanders explained that officers must ask for copies of policies, if they want them.  This reliance on officers' discretionary interest is reflected in GO 98-16 on searches and seizures, which states:

> The rules and policies of this Order attempt to incorporate the concepts, doctrine, or procedures that apply by legislative or judicial (jurisprudence) means, without meaning that they represent a catalogue of all of the situations that personnel might face on a daily basis, and should be complemented with court decisions that are produced relatively frequently and with related legal articles, since the officer is a professional of justice and should keep current on this topic.

It is unacceptable to place the onus on each patrol officer to locate, review, comprehend, and institute changes based on his or her interpretation of new case law.  It is apparent that PRPD has not devised an effective means of disseminating orders and other operational directives to ensure that all officers read and understand the orders.  While it may be impractical to provide all officers with multiple sets of binders with GOs in paper format dating back to 1967, PRPD

should ensure that all orders, revised to reflect amendments, are accessible at all times, in either paper or electronic format.

PRPD should also develop standard operating procedures to guide operations and ensure uniformity in procedure among units and geographical areas.  Officers currently rely on legalistic regulations and orders that are impractical and offer unclear guidance.  As a result, officers improvise critical aspects of the agency's work.

## B.    Insufficient Training

The effective recruitment and training of police officers is essential to constitutional policing.  PRPD fails in each area.  While PRPD mandates pre-service training for officers, it neither screens inappropriate candidates from the force nor offers an adequate foundation for police work.  In-service training is nearly non-existent.  These failures dramatically reduce public safety and place both residents and police officers at risk.

### 1.    The University College Lacks Accreditation and Independence

The University College of Criminal Justice is an institution of higher education charged with providing pre-service and in-service training to PRPD officers, an arrangement similar to nearly half of all state and local law enforcement academies in the United States.[70]  The University College was formerly a training unit within PRPD.  In 1999, the Puerto Rico Legislature authorized the creation of the University College as an independent entity.  This arrangement allowed cadets to earn an associate's degree at the college, a prerequisite for new officers beginning in 2000.  That same year, in 2000, the Puerto Rico Legislature granted the University College greater control over its financial, academic, and operational affairs to facilitate accreditation by the Middle States Association of Colleges and Schools.  The University College, however, has yet to obtain accreditation, which would make it eligible for federal funding.

The University College also has not yet achieved full independence from PRPD.  The Superintendent, as the President of the University College's Board of Directors, continues to direct the school and set its priorities.  The Superintendent selects the chancellor and associate deans with the Board's approval.  Many of the faculty members are PRPD officers designated by the Superintendent and PRPD.  In addition, the Governor, who also appoints the Superintendent, appoints eight of the Board's nine members.

PRPD's leadership changes have thus had a profound impact on the University College's development as an independent, licensed, and fully accredited institution.  In 2006, the Puerto Rico Council on Higher Education, which licenses colleges and universities in Puerto Rico, noted that the University College had "suffered frequent administrative changes" and that PRPD had four Superintendents from 2000 to 2004 with separate visions for the development of the University College.[71]  During one of those years, the University College lacked a functioning Board and PRPD attempted to transform the University College back to a police academy within PRPD.[72]  In 2003, Puerto Rico suspended the associate's degree requirement and permitted a special three-month, pre-service program for new cadets.[73]  Three cadet classes went through the abbreviated training and entered PRPD without an associate's degree.  Following the return of

former Superintendent Toledo Dávila to PRPD in 2005, the Puerto Rico Legislature reinstated the associate's degree requirement.  According to former Superintendent Toledo Dávila, a three-month training period was insufficient to prepare cadets for police work.[74]  During our December 2010 tour, former Superintendent Figueroa Sancha indicated that a significant number of officers who completed the three-month special training program were eventually expelled because of criminal activity or other misconduct.

Further, the Superintendent is responsible for recruiting, selecting, hiring, and terminating cadets who enroll in the University College as PRPD employees.  PRPD pays cadets and affords them civil service benefits and protections while they train and study at the University College.  Although cadets must serve a two-year probationary period, disciplinary actions, including termination, are carried out by PRPD and can only be authorized by the Superintendent.  University College officials have little authority over the termination process if they determine a candidate is unsuitable, academically or otherwise.  According to the University College chancellor, PRPD's human resources office can only recommend termination to the Superintendent when cadets do not meet training requirements.  Cadets who have not met the academic requirements at the University College can therefore potentially remain cadets indefinitely, or at least long enough to gain civil service protections and become permanent PRPD employees by default.  Our police consultants believe this process may result in "less than suitable" officer candidates becoming permanent employees before disciplinary proceedings are completed.  In its December 2007 report, PRPD's external evaluating committee also expressed concern with PRPD's recruitment and selection process, and recommended that Puerto Rico study the viability of allowing the University College to select and enroll students into its academic program.  PRPD would then hire cadets after they successfully complete all academic requirements and graduate from the University College.[75]

We learned that the academic curricula are not tailored to clear and specific learning objectives or to defined policies or standards.  Many officers we interviewed indicated that there was a significant disconnect between what they learned in the University College and actual expectations and requirements from supervisors once they were deployed in the field.  Critical courses are also taught from a technical legal perspective, more suitable to law students, without practical and real-world application for officers.  For instance, the University College's course on civil rights consisted of a lecture and slides on Puerto Rico's rules of criminal procedure, without any discussion on the application of legal concepts to actual encounters with civilians.  While the course cited the United States Constitution as a source of individual rights, it did not discuss specific rights, such as the Fourth Amendment's prohibition on searches and seizures without probable cause or unreasonable uses of force.  As an example, the course defined "illegitimate" force as "unjustified, deviating from the law and professional practice," but did not discuss relevant factors when considering the reasonableness of force, such as the severity of the crime at issue or the subject's level of resistance, or other standards.  The course contained virtually no interaction or engagement with students using practical examples of lawful and unlawful conduct.

Finally, PRPD fails to keep proper records on its instructors.  Despite our request, PRPD could not produce specific information about the instructor certification process followed by the University College, other than reports that instructors had been certified by the University

College at some point in time or had been grandfathered-in.  Individuals who conduct cadet training, serve as field training officers, or who conduct in-service training should be selected using heightened eligibility criteria that specially apply to these positions.  PRPD should ensure that instructors receive periodic re-training and keep current on new developments in their respective fields.  Moreover, the disciplinary records of all instructors should be evaluated to ensure that the selected individuals are suitable to instruct new cadets and re-train officers.

## 2.      Pre-Service Training Is Insufficient

Cadets review PRPD's policies and procedures while attending pre-service training, but are not provided with post-academy field training to prepare them for real-life policing.  This training is particularly essential in developing the practical skills, judgment, and tools necessary to lawfully employ force, effect arrests, and treat all persons equally.  Instead, new officers are simply armed and released into the streets and neighborhoods of Puerto Rico.  In many cases, they never return to the academy for regular in-service training.

PRPD currently requires that all cadets earn at least an associate's degree to become an officer.  All cadets enter the University College as salaried public employees while they attend classes and reside in campus dormitories.  The University College currently offers two pre-service programs:  a degree track for cadets entering without a degree and a basic training track for cadets with advanced degrees.

The number of training hours required by PRPD is well below the hours required by other large police departments.  According to the most recent Law Enforcement Management and Administrative Statistics ("LEMAS") report, the average training requirement for new officers exceeded 1,700 hours of academy and field training.[76]  PRPD requires cadets entering without an advanced degree to complete 1,170 hours of training, while cadets entering with advanced degrees must complete 855 hours of training.  The lower number of training hours in Puerto Rico is due, in large measure, to the lack of a field training program, or an adequate analogue, offered by the University College.  For law enforcement agencies serving 1,000,000 residents or more, the average number of hours required for field training was 667 hours.[77]  Even when academies do not offer a mandatory field training program as part of their basic training courses, field training is typically provided by the law enforcement agency employing the new officer.  However, PRPD also does not provide a field training program.

> "There is a clear projection of an image of the Police that does not understand the civil rights of citizens in its actions . . . this denotes that the actual [training] curriculum is not tempered to functional and operational reality.
>
> - Police Affinity Group

A comprehensive field training program incorporates community policing and problem-solving principles, and produces officers who have the necessary knowledge, skills, and attitude to meet contemporary law enforcement challenges.  Field training usually consists of several components or phases.  Each training phase should be accompanied by a learning exercise

involving real-life problems that have no easy solution and encourage cadets to view problems in a broad community-focused context.  A field training program should also include a neighborhood familiarization project to teach cadets how to partner with community residents to effectively deal with crime and neighborhood problems.  After successful completion of the field training program, new officers should be assigned to a permanent shift, but continue to be monitored for the remainder of their respective probationary periods – or longer, in the case of officers who became permanent employees prior to the completion of the field training program.

In December 2010, Superintendent Figueroa Sancha reported that PRPD is considering instituting a six-month field training program for all cadets after they complete University College training.  He added that PRPD has begun to select mentors for the implementation of the field work program among sergeants and experienced officers who do not have pending administrative investigations.  PRPD has not provided information indicating that the new field training program is being implemented.  In addition, the most recent class of cadets, which graduated in July 2011, was provided with a shortened pre-service program to allow for prompt deployment to the street.  The effectiveness of a field training program depends on many factors, including the quantity and quality of pre-service training.  A cursory pre-service program will prevent cadets from learning the policing concepts and skills that are applied in a field training program.

The Superintendent has the authority to deploy cadets – carrying regulation firearms – on policing assignments before the cadets complete their pre-service programs.  If this practice continues, PRPD must ensure that cadets complete training in core areas, such as cultural sensitivity and diversity; communication skills (including the importance of courtesy and respect); use of force, including deadly force; verbal disengagement techniques and alternatives to the use of force; and integrity and ethics.  Cadets should complete scenario-based training in these subjects to prepare them for the many situations they are likely to encounter involving interaction with civilians, including traffic enforcement and mass event likes *fiestas patronales*.  Moreover, PRPD supervisors and University College staff  should evaluate the academic performance and disciplinary records of cadets deployed on policing assignments prior to deployment.  Finally, the officers supervising cadets on actual policing assignments should provide the University College with an evaluation of the cadets' performance so that the University College can address any academic deficiencies or refer any incident of criminal or unprofessional conduct for investigation, if the cadets' field supervisors have not already done so.

Undercover officers also engage in use of excessive and illegal searches and seizures.  During our tours, we learned that PRPD recruits individuals to serve as undercover officers before they enter and complete the pre-service program at the University College.  Once the undercover officer completes policing assignments with PRPD, the officer is transferred to the University College to begin the pre-service training program.  The quality and quantity of training offered to undercover officers who do not participate in the regular University College training program appears grossly insufficient.

Several officers reported that undercover officers are only "seen" at the University College when they are taken to the shooting range for target training wearing hoods over their

heads.  If undercover officers are going to participate in PRPD interventions, it is critical that PRPD provide them with civil rights and other training offered to PRPD officers, and keep records of this training.

### 3.    In-Service Training Is Virtually Non-Existent

Effective law enforcement agencies reinforce their expectations on use of force and searches and seizures through consistent and sufficient in-service training.  However, many PRPD officers reported that they do not return to the University College for in-service training for years, or ever, after completing the pre-service program.  The dearth of in-service training and pervasive misconduct has recently prompted the Puerto Rico Legislature to set minimum training requirements for PRPD officers.  But these minimums fall significantly short.

Prior to 2008, there were no formal in-service training requirements for PRPD officers. For instance, PRPD reported that out of approximately 12,500 officers assigned to the Field Operations Division, the largest PRPD component, approximately 1,359 – or only about 11% – received some form of in-service training in 2007. The trainings varied widely and were not uniform across regions, ranging from classes on domestic violence to retention of firearms and handling terrorist bombings.  In July 2008, the Puerto Rico Legislature enacted Law 132 finding that an officer who left the University College would not generally receive any additional training.  P.R. Laws Ann. tit.25, § 3102 (2008), *as amended*.  Law 132 required PRPD to provide training to existing officers every two years "limited to the work division to which the [officer] is assigned."  *Id.*  Law 132 did not establish a minimum number of training hours and charged the Superintendent with developing specific requirements.

> "Continuous training and learning is not part of the organizational culture of the Police Department.  There is a real resistance by the Police hierarchy to send police officers to continuous education programs."
>
> - Former PRPD official

Despite the new two-year training requirement, PRPD officers continued to engage in serious misconduct.  In July 2010, the Puerto Rico Legislature enacted Law 103 and observed:

> We have witnessed various dramatic cases in which members of the police have been involved in domestic violence, police corruption, lack of control in the management of their emotions and force at the moment of exercising their duties. This Assembly believes it is necessary and urgent that . . . members of the Puerto Rico Police comply with a minimum requirement of twelve hours of continuing education.

Law 103 of July 2010 required PRPD to provide officers with a minimum of 12 hours of in-training every year.

During our December 2010 tour, we learned that the University College and PRPD had recently developed a 16-hour continuing education program for existing officers to comply with

Law 103.  PRPD subsequently produced a 16-hour, two-day training schedule, dated October 2010, listing the following courses:  civil rights, hate crimes, police responsibilities, criminal law, human relations, ethics, use of force, and personal defense.  PRPD's 16-hour training schedule did not specify whether communication skills (including the importance of courtesy and respect) and verbal disengagement techniques are part of the curriculum, nor whether the hate crimes course covers cultural diversity and sensitivity issues.  These topics are vital to any continuing education program.  Additionally, the training schedule did not specify whether any courses included scenario-based training to teach practical application of legal and operational concepts.

Although PRPD's 16-hour annual training requirement is an improvement over its prior training practices, the requirement remains insufficient.  According to a 2007 LEMAS study, police departments serving a population of one million or more residents provide an average of 27 hours of in-service training for sworn personnel.[78]  Across police departments of all sizes, the average is 35 hours.  *Id.*  Furthermore, PRPD's own consultant, Total Quality, previously recommended a 40-hour in-service training requirement.[79]  Given the years that PRPD failed to provide consistent and appropriate in-service training, and the irregular practices that have been allowed to develop across PRPD, a 40-hour annual training requirement, at a minimum, is necessary to reform PRPD.

Even though training is now required by local law, a review of the training statistics provided to the Puerto Rico Senate demonstrates how few PRPD officers have received continuing education.  When PRPD has provided training, it has failed to focus on many of the most crucial subjects related to protecting civil rights.[80]  According to the University College's report to the Puerto Rico Senate, approximately 1,000 officers completed the continuing education curriculum during October and November 2010.  At this pace, continuing education training will be provided to only approximately 6,000 officers by September 2011, or roughly one-third of PRPD officers in a year.  Survival training was only provided to 64 officers from January to November 2010.  Notably, PRPD began providing training on civil rights in September 2010 – the same month we told the Governor and other Puerto Rico officials that we would be issuing a public report with our investigative findings.  The number of officers who received training on the use of expandable baton (415), chemical spray (248), and firearms (287) is very low compared to the number of active PRPD officers (approximately 17,100).  All officers should receive continuing education annually and, given the systemic violations we have identified in this report, PRPD should focus its attention on developing and delivering training on core competencies related to civil rights that have been lacking for so long.

PRPD recently identified "local academies" as another new component of PRPD's training program.  On January 24, 2011, Puerto Rico reported that "PRPD now requires all units and division supervisors to carry out monthly 'local academies' where supervisors discuss the PRPD's orders and regulations with officers under their command."  However, PRPD has required monthly "local academies" since at least 1974 when then-Superintendent Astol Calero Toledo issued GO 74-1.  As discussed in Section IV.A, *supra*, many of the officers we interviewed indicated that supervisors simply read new policies and procedures at monthly local academies and provide little opportunity to discuss and understand core material.

## C.      Inadequate Supervision

Many officers we interviewed reported a crisis in supervision.  To date, PRPD has not filled many of the 2,100 supervisor vacancies it announced in 2009.[81]  A commander in a large metropolitan police area reported that the supervisor-to-officer ratio in the San Juan area is 1:30 and that it should not be more than 1:15.  In some specialized units, supervisors are responsible for more than 20 officers.  It is generally accepted practice that spans of control for patrol units should be no more than 1:10, and 1:5 is recommended.  Any span of control should take into account the level of activity and type of assignment of the unit being supervised.  Given the lack of any field training program and the paucity of in-service training for offices and supervisors, a span of control at the lower end of this spectrum for all field units in PRPD is necessary to ensure adequate supervision.  The former Superintendent acknowledged that lack of supervision contributes to civil rights abuses during his confirmation hearings in January 2009.[82]  Unfortunately, although the Superintendent reported that he has filled approximately 500 sergeant positions, the supervisory ranks remain sparsely filled.  Given the high number of supervisor vacancies, it is perplexing that PRPD would promote only four officers in 2009 when PRPD promoted nearly 1,200 officers in 2008.  *See Table 7, below.*

PRPD's promotion practices also contribute to poor supervision.  PRPD currently promotes officers to sergeant using special "merit" promotions that do not require officers to demonstrate their competency in core areas through objective examination.  An adequate examination is designed to reliably measure the officer's proficiency in core areas such as leadership, constitutional law, criminal procedure, agency policies and procedures, risk management, and discipline.  When promotions are carried out through examination, candidates typically devote months to learning and preparing for the examination.  Once candidates pass the examination and are selected as sergeants, the generally accepted practice is for new sergeants to attend an 80-hour first-line supervisor training that allows them to apply their skills and abilities as supervisors.  Because PRPD does not rely on examinations to identify qualified candidates for sergeants, officers are not required to dedicate any time to learning and studying.  Once candidates are selected, they are only offered a 40-hour training course.  This 40-hour course is inadequate given the lack of attendant preparation and demonstrated proficiency that would be necessary if promotions were carried out by examination.  Generally, effective first-line supervision is the cornerstone of constitutional policing and is critical for reform.  PRPD simply does not provide first-line supervisors the opportunity to develop the necessary skills to effectively manage officers and ensure lawful policing.

### Table 7:  Number of Promotions by Type

| Year | Merit | Examination | Total |
|---|---|---|---|
| 2008 | 1,172 | 9 | 1,181 |
| 2009 | 0 | 4 | 4 |
| 2010* | 443 | 79 | 522 |
| **Total** | **1,615** | **92** | **1,707** |

*As of September 10, 2010.

Officers repeatedly complained during our tours that one's political affiliations, rather than skills and competencies, drive promotion decisions.  While law enforcement organizations are typically managed by executives who are either directly elected by the people or appointed by elected officials, PRPD is unique in terms of the role that politics plays in internal promotions. Considering political affiliation in promotions to PRPD's command ranks negatively impacts the degree of confidence that line officers have in their superiors, inhibits the cultivation of institutional competence, and contravenes efforts to initiate and secure reforms. Although the agency policy is to promote officers by standardized examination,[83] we found that PRPD promoted the vast majority of officers under special authority granted to the Superintendent as "merit" promotions.  As illustrated below, only 5 percent of officers were promoted by examination from January 2008 to September 2010.  Generally, these promotions were "merit" in name only, with many awarded based on political affiliation or patronage.

As discussed previously, the Governor of Puerto Rico possesses supreme authority over PRPD.  The Governor delegates this authority in several ways, including most clearly by the appointment, with consent of the Puerto Rico Senate, of the Superintendent.  However, the Governor also maintains final approval of all promotions to PRPD's highest ranks, from auxiliary superintendents to captains.  It is clear from our discussions with PRPD officers that they believe political affiliation plays a significant role in advancement within PRPD, a belief that likely stems, in part, from the Governor's unique role.  This belief, in turn, fosters a dysfunctional professional atmosphere and encourages subordinates to question the qualifications and competence of command officers.

The use of political considerations in promotions also threatens reform of PRPD policies and practices.  Efforts to instill change in large and complex organizations require a consistent and stable commitment from leadership.  Here, however, each time a new Governor is elected there is significant turnover within the command ranks.  Such turnover stunts the cultivation of institutional competency and expertise.  It also hinders efforts to initiate and maintain reform within PRPD.

## D.    Seriously Deficient Civilian Complaint Process

We found pervasive and longstanding deficiencies in PRPD's civilian complaint process. Specifically, we found that:

- The complaint intake process discourages civilians from filing complaints;
- Procedures and protocols are insufficient to ensure complete and timely investigations; and
- Investigators lack training and resources to complete adequate investigations.

### 1.    The Complaint Intake Process Discourages Civilians from Filing Complaints

Civilians should have a full and fair opportunity to file complaints alleging officer misconduct.  Civilians should be provided with alternative means of filing complaints, including in person, by mail, by telephone, or by email.  PRPD should offer citizens a complaint form, but should not require completion of the form to initiate a complaint.  Individuals should be able to obtain and file complaint forms at places other than law enforcement agencies.  Law

enforcement agencies should prohibit officers and other employees from refusing to accept complaints, or attempting to dissuade civilians from filing complaints. Meeting with or speaking to a supervisory officer should not be a prerequisite for filing a complaint. PRPD should accept complaints from all individuals, including those who request anonymity. PRPD should also accept complaints from third parties to ensure that witnesses of abuse or misconduct can file complaints. PRPD policy should require officers to report misconduct, either witnessed or discovered, by other officers. Officers who fail to report misconduct should be subject to appropriate discipline. PRPD should establish appropriate protections against retaliation for officers who report misconduct.

PRPD's intake practices discourage civilians from filing complaints. Although not required by regulation,[84] PRPD officers explained that in practice, civilians are required to appear before an administrative investigator (or "officer of the day") and provide a sworn statement or declaration to file a complaint against an officer. On some occasions, when the complainant cannot or choses not to appear at a stationhouse, an investigator would travel to the complainant to take the declaration. During our December 2010 tour, the PRD commander confirmed this practice, indicating that an administrative investigator would attempt to take a complainant's declaration once PRD receives a complaint.

The pre-printed form provided by PRPD for civilian complaints also includes a statement admonishing the complainant about the veracity of the complaint. Language warning civilians about potential criminal prosecution for false or untrue complaints may intimidate some would-be complainants into silence.[85] For over 20 years, PRPD has been on notice that its system for receiving civilian complaints was problematic, ineffective, and backward. In *Gutiérrez-Rodríguez*, 882 F.2d at 565-66, the First Circuit upheld a lower court decision imposing liability on PRPD's supervisors based on deficient disciplinary practices, including requiring complainants to appear at a stationhouse to provide a sworn statement. The court summarized the plaintiff's expert's testimony, emphasizing that the policy ultimately served to "'frighten[] most of the average citizen[s], particularly minorities. . . .' By its formality, the system discouraged people from coming forward with information. This hampered [PRPD's] ability to discover the truth surrounding alleged incidents of misconduct. *Id.* at 565-66 (second and third alterations in original).

PRPD's Regulation 6506 on civilian complaints ("Complaint Regulation") does not expressly require that all supervisors and officers accept civilian complaints, including when they are out in the field. Not surprisingly, officers told us that PRPD officers do not accept complaints while out on assignment. The PRD commander reported during our December 2010 tour that a civilian can come to any PRPD unit to make a complaint. A precinct commander during the same tour indicated that civilian complaints against officers can only be made in person and must be made at a local police station. PRPD should clarify that complaints may be made in any form (in person, in writing, by telephone, etc.) and require that all supervisors and officers accept civilian complaints, even while out in the field. All officers should also be required to demonstrate familiarity with the referral process to ensure that complaints are submitted timely to administrative investigators. PRPD should also notify all officers that failing to accept a complaint or discouraging a civilian from filing a complaint may subject the officer to disciplinary action.

Finally, the Complaint Regulation does not specify that PRPD should accept third-party and anonymous complaints.  The regulations states simply, "A complaint may be presented by any citizen or agency employee."  Although third-party complaints are fairly common, the PRD commander informed us that he had never seen a third-party complaint at PRPD, although they were acceptable.  PRPD informed us that it currently accepts anonymous complaints, and transfers them to the Internal Affairs Bureau ("IAB"), a sub-unit within PRD, to determine whether the complaint is credible.  If IAB finds the complaint credible, it returns the complaint for a separate administrative investigation.  If not, IAB "archives" or closes the investigation.  PRPD should specifically instruct officers to accept and investigate third-party and anonymous complaints.  In addition, even if complaints are transferred to direct supervisors for investigation, PRD should continue to log and track civilian complaints through their final disposition.

## 2.      Complaint Investigations Routinely Take Years To Complete

Officers and civilians consistently reported pervasive and inordinate delays in completing administrative investigations.  A former associate superintendent reported in 2008 that the average length of an investigation was nearly four years.  Many officers and superintendents reported that investigations could take up to ten years or more to complete.  In a May 2010 budget report, PRPD indicated that the accumulation of unresolved complaints – some from the 1990s – was preventing promotions, steps increases, and other benefits.  More recently, in February 2011, an officer affinity group observed, "[a]t present, an efficient and diligent process to investigate administrative complaints has not been established. . . . The Agency should improve this process because the current process creates unnecessary delays in the resolution of [administrative complaints].[86]  The Complaint Regulation provides that all civilian complaints are to be resolved no more than 180 days from the date of receiving the complaint.  Significant delays in the investigation process also impair PRPD's ability to hold officers accountable.  For civilians, extraordinary delays breed distrust and a lack of confidence in PRPD.  Table 8, below, details the complaint history of a PRPD Lieutenant that reflects several delays.

### Table 8:  Civilian Complaint History, PRPD Lieutenant

| Type | Year | Disposition |
|---|---|---|
| Hiding info on entry application | 1986 | Expulsion; reduced to admonishment |
| Assault | 1989 | 15-day suspension |
| Immoral conduct | 1994 | Archived |
| Accident | 1994 | Archived |
| Misuse of vehicle | 1994 | Archived |
| Misused of donated money | 1994 | Archived |
| Stealing official property | 1995 | Archived |
| Assigned equipment disappeared | 1995 | Archived |
| Assigned equipment disappeared | 1995 | Archived |
| Immoral conduct | 1996 | Archived |
| Disobeyed order | 1997 | No record |
| Incident at ombudsman's office | 2003 | 30-day suspension; reduced to counseling |
| Negligence | 2003 | Archived |
| Negligence | 2003 | Archived |

| | | |
|---|---|---|
| Changed schedule to serve alcoholic beverages | 2004 | 30-day suspension |
| Failure to correct irregularities at precinct | 2005 | Archived |
| Harassment (Dominicans) | 2006 | Archived (two complaints) |

During our December 2010 tour, Superintendent Figueroa Sancha reported that PRPD had made significant progress in resolving the backlog of civilian complaints, and had no remaining cases from 2005 or 2006. He further reported that PRPD had closed approximately 7,000 cases over the past 12 to 13 months. This is remarkable, but inconsistent with statistics published by PRPD. For instance, PRPD reports that administrative investigators resolved 5,067 complaints in 2009 and 2010 by recommending "archive" or a specific disciplinary measure. In the preceding two years, 2007 and 2008, administrative investigators resolved 6,288 complaints. In 2005 and 2006, administrative investigators resolved 7,734 complaints. The data thus demonstrate that administrative investigators are resolving fewer complaints. It is possible that the 7,000 cases reported as "cleared" by the Superintendent were cases backlogged at another PRPD component, such as the Legal Affairs Office, which receives and reviews discipline recommendations before transmitting them to the Superintendent for final approval. Reviewers in the Legal Affairs Office reported significant delays in getting discipline recommendations from administrative investigators, but many other officers reported similar, if not more acute, delays at the Legal Affairs Office. Administrative investigators and staff in the Legal Affairs Office reported needing additional staff, including civil personnel, to resolve the backlog of cases. PRPD has not reported the outcomes of the 7,000 complaints that it "cleared" over the last year.

We also found a significant number of officer complaint histories with missing or unresolved complaints. In the case of missing dispositions, the complaint history would indicate "*no consta*" or "not evidenced." Table 9, below, provides the unresolved complaint history of an officer who was terminated from PRPD in May 2008 after falsely arresting several members of a family during a search in 2006. Had PRPD determined that earlier complaints were sustained, PRPD might have acted to retrain, discipline, or even expel this officer prior to the 2006 incident.

**Table 9:  Civilian Complaint History, Terminated Officer**

| Type | Year | Disposition |
|---|---|---|
| Aggression | 2003 | Pending after investigator recommended admonishment |
| Abandoned service | 2005 | Pending after investigator recommended admonishment |
| Insubordination | 2005 | Archived; investigator recommendation is unknown |
| Negligence; irregularities at the Drug Unit | 2005 | Pending after investigator recommended orientation |
| Immoral conduct; taking $4,700 during search | 2005 | Pending after investigator recommended archive |

| | | |
|---|---|---|
| Domestic violence | 2005 | Pending after investigator recommended 5-day suspension |
| Immoral conduct; $600 taken during search | 2005 | Pending after investigator recommended admonishment |
| Persecution; multiple detentions | 2005 | Pending after investigator recommended archive |
| Lawsuit for illegal search | 2005 | Informational |
| Domestic violence | 2006 | Pending after investigator recommended expulsion |
| Domestic violence | 2006 | Pending after investigator recommended expulsion |
| Domestic violence | 2006 | Pending after investigator recommended expulsion |
| Domestic violence | 2006 | Pending after investigator recommended expulsion |
| Failure to appear in court | 2006 | Pending after investigator recommended expulsion |

*As of Jan 17, 2008.

     The civilian complaint history of the following PRPD lieutenant, who is currently on the force, includes numerous missing dispositions for allegations of misconduct.  In addition, we found troubling variations between two history profiles taken of the same lieutenant only 18 months apart.  The first history, prepared by an administrative investigator in June 2006, consists of nine civilian complaints through the end of 2005.  *See Table 10A.*  The second history, prepared by a separate investigator in December 2007, consists of 12 civilian complaints for the same period; the disposition of four complaints is also unknown.  *See Table 10B.*  These discrepancies further illustrate the unreliability of PRPD's recordkeeping.  Without reliable internal affairs records, PRPD risks placing unqualified – and even dangerous – officers in the field and promoting them to positions of greater authority within PRPD.

**Table 10A:  Civilian Complaint History, Lieutenant Compiled in June 2006**

| Type | Year | Disposition |
|---|---|---|
| Physical abuse | 1989 | **Expulsion** after investigator recommended 30-day suspension |
| Verbal abuse | 1989 | Archived after investigator recommended 30-day suspension |
| Negligence during an intervention where officer was injured | 1991 | Archived after investigator recommended 5-day suspension |
| Extramarital relations | 1993 | Archived |
| Illegal appropriation; taking wallet | 1993 | Archived |
| Negligence during vehicle intervention | 1994 | Archived after investigator recommended 5-day suspension |

| | | |
|---|---|---|
| Vehicle accident | 1994 | Archived after investigator recommended admonishment |
| Immoral conduct | 2002 | Archived after investigator recommended admonishment |
| Vehicle accident | 2004 | Pending after investigator recommended orientation |

*As of June 19, 2006.

**Table 10B:  Civilian Complaint History, Lieutenant Compiled in December 2007**

| Type | Year | Disposition |
|---|---|---|
| Physical and verbal abuse | 1989 | Archived after investigator recommended 30-day suspension |
| Physical abuse | 1990 | Archived after investigator recommended 30-day suspension |
| Negligence during an intervention where officer were injured | 1991 | Archived after investigator recommended 5-day suspension |
| Physical and verbal abuse | 1992 | **Not found** after investigator recommended expulsion |
| Extramarital relations | 1993 | Archived |
| Illegal appropriation; taking wallet | 1993 | Archived |
| Vehicle accident | 1994 | Archived after investigator recommended 5-day suspension |
| Vehicle accident | 1994 | Archived after investigator recommended orientation |
| Lascivious acts | 2002 | Archived after investigator recommended admonishment |
| Vehicle accident | 2004 | **Not found** after investigator recommended admonishment |
| Negligence in investigation | 2005 | **Not found** after investigator recommended archive |
| Vehicle accident | 2005 | **Not found** after investigator recommended 30-day suspension |

On January 9, 2009, administrative investigators confirmed that the following complaints against the lieutenant remained unresolved.  The oldest of these had been open for approximately seven years.  Notably, our investigation concluded that delays of this magnitude are common. Leaving complaints unresolved places the community at risk by impeding PRPD's ability to identify and effectively counsel, retrain, or remove officers, as needed.

**Table 10C:  Civilian Complaint History, Unresolved Complaints as of January 2009**

| Type | Year | Disposition |
|------|------|-------------|
| Negligence | 2002 | Pending in Legal Affairs Office |
| Vehicle accident | 2004 | Pending in Legal Affairs Office |
| Vehicle accident | 2005 | Pending in Legal Affairs Office |
| Loss of Government Property | 2005 | Pending in Legal Affairs Office |
| Negligence | 2006 | Pending in Legal Affairs Office |
| Improper searches and seizures | 2007 | Pending investigation by Police Area |
| Loss of official vehicle license plate | 2008 | Pending investigation by Police Area |

### 3.        Procedures and Protocols Are Insufficient To Ensure Proper Investigations

PRPD has not established policies and procedures to appropriately guide the efficient disposition of civilian complaints.  PRPD's Complaint Regulation provides a broad overview of the complaint adjudication process, including intake, classification (formal vs. chain-of-command investigation), summoning declarants, use of scientific tests, reporting the results of the investigation, confidentiality, summary suspensions, and officers' duty to report criminal misconduct.  However, the Complaint Regulation does not provide operational details to ensure consistency between various regional offices, investigators, and supervisors.  For instance, the Complaint Regulation does not address assembling case files, maintaining witness logs, obtaining and storing physical evidence, coordinating parallel criminal investigations, ensuring the impartiality of the investigator, or taking statements from target officers.  Because PRPD has not established policies and procedures to guide administrative investigations, the process varies significantly.  This finding is consistent with a 2009 report from Total Quality, a contractor hired by PRPD to evaluate various administrative processes.  The contractor found, among other things, a lack of coordination among PRPD units, duplicate processes, and lack of standardized disciplinary measures.  For instance, some investigators created their own electronic spreadsheets to track complaints automatically, while others kept handwritten logs that made identifying patterns and trends more difficult.

In addition, PRPD policies provide little guidance as to which complaints must be referred to administrative investigators for a disciplinary recommendation and which may be handled by the involved officer's supervisor.  Article 5, Section C of the Complaint Regulation provides that an administrative investigation director will determine whether a complaint warrants an investigation by an administrative investigator or the officer's supervisor.  The Complaint Regulation indicates that administrative investigators must investigate cases in which a "prima facie" allegation exists that an officer engaged in misuse or abuse of authority or corruption.  However, these broad categories provide insufficient guidance, particularly as PRPD develops plans to transfer certain "less serious" complaints to supervisors.  In *Building Trust Between Police and the Citizens They Serve*, IACP notes, "[i]t is essential to have a written directive that delineates which types of complaints will be investigated by the subject officer's supervisor and which will be referred to Internal Affairs."[87]  IACP includes examples of specific complaint categories, such as "verbal abuse, on-duty, shooting incidents, profiling, and drug and alcohol," that provide for more consistent assignment to appropriate investigators.

Further, PRPD's Complaint Regulation does not provide a standard of proof for administrative investigations, such as preponderance of the evidence. This standard should be clearly delineated in policies and procedures accompanied by extensive examples and training to ensure proper application by investigators. During our tours, many investigators were unable to articulate the standard of proof used to adjudicate administrative complaints.

Separately, the Complaint Regulation requires only that investigators prepare investigation reports containing factual conclusions or determinations, the policies allegedly violated, and the recommended sanction or disciplinary measure, if any. The Complaint Regulation does not require that the report address the substance and process of the investigation, nor does it set out the types of final determinations that should be used. Generally accepted practices include the following disposition categories:

- Unfounded: the allegation was false or devoid of fact.
- Exonerated: the act occurred, but was lawful and within policy.
- Not Sustained: the evidence was insufficient to either prove or disprove the allegation.
- Sustained: the evidence was sufficient to prove the allegation.[88]

PRPD generally employs two types of determinations: (1) "archive," and (2) a specific disciplinary action, such as admonishment, reprimand, or suspension, when the allegation is proven. PRPD uses "archive" (or administratively closed) too broadly as a "catch-all" to cover three distinct scenarios, namely, complaints that are unfounded, exonerated, and not sustained. An officer with a history of five "exonerated" complaints is distinct from an officer with five "not sustained" complaints. In this latter case, investigators may find it necessary to conduct a proactive investigation to determine whether the officer is intimidating or threatening witnesses in order to discourage their cooperation during the administrative investigation. For instance, the lieutenant profiled in Table 10B (above) has an extensive history of complaints. However, the numerous "archive" designations in the lieutenant's history fail to explain whether the officer is a frequent target of false complaints (as may be indicated by repeated exonerations) or whether some other factor is contributing to the high number of complaints.

### 4.    Investigators Lack Training and Resources

PRPD units designed to promote integrity and compliance with agency standards, while staffed with dedicated individuals, lack the necessary tools to hold officers accountable. Despite their immense responsibility, officers assigned to internal affairs units reported being outcasts in the agency. These officers included individuals who had no other space but the stationhouse restroom to store internal affairs files or who traveled in their own personal vehicles to conduct surveillance because they lacked serviceable equipment. They were charged with rooting out serious misconduct of all types and at all levels within the agency, but PRPD provided them with few resources, virtually no training, and little support.

Administrative investigators tasked with evaluating civilian complaints do not receive formal training. PRPD's 2009 Total Quality study found that administrative investigators lacked training and that the failure to train investigators results in ongoing delays in investigations. In December 2010, the PRD commander indicated that he had not received any formal training on administrative investigations, although he had directed various PRPD units in his 30-year career

at PRPD.  The Director of the Administrative Complaint Bureau also indicated that he had not received any training on conducting administrative investigations, though he stated that he had studied the Complaint Regulation before taking charge of the unit.  The lack of training they described is consistent with what other investigators reported to us on prior tours.

During our 2008 and 2009 tours, internal affairs and public integrity investigators reported a scarcity of staff to complete timely investigations.  They also indicated that staff lacked necessary equipment, such as video cameras, copiers, and unmarked cars.  During our December 2010 tour, PRD supervisors reported continued shortages in staff and resources.  Although PRPD reports that it recently improved the tracking of civilian complaints by automating a portion of the civilian complaint process, substantial work remains to bring meaningful reforms that will result in greater confidence from the public.

An effective internal investigation and civilian complaint process is essential to preserving public trust.  In 2010, the International Association of Chiefs of Police ("IACP"), as part of a project supported by DOJ's Community Oriented Policing Services ("COPS"), highlighted the role of Internal Affairs as the institution best equipped to build and maintain community trust following allegations of unethical conduct by officers.[89]  According to IACP, investigation and civilian complaint processes should be comprehensive, accessible, fair, thorough, and transparent to ensure that officers are held responsible when violations occur and to deter misconduct.  The process should promote confidence from both civilians and officers.  An objective and thorough investigation also serves to protect the community and officers from complaints based on misunderstandings or false information.

In addition, officers should be required to report to their agency any instance in which they are:  arrested or criminally charged for any conduct; named as a party in a civil suit regarding on-duty conduct; or named as a party in a civil suit regarding off-duty conduct in which the allegations relate to the officer's ability to perform law enforcement duties (e.g., improper force, fraud, or discrimination).  Law enforcement agencies should seek to be notified whenever a court or a prosecutor concludes that an officer engaged in misconduct in the course of criminal investigations or proceedings (e.g., engaged in false testimony or dishonest conduct, or improperly charged an individual with resisting arrest, assault on an officer, or disorderly conduct in an attempt to justify inappropriate use of force).

## E.    Ineffective Discipline

PRPD operates nearly the same "grossly deficient" disciplinary system observed by the First Circuit when it upheld an award of punitive damages against the PRPD Superintendent and other supervisors in 1989.  *Gutiérrez-Rodríguez v. Cartagena*, 882 F.2d 553, 581-82 (1st Cir. 1989).  The deficiencies included unduly limited sanctions for misconduct and the failure to involve immediate supervisors in the disciplinary process.  *Id.* at 565-66.  More than two decades later, these deficiencies remain.  Specifically:

- PRPD's Personnel Regulation is sorely outdated and does not reflect current types of misconduct and contemporary principles of progressive discipline.
- supervisors lack authority and training to correct even minor infractions of their subordinates;
- disciplinary action is inconsistent, delayed, and ineffective in deterring misconduct; and
- officers are allowed to refuse to provide a statement during administrative investigations.

Law enforcement agencies should appropriately discipline any officer who is the subject of a substantiated misconduct allegation regarding excessive force, false arrest, improper search or seizure, discriminatory law enforcement, or who fails to report misconduct by another officer. The agency should also appropriately discipline any officer who enters a guilty plea or is found guilty in a criminal case regarding on-duty conduct, or who is found in a criminal proceeding to have intentionally committed misconduct.

In deciding the appropriate discipline for each officer who is the subject of a substantiated misconduct allegation, the agency should consider the nature and scope of the misconduct, and the involved officer's history of misconduct, investigations, and discipline. Regardless of whether a misconduct allegation is substantiated or discipline is ordered, the agency should also consider whether other remedial non-disciplinary measures, such as training or counseling, are appropriate to correct underlying problems.

> "As the expert on police practices and procedures testified, it was a disciplinary system that was going through the procedural motions without any real objective of finding the truth."
>
> - First Circuit in *Gutiérrez-Rodriguez*, 1989

### 1.    The Police Personnel Regulation Is Sorely Outdated

PRPD's disciplinary system is governed by a Police Personnel Regulation issued thirty years ago, in 1981, that does not reflect current types of officer misconduct and contemporary principles of progressive discipline.[90] The Puerto Rico Legislature recognized this deficiency and passed legislative measures in 1996 and 2004 requiring that the Superintendent update the Regulation to reflect contemporary merit principles. Specifically, Law No. 184 of August 3, 2004, required government agencies, like PRPD, to adopt regulations that uphold critical merit principles concerning selection, training, promotion, retention, and discipline of employees that do not discriminate based on political affiliation, race, color, national origin, gender, or other prohibited category. *See* Law 184 art. 2.1, 5.4. Despite these legislative mandates, PRPD has yet to adopt a new Police Personnel Regulation. A May 2009 audit report from the Puerto Rico Controller's Office found that PRPD's failure to adopt an updated personnel regulation leads to human resource errors and irregularities that are not detected and corrected in a timely manner.[91]

Consistent with the May 2009 Controller's audit report, we found numerous problems with PRPD's outdated disciplinary system that do not promote accountability. For instance, the Police Personnel Regulation contains an antiquated list of rules governing officers' conduct. The

list does not reflect current types of misconduct that should lead to discipline or corrective action.  For instance, the Police Personnel Regulation expressly prohibits officers from threatening or using their firearms against any person, except in legitimate defense of self or others.  However, the Regulation does not prohibit officers from threatening or using other weapons, such as batons, chemical agents, or CEDs, without justification.  The Regulation also prohibits interfering, obstructing, or misusing radio equipment, but does not reference misuse of computers or other electronic communication devices.  Separately, the Regulation does not address how much weight prior instances of misconduct should be given when imposing discipline and does not empower supervisors to take early remedial action to correct misconduct or problem behavior of subordinates.

### 2. Supervisors Lack Authority and Training To Correct Even Minor Infractions of Their Subordinates

Numerous supervisors indicated that they do not have authority to correct even minor infractions by officers under their supervision.  Instead, supervisors must refer misconduct to administrative investigators before formal discipline or corrective action can be imposed on an officer.  Although the regulation governing civilian complaints allows administrative investigators to refer misconduct allegations to supervisors for a chain-of-command investigation, we found few instances of investigative units employing that option.  As a result, even minor infractions were channeled through the lengthy and backlogged administrative investigation process.  Some officers reported that supervisors simply worked around the cumbersome administrative investigation process by transferring problem officers to other units.

### 3. Administrative Investigations Take Too Long To Complete

Officers from all ranks and divisions reported that administrative investigations can take up to ten years or more to resolve.  Officers complained that, in some instances, by the time officers are notified of disciplinary action, it is difficult to gather documents and witnesses to challenge the investigator's findings because the incident occurred so long ago.  Officers also told us that they often do not learn about unresolved misconduct allegations against them until they are considered for promotions.  In addition, we learned that the length of time that many administrative investigations take makes it difficult for supervisors to manage the officers working for them.  For example, an officer could have a dozen pending administrative investigations when he/she is assigned to a new precinct.  The supervisor might find out about some of these investigations from PRD, but as discussed below, records on pending and completed investigations are often incomplete.  Without these files, a supervisor cannot reliably determine whether the officer poses a risk to civilians or the integrity of the unit.

### 4. Disciplinary Action Is Inconsistent and Ineffective in Deterring Misconduct

We found that administrative investigators' findings and recommendations varied widely for similar types of offenses.  PRPD's 30-year-old Police Personnel Regulation classifies misconduct into two categories:  minor and major violations.  The range of disciplinary action reflects these two types of violations.  Discipline for minor violations ranges from a written reprimand to a suspension that cannot exceed ten days.  Discipline for major violations can result in suspension lasting up to five months and in termination of employment.[92]  This range of

corrective actions is unduly limited.  The rules on discipline do not contemplate training, counseling, or other remedial measures that are focused on correcting problem behavior beyond the imposition of written reprimands and more severe sanctions.  Alternative measures should be added to the rules on discipline that provide for professional improvement and early intervention, rather than strictly to punish.  Furthermore, available penalties involving suspension should be more finely calibrated to address the current gap between a ten-day suspension and a five-month suspension.

The PRD Commander reported that he evaluates each recommendation for discipline that comes across his desk so that discipline is consistent, regardless of the subject officer's assigned region or police unit.  While the Commander's dedication is commendable, PRPD should not rely on the efforts of one individual to standardize the disciplinary recommendation process.  During our December 2010 tour, the Superintendent reported that PRPD was developing a new discipline matrix that would recommend discipline within a pre-determined range that considered the type of violation and the officer's history of misconduct.  We have not been provided with a copy of any updated personnel regulations or a disciplinary matrix.  However, such a matrix – if applied consistently – could greatly assist PRPD in imposing consistent sanctions and/or remedial measures for similar misconduct.

In the case of lawsuits filed against officers, we found little, if any, coordination between PRD, which is responsible for administrative investigations, and the Legal Affairs Office, which reviews all disciplinary action recommended by PRD and usually receives notice first of the suits.  The lack of coordination may be due, in large measure, to PRPD's antiquated and paper-based records management system that relies on a card catalogue to track civil actions and other court proceedings.  We also found that PRPD routinely fails to inform officers about the status of pending administrative investigations and civil court proceedings.  In many cases, both proceedings run simultaneously, often reaching contradictory results.  For instance, it is not uncommon to find a civil action that resulted in a substantial settlement or finding of misconduct where the administrative investigation was completed in a cursory manner without a recommendation for discipline.  In such instances, PRPD should review closed administrative investigations and determine whether any disciplinary or corrective action is necessary to prevent the officer from engaging in similar, or more serious, misconduct in the future.

During our review of civil suits involving PRPD officers, we found cases in which officers currently on the active PRPD roster were found liable for Fourth Amendment violations – or no finding was made because settlement was reached prior to trial – and whose conduct led to awards of money damages paid by Puerto Rico.[93]  Even if PRPD conducted administrative investigations against the involved officers for the incidents giving rise to litigation and no disciplinary action was imposed, following these settlements or verdicts, PRPD should consider whether to require training, counseling, or other remedial non-disciplinary measures to correct problem behavior.

5. **Protections Against Self-Incrimination Are Offered in Administrative Investigations**

In *Gutiérrez-Rodríguez*, 882 F.2d at 565, the First Circuit upheld a lower court decision imposing liability on PRPD's supervisors based on deficient disciplinary practices, including providing officers with Fifth Amendment protections against self-incrimination during administrative investigations.  The plaintiff's expert, quoted in the opinion, stated, "[s]uch a rule is 'a really serious handicap' to an investigation of misconduct; it 'cuts off one of your main sources of investigation . . . the officer that was involved.'  By invoking such a rule an officer could easily block the department from getting to the bottom of the matter."  *Id.* at 565.  We found that PRPD still continues this practice.  For instance, we found that investigators routinely gave officers the following warning during administrative investigations:  "You have the right not to declare if you believe that doing so may be self-incriminating."

As discussed in Section III, above, administrative investigations should be considered individually.  Conducting a full administrative investigation short of compelling an interview generally does not compromise either investigation and is often critical to ensuring the later success of the administrative investigation.  Regardless of whether or for how long a compelled statement is delayed, a meaningful and timely administrative investigation is particularly important in cases alleging criminal misconduct, given the usually egregious nature of the allegations, the often slow wheels of the criminal justice system, and the very low rate at which these cases are prosecuted (regardless of jurisdiction).  Where officers are not guilty of committing the misconduct, they deserve to have the case adjudicated internally and be brought back to work; where an officer is guilty, the community and department have an interest in seeing the officer disciplined or removed from the force without having to wait months or years with the officer on paid or unpaid suspension.

F. **Limited Risk Management**

Effective risk management systems help commanders and supervisors take early corrective action when officers exhibit potential problem behaviors.  Interventions typically include targeted training, education, and counseling.  These systems are designed to protect the community and support officers who may be experiencing difficulties.  Information that agencies generally collect in their early intervention systems include:  information on shootings, other uses of force, searches and seizures, civilian complaints, civilian commendations, criminal charges against officers, civil suits alleging misconduct, other misconduct allegations, disciplinary actions, non-disciplinary remedial actions, training history, and civilian arrests.

An early intervention system should provide supervisors and managers with both statistical information and descriptive information for individual officers, regions/specialized units, and the entire law enforcement agency.  When properly implemented, an early intervention system offers numerous benefits, including:  enhancing police integrity; promoting a culture of accountability; emphasizing the department's commitment to ethical policing; decreasing reliance on negative sanctions and punitive actions; providing supportive interventions to sustain, revive, and advance individual careers; supporting and increasing efficiency of first-line supervisors; improving officer morale; and decreasing liability and costs of civil suits associated with misconduct and use of force.[94]

More than 20 years ago, PRPD recognized its responsibility to detect potential patterns of problematic behavior and intervene to avoid and deter serious misconduct. However, PRPD's risk management system remains woefully inadequate. PRPD currently relies on a system referred to as "repetitive conduct," first developed in 1990 by former Superintendent Betancourt Lebrón. In Special Order 90-5, "Repetitive Conduct," Superintendent Betancourt Lebrón observed that PRPD needed to do more to address officers that "have shown signs of emotional maladjustment" and "an inability to control their behavior in tense moments."

Special Order 90-5 highlighted three circumstances that triggered the need for an intervention: (1) a substantial number of citizen complaints filed against a member of PRPD, even when these have not culminated in a disciplinary action; (2) actions of a PRPD officer that evidence any failure to control his/her conduct in stressful situations, thus presenting a potential danger to the citizenry or the officer; and (3) a supervisor's conclusion that a member of the force may be emotionally unbalanced or in need of re-training. The sole intervention consisted of a referral to a course titled, "Professional Improvement."

On June 14, 2007, PRPD published an internal memorandum intended to clarify various items left undefined by SO 90-5. The memorandum defined the term "substantial number of complaints" as three complaints within a five-year period, and required the complaints to be related to a perceived failure by the officer to control his/her conduct in stressful situations. Despite this new definition, PRPD stopped offering the "Professional Improvement" training to PRPD officers for three years, until October 2010.

On September 27, 2010, PRPD modified its repetitive conduct policy with GO 2010-14. The new parameters provide various triggers based on the number of administrative complaints or use of force reports involving an officer. The Order also provides a referral for supervisors whose subordinates are subjects of ongoing complaints. Under the new Order, PRPD requires a referral to the "Professional Improvement" training following three or more civilian complaints within a 12-month period.

General Order 2010-14 is a significant step backward from prior procedures. For one, it shortened the relevant period for consideration of complaints from five years to one year. Thus, under the new system, an officer can continue to receive two civilian complaints every year, without triggering a referral for an intervention. Under the former parameters, a referral would be triggered. The new system also diminishes the role of supervisors in submitting referrals. Under SO 90-5, a supervisor could make a referral when an officer showed any failure to control his conduct in stressful situations, or when the supervisor found that the officer was emotionally unbalanced or in need of re-training. Currently, supervisors have less discretion to make these referrals because referrals are based on the receipt of civilian complaints. Even assuming that GO-2010-14 permits discretionary referrals, it discourages them. A supervisor who makes a referral under GO 2010-14 regarding an incident that happened under his command could see his opportunities for promotion delayed since such a referral would be counted as one of the complaint notifications against him.

Separately, during our tours, we found that information on investigations, citizen complaints (including lawsuits), training histories, supervisory reviews, disciplinary and other corrective actions was not readily available to supervisors. Although supervisors at the precinct level had access to officers' disciplinary files, the information in them is often incomplete. Even

81

when supervisors request the complaint histories of officers under their command, some complaints were listed as "not found." We further found that PRPD keeps many disciplinary records on note cards, many of which include duplicative or incomplete information, particularly regarding civil suits and criminal prosecutions. While early intervention programs do not require sophisticated technology to succeed, an automated system permits supervisors to access, organize, and search large volumes of data. Additionally, an agency can establish automated alerts, whereby the database, relying on previously selected performance indicators, will automatically inform supervisors when an individual officer exhibits potentially problematic behavior.[95] Such a system is invaluable in an agency the size of PRPD.

Early intervention programs are only a tool, however; they are not a substitute for capable and effective supervisors. For a program to be effective, "[f]irst and second level supervisors [should] familiarize themselves with their subordinates and routinely observe their demeanor, appearance, and conduct. Supervisors [should] remain alert for indications of behavioral changes or stressors that may affect a member's performance. When supervisors perceive or determine that a member has problems or is causing problems, they [should] assess the situation and take appropriate action" in accordance with the agency's policies and procedures, including those on referral to employment assistance programs.[96] To penalize supervisors and make them automatically ineligible for promotion because a certain number of complaints have been filed against officers under their command – as provided by GO 2010-14 – runs counter to the principles of a good risk management system because it shifts the focus away from correcting officers' problem behaviors.

As we discussed earlier, we are concerned about the high percentage of "merit" promotions in PRPD during the past three years, and how those promotions may impact the quality and effectiveness of supervision. We are also concerned about PRPD's apparent lack of supervisory training. Although the University College offers training for new sergeants, more training should be offered to improve the skills of higher-ranking officers so that they can become more effective managers. During our tours, we met auxiliary superintendents, who serve just under the Superintendent and oversee PRPD components, with no prior experience in the areas in which they now lead. We also met captains and higher-ranking commanders with limited management experience because they had spent the bulk of their careers working in specialized units. Sufficiently trained commanders are necessary to make effective decisions on corrective or disciplinary action when an officer requires an early intervention. In this regard, collecting accurate data as part of an early identification program is but one step in the process. Supervisors must still be able to interpret the data and take appropriate corrective action.

We are also concerned about the fixed "Professional Improvement" training curriculum that PRPD began offering in October 2010, beginning with TOU officers. The one-size-fits-all approach, such as the mass training offered to 165 officers on November 22-23, 2010, fails to take into account that referrals for corrective action can be for a wide variety of citizen complaints. "Professional Improvement" training for a TOU officer with complaints of use of excessive force for actions during a mass demonstration may require different corrective measures than for a precinct officer who is verbally abusive to civilians during traffic stops. In this regard, supervisors should be consulted about fashioning an appropriate remedy depending on the particular problem behavior. As one of the University College instructors pointed out,

even experienced traffic officers make mistakes and take short-cuts that can endanger the lives of citizens and the officers themselves.  If such an officer is displaying troubling conduct, specific training tailored to the problem can correct the behavior more effectively, and helps the officer refocus his law enforcement commitment and effort.

After choosing and implementing the appropriate type of intervention, the last element of an effective early intervention program is post-intervention monitoring.  "For instance, if an officer is indicated because of three use-of-force incidents in a year, any subsequent use-of-force incident should be reviewed thoroughly.  Increased supervision, including random roll-bys to observe the officer's performance in the field may also be warranted."[97]  Ideally, the effective use of an early intervention program will result in a decreased need for disciplinary measures.  However, an early intervention system will not replace the need for appropriate discipline.

## G.    Lack of External Oversight and Accountability

External oversight of PRPD is virtually non-existent.  As discussed above, supreme authority over PRPD is vested in the Governor.  The Governor appoints, with approval from the Puerto Rico Senate, a Superintendent who manages the day-to-day operations of PRPD.  The Superintendent exercises plenary discretion over officer recruitment, selection, training, promotion, and discipline.  Unlike all states except Hawaii, Puerto Rico does not have a state-wide authority that promulgates minimum standards and training requirements, such as POST organizations. The Superintendent has, for example, the discretion to reduce the pre-service training program for cadets entering with advanced degrees.  The Superintendent could also authorize deployment of cadets with firearms before they complete the pre-service program, modify the firearm training requirements for officers, or set new standards for the use of CEDs.  PRPD is also not accredited by any professional organization outside of Puerto Rico, such as the Commission on Accreditation for Law Enforcement Agencies.

In most jurisdictions, law enforcement agencies that adhere to contemporary policing practices are increasingly engaging in constructive dialogue with the public on accountability and oversight issues.  "In one recent survey, approximately 80 percent of the American public reports that they favor the use of civilian review."[98]  Many individuals see civilian review as a logical outgrowth of community-oriented policing.  Civilian review of police misconduct takes many forms.  Some civilian review entities are involved in every step of the complaint process, from the receipt of the initial complaint through its review and investigation, to the recommendation for sanctions, if any.  Other entities deal exclusively with appeals, leaving the investigation of civilian complaints to the law enforcement agencies they oversee.

In Puerto Rico, there is no effective external oversight of PRPD.  Currently, Puerto Rico authorizes two external entities by law to investigate civilian complaints of police misconduct.  However, these entities do not have the necessary resources and authority to hold PRPD officers accountable to the public.  As a result, they are unable to provide adequate and timely attention to hundreds of civilian complaints stemming from allegations of civil rights violations.  We discuss each of these entities below.

## 1.    CIPA

The Commission of Investigation, Processing and Appeals ("CIPA") was created in 1972 to replace Puerto Rico's former Police Commission.  Based on its enabling statute, CIPA is an independent, quasi-judicial body charged with investigating civilian complaints against law enforcement officers and adjudicating discipline appeals.  *See* Law No. 32 of May 22, 1972, *as amended*.  CIPA was intended to provide an alternative to the court system for faster and less costly vindication of individuals' civil rights.  Further, the Puerto Rico Legislature designed CIPA to be independent from PRPD in order to "provide maximum protection" to citizens from the "coercive power of the State."  *See* Law No. 23 of July 11, 1992.

CIPA is authorized to review and investigate civilian complaints involving:  (1) illegal or unreasonable arrests or detentions; (2) illegal or unreasonable searches and seizures; (3) excessive or unjustified threats or aggressions; (4) discriminatory conduct; (5) undue delays in presenting a detainee to a magistrate judge; (6) unjustified use of violence, intimidation, and/or psychological abuse during detention or interrogation; (7) misuse or abuse of surveillance mechanisms; and (8) illegal or unreasonable obstruction to the legal and peaceful exercise of the constitutional rights to free speech, press and/or association.  1 L.P.R.A. § 172(1).

Despite CIPA's critical investigative mandate, it functions solely as an appellate body determining the validity of disciplinary action imposed against officers.  In 2008, CIPA reported that budget limitations impaired its ability to hire staff to investigate allegations of police misconduct.  Based on our review, CIPA's budget continues to dissipate.  In its FY 2010-2011 budget, CIPA reduced its staff to six, down from 13 in 2008.  Many residents and even officers interviewed were unaware that CIPA was authorized to investigate police abuse.

## 2.    Puerto Rico Civil Rights Commission

The Puerto Rico Civil Rights Commission is also authorized to receive and investigate civilian complaints.  *See* Law No. 102 of June 28, 1965, *as amended.*  However, CRC's mission expands well beyond police misconduct.  The Puerto Rico Legislature established CRC to:  (1) educate the entire population about the significance of citizens' fundamental rights and the means of respecting and protecting them; (2) promote the protection of human rights and the strict enforcement of the laws that protect them; (3) publish an annual report and any other special reports required by the Governor, the Puerto Rico Supreme Court, or the Legislature, containing the recommendations it deems necessary for the continuous and effective protection of civil rights; (4) evaluate the laws, standards, and acts of the Commonwealth and its municipalities for consistency with civil rights, and suggest reforms as needed; and (5) survey citizens as to the effectiveness of protections of fundamental rights and investigate complaints and grievances by any citizen regarding violations of those rights.  Again, with significant budget limitations and a broad mandate, CRC cannot provide dedicated oversight of PRPD to ensure public accountability.

## V.     RECOMMENDED REMEDIAL MEASURES

For years, victims' families, civic leaders, legislators, civil rights advocates, and others have called for reforms in response to incidents involving civil rights violations, corruption, criminal activity, and other misconduct by PRPD officers.  Despite the calls for reform, PRPD has yet to build and maintain the necessary systems of accountability to protect individuals against unreasonable searches and seizures, including use of excessive force, and other arbitrary uses of force by officers.  Without fundamental and sustainable changes to the agency's standards, procedures, and practices, the pattern of civil rights violations will continue.

The recommendations we outline below are based on professional and generally-accepted practices in the field of local law enforcement.  As part of our investigation, we solicited feedback from various stakeholders on remedies to reform PRPD.  We received thoughtful and candid assessments from civilians, advocacy organizations, and professional associations.  Notably, many of the officers we interviewed also offered recommendations, demonstrating a genuine commitment to promoting integrity and professionalism within their ranks.  These recommendations also reflect what we heard from various stakeholders, including officers and civilians, who have called for more effective policing to fight crime and uphold civil rights.

At a minimum, Puerto Rico needs to take the steps broadly outlined below to remedy the pattern and practice of constitutional violations and ensure that individuals are not subjected to use of excessive force and unconstitutional searches and seizures.

### A.     Independence and Professionalization

To achieve lasting reform of PRPD that will address the public safety crisis, ensure that constitutional police practices are uniformly applied and sustained, and build public confidence in the police department, PRPD must have stability and protection from politicization.

(1)     Command staff:  Any employees in the command structure who do not report directly to the Superintendent should be career employees not subject to removal or demotion except for cause.

(2)     Promotions:  All promotions should be made by PRPD free from influence by the Governor or the Legislature.  Objective criteria should be developed to ensure promotions based on demonstrated competency in core supervisory and substantive areas.  These criteria should account for experience, civil rights and discipline record, training, and skills.

(3)     The University College should be an independent entity in the government of Puerto Rico with a Board of Trustees consisting of representatives of the Governor, Superintendent, Legislature, and the community.

(4)     Police Officer Standards and Training: PRPD should develop a POST board or commission that establishes minimum professional standards and training requirements for law enforcement officers in Puerto Rico.

**B.      Evaluate PRPD Staffing and Eliminate Unqualified Officers**

(5)      PRPD should assess the size of the force necessary and appropriate to fulfilling its mission.  PRPD should develop a plan to determine the adequate number of officers needed in each geographic region and in each job category.  The plan should identify each function performed by PRPD, the number of officers required to fulfill the function, and level of training, skill, and experience required for each position.  This assessment should be conducted without regard for the current staffing pattern.

(6)      PRPD should develop a plan to remove corrupt and unqualified officers from PRPD. Within 12 months, PRPD should review the discipline, training, and performance record of each officer against objective criteria to determine which officers should be removed from the force. Upon completion of the review, PRPD should immediately begin proceedings, consistent with the civil service and due process rights of officers, to remove those who are unqualified due to misconduct and to retrain those who are unqualified by lack of training.

**C.      Reform of Specialized Tactical Units**

        In contravention of established and widely accepted policing practices, PRPD employs its specialized tactical units for routine police functions.  The tactics used by the specialized tactical units have negatively impacted the effectiveness and public perception of PRPD.  To restore public confidence, PRPD must assess the character, policies, and practices of its specialized tactical units.  Along with ensuring that specialized tactical units respect general PRPD policies, PRPD shall also assess and modify its practices as they relate to:

(7)      Recruitment: PRPD shall continue to revise and implement standards related to ensuring that members of its specialized tactical units are of the highest caliber.  Initial and reoccurring evaluations of specialized tactical unit officers shall incorporate psychological tests, extensive background investigations, and drug examinations.

(8)      Training: PRPD shall develop training curricula that comply with professional standards related to specialized tactical units.  Specialized training shall emphasize constitutional standards as they relate to the use of force, searches and seizures, and the prohibition of discrimination.

(9)      Policies: PRPD shall develop, revise, and implement comprehensive standard operating procedures for its specialized tactical units that: (a) prohibit deployment solely to conduct crowd management and control; (b) ban deployment for routine patrol duties; (c) prohibit unnecessary displays of force; and (d) establish reporting requirements following deployments.

(10)     Supervision:  PRPD shall ensure that high-level officials who oversee specialized tactical units are familiar with pertinent training curricula and standard operation procedures.

**D.      Use of Force:  Internal Controls and Accountability**

        **1.      Use of Force Policies**

        Puerto Rico should ensure that all force, lethal or otherwise, used by PRPD officers is reasonably necessary and in accordance with individuals' federally-protected rights.  In order to

accomplish this, Puerto Rico should take the following specific steps related to PRPD's use of force policies:

(11)    Develop and implement a comprehensive and agency-wide use of force policy that complies with applicable law and current professional standards.  The comprehensive use of force policy shall include all force techniques, technologies, and weapons, both lethal and less lethal that are available to PRPD officers, including officers assigned to specialized tactical units. The comprehensive use of force policy shall clearly define and describe each force option and the circumstances under which use of such force is appropriate.

(12)    Develop, revise, and implement use of force policies, including related policies on each force implement or option available to PRPD officers, that:

   a.    define terms clearly and uniformly;
   b.    incorporate a use of force model that teaches disengagement, area containment, surveillance, waiting out a subject, and summoning reinforcements or calling in specialized units, as appropriate responses to a situation;
   c.    emphasize the goal of de-escalation and the use of advisements, warnings, and verbal persuasion, when appropriate;
   d.    advise that, whenever possible, individuals should be allowed to submit to arrest before force is used;
   e.    reinforce that the use of excessive force will subject officers to discipline, possible criminal prosecution, and/or civil liability;
   f.    ensure that sufficient less lethal alternatives are available to all officers and that officers are provided with appropriate requirements on the proper use of such less lethal alternatives;
   g.    prohibit the use of choke holds and similar carotid holds, except where lethal force is authorized;
   h.    provide that an intentional strike to the head with an instrument constitutes a use of lethal force;
   i.    emphasize that the continued use of force, even if initially justified, may become unreasonable if force is no longer necessary in the course of an arrest, investigatory stop, or other seizure;
   j.    require officers, immediately following a use of force or as soon as practicable, to inspect and observe subjects for injury resulting from the use of force and to obtain any necessary medical care; and
   k.    include canine deployment as a use of force, except in situations involving an on-leash article search or search of a non-fugitive missing person.

(13)    Require that all force implements, such as batons, chemical sprays, CEDs, and firearms be used and maintained in accordance with manufacturer specifications and PRPD policy.  PRPD should explicitly prohibit officers and other persons from altering or modifying force implements beyond manufacturer specifications and PRPD policy.

(14)    Revise and implement a use of firearms policy that complies with applicable law and current professional standards.  The firearms policy should:

a.   prohibit officers from possessing or using unauthorized firearms or ammunition and shall inform officers that failure to follow any disposition from the policy will result in disciplinary action;

b.   establish a single, uniform reporting system for all critical firearm discharges;

c.   prohibit officers from obtaining service ammunition from any source other than official PRPD channels, and specify the number of rounds that PRPD authorizes its officers to carry;

d.   require that all critical firearm discharges by officers, on- or off-duty, be reported and investigated;

e.   prohibit firing at or from a moving vehicle, unless the use of lethal force is justified, and prohibit officers from intentionally placing themselves in the path of a moving vehicle; and

f.   establish requirements that prohibit unholstering, drawing, or exhibiting a firearm, unless the officer reasonably believes that a situation may escalate to the point where lethal force would be authorized, and that delineate proper techniques when unholstering, drawing, or exhibiting a firearm.

(15)   Specify that officers must successfully qualify with their regulation firearm, including any other firearm they are authorized to use or carry on-duty, on an annual basis.  Officers who fail to re-qualify shall be relieved of police powers and immediately relinquish all firearms, including personal firearms.  Those officers who fail to re-qualify after remedial training within a reasonable time shall be subject to disciplinary action, up to and including, termination of employment.

(16)   Revise and implement PRPD's use of CED policy to ensure that it complies with applicable law and current professional standards.  The use of CED policy should:

a.   limit the use of CEDs to only those cases in which such force is necessary to protect the officer, the subject, or another party from physical harm, or is necessary to effectuate the arrest of an actively resisting subject, or to prevent the escape of that subject, and other less intrusive means are ineffective;

b.   require a verbal warning prior to the deployment of a CED, unless the warning would present a danger to the officer or others, and that, where feasible, the officer will defer deploying a CED a reasonable time to allow the subject to comply with the warning;

c.   require officers to minimize collateral injury to an individual, when feasible, by generally prohibiting CED deployment that may cause serious injury or death from situational hazards, including falling, drowning, losing control of a moving vehicle, or ignition from the presence of a potentially explosive or flammable material or substance;

d.   require that officers assess the need for continued CED deployment following each cycle that is applied against a subject, including whether the use of less intrusive force options are appropriate, and require that officers clearly articulate and justify each and every cycle used against a subject in written reports;

e.   provide protocols on the removal of CED probes, including a protocol requiring medical or specially trained PRPD personnel to remove probes embedded in a

subject's skin (as opposed to the subject's clothing), except for probes embedded in a subject's head, throat, groin, or other sensitive area, which should be removed by medical personnel only;

f.      require that officers report all CED discharges, except for training discharges, to their supervisor and the communications command center, as soon as possible; and

g.      require a supervisor to respond to the scene of a CED deployment and to conduct an initial review to determine the appropriateness of the CED deployment, including canvassing the scene to identify and interview potential witnesses.

(17)    Implement integrity safeguards on the use of CEDs to ensure compliance with PRPD policy, including conducting random audits of CED deployment data.  The audits should compare the downloaded data to the officer's report on use of force.  Discrepancies within the audits should be addressed and appropriately investigated.

(18)    Develop and implement a chemical spray policy that complies with applicable law and current professional standards.  The chemical spray policy should:

a.      limit the use of chemical spray to only those cases in which such force is necessary to protect the officer, the subject, or another party from physical harm, or is necessary to effectuate the arrest of an actively resisting subject, or to prevent the escape of that subject, and other less intrusive means are ineffective;

b.      require that, unless it would present a danger to the officer or others, a verbal warning to the subject that chemical spray will be used be issued prior to use, and that, where feasible, the officer will defer using chemical spray for a reasonable time to allow the subject to comply with the warning;

c.      require officers to target only the subject's face and upper torso when using hand-held chemical spray canisters;

d.      provide officers with guidance regarding the duration of a chemical spray burst and the distance from which it is applied;

e.      require that, absent exigent circumstances, officers decontaminate every subject exposed to chemical spray within 20 minutes of the application of chemical spray, and specify permissible and appropriate means of decontaminating a subject;

f.      require that officers request medical response or assistance for subjects exposed to chemical spray when they complain of continued effects after having been decontaminated, or they indicate that they have a pre-existing medical condition (e.g., asthma, emphysema, bronchitis, heart ailment, etc.) that may be aggravated by chemical spray;

g.      require that officers remove a subject exposed to chemical spray from a face-down position as soon as it is safe to do so;

h.      require that only agency-issued and approved chemical spray is used; and

i.      require that officers report all uses of chemical spray, except when used for training purposes, to their supervisor and the communications command center, as soon as possible.

89

(19)     Maintain an accounting of the number of chemical spray canisters annually distributed to, and used by, each officer.  Additionally, PRPD should account for all ammunition or other projectiles containing chemical irritants.  PRPD should continue to ban the use of Chloroacetophenone, or CN gas, by officers.

(20)     Develop and implement a crowd control and management policy that complies with applicable law and current professional standards.  The crowd control and management policy should include procedures on responding to civil disturbances and should:

a.     emphasize that all use of force, both lethal and less lethal, must be applied in a manner consistent with applicable law and professional standards;

b.     require that all use of force be reported, reviewed, and investigated;

c.     provide that a ranking officer or other higher-level PRPD official at the scene of a civil disturbance assume command and control of the incident, and:

(i)     assess the immediate situation for seriousness and the potential for escalation;

(ii)     determine the number of personnel and equipment necessary to contain and disperse the disturbance and relay this information to the communications command center; and

(iii)     establish a temporary command post to coordinate and relay information, as necessary;

d.     require that the ranking officer or official assuming control and command of a civil disturbance take reasonable and appropriate steps to ensure the safety of bystanders, including providing for the evacuation of bystanders, when feasible, from the immediate area of a civil disturbance;

e.     require the issuance of a dispersal order, absent exigent circumstances, prior to the deployment of crowd dispersal techniques, including use of force, in a manner reasonably calculated to be heard by the entire crowd under the circumstances and that provides a reasonable period of time for the crowd to disperse;

f.     provide for a range of command options to bring civil disturbances under control and disperse illegal gatherings, emphasizing, when feasible, area containment, advisements, and dialogue;

g.     prohibit the use of police canines for crowd control and management;

h.     require supervisory approval prior to deploying force as a crowd dispersal technique, including batons and chemical agents, and restrict the use of force beyond that necessary to make lawful arrests, as appropriate;

i.     prohibit the use of batons against members of a crowd who are attempting to disperse or are otherwise posing no imminent threat to officers or other persons, unless the baton is displayed or used in a pushing or leveraging motion as a justified and authorized crowd management technique against individuals who are intentionally disobeying or delaying dispersal subsequent to a lawful order to disperse.

## 2.    Use of Force Reporting and Review

Puerto Rico should require PRPD officers to report all use of force in writing and require supervisors to independently review each use of force to determine whether the use was in accordance with applicable law and agency policy.  The review should also determine whether corrective action, including disciplinary action, is necessary to prevent misconduct.  Specifically, Puerto Rico should:

(21)    Develop and implement a use of force reporting policy and use of force incident report. The use of force reporting policy should require officers to document all uses of force in writing. The use of force report form should indicate each and every type of force used and require the evaluation of each use of force.  Use of force reports should include the officer(s)' narrative description of the events preceding the use of force and the circumstances related to the use of force, including the subject(s)' behavior.  The use of force reporting policy should explicitly prohibit the use of boilerplate or conclusory language in all reports documenting use of force.

(22)    Require officers to notify the communications command center and their supervisor following any use of force or upon the receipt of an allegation of excessive force.  Supervisors should respond to the scene, examine the subject for injury, interview the subject for complaints of pain, and ensure that the subject receives medical attention from an appropriate medical provider, as necessary.

(23)    Require supervisors to review, evaluate, and document each use of force and complete the supervisor's narrative description section of the use of force report.  The supervisor's narrative description should include a precise description of the facts and circumstances that either justify or fail to justify the officer's conduct based on the supervisor's independent review of the facts and circumstances of the incident.  As part of the review, the supervisor should evaluate the basis for the use of force, determine whether the officer's actions were within PRPD policy, and assess the incident for tactical and training implications.  The supervisor should provide recommendations for corrective action, including disciplinary and non-disciplinary action, as necessary.  An officer who used force during the incident, whose conduct led to an injury, or who authorized conduct leading to the use of force or allegation of excessive force should not be eligible to review the incident.

(24)    Provide that supervisors reviewing an officer's use of force interview all witnesses to the use of force or injury resulting from the use of force.  Consistent with applicable law, supervisors should ensure that all officer witnesses provide a statement regarding the incident.  Supervisors should ensure that all use of force reports identify all officers who were involved in the incident or were on the scene when it occurred.  Supervisors should not ask officers or other witnesses leading questions that improperly suggest legal justifications for the officers' conduct.

(25)    Require that supervisors reviewing an officer's use of force consider all relevant evidence, including circumstantial, direct, and physical evidence, as appropriate, and make credibility determinations, if feasible.  Supervisors should make all reasonable efforts to resolve material inconsistencies between witness statements.  PRPD should train all of its supervisors on the factors to consider when evaluating credibility.

91

(26)    Require that supervisors reviewing an officer's use of force ensure that all reports indicate whether an injury occurred, whether medical care was provided, and whether the subject refused medical treatment.  Supervisors should ensure that all reports include contemporaneous photographs or videotapes taken of all injuries at the earliest practicable opportunity, both before and after any treatment, including cleansing of wounds.

(27)    Provide that a copy of the completed use of force report, including the supervisor's written review of each use of force, is forwarded to PRD and the supervisor's Regional Commander or higher ranking PRPD officer within five (5) days.

(28)    Require that a Regional Commander or higher ranking PRPD officer evaluate each supervisory review of an officer's use of force, identify any deficiencies in those reports, and require supervisors to correct any deficiencies.  Supervisors should be held accountable for the quality of their reviews.

### 3.    Critical Incident Review

(29)    Require that PRD respond to the scene of, and investigate, all incidents in which evidence of possible criminal misconduct by an officer exists and all serious uses of force.  PRD should evaluate the written supervisory review of the incident as part of its investigation.  PRD should complete its investigation of possible criminal misconduct and serious uses of force within 60 days of the incident.

(30)    Develop and implement critical firearm discharge and in-custody death review policies that comply with applicable law and current professional standards.  The policies should establish a specialized investigative unit or team composed of investigators from PRPD's Homicide Unit, PRD, and PRDOJ.  The specialized investigative unit or team shall respond to the scene and investigate all critical firearm discharges and in-custody deaths.

(31)    Provide that critical firearm discharge and in-custody death review policies include procedures for conducting investigations of critical firearm discharges and in-custody deaths that require:

      a.    an account of all shots fired, all shell casings, and the locations of all officers at the time the officer(s) discharged the(ir) firearm(s), including an account of all other force used by officers;

      b.    an investigator to conduct and preserve all appropriate ballistic or crime scene analyses, including gunshot residue or bullet trajectory tests, in the investigative file; and

      c.    completion of the investigation within 60 days of the incident.  Compelled statements from officers should be obtained in accordance with applicable law.

(32)    Provide that critical firearm discharge and in-custody death review policies require a command-level review team to evaluate all investigations involving critical firearm discharges and in-custody deaths.  The team should be chaired by the commanding officer or official who directly supervises PRD.  PRPD shall establish criteria for selecting the other members of the team.

(33)   Require that the command-level review team evaluating critical firearm discharge and in-custody death investigations:

a.   reviews all administrative and internal reports and investigations, including all PRD investigations and supervisory reviews (if applicable), for compliance with PRPD policies, as well as for tactical and training implications;

b.   interviews principal investigators and/or supervisors, as necessary;

c.   acts as a quality control mechanism for all critical firearm discharge and in-custody death investigations, with responsibility to return to the investigating unit all incomplete or mishandled investigations and/or supervisory reviews;

d.   conducts the command-level review contemporaneously with any criminal review, with due regard for compelled statements, and complete the command-level review, absent exceptional circumstances, within 90 days of the end of all criminal reviews;

e.   prepares a report for the Superintendent, upon completion of the command-level review, that should be made a part of the complete PRPD file regarding the incident and that includes a description of the incident (including all uses of force), a summary and analysis of all relevant evidence, proposed findings, and analysis to support those findings;

f.   includes specific determinations in the report regarding the following:

(i)   whether all uses of force during the encounter were consistent with PRPD policy and training;

(ii)   whether the officer(s) involved employed proper tactics; and

(iii)   whether lesser force alternatives reasonably were available;

g.   recommends to the Superintendent the non-disciplinary corrective action that should be taken;

h.   recommends revisions or amendments to investigative protocols and standards for all internal processes, including administrative investigations and/or supervisory reviews, to the Superintendent; and

i.   reviews all critical firearm discharges and in-custody deaths annually to detect patterns and/or problems and to report the findings and recommendations to the Superintendent.

**E.   Searches and Seizures**

PRPD should ensure that all searches and seizures, including investigatory stops and arrests, are conducted in accordance with the rights, privileges, or immunities secured or protected by the Constitution and/or laws of the United States.  Specifically, PRPD should:

(34)   Revise and implement investigatory stop and detention policies that comply with applicable law and current professional standards.  The policies should:

a.   define all terms clearly, including the terms "investigatory stop" and "reasonable suspicion;"

b.   require that all investigatory stops or detentions be based on reasonable suspicion;

c.      address pedestrian and motor vehicle stops;
d.      provide guidance on the facts and circumstances that should be considered in initiating, conducting, terminating, and expanding an investigatory stop or detention;
e.      provide guidance on the nature, scope, and duration of investigatory stops or detentions, including the level of permissible intrusion when conducting related searches, such as "pat downs" or "frisks;"
f.      explicitly prohibit the use of "canned" or conclusory language in all reports documenting the investigatory stop or detention; and
g.      explicitly prohibit officers from knowingly using or relying on information known to be materially false or incorrect in effectuating an investigatory stop or detention.

(35)    Require officers to document, in writing, all investigatory stops and detentions, including descriptive details regarding the stop or detention and any related searches that may have been conducted, and to submit the written report to their supervisors by the end of the shift in which the police action occurred.

(36)    Require supervisors to review the report to determine whether the stop and detention:

a.      was within PRPD policy;
b.      should result in a misconduct investigation by PRD;
c.      indicates a need for additional training or counseling, or any other non-disciplinary corrective measure, for the involved officer; and
d.      suggests the need for revising or reformulating agency policy, strategy, tactics, or training.  The supervisor shall document on an auditable form those investigatory stops and detentions that are unsupported by reasonable suspicion, are in violation of PRPD policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training.  The quality of these supervisory reviews shall be taken into account in the supervisor's performance evaluations.

(37)    Provide that a command-level officer or official review, in writing, all auditable forms concerning investigatory stops and detentions that are unsupported by reasonable suspicion, are in violation of PRPD policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training.  The commander should evaluate the corrective action and recommendations in the supervisor's written report and ensure that all appropriate corrective action is taken, including referring the incident for administrative or criminal investigation.

(38)    Revise and implement arrest policies that comply with applicable law and current professional standards.  The policies should:

a.      define all terms clearly, including the terms "arrest" and "probable cause;"
b.      prohibit the arrest of an individual with less than probable cause;
c.      provide guidance on effecting an arrest with and without an arrest warrant;
d.      provide guidance regarding the nature and scope of searches incident to an arrest;

94

e. explicitly prohibit the use of "canned" or conclusory language in all reports documenting an arrest; and

f. explicitly prohibit officers from knowingly using or relying on information known to be materially false or incorrect in effectuating an arrest.

(39)    Require that officers notify the communications command center and a supervisor immediately after an arrest, or as soon as practicable.  For felony arrests, PRPD should require a field supervisor to respond to the scene of the incident and approve the officer's arrest recommendation, based on the existence of justifiable probable cause and PRPD policy.

(40)    When transporting an arrestee, require that officers notify the communications command center of the starting and ending mileage on the transporting vehicle.  The officer should complete all written arrest forms and booking recommendations at the time an arrestee is presented at any PRPD precinct, station, or other unit for booking.

(41)     Require that the arresting officer take any arrestees with observable injuries or complaints of significant injury for immediate medical attention.

(42)    Require that all booking recommendations be personally reviewed and approved by a supervisor as to appropriateness, legality, and conformance with PRPD policies at the time the arrestee is presented at the precinct, station, or other unit.  The supervisory review should also include examining applicable arrest reports and forms for "canned" or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct.

(43)    Provide that, at the time of presentment at a PRPD precinct, station, or other unit, a watch commander or supervisor visually inspect each detainee or arrestee for injury, interview the detainee or arrestee for complaints of pain, and ensure that the detainee or arrestee receives medical attention from an appropriate medical provider, as necessary.

(44)    Require that supervisors evaluate each incident in which a person is detained or arrested for interfering with a police officer, resisting arrest, assault on a police officer, obstruction of justice, or other similar charge, to determine whether the incident raises any issue or concern regarding the basis for the arrest or implications for training, policies, or tactics.

(45)    Require that supervisors memorialize their review of arrests in writing.  As part of the supervisory review, the supervisor should document on an auditable form those arrests that are unsupported by probable cause, are in violation of PRPD policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training.

(46)    Require that a command-level officer or official review, in writing, all auditable forms related to arrests.  The commander should evaluate the corrective action and recommendations in the supervisor's written report and ensure that all appropriate corrective action is taken, including referring the incident to PRD for investigation.

(47)    Revise and implement policies on searches that comply with applicable law and current professional standards.  The policies should:

    a.      clearly define all terms;

    b.      provide guidance on the legal requirements for conducting searches, with and without a warrant;

    c.      provide guidance on the nature and scope of searches based on the level of permissible intrusion on an individual's privacy interests;

    d.      require that, when seeking a search warrant, an affidavit or sworn declaration supporting the application provides an accurate, complete, and clear description of the offense, the place or thing to be searched, scope of the search, and time and method of the search;

    e.      specify the procedures for executing searches, including handling, recording, and taking custody of seized property or evidence; and

    f.      require written documentation of all searches, including a complete and accurate inventory of all property or evidence seized, by the end of the shift in which the police action occurred.

(48)    Require that a supervisor review each request for a search or arrest warrant, including each affidavit or declaration filed by an officer in support of a warrant application, for appropriateness, legality, and conformance with PRPD policy.  The supervisor should assess the information contained in the warrant application and supporting documents for authenticity, including an examination for "canned" or conclusory language, inconsistent information, and lack of articulation of a legal basis for the warrant.

(49)    Provide that a supervisor review the operational plan for the execution of a search warrant and, when feasible, be present for execution of the search warrant.  Once executed, a supervisor should review the execution of the search warrant and document the review in writing.

(50)    Require that each precinct and specialized unit maintain a log listing each search warrant, the case file where a copy of such warrant is maintained, and the officer who applied for, and each supervisor who reviewed, the application for a search warrant.

(51)    Revise and implement policies to prohibit discriminatory conduct on the basis of race, ethnicity, national origin, sex, sexual orientation, or gender identity in the conduct of its law enforcement activities.  The policies should:

    a.      emphasize that arrests, traffic stops, investigative detentions, searches, and property seizures must be based, to the extent required by federal and Puerto Rico law, on legitimate and articulable reasons consistent with the standards of reasonable suspicion and probable cause;

    b.      restrict the use of race, ethnicity, national origin, sex, sexual orientation, or gender identity in establishing reasonable suspicion or probable cause to appropriate suspect-specific activities involving the identification of a particular person or persons;

    c.      apply the restrictions in this recommendation to requests for consensual searches of, and non-custodial encounters with, individuals;

    d.      emphasize that discriminatory policing will subject officers to discipline, possible criminal prosecution, and/or civil liability; and

    e.      include, as appropriate, provisions related to officer behavior during encounters that can serve to prevent perceptions of biased policing, including:

        (i)      introducing themselves at the time of the encounter;

        (ii)     stating the reason for the contact as soon as practicable, even if the individual does not ask; and

        (iii)    ensuring that the detention or encounter is no longer than necessary to take appropriate action for the known or suspected offense.

**F.**      **Policies and Procedures Generally**

Puerto Rico should ensure that all policies are comprehensive, comprehensible, up-to-date, and consistent with relevant legal standards and contemporary police practices. Specifically, PRPD should:

(52)    Develop and publish an agency policy and procedure manual governing all administrative and operational aspects of PRPD.  The agency policy and procedure manual should be organized by subject-matter area and indexed for reference.  PRPD should review and revise the manual at least annually, as necessary, or upon notice of a policy deficiency during agency audits or reviews.

(53)    Ensure that all PRPD officers and staff, including supervisors, receive a copy of the agency policy and procedures manual, in hard copy or electronically, and sign a statement indicating that they have read and understood the manual.

(54)    Advise all officers that taking police action in violation of PRPD policy shall subject officers to possible discipline, criminal prosecution, and/or civil liability.

(55)    Develop and implement standard operating procedures ("SOPs") that guide the function, operation, and administration of at least the following PRPD components:

    a.      Field Operations, including patrol, special and tactical operations, field support, special weapons and tactics, and canines;

    b.      PRD, including case and records management, administrative investigations, confidential investigations, critical firearm discharge reviews, in-custody death reviews, parallel criminal and administrative investigations, inspections, and officer drug testing;

    c.      Criminal Investigations, including sub-units assigned to investigate homicides, narcotics, vice, illegal firearms, and organized crime.

(56)    Revise and implement policies regarding off-duty officers who take police action to:

    a.      provide that off-duty officers shall notify on-duty PRPD or other local law enforcement officers before taking police action, absent exigent circumstances, so

that they may respond with appropriate personnel and resources to handle an incident;

b.    prohibit off-duty officers from carrying or using firearms or taking police action in situations when an officer's performance may be impaired or the officer's ability to take objective action may be compromised; and

c.    provide that, if it appears the officer has consumed alcohol or is otherwise impaired, the officer shall submit to field sobriety, breathalyzer, and/or blood tests.

## G.    Training

(57)    PRPD and the University College should coordinate and review all training to ensure quality, consistency, and compliance with applicable law and PRPD policy.  PRPD and the University College should conduct regular subsequent reviews, at least semi-annually, that are documented in writing.

(58)    PRPD and the University College should develop and implement appropriate training standards to ensure that officers attain and retain necessary knowledge, skills, and competencies, including establishing appropriate passing criteria, attendance and participation requirements, and valid evaluation methods.  PRPD and the University College should conduct regular needs assessments.

(59)    PRPD and the University College should establish appropriate accountability measures to ensure that officers successfully complete all necessary training programs in a timely manner, including taking disciplinary and non-disciplinary corrective action, as necessary.

(60)    PRPD and the University College should select, train, and certify qualified officer and academic instructors and should ensure that instructors teach only mandated objectives and approved lesson plans.  Instructors should engage students in meaningful dialogue regarding particular scenarios, preferably taken from actual incidents involving PRPD officers, with the goal of educating students regarding the legal and tactical issues raised by the scenarios.

(61)    The University College should keep adequate records of lesson plans and other training materials, such that the most current training documents are maintained in a central, commonly accessible file, and are clearly dated.

(62)    PRPD and the University College should continue to maintain training records regarding every PRPD officer that reliably indicate the training each officer has received.  The training records for each officer should, at a minimum, include the course description, duration, curriculum, and instructor.

(63)    PRPD and the University College should establish a curriculum and policy committee that will include core staff from the University College, a broad cross-section of PRPD field personnel, PRPD command staff, and a representative of PRPD's Legal Affairs Office.  The committee should review all training and procedures on at least a monthly basis to ensure compliance with applicable law and PRPD policy.  The committee should report its findings and recommendations in writing to the Superintendent and the University College's Board of Directors on a monthly basis.

(64)    PRPD and the University College should provide all PRPD officers with training on use of force on at least an annual basis and more often as necessary, based on developments in applicable law and PRPD policy.  Such training should include and address the following topics:

      a.     constitutional and other legal requirements regarding use of force;

      b.     PRPD's use of force policies;

      c.     proper use of force decision-making;

      d.     PRPD's use of force reporting requirements;

      e.     examples of scenarios faced by PRPD officers and interactive exercises that illustrate proper use of force decision-making;

      f.     the proper deployment and use of all intermediate weapons or technologies, including batons, chemical spray, canines, and CEDs;

      g.     de-escalation techniques that encourage officers to make arrests without using force, and instruction that disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, calling in specialized units, or delaying arrest may be the appropriate response to a situation, even when the use of force would be legally justified;

      h.     threat assessment;

      i.     crisis intervention and interactions with people with mental illnesses, including instruction by mental health practitioners and an emphasis on de-escalation strategies;

      j.     factors to consider in initiating or continuing a pursuit; and

      k.     appropriate training on conflict management.

(65)    PRPD and the University College should provide an appropriate firearm training program that:

      a.     requires officers to complete and satisfactorily pass firearm training and qualify for regulation and other service firearms, as necessary, on an annual basis;

      b.     requires cadets, officers in probationary periods, and officers who return from unarmed status to complete and satisfactorily pass firearm training and qualify for regulation and other service firearms, as necessary, before such personnel are permitted to carry and use firearms;

      c.     incorporates professional night training, stress training (i.e., training in using a firearm after undergoing physical exertion) and proper use of force decision-making training, including continuous threat assessment techniques, in the annual in-service training program; and

      d.     ensures that firearm instructors critically observe students and provide corrective instruction regarding deficient firearm techniques and failure to use safe gun handling procedures at all times.

(66)    PRPD and the University College should provide all PRPD officers with training on searches and seizures on at least an annual basis and, as necessary, based on developments in applicable law and PRPD policy.  Such training shall include and address the following topics:

      a.     constitutional and other legal requirements related to searches and seizures;

      b.     PRPD policies regarding searches and seizures; and

      c.        examples of scenarios faced by PRPD officers and interactive exercises that illustrate proper police practices, methods, and tactics in conducting consensual field interviews, investigatory stops, and arrests.  These training scenarios shall address the difference between various police contacts by the scope and level of police intrusion; between probable cause, reasonable suspicion and mere speculation; and between voluntary consent and mere acquiescence to police authority.

(67)     PRPD and the University College should provide all PRPD officers with training on biased-free policing on at least an annual basis and, as necessary, based on developments in applicable law and PRPD policy.  Such training shall include and address the following topics:

      a.        police and community perspectives related to discriminatory policing;
      b.        constitutional and other legal requirements related to equal protection and unlawful discrimination;
      c.        the protection of civil rights as a central part of the police mission;
      d.        arbitrary classifications and stereotyping based on race, ethnicity, national origin, sex, sexual orientation, or gender identity;
      e.        data regarding racial/ethnic/national origin discrimination in policing and the criminal justice system;
      f.        identification of key decision points in which prohibited discrimination can occur at both the incident and strategic-planning levels; and
      g.        methods, strategies, and techniques to reduce misunderstanding, conflict, and complaints due to perceived bias or discrimination, including problem-oriented policing strategies.

(68)     PRPD and the University College should provide supervisors with training in the appropriate evaluation of written reports, including what constitutes a fact-based description and the identification of catch phrases and/or conclusory language not supported by specific facts (or "canned" or perfunctory language) that so regularly appear in police reports that their inclusion requires further explanation by the reporting officer.

(69)     PRPD supervisors should receive leadership and command accountability training and learn techniques designed to promote proper police practices.  This training shall be provided to all PRPD supervisors upon assuming supervisory responsibilities and should be made part of annual in-service training.

(70)     PRPD and the University College should provide training on risk assessment and risk management to all PRPD supervisors, including the operation of the early identification system database.

(71)     PRPD and the University College should provide training to supervisors on fostering positive career development and imposing appropriate disciplinary sanctions and non-disciplinary corrective action, such as counseling.

(72)     PRPD and the University College should provide training on appropriate burdens of proof, interview techniques, and the factors to consider when evaluating officer, complainant or

witness credibility to all officers who conduct investigations to ensure that their investigative findings, conclusions, and recommendations are unbiased, uniform, and legally appropriate.

(73)     PRPD should develop and establish a field training program.  PRPD should develop an implementation plan that provides a time table for full implementation and specifies all program requirements, including management and oversight of the program, development of policies and procedures, selection and training of field training officers, program duration, training standards, assessment methods, and ongoing quality improvement.  The implementation plan and field training program should comply with applicable law, PRPD policy, and current professional standards.

## H.    Supervision

(74)     PRPD should develop and implement a plan to ensure that an adequate number of supervisors are deployed in the field to provide supervision consistent with generally accepted professional standards.

(75)     Supervisors of field operation, investigation, and specialized units should provide daily field presence and maintain an active role in unit operations.  Unit supervisors should brief the Regional Commander regularly regarding the activities of their unit, and shall coordinate unit activities with other unit supervisors.

(76)     Regional Commanders should be responsible for ensuring that supervisors exercise proper control and oversight of the units in their command, including units' tactical and investigative operations.

## I.    Discipline

(77)     Puerto Rico and PRPD should ensure that adequate resources are provided to eliminate the backlog of unresolved complaint investigations and disciplinary cases.

(78)     PRPD should establish guidelines, consistent with applicable law, dictating the maximum period of time that should elapse between each stage of the disciplinary process.

(79)     PRPD should create a disciplinary matrix that:

   a.    establishes a presumptive range of discipline and/or corrective action for each type of rule violation;
   b.    increases the presumptive discipline based on both an officer's prior violations of the same rule as well as violations of other rules;
   c.    requires that any departure from the presumptive range of discipline must be justified in writing;
   d.    provides that PRPD will not take only non-disciplinary corrective action in cases in which the disciplinary matrix calls for the imposition of discipline; and
   e.    provides that PRPD will consider whether non-disciplinary corrective action also is appropriate in a case where discipline has been imposed.

**J.      Civilian Complaints and Internal Investigations**

(80)      Puerto Rico should develop and implement a program to inform persons that they may make complaints regarding the performance of any officer.  This program should include distribution of complaint forms, fact sheets, informational posters, and public service announcements that describe the civilian complaint process.

(81)      Puerto Rico and PRPD should ensure that complaint forms and informational materials are easily accessible by making them available at appropriate government locations, including PRPD headquarters, stations, and substations; other government properties; over the Internet; and, upon request, to community groups, community centers, or members of the public.

(82)      At PRPD headquarters and each station and substation, PRPD should permanently post a placard describing the external complaint process that includes relevant contact information, such as telephone numbers and websites.  These placards should be displayed in both English and Spanish.  PRPD should require that all officers carry informational brochures and complaint forms, in English and Spanish, in their vehicles at all times while on duty.  If a civilian objects to an officer's conduct, that officer should inform the civilian of his or her right to make a complaint.

(83)      PRPD should require that all officers and employees report misconduct or potential criminal behavior by PRPD officers or employees to a supervisor and PRD.

(84)      Puerto Rico and PRPD should expressly prohibit all forms of discouragement, intimidation, coercion, or retaliation against any person who makes a complaint.

(85)       PRPD should accept all complaints, including anonymous and third-party complaints, for review and investigation.  Individuals should be able to make complaints in writing or verbally, in person or by mail, telephone (or TDD), facsimile, or email.  PRPD should also require officers and employees to take complaints received in the field.

(86)      All complaints should be forwarded to PRD within 24 hours, absent exceptional circumstances.

(87)      PRD should maintain a centralized numbering and tracking system for all complaints.  Upon the receipt of a complaint, PRD should promptly assign a unique numerical identifier to the complaint, which should be provided to the complainant.

(88)      PRD should determine whether the complaint will be assigned to a line supervisor for a chain-of-command investigation, retained by PRD for investigation, or referred to PRDOJ for criminal investigation.  PRPD should develop and implement a complaint classification protocol to guide PRD in determining whether a complaint will be assigned for a command investigation, retained for investigation by PRD, or referred to PRDOJ for criminal investigation.  If PRD refers a complaint for a command investigation, copies of all documents, findings, and recommendations should be forwarded immediately after the investigation is complete to PRD for tracking, monitoring, quality control, and adherence to PRPD policy.

(89)      PRD's centralized numbering and tracking system should maintain accurate and reliable data regarding the status of all complaints, from initial intake to final disposition, including all

instances in which the complainant is notified regarding the status of the investigation. Data from the system should be reviewed periodically to assess compliance with PRPD policies and procedures, including requirements on the timeliness of administrative investigations. The system should facilitate the production of reports and should contain information that includes, but is not limited to, the nature and type of complaint, the incident date, the name(s) of the complainant(s) and target officer(s), and PRPD region, precinct, and unit involved.

(90)    PRPD should investigate and resolve all complaints in writing. PRPD should adopt a single policy concerning the investigation of complaints, regardless of whether the investigation is assigned to PRD, a line supervisor, or any other PRPD officer or employee. Complaints should be evaluated based on a preponderance of the evidence standard.

(91)    PRPD should require that all command investigations be completed within 45 days of the date of referral by PRD, including intake, investigation, adjudication, and command approval. All other administrative investigations conducted by PRD should be completed within 60 days of the date of referral, including intake, investigation, adjudication, and command approval.

(92)    PRPD should explicitly prohibit an officer from investigating a use of force incident if that officer used force during the incident, led to the injury to a person, or authorized the conduct that led to the reported incident.

(93)    PRPD should establish comprehensive procedures and training on administrative and criminal investigations consistent with applicable law and current professional standards. The comprehensive procedures and training should address all aspects of administrative and criminal investigations, including appropriate management and oversight of investigative operations.

(94)    PRPD should establish investigation procedures and train all of its investigators on factors to consider when evaluating complainant or witness credibility; examination and interrogation of accused officers and other witnesses; identifying misconduct, even if it is not specifically named in the complaint; and using the preponderance of the evidence standard as the appropriate burden of proof. Consistent with applicable law, PRPD investigators should ensure that all involved officers on the scene of an incident provide a statement regarding the incident. The policy should require that all interviews that may be essential to the outcome of an investigation be mechanically or digitally recorded using an appropriate recording device, unless the interviewee refuses to allow recording. All recordings should be stored and maintained in a secure location within PRD.

(95)    PRPD should enforce its policy requiring officers to cooperate with administrative investigations, including appearing for an interview when duly summoned by a PRPD investigator. Supervisors should be notified when an officer under their supervision is summoned as part of an administrative investigation and should facilitate the officer's appearance, absent extraordinary and documented circumstances.

(96)    PRPD should provide all investigators with clear guidance regarding the handling of criminal misconduct allegations, including referring such allegations to internal or external agencies for criminal investigation and specifying the entity or individual responsible for determining whether a complaint will be investigated criminally. PRPD should continue to require that an administrative investigation be completed, irrespective of the initiation or

outcome of criminal proceedings, provided that the administrative investigation does not interfere with or jeopardize a criminal investigation or proceeding.

(97)    PRPD should develop and implement a protocol for compelled statements that complies with applicable law and current professional standards.

(98)    In each investigation, PRPD should consider all relevant evidence including circumstantial, direct, and physical evidence, as appropriate, and make credibility determinations, if feasible.  PRPD should not automatically prefer an officer's statement over a non-officer's statement, nor should PRPD completely disregard a witness' statement merely because the witness has some connection to the complainant.  PRPD should make efforts to resolve material inconsistencies between witness statements.

(99)    PRPD should not close an investigation simply because the complaint is withdrawn or the alleged victim is unwilling or unable to provide medical records or proof of injury or the complainant will not provide additional statements; rather, the investigating agency should continue its investigation, as necessary, to determine whether the original allegation(s) can be resolved based on the information, evidence, and investigatory procedures and techniques available.  In each investigation, the fact that a complainant pled guilty or was found guilty of an offense should not be considered as evidence of whether a PRPD officer used or did not use a type of force, nor should it justify discontinuing the investigation.

(100)   PRPD should require that administrative investigations determine, as necessary, whether:

   a.    the police action was in compliance with policy, training, and legal standards, regardless of whether the complainant suffered harm;
   b.    the incident involved misconduct by any officer;
   c.    the use of different tactics should or could have been employed;
   d.    the incident indicates a need for additional training, counseling, or other non-disciplinary corrective measures; and
   e.    the incident suggests that PRPD should revise its policies, strategies, tactics, or training.

(101)   The complainant should be kept informed periodically regarding the status of the investigation.  The complainant should be notified of the outcome of the investigation, including an appropriate statement regarding whether any disciplinary or non-disciplinary action was taken.  PRPD should notify the complainant that he/she may appeal the outcome of the investigation to the CIPA within 30 days of receipt of PRPD's final determination.

(102)   Each allegation in an administrative investigation should be resolved by making one of the following dispositions:

   a.    "Unfounded," when the investigation determines, by a preponderance of the evidence, that no facts support that the incident complained of actually occurred;
   b.    "Sustained," when the investigation determines, by a preponderance of the evidence, that the person's allegation is supported by sufficient evidence to determine that the incident occurred and the actions of the officer were improper;

    c.       "Not Sustained," when the investigation determines, by a preponderance of the evidence, that insufficient facts exist to decide whether the alleged misconduct occurred; and

    d.       "Exonerated," when the investigation determines, by a preponderance of the evidence, that the alleged conduct did occur but did not violate PRPD policies, procedures, or training.

(103)   PRPD should require supervisors to review and take appropriate disciplinary or non-disciplinary corrective action, where warranted, when he/she becomes aware of potential misconduct or criminal behavior by an officer under his or her command.  PRPD should also require unit commanders to evaluate each investigation of an incident under their command to identify underlying problems, including potential deficiencies in supervision and training.  Any such deficiencies or other identified needs should be relayed to the appropriate PRPD unit for corrective action at the officer or agency level, where warranted.

(104)   PRPD should develop and implement written requirements for investigator positions in PRD, which include the applicant's complaint and discipline history and investigative experience.  Officers with a sustained complaint of, or who have been disciplined for, excessive use of force, false arrest or charge, unlawful search or seizure, sexual harassment, discrimination, or dishonesty should be disqualified from PRD positions, unless the PRD commanding officer or official recommends and the PRPD Superintendent approves, the selection of the officer despite such complaint or discipline.

(105)   PRPD should establish a term of duty of up to three years for PRD officers and supervisors who conduct investigations, and should reappoint an officer to a new term of duty only if that officer has performed satisfactorily based on an appropriate annual performance evaluation.

(106)   Puerto Rico and PRPD should provide PRPD units and officers with sufficient resources and equipment to conduct adequate criminal and administrative investigations.

## K.   Risk Management

(107)   PRPD should develop and implement an early identification system to include a new computerized relational database for maintaining, integrating, and retrieving information necessary for supervision and management of the entire PRPD.  PRPD should regularly use this data to promote civil rights and professional police practices, manage risk and liability, and evaluate the performance of PRPD officers across all ranks, units, and shifts.

(108)   The early identification system should collect and record a minimum data set to competently develop a risk profile for each officer and identify potential patterns of at-risk behavior, including all uses of force, complaint history, discipline, training history, judicial proceedings involving domestic disputes, and commendations and awards.

(109)   The early identification system should include, for the incidents included in the database, appropriate identifying information for each involved officer (e.g., name, badge number, shift, and supervisor) and civilian (e.g., race, ethnicity, or national origin, if available).

(110)   PRPD should develop and implement a protocol on the use of the early identification system that addresses the following components:  data storage, data retrieval, reporting, data analysis, pattern identification, supervisory assessment, supervisory intervention, documentation and audit, and data retention.

(111)   PRPD should enter information into the early identification system in a timely, accurate, and complete manner, and maintain the data in a secure and confidential manner.

(112)   Prior to implementation of the new early identification system, PRPD should continue to use existing databases and resources, to the fullest extent possible, to identify patterns of conduct by PRPD officers or groups of officers.

(113)   PRPD should incorporate, in a meaningful way, its expectations regarding biased-free policing and equal protection into its hiring, promotion, and performance assessment processes, including appropriately evaluating an individual's character, reputation, and documented history with regard to biased attitudes and behavior through personal interviews, interviews with acquaintances and associates, review of relevant social-networking websites, and review of civilian complaints, as appropriate.

(114)   PRPD should develop a protocol for conducting audits to be used by each officer or supervisor charged with conducting audits.  The protocol should establish a regular and fixed schedule to ensure that such audits occur with sufficient frequency and cover all PRPD units and Regional Commands.  Each audit conducted by PRPD should be documented in a report that provides the methodology, data sources, analyses, conclusions, and recommendations to address any identified deficiencies or areas in need of improvement.

(115)   PRPD should issue a report to the Superintendent on the result of each audit and examine whether there is consistency throughout PRPD.  PRPD should also provide the reports to each precinct or specialized unit commander.  The commander of each precinct or specialized unit should review all audit reports regarding employees under their command and, if appropriate, should take non-disciplinary corrective action or disciplinary action.

(116)   PRPD should develop and implement a plan for organizing and executing regular, targeted, and random integrity audit checks, or "sting" operations (hereinafter "sting audits"), to identify and investigate officers engaging in at-risk behavior, including:  unlawful stops, searches, seizures (including false arrests), excessive uses of force, potential criminal behavior, or other patterns of misconduct.  These operations should also seek to identify officers who discourage the filing of a complaint or fail to report misconduct or complaints.  PRPD should use the relevant early identification system data, and other relevant information, in selecting targets for sting audits.  Sting audits should be conducted each fiscal year.

(117)   PRPD should continue to operate video cameras in all currently equipped vehicles and should repair or replace all non-functioning video cameras, as appropriate.

(118)   PRPD should conduct and document periodic random reviews of police vehicle camera videotapes for training and integrity purposes.  PRPD should require periodic random surveys of police vehicle video recording equipment to confirm proper working order.

(119)   PRPD should develop and implement protocols regarding the supervision and management of specialized units and undercover assignments to ensure compliance with applicable law and PRPD policy regarding use of force, searches and seizures, and discriminatory policing.  Specialized units include TOUs, Special Operations Units, Specialized Tactical Units, Special Weapons and Tactics Units, and the Drug, Vice, and Illegal Firearm Units.

(120)   PRPD should develop and implement appropriate eligibility criteria to select and retain qualified officers and supervisors to serve in specialized units and undercover assignments, and exclude officers and supervisors who may be unprepared or unfit to participate in such units or assignments.  PRPD should disqualify for service on a specialized unit or undercover assignment any officer or supervisor who has generated sustained complaints or adverse judicial findings for use of excessive force, improper search or seizure, false arrest or charge, sexual harassment, discrimination, or dishonesty; is under criminal investigation; or has otherwise engaged in illicit activities, including illegal drug use.

(121)   PRPD should establish pre-screening mechanisms to ensure that all eligibility criteria are met for officers and supervisors selected to participate in specialized units and undercover assignments, including determining whether the officer:

   a.   has completed all probationary requirements;
   b.   is current with all firearm and service weapon certifications, as necessary;
   c.   has demonstrated a proficiency in a variety of law enforcement activities, interpersonal and administrative skills, cultural and community sensitivity, and a commitment to police integrity; and
   d.   has received a positive evaluation based on the officer's relevant and appropriate early identification system record.

(122)   PRPD should screen officers interested in participating in specialized units or undercover assignments on an ongoing basis to develop and maintain a pool of seasoned and competent officers with exemplary records and up-to-date training.

(123)   PRPD should ensure that a sufficient number of trained supervisors exist to ensure appropriate supervision of officers assigned to a specialized unit or undercover assignment. Supervisor training should consist of appropriate pre-service and ongoing training in the operation and management of the specialized unit or undercover assignment to ensure compliance with relevant laws and PRPD policy.

(124)   PRPD should provide adequate pre-service and ongoing training to officers in specialized units and undercover assignments to ensure compliance with relevant laws and PRPD policy, including addressing the desired knowledge, skills, and abilities of the officers participating in the unit or assignment.

(125)   PRPD should track all activities relating to officers participating in a specialized unit or undercover assignment, including enforcement actions, complaints, and misconduct investigations, to enable supervisors to determine whether particular officers should be allowed to continue participating in a specialized unit or undercover assignment.  PRD should inform

commanding officers of specialized units or undercover operations of any complaint received regarding the conduct of an officer in a specialized unit or undercover assignment.

## L.    Oversight and Community Engagement

(126)   PRPD should establish and conduct a Community Outreach and Public Information program in each PRPD Regional Command area.  The Community Outreach and Public Information program should require semi-annual open meetings in each of PRPD's 13 Regional Commands to inform the public about its specific reform efforts and the various methods of filing a complaint against an officer.  Puerto Rico should provide sufficient advance notice and publicity for the meetings in English and Spanish.

(127)   The open public meetings should include presentations and information on PRPD and PRPD operations designed to enhance interaction between officers and community members in daily policing activities.  The presentations shall include the following subject areas, with appropriate safeguards to protect ongoing criminal or administrative investigations, confidential or privileged information, or personal information protected from disclosure by applicable laws:

      a.    statistics on arrests, motor vehicle and pedestrians stops, use of force, and geographic deployment of specialized tactical units, broken down by each PRPD Regional Command and precinct, including statistics on race, ethnicity, national origin, and gender;

      b.    a summary of all audits completed and any significant action taken as a result of such audits;

      c.    a summary of all discipline imposed during the period, reported by type of misconduct and broken down by type of discipline, Regional Command, and rank; and

      d.    a summary of all new policies or changes in policies made by PRPD related to civil rights.

(128)   PRPD should continue to use community advisory groups in each Regional Command area and meet periodically with the communities they serve.  PRPD shall establish a liaison, through its community relations units, with members of minority communities to foster dialogue, solicit feedback, increase opportunities for positive interaction, constructively address perceptions and concerns regarding biased policing, and encourage minority group participation in policing activities, including officer recruitment and training.

(129)    PRPD should establish a command-level liaison committee consisting of PRPD command officers who communicate, on at least a monthly basis, with representatives of criminal justice agencies in all regions in Puerto Rico, including judicial courts, prosecutors, and municipal police departments.  The committee should seek feedback and information on performance issues or concerns related to PRPD, its officers, employees, or units.  All PRPD commanders and staff who participate in the command-level liaison committee should ensure that all allegations of misconduct or potential criminal activity are referred to PRD and other pertinent law enforcement agencies.

(130)   Puerto Rico should provide for independent civilian review of PRPD.  The members of the civilian review body should represent a cross-section of the communities in Puerto Rico. CIPA's enabling statute should be amended to increase the number of commissioners and ensure that half of these commissioners are selected by a panel of non-government civil rights organizations instead of the Governor.  If CIPA is not to assert its civilian review role, a new civilian review body should be established.  The civilian review body should develop a program to inform persons that they may make complaints regarding the performance of any officer.  This program will include distribution of complaint forms, fact sheets, informational posters, and public service announcements that describe the civilian complaint process.

(131)   The civilian review body should develop and implement a protocol for the intake, referral, investigation, and disposition of complaints against PRPD consistent with national guidelines and best practices.  The civilian review body should be empowered to access and review PRPD investigations concerning civilian complaints against PRPD.

(132)   PRPD should provide the civilian review body with intake information regarding all complaints received.  PRPD should keep the civilian review body informed on a monthly basis regarding the status and disposition of all complaint investigations.  The civilian review body should review all civilian complaints alleging retaliation against a complainant for reporting possible misconduct or at-risk behavior by a PRPD officer.  The civilian review body should evaluate PRPD investigations to determine whether they conform to applicable standards and requirements.

(133)   The civilian review body should issue a publicly available, semi-annual report summarizing its review activities.  The report should include recommendations on corrective action to address identified deficiencies and promote civil rights protections within PRPD.

# VI.    CONCLUSION

We value the hard work and dedication of the men and women of PRPD who have sworn to protect and serve the people of Puerto Rico.  We also appreciate the great risk that policing entails and the many public safety challenges confronting Puerto Rico.  To meet these challenges, officers are entrusted with unequaled powers, including the authority to use force and detain individuals, to enforce the law and maintain order.  This authority is not unlimited and carries significant responsibilities.  PRPD's motto, *Proteccion, Integridad* ("Protection, Integrity"), showcases these responsibilities and sets out PRPD's vision for ensuring the safety of the people of Puerto Rico while adhering to the highest professional, ethical, and legal standards.  Unfortunately, far too many PRPD officers have broken their oath to uphold the rule of law, as they have been responsible for acts of crime and corruption and have routinely violated the constitutional rights of the residents of Puerto Rico.  These officers have frequently subjected the very people they swore to protect to unreasonable force and unlawful searches and seizures.  In addition, when faced with public demonstrations, PRPD relies on tactics that violate the free speech rights of demonstrators and the press.

The patterns and practices of civil rights violations we identified are profound.  They are the result of chronic institutional and systemic deficiencies that directly contribute to repeated violations of the Constitution and federal law.  PRPD does not currently provide its officers with sufficient or appropriate training, guidance, discipline, or supervision.  As a result, PRPD both fails to equip its officers with the necessary skills to effectively serve the public and address officer misconduct in a timely or effective manner.  Outdated policies and ineffective external oversight exacerbate PRPD's failure to ensure constitutional policing and contribute to continuing violations that erode the public's confidence in its efforts.

To date, Puerto Rico has failed to adequately address the causes that contribute to both its unconstitutional law enforcement and ineffective policing.  Puerto Rico must act decisively, transparently, and immediately to restore the public's trust and correct PRPD's pattern of unconstitutional policing.  We have outlined the minimum measures necessary to remedy PRPD's pattern of constitutional violations.  Implementing these steps, with the oversight of the federal courts, will place PRPD on the path to lasting reform and permit PRPD to meet its public safety challenges while respecting the constitutional rights of the people of Puerto Rico.  We look forward to working with the Commonwealth, PRPD, and the University College to ensure that these efforts succeed.

ENDNOTES

[1]     Throughout this report, "pattern and practice" refers to conduct of PRPD officers that constitutes a pattern, practice, or both.

[2]     Nagourney, Adam, *In Los Angeles, A Police Force Transformed*, New York Times, Aug. 11, 2011, http://www.nytimes.com/2011/08/13/us/13lapd.html?pagewanted=1

[3]     Arturo Negrón García et al., *Report of the External Evaluating Committee of the Puerto Rico Police* (Dec. 21, 2007); Arturo Negrón García et al., *Report of the External Evaluating Committee of the Puerto Rico Police: Corruption in the Puerto Rico Police* (May 1, 2008).

[4]     Arturo Negrón García et al., *Report of the External Evaluating Committee of the Puerto Rico Police* at 20 (Dec. 21, 2007);

[5]     Press Release, La Fortaleza, "Gobernador nombra Monitor Independiente para supervisor a la Policía," Sept. 24, 2010, *available at* http://www.fortaleza.gobierno.pr/2011/news.php?cnt_id=562.

[6]     PRPD also has an additional 9,041 inactive officers on its personnel rolls. Puerto Rico Office of the Controller, PRPD Audit Report DA-09-27, Audit No. 12781 at 13 (May 27, 2009).

[7]     The national average is 2.2 officers per 1,000 residents for jurisdictions with 250,000 residents or more. U.S. Dep't.of Justice, Office of Justice Programs, Bureau of Justice Statistics, Local Police Departments 2007, Law Enforcement Management and Administrative Statistics at 9 (Dec. 2010). This figure does not include municipal police officers.

[8]     P.R. Office of Mgmt. & Budget, Government of Puerto Rico, Proposed Budget for 2011-12, Statistical Table of Federal Funds to Puerto Rico Distributed by Agency, FY 2009-2012; Statistical Table of American Recovery and Reinvestment Act Distributed by Agency, FY 2009-2012, *available at* http://www.presupuesto.gobierno.pr.

[9]     Crime statistics for Puerto Rico were obtained from PRPD, *available at* http://www.policia.gobierno.pr. National crime statistics were obtained from the FBI, *available at* http://www.fbi.gov/stats-services/crimestats.

[10]     Puerto Rico Police Department, *Crime Clearance Rate Report*, PR S.B. 595 (Aug. 30, 2010).

[11]     The reports are available at http://www.nyclu.org/news/nyclu-releases-16-years-of-nypd-corruption-reports. There are approximately 34,500 uniformed officers in NYPD, http://www.nyc.gov/html/nypd/html/faq/faq_police.shtml#1.

[12]     Press Release, FBI, San Juan Division, "Two Law Enforcement Officers Convicted for Participation in Drug Transaction," Dec. 9, 2010, *available at* www.sanjuan.fbi.gov.

[13]     Judgment, *People v. Mercado Irizarry*, KBD2009G0925-6; KFJ2009G0013-15; KFJ2009M0005-6; and KLE2009G0321 (Dec. 16, 2009).

[14]     *U.S. v. Flores Vázquez*, No. 08-CR-0436 (D.P.R. filed on Dec. 18, 2008).

[15]     Indictment, *U.S. v. Quiñones Rosario*, No. 09-CR-00246 (D.P.R. July 23, 2009). Plea Agreement filed on August 5, 2010.

[16]     Administrative Leave, Legal Affairs Card, SAOC-1-2-334 (Sept. 18, 2008). Judgment, *People v. Semidey Rivera*, JEG2008G0010 (June 15, 2006).

---

[17]     *People v. Ramos Santiago*, JLE2008G0490 to 92.

[18]     *People v. López Martínez*, BVI2007G009.

[19]     We did not include civil suits filed before 2004, although they may have been resolved within the period of our review.  *See, e.g.*, Carmen *Guzmán v. ELA*, DDP2001-0081 (illegal search; $51,496.03 paid on July 10, 2009); *Ortiz Ortiz v. Policía*, IDP2002-0260 (illegal seizure; $76,500.75 paid on July 10, 2009); *Rodríguez Santiago v. ELA*, JDP 2000-0522 (illegal stop; $93,277.81 and $5,783.17 paid on Feb. 1, 2010); *Casanova García v. ELA*, CDP 2001-0322 (illegal arrest; $50,000 paid on Feb. 27, 2009); *Irizarry Irizarry v. ELA*, JDP 20040544, KLCE200501631 (2005 Westlaw 3741500) (illegal search; $30,000 paid on May 11, 2010); *López Méndez v. ELA*, KDP20031248 (503), KLAN200700494 (2008 Westlaw 2885958) (illegal search and detention) ($142,269.86 paid on Nov. 7, 2008).

[20]     *People v. Pagán Cruz*, HSCR2007-1965-1966.

[21]     Complaint, *Pérez Liz et al v. Toledo Dávila, et al*, No. 08-CV-1659 (D.P.R. filed on June 17, 2008).

[22]     *People v. Pérez Liz*, DLA2007G0875, DLA2007G0875 and DVI2007G0081.Verdict, *Pérez Liz v. Toledo Dávila*, entered on Mar. 25, 2010.

[23]     Complaint, *Cruz Santiago v. Alvarez Boneta, et al.,* No. 08-CV-1311 (D.P.R. filed on Mar. 14, 2008).

[24]     Press Release, Puerto Rico Dep't. of Justice, "Criminal Charges Filed Against Officer Pedro Cruz Sierra," Mar. 13, 2009; Guilty Plea, *People v. Cruz Sierra*, FIC2009G0009 (Apr. 28, 2009).

[25]     Order, *Rodríguez Rivero et al v. Commonwealth of Puerto Rico Police Department, et al.,* No. 08-CV-1016 (D.P.R. entered on Nov. 5, 2009).  Jury Verdict entered on Nov. 10, 2009.

[26]     Complaint, *Leyva Ramos et al v. Toledo Dávila, et al*, No. 07-CV-1178 (D.P.R. filed on Mar. 1, 2007).

[27]     Joint Pretrial Memorandum filed on March 16, 2010.

[28]     *See, e.g.*, CDC, Annual Report 2009-2010 at 16-17 (discussing the requirements of Law 141 of July 3, 1999 requiring police offices to visibly display an identification number and CDC letters to the Superintendent following protests in June and October 2009 in which a significant number of officers were observed not wearing an identification number).

[29]     Arturo Negrón García, *et al.*, *Report of the External Evaluating Committee of the Puerto Rico Police* at 12 (Dec. 21, 2007).

[30]     *Id.*

[31]     The University Avenue incident was not the only confrontation between PRPD officers and the student community.  Numerous clashes between protesting students and officers took place during a 58-day student strike – from April 23 to June 17, 2010 – on various UPR campuses.  On May 4, 2010, officers entered the Río Piedras campus after students reportedly blocked access to the campus gates.  Students and journalists reported that officers, who had removed their name badges, struck them repeatedly with batons.  Confrontations between students and police continue.  One of the most violent of these occurred on February 9, 2011, inside the UPR Río Piedras campus.

[32]     David Helfeld, Carlos Ramos Bellido, William Vázquez Irizarry, *Report of the Commission Investigating the Incidents of August 21, 2009* at 4 (Sept. 25, 2009).

[33]     Nydia Bauzá& Maritza Díaz Alcaide, *Motín en Actividad de Fortuño por Huelga en la UPR*, Primera Hora, May 21, 2010.

[34]     Memorandum from Lt. Reinaldo Santiago González to Lt. Col. Miguel A. Mejías Cruz (May 21, 2010).

[35]     CRC, Resolution 2010-14, "Resolution to Investigate the Events Transpiring on May 20, 2010 at the Hotel Sheraton, San Juan, Puerto Rico," (Dec. 14, 2010).

[36]     *Id.*

[37]     PRPD, October 25, 2010, Memorandum.

[38]     *See* CRC resolution 2010-014 (Dec. 14, 2010).

[39]     CRC, Resolution 2010-10, "Resolution to Investigate the Events Transpiring on June 30, 2010 at the Capitol, San Juan, Puerto Rico," (July 2, 2010).

[40]     *Id.*

[41]     *See* CRC Resolution 2011-01, "Resolution to Investigate the Events Transpiring in the University of Puerto Rico," (Feb. 14, 2011).

[42]     *Id.*

[43]     Arturo Negrón García, *et al.*, *Report of the External Evaluating Committee of the Puerto Rico Police* at 12 (Dec. 21, 2007).

[44]     Merriam-Webster Dictionary, Medical Terms, *available at* http://www.merriam-webster.com/medical/celiac+plexus.

[45]     Office of Community Oriented Policing Services, Dep't of Justice, *2011 Electronic Control Weapon Guidelines* 13 (2011).

[46]     NYPD, Office of Management Analysis and Planning, "Annual Firearms Discharge Report, 2009," vii (2009), *available at* http://www.nyc.gov/html/nypd/html/analysis_and_planning/reports.shtml; "NYPD Shooting Restraint," Officer Discharges, Data from 1971-2010, *available at* http://www.nyc.gov/html/nypd/html/analysis_and_planning/reports.shtml.

[47]     Arturo Negrón García, *et al.*, *Report of the External Evaluating Committee of the Puerto Rico Police* at 12 (Dec. 21, 2007).

[48]     *Id.*

[49]     Sample community surveys are published as Appendix C in IACP, *Building Trust Between the Police and the Citizens They Serve:  An Internal Affairs Promising Practices Guide for Local Law Enforcement*, (2010).

[50]     Officer Efraín Bey Arce was acquitted, but separated from PRPD on November 9, 2007.

[51]     Amended Complaint, *Candelaria Cabán, et al. v. Toledo Davila*, No. 10-1100 (D.P.R. filed on Dec. 17, 2010).

[52]     As discussed further in Section IV, PRPD uses "archive" to administratively close an internal investigation. The term is used to close cases for a variety of reasons, including when an officer is exonerated, the investigation is inconclusive due to insufficient evidence, or the complainant withdraws the complaint and no longer wishes to cooperate.  Critical distinctions between these various circumstances are lost through PRPD's use of this catch-all term.

[53]    Verdict (Santos Soto and Plaza Santiago), *U.S. v. Santos Soto*, No. 07-CR-400 (D.P.R entered on Oct. 28, 2010).

[54]    *U.S. v. Pérez Rosado, et al.,* No. 07-392 (sealed plea agreements filed on Mar. 4, 2008).  State criminal charges for robbery, illegal search, kidnapping, and weapons for this same incident had earlier been dismissed because of delays in presenting the charges in court.  *See People v. Gaud Colón*, VP2007-5843 to 5846(608), KLCE200701709 (2008 Westlaw 949659).

[55]    *Jorge Vargas Torres, et al., v. Toledo Dávila, et al*., No. 08-CV-1527 (D.P.R. filed on May 6, 2008).

[56]    *See* Facts in Controversy filed on May 25, 2010, at p. 37, in *Diaz Román v. Denis, et al.,* No. 08-CV-1420 (GAG), indicating that Officer Ortiz Correa based his statement exclusively on the information he received from a colonel and inspector.

[57]    Zulma Méndez Ferrer, *University College of Criminal Justice:  Report on Accomplishments* (Nov. 30, 2010), *available at* www.senadopr.us.

[58]    ACLU Human Rights Program request to the OAS, *Request by the American Civil Liberties Union, et. al. for Precautionary Measures Under Article 25(2) of the Commission's Rules of Procedure Against the United States of America.*

[59]    *Id.* at 10-11.

[60]    Eugenio Hopgood Davila, *Dominicanos Denuncian Persecucion de Parte de la Policia*, El Nuevo Día, May 26, 2011

[61]    *Id*.

[62]    *Escolástico Rodríguez v. Acevedo Vila, et al.* No. 07-CV-2227 (D.P.R. filed on Dec. 26, 2007).

[63]    *Santos Rosario v. Commonwealth of Puerto Rico, et al.,* No. 06-CV-2155 (D.P.R. filed on Nov. 17, 2006).

[64]    Justin Fenton, *U.S. Senate Committee to Hold Hearings on Rape Investigations*, Baltimore Sun, Sept. 7, 2010, http://articles.baltimoresun.com/2010-09-07/news/bs-md-senate-hearing-rapes-20100907_1_patrol-officers-philadelphia-police-police-departments.

[65]    Data from United Nations Statistics Division, *Demographics and Social Statistics: Statistics and Indicators on Women and Men*, Table 6.C, Physical Abuse against Women by an Intimate Partner (1991-99), *available at* http://unstats.un.org/unsd/demographic/products/indwm/table6c.html.

[66]    Esplugues, Jose Sanmartin, et al., *3rd International Report: Partner Violence against Women*, *Statistics and Legislation*, Centro Reina Sofia 90 (2006).

[67]    Oficina de La Procuradora de Mujeres, *Mujeres Asesinadas Por Sus Parejas o Ex-parejas, 2000-2009*, *available at* http://www.mujer.gobierno.pr.

[68]    *See e.g.*, U.S. Dep't. of Justice, Community Relations Service, *Principles of Good Policing:  Avoiding Violence Between Police and Citizens*, 1-5 (2003), *available at* http://www.justice.gov/crs/publist.html.

[69]    *Building Trust Between the Police and the Citizens They Serve* at 7 (internal citations omitted).

[70]    U.S. Dep't. of Justice, Bureau of Justice Statistics, Special Report, *State and Local Law Enforcement Training Academies*, 2006,  (Apr. 14, 2009).

[71]     Letter from Justo Reyes Torres, Executive Director of the Puerto Rico Council on Higher Education, to Rep. Liza Fernández Rodríguez, President of the House of Representative's Judiciary and Public Safety Committee, of June 27, 2006 at 2-3.

[72]     Letter from Justo Reyes Torres, Executive Director of the Puerto Rico Council on Higher Education, to Rep. Liza Fernández Rodríguez, President of the House of Representative's Judiciary and Public Safety Committee, of June 27, 2006 at 2.

[73]     Letter from Pedro Toledo Dávila, Superintendent, to Sen. Orlando Parga, President of the Senate Special Committee on PRPD, of Mar. 11, 2008 at 9-10.

[74]     *Id.* at 10.

[75]     Arturo Negrón García, *et al.*, *Report of the External Evaluating Committee of the Puerto Rico Police* at 22 (Dec. 21, 2007).

[76]     U.S. Dep't. of Justice, Office of Justice Programs, Bureau of Justice Statistics, *Local Police Departments 2007*, Law Enforcement Management and Administrative Statistics at 12 (Dec. 2010).

[77]     *Id.* at 12.

[78]     *Id*. at 36.

[79]     Carmen M. Acosta Sanchez, Puerto Rico Police Department, *Resumen de Evaluación del Proceso* at 9, 12.

[80]     Zulma Méndez Ferrer, *University College of Criminal Justice: Report on Accomplishments* (Nov. 30, 2010), *available at* www.senadopr.us.

[81]     Commonwealth of Puerto Rico, Entering Transition Committee, *Final Report on the Transition Process* 8-9 (2009).

[82]     Commonwealth of Puerto Rico, *Report on Nomination of José Figueroa Sancha to Post of Superintendent of PRPD*, S. Rep. (Jan. 21, 2009).

[83]     Puerto Rico Regulation No. 6644, "Regulation for Special Promotions by Merit and/or Heroism through the Rank of Captain," (2003); *see also* Puerto Rico Office of the Controller, PRPD Audit Report DA-09-27, Audit No. 12781 (May 27, 2009).

[84]     Puerto Rico Regulation 6506, "Regulation for the Handling of Administrative Complaints against Members of the Force and Civil Personnel Who Work in the Puerto Rico Police," (2002).

[85]     IACP, *Protecting Civil Rights: A Leadership Guide for State, Local, and Tribal Law Enforcement*, at 88 (Sept. 2006), *available at* http://www.theiacp.org/ PublicationsGuides/tabid/71/ Default.aspx.

[86]     Memorandum  from José Taboada de Jesus, President of the Police of Puerto Rico Member Association, to Efraín Rivera Pérez, Police Monitor, of Feb. 8, 2011.

[87]     *Building Trust Between the Police and the Citizens They Serve* at 22.

[88]     *Id.* at 26.

[89]     *Id.* at 3.

[90]     Puerto Rico Regulation No. 4216, "Puerto Rico Police Regulation," as amended (1981).

[91]     Puerto Rico Office of the Controller, PRPD Audit Report DA-09-27, Audit No. 12781 at 14 (May 27, 2009).

[92]     Puerto Rico Regulation No. 4216,  Art. 14.3.2.a.

[93]     *See, e.g.*, Officer Rafael Ramos Vélez (*Rodríguez Rivero v. Commonwealth*, 08-CV-1016, paid on September 9, 2010); Mayagüez Drug/Vice/Illegal Weapons Sergeant José Figueroa Andújar and officers Camille Ortiz Sepúlveda, Robert Martínez Medina and Maritza Nazario Vega (*Vargas Torres v. Toledo Dávila et al.*, 07-CV-2002, undisclosed amount deposited on August 6, 2010, in satisfaction of judgment after a jury awarded $6.7 million on October 13, 2009); Officer Christian Rodríguez Cruz (*Canals Marcano v. Rodríguez Cruz*, E2CI200601018, KLAN0801565 (2009 Westlaw 2351439), paid on August 11, 2009; Officer Daniel Alvarado Alicea (*Velázquez Ramírez v ELA*, EDP2005-0172, paid on February 22, 2008); Sergeant Hermenegildo Rivera Ruiz and officers José Meléndez Meléndez and David Rodríguez Franqui (*Malavé Colón v. Rivera Ríos* (incorrect last name), 06-CV-1381, settlement reached on August 7, 2009).  Sergeant Rivera Ruiz was involved in another incident that resulted in a federal civil suit with officers José Rodríguez Cora and Gerarda Vázquez Quiñones (*Lozano Benítez v. Rivera Ruiz, et al.*, 08-CV-1766, paid on November 13, 2009).

[94]     *Protecting Civil Rights:  A Leadership Guide* at 52-53.

[95]     *Id.* at 54

[96]     *Id.* at 55.

[97]     *Id.* at 65.

[98]     *See* Tom O'Connor, *Employee Review Programs*, http://faculty.ncwc.edu/toconner.

**APPENDIX A:**  Additional Illustrative Incidents

## I.      Crime and Corruption Involving PRPD Officers

The following incidents further illustrate the widespread criminal activity of PRPD officers:

- On October 14, 2009, Officer Félix Rosa Soto pled guilty to possessing five kilograms of cocaine with intent to distribute and escorting a shipment of 75 kilograms of cocaine. The court sentenced Officer Rosa Soto to 70 months of imprisonment.[1]

- On April 30, 2009, Officer Josué López Rivera pled guilty to attempted murder for shooting the companion of his ex-girlfriend with his service weapon.[2]  Officer López Rivera shot the man in the chest, abdomen, right shoulder, and both hands.  At the time of the shooting, Officer López Rivera had two pending administrative complaints against him, including one for misuse of his firearm.

- On December 19, 2008, Lieutenant Carlos Cochran Ortiz, who served as the Director of the Weapons Registration Section at PRPD Headquarters, pled guilty to conspiracy charges for participating in a scheme that enabled applicants to obtain firearm permits by providing false information.  The district court sentenced him to twelve months imprisonment.[3]  Twenty-seven other individuals, including a civilian employee of the PRPD, were also arrested for their participation in the conspiracy.

- On July 29, 2008, Officer Ricardo Rivera Astacio pled guilty to importing narcotics into the United States after conspiring with two individuals to transport 60 to 80 kilograms of cocaine from the Dominican Republic to Puerto Rico.[4]

- On November 15, 2007, Officer Angel Fonseca Guilfú was convicted of sexually assaulting a 13-year-old girl he met through a telephone chat line.[5]

- On June 28, 2007, Officer Meléndez Otero pled guilty to conspiracy to possess illegal substances with the intent to distribute and to a firearm-related charge; he was sentenced to a year and a day of imprisonment.

- On January 20, 2007, in an incident known as "the Massacre of Las Piedras," Officer Javier Santiago Velázquez killed his father-, mother-, and sister-in-law, and wounded his brother-in-law (shooting him nine times) over a property dispute.  Officer Santiago Velázquez was convicted of three counts of first-degree murder, one count of attempted murder in the first-degree, and four weapons charges.  His wife, Officer Jesly Ann Márquez Arés, was also convicted on three counts of first-degree murder, one count of attempted murder, and four counts of weapons charges, although an appeals court reduced Officer Márquez Arés' weapons convictions from four counts to one.[6]

- On May 26, 2006, Officer William Castro Arocho, who was off duty, fired his service weapon at Carmen Ramírez Irizarry during a dispute with his neighbor.  On October 19,

2009, Officer Castro Arocho was found guilty of illegally discharging his service firearm.[7]   At least 23 citizen complaints were filed against Officer Castro Arocho prior to his arrest, including verbal abuse, assault, illegal persecution, and domestic violence.

## II.    PRPD Engages in a Pattern and Practice of Use of Excessive Force

The following incidents and allegations further support the finding that PRPD has engaged in a pattern and practice of use of excessive force in violation of the Fourth Amendment:

- On February 21, 2008, according to a lawsuit, Officer Rashid Feliciano Vázquez shot Kelmit Oquendo Rivera three times without a valid law enforcement purpose while PRPD officers were conducting surveillance of a home.  Oquendo Rivera sued PRPD alleging that he was shot without justification and falsely charged.  He also alleged that 10 to 15 officers, including Sergeant Antonio Rodríguez and Officers José Bracero Sepúlveda, David Colón, and Eddie Rivera Nazario, failed to intervene on his behalf.  In 2010, the parties agreed to settle under undisclosed terms.[8]

- On July 12, 2007, according to a lawsuit, Sergeant Hermenegildo Rivera Ruiz and Officers José Rodríguez Cora and Gerarda Vázquez Quiñones assaulted Oscar Lozano Benítez following a traffic stop, predicated on Lozano Benítez's alleged use of high-intensity headlights.  Without a valid law enforcement purpose, officers twisted Lozano Benítez's arm.  Officers then threw Lozano Benítez against a car causing him to fall to the ground, stepped on his face with a boot, and handcuffed him so tight that he could not feel his fingers.  Lozano Benítez was then arrested and detained overnight at a PRPD station.  Lozano Benítez was not provided medical attention for his injuries.  Lozano Benítez filed suit and in 2009, the parties entered into a confidential settlement.[9]  At the time of the incident, the Legal Affairs Office had not acted on a 2003 recommendation from administrative investigators to expel Sergeant Rivera Ruiz after he submitted false documents and lied to investigators.  Additionally, PRPD closed other investigations into Sergeant Rivera Ruiz's conduct without imposing disciplinary action, even after investigators had sustained misconduct allegations and recommended discipline, as set forth below:

**Table A-1:  Civilian Complaint History, Sergeant Rivera Ruiz**

| Type | Year | Disposition |
| --- | --- | --- |
| Illegal search and verbal abuse | 1989 | Archived after investigators recommended a 2-day suspension |
| Physical and verbal abuse | 1989 | Archived after investigators recommended an admonishment |
| Illegal search and arrest | 1992 | Archived |
| Theft of official vehicle | 1992 | Pending in Legal Affairs Office |
| Damage to official vehicle from bullet | 1994 | Archived |
| Illegal arrest | 1995 | Archived |
| Illegal arrest | 1995 | Archived |

| | | |
|---|---|---|
| Submitting false document and lying to administrative investigator | 2002 | Pending in Legal Affairs Office; expulsion recommendation in 2003 |

\*As of May 20, 2008.

- On June 29, 2007, according to a lawsuit, Alsemmi Martín was driving from the Veterans Administration Hospital with passenger Mario Salazar Cintrón when Officers Orlando Rivera Canaan and Nelson Rodríguez pulled up beside them.  Salazar Cintrón made an obscene gesture toward the officers, who proceeded to stop Alsemmi's vehicle.  After a verbal exchange, an officer pulled Salazar Cintrón out of the vehicle and, without a legitimate law enforcement purpose, began hitting him in the face and body, causing a rib fracture, bleeding, and bruises on his head.  The officer deployed a taser to incapacitate Salazar Cintrón, and handcuffed his hands and feet.  The officers dragged Salazar Cintrón on the ground and ordered him to squeal like a pig.  Martín and Salazar Cintrón filed a federal civil rights suit alleging that the officers had used excessive force and committed an unreasonable search and seizure.

  On September 30, 2009, the district court entered default judgment against Sergeant Samuel Hernández, the supervising officer on the scene.  An amended judgment was entered on April 23, 2010, after the parties reached a confidential settlement agreement.[10]

- On May 10, 2007, Juan Salcedo Collazo and his friend, José Negrón Rivera, pulled over on the side of the road in Utuado when their vehicle malfunctioned.  Six PRPD officers arrived on the scene.  Without a legitimate law enforcement purpose, Officer Freddie Lucena Pérez pulled out his weapon and handcuffed Salcedo Collazo and Negrón Rivera.  Officer Lucena Pérez allegedly told  Salcedo Collazo, "if you mess with a policeman, you mess with all of us" (referring to an incident where Salcedo Collazo and his cousin, Miguel Figueroa Collazo, stopped a municipal police officer from abusing his wife).  Officer Lucena Pérez then allegedly hit Salcedo Collazo, Negrón Rivera and later Figueroa Collazo and played Russian roulette with Salcedo Collazo.  The officers then placed Salcedo Collazo, who was bleeding profusely, in the police vehicle's trunk.  Neither Officer Carlos Vélez nor the other four officers intervened to stop Officer Lucena Pérez from hitting the plaintiffs.  In 2010, the parties entered into a confidential settlement agreement.[11]

- On April 15, 2007, according to a lawsuit, Misael Medero García was driving his father's car with two friends when PRPD officers Samuel Galloza González, Leonardo Vázquez Martínez, and Javier Avilés Crespo stopped Medero García, allegedly without probable cause.  The officers told Medero García and his friends that they were not wearing their seat belts, which Medero García denied.  Although neither Medero García nor his passengers posed any threat to the officers or others, Officer Galloza González then pointed his firearm at them, punched Medero García in the back, and cited them for not wearing seatbelts.  Officer Vázquez Martínez searched the vehicle without consent and found nothing suspicious.  Medero García and his friends left and drove toward the Barceloneta police station to file a complaint against the officers.  They were followed by the officers who stopped them a second time and assaulted them, again without a legitimate law enforcement purpose.  The officers detained Medero García and his

A-3

friends at the station, but filed no charges against them.  In 2009, the parties entered into a confidential settlement agreement.[12]

- On March 19, 2007, according to a lawsuit, approximately 15 PRPD officers arrived at Matthew McLeod López's home to execute a search warrant.  Upon opening the door, seven officers, including Juan Rosa Algarín, jumped on McLeod López, threw him to the ground, and hit him all over his body, including in his groin.  The officers had no legitimate law enforcement purpose for this use of force.  Although the officers did not have a search warrant for a safe deposit box, they ordered McLeod López to open it.  The officers took $3,000 from the box and drove McLeod López to PRPD headquarters, where they detained him for more than fourteen hours.  Once released, McLeod López needed emergency surgery due to injuries he sustained during the officers' beating.  In 2011, the parties entered into a settlement agreement.[13]

- On January 1, 2007, according to a lawsuit, Xavier Muñoz Mejías and his cousin, David Santiago Muñoz, exited a business establishment when an argument ensued outside.  Approximately six officers, including a sergeant, arrived and, without a legitimate law enforcement purpose, began hitting Muñoz Mejías with their batons and boots.  Muñoz Mejías lay on the floor bleeding profusely as the officers continued to hit him.  When Santiago Muñoz attempted to protect his cousin, the officers hit him with batons, causing linear bruising and injuries.  In 2009, the parties entered into a confidential settlement agreement.[14]

- On September 26, 2006, according to a lawsuit, Officer Edwin Félix De Jesús attacked José Cancél Vega without a legitimate law enforcement purpose.  On April 3, 2006, Officer Félix De Jesús pleaded guilty to charges of assault.[15]

- On September 19, 2006, according to a lawsuit, Orvil Cabán Torres was sitting in his parked vehicle when an unmarked vehicle approached him with the lights off.  A man dressed in plainclothes, later determined to be an officer assigned to the Aguadilla Narcotics Division, exited the vehicle, ordered Cabán Torres to "freeze," and pointed a firearm at him.  Cabán Torres then grabbed a canister of chemical agent and sprayed it in the direction of the man.  The man responded by shooting Cabán Torres in the hand and abdomen without adequate justification for using lethal force.  Cabán Torres became aware the man who shot him was an officer when the man addressed another person on the scene as "Sergeant."  In 2009, the parties entered into a confidential settlement agreement.[16]

- On July 25, 2006, according to a lawsuit, during a disturbance related to Constitution Day activities in the Plaza de Recreo in Dorado, Esther López Morales's young son, Agustín, was on his way to a restaurant when PRPD officers repeatedly struck him with batons on his head.  Agustín was not involved in the disturbance, and the officers had no legitimate law enforcement reason to strike him.  Agustín required stitches on his forehead, which left a permanent scar.  In 2009, the parties entered into a confidential settlement.[17]

A-4

- On March 3, 2005, according to a lawsuit, five officers followed Andrés García Quiñones and a friend, Edwin Sepúlveda, as they were driving. Without probable cause or justification, the officers got out of their vehicle at a red light and pointed their weapons at García Quiñones and Sepúlveda. Fearful for their lives, they drove away. Although Andrés and Sepúlveda posed no threat to the officers or the community, the officers allegedly fired at least 15 times at García Quiñones's vehicle. On January 13, 2006, four unidentified officers allegedly entered García Quiñones's home without a search warrant or justification, attacked him, and took him to an empty house in Mayagüez while they searched his home. As a result of the officer's' beating, García Quiñones suffered a cervical sprain, trauma, and other injuries. In 2010, García Quiñones and Sepúlveda settled their civil rights action against the PRPD.[18]

## III.   UNCONSTITUTIONAL SEARCHES AND SEIZURES

The following incidents and allegations further support the finding that PRPD has engaged in a pattern and practice of unconstitutional searches and seizures in violation of the Fourth and Fourteenth Amendments:

- On May 20, 2008, Elis Manuel Andrades Telleira was pulled over by a marked PRPD vehicle driven by uniformed Officer Osvaldo Hernández Adorno. A group of individuals posing as federal agents joined Hernández Adorno on the scene. The group staged Andrades Telleira's stop in order to steal drugs he was reportedly transporting.[19] Among the individuals posing as a federal agent was Noel Rosario Colón, a sergeant on administrative leave who had engaged in similar activities in 2005 and 2006 where he impersonated a federal agent to detain individuals and seize money from them.

  After Officer Hernández Adorno, Sergeant Rosario Colón, and the other individuals stopped Andrades Telleira, handcuffed him and took him to an auto body repair shop. They seized the narcotics in Andrades Telleira's car and interrogated him. With the information obtained during the interrogation, Sergeant Rosario Colón and two other individuals went to Andrades Telleira' home and stole additional narcotics and other property. They then executed Andrades Telleira.[20]

  On January 8, 2010, Officer Hernández Adorno entered into a plea agreement after being charged with conspiracy to commit carjacking with intent to cause death, motor vehicle theft, and conspiracy against the rights of citizens.[21] According to the plea agreement, for a payment of $700, Officer Hernández Adorno subjected Andrades Telleira to a traffic stop without probable cause. Sergeant Rosario Colón was expelled from the PRPD a month after Andrades Telleira's death. Before the incident, Sergeant Rosario Colón was the subject of multiple civilian complaints.

- On December 5, 2007, Officer David González Pérez of the Arecibo Special Operations Division stopped and searched Ramón Santiago Quiñones' vehicle. Officer González Pérez reportedly found illegal contraband and subsequently offered not to arrest Santiago Quiñones in exchange for a cash payment. Officer González Pérez pleaded guilty to extortion on August 5, 2009 and was fined $200.[22] Officer González Pérez also had an

extensive history of civilian complaints involving illegal searches and seizures, assault, domestic violence, and negligence. Many of these complaints remained open for years.

- On August 9, 2007, according to a lawsuit, TOU Officer Wendel Delgado Sánchez and a relative were visiting a friend when the Carolina Drug Unit assaulted, arrested, and detained them without probable cause for 12 hours. Although PRPD alleged in the media that Delgado Sánchez was part of a large drug trafficking organization, no charges were ever filed against Delgado Sánchez or his relative. Delgado Sánchez was summarily expelled from PRPD. In 2010, the parties reached a confidential settlement agreement.[23]

- On June 26, 2007, Luis Velázquez González filed a complaint alleging that Officer Osvaldo Acevedo Patiño of the San Juan Narcotics Division stole $606 during a search of his home. Velázquez González alleged that Officer Acevedo Patiño took the money, did not give him a property receipt, and lied both about returning the money and giving him a receipt. An investigation later revealed that Officer Acevedo Patiño took the money, but returned it at a later date at the behest of his superior, and that the officer instructed Velázquez González to sign a back-dated receipt. The investigation also disclosed that Officer Acevedo Patiño was not on duty while he was allegedly conducting surveillance of Velázquez González's home.

  Officer Acevedo Patiño was convicted of making a false statement and violating government ethics laws for theft during an illegal search. He was sentenced to a year and nine months of imprisonment and fined $1,000. He was also expelled from PRPD.[24]

- On January 18, 2007, according to a lawsuit, officers from unmarked vehicles stopped Datiz Rodríguez and ordered him to get out of his car at gunpoint and told him they had a search warrant for his vehicle. The officers then searched his vehicle and home, without a legitimate law enforcement purpose. They found drugs and detained Datiz Rodríguez without bail on federal drug charges from January 24 to August 28, 2007, when the district court ordered his release. Datiz Rodríguez alleged malicious prosecution, illegal arrest, seizure, and detention and in 2009, the parties entered into a confidential settlement agreement.[25]

- On December 17, 2006, Officer Diego Santos Pabón arrested Eliseo Pérez Sánchez and another youth for displaying "suspicious attitudes." Officers subsequently hit the youth , sprayed them with chemical agents, and forced them to kiss. Officer Emilio Meléndez Santiago and Sergeant José Feliciano Rodríguez did not intervene to protect the youth. Officer Santos Pabón, Officer Meléndez Santiago, and Sergeant Feliciano Rodríguez were separated from PRPD and convicted for unlawfully restraining and assaulting the youth.[26]

- On October 20, 2006, a group of Mayagüez Drug Division officers searched various adjacent homes belonging to the Pietri Vargas family. Officers Camille Ortiz Sepúlveda, Jorge Vélez Rodríguez, Joel Soto Ramírez, and William Irizarry Cintrón entered the residence of Noel Pietri Figueroa and Marilyn Vargas Vargas without consent or a valid search warrant. Once inside, they opened the bathroom door while Marilyn was taking a

shower, exposing her naked body to the officers at the scene.  The officers asked about the whereabouts of Carlitos Pietri Vargas, Noel and Marilyn's 19-year-old son.

At the same time, a group of approximately 15 officers searched an adjacent house owned by Marilyn's parents, Carlos Vargas Torres and Miriam Vargas Sepúlveda.  Among the officers searching the house were José Alago Feliciano, Robert Martínez Medina and Maritza Nazario Vega.  At this second residence, the officers conducted an hour-long search and detained five members of the family, including Carlitos Pietri Vargas, who arrived after the search began.  The officers also searched a third neighboring residence.  During the searches, the officers planted an illegal firearm and seized several legally registered weapons.  Four members of the Pietri Vargas family were arrested.  Three of them were charged with weapons violations.  The charges were later dismissed.

On October 13, 2009, at the conclusion of a federal civil trial, a jury found Officers Martínez Medina, Alago Feliciano, Nazario Vega, and Ortiz Sepúlveda liable for violating the Fourth Amendment rights of various members of the Pietri Vargas family when they conducted an unreasonable search and used excessive force against them.  Notably, the jury also found the officers' supervisors – Mayagüez Illegal Weapons Unit Sergeant José Figueroa Andújar, Colonel Francisco Carbo Marty, who oversaw PRPD's Drug Division, and then-Superintendent Toledo Dávila – liable for having failed to adequately train, supervise and discipline the involved officers.  The jury awarded $6.7 million to the Pietri Vargas family.[27]

- On September 13, 2006, according to a lawsuit, officers dressed in civilian clothing entered Luis Cruz Acevedo's home.  The officers pushed and threatened Cruz Acevedo, identifying themselves as officers of the Mayagüez Drug Division.  The officers asked Cruz Acevedo whether he had drugs or weapons and hit him.  The officers searched Luis' home for more than two hours.  After the incident, Cruz Acevedo went to the Mayagüez Police Station to file a complaint against the officers, but was not permitted to do so.[28]

  Approximately two months later, on November 21, 2006, four officers dressed in civilian clothing came to Cruz Acevedo's home and advised him that they had a search warrant.  The officers falsely told Cruz Acevedo that they had a videotape of him taking part in a drug transaction.  The officers entered his home without consent and without a legitimate law enforcement purpose and planted ammunition and marijuana there.  After the search, the officers arrested Cruz Acevedo and transported him to a police station in Aguadilla.  Cruz Acevedo was subsequently released.  In 2009, Cruz Acevedo settled his case against some of the officers.[29]On October 28, 2009, a jury found Officers Víctor Cortés Cabán, Luis Ruperto Torres, and Dennis Muñiz Tirado liable for violating Cruz Acevedo's Fourth Amendment rights.  The jury awarded him $300,000 in damages.[30]

- On June 6, 2006, Officers Abimelec Sosa Díaz, Edwin Ruiz Vellón, and Elliot Fernández López entered a private residence and searched it without a warrant or consent and also stole private property, including jewelry.  On April 19, 2007, Officer Sosa Díaz was found guilty of receiving and transporting stolen items.  On May 23, 2007, Officer Ruiz Vellón was found guilty of performing an illegal search and aggravated illegal appropriation.  On May 23, 2007, Officer Fernández López was found guilty of

performing an illegal search and aggravated illegal appropriation.  All three officers were expelled from PRPD.[31]On December 24, 2005, plainclothes Officers Fundador González Santos and Luis Ortiz Soto stopped Billy Tavares Bruno.  One of the officers was wearing his badge on a chain and identified himself as a PRPD officer.  The officers then searched Tavares Bruno, and one removed $40 from his pocket.  None of these actions were supported by a legitimate law enforcement purpose.  The officers were found guilty of robbery, weapons violations, and possession of an illegal weapon.  Both officers were expelled on July 13, 2007.

---

[1]      Indictment*, U.S. v. Rosa Soto*, No. 08-CR-0099 (Mar. 18, 2008).

[2]      *People v. López Rivera,* GVI2008G0013 (Apr. 30, 2009).

[3]      Superseding Indictment, *U.S. v. Mojica Hernández*, No. 08-CR-0060 (D.P.R. filed on Mar. 6, 2008).  Amended Judgment entered on May 5, 2009.

[4]      Press Release, FBI, San Juan Division, "Arrest of Police of Puerto Rico Officer" (Feb. 28, 2008), *available at* www.sanjuan.fbi.gov; Indictment, *U.S. v. Rivera Astacio*, No. 08-CR-0071 (D.P.R. filed on Feb. 28, 2008).  Plea Agreement filed under seal on July 29, 2008.

[5]      Judgment, *People v. Fonseca Guilfú*, KIS2007G0012 (Nov. 15, 2007).

[6]      *People v. Santiago Velázquez and Márquez Arés*, HSCR200700589 to 596.  *See also*, *People v. Márquez Arés*, KLAN200800914 (June 30, 2009) (2009 Westlaw 2420009); *Liomar Márquez, et al. v. Toledo Dávila*, No. 07-CV-1340 (D.P.R. filed on Apr. 24, 2007).

[7]      Judgment, *People v. Castro Arocho*, ALA2008G0245 (Oct. 19, 2009).  Castro Arocho was acquitted of attempted murder.  Judgment, *People v. Castro Arocho*, AVI2008G0048 (Aug. 31, 2008).

[8]      *Kelmit Oquendo Rivera v. Toledo Dávila, et al.,* No. 09-CV-1154 (D.P.R. filed on Feb. 18, 2009).

[9]      *Oscar Lozano Benítez v. Rivera Ruiz, et al*., No. 08-CV-1766 (D.P.R. filed on Jul. 11, 2008).

[10]     *Salazar Cintrón, et al. v. Rivera Canaan*, 08-CV-1700 (D.P.R. filed on June 27, 2008).

[11]     *Juan Salcedo Collazo, et al., v. Freddie Lucena, et al*., No. 08-CV-1539 (D.P.R. filed on May 9, 2008).

[12]     *César Medero Ponce, et al., v. Toledo Dávila*, No. 08-CV-1446 (D.P.R. filed on Apr. 15, 2008).

[13]     *McLeod López v. Juan Rosa Algarín, et al.* No. 08-CV-1315 (D.P.R. filed on Mar. 14, 2008).

[14]     *Xavier Muñoz Mejías, et al., v. Toledo Dávila*, No. 07-CV-1845 (D.P.R. filed on Sept. 13, 2007).

[15]     Guilty Plea, *People v. Félix De Jesús*, GIC2006G0077 (Apr. 3, 2007).

[16]     *Cabán Torres v. Toledo Dávila, et al.* No. 07-CV-1864 (D.P.R. filed on Sept. 18, 2007).

[17]     *Esther López Morales, et al., v. Toledo Dávila*, No. 07-CV-1659 (D.P.R. filed on Jul. 23, 2007).

[18]     *García Quiñones, et al., v. González Ramos, et al*., No. 06-CV-1211 (D.P.R. filed on Mar. 2, 2006).

A-8

[19]     Press Release, FBI, San Juan Division, "Twelve Individuals Indicted for Conspiracy to Commit Carjacking Resulting in Death and Civil Rights Violations" (July 8, 2009), *available at* www.sanjuan.fbi.gov; Indictment, *U.S. v. Torres Sobrado*, No. 09-CR-0228 (D.P.R. filed on July 7, 2009).

[20]     Conviction, *U.S. v. Torres*, No. 08-CR-0213 (D.P.R. entered on Oct. 13, 2009) (sentenced to 24 months of imprisonment); Judgment, *U.S. v. Torres*, No. 06-CR-0270 (D.P.R. entered under seal on Aug. 4, 2008).

[21]     Plea Agreement, *U.S. v. Hernández Adorno*, No. 09-CR-0228 (entered on Jan. 8, 2010).  He was separated from the PRPD on November 17, 2009.

[23]     *Wendel Delgado Sánchez v. Toledo Dávila, et al.,* No. 07-CV-1709 (D.P.R. filed on Aug. 8, 2007).

[24]     *People v. Acevedo Patiño*, KFJ2008G0011and KLE2008G0198.

[25]     *Ovidio Datiz Rodríguez, et al., v. Toledo Dávila*, No. 08-CV-1000 (D.P.R. filed on Jan. 2, 2008).

[26]     *See People v. Santos Pabón*, KDC2008G0018.  Officer Meléndez Santos was separated on June 16, 2008, after being convicted of felonious restraint and assault.  *See People v. Meléndez Santiago*, KDC2008G0020; KIC2008M0044.  The supervisor at the Puerto Nuevo Precinct, Sergeant Feliciano Rodríguez, was separated on June 16, 2008.  *See People v. Feliciano Rodríguez*, KDC2008G0017 (civil rights violations – restriction of liberty – guilty); KDC2008G0018 (aggravated restriction of liberty – guilty); KIC2008M0043 (crime against corporal integrity – assault – guilty).

[27]     *Vargas Torres v. Toledo Dávila, et al*, No. 07-CV-2002 (D.P.R. filed on Oct. 22, 2007).  Judgment was entered on October 13, 2009.  Verdict was entered on October 13, 2009.

[28]     Complaint, *Cruz Acevedo v. Toledo Dávila, et al.,* No. 07-CV-2104 (D.P.R. filed on Sept. 12, 2007).

[29]     Judgment, *Cruz Acevedo v. Pedro Toledo, et al.,* No. 07-CV-2104 (D.P.R. entered on Dec. 2, 2009).  *See also U.S. v. Muñiz Tirado, et al.,* No. 07-CR-0346, in which multiple Mayagüez officers and supervisors were convicted of civil rights violations.

[30]     Verdict, *Cruz Acevedo v. Pedro Toledo, et al.,* No. 07-CV-1844 (D.P.R. entered on Oct. 28, 2009).

[31]     Judgment, *People v. Sosa Díaz,* FDC2006G0022 (Apr. 19, 2007); Judgment, *People v. Ruiz Vellón*, FDC2006G0023 (May 23, 2007); Judgment, *People v. Ruiz Vellón*, FBD2006G0219 (May 23, 2007); Judgment, *People v. Fernández López*, FDC2006G0021 (June 27, 2007); Judgment, *People v. Fernández López*, FBD2006G0217 (June 27, 2007).

A-9



**U.S. Department of Justice**

Civil Rights Division

_____

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

JUL  1 2008

Pedro Toledo Dávila
Superintendent
Puerto Rico Police Department
601 F.D. Roosevelt Ave.
San Juan, PR  00936

     RE:  <u>Investigation of the Puerto Rico Police Department</u>

Dear Superintendent Toledo Dávila,

    As you discussed with Special Litigation Section Chief, Shanetta Y. Cutlar, this is to inform you that the United States Department of Justice is commencing an investigation concerning allegations of use of excessive force, unconstitutional searches and seizures, and discriminatory policing by members of the Puerto Rico Police Department ("PRPD"), pursuant to the pattern or practice provision of the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 and the anti-discrimination provisions of the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d.

    In conducting the investigation, we will seek to determine whether there are systemic violations of the Constitution or laws of the United States in the use of force and police practices by members of the PRPD.  We have not reached any conclusions about the subject matter of the investigation.  We believe that you and other Commonwealth officials want to operate the PRPD consistent with the requirements of the Constitution and federal law.  During the course of our investigation, we will consider all relevant information, particularly the efforts Puerto Rico has undertaken to ensure compliance with federal law.  We also will offer to provide recommendations on ways to improve use of force and other police practices, when appropriate.  Provided that the PRPD cooperates fully with our investigation, if we conclude that there are not systemic violations of constitutional or other federal rights, we will notify you that we are closing the investigation.  In addition, we will identify any financial, technical, or other assistance the United States may be able to provide to assist PRPD in correcting the identified deficiencies.

    Our enforcement of the Violent Crime Control and Law Enforcement Act of 1994 and the Omnibus Crime Control and Safe Streets Act of 1968 has involved a variety of state and local law enforcement agencies, both large and small, in jurisdictions such as New York, California,

A-10

- 2 -

Ohio, New Jersey, Georgia, and the District of Columbia.  In over ten years of enforcing these statutes, the good faith efforts of state and local jurisdictions working with us have enabled us routinely to resolve our claims without resort to contested litigation.  We encourage the PRPD to cooperate with our investigation and can assure you that we will seek to minimize any potential disruption our efforts may have on the operations of the PRPD.  Our Special Litigation Section will be handling the investigation and will continue to be in contact with your office as the investigation progresses.  Ms. Cutlar may be reached at (202) 514-6255.

Sincerely,

Grace Chung Becker
Acting Assistant Attorney General

cc:    The Honorable Aníbal Acevedo Vilá
       Governor of the Commonwealth of Puerto Rico

       The Honorable Roberto Sánchez Ramos
       Secretary of Justice
       Puerto Rico Department of Justice

       The Honorable Rosa Emilia Rodríguez Velez
       United States Attorney
       District of Puerto Rico



**U.S. Department of Justice**

Civil Rights Division

SYC:DHW:LES:ZIL:SSL:NO
DJ 207-65-3

*Special Litigation Section - PHB*
*950 Pennsylvania Avenue, NW*
*Washington, DC 20530*

December 19, 2008

**VIA ELECTRONIC AND U.S. MAIL**

Pedro Toledo Dávila, Esq.
Superintendent
Puerto Rico Police Department
601 F.D. Roosevelt Avenue
San Juan, PR  00936

　　　RE:　<u>Investigation of the Puerto Rico Police Department</u>

Dear Superintendent Toledo:

　　　We write to provide you with a brief summary of the concerns we raised regarding the Puerto Rico Police Department ("PRPD") during our exit conference on December 5, 2008.  As you know, the Civil Rights Division is conducting a pattern or practice investigation into alleged police misconduct by members of the PRPD, pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, and the anti-discrimination provisions of the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d.

　　　As an initial matter, we wish to express our appreciation to you and your staff for your cooperation and hospitality during our tour.  In particular, we would like to thank all of the PRPD officers and staff who took time to meet with us, including Associate Superintendent Ramón Ortega and other auxiliary superintendents, area commanders, unit directors, educators, supervisors, rank-and-file officers, and support staff.  We especially would like to thank Legal Director Rosa Seguí for her invaluable assistance in coordinating our tour and facilitating our interviews with PRPD officers and staff.  As we indicated during our exit conference, it was apparent from our interviews that the PRPD is staffed with dedicated men and women who are genuinely concerned with providing professional and effective policing services to the citizens and residents of Puerto Rico.

- 2 -

Separately, we recognize that under your leadership, the PRPD has initiated various reform efforts to address allegations of misconduct and improve systems of accountability within the PRPD.  For instance, we understand that you have issued policies and procedures concerning periodic training for existing officers and have reorganized the operational structure of the PRPD to provide for more coordinated support services for officers and their families, including psychological treatment and counseling. We also understand that you have launched initiatives to address significant backlogs of administrative investigations and to upgrade the PRPD's communication and information systems to better manage PRPD personnel and resources.

Consistent with our pledge to conduct our investigation as transparently as possible based on the PRPD's cooperation, we met with you, Associate Superintendent Ortega and PRPD Legal Affairs Director Seguí on December 5 at the conclusion of our five-day tour to share our consultants' initial impressions and observations.  Our intention was to assist the PRPD in identifying policies, practices, and processes at the outset that may warrant further focused review or corrective action by the PRPD as our investigation progresses.

As we indicated during our meeting, our investigation remains ongoing and we have not formulated any formal opinions or conclusions regarding the PRPD or the conduct of its officers and agents.  We also plan to conduct additional interviews and tours, accompanied by our police practices consultants, and plan to review additional documents, including documents that have yet to be provided, such as incident and investigation reports.

At this early juncture, we identified several areas of concern that warrant further attention based on our consultants' preliminary observations.  These areas, which we discussed at our December 5 exit conference, are:

- **Inconsistent guidance on the application of force:**  We are concerned that there may be inconsistent guidance on the application of force by PRPD officers between geographic areas and operational components within the PRPD.

- **Insufficient reporting on use of force:**  We are concerned that PRPD officers may not be required to sufficiently report all uses of force to provide for adequate supervisory review.

- 3 -

- **Inadequate citizen complaint and internal investigation processes:** We are concerned that systemic deficiencies may impede the effective resolution of citizen complaints and internal investigations. For instance, we are concerned that the PRPD: (1) may not accept third party complaints at intake; (2) does not complete timely internal investigations; and (3) issues findings in internal investigations that may not be consistent with generally accepted standards and practices, such as the use of "archive" to close investigations where allegations are found to be unsubstantiated or where an officer is exonerated of misconduct.

- **Lack of an early warning system:** The PRPD does not appear to have a uniform and integrated system that allows supervisors to proactively detect potential patterns of at-risk conduct by officers.

- **Inadequate supervision of field personnel:** We are concerned that field personnel, including officers in specialized units, may be inadequately supervised. We understand that, as of October 2008, there were approximately 2,020 vacancies in sergeant and lieutenant positions reported by the PRPD. We recognize, however, that other factors may contribute to adequate supervision, including deployment patterns and compliance with deployment orders.

- **Fragmented community engagement:** We are concerned that the PRPD may not be fully engaging all of the communities it serves on policing priorities and collaborative approaches to law enforcement, which may contribute to allegations of disparate treatment.

- **Limited training:** We understand that the PRPD does not have a formal field training program for new officers. We are also concerned that the PRPD may be offering limited re-training to existing officers, which could impair the PRPD's ability to provide up-to-date guidance on issues related to use of force, searches and seizures, and equal protection.

- **Ineffective disciplinary system:** We are concerned that the PRPD may have a cumbersome and fragmented disciplinary system that may impair its ability to hold its officers accountable and prevent potential misconduct proactively. For instance, supervisors told us during our interviews that they do not feel

- 4 -

empowered to take action early in the disciplinary
process to correct a subordinate's behavior and prevent
serious misconduct.  A lack of effective communication
between PRPD supervisors and components may also
frustrate prompt corrective action when officers are
transferred between PRPD units and components.

We hope that the foregoing summary of our consultants'
preliminary impressions is useful to future reform efforts.  We
look forward to your continued cooperation in furtherance of our
mutual goals of ensuring lawful and effective policing in
Puerto Rico.  If we can be of any assistance in the future,
please do not hesitate to contact us.  You may reach me at
(202) 514-6255, Luis Saucedo at (202) 353-0299, or Zazy López at
(202) 305-8702.

Sincerely,

Shanetta Y. Cutlar
Chief
Special Litigation Section


cc:  Rosa M. Seguí Cordero, Esq.
     Director
     PRPD Legal Affairs Office

A-15



**U.S. Department of Justice**

Civil Rights Division

SYC:DHW:LES:ZIL:SSL:NO:db                    *Special Litigation Section - PHB*
DJ 207-65-3                                  *950 Pennsylvania Avenue, NW*
                                             *Washington, DC 20530*

March 5, 2009

**VIA ELECTRONIC AND U.S. MAIL**

José Figueroa Sancha
Superintendent
Puerto Rico Police Department
601 F.D. Roosevelt Avenue
San Juan, PR   00936

    RE:   <u>Investigation of the Puerto Rico Police Department</u>

Dear Superintendent Figueroa:

    Thank you for meeting with us during our tour of the
Puerto Rico Police Department ("PRPD") on February 2-6, 2009.  As
you know, we conducted our tour as part of the Civil Rights
Division's ongoing pattern or practice investigation of the PRPD,
pursuant to the Violent Crime Control and Law Enforcement Act of
1994, 42 U.S.C. § 14141, and the anti-discrimination provisions
of the Omnibus Crime Control and Safe Streets Act of 1968,
42 U.S.C. § 3789d.  This letter summarizes briefly the concerns
we raised during our February 6 exit conference and addresses two
related issues regarding document preservation and protections
against retaliatory conduct.

    At the outset, we would like to reiterate our appreciation
for the cooperation and cordial reception we received from you
and your staff during our tour.  We understand that the PRPD is
charged with significant responsibilities and that our visits
require your staff to share their time and resources.  In this
regard, we would like to thank all of the dedicated men and women
of the PRPD who facilitated our tour and participated in our
interviews, many of whom expressed a genuine commitment to the
critical mission and the overall success of the PRPD.  We would
especially like to thank Legal Director Mirla Rodríguez for her
leadership and Staff Attorney Efrén González for his hard work
coordinating our tour and facilitating the PRPD's production of
documents.

- 2 -

As we mentioned during our exit conference, we have identified several areas of concern based on our consultants' preliminary observations and impressions.  While our investigation remains ongoing, given the serious nature of our concerns, we believe it is appropriate to memorialize these issues to assist the PRPD in identifying policies and practices that may warrant further focused review or corrective action as our investigation progresses.  In this regard, we recognize that under your short tenure at the PRPD, you have demonstrated a firm commitment to pursuing necessary reforms by taking steps to address internal processes of mutual concern that warrant immediate attention.  We appreciate these efforts and look forward to learning more about the PRPD's initiatives.

As you will see, many of the areas we outline below build upon our earlier letter, dated December 19, 2008, following our first tour and exit conference with former Superintendent Pedro Toledo.  Significantly, our preliminary observations indicate strongly that the PRPD appears to lack basic contemporary practices that have been adopted by many law enforcement agencies to safeguard the fundamental constitutional rights of the citizens they serve.  These areas of concern are:

- **Insufficient guidance on the application of force:**  We are concerned that the PRPD lacks basic policies and other written guidance on the use of force by officers.  Significantly, the PRPD does not appear to have an integrated policy that is based on contemporary legal standards and generally-accepted law enforcement practices that incorporates all force options available to, and used by, officers.  For instance, the PRPD has developed separate policies for the use of batons, Tasers,[1] and firearms, but has not developed targeted policies on other available force implements, such as chemical irritants and less lethal weapons (e.g., foam projectiles).

- **Lack of formal requirements for reporting and reviewing use of force:**  The PRPD does not appear to have a formal policy that requires uniform and thorough reporting of officers' use of force.  The lack of such a requirement may impair the PRPD's ability to adequately review and investigate officers' use of force and impedes the PRPD's ability to compile

---

[1]     TASER is the brand name of an electro-muscular disruption device that is currently employed by the PRPD.

A-17

- 3 -

statistical information on use of force at the agency-
level (to assess policy, training, and supervisory
needs) or the officer-level (to provide for early
detection of potential patterns of at-risk conduct).
The PRPD also does not have a dedicated policy on
conducting internal investigations of police-involved
shootings or uniform administrative reviews of
officers' use of deadly force.

- **Ineffective disciplinary system:**  The PRPD's discipline
  process does not appear to effectively promote police
  accountability.  In this regard, supervisors reported
  that they are not empowered to take corrective action
  to address minor infractions by subordinates before
  such officers engage in more serious misconduct.
  Supervisors consistently identified inordinate delays
  in completing administrative investigations, many of
  which have remained unresolved for years, as a
  significant barrier to the appropriate discipline of
  officers and as a constant source of low morale among
  officers who are denied promotions or transfers due to
  unresolved administrative investigations.  Indeed, the
  failure to adequately resolve citizen complaints
  against officers may perpetuate distrust of the agency
  and may discourage citizens from lodging valid
  complaints when officers engage in misconduct.

- **Lack of basic processes and resources for internal
  investigations:**  We are concerned that the PRPD
  components charged with conducting internal
  investigations, particularly the Internal Affairs
  Superintendency, appear to lack basic controls and
  resources to conduct fair and thorough investigations.
  The failure to properly equip, train, and develop these
  units is of particular concern given the fundamental
  role they play in the investigation of serious
  allegations of misconduct, including allegations of
  excessive force, false arrest, improper search and
  seizure, discriminatory policing, and corruption.  For
  instance, we understand that Internal Affairs units:
  lack proper equipment, such as video cameras, secure
  photocopiers, and vehicles; have little authority to
  conduct thorough investigations, including
  investigations of higher-ranking officers; lack basic
  internal controls, including systems to preserve
  confidential files and track the disposition of cases;
  and lack processes to follow-up or otherwise provide

A-18

- 4 -

appropriate feedback to field investigators on the
status or outcome of investigations.

- **Inadequate guidance on conducting searches and
  seizures:**  We are concerned that PRPD officers lack
  proper guidance and training on conducting lawful
  searches and seizures.  In some cases, officers
  reported that violations of citizens' civil rights are
  necessary to meet agency expectations in the seizure of
  illegal drugs and weapons.

- **Inadequate supervision:**  We are concerned that some
  units may consistently lack adequate supervision.
  While this may be due to insufficient numbers of
  adequately trained supervisors, the deployment pattern
  of supervisors may also be a contributing factor.  A
  manpower allocation study may assist the PRPD in
  determining staffing needs and appropriate deployment
  patterns to ensure that officers are properly
  supervised within generally-accepted supervisor-to-
  officer ratios.

- **Fragmented community engagement:**  Although our
  consultants observed instances of proactive community
  engagement, such efforts appear to be inconsistent and
  fragmented.  The lack of consistent community
  engagement may lead to perceptions of fear and
  disparate treatment, particularly in communities that
  may be exposed exclusively to highly-tactical,
  military-like operations with little, or no, engagement
  in collaborative or proactive policing efforts.

During our exit conference, our consultants elaborated on
each of the areas discussed above and offered preliminary
recommendations based on their experience as reform leaders in
law enforcement agencies across the United States.  Our
consultants also identified various professional and research
organizations that may assist the PRPD in developing critical
policies and processes, such as the International Association of
Chiefs of Police ("IACP") (www.theiacp.org), the Police Executive
Research Forum (www.policeforum.org), the Major City Chiefs
Association (www.majorcitieschiefs.org), and the National
Sheriffs' Association (www.sheriffs.org).  Our consultant,
Charles Gruber, also provided you with a copy of "Protecting
Civil Rights:  A Leadership Guide for State, Local, and Tribal
Law Enforcement," published by the IACP.

- 5 -

Separately, we take this opportunity to remind you that the PRPD should take all necessary steps to preserve relevant documents and information and to protect PRPD officers and staff from any unlawful or otherwise improper retaliatory action regarding our investigation.  It also is imperative that the Commonwealth take these steps, including protecting all PRPD officers and staff who participate in our investigation from retaliation, as part of the Commonwealth's pledge of cooperation and consistent with applicable laws and regulations.  While we trust that the Commonwealth will take appropriate steps in this regard, we must emphasize that the Department of Justice takes allegations of destruction or spoliation of evidence and improper retaliation of cooperating individuals seriously, and that we will consider all available remedies under federal law should such conduct occur.  We appreciate your assistance in this regard and look forward to your continued cooperation.

Thank you again for taking the time to meet with us and for the PRPD's hospitality during out tour.  Should you have any questions regarding the foregoing, do not hesitate to contact us. You may reach me at (202) 514-6255, Deputy Chief Daniel Weiss at (202) 616-6594, Attorney Luis Saucedo at (202) 353-0299, or Attorney Zazy López at (202) 305-8702.

Sincerely,

Shanetta Y. Cutlar
Chief
Special Litigation Section

cc:  Mirla Rodríguez Marín, Esq.
     Efrén González González, Esq.
     PRPD Legal Affairs Office

A-20



**U.S. Department of Justice**

Civil Rights Division

SYC:DHW:LES:ZIL:SSL:NO:mb
DJ 207-65-3

*Special Litigation Section - PHB*
*950 Pennsylvania Avenue, NW*
*Washington, DC 20530*

April 10, 2009

**VIA ELECTRONIC AND U.S. MAIL**

José Figueroa Sancha
Superintendent
Puerto Rico Police Department
601 F.D. Roosevelt Avenue
San Juan, PR  00936

    RE:   <u>Investigation of the Puerto Rico Police Department</u>

Dear Superintendent Figueroa:

    We write to memorialize the issues and concerns that we discussed at our March 20, 2009 exit conference, following our third investigative tour of the Puerto Rico Police Department ("PRPD"). As you know, the Civil Rights Division is conducting a pattern or practice investigation of the PRPD, pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, and the anti-discrimination provisions of the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d. During our March 17-27 tour, we met with PRPD officers from the Ponce, Mayaguez, and Aguadilla regions; conducted follow-up interviews at PRPD headquarters; observed PRPD training at the University College of Criminal Justice; and reproduced documents as part of an outstanding request for documents. We were accompanied by our police practices consultants Rachel Burgess, Charles Gruber, and Arturo Venegas.

    As an initial matter, we would like to express our continued appreciation to the PRPD officers and staff who participated in our tour for their cooperation, professionalism, and hospitality. We would especially like to thank the commanders in Ponce, Mayaguez, and Aguadilla for facilitating our visits to each of their respective regions; the officers and staff of the Legal Affairs Office and the Public Integrity Superintendency for their assistance during our inspection and reproduction of documents; and the staff at the University College of Criminal Justice for coordinating our visits to the various classes and training sessions that we observed.

- 2 -

We would also like to thank you for providing us with an
update on the organizational changes that have taken place at the
PRPD.   In this regard, we understand that the PRPD has undergone
significant restructuring through the development of police
regions that are intended to provide for greater localized
control over operational planning.   Similarly, we understand that
several central-level superintendencies and offices have been
reorganized or eliminated to realign functions and
responsibilities within the PRPD.   For instance, we understand
that the Superintendency for Criminal Investigations was
eliminated and its responsibilities transferred to directors in
each of the PRPD's thirteen regions.   We also understand that the
Superintendencies for Public Integrity and Internal Affairs were
consolidated into a newly-created Superintendency for
Professional Responsibility.

You also reported that the PRPD has taken steps to address
concerns that we raised in prior exit conferences, including:
(1) establishing a use of force committee composed of various
disciplines to develop related policies and procedures;
(2) meeting with Dominican leaders and identifying a liaison
officer to work with the Dominican community; (3) re-training
officers in the Tactical Operations units; (4) drafting new
policies and procedures for internal affairs and administrative
investigations, including creating a conciliation or mediation
committee to address less serious policy infractions by officers;
and (5) discussing civil rights issues at all levels of the
agency, including bringing speakers to weekly staff meetings to
address related issues.   Finally, we would like to thank you for
inviting us to the National Congress of Community Leaders event
on March 21 in Aibonito.   We were able to attend near the
conclusion of the event and were appreciative to see the many
residents and families who attended in support of the PRPD's
efforts.

As we noted during our exit conference, our investigation
remains ongoing and we have not reached any conclusions on the
existence of a pattern or practice of unconstitutional or
unlawful conduct by PRPD officers.   However, consistent with our
prior tours and our letters of December 19, 2008 and March 5,
2009, we continue to identify areas of concern based on our
consultants' preliminary observations and impressions.   At this
juncture, our preliminary observations indicate strongly that
systemic deficiencies may be impairing the PRPD's ability to
ensure the full enjoyment of federal constitutional rights and
protections afforded to individuals in Puerto Rico.   These
deficiencies appear to be departures of basic contemporary
practices that have been implemented by law enforcement agencies

- 3 -

across the country to secure the fundamental constitutional
rights of the citizens they serve, and consist of the following
areas of concern:

- **Insufficient guidance on the application of force:**  We
  continue to be concerned that the PRPD lacks policies
  and other written guidance on the application of force
  used by officers.  For instance, we understand that the
  PRPD lacks policies on the use of chemical irritants
  and less-lethal projectiles, although such weapons are
  available to officers in the field.  Similarly, clear
  written instructions for decontaminating individuals
  who have been subjected to chemical irritants also do
  not appear to exist.  Such decontamination procedures,
  as well as procedures related to all types of force
  authorized by the PRPD, should be clearly addressed
  through written policy that is provided to all
  officers.

- **Lack of formal requirements for reporting and reviewing
  use of force:**  We remain concerned that the PRPD lacks
  formal reporting and review requirements regarding
  officers' use of force and that the lack of such
  requirements has allowed ad hoc practices to develop
  within the PRPD.  For instance, we found that officers
  in the Superintendency for Drugs, Narcotics, Vice, and
  Illegal Firearms ("Drug Superintendency") have
  developed their own use-of-force forms and review
  boards that do not appear to be governed by agency-wide
  policy.  Given the apparent unofficial nature of the
  process, it is unclear whether any reports or other
  information regarding the outcome of force reviews are
  distributed to other agency components, such as
  internal affairs or public integrity, or whether any
  use-of-force data is tracked systemically to identify
  patterns or trends.  We also obtained information that
  officers are instructed informally in the field not to
  report their use of force in reports that are required
  by agency policy, such as PRPD Incident Reports, unless
  an individual is injured seriously.  As we discussed
  during our exit conference, the lack of formal written
  policies – and internal mechanisms to ensure adherence
  to such policies – allows for informal practices to
  inure among officers and within units that may be
  inconsistent with agency expectations.

- 4 -

- **Ineffective disciplinary system:**  We continue to be concerned that the PRPD's discipline process does not appear to promote police accountability effectively. For instance, the PRPD's current system appears to be based almost entirely on referrals to the Public Integrity Superintendency and the Legal Affairs Office, which has resulted in inordinate delays – more than five years, in some cases – in imposing discipline against officers who violate agency policy.  We understand that procedures are currently being developed that would allow for minor policy infractions to be handled at the regional-level through mediation or conciliatory committees.  However, we understand that substantial training will still be necessary to ensure that fair and consistent discipline is imposed by supervisors who have not had such responsibilities in the past.  Separately, we obtained information that the PRPD's procedures for identifying officers who demonstrate "repetitive conduct" in administrative complaints (see Special Order 90-5) are not being implemented.  For instance, we learned that the intervention that the agency offers to all such officers – a week-long course entitled, "Human Relations" – has not been provided since August 2007, despite evidence of continuing referrals by supervisors.  We also learned that the PRPD's "repetitive conduct" policy was recently changed to require identification of only those officers who engage in "aggression."  As we noted at the exit conference, limiting the triggering event to acts of "aggression" may result in patterns of other types of significant misconduct – such as unlawful searches and seizures – to be missed that may, nonetheless, warrant early agency intervention.

- **Lack of basic processes and resources for internal investigations:**  We remain concerned that the PRPD components charged with conducting internal investigations appear to lack basic controls and resources to conduct fair, thorough, and timely investigations.  We also understand that the PRPD lacks written standard operating procedures to ensure uniformity in the daily operation of internal investigation units.  As a result, there appears to be significant inconsistency in the forms, methods, and processes employed by members of the same units.  There also appear to be inconsistencies in the warnings that are provided to officers who are interviewed as targets

A-24

- 5 -

of internal investigations.  For instance, we learned
that some officers are warned that they must disclose
all relevant information that is known to them, but
also instructed that they may remain silent.  In this
regard, it appears that administrative investigators
have adopted protections against self-incrimination in
the criminal context without fully understanding the
legal parameters of compelled statements in the
administrative context.  (See, Garrity v. New Jersey,
385 U.S. 493 (1967)).  Separately, we discovered the
existence of an internal affairs unit within the Drug
Superintendency that does not appear in the PRPD's
organizational chart or the current PRPD general order
governing the structure of that superintendency.
Several individuals who handle administrative
investigations at PRPD headquarters also told us that
they were unaware of the existence of the Drug
Superintendency's internal affairs unit.  Unlike
investigators in the Superintendency for Internal
Affairs, we understand that internal affairs
investigators in the Drug Superintendency have
increased access to necessary investigative equipment,
such as video cameras and unmarked vehicles, and were
allowed to be promoted in the last year.  As we
mentioned during our tour, we are concerned that the
existence of multiple internal affairs units within the
same agency may lead to conflict, confusion, and
duplicity in the agency's efforts to adequately address
allegations of officer misconduct.

- **Limited training:**  We recognize that the PRPD has made
  significant efforts to re-train officers in its
  Tactical Operations units in anticipation of labor
  demonstrations or civil unrest that may ensue in the
  coming months.  However, we remain concerned that the
  PRPD's overall training may be too limited to ensure
  compliance with agency policies and constitutional
  requirements.  For instance, the PRPD does not offer a
  field training program to new officers who are assigned
  to patrol duties.  Officers also appear to lack
  training on essential problem-solving techniques that
  may be necessary in implementing community policing
  models and approaches.  We also understand that field
  supervisors will require training on supervision and
  discipline as they assume greater responsibilities in
  the disciplinary process.  Separately, criminal and
  administrative investigators expressed a significant
  need for additional training on investigative methods

- 6 -

and techniques, particularly in cases involving allegations of officer misconduct.

Thank you again for your continued cooperation.  Should you have any questions regarding the foregoing, do not hesitate to contact us.  You may reach me at (202) 514-6255, Deputy Chief Daniel Weiss at (202) 616-6594, Attorney Luis Saucedo at (202) 353-0299, or Attorney Zazy López at (202) 305-8702.

Sincerely,

Shanetta Y. Cutlar
Chief
Special Litigation Section


cc:  Mirla Rodríguez Marín, Esq.
     Efrén González González, Esq.
     PRPD Legal Affairs Office

     Col. Jose Luis Rivera
     Special Assistant to the Superintendent