

FROM THE

# BAR

A publication of the Federal Bar Association,
Hon. Raymond L. Acosta Puerto Rico Chapter

SUMMER 2016
ISSUE NO. 57

# 50TH ANNIVERSARY
# SPECIAL ISSUE



## IN THIS ISSUE

Anniversary Message from the Chief Judge of the
U.S. District Court • 3

The History of the U.S. District Court for the District of
Puerto Rico as an Article III Court Over Five Decades • 6

Historical Development of the U.S. Bankruptcy Court
for the District of Puerto Rico • 18

Magistrate Judges in the District of Puerto Rico:
A History of Service • 21

A Legislative History of the District of Puerto Rico
Article III Court • 24

From Cardstock to Paperless: 50 Years of Evolution • 26

Trial by Jury • 31

The U.S. Probation and Pretrial Office: District of
Puerto Rico • 33

Did You Know Answers • 36

**IN EVERY ISSUE:**

Message from the Editor • 2

## The Federal Bar Association
## Hon. Raymond L. Acosta
## Puerto Rico Chapter



## BOARD OF DIRECTORS

**President**
Salvador J. Antonetti Stutts

**President Elect**
Mariano A. Mier Romeu

**Vice President**
José L. Ramírez Coll

**Secretary**
Héctor L. Ramos Vega

**Treasurer**
Ricardo L. Ortiz Colón

**National Delegate**
María Ligia Giráldez

**Directors**
Roberto Abesada Agüet
Joseph G. Feldstein del Valle
Joanna Matos Hicks
Luz C. Molinelli González
Natalia Morales Echevarría
María Dolores Trelles Hernández

**Immediate Past President**
Roberto A. Cámara Fuertes



Copyright ©2016 by the Federal Bar Association, Honorable Raymond L. Acosta Puerto Rico Chapter.

The contents of *From the Bar* may not be reproduced without the express written consent of the author. This newsletter is intended for information only and is not to be considered legal advice. The views expressed by counsel in the articles published herein are entirely theirs and not of the Chapter or the editorial board.

**Editor**
Luz C. Molinelli-González, Esq.
luzmolinelli@gmail.com

Requests for additional copies, submissions, or address updates should be directed to Luz C. Molinelli-González at luzmolinelli@gmail.com.

# MESSAGE FROM THE EDITOR

Luz C. Molinelli-González



With this issue we commemorate the 50th Anniversary of the District of Puerto Rico Article III Court. In honor of this event, we look back to the Court's history as well as its current and future projects.

As you may already know, the Hon. Raymond L. Acosta PR Chapter of the Federal Bar Association–Puerto Rico Chapter (previously the Antilles Chapter of the FBA) was founded only one year after President Lyndon B. Johnson signed Public Law 89-571. Since its inception, our Chapter has been blessed with the continued support from the federal judiciary, its judges, magistrates, clerks and bar members. Today we celebrate them.

In this issue you will find articles about the historical development of the USDC-PR, the USBC-PR, the magistrate judge system; a look into jury trials; and the evolution of the Clerk's Office during the last 50 years.

We thank Hon. Aida M. Delgado Colón, Chief Judge of the USDC-PR, and Frances Ríos de Morán, Esq., Clerk of the Court, for making this issue possible. We also thank Hon. Enrique S. Lamoutte Inclán, Hon. Francisco A. Besosa, Hon. Gustavo A. Gelpí, Hon. Silvia Carreño Coll, Hon. Bruce J. McGiverin, and colleagues Ricardo Casellas, Francisco J. Colón-Pagán, Francisco E. Colón-Ramírez, Joseph Feldstein, Brian Gumz, Mariano Mier Romeu, Manuel San Juan, and Jorge E. Vega Pacheco for their contributions to this issue.

We hope you enjoy this issue of *From the Bar* and invite you to submit your articles or notes for publication in upcoming issues by e-mail to luzmolinelli@gmail.com.



## Donate to the Foundation of the Federal Bar Association!

Your donations to the annual campaign of the Foundation of the Federal Bar Association help fund legal education, scholarships and community outreach programs.

To learn more, visit http://www.fedbar.org/Foundation

# ANNIVERSARY MESSAGE FROM THE CHIEF JUDGE OF THE U.S. DISTRICT COURT

by Aida M. Delgado Colon, Chief Judge, USDC-PR



As Chief Judge of the United States District Court for the District of Puerto Rico, it is an honor and my pleasure to invite all of you, fellow members of the judiciary, distinguished members of the federal bar and Unit Heads from state and federal agencies, to our District Court's celebration of its 50th anniversary as an Article III Court.

As you may know, immediately after the United States' intervention here, Puerto Rico was ruled by a military government. In 1899, Brigadier-General Davis, empowered by the provisions of General Order 88, created a U.S. Provisional Court in Puerto Rico. This Provisional Court was superseded when the U.S. Congress enacted the Foraker Act in 1900, which provided a new civil government for Puerto Rico.

Under the Foraker Act, the United States District Court for the District of Puerto Rico was considered a territorial court. Back then, federal judges served four (4) year terms. Thereafter and until 1966, judges were appointed to serve eight (8) year terms. Throughout these years, the number and complexity of the cases brought before the Puerto Rico federal court system were impressive and the presence of visiting judges was often necessary.

On January 28, 1952, President Harry S. Truman nominated Clemente Ruíz- Nazario to be the first native-born Puerto Rican United States District Judge. He was appointed to the bench after being confirmed by the United States Senate on March 15, 1952. After an outstanding career as a solo judge, Judge Ruíz-Nazario's call for the appointment of a due to Judge Cancio's initiative.

July 21, 1965, President Lyndon B. Johnson appointed Judge Hiram Cancio to the federal bench to fill the second seat, which Congress had created in 1961. Like his predecessors, Judge Cancio's appointment was for a fixed term. However, after his appointment, Congress, on September 12, 1966, enacted Public Law 89-571 (80 Stat. 764), which provided life tenure to the federal judges on our bench under the protections of Article III of the U.S. Constitution. Undoubtedly, the most significant advancement the statute intended to achieve was that "the judges in the District Court of Puerto Rico were to become completely integrated into the federal judicial system."[1]

As the 1967 Annual Report of the Director of the Administrative Office of the U.S. Courts stated, upon conferring "the same life tenure upon the U.S. District Judges in Puerto Rico, as is provided for [other Article III district judges...] the last remaining barrier to the full and complete integration of the District Court in Puerto Rico into the federal constitutional judicial system has been eliminated."

Thus, on January 16, 1967, President Johnson proceeded to nominate Judge Cancio to become the first judge to serve in Puerto Rico with life tenure under Article III. Judge Cancio was confirmed by the Senate on June 12, 1967, and he served brilliantly on the bench until January 31, 1974. Interestingly, the fact that, to this day, the Puerto Rico flag is displayed together with that of the United States in every courtroom in our District is due to Judge Cancio's initiative.

On June 2, 1970, President Richard M. Nixon nominated José V. Toledo to serve on our Court and, on September 25, 1970, the United States Senate confirmed him. Upon receiving his commission on December 1, 1970, at the age of 39, he became the youngest member of the federal judicial system. He then became Chief Judge in 1974 on the same day that Judge Cancio retired. Regrettably, Judge Toledo passed away on February 3, 1980, but his ten years on the bench did not go unnoticed. During his short tenure, our District was transformed in all imaginable ways as he literally revolutionized the Court, especially its administrative structure. Judge Toledo modernized equipment, added support staff, and improved salaries. He also initiated the student law program, implemented the Speedy Trial Act of 1974, and obtained for the District professional library services and a second Magistrate Judge position. Due to his contributions to the Puerto Rico federal judiciary, the Old San Juan Courthouse was named, in 1999, the José V. Toledo Federal Building and United States Courthouse.

Since 1966, when two District Judge seats existed, and despite an ever increasing and ever more complex workload, only five (5) additional seats, for a total of seven (7) active judgeship positions, have been created. The last of these positions was created in 1978. Nonetheless,

---

1   Legislative History, 2 USC Can 2786-2790 (1960).

*Continued on next page*

# MESSAGE...

*Continued from previous page*

nineteen (19) District Judges have been appointed to fill these seats. Currently, the District Court consists of seven (7) active District Judges, three (3) senior District Judges and four (4) Magistrate Judges. The District of Puerto Rico is the second largest district (the first being the District of Massachusetts) in the First Circuit.

Given the geographic and socio-economic conditions prevailing in our District, our criminal workload continues to increase. Civil filings, which for sometime experienced a reduction here as they did nationwide, have increased over the last two years.

From 2014 to 2015, civil filings increased 135.8% (from 925 to 2,181). Civil trial hours increased 55.7% between 2013 (241.8) and 2015 (376.4). In the last year alone, real property civil filings increased from 7 to 113 cases, representing, as of December 2015, 5.1% of our civil workload. So far this year, 1,518 real property foreclosure cases have been filed.

Criminal filings, while decreasing nationwide, have increased in Puerto Rico by 2.4% from 2014 to 2015. The District of Puerto Rico ranks first nationwide in weapons-related filings. In 2015, firearms cases constituted 32.5% of our criminal workload, far exceeding the national average of only 10%. Due to the number of drug cases filed, Puerto Rico is ranked first, nationwide, in the filing of multi-defendant cases. Drug filings account for 39.3% of our criminal workload, exceeding the national average of 31.8%. To date, the District of Puerto Rico generates 60.2% of the criminal workload that appears before the First Circuit Court of Appeals. Excluding the border states, Puerto Rico is the district with the third highest criminal workload in the nation. We are, in other words, a very busy court.

During the past 38 years, the number of judicial officers has not increased but the Court's administrative and operational structure, comprised of the Clerk's Office and Probation Office, has rapidly developed and modernized, especially during the last 20 years. The Clerk's Office, under the leadership of Frances Morán, our Clerk of Court for the past 22 years, embraced early on the improvements to be derived from technology. Courtrooms continue to be upgraded with necessary technology to facilitate litigants' practice, WiFi is available within all of our courthouses, and Puerto Rico was among the very first districts to switch over to electronic case filing (CM/ECF) and was the second district in the nation to implement electronic voucher filing under the Criminal Justice Act. Most recently, we have implemented a Jury Electronic System (JERS) that enables litigants to submit, and jurors to receive, trial evidence in electronic format. Today, members of the bar comfortably operate in a "paperless" setting.

The Pre-Trial and Probation Office, as it now exists, has undergone a merger of its two main areas of work: one being the pre-trial activation of cases and the supervision of individuals on bail, and the other being the court services component which involves pre- sentence investigations and the supervision of individuals on supervised release. The office is staffed with approximately 85 officers and

> SINCE 1966, THE FEDERAL JUDICIARY IN PUERTO RICO HAS UPHELD ITS COMMITMENT TO EXCELLENCE IN SERVICE NOT ONLY BY UPHOLDING THE U.S. CONSTITUTION AND LAW, BUT BY CONTRIBUTING TO THE FEDERAL JUDICIARY NATIONWIDE.

support personnel, even though their caseload warrants a larger number of positions. The Probation Office, since 2002, has been led by Mr. Eustaquio Babilonia who, while tackling an ever increasing workload, has raised the office to new heights. In 2015-2016, the District of Puerto Rico processed 50% of all active cases within the First Circuit; 47% of all post-conviction and pretrial supervision cases, 55% of all pretrial activations (bail reports), and 55.5% of all pre-sentence investigations completed in our Circuit. In addition, the Probation Offices remains active in developing an impressive Outreach Program, earning peer and nationwide recognition. Since 1966, the federal judiciary in Puerto Rico has upheld its commitment to excellence in service not only by upholding the U.S. Constitution and law, but by contributing to the federal judiciary nationwide. Puerto Rican born and Puerto Rico descendant judges serve the federal judiciary at all levels, from the Supreme Court, to the Courts of Appeals, to the District Courts. By our active participation on Judicial Conference Committees and our service throughout the federal judiciary, Puerto Rico's Article III District Court has faithfully carried out

*Continued on next page*

# MESSAGE...

*Continued from previous page*

its constitutional role and continues to fulfill its mission at both the local and federal level.

From FY 2011 through FY 2015, the Puerto Rico District Court has figured amongst the 20 most productive courts in the nation, with an average rank of the 15th most productive court of the 94 district courts in the United States. For FY 2015, we ranked 17th in the nation productivity-wise. Similarly, for FY 2015, the District of Puerto Rico ranked 33rd in the nation in civil trials, 22nd in criminal trials, 19th in trial hours and 7th in bench hours.

At the local level, the federal court has played an integral part in Puerto Rico's social and economic development and has been at the vanguard of securing civil rights and the core values essential to our democratic system. Within the past 50 years, all private or public surveys conducted in Puerto Rico have shown that the U.S. District Court for the entities earning the highest percentage of public trust and confidence.

Cognizant of the fact that we stand on the shoulders of those giants who preceded us, we publicly reaffirm at this, our 50th Anniversary, our Oath of Service. We are here to celebrate this milestone with fellow members of the federal and state judiciary, the local bar and the people of Puerto Rico.

The celebration events will take place from September 28 through September 30, 2016. During this celebration, we will host as our special guests: Chief Circuit Judge Jeffrey R. Howard, Circuit Judge Juan R. Torruella, and Justices of the Puerto Rico Supreme Court. This important milestone will bring together heads of state and federal agencies, fellow judges from other Districts in the First Circuit, Circuit Executives, and members of Committees of the Judicial Conference of the United States, along with representatives of the Administrative Office of the U.S. Courts.

Consistent with our lifetime commitment to the Bar, and in collaboration with the Federal Bar Association, we have developed a program geared to make our history, development and achievements known to local members of the bar and the community in general. Together, with fellow members of the state and federal judiciaries and with heads of government agencies, we shall recognize those who have preceded us and those still among us, who through hard work and dedication have made this District Court excel.

During this three-day program, we will educate employers about the importance of jury service to our democratic system of government, conduct a Second Chance Program, which promotes rehabilitation through the employment of individuals on supervised release, and reach out to approximately 1,500 students from public schools with an educational program that alerts them to the risks associated with the improper use of social media while also promoting good values. As is customary, there will also be a continued legal education training session. Through these programs, you will learn about all the services and diverse outreach programs that the Court has sponsored in recent years. All these programs are geared not only to improve the professionalism and quality of services rendered by members of the bar, but to provide educational opportunities for law students, enhance rehabilitation for the significant number of individuals in our District in need of educational and employment opportunities, and promote access to drug and mental health treatment programs.

I invite and thank the support of every member of the bar and judicial officer who aspires to equality and is determined to fulfill his or her duties guided by high moral and ethical standards, professionalism, hard work, and devotion to the principles of law, justice and democracy.

With this celebration, all Judicial Officers, Court Unit Executives and Court Employees acknowledge the devoted service of those who have preceded us in the Puerto Rico federal judiciary, thanks to whose hard work and commitment to the rule of law our Court is today recognized as "one among equals". Their achievements inspire us to reiterate our commitment to the people of Puerto Rico to continue to ensure their access to justice and the fair, firm and timely application of the law to every suit brought before this Court.

We also take this opportunity to assure the people of Puerto Rico that, aside from our daily duty to dispense justice, we remain committed, as an integral part of this community, to promoting the rule of law, trust and confidence in the judiciary, and the development of quality legal professionals, who shall themselves promote better opportunities, social action and positive reforms in our community.

# The History of the U.S. District Court for the District of Puerto Rico as an Article III Court Over Five Decades

By:

Francisco J. Colón-Pagán
Francisco E. Colón-Ramírez
Manuel San Juan
Ricardo Casellas
Joseph Feldstein
Mariano Mier
Jorge E. Vega-Pacheco



## 1966-1976

On September 12, 1966, the U.S. District Court for the District of Puerto Rico was born as an Article III court, upon the passage of Public Law 89-571, 80 Stat. 764. Before then, it had been an Article I court, meaning its judges were appointed for fixed terms of four years (later increased to eight years). Two Article I judges served in Puerto Rico at the time: Clemente Ruiz-Nazario, the first native-born Puerto Rican appointed to the federal bench by President Harry S. Truman, and Hiram Rafael Cancio, appointed by President Lyndon B. Johnson on July 21, 1965, to fill a second seat created by Congress in 1961.

Public Law 89-571 granted life tenure upon good behavior to future judgeships appointments for our District, thus granting our court the same status as other U.S. District Courts. The law extended the protections envisioned by the U.S. Constitution to federal litigants in Puerto Rico: independent life-tenured jurists, free from the political pressures of the Executive and Legislative branches. Furthermore, as a result of Public Law 89-571, all judges appointed thereafter would enjoy the same privileges as their brethren in other federal district courts, including the eligibility for retirement benefits. It was in part an overdue acknowledgement of the work carried out in our district; by May 1961, Judge Ruiz-Nazario's workload had become the largest in the First Circuit. In December 1966, Judge Ruiz-Nazario retired and Judge Cancio became Chief Judge. The following month, on January 16, 1967, President Johnson nominated Judge Cancio as the District Court's first Article III judge. He was confirmed by the Senate on June 12, 1967, and received his commission that same day. As a result, Judge Cancio enjoyed the unique distinction of being both the last Article I judge and the first Article III judge in our district. During his tenure Judge Cancio ordered that the Puerto Rico and United States flags be displayed together in the courtrooms, behind the bench, a tradition that continues to this day.

Judge Cancio was soon joined on the federal bench by Juan Fernández-Badillo, the Solicitor General for the Commonwealth of Puerto Rico at the time. He was nominated by President Johnson on September 18, 1967, to fill the second seat created by Public Law 89-571. He was confirmed by the Senate on October 12, 1967, receiving his commission that same day.

On June 2, 1970, a third judicial seat was authorized by Public Law 91-271, 84 Stat. 294. That same day, President Richard M. Nixon nominated José Víctor Toledo, an attorney in private practice, to fill that newly created judgeship. He was confirmed by the Senate on September 25, 1970, and received his Commission on December 1, 1970, at the age of 39, becoming the youngest federal judge in the federal judicial system at the time.

On June 30, 1972, Judge Fernández-Badillo took on senior status, creating a vacancy for district judges. On September 5, 1972 President Nixon filled this vacancy by nominating Hernán G. Pesquera. Judge Pesquera was also an attorney in private practice, litigating cases in the federal and commonwealth courts, as Judge Toledo had done prior to his appointment. He was confirmed on October 12, 1972, and received his commission five days later.

On January 31, 1974, Judge Cancio resigned after a very busy tenure and Judge Toledo was sworn-in as Chief Judge. On November 18, 1974, President Gerald Ford nominated

*Continued on next page*

# History...

*Continued from previous page*

Juan R. Torruella to fill the vacancy created by Judge Cancio's resignation; he received his commission the following month, on December 20, 1974.

Chief Judge Toledo was quick to embark the District Court on the evolutionary path that led to the court as we know it today. He used allocated resources at hand to initiate the electronic modernization of the judges' chambers, realign the staff, and increase their salaries. Furthermore, he lobbied to add four active judges to the District Court, in order to handle the court's inordinately high and ever-growing caseload.

that it was too small. Chief Judge Toledo insisted on staying in Old San Juan while the Hato Rey building was expanded.

Although the number of judges in the District Court grew modestly in its first ten years as an Article III court, the workload of the court increased at an accelerated pace. During these years federal judges from other courts visited our District Court to assist with its caseload. These visiting judges came from New York, Minnesota, Louisiana, Virginia, Illinois, Maine, Rhode Island, among other jurisdictions, and assisted by presiding over different cases assigned to them, including complex criminal cases and high-profile civil cases. Visiting judges were, of course, not the only resource employed by the District Court to tackle its ever-increasing workload; it also had court-appointed officers known as "United States Commissioners."



[Chief Judge José Victor Toledo] used allocated resources at hand to initiate the electronic modernization of the judges' chambers, realign the staff, and increase their salaries.

It would take Congress eight years to add an additional four seats to our court. In the meantime, Chief Judge Toledo allowed excelling third-year law students to practice in our court, which helped distribute the load of criminal cases. He also partnered with the University of Puerto Rico School of Law to have up to three top-performing law students assigned as law clerks to each judge. This program continues to this day and has proven to be an invaluable resource for the judges while providing an unparalleled educational experience to future jurists. Chief Judge Toledo was also instrumental in obtaining professional library services for the judges, which he achieved by persuading the librarian for the First Circuit to create a librarian's position that would serve the court and its staff in Puerto Rico, and manage its collections.

Finally, Chief Judge Toledo also oversaw the construction of the new courthouse in Hato Rey, even though he preferred the Old City. When his efforts to persuade the General Services Administration to build a new courtroom in Old San Juan were not fruitful, he directed his energies to the restoration and preservation of the Old San Juan Courthouse and Post Office, where he chose to stay when the new U.S. District Court and Federal Building at Chardón Avenue in Hato Rey was completed in 1976. It took three years to build, and by the time it was finished it was evident

The commissioner system was established in 1793. When Congress subsequently established the formal office of "United States Commissioner" in 1896, the power to appoint commissioners, which until then resided with the Court of Appeals in each circuit, was transferred to the district courts. In 1940, Congress allowed the judges of the district courts to delegate to their commissioners the authority to try and to sentence individuals charged with petty offenses committed on federal property. Commissioners could also issue search warrants and arrest warrants, set bail for federal defendants, and conduct other initial proceedings in federal criminal cases. Commissioners were appointed for terms of four years, although they could be removed by the district court at any time.

The Federal Magistrates Act of 1968 abolished the United States Commissioner, replacing it with the United States Magistrate, authorized to assume all former duties of the commissioners and, also, to conduct a wide range of judicial proceedings to expedite civil and criminal cases. The title of this judicial officer would be changed in 1990 to "Magistrate Judge", in recognition of the ever-increasing importance of their work.

Magistrate Judges were appointed by the district judges in each district: full-time magistrates served for a renewable

*Continued on next page*

# HISTORY...

*Continued from previous page*

term of eight years while part-time magistrates served for a renewable term of four years. A pilot program was established and by July 1971 the new magistrate system was in place throughout the federal judiciary. In 1974, the Supreme Court ruled that magistrates could not conduct evidentiary hearings in *habeas corpus* proceedings, which led to the enactment of Public Law 944-577, 90 Stat. 2729, which further defined the magistrates' authority and granted them the power to conduct habeas proceedings. The Federal Magistrates Act of 1979 later granted magistrates additional powers, including the authority to preside over civil trials with the parties' consent.

In 1966, our district court had four commissioners: Carlos García-Méndez in Mayaguez; Harley A. Miller in San Juan; Héctor Reichard in Aguadilla; and Ariel Colón-Clavell in Ponce. Their main functions were to set bail and make findings of probable cause in criminal cases. When the magistrate system was first implemented, only one magistrate was allocated for Puerto Rico. On January 25, 1971, Harley A. Miller became the first U.S. Magistrate for our district; he served until his retirement on October 31, 1972. This vacancy was filled on November 9, 1972, by John M. García-Nokonechna, the first full-time Hispanic United States Magistrate Judge to be appointed under the Federal Magistrates Act of 1968. Magistrate García was only 26 years old at the time, which was quite an accomplishment given that magistrates had to be admitted to the Bar for a minimum of five years in order to qualify for the position. He served with distinction until he resigned in 1977.

Although Puerto Rico initially had only one magistrate judge, in 1975 a second position was allocated to Puerto

Rico, mainly as a result of Chief Judge Toledo's efforts. On October, 1, 1975, Judge Toledo appointed then-Assistant U.S. Attorney Juan M. Pérez-Giménez as a U.S. Magistrate Judge, whose distinguished service led to his subsequent nomination and appointment as a federal district judge in 1979.

Prior to 1979, federal district courts also served as courts of bankruptcy pursuant to the Bankruptcy Act of 1898. This was the first act of Congress involving bankruptcy that gave companies the option of being protected from creditors and created the position of Referee—an officer appointed by the district judges to supervise the administration of bankruptcy cases and allowed to have certain judicial powers by referral from the district court.

In 1973, the rules issued by the Supreme Court recognized the judicial character and duties of the office by interchangeably employing the terms "bankruptcy judge" with "referee." Also in 1973, the congressionally chartered Commission on Bankruptcy Laws of the United States recommended the formal establishment of bankruptcy judgeships to preside over judicial proceedings related to bankruptcy in courts that would be independent of the U.S. district courts. The commission called for the appointment of executive branch officers to carry out administrative responsibilities related to bankruptcy cases. These changes, however, would not come about until 1978. When our District Court first became an Article III Court, there was only one bankruptcy referee, William H. Beckerleg, who was subsequently appointed as bankruptcy judge.

During its initial decade as an Article III court, operations continued at the historic U.S. Post Office Building and Courthouse in Old San Juan, originally constructed between 1911 and 1914, and expanded in 1940. In 1976, the judges' chambers and courtrooms were located on second floor, Judge Toledo's on the western side, Judge Pesquera's on the east. The Clerk's Office was in the southern area of the second floor. Judge Torruella's chambers and courtroom, which were the largest, were on the fifth floor. The building also housed the Bankruptcy Court as well as the U.S. Attorney's Office.

Several District Court cases made headlines during that first decade as an Article III court. In 1968, Judge Cancio presided over a death-penalty case involving a woman accused of stabbing her husband, who was in active military service. The incident took place in Fort Buchanan, a federal property. Judge Cancio gave the jury what many legal scholars have considered to be brilliant instructions. After two days of deliberations the jury could still not reach a verdict. Judge Cancio dismissed the jury and scheduled



*Judge Hernán G. Pesquera (1972-1982)*



*Judge Juan R. Torruella (1974-1984)*

*Continued on next page*

# HISTORY...

*Continued from previous page*

a new trial; however, when the defense asked for the defendant's acquittal, the United States Attorney dismissed the charges.

Judge Cancio's death penalty case came on the heels of another well-known case over which he had presided the year before. It was a difficult decade in the United States, marred by the Vietnam War, and the deaths of President John F. Kennedy, civil rights activist Martin Luther King, Jr., and presidential candidate Robert Kennedy. The Vietnam War caused a lot of rift within the population, with opposition to the war and the military draft, compounded by the presence of the Reserve Officer Training Corps (ROTC) in college campuses. The U.S. Attorney's Office in Puerto Rico criminally charged 97 young men for hindering and interfering with the Military Service Act. The first trial against eleven defendants began before Judge Fernández-Badillo. The defense lawyers included attorneys Juan Mari Bras and Rubén Berríos-Martínez, as well as lawyers from the American Civil Liberties Union. All sorts of legal challenges were raised, including challenges to the Military Service Act, and claims of illegality of the Treaty of Paris and the presence of the federal court in Puerto Rico. None of the arguments prevailed.

One of the 97 charged was Edwin Feliciano-Grafals. After receiving his A-1 classification by the local Selective Service Board, he was drafted three months later. He opposed the war and refused to enlist, for which he was subsequently arrested in June 1967. The trial against Mr. Feliciano-Grafals began on April 24, 1967, and on May 7, 1967, he was found guilty after an 8-day trial. Judge Cancio allowed Mr. Feliciano-Grafals to remain free on bail until sentencing. On July 26, 1967, Judge Cancio sentenced Mr. Feliciano-Grafals, then a young man, to one year of imprisonment. The sentence weighed heavy on Judge Cancio, as he felt Mr. Feliciano-Grafals was not a criminal, but instead felt he was an honest citizen who had committed a technical violation of the law. He did however deny defendant's motion to set aside the verdict.

Mr. Feliciano-Grafals appealed. While his appeal was pending before the First Circuit, Judge Cancio requested that the case be remanded to him. The First Circuit in turn acquiesced. Presiding over the case again in 1970, and over the objection of the U.S. Attorney, Judge Cancio, who was a World War II veteran, followed his conscience and his sense of justice, and symbolically sentenced the conscientious objector to the Vietnam War to one hour of imprisonment to be served in the U.S. Marshals' holding cell.



*Judge Hiram Rafael Cancio (1965-1974)*

The first decade as an Article III court had its share of confrontations with the Commonwealth government over the use of La Princesa, a colonial prison located near the Old San Juan courthouse. Constructed by the Spanish in 1808 and used as a jailhouse since 1838, it continued to be used by the local government for the same purpose after the Spanish-American War. Its conditions, however, were deplorable. In 1975, several inmates filed a civil rights class action under 42 U.S.C.S. §1983 against two Commonwealth officials, the Administrator of Corrections and the Warden, challenging the conditions of their confinement and seeking declaratory and injunctive relief. See, *Martínez Rodríguez v. Jiménez,* 469 F.Supp. 582 (D.P.R. 1975). Plaintiffs were represented by Stanley L. Feldstein, Francisco López-Romo, Roberto Busó-Aboy, and Rafael Pérez-Bachs, while defendants were represented by Arturo Díaz, an Assistant District Attorney with the Puerto Rico Department of Justice.

In 1976, after a four-day hearing, the Court ruled for plaintiffs, granting the declaratory and injunctive relief sought by the inmates and concluding that the conditions of confinement violated the constitutional rights protected by the Eighth and Fourteenth Amendments. Judge Torruella described the jail as a "notorious monument to man's inhumanity to man," finding that "[t]he overcrowding, which reached more than two or three times the jail's capacity, made it impossible to classify inmates," and that the jail was so understaffed that it was impossible to have adequate supervision. Id. Judge Torruella "enjoined the admission of minors, substance abusers, and the mentally deranged because other facilities were available," and prohibited the housing of inmates in excess of its capacity. Id. Defendants appealed, but while the appeal was pending La Princesa was shut down and the appeal became moot, save for the court's award of attorneys' fees to plaintiffs, which the appellate court affirmed. Although the La Princesa case was over, it paved the way for the Morales-

*Continued on next page*

# HISTORY...

*Continued from previous page*

Feliciano lawsuit and the prison reform litigation that followed in the next decade.

The first decade also saw another landmark case begin that still resonates to this day. It involved the tiny, idyllic island of Culebra which, although inhabited, was used by the U.S. Navy for many years as a bombing range. Not surprisingly, this activity hampered economic development in Culebra and was very unpopular with its residents. The Navy, on the other hand, sought to increase its presence in Culebra and opposition mounted. The Mayor of Culebra attempted to negotiate, to no avail. Consequently, on June 25, 1968, a group of residents who called themselves the Culebra Citizens Committee, led by its Mayor, Ramón Feliciano-Encarnación, filed suit in the District Court raising several constitutional issues and requesting a preliminary injunction. In 1969 the Culebra Citizens Committee lost. See, *Feliciano v. United States,* 297 F.Supp. 1356 (D.P.R. 1969), aff'd 422 F.2d 943 (1st Cir. 1970). The U.S. Supreme Court, in turn, denied a petition for *certiorari.*

The battle however was far from over. In 1971, residents of Culebra initiated a series of protests against the Navy. A second and very successful front against the Navy was mounted in the Nation's capital, led by Richard Copaken, a Washington lawyer who agreed to represent the residents of Culebra *pro-bono.* In 1975, the Navy ceased using Culebra for target practice. It relocated its bombing range to the nearby island of Vieques, where another battle would erupt the following decade.

Our legal system is a pillar of our democracy. The "rebirth" of the Puerto Rico District Court as an Article III court guaranteed a forum where federal rights could be vindicated. In its first decade, the District Court cemented its roots in a legal culture that would continue to serve our society in the decades to come. Since then, all judicial appointments have gone to Puerto Ricans, an acknowledgment by the Presidents and Congress "of the quality among Puerto Rican attorneys and their great deference to the cultural identity of the Puerto Rican people." (Guillermo A. Baralt, *History of the Federal Court in Puerto Rico: 1899-1999.* Publicaciones Puertorriqueñas, Inc., 2004, pp. 340-1.)

## 1977-1986

The second decade of our district court as an Article III court started with Judge Toledo at the helm as Chief Judge. His efforts to increase the number of judgeships in Puerto Rico paid off with the enactment, on October 20, 1978, of Public Law 95-486, 92 Stat. 1629, which added four additional judgeships to our District Court, for a total of seven.

On October 23, 1979, President Jimmy Carter nominated then-U.S. Magistrate Juan M. Pérez-Giménez to serve as U.S. District Judge; he was confirmed by the Senate on December 5, 1979, and received his commission the following day. On November 30, 1979, President Carter nominated Commonwealth Superior Court Judge Gilberto Gierbolini-Ortiz to the second of the four additional positions; he was confirmed by the Senate on February 20, 1980, and received his commission that same day. On May 14, 1980, President Carter nominated Carmen Consuelo Cerezo, also a Commonwealth Superior Court judge, to fill the third judgeship. She was confirmed on June 26, 1980, and received her commission four days later, becoming the first Hispanic woman to serve on the federal bench, and the first female U.S. District Judge in Puerto Rico. The fourth judgeship was filled by Jaime Pieras, Jr.; he was appointed in 1982 by President Ronald W. Reagan, confirmed by the Senate on July 14, 1982, and commissioned the following day.

On February 3, 1980, the District Court mourned the loss of Chief Judge Toledo, who passed away at the early age of 48. Judge Pesquera was sworn in as Chief Judge that day, and served until he too passed away in 1982 at the age of 59, at which point Judge Torruella was sworn in as Chief Judge. On September 9, 1982 President Reagan nominated Raymond L. Acosta, U.S. Attorney for the District of Puerto Rico since 1980, to fill the first of those vacancies; he was confirmed by the Senate twenty days later, and commissioned on September 30, 1982. President Reagan next nominated Héctor M. Laffitte, who was confirmed on July 26, 1983, and commissioned the next day.

In 1984 Judge Torruella was designated to the Court of Appeals, becoming the first Hispanic judge to serve on the First Circuit. Judge Pérez-Giménez took the oath as Chief Judge. Thereafter, on September 27, 1985, President Reagan nominated José Antonio Fusté to fill the vacant judgeship; he was confirmed by the Senate on October 25, 1985, and received his commission three days later.

Various magistrate judges served the court during this decade. In addition to Magistrate Judge Pérez-Giménez, who served from 1975 until he became a district judge in 1979, in 1977 Chief Judge Toledo appointed then-Clerk of Court and part-time magistrate, Dennis A. Simonpietri-Monefeldt, as a full-time magistrate. He was soon joined by Ramón A. Alfaro, who served from 1977 to 1979. Other magistrates included Arturo Díaz, who served from 1979-1980; Jesus A. Castellanos, who served from 1980 to 2004;

*Continued on next page*

# HISTORY...

*Continued from previous page*

Justo Arenas, who served from 1981 to 2011; and Roberto Schmidt-Monge, who served from 1985 to 1993.

The years 1977-1986 were thus marked by a rapid expansion of the court's caseload and its personnel. Still, it retained much of the quaint character of a relatively small courthouse. There was a great deal of camaraderie among the judges, lawyers, public defenders, and prosecutors, who would



*Judge Jose A. Fuste (1985-2016)*

often trade war stories over a drink at the old Palm Beach Cafe on the corner of San Justo and Tetuán streets.

The Office of the Federal Public Defender had just been created in 1978. Legendary criminal defense lawyer Gerardo Ortíz-del Rivero, who served as the Federal Public Defender almost this entire period, lent an air of anticipation whenever he stepped into the courtroom. A talented and tenacious advocate, Ortíz-del Rivero was blessed with a somewhat irreverent sense of humor that never failed to both amuse and amaze the Bench and the Bar. On one memorable occasion, as he argued before Judge Torruella during a sentencing hearing, Ortiz del Rivero's plea for leniency on behalf of his client was based, among other things, on the fact that the poor man had only one eye. In a flash the client popped his glass eye out of its socket, and Ortíz snatched it from his hand, attempted to give it to the judge's courtroom deputy, Violeta Maldonado, who let out a yelp and immediately dropped it on the floor, whereupon it proceeded to roll around the courtroom like a giant rogue marble with a mind of its own.

Many outstanding lawyers graced the corridors of the federal courthouse during these years, including such luminaries as Harvey B. Nachman, Blas Herrero, and Francisco "Paco" Ponsa-Feliú. By the same token, a number of important and controversial cases came before the Court. There was, for

example, considerable litigation involving prison reform. Judge Torruella, who had presided over the La Princesa litigation, subsequently enjoined the Commonwealth government from engaging in certain practices as part of the juvenile detention system, such as corporal punishment and the use of isolation cells. See, *Santana v. Collazo,* 533 F.Supp. 966 (D.P.R. 1982). Additionally, upon Judge Pérez-Giménez's appointment to the District Court in 1979 he began presiding over what would become his longest-lasting and most significant institutional reform case, the Morales-Feliciano prisoner's rights litigation, which remained before the Court for more than 30 years and ultimately resulted in numerous significant reforms to the Puerto Rico prison system. Judge Pérez-Giménez also presided over one of the most sensational and shocking trials of the era, the infamous "Jessica" case, *United States v. Cátala Fonfrías,* 612 F.Supp. 999 (D.P.R. 1985), where a lawyer, his client, and several high-ranking corrupt Commonwealth police officers were convicted of conspiring to kill a federal witness.

There were also a number of important cases involving the protection of Puerto Rico's environmental patrimony. Among these was the maritime law case involving the, grounding of the Steamship "Zoe Colocotroni" and the resulting oil spill, heard by Judge Torruella. See, *Puerto Rico v. SS Zoe Colocotroni,* 456 F.Supp. 1327 (D.P.R. 1978), aff'd in part and vacated in part, 628 F.2d 652 (1st Cir. 1980). Another case involved environmental pollution from the discharge of toxins into a waterway adjacent to the Ciudad Cristiana housing subdivision in Humacao. The trial in this case ended with a $12.3 million judgment for plaintiff, and brought about spin-off litigation that lasted over ten years.

In *Romero-Barceló v. Brown,* 478 F.Supp 646 (D.P.R. 1979), aff'd in part and vacated in part, 643 F.2d 835 (1st Cir. 1981), rev'd, *Weinberger v. Romero-Barceló,* 456 U.S. 305 (1982), Judge Torruella refused to enjoin the U.S. Navy from discharging ordnance into the waters off the coast of Vieques, but required it to obtain a permit to do so from the EPA or a waiver from the President. To make his findings, Judge Torruella spent hours diving and examining the reefs surrounding the island. The heated controversy over the Navy's use of Vieques as a firing range was emblematic of the era and resulted in much high-profile federal court litigation. In May 1979, 21 people, including three clergymen, five attorneys, a fisherman, and a school teacher, were arrested while participating in an ecumenical protest service held on land claimed by the Navy. Seventeen of the 21 defendants were convicted and sentenced to prison.

The Bar Association also came before the U.S. District Court in *Schneider v. Colegio de Abogados de Puerto Rico,* 546 F.Supp. 1251 (D.P.R. 1982), the first of many cases in 20 years of ensuing litigation challenging compulsory Bar

*Continued on next page*

# History...

*Continued from previous page*

Association membership and the use of member's fees for political activities.

Overall, the years 1977-1986 were characterized by the rapid growth of the U.S. District Court, and an expansion of its historic role within Puerto Rican society. In 1986 the Old San Juan Federal Courthouse was listed in the National Register of Historic Places.

## 1987-1996

On December 31, 1986, a fire broke out at the Dupont Plaza Hotel (later the San Juan Marriott Resort & Stellaris Casino). Hotel management, lawyers, and members of the Teamsters Union had been engaged in tense labor negotiations within the hotel's premises. As tempers flared, a union member, who was eventually convicted and sentenced by Judge Fusté, lit a "sterno" can underneath furniture stored inside a room on the main floor. The raging inferno quickly spread, killing 97 persons and injuring hundreds more. The civil litigation that followed became one of the largest and most complex civil cases in United States history, with over 275 consolidated actions with more than 2,300 plaintiffs.

Judge Raymond L. Acosta presided over the gigantic litigation. The case was divided into three phases: a liability phase to pierce the corporate veil of the hotel's owners; a second liability phase for products and services; and a third phase on insurance coverage issues. A selected sample of plaintiffs represented similarly-situated plaintiffs at a subsequent damages phase. The courthouse in Old San Juan was not designed to accommodate the large number of witnesses, documents, and lawyers in that case. A makeshift courtroom was set-up in a building close to the Clemente Ruiz Nazario U.S. Courthouse in Hato Rey. Several witnesses residing in distant places testified by videoconference, a first for the district. The case settled in 1991, on its fourth year of litigation, after partial jury trials and settlements worth over $220 million.

High-profile cases continued to come before the Court during the late 1980's and through the mid to late 1990's, including terrorist acts. Judge Cerezo presided over one of these trials, in which the defendant was charged with evading arrest and shooting an FBI agent. He was allowed to represent himself and question witnesses in Spanish without an interpreter. The defendant was acquitted by the jury.

White-collar crimes and police corruption offenses also escalated during the 1980's. Prosecutions for embezzlement, money laundering, and RICO Act, among others, led to

convictions of financial institutions such as the Girod Trust Company and the Caribbean Federal Savings Bank.

One of the most notable and politically charged fraud cases at the time involved the San Juan AIDS Institute. By 1997, AIDS was the fourth cause of death in Puerto Rico. The San Juan municipality awarded millions of dollars in contracts from federal funds to the Institute and other entities to have them provide essential services and medications to AIDS patients. Judge Fusté presided over the heated criminal trial in which the jury returned guilty verdicts for fraud and embezzlement.

Tensions flared during this decade as partisan politics clashed with the federal court. A notable case was *El Nuevo Día's* action against Puerto Rico's sitting governor to enjoin the enforcement of a gag order. The district court ruled that the governor's Executive Order controlling the flow of public



*Judge Juan B. Fernandez Badillo (1967-1989)*

information violated the First Amendment and separation of powers doctrine.

Other major events during this decade include the passing of Senior Judge Fernández-Badillo in 1989. In 1991, the role of Chief Judge passed from Judge Pérez-Giménez to Judge Gierbolini-Ortiz. In 1993, Judge Pieras took on senior status, followed by Judge Gierbolini-Ortiz; Judge Cerezo was thereafter sworn-in as Chief Judge. On June 21, 1994, President William J. Clinton nominated Salvador E. Casellas and Daniel R. Domínguez to fill the two vacancies left by Judges Pieras and Gierbolini. Both were confirmed on September 28, 1994, and both received their commission the following day. In 1993, Roberto Schmidt-Monge resigned as Magistrate Judge, and Aida M. Delgado-Colón, an Assistant Federal Public Defender at the time, was appointed to be the first female U.S. Magistrate Judge in our District. In 1994, Judge Torruella became Chief Judge for the First Circuit

*Continued on next page*

# HISTORY...

*Continued from previous page*

Court of Appeals, thus becoming the first Puerto Rican chief judge in a federal court of appeals.

On a more somber note, the 1990's brought a record number of murders, mostly related to drug trafficking and carjackings. Multi-defendant criminal cases began to take their toll on the court's workload, as well. By 1996, our district had the highest number of multi-defendant criminal cases per judge and there were no less than 50 criminal defendants eligible for the death penalty.

On the civil side, a few cases originating in our district went to the U.S. Supreme Court. Gasoline refineries and wholesalers challenged local government regulations for wholesale and retail prices as well as profit margins on the sale of gasoline. Although the First Circuit sided with Judge Fusté in finding preemption of local regulation, in *Puerto Rico Department of Consumer Affairs v. Isla Petroleum Corporation,* 485 U.S. 495 (1988), the Supreme Court reversed, holding there was no preemption by federal law. A few years later, in 1993, the Supreme Court decided the *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139 (1993), where it held that an order denying 11th Amendment Immunity was subject to interlocutory appeal.

The period that began with the Dupont tragedy ended with tragedies of environmental and human proportions. In 1994, the Morris J. Berman barge collided with a coral reef near a north-coast beach, spilling 750,000 gallons of diesel fuel that contaminated the entire coastline. With the court's appointment of a monitor, the civil case before Judge Cerezo was settled successfully in favor of the Puerto Rico government. The criminal jury trial against a company



*Clean up activities after the Morris J. Bergman barge oil spill. Photo courtesy of Office of Response and Restoration, National Ocean Service, National Oceanic and Atmospheric Administration*

official and three corporations before Judge Laffitte resulted in felony convictions. Then, in 1996, a propane gas leak from pipes located beneath a shoe store in Río Piedras caused a massive explosion that brought down a 3-story building, killing 33 persons and injuring many others. The defendant, ENRON, admitted liability and settled for $28 million as part of the company's bankruptcy case.

It was also during this decade that the main courthouse relocated to Hato Rey. In 1984, Congress designated the new location as the "Clemente Ruiz Nazario United States Courthouse" in honor of the first Article I Puerto Rican judge appointed to our district court in 1952. See, Public Law 98-589, 98 Stat. 3114. Completed in 1976, the building had originally been intended to house the judges' chambers and courtrooms, the magistrates' chambers and courtrooms, the grand jury, and the clerk's office. Due to subsequent increases in the number of judicial officers, the move had to wait for the layout to be redesigned, and did not take place until December 1990, during Chief Judge Pérez-Giménez's tenure.

## 1997-2006

The decade of 1997-2006 came with yet more changes and challenges for the U.S. District Court. During this period, the Court successfully tackled an increasing case load, welcomed new judges, expanded and renovated its physical facilities, and implemented a broad range of technological innovations that transformed practice and operations as the Court entered the 21st century. The District Court for Puerto Rico became the federal district court with the highest number of multi-defendant cases per judge, due to the frequency of large drug trafficking conspiracy arrests.

At the beginning of the decade, the court conceived and implemented the Technologically Enhanced Courtroom (TEC) Project. This project began with a visit by Chief Judge Cerezo and the Clerk of Court, Frances Ríos-de Morán, to the Williams & Mary School of Law to learn about what was then an experimental courtroom endowed with new technologies. The TEC project brought state-of-the-art evidence presentation systems to the courtrooms that integrated audio, visual, and computer technology. The implementation began during Judge Cerezo's tenure as Chief Judge and continued with her successor, Judge Laffitte. By the year 2000, all of the district judges' courtrooms at the Clemente Ruíz Nazario U.S. Courthouse were equipped with the new system. The District of Puerto Rico became the first district in the federal court system to equip all its courtrooms with the new technology.

The TEC Project was only the beginning. Soon after, the Court began to implement an even larger technological project: the Case Management/Electronic Case Filing (CM/

*Continued on next page*

# HISTORY...

*Continued from previous page*

ECF) system. This system, which extended to all federal district, appellate and bankruptcy courts, allowed for electronic case management, docketing, and reporting, and for the filing of documents over the internet. It substituted paper documents with digital ones and provided reliable, secure, 24-hour access to case files in electronic form.



2014 | CM/ECF MANUAL

United States District Court | District of Puerto Rico

The Court's implementation of the CM/ECF system began formally in March 2003 under the tenure of Chief Judge Laffitte. Judge Fusté oversaw the project, which was carried out by a team appointed by Clerk of Court Frances Ríos de Morán. This team also took on the task of training all members of the Bar on the use of the new system. To expedite the change to the new CM/ECF system, the Court decided to transition into a full use of the system all at once, rather than going through various phases of partial implementation. Thus, at the start of 2004, the Court launched CM/ECF and made the transition from paper to electronic filing for both civil and criminal cases. Keeping in step with the times, the Court also launched a webpage in 1998, which it has continued to revamp, making it one of the top three court websites nationwide. The Court also took steps to improve the Bar's practice and handling of cases by implementing a new set of Local Rules, and formally adopting court-ordered mediation as a dispute resolution tool.

Between 1997 and 2006, three different judges presided the Court: Judge Cerezo (until 1999); Judge Laffitte (from 1999 to 2004); and Judge Fusté (from 2004 to 2010). On April 5, 2000 President Clinton nominated Jay A. García Gregory, who was in private practice, to fill the vacancy created when Judge Acosta took on senior status in 1994. He was confirmed by the Senate on June 16, 2000, and received his commission on July 11, 2000. The following year Magistrate Judge Aida M. Delgado-Colón was reappointed to a second term, and a fourth magistrate judgeship was created to which Gustavo A. Gelpí was appointed. In 2004, Senior Judge Gierbolini-Ortiz retired. Magistrate Judge Jesús Castellanos also retired in 2004, and as a result that same year Camille I. Vélez-Rivé, who at the time was an Assistant U.S. Attorney, was appointed as Magistrate Judge.

On June 10, 2005 Judge Casellas took on senior status. October 25, 2000 President George W. Bush nominated Magistrate Judge Delgado-Colón to fill this vacancy. She was confirmed on March 6, 2006, and received her commission 11 days later. In the meantime, on November 15, 2005 Judge Laffitte took on senior status as well. As a result of this vacancy, on April 24, 2006 President Bush nominated Magistrate Judge Gelpí as District Judge. He was confirmed by the Senate on July 20, 2006, and received his commission on August 1st. Also on March 28, 2006, Judge Pérez-Giménez took on senior status. As a result, on May 16, 2006 President Bush nominated Francisco A. Besosa to the Bench; he was confirmed by the Senate on September 25, 2006, and received his commission two days later.

The years 1997 to 2006 were characterized by criminal cases with a high public interest. The prosecution of corruption cases against Puerto Rico government officials continued after the indictments related to the San Juan AIDS Institute, and gained increased force. Over 100 Puerto Rico government officials, including cabinet members, mayors, legislators, and even a sitting governor, were indicted in relation to a number of corruption scandals within the Department of Education, the Aqueducts and Sewer Authority's Superaqueduct project, the Ports Authority, the government's pension plan, juvenile correctional institutions, and even for scheming to defraud the Federal Emergency Management Agency (FEMA), among others.

Most notably, the struggle with the U.S. Navy over Vieques flared anew. It was triggered by the death of civilian Navy employee David Sanes-Rodríguez, who was killed during a training accident when a military aircraft mistakenly dropped bombs too close to his security post. This incident triggered extensive protests and civil disobedience against the Navy's presence in Vieques. Federal authorities carried out numerous arrests between 2000 and 2002, resulting in the prosecution of over 900 criminal cases in the District Court, many involving leaders of Puerto Rico's independence movement as well as prominent figures from the mainland.

The Court also addressed many electoral and civil rights issues during this time. For instance, Judge Pérez-

*Continued on next page*

# History...

*Continued from previous page*

Giménez and Judge Cerezo handled litigation about the constitutionality of a proposed plebiscite on Puerto Rico's political statute in 1998. In 2003, Chief Judge Laffitte ruled that a Puerto Rico statute requiring notarized signatures in petitions to register a political party was unconstitutional, as it violated the First Amendment. Judge Laffitte also held unconstitutional an internal regulation of the Puerto Rico Police Department forbidding police officers from associating with homosexuals and sanctioning those who did with disciplinary actions. The Court also handled controversies in the certification of death penalty cases, as this certification was in direct conflict with Puerto Rico's Constitutional prohibition of the death penalty. Indeed, Puerto Rico became the federal jurisdiction with the highest number of death penalty-eligible cases on a per capita basis at the time. A notable case on this issue was heard by Judge Casellas, who ruled that the death penalty was inapplicable in Puerto Rico, although the First Circuit Court of Appeals subsequently reversed him.

In 1997, the Navarro Ayala case for violations of mental patients' civil rights at the Río Piedras Psychiatric Hospital, ended after twenty-eight years of litigation. Judge Laffitte terminated the action after receiving reiterated submissions of satisfactory evaluations. Meanwhile, the Morales-Feliciano prison reform litigation intensified after a court-appointed monitor continued to report overcrowding, unsanitary conditions, and lack of medical services. As a result, Judge Pérez-Giménez imposed additional fines on the Puerto Rico government in 2000, and considered placing the Correctional Health Program under a trusteeship.

Between 1997 and 2006, several of the Court's physical facilities were improved and expanded. A chamber and courtroom were constructed for the new magistrate judge, as now there would be four instead of three. An additional access to the Courthouse was enabled, which proved useful during the Vieques cases and other multi-defendant actions. Extensive renovations were made to the Clerk's Office. The Court's former home, the historical courthouse in Old San Juan, was renovated, reopened, and renamed in honor of Judge José V. Toledo. The U.S. Courthouse in Ponce, too, was reopened and renamed after former governor Luis A. Ferré.

The public's awareness of the federal court's role grew significantly, as well, through community outreach programs, court-sponsored CLE programs for attorneys, and good relations with the press. A Press Room was furnished at the Clemente Ruiz Nazario U.S.



*Judge Hector M. Laffitte (1983-2007)*

Courthouse and a seminar on news coverage of the Court was hosted, as well. Chief Judge Laffitte also commissioned the preparation and publication of the *History of the Federal Court in Puerto Rico: 1899-1999,* by historian Guillermo A. Baralt.

## 2007-2016

In 2007 Apple released its first iPhone. The stage was set for the future and the United States District Court for Puerto Rico was eager to be part of the changes. While the Court's caseload has continued to grow over the course of the last ten years and it is now proportionally bigger than most geographically larger districts, the number of active judges has nonetheless remained the same.

In January 2007 the Court welcomed two new Magistrate Judges: Bruce J. McGiverin, appointed on January 19, 2007, and Marcos E. López, an Assistant U.S. Attorney at the time who was appointed on January 24, 2007.

In 2011, Chief Magistrate Judge Justo Arenas retired after having served the Court for 30 years. On September 12, 2011 Chief Judge Delgado-Colón appointed Silvia Carreño-Coll to fill Magistrate Judge Arena's vacancy. At the time of her appointment, Magistrate Judge Carreño-Coll was the Associate Regional Counsel for Caribbean Programs at the U.S. Environmental Protection Agency, and a Special Assistant U.S. Attorney. Today Magistrate Judges Vélez-Rivé, McGiverin, López, and Carreño-Coll continuously provide vital assistance in handling the Court's ever-growing number of civil and criminal cases.

An examination of the statistical report of the U.S. Sentencing Commission reflects that in 2015 the District Court for the District of Puerto Rico handled 1,478 guilty pleas or trials, whereas Massachusetts, which has almost twice the number of active judges (13), as well as five senior judges, handled 524 guilty pleas or trials, roughly a third. In fact, the First Circuit as a whole (comprised of the districts

*Continued on next page*

# History...

*Continued from previous page*

of Rhode Island, Maine, Massachusetts, New Hampshire and Puerto Rico) presided over a combined total of 2,454 guilty pleas or trials in 2015. To put this in perspective, the four other district courts in the First Circuit, which have a total of 21 active judges between them, handled 976 criminal trials or guilty pleas, while our district alone, with just a third of the number of active judges, handled 1,478, that is, about 50 percent more.

There have also been a few changes on the Bench during these ten years. In 2011, Judge Delgado-Colón became the Chief Judge. On July 31, 2011 Judge Domínguez took on senior status, leaving a vacancy that was filled by Pedro A. Delgado-Hernández. Nominated by President Barack Obama on June 26, 2013, Judge Delgado-Hernández was confirmed by the Senate on March 5, 2014, and received his commission two days later. On June 1, 2016, after 31 years of service on the Bench, Judge Fusté retired. This judeship remains vacant at this time.

This last decade has been one of farewells. It 2007, Judge Laffitte retired and returned to private practice after



*Judge Aida M. Delgado Colon*
*(2006-Present)*

serving for 24 years on the Bench. Judge Gierbolini-Ortiz, who had retired in 2004, died peacefully in his sleep on December 29, 2009. Judge Pieras also passed away on June 11, 2011, while still in office as a senior judge with 29 years of service. Most recently, on December 23, 2014, Judge Acosta died in his home in Chapin, South Carolina, after a long and courageous battle with cancer. Judge Acosta will also be remembered as one of the foot-soldier who participated in the Normandy landing, in France, on D-Day, and for his dexterous handling of the epic multi-district litigation in the Dupont Plaza case, which at one point the First Circuit referred to as a "litigatory monster." In *re Recticel Foam Corp.,* 859 F.2d 1000, 1001 (1st Cir. 1988). Most of all, however, Judge Acosta will be remembered for his respectful treatment of others, his capacity to listen, and his kind deference to all.

During this past decade Gerardo Ortiz-del Rivero, the legendary Federal Public Defender, also passed away in 2014. As a tribute to his exemplary legal career, the lounge used by attorneys at the Clemente Ruiz Nazario U.S. Courthouse was dedicated to him, as a reminder for all who follow in his footsteps.

In the decade of 2007-2016, the Court's facilities have also undergone many changes. A much-needed parking garage was built to the east of the Federico Degetau federal building. The TEC Project has been deployed in magistrate judge courtrooms using the latest technology, and all existing equipment is being upgraded, plus a building-wide wi-fi network is now available to attorneys. On the technology front, an e-voucher system has been implemented, providing attorneys with electronic means to invoice for their services and those of their experts in criminal cases. Under Chief Judge Delgado-Colón's tenure emphasis has been placed on resources to oversee, audit, and minimize delays in CJA payments to attorneys and their service providers. As chair of the District CJA Committee, she maintains an open dialogue with members of the Bar and promotes mentoring towards CJA panel membership.

Jury service has also entered the digital era with the nationwide eJuror system that streamlines potential jurors' responses to jury qualification questionnaires and jury duty summons, using web-based interactive functions.

Along with these changes and improvements, Chief Judge Delgado-Colon has made security one of most important items in her agenda. As Chair of the Facilities Security Committee, she has ensured that safety concerns regarding court proceedings and involving the general public are adequately addressed. Improvements have been made throughout the entire perimeter of the Hato Rey Federal Courthouse to include an increase in Protective Security Officer posts. Formal security studies have also been commissioned for the continued implementation of security improvements.

Over the course of these lasts ten years the Court's presence in the community has grown by way of activities on the Hato Rey campus designed to reach students and their parents. The Court hosts visits from junior and senior high school students, as well as community-based organizations, so they can see first-hand how the court works, and even ask

*Continued on next page*

# History...

*Continued from previous page*

questions directly from district and magistrate judges.

Court personnel also support and participate in trial advocacy competitions, and judges often preside over induction ceremonies for local student chapters of the Federal Bar Association. Every year, through the Combined Federal Campaign, the Court becomes very active in raising awareness about every citizen's social and civic responsibility. Educational outreach is also very active under the direction of Judge Cerezo, who chairs the District's Educational Programs Committee. Courses are offered on a regular basis for local attorneys to earn their required Continuing Legal Education (CLE) credits, taught by highly reputable professors from the United States and Puerto Rico.

Given its unique position as an English-speaking court in a Spanish-speaking island right between North and South America, the U.S. District Court for the District of Puerto Rico is the quintessential host for Latin American judges and attorneys participating in judicial reform educational programs. Official visitors from countries in Central and South America regularly come to our courthouse to observe and learn about the federal judicial system, case management strategies, and the use of technology.

Another unique situation for our District Court came up in 2007, after President Bush appointed Rosa Emilia Rodríguez-Vélez as U.S. Attorney for Puerto Rico pursuant to 28 U.S.C. §541. Her appointment had to be confirmed by the Senate or would expire in 120 days pursuant to 28 U.S.C. § 546(c)(2). On October 13, 2007, faced with Congress' inaction, the seven judges of our District Court unanimously appointed Rodríguez-Vélez as U.S. Attorney, under the authority conferred by 28 U.S.C. § 546(d). More recently, on October 4, 2011, the Court again voted unanimously to reappoint her. This action alone underscores the importance of having an Article III court that is free from the daily political wrangles that often hinder the other two branches. It goes without saying that the District Court for the District of Puerto Rico enjoys a stellar reputation as one of our citizens' most trusted institutions.

In September 2016, the District of Puerto Rico will commemorate the 50th anniversary of the Act signed into law by President Lyndon B. Johnson which transformed our judicial system by converting our judgeships from Article I to Article III judgeships. Unlike the District Court for the Northern Mariana Islands, the District Court of Guam and the District Court of the Virgin Islands, Puerto Rico has attained a status within the Federal Judiciary similar to

> GIVEN ITS UNIQUE POSITION AS AN ENGLISH-SPEAKING COURT IN A SPANISH-SPEAKING ISLAND RIGHT BETWEEN NORTH AND SOUTH AMERICA, THE U.S. DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO IS THE QUINTESSENTIAL HOST FOR LATIN AMERICAN JUDGES AND ATTORNEYS PARTICIPATING IN JUDICIAL REFORM EDUCATIONAL PROGRAMS.

a state, "[providing] the same life tenure and retirement rights for judges hereafter appointed to the United States District Court for the District of Puerto Rico as the judges of all other United States district courts now have." Public Law 89-571. For their proven track record, our Judges and the citizens of Puerto Rico deserve no less.

## DO YOU KNOW...?

1) Name of the first Puerto Rican to be appointed to the Federal Bench in our District?

2) Who was the Federal District Judge to hold Commissions as an Article I and Article III Judge?

*Answers on page 36*

# Historical Development of the U.S. Bankruptcy Court for the District of Puerto Rico

By Hon. Enrique S. Lamoutte Inclán,
Chief, U. S. Bankruptcy Judge
District of Puerto Rico

## Background: Bankruptcy Laws

The power of the United States Congress over bankruptcies stems from Article I, Section 8, Clause 4 of the U. S. Constitution, which provides that "The Congress shall have Power ... To establish... uniform Laws on the subject of Bankruptcies throughout the United States." Bankruptcy laws serve two main purposes: one is to allow the honest but unfortunate debtor a fresh start and two, to provide a fair and equitable treatment to creditors.

The history of the United States Bankruptcy Court for the District of Puerto Rico ("Bankruptcy Court") has been directly affected by the changes in the bankruptcy laws of the United States. The main change to the bankruptcy laws is the Bankruptcy Act of 1978, which superseded the Bankruptcy Act of 1898. The 1978 Bankruptcy Code changed the structure of the bankruptcy courts and enlarged its jurisdiction to hear cases "arising under" and "related to" bankruptcy proceedings. The goal was to have one court to hear all bankruptcy issues. However, the increased jurisdiction has been the subject of continuous struggles.[1] Mainly, because the jurisdiction lies in the U. S. District Courts, 28 U.S.C. §1334, but may be referred to the bankruptcy judges for the district, 28 U.S.C. §157, who will constitute a unit of the district court to be known as the Bankruptcy Court, 28 U.S.C. §151, but who are non-Article III adjuncts to the federal district judges.

Bankruptcy judges are appointed for a 14 year term by the Court of Appeals of the United States for the circuit in which such district is located. 28 U.S.C. § 152. Puerto Rico is in the First Circuit. Puerto Rico is authorized four (4) bankruptcy judge positions, two permanent and two temporary that are due to lapse in May 2017, unless Congress acts and adopts pending legislation that provides for the conversion of the temporary bankruptcy judgeships to permanent ones.



Under the Bankruptcy Act of 1898 and up to the enactment of the 1978 Bankruptcy Code, bankruptcy proceedings were held before referees appointed by the District Court judges. Under the 1898 Act the jurisdiction was based on whether it was summary or plenary. Summary related to the property of the bankruptcy estate, and plenary referred to claims against third persons. The 1978 Bankruptcy Code intended to eliminate this distinction by granting the Bankruptcy Court jurisdiction over both. In 1984 Congress introduced the concepts of core and noncore. A more subtle difference but still the subject of substantial litigation (See U. S. Supreme Court cases cited in footnote 1).

## History

The U. S. District Court for the District of Puerto Rico was established as an Article III Court in September 1966. At the time, bankruptcy proceedings were filed with the District Court and referred to and heard before bankruptcy referees. The first referee appointed by the district judges during the 1940s was attorney Enrique Igaravidez, who served until 1951. He was succeeded by attorney William H. Beckerleg, who served until 1970. Both were part time referees, and also had a private practice. In 1970 attorney

---

1  *Northern Pipeline Construction Co. v. Marathon Pipe Line Construction Company*, 458 U.S. 50 (1982); *Thomas v. Union Carbide Agricultural Products, Co.,* 473 U.S. 568 (1985); *Commodities Futures Trading Commission v. Schor,* 478 U.S. 833 (1986); *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33 (1989); *Langenkamp v. Culp,* 498 U.S. 42 (1990); *Marshall v. Marshall,* 547 U.S. 293 (2006); *Stern v. Marshall,* 564 U.S. 462 , 131 S. Ct. 2594 (2011); *Hall v. U.S.,* 132 S. Ct. 1882 (May 14, 2012); *Executive Benefits Ins. Agency v. Arkison,* 134 S. Ct. 2165 (June 9, 2014); *Bullard v. Blue Hills Bank,* 135 S. Ct. 1686 (May 4, 2015); *Wellness Intern. Network, Ltd. v. Sharif,* 135 S. Ct. 1932 (May 26, 2015).

*Continued on next page*

# Bankruptcy Court...

*Continued from previous page*

Rafael Rivera Cruz was appointed as the first full-time referee. He presided over bankruptcy proceedings until his retirement in 1976.

In October 1976 attorney Antonio I. Hernández Rodríguez was appointed as a full time referee. In 1977 attorney William H. Beckerleg returned as a full time referee. Both were designated as bankruptcy judges in 1978. During the post *Marathon* period and until The Bankruptcy Amendments and Federal Judgeship Act of 1984 was enacted, they were considered in official records as consultants on bankruptcy matters. They served until October 1986, when their terms expired.





On November 6, 1986, Enrique S. Lamoutte Inclán was appointed as bankruptcy judge. He is currently serving his third 14-year term and is Chief Judge of the Bankruptcy Court. In December 1986, Sara de Jesús Kellog was appointed as bankruptcy judge. She served until 2011. Gerardo A. Carlo Altieri was sworn in as bankruptcy judge on August 24, 1994, increasing the number of bankruptcy judges to three. He retired in August 2009. On November 13, 2006, Brian K. Tester was appointed as the fourth bankruptcy judge for the District of Puerto Rico. He is currently serving his first term. Mildred F. Cabán Flores was appointed as bankruptcy judge on March 17, 2010 and Edward A. Godoy on September 1, 2011. Judges Cabán and Godoy are currently serving their first term.

The U. S. Bankruptcy Court for the District of Puerto Rico has two court locations: Old San Juan, in the José V. Toledo Federal Building and U. S. Courthouse, on 300 Recinto Sur Street; and Ponce, in the MCS Building, on 880 Tito Castro Avenue.

The administration and operation of the bankruptcy court lies in the Clerk's Office. Although the Bankruptcy Court is a unit of the District Court, the office of the bankruptcy clerk of court operates independently of the district court clerk's office. The bankruptcy clerk is primarily responsible for the administrative operations of the bankruptcy court and the implementation of the policies set by the bankruptcy judges. María de los Angeles González is the Clerk of Court. She was appointed on June 4, 2011. Former Clerks of Court are: Celestino Matta Méndez (1994); Frances Rios de Morán

(1988); Juan J. Fernández (1985); Roberto Morales Sánchez (1983) and Enrique S. Lamoutte Inclán (1979).

One of the purposes of the 1978 Bankruptcy Code was to remove the administrative duties from the bankruptcy judges functions. The administrative duties were delegated to United States Trustees, who are part of the U. S. Department of Justice, appointed and supervised by the Attorney General, and coordinated through the Executive Office of the United States Trustee. 28 U.S.C. §§ 581, 586. Region 21 of the U. S. Trustee is composed by Alabama, Florida, Georgia, Puerto Rico and the Virgin Islands. The Acting U. S. Trustee for Region 21 is Guy G. Gebhardt, and Monsita Lecaroz Arribas is the Assistant U. S. Trustee for Puerto Rico. The U. S. Trustee appoints, monitors and oversees the private panel of Chapter 7 and Chapter 11 trustees (Wigberto Lugo Mender, Noreen Wiscovitch Rentas, and Roberto Román Valentín); the standing chapter 13 trustees (José R. Carrión and Alejandro Oliveras Rivera); and the standing chapter 12 trustee (José R. Carrión).

## Bankruptcy Filings

The Bankruptcy Act of 1898 was overhauled by the Chandler Act of 1938, which expanded on previous reorganization provisions by enhancing corporate reorganizations under Chapter X, arrangements under Chapter XI, real property arrangements under Chapter XII, and Chapter XIII plans for wage earners. During the period following the Chandler Act and up to the implementation of the Bankruptcy Reform Act of 1978, Puerto Rico's filings were mostly Chapter XI.

The Bankruptcy Reform Act of 1978 changed that scenario. The filings in Puerto Rico are now mostly Chapter 13 cases for individuals with regular income, who submit a plan to pay creditors. Chapter 13 filings have averaged

*Continued on next page*

# BANKRUPTCY COURT...

*Continued from previous page*

approximately 60% of total filings during the past ten (10) years.

The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA) changed the nature of consumer bankruptcy to make it more difficult for debtors. The effects of BAPCPA resulted in a 59% decrease in total filings for Puerto Rico during 2006. These increased in 2007, leveled off in 2009, and have since averaged 11,000 per year. The bankruptcy filings data refers only to bankruptcy cases, and does not consider the number of adversary proceedings filed each year, which are approximately 300. Adversary proceedings are civil disputes arising in a bankruptcy case.

Nationwide bankruptcy filings have declined 44% since June 2010; and 36.4% from June 2010 to June 2014. During this period, Puerto Rico experienced a modest decline of 4.9%. Puerto Rico's total filings decreased 3% in 2014 (10,716) and 2% in 2015 (10,489). National filings are experiencing a decrease of 8.5% during 2016. Total national filings as of March 2015 were 911,086, and are 833,515 as of March 2016. As of June 14, 2016, total filings in Puerto Rico (4,746) have increased 6% compared to the same period in 2015 (4483). To date, 55% are Chapter 13, 41% Chapter 7, and 3% Chapter 11.

Clearly, the economic crisis affecting Puerto Rico, being in a recession mode since 2006, has had an effect on bankruptcy filings in the District of Puerto Rico, contrary to the nationwide trend.

## Puerto Rico and Bankruptcy Law

The recent decision by the Supreme Court of the United States in *Commonwealth of Puerto Rico, et al. v. Franklin California Tax-Free Trust, et al.* ____ U.S. ____ (June 13, 2016) must be noted and highlighted.[2] The court held that section 903(1) of the Bankruptcy Code pre-empts Puerto Rico Public Corporation Debt Enforcement and Recovery Act, which enabled public utility corporations to restructure their debts, in response to an ongoing economic and fiscal crisis. The Supreme Court's decision must be analyzed together with the Puerto Rico Oversight, Management, and Economic Stability Act or "PROMESA",

signed into law on June 30, 2016. The law has significant historical, political and constitutional implications for the relationship between the United States and Puerto Rico. The Act (PROMESA) falls under Title 48 of the United States Code, which governs the code of territories and insular areas in the United States Code, consonant with Article IV, section 3, of the United States Constitution (the territorial clause).

It is undisputed that Puerto Rico is undergoing a fiscal and economic crisis. Any solution must be premised and based on a sound fiscal and economic strategic plan. The implementation tactics toward reaching the goal of giving Puerto Rico fiscal stability and soundness, as well as a platform for economic progress, must be an integrated effort concentrated on the objective, that is, the restructuring and redirection of Puerto Rico's economy. Divided efforts based on parochial directives with control overtones will frustrate the goal.

Any political or constitutional development of the relations between Puerto Rico and the United States of America should not be divorced from the restructuring of Puerto Rico's debt and economy. Bankruptcy, insolvency laws, debt restructuring laws, are not purely economic in nature. There are moral consequences to bankruptcy and insolvency, with a social impact for all.

## DO YOU KNOW....?

3) Name of the first federal judge in Puerto Rico to assume "senior status".

4) Name of the first Hispanic female appointed to the federal bench (nationwide).

5) Name of the Acting Attorney General, who addressed the audience and justices on the role of the Supreme Court in the administration of justice, during the inaugural session of the Puerto Rico Supreme Court on March 5, 1956.

6) The first Superior Court Judge who became a federal judge while still in office, and the first federal court law clerk in Puerto Rico who became a federal judge.

7) First Assistant U.S. Attorney and the first Magistrate Judge to be appointed as District Judge in Puerto Rico.

8) Name and age of the youngest District Judge appointed in Puerto Rico.

9) Name of the first female attorney appointed as Magistrate Judge within our district.

*Answers on page 36*

---

2   See also the Supreme Court's decision in *Commonwealth of Puerto Rico v. Sanchez Valle et al*, ___ U.S. ___ (June 9, 2016), entered the same day that the House voted in favor of H. R. 5278 (PROMESA). Justice Kagan delivered the opinion for the Supreme Court, and acknowledged that Puerto Rico has a relationship to the United States that has no parallel in our history and "can avail itself a wide variety of futures." After analyzing Puerto Rico's relation with the United States since it became a territory in 1898 as a result of the Spanish-American War, Justice Kagan concluded under the "ultimate source" of power doctrine that Puerto Rico is not sovereign and that the ultimate source of prosecutorial power remains in the U. S. Congress.

# MAGISTRATE JUDGES IN THE DISTRICT OF PUERTO RICO: A HISTORY OF SERVICE

by Hon. Bruce J. McGiverin and
Brian Gumz[1]

I n the fifty years since the District of Puerto Rico acquired Article III status, the court has enjoyed enormous success thanks to the dedication of its judges and court staff. For a loarge portion of that time, the court has relied on the work and expertise of magistrate judges. Only two years after the District of Puerto Rico became an Article III court, Congress passed the Federal Magistrate Act and the District appointed its first magistrate, Harley Miller, in 1971. In keeping with the 50th Anniversary celebration, I would like to briefly explore how the magistrate judge system arrived at its present form and recognize the integral role that magistrate judges play in the District of Puerto Rico today.

The magistrate judge system originated in the commissioner system established by Congress in the early years of the nation. The Judiciary Act of 1789 granted federal judges and certain state judicial officers the authority to order the arrest, detention, and release of persons accused of committing federal crimes.[2] In 1793 Congress authorized the federal circuit courts to appoint "discreet persons learned in the law" who could take bail in federal criminal cases.[3] During the 19th century, these persons came to be known as commissioners and were granted additional authority including the power to issue arrest and search warrants and the power to hold persons for trial.[4] In 1896, Congress reconfigured the commissioner system by establishing a four-year term of office for commissioners and providing for appointment and removal of commissioners by district courts instead of the circuits.[5]

But the commissioner system was not without its problems. Senate hearings in 1965 and 1966 identified several fundamental defects within the commissioners system: (1) there was no requirement that commissioners be members of the bar; (2) commissioners were unevenly distributed among the district courts; (3) the commissioners did not have sufficient support services; and (4) the compensation structure—a fee system—was both unfitting for judicial officers and inadequate to attract a strong bench.[6]

In response to these concerns, members of the Senate Judiciary Committee drafted legislation that would effectively replace the commissioner system with a new system of federal judicial officers called U.S. Magistrates. A



From top to bottom, left to right: U.S. Chief Bankruptcy Judge Enrique S. Lamoutte, U.S. Chief District Judge Aida M. Delgado-Colón, U.S. Court of Appeals Judge Jeffrey R. Howard, Magistrate Judges Marcos E. López, Silvia Carreño-Coll, Camille Vélez-Rivém and Bruce J. McGiverin.

final version of the bill, called the Federal Magistrates Act, was introduced at the opening of the new Congress in 1967. On October 17, 1968, President Johnson signed the Federal Magistrates Act into law.[7]

The Act was sweeping in its changes. First, it established that all magistrates must also be attorneys and provided an eight-year term for full-time magistrates and a four-year term for part-time magistrates. It also authorized the Judicial Conference to set the number of magistrates for each district court based on the needs of the court. The Act authorized support services for magistrates and provided magistrates with office space, facilities, and furniture. Additionally, it abolished the fee system of compensation and permitted the Judicial Conference to set the salary for each magistrate.

In response to concerns regarding district court judges' growing caseloads, the Act also substantially expanded the magistrates' jurisdiction. It granted magistrates trial authority, with the defendant's consent, in all federal offenses for which the maximum penalty on conviction was not more than one year of imprisonment, a fine of $1,000, or both. It also specifically authorized magistrates to serve as special masters in appropriate civil actions, assist district

*Continued on next page*

## Current Magistrate Judges for the District of Puerto Rico

**Camille L. Vélez-Rivé**

(March 22, 2004 – Present)

**Bruce J. McGiverin**

(January 19, 2007 – Present)

**Marcos E. López-González**

(January 24, 2007 – Present)

**Silvia L. Carreño-Coll**

(September 12, 2011 – Present)

## Former Magistrate Judges for the District of Puerto Rico

**Harley A. Miller**

(January 25, 1971 – October 31, 1972)

**John M. García Nokonechna**[17]

(November 09, 1972 – April 11, 1977)

**Dennis A. Simonpietri**

(July 03, 1975 – May 31, 1985)

**Juan M. Pérez-Giménez**

(October 01, 1975 – December 16, 1979)

**Ramón A. Alfaro**

(December 09, 1977 – November 30, 1979)

**Arturo Díaz**

(December 01, 1979 – September 15, 1980)

**Jesús A. Castellanos**

(March 21, 1980 – March 20, 2004)

**Justo Arenas**

(April 20, 1981 – May 31, 2011;
January 03, 2012 – December 31, 2015)

**Roberto Schmidt-Monge**

(November 01, 1985 – October 31, 1993)

**Aida M. Delgado-Colón**

(December 23, 1993 – March 19, 2006)[18]

**Gustavo A. Gelpí**

(June 29, 2001 – August 01, 2006)

# MAGISTRATE JUDGES...

*Continued from previous page*

judges in conducting pretrial or discovery proceedings, and conduct preliminary review of applications for post-trial relief made by individuals convicted of criminal offenses. Perhaps the most drastic of all changes was that the Act granted the district court enormous flexibility to assign magistrates other "additional duties as are not inconsistent with the Constitution and laws of the United States."

 

*Left to Right: Magistrate Judges Dennis A. Simonpietri and Ramón A. Alfaro*

Throughout the next four decades, Congress further refined the role of magistrates. In 1976, Congress passed legislation allowing magistrates to decide most pretrial and discovery matters with finality.[8] In the same act, Congress also restricted magistrate authority regarding eight specific, case-dispositive motions by allowing magistrates to hear the motions, but not decide them.[9] In 1979, Congress authorized magistrates to hear and decide any civil case upon the consent of the parties and expanded the trial jurisdiction of magistrates to all federal misdemeanors rather than just "minor offenses." [10] In 2000, legislation eliminated the requirement that the defendant must consent to disposition by a magistrate judge in petty offense cases.[11]

Since the Federal Magistrates Act of 1968, magistrates have also gained considerable standing in the legal community. In 1976, two magistrates were appointed as Article III judges for the first time and in 1980 a magistrate was appointed to a Judicial Conference committee, also for the first time.[12] In 1990 the title "U.S. Magistrate" was statutorily amended to "U.S. Magistrate Judge," and in 2008, magistrate judges were added to the list of judges summoned to attend annual circuit conferences.[13]

Today, magistrate judges are an integral part of the federal court system, and in the United States District Court for the District of Puerto Rico magistrate judges are tasked with a broad variety of duties. They may try civil cases by consent of the parties, and are authorized to determine most pretrial matters.[14] They may also oversee preliminary

*Continued on next page*

# MAGISTRATE JUDGES...

*Continued from previous page*

proceedings in felony cases, such as conducting hearings to modify, revoke, or terminate supervised release; issuing subpoenas; approving surety bonds; or conducting initial appearances, bail, preliminary hearings and arraignments in all criminal matters.[15] Magistrate judges also conduct hearings and issue reports and recommendations on dispositive motions in both civil and felony criminal cases.[16]



*Left to right: Magistrate Judges Gustavo A. Gelpí, Jesús A. Castellanos, Aída M. Delgado-Colón and Justo Arenas*

In the 50 years since the District of Puerto Rico became an Article III court, magistrate judges have been vital to the district's work. The District Court's reliance on its magistrate judges and trust in their decisions is confirmed by the sheer number of cases and proceedings overseen by magistrate judges in the district. During the 2015 calendar year alone, magistrate judges in the District of Puerto Rico were assigned 286 civil cases on consent of the parties and oversaw 7,470 preliminary proceedings in felony cases. Given the important role played by magistrate judges during the district's last fifty years, there can be little doubt that magistrate judges will continue to contribute to the court's success in the fifty years to come.

## ENDNOTES

[1] Brian Gumz is a rising 2L at the George Washington University Law School in Washington, D.C.

[2] Judiciary Act of 1789, ch. 20, § 33, 1 Stat. 91.

[3] Act of March 2, 1793, ch. 22, § 4, 1 Stat. 334.

[4] Peter G. McCabe, A Brief History of the Federal Magistrate Judges Program, *The Federal Lawyer*, May-June 2014, at 44, 45.

[5] Act of May 28, 1896, ch. 252, §§ 19, 21, 29 Stat. 184.

[6] The U.S. Commissioner System: Hearings Before the Subcommittee on Improvements in Judicial Machinery of the Senate Committee on the Judiciary, 89th Cong. 43-44 (1965); S. Rep. No. 90-371 (1967).

[7] Federal Magistrates Act, Pub. L. No. 90-578, 82 Stat. 1107 (1968).

[8] Pub. L. No. 944-577, 90 Stat. 2729 (1976).

[9] Id.

[10] Federal Magistrate Act of 1979, Pub. L. No. 96-82, 93 Stat. 643 (1979).

[11] Federal Courts Improvement Act of 2000, Pub. L. No. 106-518 § 203(b), 114 Stat. 2410 (2000).

[12] Peter G. McCabe, A Brief History of the Federal Magistrate Judges Program, *The Federal Lawyer*, May-June 2014, at 50.

[13] Id.

[14] Local Rules of the United States District Court for the District of Puerto Rico, Local Rules 72 & 159

[15] Id., Local Rule 159

[16] Id., Local Rules 72 & 159

[17] Magistrate Judge García-Nokonechna remains as one of four (4) Magistrate Judges appointed to the position at the early age of 26. The others were: Charles K. McCotter, Jr., Eastern District of Virginia; James Hodges, Northern District of Iowa; and K. Nicole Mitchel, Eastern District of Texas.

[18] First woman appointed to serve as Magistrate Judge in the District of Puerto Rico. The first woman to be appointed to serve as a Magistrate Judge was Vanetta Tassopulos, appointed to the Central District of California in 1971.

## DO YOU KNOW...?

10) Number of years elapsed between the appointment of the first and second female District Judge

11) Year in which the District of Puerto Rico was last assigned a new federal judgeship?

12) How many of the District Judges have previously held the positions of Magistrate Judge

13) How many of the District Judges have previously held positions within the state judiciary?

14) First Hispanic to serve in the First Circuit Court of Appeals and when he was appointed.

15) Number and names of District Judges in Puerto Rico who have held the position of "Puerto Rico Solicitor General" [Procurador General]

16) Name of the federal civil practitioner after whom the Court's library is named

17) Name of the federal criminal defense attorney to whom the attorney's lounge is dedicated.

18) Year in which the Hato Rey Federal Courthouse was inaugurated.

19) What are the names of the four (4) Bankruptcy Judges?

20) First District Judge to be elected President of the National Federal Bar?

21) As a soldier, he participated in the D-Day Invasion of Normandy on June 6, 1944; in 1980 he was appointed U.S. Attorney for the District of Puerto Rico; in 1982 he became a District Judge; and the Puerto Rico Federal Bar Chapter is named in his honor. Who is he?

*Answers on page 36*

# A Legislative History of the District of Puerto Rico Article III Court[1]



**By: Hon. Gustavo A. Gelpi,
United States District Judge**

September 12 of this year marks a half century since President Lyndon Johnson signed Public Law 89-571,80 Stat. 764, which transformed the then federal territorial court in Puerto Rico to an Article III one. From that moment on, federal judges in the District of Puerto Rico would enjoy life tenure and have the same constitutional duties as their brethren across the United States.

This significant change, embodied within Puerto Rico's unique constitutional relationship with the United States, came as a result of repeated recommendations before Congress by the Judicial Conference of the United States in 1961, 1963, and finally, 1965. In addition, the U.S. Departments of Justice and the Interior endorsed the measure. As such, said significant measure is unique, given that it was not conceived in the political arena.

In the enabling legislation, both the Senate and House recognized that said constitutional change was imperative, given that following the approval of Puerto Rico's constitution and its achieving commonwealth status in 1952, it became a "free state associated with and subject to the Constitution and laws of the United States, but not a State of the Union. It has virtual complete local autonomy." Senate Report 1504 of August 26, 1966, as well as House Report 3999 of March 15, 1966, contain identical findings and language to said effect, therefore recognizing the change in Puerto Rico's status 14 years earlier. Both legislative bodies also recognized the change from a mere territorial status to that of a "state," in contrast to the then U.S. territories: Virgin Islands, Guam and Panama Canal Zone, which were governed by organic acts of Congress, rather than by local constitutions. In those territories federal judges were appointed pursuant to the Constitution's territorial clause to 8-year terms, as was the case in Puerto Rico prior to 1966. Also, the Senate and House further recognized in their respective reports that when the territories of Alaska and Hawaii were admitted to the Union as states in 1959, both of their enabling acts created an Article III court therein. Hence, it was necessary to treat Puerto Rico in a similar manner by establishing an Article III court in Puerto Rico.

Congress further emphasized in both Senate and House Reports that, given the local autonomy achieved by Puerto Rico, it was proper to "accord it the same treatment as a State by conferring upon the Federal district court there the same dignity and authority enjoyed by the other Federal district courts." This would thus, "aid the district judges to perform their functions impartially, particularly in those cases involving the Federal Government on one side and the Commonwealth government on the other if they have full independence inherent in a life tenure appointment."

In *Examining Board of Engineers, Architects and Surveyors v. Flores de Otero*, 426 US 572, 595 n. 26 (1976), the Supreme Court acknowledged the District of Puerto Rico's Article Ill Court, noting that it "is in its jurisdiction, powers, and responsibilities the same as the U.S. district courts in the States."

> *"…ACCORD IT THE SAME TREATMENT AS A STATE BY CONFERRING UPON THE FEDERAL DISTRICT COURT THERE THE SAME DIGNITY AND AUTHORITY ENJOYED BY THE OTHER FEDERAL DISTRICT COURTS."*

The first Article III judge in the district of Puerto Rico was Hiram Cancio. At the time of his appointment he had been serving for one year as a federal territorial judge, so he had had to again be nominated, the second occasion for the life-tenured position. Including Judge Cancio, there have been 19 Article III judges appointed to serve in the District of Puerto Rico: Hiram Cancio (1966), Juan B. Fernandez Badillo (1967), Jose V. Toledo (1970), Hernan Pesquera (1972), Juan R. Torruella (1974), Juan M. Perez Gimenez (1979), Gilberto Gierbolini (1980), Carmen Cerezo (1980), Jaime Pieras, Jr. {1982), Raymond L. Acosta (1982), Hector M. Laffitte (1983), Jose A. Fuste (1985), Salvador E.

*Continued on next page*

# ARTICLE III COURT...

*Continued from previous page*

Casellas (1994), Daniel R. Dominguez (1994), Jay A. Garcia-Gregory (2000), Aida M. Delgado-Colon (2006), Gustavo A. Gelpí (2006), Francisco A. Besosa (2006) and Pedro A. Delgado-Hernandez (2014).

Since the enactment of Public Law 95-486, 92 Stat 1629 in 1978, the number of authorized Article III judgeships in the District of Puerto Rico has been set as seven. With the exception of Massachusetts, this number is twice as much as that of the other districts within the First Circuit, to wit, Rhode Island, New Hampshire and Maine. Throughout the years, most of the district judges in Puerto Rico have additionally performed important work at the circuit and national level, sitting by designation in the sister district courts of the First Circuit, as well as in the Court of Appeals itself, as authorized by 28 USC § 292(a) and (b), and by serving as members of the First Circuit Judicial Council, the Judicial Conference of the United States and its several committees. These judges—all fully bilingual Spanish and English speakers—have always also volunteered to promote the Rule of Law abroad by participating in educational programs for judges from South and Central America, the Caribbean, Europe and Africa.

At present, the Commonwealth of Puerto Rico is indistinguishable from the States inasmuch as its federal judiciary. Throughout its 50 year history, Puerto Rico's Article III district court has faithfully carried out its constitutional role and mission, meting justice in an impartial and expeditious manner to all those who appear before it, including the Commonwealth and United States governments. This would not have been possible but for the vision of the Judicial Conference and Congress to provide for equal justice under the law.

[1] Article originally published in *The Federal Lawyer*.



## SAVE THE DATE!

**Federal Bar Association Annual Meeting and Convention 2016**

September 15–17, 2016 | Cleveland, OH

More information available at www.fedbar.org/FBACON16

# FROM CARDSTOCK TO PAPERLESS: 50 YEARS OF EVOLUTION

## The Clerk's Office of the U.S. District Court for the District of Puerto Rico



by Frances Ríos de Morán, Esq.[1] Clerk of Court (1994-present)

In 1966 President Lyndon B. Johnson signed Public Law 89-571 by which the United States Congress had conferred Article III status to judges sitting in Puerto Rico's federal court. At the time there were two judgeships authorized for Puerto Rico, one held by the Hon. Hiram Rafael Cancio (1966-1974) and the other by the Hon. Juan B. Fernández-Badillo (1966-1972.) An additional judgeship was created in 1970 to which the Hon. José Victor Toledo was appointed (1974-1980), and four more in 1978 (Judges Juan Manuel Pérez-Giménez, Gilberto Gierbolini-Ortiz, Carmen Consuelo Cerezo, and Jaime Pieras, Jr.) for a total of seven District Judges. Today we have those same seven judgeships, plus four Magistrate Judges, and three Senior Judges.

The first clerk of court under the new Article III Court was Carmen Aida Carreras (1964-1974.) At that time the Court had 10 employees. The change from a territorial to a full-fledged federal district court had many ramifications, not the smallest of which was the way in which the Clerk's Office functioned. The federal court clerk position was initially created under the Judiciary Act of 1789. The duties of the district court clerk at that time included clerking for the circuit court, and the clerk had to post a two thousand dollar bond "to discharge the duties of his office."[2]

From the onset, clerks of court have "serve[d] as liaisons between the courts and the increasing number of lawyers and litigants appearing therein and to screen the writs and motions submitted by those parties to determine whether they conformed to local rules."[3]

The functions of the clerk of court have evolved throughout the years, from issuing writs, summoning jurors, recording decrees, judgments and decisions by the court, to handling all aspects of the judiciary's administration and operations. The Clerk's Office for the District of Puerto Rico has grown to include a Court Services area that handles Jury Administration, Court Reporters, and Court Interpreters; a Finance Department that handles CJA vouchers, payments to vendors and contractors, fines, bonds, restitution, and filing fees, among others financial functions; an Operations area that includes the case managers (also known as courtroom deputies), Quality Control Analysts (also known as docket clerks), a CM/ECF help desk, plus an intake counter where documents can be filed and copies of records can be obtained; and an Administration area that handles the federal bar exams and admissions, minor violations claims (CVB), citizen naturalization ceremonies,

*Continued on next page*

---

1  I wish to thank Staff Interpreter **Janis Palma** for her special assistance in the research and writing of this article.

2  *A Century of Lawmaking for a New Nation: U.S. Congressional Documents and Debates, 1774-1875* [https://memory.loc.gov/cgi-bin/ampage?collId=llsl&fileName=001/llsl001.db&recNum=199]

3  Scott Messinger, *Order in the Courts: A History of the Federal Court Clerk's Office*, Federal Judicial Center, 2002 (p. 6) [http://www.fjc.gov/public/pdf.nsf/lookup/ordcourt.pdf/$file/ordcourt.pdf]

# Paperless...

*Continued from previous page*

among other matters, and is where the Clerk of Court has her office.

Fifty years ago, the Court and its Clerk were housed in Old San Juan. The Court moved to Hato Rey in 1990. Today, the Court has two campuses, one in the original Old San Juan court building, called the José V. Toledo U.S. Courthouse, which also houses the U.S. Bankruptcy Court; and one in Hato Rey, called the Federico Degetau Federal Building, which also houses several federal agencies, such as the U.S. Probation/Pretrial Services Office, the U.S. Marshals Service, and the Federal Bureau of Investigation.





*U.S. Post Office and Courthouse, Old San Juan*

Before the Hato Rey courthouse was built, the Old San Juan building also housed the U.S. Post Office on the first floor. There was no e-mail, so every notice and every piece of paper that left the Court had to be prepared by hand, using typewriters, carbon paper when copies were required, individually placed inside envelopes, stamped, and sent through the U.S. Postal Service. Every piece of paper that came in was also received, stamped, and filed by hand. During the early '70s a deputy clerk assigned to Intake would spend the entire day receiving documents and manually stamping them as "Received and Filed," with the current date and time.[4]

Documents, particularly docket sheets, which were made of cardstock or very heavy-weight paper, were kept in fire-proof metal boxes that had to be locked every night and re-opened every morning, because there were no "clouds"

or remote servers to store data and scanned documents during the early decades of the Article III Court. Court proceedings were recorded on enormous reel-to-reel machines that courtroom deputies handled while taking minutes by hand. If a reel was full, the proceeding had to be stopped in order to change it, and then proceed with the recording. When court reporters were used to create a record of court proceedings, they had manual stenography machines that printed out the reporters' shorthand notes in blue ink on steno paper. The actual transcript was then typed from those notes and, again, copies were made with carbon paper. With current technology, court reporters can now see their shorthand notes converted to readable text on a computer screen. This text can be shared with judges and attorneys through wireless transmissions to computer-resident compatible software, making daily copies of proceedings possible for a single court reporter. It would have taken at least two court reporters to produce the same number of pages before this technology became available.

The Director of the Administrative Office of the U.S. Courts reported just before Puerto Rico became an Article III court that "pending civil cases climbed to a record 79,117 [in the United States District Courts][5] while "29,729 criminal cases, excluding transferred cases, were docketed in the

---

4  This article was prepared with information provided by current and former staff members, including former Clerk of Court Juan M. Masini-Soler, Staff Attorney Jorge Soltero, Human Resources Manager Agnes Ferrer-Auffant, Court Services Manager Becky Agostini, Project Manager Manuel Sellés, current CM/ECF Project Manager/Administrator Kim D. Kalife, Staff Interpreter Maria de los Ángeles Hernández, First Circuit Librarian Ana Milagros Rodríguez, former Operations Manager Laura Rivera, and former Administrative Assistant to the Clerk of Court and Human Resources Director, Carmen Arroyo.

5  Annual Report of the Director of the Administrative Office of the United States Courts, 1966. (p. 68)

*Continued on next page*

# Paperless...

*Continued from previous page*

district courts [during Fiscal Year 1966]."[6] Out of those, 660 civil cases[7] and 100 criminal cases[8] had been commenced in Puerto Rico. By Fiscal Year 1967, when Puerto Rico's District Judges were already Article III judges, the civil caseload for our District was reported to be 788 civil cases and 89 criminal cases commenced.[9] The types of offenses for which charges were filed back then were homicide, burglary, larceny, embezzlement, and fraud.[10]

In 1966 salaries for courtroom clerks were restructured to be commensurate with greater or lesser calendar responsibilities,[11] court reporters received an increase from 65 to 90 cents a transcript page, with daily copy going up from $1.30 to $1.50 a page.[12] At that time the courts used the Judiciary Salary Plan (JSP) to classify positions and define



grade level and salary scale for court employees. In 1993 the Judicial Conference decentralized the budget and approved the implementation of the Court Personnel System (CPS), which gave the Clerk's Office greater flexibility to create positions that met specific local needs, therefore becoming more efficient and responsive to each District Court's particular workload. As technology was incorporated into the human resources administration area, time and attendance cards, as well as paper evaluations of Clerk's Office personnel migrated to the Human Resources Information Management System (HRMIS), which now handles personnel data, performance evaluations, payroll, leave, and other HR processes.

Going back to 1966, a request for a full-time interpreter in Puerto Rico was authorized at that time by the Judicial Council.[13] There were no objective standards for an interpreter's performance or specific requirements to appoint one so judges relied on *ad hoc* evaluations of candidates. Twelve years later, in 1978, Congress enacted the Court Interpreters Act, requiring the certification of court interpreters to be used in federal court proceedings initiated by the United States, through a performance-based and criterion-referenced exam.[14] The U.S. District Court for the District of Puerto Rico currently has nine official staff interpreters.

During the early years of the Article III court, jury panels were selected manually using index cards, petit juries were selected with the aid of a lottery wheel, and cases were assigned to judges at random using small envelopes with the judge's initials. The first fax machine arrived in the early '80s and took all of six minutes for a transmittal to go through. But the day-to-day operations still ran on wheels, literally. Case files—which could sometimes be as many as five volumes—had to be moved to the judges' chambers in carts. On the other hand, interoffice and incoming mail was placed in pigeon boxes for each chamber staff to pick up, whereas now it is delivered daily to chambers in a special "round", jurors are managed through the automated Juror Management System, and judges are still assigned to cases randomly, except that now it is all done by automated systems.

There was also a time when the cash received at the Clerk's Office had to be deposited daily, and the cashier would be escorted to the bank by armed U.S. Marshals. Nowadays an armored truck comes to the courthouse and once a week and securely transports the cash from the courthouse to the bank. Other "unique" working conditions included keeping drug evidence in the court's vault, and having smokers light up in shared office spaces. On the flip side, small-town customs still prevailed, and anyone who had a little piece of land and grew produce would share the bounty, bringing plantains, avocados, and other good-neighbor offerings for everyone to share.

The Clerks of Court that followed Carmen Aida Carrera were Dennis A. Simonpietri-Monefeldt (1974-1977), Ramón Alfaro (1977-1987), Juan A. Masini-Soler (1988-1990), and Lydia Pelegrin (1991-1994). A full review of the Clerk's Office needs was entrusted to the new Clerk upon Carrera's retirement. At the request of the Chief Judge at that time, José V. Toledo, Dennis Simonpietri travelled to six small-

---

6   *Ibid*, p. 69.
7   *Ibid*, p. 166.
8   *Ibid*, p. 209.
9   Annual Report of the Director of the Administrative Office of the United States Courts, 1967. (p. 196)
10  *Ibid*, p. 254.
11  *Ibid*, p. 59.
12  *Ibid*, p. 60.

13  *Ibid*, p. 59.
14  28 U.S.C. §1827 *et seq.*

*Continued on next page*

# PAPERLESS...

*Continued from previous page*

and large-sized courts on the mainland "to learn how these were organized to handle workloads"[15] and other aspects of the court's administration. After a few short months, Simonpietri made some recommendations that Judge Toledo found acceptable, and a restructuring of the court began thereafter. Foremost on the list were the modernization of the judges' chambers, staff reorganization, improvements in salaries for all employees, and the justification for a total of four new judges in light of the excessive work load.[16] Due to the language issues involved as well, each judge was assigned an interpreter.[17]

During their tenure, Dennis Simonpietri and Ramón Alfaro performed the duties of a Magistrate Judge on a part-time basis in addition to their duties as Clerks of Court.[18] Simonpietri was later appointed as a full-time Magistrate Judge in 1975 and Alfaro in 1977.

The Federal Bar Exam was administered for the first time in 1982 under Clerk of Court Ramón Alfaro to 22 candidates, of which only two passed. The exam at that time was corrected manually by the Clerk and a member of the Examinations Committee.[19] Not surprisingly, the

---

15 USDC Juan M. Pérez-Giménez's remarks during the Dedication Ceremony of the José V. Toledo U.S. Post Office and Courthouse, 180 F. Supp. 2d. XLVII (D.P.R. 2000).
16 Guillermo A. Baralt interview with Dennis A. Simonpietri, May 25, 2002.
17 Baralt, Guillermo A. *History of the Federal Court in Puerto Rico: 1899-1999*. Hato Rey, PR: Publicaciones Puertorriqueñas, 2004. (pp. 381)
18 *Ibid*, pp. 383-384.
19 *Ibid*.


*Swearing-in ceremony of Frances Ríos de Morán, current Clerk of the Court*

most recent federal bar exam had over 300 candidates registered, and the entire process, from registration to score notification, is now computer-based.

The Clerk's Office has in its possession a historical roll of counsellors book where the first signature to be found, dating back to October 8, 1900, is that Judge Noah Brooks Kent Pettingill, Law Judge of the Provisional Court from June 27, 1899 to 1900. It is a time-honored tradition that has not changed with the transition to the Article III court, and to this date every attorney admitted to practice in federal court has signed it.

The signature of the current Clerk of Court, Frances Ríos de Morán, is also on that roll book of counsellors as of February 10, 1967. Ríos de Morán took office on July 1, 1994, bringing with her the knowledge and experience of public service in the local government as Undersecretary of State, Executive Director of the Tourism Office, and with the federal government as Clerk of the U.S. Bankruptcy Court. During her 22-year tenure she has witnessed and oftentimes pioneered the greatest changes the district court has gone through since it became an Article III court.

She was the first Clerk to learn of the Courtroom 21 Project at the William & Mary Law School in Virginia, and with the support of then-Chief Judge Carmen Consuelo Cerezo took the initiative to bring state-of-the-art evidence presentation technology to the courtrooms. Under her clerkship the courtrooms in Puerto Rico's federal court have become highly sophisticated environments that enable simultaneous interpreting, high-definition evidence presentation, real-time transcripts of proceedings,


*Computer room in Hato Rey.*

*Continued on next page*

# PAPERLESS...

*Continued from previous page*

videoconferencing, digital recording of court proceedings, touchscreen controls, among many other features.

The greatest change during the last 50 years has undoubtedly been the transition from typewriters to computers and from a paper-based to a paperless work environment. The first computers were assigned to the judges when the District Court moved from Old San Juan to Hato Rey in 1990. Having added computers to other Clerk's Office areas, the federal court system started to migrate to an Integrated Court Management System (ICMS) that automated and tracked cases from initial filing through appeal. The transition was implemented in Puerto Rico in the early '90s

> NOTWITHSTANDING THE ADVANCES IN TECHNOLOGY, THE *FORCE MAJEURE* OR GREATER FORCE BEHIND THE MODERNIZATION AND CHANGE OF THE CLERK'S OFFICE AND THE COURT IS, WITHOUT A DOUBT, ITS STAFF.

under the clerkship of Lydia Pelegrin, and started with civil cases, then added the criminal cases. However, the ICMS platform had certain limitations that by the year 2003 made it obsolete. At that point the District Court decided to transition to the current Case Management/Electronic Case Files (CM/ECF) system.

This change propelled the Clerk's Office into the 21st Century, reaching dramatic new levels of efficiency through the automation of every task performed by Clerk's Office personnel. It took a tremendous amount of hours to make the transition, and "all hands on deck"—from intake and docketing staff to jury clerks and interpreters—to transition all criminal and civil matters, district judge and magistrate judge files, all at once into the CM/ECF system. CM/ECF brought imaging into the mix, which ICMS did not. Court documents could now be scanned and filed in a Portable

Document Format (PDF) at any time of the day, and any day of the week; all that was needed was a computer and access to the Internet. It made case management accessible to all stakeholders—judges, attorneys, and court staff—with just a login name and a password. Notices were now sent automatically to all concerned parties in a case; motions were filed and instantly received by litigants and the Court alike; cases could even be transferred from one jurisdiction to another, because every U.S. District Court now used the same automation platform. For those courts where users do not have a CM/ECF login name and password, they can always gain access through a sister program, PACER (Public Access to Court Electronic Records.)

At this time the Federal Judiciary already has a Next Generation (NextGen) Case Management/Electronic Case Files system that will allow for the use of both PACER and CM/ECF with a single sign-on.

Without a doubt, technology has been an important force in the way that the Clerk's Office conducts business. Notwithstanding the advances in technology, the *force majeure* or greater force behind the modernization and change of the Clerk's Office and the Court is, without a doubt, its staff. It is my firm belief that the future of the Court's evolution lies in its human resources. Clerk's Office employees take pride in being at the forefront of the implementation of state-of-the-art technology and every other advance and innovation. The hard work and passion of those who have conformed "the Court Family" throughout the years have been the foundation of the Clerk's Office and the Court's sustained excellence.

As I look through the prism of my almost 28 years, first as Bankruptcy Clerk, then Clerk of the District Court for the District of Puerto Rico, I feel privileged to have clerked under four distinguished Chief Judges: Carmen Consuelo Cerezo, Héctor M. Lafitte, José A. Fusté, and Aida M. Delgado-Colón, whose interactions with me have always been open, respectful, engaging, and very rewarding. I treasure this deeply gratifying journey filled with memorable events and achievements, and will forever have a special place in my heart for all the people who have shared this journey with me.

## DO YOU KNOW...?

22) Judicial officer largely credited for implementing "case management" in the Puerto Rico District Court?

23) District Judges who have become Chief Judges after 1966.

*Answers on page 36*

# TRIAL BY JURY

By Hon. Francisco A. Besosa

The United States Constitution provides that a person has a right to a jury trial in both criminal prosecutions and civil cases. The Constitution provides that guarantee for criminal defendants in both the Constitution itself, Art. III, §2, cl.3 and in the Bill of Rights — the 6th Amendment. So important did the Framers believe it to be, that the right to trial by jury in criminal prosecutions is the only guarantee to appear in both the original Constitution in 1787 and the Bill of Rights in 1791. Indeed, one of the grievances against King George III mentioned in the Declaration of Independence of 1776 was "depriving us ... of the benefit of trial by jury."

The first time we find the right to trial by jury is not in the United States Constitution of 1787. As early as 1774, even before the Declaration of Independence, the First Continental Congress' Declaration of Rights proclaimed the right to a jury trial. Twelve states had already enacted their own constitutions prior to the 1787 Constitutional Convention. The only right unanimously proclaimed in those state constitutions was the right of a criminal defendant to trial by jury.

In civil cases trial by jury was guaranteed by the Seventh Amendment to the Constitution. That guarantee, however, was for cases originally tried in courts of law, rather than courts of equity or admiralty, and for such causes in which legal rights, as opposed to equitable or admiralty rights were at stake—generally private tort, contract and property cases.

In Puerto Rico's local courts, criminal defendants do have a right to trial by jury; civil litigants do not.

In 1901, the Supreme Court of the United States decided that if distant possessions "inhabited by alien races" are annexed by the United States and those "alien races" differed in religion, customs, laws, the methods of taxation and modes of thought," then "the administration of justice, according to Anglo—Saxon principles, may for a time be impossible." *Downes v. Bidwell,* 182 U.S. 244, 286-87 (1901). Three years later, the Supreme Court held that "the right to trial by jury was not a fundamental right which goes wherever the jurisdiction of the United States extends, "unless Congress established the trial by jury system by affirmative legislation." *Dorr v. United States,* 195 U.S. 138, 148-49 (1904). Furthermore, in 1922, the Supreme Court held that the 6th Amendment right to a jury in criminal cases does not apply to the residents of Puerto Rico unless the right were applicable by local legislation. *Balzac v. Porto [sic] Rico,* 258, U.S. 298, 310-11 (1922).



That right had already been established in Puerto Rico since 1901. See Laws of P.R. Ann. Ap. II, R. 111 (1971). Juries were composed of twelve persons and verdicts had to be unanimous. In 1948, however, the Puerto Rico Legislative Assembly enacted a law by which verdicts of three-fourths of the jury members were authorized. That law was subsequently incorporated in Article II, section 2 of the Puerto Rico Constitution enacted in 1952. That is why a 9-3 verdict in local criminal cases is valid. The United States Supreme Court has not decided whether criminal jury verdicts must be unanimous. We have found no case in which this issue has reached the Supreme Court for a decision.

No law has been enacted providing for trial by jury in civil cases in the courts of Puerto Rico. The Supreme Court has consistently decided, however, that states are not constitutionally required to provide a jury in civil cases. *City of Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687 (1999).

## Qualifications to be a Juror in Federal Court

To be legally qualified for jury service, an individual must:

- be a United States citizen;
- be at least 18 years of age;

*Continued on next page*

# TRIAL BY JURY ...

*Continued from previous page*

- reside primarily in the judicial district for one year;
- be adequately proficient in English to satisfactorily complete the juror qualification form;
- have no disqualifying mental or physical condition;
- not currently be subject to felony charges punishable by imprisonment for more than one year; and
- never have been convicted of a felony (unless civil rights have been legally restored)

There are three groups that are exempt from federal jury service:

- members of the armed forces on active duty;
- members of professional fire and police departments; and
- "public officers" of federal, state or local governments, who are actively engaged fulltime in the performance of public duties.

Persons employed on a fulltime basis in any of these three categories are barred from serving on federal juries, even if they desire to do so.

Jury service is a way for United States citizens to participate in the judicial process.

## Juror Selection

Each district court randomly selects citizens' names from lists of registered voters and people with drivers licenses who live in that district. The people randomly selected complete a questionnaire to help determine if they are qualified to serve on a jury. This selection process helps to make sure that jurors represent a cross-section of the community, without regard to race, gender, national origin, age, or political affiliation. This group is generally called "the Jury Pool."

From this "Jury Pool," persons are chosen to be summoned to appear for jury duty for a trial pending in court.

## Jury Pool to Jury Box

Being summoned for jury service does not guarantee that a person will actually serve on a jury. When a jury is needed for a trial, a group of qualified jurors randomly selected by computer from the Jury Pool is taken to the courtroom where the trial will take place. The judge then asks questions to the potential jurors in order to determine their suitability to serve on the jury for that trial, a process called voir dire. The purpose of *voir dire* is to exclude from the jury those who may not be able to decide the case fairly and impartially, based solely on the evidence presented during the trial and the instructions given by the judge. Members of the panel who know any person involved in the case, who have information about the case, or who may have strong prejudices about the people or issues involved in the case, typically will be excused by the judge. The attorneys may also exclude a certain number of jurors without giving a reason, using peremptory challenges, or may exclude jurors for cause.

## Types of Cases Heard by Juries

There are two types of judicial proceedings in the federal courts that use juries.

1.  Criminal trial

    An individual is accused of committing a crime that is considered to be against society as a whole. Twelve people, plus alternates, make up a criminal jury. A unanimous decision must be reached before a defendant can be found "guilty." Alternate jurors do not participate in the jury's decision. The government must prove the crime was committed "beyond a reasonable doubt."

    Guilty pleas and plea negotiations reduce the need for juries in criminal cases.

2.  Civil trial

    Litigants seek remedies for private wrongs that don't necessarily have a broader social impact. At least six people, but not more than twelve, make up a civil jury. The jury must come to a unanimous decision unless otherwise specified. The standard of proof is a "preponderance of the evidence," or "more true than not."

    Settlement negotiations reduce the need for juries in civil cases.

## Working Together: Judge and Jury

The judge determines the appropriate law that should be applied to the case and the jury finds the facts in the case based on what is presented to them during the proceedings.

At the end of a trial, the judge instructs the jury on the applicable law. While the jury must obey the judge's instructions as to the law, the jury alone is responsible for determining the credibility of the witnesses, determining the facts of the case, and ultimately deciding the case. In criminal cases, the jury unanimously decides whether a defendant is guilty or not guilty; in civil cases, the jury unanimously decides in favor or against the plaintiff.

# The U.S. Probation and Pretrial Office: District of Puerto Rico

By: Eustaquio Babilonia

Chief U.S. Probation and Pretrial Services Officer

## I. Mission

The U.S. Probation and Pretrial Services System is a vital part of the federal judiciary. The System's mission is to investigate and supervise defendants and offenders. We serve as the Court's fact finders, conducting bail and presentence investigations, as well as managing the risk of defendants and offenders who have been conditionally released to the community. To achieve this goal, U.S. Probation and Pretrial officers serve as agents of change, providing treatment and support to assure law abiding behavior.

Officers responsibilities require us to work not only with federal judges and other Court professionals, but with U.S. Attorneys, defense attorneys, Bureau of Prisons, state and local law enforcement agents, treatment providers and community leaders. In essence, officers deliver services that benefit the Court, the community and the offenders. As in any other district, Probation and Pretrial Officers in Puerto Rico have three (3) core and statutory mandates:

### A. Bail Investigations

Officers balance the defendants right to pretrial release with the Court's concern that the defendant appear in Court as required and not endanger the public. The officer conducts a pretrial investigation, gathering and verifying information about the defendant and defendant's suitability for pretrial release under the least restrictive conditions.

### B. Presentence Investigations

As required by Title 18, U.S. Code Section 3553(a), the officer prepares a presentence report that contains information about the offenses, the offenders, the impact of the offense on the victim, the sentencing options under the Federal Sentencing Guidelines. The primary purpose is to provide objective information that enables the Court to impose a fair sentence that satisfies the punishment, deterrence and corrective goals of sentencing.

### C. Pretrial and Post Conviction Supervision

Officers supervise defendants and offenders in the community and in doing so promote positive change and law abiding behavior, so as to reduce risk to the community

> ...The Federal Probation Act of 1925. ...provided for a national Probation system in the U.S. Courts and gave the Courts the power to appoint Probation Officers and to place defendants on Probation.

and promote Court appearance. Officers intervene with a variety of supervision treatment strategies aimed at maximizing defendant and offender success during the period of supervision. Supervision begins with assessing the offender, his risk level, and barriers to supervision, identifying what is known in the field of criminology as "crimonogenic needs" and "responsivity factors". The officer establishes an individualized plan that effectively deals with those risk factors and barriers that increase the likelihood of recidivism. In supervising defendants and offenders, officers both consider public safety responsibilities and the need to provide correctional treatment such as drug, alcohol, sex offender, mental health treatment, education or vocational training, employment and housing assistance, among many other services and controlling strategies such as location monitoring technology, associations and residency restrictions.

## II. History

Congress laid the foundation for Probation by establishing The Federal Probation Act of 1925. This Act provided for a national Probation system in the U.S. Courts and gave the Courts the power to appoint Probation Officers and to place defendants on Probation. The Administrative Office of the U.S. Courts assumed responsibility for the Probation

*Continued on next page*

# Probation Court...

*Continued from previous page*

System in 1940. Pretrial Services came along more than 50 years after Probation as a means to reduce both crime committed by persons released to the community pending trial and reduce unnecessary pretrial detention. The Pretrial Services Act of 1982 authorized implementation of Pretrial Services nationwide. Today the U.S. Probation system services in 94 federal judicial districts and over 6,000 appointed U.S. Probation and Pretrial Officers.

The U.S. Probation Office in Puerto Rico was established in February of 1935. The reasons as to why it took a decade to implement the 1925 Probation Act are not known. The first U.S. Probation Officer in Puerto Rico was Mr. James M. Johnson of Florence, South Carolina, appointed by territorial Judge, Hon. Robert Cooper. It seems that among the first Puerto Rican federal Probation Officers was Manuel F. Rodríguez, member of the U.S. Navy (1942) and Antonio M. Bird, a graduate of Tulane University (1942). Furthermore, the first Puerto Rican to be appointed Chief U.S. Probation Officer was Manuel Cabranes, father of Second Circuit Court of Appeals, Hon. José A. Cabranes.

Although documentation is scarce, we have managed to determine that Mr. Gregorio Mercado was named Chief U.S. Probation Officer in the early 1970's until January 1977. Therafter, Mr. José M. De Choudens was appointed Chief on February 13, 1978 thru May 29, 1983. From August 27, 1983 until July 31, 1994, Mr. Isidoro Mojica-Vázquez was Chief of the U.S. Probation Office. Mr. Carlos D. Rodríguez, who was serving as the first Chief Pretrial Services Officer at that moment, was appointed Chief U.S. Probation Officer on August 1, 1994 until October 1, 2002. Since then,



*From left to right: Edward Fankhabnel, Deputy Chief, USPO; Eustaquio Babilonia, Chief, USPO; and Hector Torres, Chief, Pretrial Officer*

Mr. Eustaquio Babilonia has remained in charge of the U.S. Probation Office as Chief, first as Acting Chief until his appointment in December 2002. The U.S. Pretrial Services Office in Puerto Rico was created in March 1985, as a result of the Pretrial Services Act of 1982. In addition, to Mr. Carlos Rodríguez, Mr. Salixto Medina and Mr. Héctor Torres also served as Chief U.S. Pretrial Services Officers. In February 2007, U.S. District Court Judges approved the consolidation of the Pretrial Services Office and Probation Office under the direction of Chief U.S. Probation Officer Eustaquio Babilonia.

## III. Probation Puerto Rico Today

In the last ten (10) years, the U.S. Probation Office in Puerto Rico has been one of the fastest growing offices in the nation. A review of our staffing history reveals that on June 30, 2005, the office in Puerto Rico had a total of 69.5 authorized work positions (staff). In 2005, the district averaged 600 Presentence Investigation Reports, 700 Bail Investigation Reports and had an average of 1,700 Post Conviction Supervision Cases. More than ten (10) years later (2016), the U.S. Probation Office in Puerto Rico has more than doubled its authorized work positions to 145. As of June 30, 2016, the office averaged a total of 1,250 Presentence Investigations per year, 1,300 Bail Investigations and 3,250 Post Conviction Supervision cases. These workload numbers are the highest ones in the First Circuit. This year the U.S. Probation Office filed over 1,500 retroactive 782 motions, being the district with most cases eligible for early release from imprisonment.

The office is divided in two (2) divisions: (1) Court Services Division where primary responsibility is to conduct bail and presentence investigation reports and (2) Supervision Division in charge of supervising all persons released on bail, probation or supervised release.

In spite of this dramatic growth, the Probation Office in Puerto Rico compares favorably in terms of compliance with national compliance standards. As an example, the average national submission time for Presentence Reports is 95.91 days and in Puerto Rico the average is 73.19 days. The average detention rate is 73.12% and our detention rate 70.60%. In terms of staff profile, 80.3% of our districts Probation Officers have either a Masters Degree and/or a PhD, comparing favorably to the national numbers that are approximately 53%. Our district is number one in the use of second chance funds, spending an average of over $200,000.00 per year to assist our clientele in emergency housing, vocational training, job placement, small business initiatives, and providing basic emergency services such as: Food, medication, etc. Additionally, we project that in 2016, the Probation Office will spend approximately $2,000,000.00, in treatment programs to address

*Continued on next page*

# PROBATION COURT...

*Continued from previous page*

alcohol, drug, sex offender and mental health needs, both ambulatory and residential.

Among the many other programs and initiatives that the U.S. Probation Office in Puerto Rico has implemented, three (3) of them deserve special mention:

1. **Memorandum of Understanding with Commonwealth of Puerto Rico Department of Corrections authorizing Task Force Probation Officers**

   For the past four (4) years, the Office of Probation has benefitted from having state Probation Officers assigned and deputized as Task Force Probation Officers. Puerto Rico is the only U.S. Probation Office in the nation with this agreement, as authorized by Title 5, CFR Part 334, the 1970 Intergovernmental Personnel Act (IPA). Eight (8) state officers are presently on a four (4) year detail with U.S. Probation.

2. **Community Service Initiative**

   The U.S. Probation Office has signed numerous Collaborative Agreements with municipalities and non-profit organizations. The agreements allow for placement of offenders who have been imposed Community Service work to serve those hours providing a valuable service to our community.

3. **Community Outreach Program**

   With the understanding that part of our mission is to promote prevention and end the endless cycle of violence and substance abuse, the U.S. Probation Office has a very active outreach team that regularly visits public and private schools, as well as universities.

## IV. Probation at the forefront of Evidence Based Practices and Reentry Initiatives

### A. Evidence Based Practices

The Probation Office in Puerto Rico has moved towards becoming a results based organization. This means that our resources are focused towards desired outcomes, specifically, the execution of the sentence and the protection of the community by reducing the risk and recurrence of crime and maximizing offender and defendant success during the period of supervision and beyond. For us the goal in all cases is the successful completion of the term of supervision during which the defendant/offender commits no new crimes; is held accountable for victim, community and other Court-imposed responsibilities; and prepares for continued success through improvements in his or her conduct and condition.

The District of Puerto Rico was recently awarded a recognition by the Administrative Office of the U.S. Courts, for being the first district to implement the National Office of Probation and Pretrial evidence based practices blueprint, which establishes core principles of effective intervention. We are guided by these principles:

1. **Risk Principle**

   Our district has prioritized and allocated supervision and treatment resources for higher risk defendants and offenders by using the Post Conviction Risk Assessment (PCRA) and Pretrial Risk Assessment (PTRA). Both are Actuarial Risk Assessment tools.

2. **Need Principle**

   Our programs and interventions target the most serious factors that evidence has proven may trigger/promote criminal behaviors. These factors are identified as criminogenic needs, such as criminal thinking, associations, criminal attitude etc...

   The District of Puerto Rico was the first in the nation to have all of its supervision officers trained and certified in STARR (Staff Training Aimed at Reducing Re-Arrest), which is a set of supervision skills officers use in their interactions with offenders and defendants to address and navigate risk. These skills, heavily influenced by social learning theory, have been found to be effective reducing recidivism in criminal justice populations.

3. **Responsivity Principle**

   The Probation Office provides an array of treatment and supervision styles that are responsive to the offenders learning style and ability. Group and individual treatment programs such as: MRT (Moral Reconation Therapy), which is a Cognitive Skills Program, Making It Work, a job readiness program, GED and Financial Planning are part of the many treatment options that the Probation Office in Puerto Rico offers to respond to our population.

In conclusion, the U.S. Probation and Pretrial Services Office in Puerto Rico is proud to represent the Federal Court System in our beautiful Caribbean Island. As we face the new challenges of the Twenty First Century, our staff in Puerto Rico stands committed in assisting the Court in the fair administration of justice and the protection of the community.



# FBA National Calendar of Events

## OCTOBER

**13-15** Idaho Chapter: Tri-State Conference

**13-15** Utah Chapter: 12th Annual Tri-State Conference

**27** Utah Chapter: Ronald N. Boyce Federal Court Litigation Seminar

## NOVEMBER

**4** 2016 DC Indian Law Conference

**17-18** 4th Annual International Conference on Legislative
Drafting and Law Reform
Criminal Law Section
Environment Energy and Natural Resources Law
Section
International Law Section

**17-18** District of Columbia Chapter: 4th Annual
International Conference on Legislative Drafting and
Law Reform

## SEPTEMBER

**15-17** 2016 Annual Meeting and Convention

**15** Board of Directors Meeting

**27** Cincinnati/Northern Kentucky Chapter: Board Meeting

# DO YOU KNOW...?   ANSWERS!

1) Hon. Clemente Ruiz-Nazario
2) Hon. Hiram R. Cancio
3) Hon. Juan B. Fernández-Badillo
4) Hon. Carmen C. Cerezo
5) Hon. Juan Fernández-Badillo
6) Hon. Carmen C. Cerezo
7) Hon. Juan M. Pérez-Giménez
8) Hon. Juan M. Pérez-Giménez
9) Hon. Aida M. Delgado-Colón
10) (26 years) Hon. Carmen C. Cerezo in 1980;
Hon. Aida M. Delgado-Colón in 2006
11) 1978
12) Three: (Juan M. Pérez-Giménez, Aida M. Delgado-Colón,
and Gustavo A. Gelpí
13) Two: Carmen C. Cerezo and Pedro A. Delgado
14) Hon. Juan Torruella – 1984

15) Four District Judges have held the position of
Puerto Rico Solicitor General (*Procurador General*)

| | |
|---|---|
| 1999-2000 | Hon. Gustavo A. Gelpí |
| 1993-1995 | Hon. Pedro A. Delgado |
| 1969-1972 | Hon. Gilberto Gierbolini |
| 1957-1958 | Hon. Juan B. Fernández-Badillo |

16) Harry Nachman, Esq.
17) Gerardo Ortíz del Rivero, criminal defense counsel since
1953, held the position of Federal Public Defender for the
District of Puerto Rico from
1978 to 1990.
18) 1990
19) Hon. Enrique S. Lamoutte, Chief Judge; Hon. Mildred
Cabán; Hon. Brian K. Tester; and Hon. Edward A. Godoy
20) Hon. Gustavo A. Gelpí
21) Hon. Raymond L. Acosta
22) Hon. Jaime Pieras, Jr.
23) Hon. Juan R. Torruella, Hon. Juan M. Pérez-Giménez,
Hon. Gilberto Gierbolini, Hon. Carmen C. Cerezo,
Hon. Héctor M. Laffitte, Hon. José A. Fusté, and
Hon. Aida M. Delgado-Colón