\

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN MARIANA ISLANDS

PAUL MURPHY,

                Plaintiff,

       v.

ROBERT GUERRERO, in his official capacity
as Commissioner of the Department of Public
Safety of the Commonwealth of the Northern
Mariana Islands, and LARRISA LARSON, in
her official capacity as Secretary of the
Department of Finance of the Commonwealth
of the Northern Mariana Islands,

                Defendants.

Case 1:14-CV-00026

**DECISION AND ORDER GRANTING
IN PART AND DENYING IN PART
CROSS-MOTIONS FOR SUMMARY
JUDGEMENT**

## Table of Contents

I.    INTRODUCTION ................................................................................................ 2

II.   PROCEDURAL BACKGROUND ....................................................................... 2

III.  STATEMENT OF FACTS .................................................................................. 4

IV.  DISCUSSION ....................................................................................................... 7

   A.  Summary Judgment Standard ...................................................................... 7

   B.  The Second Amendment in the Commonwealth ......................................... 7

   C.  Second Amendment Analytical Framework ............................................... 8

   D.  Analysis ...................................................................................................... 12

      1.  License and Registration ...................................................................... 12

      2.  Storage Restrictions in the Home ........................................................ 24

      3.  Ban on Large Capacity Magazines ...................................................... 28

      4.  Long Gun Caliber Restrictions ............................................................ 33

      5.  Assault Rifle Ban ................................................................................. 37

      6.  Public Carry Ban and Transportation Restriction ............................... 41

      7.  $1,000 Excise Tax ............................................................................... 46

V.   CONCLUSION .................................................................................................. 51

1

## I.    INTRODUCTION

Plaintiff Paul Murphy, a veteran who served honorably on active duty in Iraq and Afghanistan as a U.S. Army Ranger, seeks to validate his constitutional right to keep and bear arms for self-defense. He sues Defendants Robert A. Guerrero and Larissa Larson in their official capacities as the Commissioner of the Department of Public Safety ("DPS") and the Secretary of the Department of Finance, respectively, to enjoin them from enforcing certain provisions of the Commonwealth's Weapons Control Act and Special Act for Firearms Enforcement ("SAFE").[1] In particular, Murphy challenges: (1) the requirement that he obtain a license and register his weapons; (2) the restrictions on how he may store his weapons at home; (3) the ban on large capacity magazines ("LCMs"); (4) the ban on rifles in calibers above .223; (5) the ban on "assault weapons"; (6) the ban on transporting operable firearms; and (7) the $1,000 excise tax imposed on handguns. Murphy and the Commonwealth filed cross-motions for summary judgment.

The Court will grant Murphy's motion with respect to the firearm registration requirement, the ban on rifles in calibers larger than .223, the ban on assault weapons, the ban on transporting operable firearms, and the $1,000 excise tax. The Court will grant the Commonwealth's motion with respect to the license requirement, the restrictions on storing firearms in the home, and the ban on LCMs.

## II.    PROCEDURAL BACKGROUND

Murphy filed his initial complaint pro se on December 24, 2014. (ECF No. 1.) In it, he challenged several provisions of the Commonwealth's Weapons Control Act as violating his Second Amendment rights. As Murphy and the Commonwealth grappled over several motions to

---

[1] For convenience, the Court will refer to Defendants Guerrero and Larson collectively as the Commonwealth of the Northern Mariana Islands ("Commonwealth" or "CNMI").

dismiss and amended complaints, the Court heard and decided another case challenging the Commonwealth's ban on handguns, *Radich v. Deleon Guerrero*. On March 28, 2016, the Court struck down the handgun ban. *See Radich*, No. 1:14-cv-00020, 2016 WL 1212437, at *9 (D. N. Mar. I. Mar. 28, 2016). Two weeks later, on April 11, 2016, the Commonwealth Legislature passed and the Governor of the Commonwealth signed into law SAFE, which dramatically overhauled the CNMI's gun control laws and allegedly mooted several issues of Murphy's complaint. (Commonwealth Notice of Change in Law, ECF No. 81.) Murphy and the Commonwealth met with the Court and agreed that Murphy would file another complaint—his fourth amended—to challenge any remaining issues with the Weapons Control Act and new issues arising from SAFE.

Murphy filed his fourth amended complaint on April 29, 2016. (Compl., ECF No. 86.) In it, he alleges that on July 30, 2007, customs officials (under the Department of Finance) confiscated certain firearms and ammunition he had brought with him to the CNMI. (Compl. ¶ 20.) The confiscated weapons include a WASR 10/63 rifle and a Glock 19 pistol. (Compl. ¶ 21.) The confiscated ammunition includes 2,773 rounds of 7.62 mm Long Range M118, 161 rounds of 7.62 x 39, and one 9mm round. (Compl. ¶ 22.) Two months later, Murphy was issued a firearms identification card (license) allowing him to own and possess firearms in the CNMI. (Compl. ¶ 23.) With this license, he was able to register a .223 rifle only; his WASR rifle and Glock pistol were not returned to him. For the next six years, he continuously renewed his license and, starting in 2011, submitted applications and requests to register the WASR and Glock pistol. (Compl. ¶¶ 24-27.) Also during this same period, he imported four new rifles that complied with the CNMI's caliber restrictions and registered them. (ECF No. 47-6, Pl's Ex. 5.) However, because he refused to re-register his rifles and register the new ones that he imported under the CNMI's registration requirements pending his lawsuit, he surrendered six of his rifles to DPS. (Declaration of David

Hosono, ECF No. 75-1.) In 2014, Murphy demanded the return of his six rifles: three American Tactical .22 rifles and three Palmetto Arms AR-15 stripped lower receivers. (Compl. ¶ 29.) Murphy's last firearms license expired on April 10, 2015. (Elma Tenorio Decl., ECF No. 104-1.) To date, none of Murphy's weapons have been returned to him, and he now challenges some of the particular restrictions imposed by the Weapons Control Act and SAFE so that he may obtain and use his weapons. (*See* Compl. ¶ 30.)

The parties filed cross-motions for summary judgment on June 30, 2016.[2] The Court heard oral arguments and now rules as follows.

### III.    STATEMENT OF FACTS

Plaintiff Murphy filed this action pursuant to 42 U.S.C. § 1983 for deprivation of a right secured by federal law—the individual right to keep and bear arms as secured by the Second Amendment and incorporated through Section 501(a) of the Covenant. Murphy is a U.S. citizen and resident of the CNMI since 2007. (Fourth Amended Compl., ECF No. 86 at 3.) Murphy is also an honorably discharged U.S. Army veteran, (ECF No. 47-8, Pl's Ex. 7.) authorized holder of a Georgia Firearms License, (ECF No. 47-7, Pl's Ex. 6.) and "expert" marksman as indicated by his Department of Defense Record Fire Scorecard. (ECF No. 47-13, Pl's Ex. 12.)

On July 30, 2007, the Division of Customs Services, a division of the Department of Finance, confiscated Murphy's firearms and ammunition to be turned over to DPS. (Statement of Articles Held by Customs Service, ECF No. 47-14.) Two of the firearms—a WASR 10/63 rifle

---

[2] The Court considered the following briefs on the cross-motions for summary judgment: Murphy's Opening Brief, ECF No. 97; Commonwealth's Opposition, ECF No. 104; and Murphy's Reply, ECF No. 107; Commonwealth's Opening Brief, ECF No. 98; Murphy's Opposition, ECF No. 103; Commonwealth's Reply, ECF No. 105. Additionally, the parties stipulated to use earlier summary judgment briefs on the issue of the Commonwealth's ban on rifles in calibers larger than .223. Those briefs are: Murphy's Opening Brief (Caliber), ECF No. 68; Commonwealth's Opposition (Caliber), ECF No. 75; and Murphy's Reply (Caliber), ECF No. 78; Commonwealth's Opening Brief (Caliber), ECF No. 71; Murphy's Opposition (Caliber), ECF No. 74; and Commonwealth's Reply (Caliber), ECF No. 76. The Court will also consider the exhibits provided by both parties.

and Glock 19 pistol—were sent to Guam for holding. (ECF No. 47-15, Pl's Ex. 14.) The ammunition—2,773 rounds of 7.62 mm long range M118, 161 rounds of 7.62 x 39, and one 9 mm round—is still being held by DPS Firearms Section. (ECF No. 47-14, Pl's Ex. 13.) Two months later, Murphy received his "Firearms, Ammunition Explosive I.D. Card" solely for the possession and use of his AR-15 .223 caliber rifle. (ECF No. 47-5, Pl's Ex. 4.) Murphy supported (and continued to support) every application for his ID card with certifications of no criminal record in the CNMI, Los Angeles, and the Department of the Army. (ECF Nos. 47-9, 47-11, 47-12; Pl's Exs. 8, 10, 11.) From 2009 to 2015, Murphy has held an ID card to use and possess initially one .223 L.A.R. AR-15 rifle, then he added a .22 caliber Ruger rifle, and finally two .223 caliber Bushmaster rifles. (ECF No. 47-6, Pl's Ex. 5.)

In 2011, Murphy applied for and was denied possession and use of both his WASR 10/63 rifle and Glock 19 pistol. (ECF Nos. 47-18, 47-20; Pl's Exs. 17, 19.) Although the Weapons Control Act does not have a "good cause" requirement, Section D, Question 2 of the Application for a Weapons Identification Card required the applicant to list the purpose for carrying or possessing the firearm with the caveat "Strongly Recommended Not to Use, FAMILY PROTECTION as Reason to Carry or Possess Firearms or Any Dangerous Device" (original emphasis). (ECF No. 47-16 at 2, Pl's Ex. 15.) As a result of the recommendation, Murphy listed "sports" as his purpose for his March 30, 2011 application despite personal and family security being his main purpose. (ECF No. 46-16 at 2.) Murphy later changed his answer on subsequent applications to "sport/security," (ECF. No. 47-18 at 2.) and "keep and bear arms." (ECF No. 47-20 at 2.)

On April 14, 2011, Police Officer Jesse Concepcion of DPS Records and Firearms Section wrote a letter to then-Commissioner Ramon C. Mafnas inquiring as to whether Murphy's

WASR 10/63 rifle would be approved due to the firearm being held by the Guam Police

Department Armory Unit. The terse response of the word "NO" written on the same letter was

all Murphy received. (ECF No. 47-17, Pl's Ex. 16.) Murphy then wrote a letter directed to the

DPS Commissioner himself challenging his denial and bringing to his attention the decisions in

*District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v.Chicago*, 561 U.S. 742

(2010) but to no avail. (ECF No. 47-19, Pl's Ex. 18.) In January 2013, Murphy submitted his

WIC application under protest. (ECF No. 47-22.) DPS only responded to Murphy's concerns in a

letter dated March 12, 2013 from then-Commissioner James Deleon Guerrero. (ECF No. 47-23,

Pl's Ex. 22.) Besides denying Murphy from renewing his ID card for his Ruger .22 rifle,

Bushmaster .223 rifle, and L.A.R. .223 rifle based on missing documentation, Commissioner

Deleon Guerrero acknowledged Murphy's disagreements with the law but stated that the

Weapons Identification Application Form was not the proper forum to address such concerns.

(ECF No. 47-23 at 3.) Commissioner Deleon Guerrero then emphasized that DPS is only charged

with enforcing the CNMI laws and recommended that Murphy speak to an attorney if he

believed that his rights are being infringed upon. (ECF No. 47-23 at 3.)

      In 2014, Murphy continued to protest his application denials by submitting letters to the

CNMI Office of the Attorney General regarding the enforcement of the CNMI Weapons Control

Act. In a demand letter dated July 18, 2014, Murphy requested from the Attorney General's

Office that the items in DPS custody be returned to him but received no known response. (ECF

No. 47-24, Pl's Ex. 23.) In a second demand letter dated November 7, 2014, Murphy requested

the return of three American Tactical .22 rifles and three Palmetto Arms AR-15 stripped lower

receivers but again received no known response. (ECF No. 47-25, Pl's Ex. 23.)  Having received

no response, and after being turned down by every attorney he approached, Murphy filed his

complaint pro se in this U.S. District Court on December 24, 2014 (ECF No. 1.) challenging provisions of the Commonwealth's Weapons Control Act as violating his Second Amendment rights.

## IV.   DISCUSSION

### A.   Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law makes clear which facts are "material," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. However, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Here, summary judgment is appropriate because the facts are undisputed and the lawsuit revolves purely around issues of law.

### B.   The Second Amendment in the Commonwealth

The Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America ("Covenant"),[3] together with "those provisions of the Constitution, treaties and laws of the United States applicable to the Northern Mariana Islands," is "the supreme law of the Northern Mariana Islands." Covenant § 102. In its provision covering

---

[3] Pub. L. No. 94-241, 90 Stat. 263 (1976), codified at 48 U.S.C. § 1801 note.

individual rights and liberties, the Covenant adopts the Second Amendment and section 1 of the

Fourteenth Amendment of the Constitution as they apply to the states.[4] Covenant § 501(a). Thus,

just as the Second Amendment applies to the States through the Fourteenth Amendment, *see*

*McDonald v. City of Chicago,* 561 U.S. 742, 750 (2010), it likewise applies to the Commonwealth.

*See Radich*, 2016 WL 1212437, at *3 (holding that "the Second Amendment applies with full force

in the Commonwealth as if it were a state").

The Court will therefore analyze the relevant Commonwealth statutes using the tools the

courts of appeals have developed for deciding Second Amendment challenges to state restrictions.

## C. Second Amendment Analytical Framework

The Second Amendment enshrines an individual right to keep and bear arms for self-

defense, such that laws prohibiting the possession of handguns by law-abiding citizens within their

homes for self-defense violate that right. *McDonald*, 561 U.S. at 780 ("the Second Amendment

protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense

within the home"); *District of Columbia v. Heller (Heller I)*, 554 U.S. 570, 628–29 (2008).

Although the Supreme Court has not identified a level or form of scrutiny for analyzing Second

Amendment cases, it has stated that "rational basis" scrutiny is inappropriate. *Id*. at 628 n.27 ("If

all that was required to overcome the right to keep and bear arms was a rational basis, the Second

Amendment would be redundant with the separate constitutional prohibitions on irrational laws,

and would have no effect."); *see United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4

---

[4] The Second Amendment provides: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." Section 1 of the Fourteenth Amendment provides:

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

(1938) (suggesting higher levels of scrutiny "when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten Amendments").

Borrowing from First Amendment jurisprudence, the Ninth Circuit and other circuit courts have adopted a two-step approach for evaluating whether a law violates the Second Amendment. *See Teixeira v. County of Alameda*, 822 F.3d 1047, 1053 (9th Cir. 2016); *Heller I*, 554 U.S. at 606 (identifying the similar historical treatment of the protections of the Second Amendment with those of the First Amendment). "The two-step Second Amendment inquiry we adopt (1) asks whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, directs courts to apply an appropriate level of scrutiny." *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013) (citing *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010), and *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010)).

The first step asks whether the prohibited conduct "was understood to be within the scope of the right at the time of ratification." *Chester*, 628 F.3d at 680. If the conduct at issue relates to the right—for instance, because it touches on "preserving the militia" or "self-defense and hunting," *Heller I*, 554 U.S. at 599—then the Government must present historical evidence proving that the conduct fell outside the scope of the right. *See Chovan*, 735 F.3d at 1137 (government failed to show that domestic violence misdemeanants have historically been restricted from bearing arms); *Marzzarella*, 614 F.3d at 95 (applying intermediate scrutiny because "we cannot be certain that the possession of unmarked firearms in the home is excluded from the right to bear arms"); *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011) ("if the historical evidence is inconclusive or suggests that the regulated activity is *not* categorically unprotected—then there must be a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights" (original emphasis)). When the historical

9

investigation conclusively shows that the challenged conduct falls outside the scope of the Second Amendment, however, the analysis is over and the law stands. *See Peruta v. County of San Diego (Peruta II)*, 824 F.3d 919, 929 (9th Cir. 2016) ("the history relevant to both the Second Amendment and its incorporation by the Fourteenth Amendment lead to the same conclusion: The right of a member of the general public to carry a concealed firearm in public is not, and never has been, protected by the Second Amendment").

There is another way the Government can prevail on the first step: *Heller I*'s list of "longstanding prohibitions" and "presumptively lawful" regulations. *See Heller I*, 554 U.S. at 626, 627 n.26. Noting that the right guaranteed by the Second Amendment is "not unlimited," the Supreme Court identified three prohibitions its opinion would not disturb: (1) "the possession of firearms by felons and the mentally ill," (2) "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," and (3) "laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27. The Supreme Court also acknowledged the traditional absence of any individual right to "dangerous and unusual weapons," as distinct from commonly used weapons. *Id.* at 627; *see Jackson v. City and County of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014) ("we ask whether the regulation is one of the 'presumptively lawful regulatory measures' identified in *Heller [I]*, or whether the record includes persuasive historical evidence establishing that the regulation at issue imposes prohibitions that fall outside the historical scope of the Second Amendment" (citations omitted)). To the extent that a law is found to be longstanding and presumptively lawful, a plaintiff may rebut the presumption by showing that "the regulation [has] more than a de minimis effect upon his right." *Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1253 (D.C. Cir. 2011) (holding that the District's basic registration requirements are "self-evidently de minimis, for they are similar to other

common registration or licensing schemes, such as those for voting or for driving a car, that cannot reasonably be considered onerous" *Id.* at 1254-55.)

The second step requires a court to gauge "(1) 'how close the law comes to the core of the Second Amendment right,' and (2) 'the severity of the law's burden on the right.'" *Chovan*, 735 F.3d at 1138 (quoting *Ezell*, 651 F.3d at 703). Laws that eviscerate the right—such as the handgun bans struck down in *Heller I* and *McDonald*—are irredeemable regardless of how compelling a state's interest may be. *See Heller I*, 554 U.S. at 636 ("the enshrinement of constitutional rights necessarily takes certain policy choices off the table").

Laws that only regulate the manner in which the right may be exercised are subject to intermediate scrutiny. *Marzzarella*, 614 F.3d at 96–98 (applying intermediate scrutiny because criminalizing the possession of a firearm with an obliterated serial number did not prevent anyone from owning a particular type of firearm for self-defense, and was therefore more akin to a regulation on the manner of exercising the right rather than the more serious concern of cutting off a particular class of firearms). A law must satisfy two requirements to be upheld by a court applying intermediate scrutiny. First, it must advance an important, significant, or substantial government interest. *Chovan*, 735 F.3d at 1139. Second, the law must reasonably fit that interest, although it need not be the least restrictive means of doing so. *Marzzarella*, 614 F.3d at 98; *see Chovan*, 735 F.3d at 1140–41 (upholding the federal law banning domestic violence misdemeanants from possessing firearms under intermediate scrutiny because such individuals are likely to recidivate and doing so with a gun increases the risk of the victim's death, a result against the government's significant interest to the contrary).

If a law substantially burdens the right of self-defense, however, strict scrutiny applies. *Kolbe v. Hogan*, 813 F.3d 160, 168 (4th Cir. 2016) (remanding Maryland assault weapon and LCM

11

bans to the district court to apply strict scrutiny because the bans substantially burden the core

protection of the Second Amendment—self-defense.[5] Strict scrutiny requires a greater showing

from the government: it "asks whether the law is narrowly tailored to serve a compelling

government interest." *Marzzarella*, 614 F.3d at 96 n.14 (citation omitted). Moreover, to be

narrowly tailored, the restriction must be the least restrictive means of achieving the government's

compelling interest. *See Kolbe*, 813 F.3d at 179. Laws can be subject to a standard between

intermediate and strict scrutiny depending on how severely they impact the right. *See Ezell*,

651 F.3d at 708 (noting that a Chicago ban on gun ranges within the city came close to implicating

the core Second Amendment right, and would therefore require a "rigorous showing" from the

government, if not quite strict scrutiny).

Keeping these standards in mind, the Court will evaluate each of Murphy's challenged

provisions.

*D. Analysis*

1. License and Registration

Murphy argues that SAFE, the Weapons Control Act, and the relevant implementing

regulations violate the Second Amendment because they require him to obtain a license and

register all of his firearms, thereby preventing him from immediately exercising his right to self-

defense at home or anywhere else. In particular, Murphy objects to obtaining a weapon

identification card ("WIC") (which functions as both an individual license to possess a firearm and

a firearm registration document), re-registering his WIC every two years, and the Commonwealth

---

[5] On March 4, 2016, the Fourth Circuit granted Maryland's petition for rehearing en banc. 636 Fed. Appx. 880 (Mem.).

practice of seizing the weapons and ammunition of visitors without a WIC at a port of entry.[6] The Commonwealth counters that such requirements are longstanding under *Heller I*, and that they therefore do not raise Second Amendment concerns. The Commonwealth also contends that any interference with the right to keep and bear arms is de minimis, that intermediate scrutiny applies, and that the regulations satisfy such a standard.

The Weapons Control Act makes it a crime to possess firearms and ammunition unless a person has a valid WIC. 6 CMC (N. Mar. I. Code.) § 2204(a).[7] Individuals who do not already possess a firearm must obtain a WIC before they may purchase or import one. *See* 6 CMC § 2205(a).[8] If an individual arrives in the Commonwealth with firearms but without having already obtained a WIC, then the firearms are confiscated as contraband. 4 CMC §1407(b)[9]; 6 CMC §§ 2302,[10] 10207 (ammunition too). Somewhat unusual, the WIC functions as both an individual

---

[6] At oral argument, Murphy objected to the costs associated with the Commonwealth's licensing and registration scheme. However, because that argument was not raised in his motion for summary judgment, the Court cannot fairly address it here. The Court will address Murphy's objection to the Commonwealth's $1,000 excise tax below.

[7] 6 CMC § 2204(a):

(a) No person may acquire or possess any firearm, dangerous device or ammunition unless the person holds an identification card issued pursuant to this article. The identification card is evidence of the holder's eligibility to possess and use or carry firearms, dangerous devices, or ammunition.

[8] 6 CMC § 2205(a):

(a) No person may purchase, possess or use a firearm, dangerous device, or ammunition unless the person is the holder of an identification card issued pursuant to this article evidencing the eligibility of the person to purchase, possess or use a firearm, dangerous device or ammunition. That person shall be at least 21 years of age.

[9] 4 CMC § 1407(b):

(b) *Customs Inspection and Clearance Required*. In the case of those goods, commodities, resources, or merchandise whose first use in the Commonwealth requires customs inspection and clearance, payment shall be made within 30 days after entry. Such goods, commodities, resources, or merchandise may be released prior to payment of excise tax and upon the submission of the bill of lading and/or manifest or invoice or any other form prescribed by the secretary. Where the actual amount of tax cannot be determined within seven calendar days after the entry, an estimated tax shall be paid within 30 days after entry, subject to later adjustment. However, firearms may not be released until complete payment of all taxes due and owing is made, and upon a showing that the firearm has been properly registered and that the owner has a valid Weapons Identification Card or Firearms Identification Card.

[10] 6 CMC § 2302:

13

license to possess a firearm and proof of a firearm registration. 6 CMC § 2204(b).[11] For clarity, the Court will at times distinguish a WIC as a firearm I.D. card. Indeed, it appears that an individual must submit a separate WIC application for each weapon he or she seeks to possess.[12] WICs are issued by the Department of Public Safety ("DPS"), which runs a mandatory firearm safety course and conducts background checks for all WIC applicants. 6 CMC § 2204(d), (f).[13]

---

(a) The Customs Service, a division of the Department of Finance, shall have the primary responsibility and authority to enforce the provisions of this chapter. This authority shall be concurrent with the authority of any other law enforcement agency as provided by law.

(b) Any officer who is authorized by the Customs Service to enforce the provisions of this chapter may:

> (1) Arrest any person, if there exists probable cause to believe that such person committed an act in violation of this chapter;

> (2) Seize any evidence related to any violation of any provision of this chapter;

> (3) Execute any warrant or other process issued by a court of competent jurisdiction.

[11] 6 CMC § 2204(b):

(b) Identification cards are issued only by the Department of Public Safety pursuant to regulations made by the Department of Public Safety in the manner which is or may be provided by law. The identification card shall have on its face all of the following:

> (1) The name and address of the holder.

> (2) The sex, height and weight of the holder.

> (3) The birth date of the holder.

> (4) The date of expiration for the card, which shall be two years from the date of issue.

> (5) A photograph of the holder taken within 10 days prior to issuance.

> (6) An endorsement setting forth the extent of the holder's eligibility to possess, use and carry firearms, dangerous devices, or ammunition.

> (7) The number of the identification card.

> (8) The manufacturer, model, type and serial number of the firearm.

[12] *See* 6 CMC § 2204(b)(8) (calling for "[t]he manufacturer, model, type and serial number of the firearm" per identification card)

[13] 6 CMC § 2204(d):

(d) *Mandatory Firearms Safety Education Class*. Prior to the issuance of Identification Cards by the Department of Public Safety, applicants applying for an identification card for the first time are required to attend a Mandatory Firearms Safety Education class ("MFSEC"). The MFSEC shall be organized and conducted as follows:

> (1) The Department of Public Safety is hereby authorized to establish a program to conduct these classes.

> (2) The Department of Public Safety is required to provide National Rifle Association firearms certified instructors to conduct these classes.

> (3) A fee of $10.00 will be charged for the class. Fees shall be used to fund the MFSEC.

DPS cannot issue a WIC until 15 days after an application has been submitted, but must issue the WIC within 60 days of submission unless the application is denied. 6 CMC § 2204(e).[14] The WIC lasts two years, but renewal applications are automatically granted so long as the applicant submits an application for renewal 30 days before the WIC expires and certifies that he or she is not prohibited from possession under § 2204(f). 6 CMC § 2204(m).[15]

The Commonwealth argues that the license and registration regulations are "longstanding" and therefore presumptively lawful under *Heller I*. Although there is evidence to support that position, on balance both requirements were a historical oddity rather than the norm. The

---

6 CMC § 2204(f):

(f) No person may be issued an identification card if the person has been:

    (1) Acquitted of any criminal charge by reason of insanity.

    (2) Adjudicated mentally incompetent.

    (3) Treated in a hospital for mental illness, drug addiction or alcoholism.

    (4) Convicted of a crime of which actual or attempted personal injury or death is an element.

    (5) Convicted of a crime in connection with which firearms or dangerous devices were used or found in his or her possession.

    (6) Convicted of a crime of which the use, possession or sale of narcotics or dangerous drugs is an element.

[14] 6 CMC § 2204(e): No identification card may be issued until 15 days after application is made, and unless the issuing agency is satisfied that the applicant may lawfully possess and use or carry firearms, dangerous devices, or ammunition of the type or types enumerated on the identification card. Unless the application for use and possession is denied, the identification card shall issue within 60 days from the date of application.

[15] 6 CMC § 2204(m):

(m)(1) Any person holding a firearms identification card pursuant to this section who desires renewal of the identification card shall submit an application for renewal at the Department of Public Safety 30 days prior to the expiration date of the person's current firearms identification card.

(2) The application forms shall contain a formal request for a renewal of two years and shall also contain a certification that the holder of the identification card has not been subjected to any of those conditions set forth in subsection (f) of this section.

(3) The identification card shall be automatically renewed upon its expiration date for a period of two years, provided that the requirements of subsections (m)(1) and (m)(2) are complied with, and, provided, further, that the Department of Public Safety does not have any cause, pursuant to rules and regulations adopted under this article, to disapprove the renewal.

(4) If the time period for renewal stated in subsection (m)(1) of this section is not complied with, the identification card holder shall be required to follow the procedures for an original application.

Commonwealth primarily relies on *Heller II* for the proposition that firearm registration requirements—at least for handguns—are longstanding and therefore exempt from Second Amendment scrutiny. *See Heller II*, 670 F.3d at 1253–55. The Court disagrees with the methodology and conclusions of the D.C. Circuit, and therefore rejects the Commonwealth's argument with respect to firearm registration.

Unlike *Heller I*, in which the Supreme Court focused on the commonality and historical pedigree of regulations on the right to keep and bear arms before finding them presumptively lawful, the D.C. Circuit in *Heller II* focused on whether any jurisdictions historically required firearm registration, regardless of how rare such regulations were. Applying *Heller I*'s theory of presumptively lawful regulations, this Court must reject *Heller II*'s rationale.

In *Heller II*, the D.C. Circuit upheld the District of Columbia's handgun registration requirement as falling outside the scope of the Second Amendment, and declined to analyze the regulation under any level of scrutiny. 670 F.3d at 1254. The D.C. Circuit held that registration requirements were longstanding based on the early-twentieth-century laws of only eight jurisdictions: New York, Illinois, Georgia, Oregon, Michigan, California, Hawaii (before statehood), and the District of Columbia. *Id.* at 1253–55, (noting that more than a quarter of Americans currently live in jurisdictions with some registration requirement). This approach bears little resemblance to that adopted by the Supreme Court, which focused on both the age of the burdening regulation as well as its ubiquity. *See Heller I*, 554 U.S. at 626 ("the *majority* of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues" (emphasis added)). Presumably, the Supreme Court meant that regulations with both historical *and* popular acceptance (particularly those upheld by the judiciary at the time) are unlikely to violate the Second Amendment. *See id.*

16

at 629 ("*Few laws* in the history of our Nation have come close to the severe restriction of the District's handgun ban." (emphasis added)). Indeed, even relatively recent enactments with universal judicial acceptance would seem to pass *Heller I* scrutiny. *See United States v. Yancey*, 621 F.3d 681, 683 (7th Cir. 2010) (observing *Heller I*'s inclusion of the ban on the mentally ill from possessing firearms as a presumptively lawful and longstanding regulation but noting that Congress did not institute the ban until 1968); *United States v. McCane*, 573 F.3d 1037, 1048 (10th Cir. 2009) (Tymkovich, J., concurring) (stating that *Heller I*'s "felon dispossession dictum may lack the 'longstanding' historical basis that *Heller* ascribes to it" and examining the conflicting literature on just how longstanding the felon-in-possession ban actually is). Because only a minority of jurisdictions have adopted firearm registration laws—even to this day—the Commonwealth's firearm registration law cannot be presumptively lawful under *Heller I*.

The Court finds that criminalizing the possession of firearms without a WIC license and proof of firearm registration burdens protected conduct, including the right to armed self-defense, and therefore requires the Court to assess the relative weight of the burden and its relation to the core Second Amendment right and apply a suitable level of scrutiny. *See Chovan*, 735 F.3d at 1136. The Commonwealth has failed to show that the licensing and registration requirements fall outside of the historical scope of the Second Amendment; therefore, Murphy passes step one. *See Chester*, 628 F.3d at 681–82. For step two, the Court must identify the proper level of scrutiny by considering the burden of the regulation and its proximity to the core right. *See Jackson*, 746 F.3d at 960–61.

Here, the law completely prevents a law-abiding citizen from using a firearm in exercise of his or her right to self-defense—at least while their first WIC application is pending. *See* 6 CMC § 2204(a). This burden is temporary, as the wait for a WIC takes between 15 to 60 days. 6 CMC

§ 2204(e). Completely preventing an individual from exercising his right to keep and bear arms, even for a limited time, represents a serious imposition, but the regulation shares more in common with First Amendment "time, place, and manner" restrictions than with more serious bans on the content of speech (or a particular type of firearm). *See Marzzarella*, 614 F.3d at 96–97 (time, place, and manner restrictions evaluated under intermediate scrutiny). Therefore, the Court will apply intermediate scrutiny.

The Commonwealth argues that it has a substantial interest in preventing individuals who are most likely to abuse firearms—such as felons and the mentally ill—from obtaining them. The Court agrees. Whatever the scope and validity of the Commonwealth's limitations on firearm ownership, the Commonwealth's interest in protecting public safety and enforcing its provisions remains important.

The Court also agrees with the Commonwealth that the licensing requirement closely fits the Commonwealth's goal by requiring background checks for all aspiring gun owners. The background check verifies an applicant's status as a law-abiding responsible citizen and prevents a criminal from legally obtaining firearms. *See Chovan*, 735 F.3d at 1130–31 (describing how Chovan's attempt to purchase a firearm after lying about his prior conviction was thwarted by a background check). As Murphy correctly pointed out at oral argument, to the extent that federal law mandates background checks on gun purchases, the Commonwealth's licensing scheme replicates the already-established federal standard. *See* 18 U.S.C. § 922(t) (national background checks required); Brady Handgun Violence Prevention Act ("Brady Act"), Pub. L. No. 103-159 § 103, 107 Stat. 1536 (1993) (creating the "national instant background check system"). Of course, as a separate sovereign, the Commonwealth is perfectly within its authority to craft its own laws to the extent not otherwise prevented from doing so. *See* U.S. Const. art. VI, cl. 2 (supremacy

clause); *e.g.*, *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824) (holding that state laws inconsistent with federal laws must yield).

Here, however, the Commonwealth's system actually provides more robust protection than its federal counterpart because it requires universal background checks. The Brady Act requires a federal background check before a "licensed importer, licensed manufacturer, or licensed dealer" may transfer a firearm to an unlicensed individual, but does not require a background check for firearm transfers when the transferor is not (and does not need to be) licensed under federal law. 18 U.S.C. § 922(t); *see* 18 U.S.C. § 923(a) ("No person shall engage in the business of importing, manufacturing, or dealing in firearms, or importing or manufacturing ammunition, until he has filed an application with and received a license to do so from the Attorney General."); § 921(a)(21) (defining persons engaged in the business of importing, manufacturing, or dealing in firearms as those who conduct such business as "a regular course of trade or business with the principal objective of livelihood and profit"). The Commonwealth closes the Brady Act loophole that allows small-time or private sellers to transfer firearms without conducting a background check on the transferee by requiring the transferee to obtain a license—complete with a background check— before he may possess a gun or one may be sold to him. 6 CMC §§ 2204(a), 2205(a); *see* 6 CMC § 2215 ("No person other than a manufacturer, wholesaler or dealer licensed pursuant to this article may transfer a firearm or dangerous device to any person other than a manufacturer, wholesaler or dealer without first ascertaining that the transferee is the holder of an identification card issued pursuant to this article."). Because the Commonwealth's individual licensing scheme squarely fits its legitimate end of keeping firearms out of the hands of those most likely to abuse them, it passes intermediate scrutiny.

The Commonwealth's firearm registration provision, on the other hand, does not pass

intermediate scrutiny. Unlike the individual licensing scheme, which likely prevents felons from obtaining firearms, the registration provision only informs the Commonwealth that a certain individual has a certain firearm. But that does not prevent dangerous individuals from getting their hands on firearms or otherwise safeguard public safety, and so does not further the Commonwealth's stated goals.

The Commonwealth makes two arguments for the registration requirement. First, the Commonwealth relies on *Heller III* for the proposition that registration creates only a de minimis burden, which does not violate the Second Amendment. *See Heller v. District of Columbia (Heller III)*, 801 F.3d 264, 274 (D.C. Cir. 2015) (holding that "the burden of the basic registration requirement . . . does not implicate the second amendment right" because it is "de minimis"). Quite simply, that is not how any form of heightened scrutiny works—not even the most modest form of intermediate scrutiny. *See Mance v. Holder*, 74 F. Supp. 3d 795, 806 (N.D. Tex. 2015) (a law imposing a de minimis burden only escapes heightened scrutiny if it is longstanding); *cf. Heller II*, 670 F.3d at 1254–55 (comparing the registration of handguns—possession of which is a constitutional right—to the registration of motor vehicles). The Ninth Circuit, for instance, recently applied intermediate scrutiny in a First Amendment case challenging Los Angeles County's requirement that pornography performers use condoms in certain contexts, despite finding that the requirement was a "de minimis" burden. *Vivid Entertainment, LLC v. Fielding*, 774 F.3d 566, 571, 577–78 (9th Cir. 2014) ("The condom mandate survives intermediate scrutiny because it has only a de minimis effect on expression, is narrowly tailored to achieve a substantial government interest of reducing the rate of sexually transmitted infections, and leaves open adequate alternative means of expression"). Indeed, the Supreme Court and many other courts of appeals have similarly applied intermediate scrutiny to First Amendment cases despite finding a de minimis interference

with the right. *See Crawford v. Marion County Election Bd.*, 553 U.S. 181, 191 (2008) ("However slight that burden may appear, . . . it must be justified by relevant and legitimate state interests"); *Vivid Entertainment*, 774 F.3d at 580 (collecting cases); *cf. Arizona Libertarian Party v. Reagan*, 798 F.3d 723, 732 (9th Cir. 2015) (applying rational basis scrutiny where a "state election law imposes only a *de minimis* burden on a party's First and Fourteenth Amendment rights").

Furthermore, according to *Heller I*, laws that burden enumerated rights, expressly including the Second Amendment, cannot be subject to the deference of rational basis scrutiny, which "is not just the standard of scrutiny, but the very substance of the constitutional guarantee" against "irrational laws." 554 U.S. at 628 n.27; *see McDonald*, 561 U.S. at 778–79 (rejecting suggestion that the Second Amendment cannot be singled out for especially unfavorable treatment). Surely, if rational basis scrutiny does not suffice for Second Amendment consideration, then *no* scrutiny, as the D.C. Circuit applied in *Heller III*, cannot be sustained. Because even de minimis burdens on enumerated rights must at the very least be supported by a substantial government interest reasonably related to its law, this Court cannot credit *Heller III*'s failure to scrutinize in any way the gun registration regime that came before it.

Even if a de minimis burden on an enumerated right could satisfy constitutional scrutiny, the burden imposed by the Commonwealth's particular registration requirement is not de minimis. For each firearm a responsible law-abiding individual seeks to register, even if he or she already has a WIC card, he or she must wait at least 15 days before he may lawfully possess it. 6 CMC § 2204(e). Such a requirement may be appropriate to allow DPS to complete a background check on a potential licensee, but makes no sense for merely registering a weapon. *Cf. Heller II*, 670 F.3d at 1254–55 (comparing D.C.'s gun registration requirement to registering a car, both of which are presumably de minimis because they require nothing more than a small payment and proof of

compliance with relevant laws). In this case, Murphy was separated from the firearms he imported for at least 15 days each time he acquired a new rifle until it was registered with DPS, even though he had already obtained a CNMI WIC card. No D.C. car owner had to surrender their vehicle while it was being registered.

Second, the Commonwealth argues that firearm registration laws protect public welfare. The Court agrees that the Commonwealth has a significant interest in preventing gun-related deaths, but the firearm registration requirement—as opposed to the individual licensing requirement—does not rationally serve that interest.

The Commonwealth's research supports the conclusion that individual licensing, not firearm registration, serves the interest of preventing gun-related deaths. For instance, in *Association Between Connecticut's Permit-to-Purchase Handgun Law and Homicides*, researchers estimated that Connecticut's adoption of a handgun purchaser licensing law in October 1995 was "associated with a 40% reduction in Connecticut's firearm homicide rates during the first 10 years that the law was in place," but that there was "no evidence for a reduction in nonfirearm homicides." K.E. Rudolph et al., 105 Am. J. Pub. Health 49 (2015). Connecticut's "permit-to-purchase" law, like the Commonwealth's Weapons Control Act, mandates that anyone seeking to purchase a handgun first obtain a license. *See* Conn. Gen. Stat. § 29-36f(b) (reasons a person may be denied a license to purchase, including felony conviction), § 29-36g (background check). Those provisions do not include a registration requirement. *Id.* The Commonwealth's research, most of which centers on Connecticut, does not support its *registration* requirement. *See* C.K. Crifasi et al., *Effects of Changes in Permit-to-Purchase Handgun Laws in Connecticut and Missouri on Suicide Rates*, 79 Preventative Medicine 43 (2015). It makes sense that a firearm registration requirement would not decrease firearm-related deaths; the regulation makes no

distinction between prospective gun owners as to the likelihood that they will misuse the weapon, as distinct from the individual license requirement, which does.

There may be legitimate reasons for a state to implement a registration requirement that creates a de minimis hardship on an individual; however, this Court cannot say that the CNMI's current registration requirements are de minimis.[16] *Cf. Heller III*, 801 F.3d at 274–75 (finding that "protecting police officers by enabling them to determine, in advance, whether guns may be present at a location to which they are called" does not justify certain registration requirements because police treat every encounter as if a gun could be involved and the D.C. police only rarely checked the registration database). The Court's holding is accordingly limited to the rationale presented.

Next, Murphy objects to the requirement that he renew his WIC every two years. He relies on *Heller III*, which held that the District of Columbia's requirement that an individual re-register his firearms every three years failed intermediate scrutiny. 801 F.3d at 277–78. Because this Court has already found that the firearm registration requirement fails constitutional muster, the re-registration requirement for firearms also fails.

To the extent that *Heller III* held that requiring background checks at regular intervals failed intermediate scrutiny—and it is not entirely clear that the D.C. Circuit so held—this Court disagrees. *See id.* at 277 ("District officials and experts conceded [that] background checks could be conducted at any time without causing the registrations to expire" (internal quotation marks omitted)). The Court agrees with the Commonwealth that a renewal of the individual license, coupled with an additional background check, every two years ensures that individuals who can

---

[16] Alternatively, the Commonwealth could craft regulations that do not infringe on the Second Amendment right, such as voluntary firearm registration. *Cf. Heller III*, 801 F.3d at 278 (rejecting the argument that D.C.'s re-registration requirement for firearms supplements its loss-reporting requirement).

1    no longer legally possess firearms (such as those who have fallen victim to certain mental illnesses)

2    will not be licensed to do so. *Cf.* 6 CMC § 10209(a) (granting amnesty to individuals who

3    surrender firearms to DPS). Although not a perfect fit with its goal of disarming dangerous

4    individuals, the Commonwealth's relicensing requirement (as distinct from the re-registration of

5    firearms) is narrowly tailored because it only requires an application and a background check every

6    two years—nothing more. 6 CMC § 2204(m) (an additional firearms safety training class is not

7    required to renew a WIC). The provision regarding the renewal of an individual license to possess

8    firearms passes intermediate scrutiny.

9          Finally, Murphy objects to the Commonwealth policy of seizing firearms and ammunition

10    from individuals arriving in the CNMI without a WIC. However, because the Court has already

11    substantially upheld the WIC and its background check requirement, and thus the basis for the

12    corresponding penalties imposed for possessing a gun without a WIC, it logically follows that the

13    seizure provisions do not violate the Second Amendment. *See* 4 CMC §1407(b), 6 CMC §§ 2303,

14    10207. The Commonwealth may categorize firearms as contraband as a means of enforcing its

15    constitutional prohibition on allowing arms for non-WIC holders—i.e., persons for whom DPS

16    has not conducted a background check—in service of its legitimate public safety end. However,

17    to the extent that the same statute, 4 CMC §1407(b), requires a seizure of firearms from owners

18    who have a valid WIC or Firearms Identification Card until the firearms are registered, it violates

19    the Second Amendment.

20                  2.   Storage Restrictions in the Home

21          Murphy challenges the provisions of SAFE that require a firearm in the home to be either

22    "stored in a locked container or disabled with a trigger lock" or "carried on the person of an

23

24

individual over the age of 21." 6 CMC § 10204(a).[17] Because a nearly identical provision was upheld in *Jackson*, this Court will uphold the same law here.

In *Jackson*, the Ninth Circuit considered the constitutionality of San Francisco Police Code § 4512, which states that "'[n]o person shall keep a handgun within a residence owned or controlled by that person unless' (1) 'the handgun is stored in a locked container or disabled with a trigger lock that has been approved by the California Department of Justice,' or (2) '[t]he handgun is carried on the person of an individual over the age of 18.'" *Jackson*, 746 F.3d at 958. Although the Ninth Circuit recognized the similarities between San Francisco's ordinance and the District of Columbia trigger lock regulation struck down in *Heller I*, it nevertheless applied intermediate scrutiny. *Id.* at 964. Contrary to the stricken D.C. ban, which always required a trigger lock, the San Francisco ordinance regulated only gun *storage*, not *carrying*, and thus allowed an individual to retain his or her right to immediate self-defense within the home. *Id.* ("San Franciscans are not required to secure their handguns while carrying them on their person").

San Francisco's firearm storage restriction survived intermediate scrutiny because it took

---

[17] 6 CMC § 10204:

(a) No person shall keep a firearm within a residence owned or controlled by that person unless:

  (1) the firearm is stored in a locked container or disabled with a trigger lock; or

  (2) the firearm is carried on the person of an individual over the age of 21; or

  (3) the firearm is under the immediate control of a person who is a law enforcement officer.

(b) A person who violates the foregoing subsection (a) of this section is guilty of criminally negligent storage of a firearm and, except as otherwise provided in this section, shall be fined not more than $1,000, imprisoned not more than 180 days, or both.

(c) A person who violates subsection (a) of this section, and as a result, a minor causes injury or death to himself or another with the firearm, shall be fined not more than $5,000, or imprisoned not more than 5 years, or both.

(d) The provisions of this section shall not apply if the minor obtains the firearm as a result of an unlawful entry or burglary to any premises by any person.

(e) For the purposes of this section, the term "minor" shall mean a person under the age of 21 years.

(f) This section shall not apply to a properly registered firearm on the effective date of this Act until ninety days after this Act becomes law.

reasonable and narrow steps to achieve its important objective—"reduc[ing] the number of gun-related injuries and deaths from having an unlocked handgun in the home." *Id.* at 965, 966. (The court also accepted San Francisco's assertion that § 4512 helped prevent firearms from being stolen. *Id.*) Because San Francisco's research indicated that keeping firearms in a locked box reduced the risk of accidental handgun deaths and injuries, § 4512 fit the government's interest. *Id.* at 966.

Here, the Commonwealth's regulation likewise "requires handguns to be stored in a locked container when not carried on the person." *Id.* at 961. Like San Francisco, the Commonwealth argues that it has a substantial interest in preventing firearm accidents and thefts in the home, and that SAFE's storage regulations reasonably fit those objectives. The Court agrees.

Like the Ninth Circuit in *Jackson*, this Court emphasizes the distinction between carrying and storing a firearm. The regulation struck down in *Heller I* mandated that an individual keep his or her handgun inoperable *at all times*. *See* 554 U.S. at 628. Because self-defense is impossible with an inoperable weapon, the law destroyed the Second Amendment right and could not stand. *Id.* at 629. But *Jackson* provides an alternative: regulate storage, not carrying. A person may be somewhat burdened by rendering his or her distant weapons inoperable—imagine, for example, fleeing pursuers and attempting to open a safe or disable a trigger lock—but an individual carrying his or her weapon would not be so burdened. *See Jackson v. City and County of San Francisco*, 135 S.Ct. 2799, 2800 (2015) (Thomas, J. dissenting from denial of cert.) ("petitioners contended that the law effectively denies them their right to self-defense at times when their potential need for that defense is most acute" because, for example, "it is impossible to 'carry' a firearm on one's person while sleeping" at night, which is when most burglaries occur).[18] The law is also sensibly

---

[18] The scenario raised in Justice Thomas's dissent is troubling. The Second Amendment protects an individual's right to immediate self-defense, which should reasonably account for weapons within his or her reach or control, not just

narrowed to its rationale; the legislature could reasonably conclude that it is less likely children will find and misuse an unsecured handgun, or criminals will steal one, when the operable gun is carried rather than stored.

General self-defense law, as restated by SAFE, further strengthens the Commonwealth's argument. As in most jurisdictions, an individual in the Commonwealth may not use lethal force in self-defense unless he reasonably believes that it is the only way to prevent imminent serious injury or death. *See* 6 CMC § 10210(a)(1) (lethal force is used to "reasonably prevent the immediate use of force by an aggressor")[19]; *Commonwealth v. Demapan*, 2008 MP 16 ¶ 16 (providing the traditional common law self-defense requirements: "(1) the defendant must have a

---

his or her person. *Cf. Arizona v. Gant*, 556 U.S. 332, 335 (2009) (reaffirming the Fourth Amendment rule that "police may search incident to arrest only the space within an arrestee's immediate control, meaning the area from within which he might gain possession of a weapon or destructible evidence" (internal quotation marks omitted)). It is unlikely that the governmental interest in preventing accidental shootings or thefts would be significantly harmed by adopting a reach or control rule, rather than an "on the person" rule as it currently stands. However, *Jackson* represented a facial challenge. An as-applied challenge, should one ever emerge from the sleep scenario described by Justice Thomas, could lead to a more limited holding.

[19] 6 CMC § 10210:

(a) An individual is allowed to use a firearm or deadly force in self-defense if:

(1) The individual is protecting him or herself and the use of the firearm or deadly force would reasonably prevent the immediate use of force by an aggressor. Provided further that this use is based upon the reasonable belief that the aggressor is about to inflict an intentional contact that would or could reasonably result in serious bodily harm or death; and the use of force by the aggressor can safely be prevented only by the immediate use of deadly force.

(b) An individual is allowed to use a firearm or deadly force in self-defense of a third party if:

(1) The individual is protecting a third party and the use of the firearm or deadly force would reasonably prevent the immediate use of force by an aggressor. Provided further that this use is based upon the reasonable belief that the aggressor is about to inflict an intentional contact that would or could reasonably result in serious bodily harm or death; and the use of force by the aggressor can safely be prevented only by the immediate use of deadly force.

(c) The right to use deadly force for self defense [sic] or defense of a third person does not exist if the individual correctly or reasonably believes that he or she, or the third party in the case of self defense [sic] of a third party, can with complete safety avoid the necessity of so defending himself by

(1) retreating if attacked in any place other than his dwelling place, or in a place which is also the dwelling of the other, or

(2) relinquishing the exercise of any right or privilege other than his privilege to prevent intrusion upon or dispossession of his dwelling place.

(d) An individual loses the right to self-defense with a firearm if he or she is the initial aggressor or intentionally provoked the aggressor by word or deed that is reasonably calculated to elicit a violent response from a reasonable person or the individual aggressor.

reasonable fear of imminent danger; (2) the defendant may only use force against an unlawful aggressor; (3) the defendant's use of force must be necessary; and (4) the defendant's use of force must be proportional to the aggressor's use of force"). Obviously, a person carrying a handgun will be able to prevent the *immediate* use of force by an assailant, and thus exercise his Second Amendment right. The immediacy of the need will likely be lessened for a person seeking out a distant weapon, whether readily operable or not.

Murphy argues that the Court should reject the storage regulation because the Commonwealth, unlike other jurisdictions that have imposed such restrictions, has no history of widespread civil unrest and rioting. Murphy may be correct in his historical analysis, but it is irrelevant. San Francisco did not justify its storage law by pointing to the danger of riots, but by highlighting the danger of accidental firearm misuse and theft. Those dangers are as real in the CNMI as they are in California or any other place, and the government's interest is every bit as keen.

The Commonwealth's storage regulation achieves its substantial goal while narrowly imposing only a fairly minor burden on the right to armed self-defense. The statute thus survives intermediate scrutiny.

### 3. Ban on Large Capacity Magazines

Murphy next objects to SAFE's ban on LCMs, or magazines with a capacity to hold more than 10 rounds. 6 CMC § 10207(b).[20] Applying the Ninth Circuit's rationale in *Fyock v. City of*

---

[20] 6 CMC § 10207:

(a) No person shall possess ammunition in the Commonwealth unless:

    (1) he or she is a licensed firearm vendor;

    (2) he or she is the holder of the valid registration certificate for a firearm of the same gauge or caliber as the ammunition he possesses; except, that no such person shall possess one or more restricted bullets; or

    (3) he or she temporarily possesses ammunition while participating in a firearms training and safety class conducted by a firearms instructor.

*Sunnyvale*, which found that a district court did not abuse its discretion in denying a preliminary injunction against the city of Sunnyvale from enforcing its LCM ban, this Court will uphold SAFE's identical ban here.[21]

In *Fyock*, the Ninth Circuit did not determine whether Sunnyvale's ban on LCMs had sufficient historical antecedents to fall outside the scope of the Second Amendment. 779 F.3d at 997 and n.3 (citing *Peruta v. County of San Diego (Peruta I)*, 742 F.3d 1144, 1167 (9th Cir. 2014)). Nor could the Ninth Circuit determine that LCMs were "dangerous and unusual." 779 F.3d at 998 (noting that because handguns capable of receiving magazines holding more than 10 rounds are commonly held by law-abiding citizens for lawful purposes, LCMs were probably not unusual); *see New York State Rifle and Pistol Ass'n Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) (finding that assault weapons and LCMs are "in common use"). Rather, it held that the district court did

---

(b) No person in the Commonwealth shall possess, sell, or transfer any large capacity ammunition feeding device regardless of whether the device is attached to a firearm. For the purposes of this subsection, the term "large capacity ammunition feeding device" means a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition. The term "large capacity ammunition feeding device" shall not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.

(c) Penalties.

(1) Any person convicted of a violation of subsection (a) of this section for legally allowable ammunition shall be fined not more than $2,500 or imprisoned for not more than 1 year, or both.

(2) A person convicted of possessing more than one restricted pistol bullet in violation of subsection (a)(2) of this section may be sentenced to imprisonment for a term not to exceed 10 years, and shall be sentenced to imprisonment for a mandatory-minimum term of not less than 1 year and shall not be released from prison or granted probation or suspension of sentence prior to serving the mandatory-minimum sentence, and, in addition, may be fined not more than $25,000.

(3) A person convicted of possessing a single restricted pistol bullet in violation of subsection (a)(2) of this section shall be fined not more than $2,500 or imprisoned for not more than 1 year, or both.

(4) A person convicted of possessing a large capacity ammunition feeding device in violation of subsection (b) of this section may be sentenced to imprisonment for a term not to exceed 10 years, and shall be sentenced to imprisonment for a mandatory-minimum term of not less than 1 year and shall not be released from prison or granted probation or suspension of sentence prior to serving the mandatory-minimum sentence, and, in addition, may be fined not more than $25,000. This section shall not apply to any large capacity ammunition feeding device possessed by the owner of a properly registered firearm capable of receiving such a device until ninety days after this Act becomes law.

[21] Because *Fyock* was an interlocutory appeal reviewing a district court's denial of a preliminary injunction, the Ninth Circuit asked whether the district court abused its discretion in finding Fyock's challenge unlikely to succeed on the merits. 779 F.3d at 995–96 ("we are not called upon today to determine the ultimate merits of Fyock's claims").

not abuse its discretion in finding that the regulated conduct did not fall outside the Second Amendment. *Fyock,* 779 F.3d at 996, 998.

The Ninth Circuit next determined that intermediate scrutiny applied because the regulation did not severely impact the core Second Amendment right to self-defense. *Id.* at 999 and n.6 (observing that, at the time, every district court to have considered an LCM ban had upheld it). Because Sunnyvale only limited the number of rounds per magazine, rather than the type of weapon holding that magazine, the ban impacted self-defense much less severely than the D.C. handgun ban struck down in *Heller I,* 779 F.3d at 999 (noting that Sunnyvale contained an exception for lawfully possessed firearms that would not be able to function without an LCM).[22]

Applying intermediate scrutiny, the Ninth Circuit upheld the LCM ban. Sunnyvale offered several legitimate and substantial interests in favor of restricting the number of rounds per magazine, including stopping mass shootings and crimes against law enforcement officers. *Id.* at 1000. To show fit, Sunnyvale offered evidence suggesting that LCMs "are disproportionately used in mass shootings as well as crimes against law enforcement." *Id.* Fyock presented evidence to show that LCMs are useful for self-defense, but "the record also contained studies indicating that most defensive gun use incidents involved fewer than 10 rounds of ammunition." *Id.* The city's ban offered a reasonable fit and was narrowly tailored not to overly burden the Second Amendment right to armed self-defense. It passed intermediate scrutiny.

This Court reaches the same conclusion with respect to SAFE's LCM ban.[23] The law burdens the Second Amendment right, but nevertheless allows effective self-defense using any

---

[22] Murphy has not argued that his firearms will not function without an LCM.

[23] The Commonwealth does not argue that its LCM ban falls outside the scope of the Second Amendment as a longstanding regulation. The Court will presume that the LCM ban burdens conduct protected by the right to keep and bear arms. *See Fyock*, 779 F.3d at 997.

firearm a responsible law-abiding citizen would like. Intermediate scrutiny is therefore appropriate. *See Marzzarella*, 614 F.3d at 97–98 (manner restriction reviewed under intermediate scrutiny).

Like the city of Sunnyvale, the Commonwealth seeks to prevent mass shootings. The Court agrees that preventing mass shootings or making them more difficult to commit represents a substantial and legitimate government interest. *See Chovan*, 735 F.3d at 1139. The restriction on LCMs serves that purpose by reducing the number of rounds an individual may fire before needing to reload. *See Heller II*, 670 F.3d at 1264 ("the Chief of Police testified the '2 or 3 second pause' during which a criminal reloads his firearm 'can be of critical benefit to law enforcement'").

Indeed, in one tragic and well-known example within the Ninth Circuit, a gunman, using a handgun with a 31-round magazine, shot 19 and killed 6—including the Honorable John Roll, Chief Judge of the District of Arizona, who heroically put himself between the shooter and other innocents—in Tucson on January 8, 2011. *See* "A Single, Terrifying Moment: Shots Fired, a Scuffle and Some Luck," http://www.nytimes.com/2011/01/10/us/10reconstruct.html (last visited Sept. 8, 2016).[24] The shooter's rampage was only brought to a halt when he paused to reload and was tackled by two of his victims. It is not unreasonable to surmise that if the shooter had not been using an LCM, he could have been stopped sooner. The Commonwealth's ban could produce such a result, satisfying the close fit of intermediate scrutiny.

Moreover, the Commonwealth's ban would probably not impact the ability of law-abiding citizens to defend themselves. Studies indicate that successful self-defense usually requires fewer than 10 rounds. *Fyock,* 779 F.3d at 1000. A law that defined LCMs as magazines with fewer than

---

[24] To the extent necessary, the Court takes judicial notice of the Tucson shooting. *See* Fed. R. Evid. 201. The tragedy was widely reported, and President Obama led a televised national memorial service for the victims.

10 rounds would likely be unconstitutional despite the legitimate government interest in preventing mass shootings because it would also greatly impede an individual's right to self-defense. *Cf. Cuomo*, 804 F.3d at 264 (striking down New York's ban on loading magazines with more than seven rounds). Here, the regulation is narrowly tailored because it allows self-defense in the majority of circumstances. The Commonwealth's important interest is reasonably served by its restriction, and because the restriction does not go too far, the LCM ban survives intermediate scrutiny.

In his Memorandum in Support of Opposition to Defendants' Cross Motion, Murphy admits to this Court that his WASR 10/63 rifle has a standard 30-round magazine while the Glock 19 pistol has a standard 15-round magazine. (ECF No. 107 at 11.) Those magazines, in their current form, would be considered as LCMs under SAFE. This is not to say, however, that Murphy would not be able to lawfully use and possess such weapons. In the event that Murphy modifies or converts both magazines or purchases new magazines to where their maximum capacity could hold no more than 10 rounds, he would be lawfully authorized to use and possess both firearms in the CNMI.

At the hearing on the cross-motions for summary judgment, Murphy argued that LCMs are useful not only for self-defense, but also for general community defense in the face of foreign invasion. The Court credits Murphy's statements as a veteran and an individual who clearly keeps apprised of geo-political events in the nations around the CNMI. And Murphy is correct that the Founders viewed all able-bodied men as the "militia" who would defend the Republic from invasion. *See Heller I*, 554 U.S. at 580 ("the 'militia' in colonial America consisted of a subset of 'the people'—those who were male, able bodied, and within a certain age range"). However, the militia is properly regulated by the Commonwealth and the federal government. *See* U.S. Const.

art. II, § 2, cl.1 ("The President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States"). Additionally, the Supreme Court in *Heller I* observed that it does not necessarily violate the Second Amendment to ban "weapons that are most useful in military service—M–16 rifles and the like" simply because they would be useful for modern militia purposes. 554 U.S. at 627–28. Because a weapon's usefulness to the general defense or for military purposes does not control whether it is or is not protected by the Second Amendment, the Court must reject Murphy's argument.

The Court finds that the Commonwealth's ban on LCMs is narrowly tailored in support of a significant government interest, and that it therefore survives intermediate scrutiny.

### 4. Long Gun Caliber Restrictions

Murphy next challenges SAFE's restriction on bullets larger than .22 or .223 for long guns. *See* 6 CMC § 10208(a)(6).[25] He contends that the restriction has no precedent in any other state or U.S. territory, and that it substantially interferes with his right to defend himself. The Commonwealth argues that it banned large caliber rifles because the bullets tend to travel farther

---

[25] 6 CMC § 10208:

(a) No person shall possess:

    (1) sawed-off shotgun;

    (2) a silencer, sound suppressor or sound moderator;

    (3) machine gun;

    (4) short-barreled rifle;

    (5) an assault weapon;

    (6) a rifle other than a .22 caliber rimfire, .22 caliber center-fire and .223 caliber center-fire; or

    (7) a shotgun other than a .410 gauge.

(b) Whoever violates this section shall be punished by a fine of not more $2,500 or imprisonment for not more than 1 year, or both. However, if the violation occurs after such person has been convicted in the Commonwealth of a violation of this Division, or of a felony, either in the Commonwealth or in another jurisdiction, in which case such person shall be imprisoned for not more than 10 years, and may be fined not more than $25,000.

than smaller caliber or handgun bullets, and that they therefore carry a more significant risk of collateral damage for missed shots than do their smaller cousins. However, the Commonwealth presents no evidence supporting its claim, and common sense suggests that the law is unlikely to achieve its goal. Under either strict or intermediate scrutiny, therefore, the law fails.[26]

The Court begins with historical analysis. Neither party presented any evidence suggesting that caliber bans are popular longstanding regulations not subject to Second Amendment scrutiny. In fact, it appears that the Commonwealth is entirely alone in banning rifles in calibers above .223, although two jurisdictions recently banned much larger .50 caliber rifles. *See* Cal. Penal Code § 30610 (restricting possession of .50 caliber rifles); D.C. Code § 7-2502.02(a)(7) (making it unlawful to register a .50 caliber BMG rifle); *People v. James*, 174 Cal. App. 4th 662, 673–74 (2009) (upholding California's ban on .50 caliber rifles and observing that the rifles could be used to destroy critical infrastructure and shoot down aircraft). At the federal level, Congress restricted weapons in calibers above .50 in the Gun Control Act of 1968. *See* 18 U.S.C. § 921(a)(4)(B) (defining "destructive device" as any non-shotgun "which has any barrel with a bore of more than one-half inch in diameter"). Because the Commonwealth's caliber restriction impacts the Second Amendment and there is no history of restricting rifles by caliber, the Court will apply heightened scrutiny.

The Commonwealth's ban on rifles larger than .223 caliber burdens the core Second Amendment right to armed self-defense. *See McDonald*, 561 U.S. at 780 (reiterating that the Second Amendment "protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home"). It completely prohibits every law-abiding citizen in

---

[26] As the Court explained above, the issue of the caliber ban was submitted by the parties in earlier cross-motions for summary judgment. The parties stipulated to using the arguments as presented before, and the Court will therefore refer to those older briefs in this section.

the CNMI from possessing a class of arms legal in every other United States jurisdiction. The law does not ban the possession of the most popular weapon for self-defense—the handgun—but it does ban a class of arms useful for self-defense. *See Marzzarella*, 614 F.3d at 96–97 (comparing "manner" restrictions with outright weapons ban and applying intermediate scrutiny to the former). Indeed, according to the Fourth Circuit, Murphy's banned WASR 10/63, an AK-47-style firearm, is "by far" one of the most popular semi-automatic rifles possessed by law-abiding Americans for self-defense. *Kolbe*, 813 F.3d at 169; *see Heller I*, 554 U.S. at 629 (rejecting the argument that handguns could be banned if other firearms were available). Because the law substantially limits the exercise of a fundamental right, the Court will require a close fit between the restriction and the intended benefit. *Cf. Ezell*, 651 F.3d at 708 ("a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end").

The Commonwealth contends that its substantial interest in restricting higher caliber bullets is public safety. In particular, the Commonwealth argues that the risk of errant rounds striking distant bystanders is reduced by the caliber ban because the restriction essentially limits the effective range of all firearms. Indeed, the parties' stipulated expert, Officer David M. Hosono of the Department of Public Safety, stated that higher-caliber bullets fired from rifles generally travel further than bullets fired from lower-caliber rifles. However, as Murphy pointed out and Officer Hosono agreed, other factors, such as barrel length, bullet weight, and the amount of gunpowder, also determine the distance a bullet will travel. It is therefore uncertain whether the Commonwealth's restriction will actually reduce the effective range of rifles in the CNMI.

But even assuming that the restriction will have its intended effect of reducing the effective range of weapons, there is no evidence that such a limitation actually makes bystanders any safer

from errant shots. In fact, it seems unlikely that many innocent bystanders would be struck by missed shots that fall between the effective range of .223 caliber rifles and rifles of higher calibers. According to the Commonwealth's exhibits, a legal .223 caliber bullet has a maximum horizontal range of 3,850 yards (ECF No. 72-3), while an illegal 7.62 x 39mm has a maximum horizontal range of 4,400 yards (ECF No. 72-6). Given the prevalence of dense jungle, hills, and buildings within the CNMI, most bullets fired from almost any gun would probably be stopped before reaching its effective range. If most accidental shootings will occur well within the effective range of even .223 caliber weapons, as seems likely, then the slight increased risk from the longer effective range of larger bullets cannot be a reason to impose on the Second Amendment right. The Commonwealth cannot heavily burden a constitutional right with such scant evidence. *See Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180, 195 (1997) ("Our sole obligation is to assure that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence." (internal quotation marks omitted)).

The Commonwealth also argues that its restriction on higher caliber rifles prevents more serious injuries to individuals who are shot. Murphy contests that fact; but even if true, the policy cannot survive. As the parties suggest, the guns that most effectively serve the purpose of self-defense also tend to cause the most grievous injuries. The right to use lethal force in self-defense is the right to kill if necessary to protect oneself or others, which is why the common law and SAFE impose stringent standards on its use. *See* 6 CMC § 10210(a)(1) (lethal force is used to "reasonably prevent the immediate use of force by an aggressor"). But when the right is lawfully exercised, the government's interest in protecting the life of the aggressor cannot render self-defense less effective at the expense of the victim. Here, the Commonwealth seeks to restrict weapons that are effective for self-defense for the very reason that makes them effective. That is

not a legitimate reason.

The Commonwealth cannot establish even a loose fit between its blanket ban and its intended policy objective. The caliber restriction under 6 CMC § 10208(a)(6) must fall.

5.   Assault Rifle Ban

Murphy next challenges SAFE's ban on assault rifles. *See* 6 CMC § 10208(a)(5) (unlawful to possess "assault weapons"). In particular, he argues that the Commonwealth violates the Second Amendment by prohibiting certain rifle attachments: (1) a pistol grip under the action of the weapon; (2) a thumbhole stock; (3) a folding or telescoping stock; (4) a flare launcher; (5) a flash suppressor; and (6) a forward pistol grip. *See* 6 CMC § 10101(e)(1)(i).[27] The Commonwealth argues that the ban passes intermediate scrutiny because it serves the important government interest of maintaining public safety. The Court disagrees. In fact, the evidence suggests that the banned attachments actually tend to make rifles easier to control and more accurate—making them safer to use. Because the Commonwealth's ban does not match its legitimate and important interest, the ban fails intermediate scrutiny and will be struck down.

As an initial matter, the Court notes that SAFE's assault rifle ban only applies to rifles in

---

[27] 6 CMC § 10101(e)(1)(i):

(e) "Assault weapon" means: (1) The following semiautomatic firearms:

(i) a semiautomatic rifle in a caliber greater than .223 that has the capacity to accept a detachable magazine and any one of the following:

(A) a pistol grip that protrudes conspicuously beneath the action of the weapon;

(B) a thumbhole stock;

(C) a folding or telescoping stock;

(D) a grenade launcher or flare launcher;

(E) a flash suppressor; or

(F) a forward pistol grip

37

calibers above .223. 6 CMC § 10101(e)(1)(i).[28] Because the Court has already determined that the caliber restriction is unconstitutional, the sole issue here is whether the restrictions on rifle configurations passes constitutional muster.

The Commonwealth concedes that assault weapons bans lack any significant history in this nation, and that they therefore impinge on conduct protected by the Second Amendment. *See Heller II*, 670 F.3d at 1260. Similarly, the weapons are not dangerous and unusual. *See Kolbe*, 813 F.3d at 177–78 ("In sum, semi-automatic rifles and LCMs are commonly used for lawful purposes, and therefore come within the coverage of the Second Amendment."). The Court must therefore determine which form of heightened scrutiny to apply.

The Court will apply intermediate scrutiny. Like the LCM ban, SAFE's restrictions on rifle attachments and stocks regulate the manner in which a person may exercise his right to self-defense, but do not ban any particular arms. *See Marzzarella*, 614 F.3d at 96–97; *cf. Kolbe*, 813 F.3d at 180 (applying strict scrutiny against Maryland's ban on AR-15s and their "copies" because the law "completely prohibits, not just regulates, an entire category of weaponry"). Here, the Court is not asked to consider a question of banning categories of rifles, but of restricting rifle accessories. *See Heller II*, 670 F.3d at 1284–85 (Kavanaugh, J., dissenting) (comparing bans on certain gun models to content-based restrictions subject to strict scrutiny under the Supreme Court's First Amendment doctrine). Intermediate scrutiny is the most appropriate model.

The Commonwealth argues that its legitimate and important interest in promoting public safety—particularly to prevent mass shootings—justifies its assault weapons ban. Once again, the problem is not the goal, but the means of achieving it. The Commonwealth has not shown through

---

[28] SAFE's ban on assault weapons does not apply to the popular AR-15, which can be outfitted with the attachments banned on other, larger caliber weapons, such as Murphy's AK-style WASR.

any evidence that its means fit its end.

There are numerous problems with the Commonwealth's evidence. The record shows that few of the particular attachments at issue make a rifle more dangerous. For instance, when asked about a flash suppressor, which attaches to the front barrel of the rifle, Officer Hosono stated that it reduces noise and potentially increases accuracy. (Hosono Tr., ECF No. 98-1, 14:1–5; 26:13–19.) He also testified that there is no law enforcement concern for pistol grips or thumbhole stocks, which simply assist a shooter in absorbing recoil. (Hosono Tr. 23:24–24:14.) See the diagram below (Murphy, PL 19-42 Visualization Powerpoint Presentation at 18 (2016)).



Officer Hosono did present concerns about two attachments: (1) a retractable stock could make the rifle smaller, and thus more easily concealed (Hosono Tr. 14:22–15:8), and (2) a "bump stock"[29] could allow a semi-automatic weapon to fire as if it were an automatic, with the recoil working with the action of the springing stock to continually fire rounds so long as the shooter

[29] With respect to the "bump stock," the Court completely agrees that such an attachment could be restricted. Machine guns are not the sorts of weapons commonly held by responsible law-abiding citizens for self-defense, and attachments that effectively turn lawful weapons into unlawful ones can be restricted without running afoul of the Second Amendment. *See United States v. Henry*, 688 F.3d 637, 638 (9th Cir. 2012) (upholding conviction of defendant for making a machine gun over his Second Amendment challenge). Unfortunately, SAFE does not cover bump stocks, which Officer Hosono explained were only "similar to the retractable stock." (Hosono Tr. 24:23–24.)

keeps a finger on the trigger. (Hosono Tr. 24:19–26:11.) With respect to the retractable stock, Officer Hosono clarified with Murphy that there is essentially no difference between a short standard stock and a shortened retractable stock, except that the former is legal and the latter is not. (Hosono Tr. 15:9–21.) Both would be legal under federal law, which requires that rifles be 26 inches in length. *See* 18 U.S.C. § 921(a)(7) ("rifle"), (8) ("short-barreled rifle" is less than 26 inches in length); § 922(a)(4) (restricting interstate commerce with short-barreled rifles to federal licensees), (b)(4) (federal licensees cannot sell or deliver short-barreled rifles). Because both weapons would be equally concealable, it simply makes no sense to ban one but not the other. See the diagram below (Murphy, PL 19-42 Visualization Powerpoint Presentation at 15 (2016)).



The Commonwealth also relies on studies purporting to show that banning assault weapons serves public safety. However, the comparison is not apples-to-apples. Some states that restrict assault weapons, such as California, do so by make and model, as well as by attachment. *See* Cal. Penal Code § 30510 (defining assault weapon by model), § 30515 (defining assault weapon by attachment). Additionally, many of the studies mix assault weapons with LCMs, further confusing the data. *See Shew v. Malloy*, 994 F. Supp. 2d 234, 249 n.50 (D. Conn. 2014), *affirmed in part and denied in part by Cuomo*, 804 F.3d 242 (quoting Christopher S. Koper, a criminologist, for the

proposition that "Connecticut's bans on assault weapons and large-capacity magazines, *and particularly its ban on LCMs*, have the potential to prevent and limit shootings in the state over the long run" (emphasis added)). Most problematically, none of the Commonwealth's evidence shows that restricting any particular attachment makes any particular public safety impact.

To the contrary, it appears that several of the attachments would actually make self-defense safer for everyone. To the extent that the Commonwealth worries about stray bullets striking innocent bystanders, features that make guns more accurate—as it appears most of the grips and the flash suppressor may do—actually serve public safety by making such stray shots less likely.

Because the assault weapons ban does not support the Commonwealth's legitimate interest in protecting the public, it fails intermediate scrutiny. The Court will strike down the bans on the following rifle attachments: (1) pistol grips that protrude beneath the action; (2) thumbhole stocks; (3) folding or telescoping stocks; (4) flare launchers; (5) flash suppressors; and (6) forward pistol grips. The ban on grenade launchers, as stated in 6 CMC § 10101(e)(1)(i)(D), is not challenged, and so the Court will not address it here.[30]

### 6. Public Carry Ban and Transportation Restriction

Murphy next challenges the Commonwealth's public carry ban and transportation restrictions on firearms. *See* 6 CMC § 10206.[31] To the extent that this statutory provision prohibits

---

[30] The Court notes that grenade launchers are banned under federal law. *See* 18 U.S.C. §§ 921(a)(4), 922.

[31] 6 CMC § 10206:

(a) Any person who is not otherwise prohibited by the law from transporting, shipping, or receiving a firearm shall be permitted to transport a firearm for any lawful purpose from any place where he may lawfully possess and carry the firearm to any other place where he may lawfully possess and carry the firearm if the firearm is transported in accordance with this section.

(b)     (1) If the transportation of the firearm is by a vehicle, the firearm shall be unloaded, and neither the firearm nor any ammunition being transported shall be readily accessible or directly accessible from the passenger compartment of the transporting vehicle.

the carrying of a concealed pistol on a person, loaded or unloaded, it is upheld as there is no constitutional right to carry a concealed weapon in public. *See Peruta II*, 824 F.3d 919. Furthermore, to the extent that § 10206 is consistent with the requirements and rationale of *Jackson*, it will be upheld. However, unlike *Jackson* and 6 CMC § 10204 (relating to storage restrictions in the home), which the Court upheld because it does not restrict an individual from carrying an operable weapon in his home for immediate self-defense, the transportation ban of § 10206 does not allow a person to carry an operable firearm at all. To analyze Murphy's challenge to § 10206, the Court must first determine whether the Second Amendment includes a right to armed self-defense outside the home. After all, if the Second Amendment does not apply outside the home, then a law burdening armed self-defense in public will not raise Second Amendment questions.[32]

The Court finds that the Second Amendment secures a right to bear arms for self-defense in public. Because SAFE *completely* destroys that right, it is unconstitutional regardless of the level of scrutiny applied, and the Court must strike it down.

At least six circuit court decisions have touched on whether and how the Second

---

　　　(2) If the transporting vehicle does not have a compartment separate from the passenger compartment, the firearm or ammunition shall be contained in a locked container other than the glove compartment or console, and the firearm shall be unloaded.

(c) If the transportation of the firearm is in a manner other than in a vehicle, the firearm shall be:

　　　(1) unloaded;

　　　(2) inside a locked container; and

　　　(3) separate from any ammunition.

(d) It shall be a felony punishable by a fine of not more than $10,000 or imprisonment for not more than 10 years, or both, for any person to knowingly transport a firearm in violation of this section.

[32] Strangely, the Commonwealth declined to address whether the Second Amendment applies outside the home, even though such a finding is necessary to deciding the constitutionality of the carry restriction in § 10206, and Murphy sought to carry his weapons outside the home. (Commonwealth Opp'n 13.) The Court declines the Commonwealth's invitation to order additional briefing; the issue was properly raised and should have been addressed in the current briefs.

Amendment applies outside the home. *See Hightower v. City of Boston*, 693 F.3d 61, 72 (1st Cir. 2012) (declining to determine how the right to armed self-defense applies outside the home); *Kachalsky v. County of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012) (assuming that the Second Amendment applies outside the home); *Drake v. Filko*, 724 F.3d 426, 431 (3d Cir. 2013) ("the Second Amendment's individual right to bear arms *may* have some application beyond the home" (original emphasis)); *United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011) (Wilkinson, J. and Duffy, J., writing for the court) ("The whole matter [of applying the Second Amendment outside the home] strikes us as a vast *terra incognita* that courts should enter only upon necessity and only then by small degree."); *Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013) (applying intermediate scrutiny to laws that burden the right to self-defense outside the home); *Moore v. Madigan*, 702 F.3d 933, 935–36 (7th Cir. 2012) (holding that the Second Amendment necessarily applies outside the home); *Bonidy v. U.S. Postal Service*, 790 F.3d 1121, 1126 (10th Cir. 2015) (assuming that the right to armed self-defense applies outside the home as part of an alternative holding). Regrettably, the Ninth Circuit, sitting en banc, recently declined to reach the issue. *Compare Peruta I*, 742 F.3d at 1166 (finding that the Second Amendment protects the right to carry a handgun outside the home), *with Peruta II*, 824 F.3d at 924–25 (reversing *Peruta I* and determining that the Second Amendment does not protect the right to carry a *concealed* firearm outside the home but reserving the question of open carry). Accordingly, this Court must conduct its own analysis.

Of the cases cited above, only the Seventh Circuit dealt with a blanket ban on the public carrying of firearms: *Moore*, 702 F.3d at 934 ("An Illinois law forbids a person, with exceptions mainly for police and other security personnel, hunters, and members of target shooting clubs, 720 ILCS 5/24–2, to carry a gun ready to use (loaded, immediately accessible—that is, easy to reach—

and uncased).”). The others—the Ninth Circuit, First Circuit, Second Circuit, Third Circuit, Fourth Circuit, and Tenth Circuit—each dealt with state laws that restricted public carry, sometimes severely, without banning it entirely. This Court finds *Moore* to be on point and persuasive, and follows its lead here.[33]

The Seventh Circuit begins its analysis of the Second Amendment by observing that much of the historical heavy-lifting had already been accomplished—definitively—by the Supreme Court in *Heller I*. *Id.* at 935 (rejecting the government’s historical arguments about the purported nonexistence of a right to publicly bear arms as too similar to those rejected in *Heller I*). Reasonable minds can differ on the history—for instance, regarding the implication of “the fourteenth-century Statute of Northampton, which provided that unless on King's business no man could ‘go nor ride armed by night nor by day, in Fairs, markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere,’ 2 Edw. III, c. 3 (1328)”—but to the extent that the Supreme Court determined that “eighteenth-century English law recognized a right to possess guns for resistance, self-preservation, self-defense, and protection against both public and private violence,” the issue is closed. *Id.* at 936–37. The implication is clear: “one doesn't have to be a historian to realize that a right to keep and bear arms for personal self-defense in the eighteenth century could not rationally have been limited to the home.” *Id.* (“And in contrast to the situation in England, in less peaceable America a distinction between keeping arms for self-defense in the home and carrying them outside the home would, as we said, have been irrational.”).

---

[33] Although an en banc panel of the Ninth Circuit rejected *Peruta I*’s decision to rule on the Second Amendment’s public application, it did not actually rule on that issue. *Peruta II*, 824 F.3d at 941–42 (response to dissent). However, four judges (as well as the original *Peruta I* author, who did not participate in *Peruta II*) would have held that the Second Amendment must allow for *some* sort of public carry. *See id.* at 945–49 (Callahan, J., dissenting). No judge in the majority offered a contrary opinion; the majority simply argued that the question was not properly raised. *Id.* at 941–42. Because this case, like *Moore* but unlike *Peruta*, squarely raises the issue of firearm self-defense in public, the Court finds persuasive (but not in any way precedential) the opinions of the *Peruta I* majority and the *Peruta II* dissent as the only voices to have addressed the issue in the Ninth Circuit.

The language of *Heller I* and *McDonald*, as well as the text of the Second Amendment itself, also necessitate finding that the right to bear arms applies outside the home. *See id.* at 935–36. For instance, "*Heller* repeatedly invokes a broader Second Amendment right than the right to have a gun in one's home, as when it says that the amendment 'guarantee[s] the individual right to possess and carry weapons in case of confrontation.'" *Id.* (quoting *Heller I*, 554 U.S. at 592). *Heller I* does not limit its description of the right because the Second Amendment does not. *See Kachalsky*, 701 F.3d at 89 n.10 ("The plain text of the Second Amendment does not limit the right to bear arms to the home."). Confrontation is at least as likely to occur outside the home as in it. As the Seventh Circuit described it:

> A woman who is being stalked or has obtained a protective order against a violent ex-husband is more vulnerable to being attacked while walking to or from her home than when inside. She has a stronger self-defense claim to be allowed to carry a gun in public than the resident of a fancy apartment building (complete with doorman) has a claim to sleep with a loaded gun under her mattress. But Illinois wants to deny the former claim, while compelled by *McDonald* to honor the latter. That creates an arbitrary difference. To confine the right to be armed to the home is to divorce the Second Amendment from the right of self-defense described in *Heller* and *McDonald*. It is not a property right—a right to kill a houseguest who in a fit of aesthetic fury tries to slash your copy of Norman Rockwell's painting *Santa with Elves*. That is not self-defense, and this case like *Heller* and *McDonald* is just about self-defense.

*Moore*, 702 F.3d at 937.

Having established that the Second Amendment right to bear arms applied to some degree in public, the Seventh Circuit considered Illinois' justifications. *Id.* at 937–40. Studies from advocates of the law as well as its detractors presented contradictory conclusions, which could not support Illinois' total ban. *Id.* at 940. "A blanket prohibition on carrying gun[s] in public prevents a person from defending himself anywhere except inside his home; and so substantial a curtailment of the right of armed self-defense requires a greater showing of justification than merely that the public *might* benefit on balance from such a curtailment, though there is no proof it would." *Id.*

(original emphasis) ("Even jurisdictions like New York State, where officials have broad discretion to deny applications for gun permits, recognize that the interest in self-defense extends outside the home."). Because Illinois could not justify its prohibition, the Seventh Circuit struck it down.

This Court agrees that the Second Amendment, based on its plain language, the history described in *Heller I*, and common sense, must protect a right to armed self-defense in public. As *Heller I* and the Ninth Circuit decisions discussed earlier in this decision make clear, the right of armed self-defense, including in public, is subject to traditional limitations—for instance, the prohibition on the "carrying of firearms in sensitive places such as schools and government buildings"[34]—but it is *not* subject to elimination. *Heller I*, 554 U.S. at 626–27.

The situation in the CNMI is essentially the same as it had been in Illinois: operable guns cannot be carried for self-defense in public. *See* 6 CMC § 10206. Because the law destroys the right of a licensed individual to carry and transport an operable gun in public, it cannot withstand any traditional type of scrutiny, and must be struck down. *See Heller I*, 554 U.S. at 628–29; *Moore*, 701 F.3d at 942.[35] This Court's ruling is based on the provision's impact on the individual's right to carry and transport an operable handgun openly for self-defense outside the home. It does not apply to the provision's restrictions on the transportation of other firearms.

### 7.   $1,000 Excise Tax

Finally, Murphy challenges the excise tax of $1,000 that SAFE applied against handguns

---

[34] Obviously, if the Second Amendment were limited to the home, it would make little sense for *Heller I* to expressly approve regulations that forbid guns in certain public places.

[35] To the extent that the Commonwealth seeks to prevent accidental shootings and the theft of firearms while they are being transported—surely legitimate and important objectives—storage restrictions may satisfy those goals in a tailored way, but a total carrying ban cannot. *See Jackson*, 746 F.3d at 964–65 (noting that San Francisco's home storage regulations do not destroy the right of self-defense because an individual may still carry his firearms in his house).

imported to the Commonwealth. 4 CMC § 1402(h).[36] Murphy argues that the tax heavily burdens the exercise of the right to purchase a handgun, and therefore fails constitutional scrutiny. The Commonwealth, on the other hand, contends that the tax has a legitimate revenue-generating purpose and that the Court should not second-guess the legislature's means of raising funds to operate the government. The Court agrees with Murphy that the tax places an excessive burden on the exercise of the right of law-abiding citizens to purchase handguns for self-defense without a corresponding important government interest. Accordingly, the law cannot stand.

The Second Amendment protects the right to armed self-defense, which includes the right to acquire such arms. *Teixeira*, 822 F.3d at 1055–56 (zoning restriction on gun shop burdened Second Amendment by limiting firearm sales and training); *see Jackson*, 746 F.3d at 968 (sale of ammunition covered as well). The reason is simple: without the arms, the right would be useless. *See Radich*, 2016 WL 1212437, at *7 (striking down the Commonwealth's ban on importing handguns).

The principle that a court must protect constitutional rights from extinction by means both direct and indirect has a significant pedigree with the Supreme Court. In *Carey v. Population Services, International*, for instance, the Supreme Court noted that "[l]imiting the distribution of nonprescription contraceptives to licensed pharmacists clearly imposes a significant burden on the right of the individuals to use contraceptives if they choose to do so." 431 U.S. 678, 689 (1977). Had the Supreme Court upheld the New York statute in question, which required non-medical contraceptives to be distributed by a licensed pharmacist, the right to contraceptives established in

---

[36] 4 CMC § 1402(h):

(h) *Pistols*. $1,000 per pistol. Pistol shall have the same meaning as set forth in Title 6, Division 10 of the Commonwealth Code. The exemption for Nonbusiness Use, 4 CMC § 1402(d) shall not apply to the excise tax imposed on pistols. This provision shall automatically expire one year after the effective date of the Special Act for Firearms Enforcement.

1    *Griswald v. Connecticut* would have been, if not lost, severely impeded. *See* 381 U.S. 479, 485–

2    86 (1965). The same was true in *Minneapolis Star and Tribune Co. v. Minnesota Commissioner*

3    *of Revenue*, where the Supreme Court struck down a tax on newspaper ink and paper because it

4    burdened the First Amendment freedom of the press. 460 U.S. 575, 585 (1983); *see Grosjean v.*

5    *American Press Co.*, 297 U.S. 233, 250 (1936) (striking down a similar Louisiana tax on larger

6    newspapers).

7          SAFE's $1,000 excise tax imposes a tremendous burden on the rights of responsible law-

8    abiding citizens in the CNMI to obtain handguns. Handguns, like most consumer goods, are

9    available at a variety of price points. For instance, at a large mainland outdoor outfitter, Cabela's,

10   handguns range in price from approximately $150 to well over $2,000. *See* CABELA'S,

11   *Semiautomatic Pistols*, http://www.cabelas.com/catalog/browse/semiautomatic-pistols/_/N-

12   1114851/Ns-CATEGORY_SEQ_105529680 (last visited Sept. 9, 2016).[37] The vast majority of

13   handguns sold by that vendor fall within the $250–$750 range. *Id.* Applied against the most

14   expensive handgun, which lists for $7,699.99, a $1,000 excise tax is high—about 13%—but within

15   the general scope of other Commonwealth excise taxes. *See, e.g.*, 4 CMC § 1402(a)(4) (perfume

16   taxed at 23% ad valorem). However, when applied against the least expensive $150 handguns, the

17   excise tax amounts to a whopping 667% tax, more than six times higher than the *punitive*

18   provisions of the Commonwealth's import tax scheme. *See* 4 CMC § 1412(a) (imposing a 100%

19   "penalty" on "on any person who . . . files a false or misleading declaration, bill of lading, manifest,

20   airway bill, invoices, and/or other documentation which fails to declare . . . or under-declares . . .

21   [the] value of such goods, commodities, resources, or merchandise").

22

23   [37] The Court takes judicial notice of the Cabela's website, which is publicly available for all to see. *See* Fed. R. Evid. 201; *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1204 (N.D. Cal. 2014) (stating that publicly accessible websites are proper subjects of judicial notice); *see O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007) ("It is not uncommon for courts to take judicial notice of factual information found on the world wide web.").

24

The Commonwealth argues that the taxation of firearms in the United States is longstanding, and therefore presumptively valid. The Court disagrees. It is true that Congress has taxed firearms since 1919. *See* Revenue Act of 1918, Pub. L. No. 254, 40 Stat. 1057, § 900(10) (imposing a 10% tax on firearms, shells, and cartridges, but exempting countries engaged in the war with Germany). But to the extent that the law is therefore longstanding—perhaps a dubious assumption—the Court finds that Murphy has demonstrated that the Commonwealth's tax imposes more than a de minimis burden on his right. *See Heller II*, 670 F.3d at 1253 (explaining that a plaintiff may rebut the presumption of validity for longstanding regulations if he shows that the challenged law imposes more than a de minimis burden on the right). A 667% tax on handguns is not de minimis. Murphy has therefore rebutted any presumption that the Commonwealth's tax is valid, and the usual Second Amendment scrutiny applies.

Because the Commonwealth argues that the excise tax does not fall within the scope of the Second Amendment, it does not contend that the tax survives any form of heightened scrutiny. Reviewing the Commonwealth's general interests, the Court finds no legitimate and important interest to be served by the special tax on handguns. Public safety cannot be the legitimate interest, unless the Commonwealth seeks to safeguard the community by disarming the poor. The Court will not ascribe such an invidious motive to the legislature. *See Heller I*, 554 U.S. at 583 n.7 ("'Who has been deprived by [the law] of keeping arms for his own defence? What law forbids the veriest pauper, if he can raise a sum sufficient for the purchase of it, from mounting his Gun on his Chimney Piece . . . ?'" (quoting Some Considerations on the Game Laws 54 (1796))).

Perhaps the interest could be in generating revenue to operate the government. The Court agrees that such an interest is legitimate and important. But the tax, which imposes an extraordinary burden on those protected by the Second Amendment, lacks the necessary tailoring

to survive taxing a constitutionally protected item. *See Minneapolis Star and Tribune*, 460 U.S. at 585 n.7 (applying strict scrutiny because the burdensome law arose directly under the First Amendment). Most notably, the tax is specifically directed to handguns only. It does not apply to any rifle or shotgun. Furthermore, there are other means for the government to raise revenue without burdening the Second Amendment. It could, and does, tax income. *See* 4 CMC § 1201. It could, and does, tax imports not expressly protected by the Bill of Rights. *See* 4 CMC § 1402(a). The excise tax on handguns is not narrowly tailored to a legitimate interest, and cannot survive any form of heightened scrutiny. The Court will strike it down.

The power to tax is not just the power to fund the government; it is the power to destroy. *M'Culloch v. Maryland*, 17 U.S. 316, 327 (1819). And what the Commonwealth cannot do by ban or regulation, it cannot do by taxation. *See Minneapolis Star and Tribune*, 460 U.S. at 585. Here, the Commonwealth's law would come close to destroying the right to keep and bear a handgun for self-defense—particularly for the most vulnerable members of society. *See Moore*, 702 F.3d at 937 (the need for self-defense is most acute in rough neighborhoods). The government need not arm the poor, but it cannot impose uncommon burdens on their ability to exercise their fundamental constitutional rights.

Because SAFE's excise tax comes close to destroying the Second Amendment right to acquire "the quintessential self-defense weapon," *Heller I*, 554 U.S. at 629, the Court will strike it down.

/ /

/

## V.    CONCLUSION

The Weapons Control Act and SAFE clearly demonstrate the Commonwealth's commitment to reducing gun crimes through regulation. However, in its understandable zeal to keep the community safe, the Commonwealth has encroached on certain individual rights provided for by the Covenant and the Second Amendment. The individual right to armed self-defense in case of confrontation, like the other rights enshrined in the Covenant, cannot be regulated into oblivion. Such overly restrictive laws not only impact would-be criminals, but also law-abiding individuals like Paul Murphy. When Murphy properly renews his weapons license, the Commonwealth must return the weapons and ammunition that he is entitled to possess consistent with this decision.

The Second Amendment, as applied to the CNMI through the Covenant, protects the right to armed self-defense in case of confrontation. Laws that burden the right will generally be upheld if they: (1) prevent individuals who should not have firearms— (e.g., violent felons and the mentally ill) from getting them (e.g., license requirements); (2) do not burden conduct necessary for the use of lethal force when justified (e.g., storage requirements with carrying exceptions); or (3) burden self-defense lightly but significantly reduce criminal activity (e.g., LCM ban). However, laws that burden the Second Amendment right cannot survive if they: (1) lack a sound rationale (e.g., firearm registration); (2) are not supported by evidence (e.g., long gun caliber restriction and attachment ban for assault rifles); (3) completely destroy the right to armed self-defense, no matter the importance of the government's interest (e.g., public carry ban and transportation restriction); or (4) attempt to destroy the right through ordinarily legitimate means (e.g., the $1,000 excise tax).

Plaintiff has valiantly pursued all lawful efforts to protect and defend his rights in a

51

community where the voice of the majority can often overpower the equally important rights of the minority. Murphy's battle for justice began more than nine years ago when he first applied for and was denied possession and use of his firearms. Despite extensive statutory and case law research to support his stance, his appeals to the Department of Public Safety, Office of the Attorney General, and Commonwealth Legislature fell on deaf ears. As Murphy has reiterated time and time again, he felt deprived of his rights, discriminated against, and fearful for the security of his person, family, and property. His petition to this Court came at a time when he had exhausted every administrative remedy possible.

In the midst of Murphy's litigation, this Court struck down the Commonwealth's ban on handguns in *Radich v. Deleon Guerrero*, 2016 WL 1212437. The Commonwealth Legislature and Governor rushed to sign into law SAFE in an attempt to make the community's regulations "as strict as possible."[38] The passage of SAFE, however, was a majority's attempt to overregulate an inalienable constitutional right that could not be infringed upon. Local legislators reasoned that their intent was not to make it difficult for people to access guns but to make communities safer; yet Murphy's case proves otherwise. In the wake of SAFE, Murphy—denied assistance by every attorney he sought help from—found himself in a lone uphill battle to defend his rights and the rights of other law-abiding citizens.

Murphy has asked that this Court award him legal fees and costs pursuant to 42 U.S.C. § 1988, but a pro se plaintiff is not entitled to an award of attorney fees in a civil rights action. *See Ramirez v. Guinn*, 271 Fed. Appx. 574, 576 (9th Cir. 2008) (affirming the district court's determination that pro se civil rights litigants were not entitled to attorney fees under 42 U.S.C. § 1988). Costs, however, are awarded to Murphy. As a pro se plaintiff, Murphy sued Defendants

---

[38] Dennis B. Chan, *Torres signs SAFE Act into law*, SAIPAN TRIBUNE, Apr. 12, 2016, http://www.saipantribune.com/index.php/torres-signs-safe-act-law/.

Guerrero and Larson solely in their official capacities as Commissioner of DPS and Secretary of the Department of Finance, respectively. Thus, Murphy's only relief as the prevailing party in an official-capacity action is a permanent injunction to prevent Defendants Guerrero and Larson from enforcing the provisions of the Commonwealth Code that have been deemed unconstitutional.

Based on the foregoing, Murphy's motion for summary judgment and the Commonwealth's cross-motion for summary judgment are granted in part and denied in part. In particular, judgment is entered in favor of the Commonwealth and against Murphy on the following issues:

    a. Licensing individuals who seek to possess firearms under 6 CMC § 2204;

    b. Storage restrictions on firearms in the home under 6 CMC § 10204(a); and

    c. The ban on large capacity magazines under 6 CMC § 10207(b).

On the other hand, judgment is entered in favor of Murphy and against the Commonwealth on the following issues:

    a. The registration of firearms;

    b. The ban on long gun caliber restrictions above .223;

    c. The ban on the following "assault weapon" attachments to semiautomatic rifles:

        i. a pistol grip under the action of the weapon;
        ii. a thumbhole stock;
        iii. a folding or telescoping stock;
        iv. a flare launcher;
        v. a flash suppressor; and
        vi. a forward pistol grip;

    d. The ban on carrying a handgun in public, as implemented in the transportation regulations; and

    e. The $1,000 excise tax on pistols.

Accordingly, the Court declares that the following provisions of the Commonwealth Code,

as described, unconstitutionally violate the individual right to armed self-defense, in violation of the Second and Fourteenth Amendments to the United States Constitution, made applicable in the CNMI by the Covenant:

1. 6 CMC § 2204, to the extent that it requires the registration of firearms;

2. 6 CMC § 10208(a)(6), to the extent that it restricts the caliber of long guns;

3. 6 CMC § 10101(e)(1)(i), to the extent that it defines "assault weapon" to include a semiautomatic rifle in a caliber greater than .223 that has the capacity to accept a detachable magazine and any one of the following:

   a. a pistol grip under the action of the weapon;
   b. a thumbhole stock;
   c. a folding or telescoping stock;
   d. a flare launcher;
   e. a flash suppressor; and
   f. a forward pistol grip;

4. 6 CMC § 10206, to the extent that it criminalizes the open carry of a handgun (pistol) in operable use for self-defense outside the home;

5. 4 CMC § 1402(h), to the extent that a $1,000.00 excise tax is applied to per pistol; and

6. The last sentence of 4 CMC § 1407(b), to the extent that it is a registration measure that requires customs to withhold imported firearm until or "upon a showing that the firearm has been properly registered." The remaining portion of this statute passes constitutional muster.

Defendants Guerrero and Larson are permanently enjoined from enforcing the provisions of the Commonwealth Code that have been declared unconstitutional. Costs are awarded to Murphy. Murphy shall file an accounting no later than October 11, 2016, itemizing any costs expended in filing this suit. Defendants shall file a response, if any, no later than October 18, 2016. Murphy shall file a response, if any, no later than October 25, 2016.

The Clerk of Court is hereby directed to enter judgment accordingly.

IT IS SO ORDERED this 28th day of September, 2016.

RAMONA V. MANGLONA
Chief Judge