**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| Jose A. Cruz-Kerkado, *et al.*<br>*Plaintiffs*<br><br>v.<br><br>Commonwealth of Puerto Rico, *et al.*<br>*Defendants* | CIVIL ACTION<br><br>Case No 3:16-cv-2748<br><br>Constitutional Rights |

# Plaintiff's Opposition
## to PRSA's Motion to Dismiss (Docket No. 18) and
## Justice Department's Motion to Dismiss (Docket No. 19).

Introduction                                                          2

Plaintiff's §1983 Federal Claim against PRSA                          5

Plaintiff's Second Amendment Case                                     12

Third-party disclosure violates Right to Privacy                      15

Mandatory PRSA affiliation violates Freedom of Association            18

Restriction on Interstate Travel with Firearms/Preemption            22

Plaintiff's standing to represent Students/Members                    27

Arguments                                                             27

Legal Standard                                                        29

Conclusion                                                            35

**To the Honorable Court:**

Comes now the Plaintiffs represented by the undersigned counsel and respectfully submit this *Opposition* to defendant Puerto Rico Shooting Association's ("PRSA") *Motion to Dismiss* (Docket No.18) and Commonwealth Justice Department's dispositive motion (Docket No.19). The Plaintiffs hereby move the Court to deny both motions, which is are an elaborate charade to blitzkrieg a way out from extinction of Commonwealth-sponsored *fees* imposed by law on lawful gunowners. In its desperate attempt for self-preservation, rogue PRSA ventures in murky waters with bewilderingly arguments inconsistent with prior statements, while taking for granted the Second Amendment's *infringement* restraint. Whereas Justice Department's motion offered no empirical proof or evidence to justify *restrictions* of constitutionally protected lawful conduct by weapon license holder that justify *mandatory* association with a PRSA's affiliated *sport* gun club.

In moving to dismiss, both the PRSA and the Justice Department mischaracterizes the Complaint, attacks claims not made, and foolishly ignore PRSA/Justice previous statements; now supporting the same regulation the PRSA advocated *against* for years. All the while, attempting to deny associations the right to represent *members*, when the PRSA has often appeared in a Court of Law to represents their *compelled* members. Plaintiff has a plausible constitutional claim against the PRSA, the Police and the Recreation Department for unconstitutional sections of Act. No. 404. As demonstrated with references to PRSA, Recreation, Police and Justice documents, among other admissible evidence, defendants' dispositive arguments have no merits and no factual basis.

## Introduction

Plaintiff Jose Cruz-Kerkado is an honorably discharged U.S. Army veteran with 21 years of service that makes a plausible constitutional claim for violation of his fundamental right to freely associate with or *not*, PRSA affiliated gun-clubs (only kind allowed by law) and pay for required PRSA "Federation" Stamp as part of his weapon license's renewal process. As discussed below, contrary to self-serving assertion, PRSA does *not* operate with "independence" from the government. *Ab initio* lets clarify that membership to PRSA's affiliated clubs is mandated *by law*.

2

As part of PRSA's smoke screen it misleadingly asserts the plaintiff attempt to "sidestep" the ruling made in *Danny Williams v. Commonwealth of Puerto Rico*, 910 F. Supp. 2d 386 (D.P.R. 2012) 12-1218 (FAB). Such assertion is incorrect, the *Complaint* recognized Commonwealth's power to regulate weapons by way of its *licensing* process. (Complaint, ¶1, pg. 2.) A distinction can be made when the Court identified in *Williams* that plaintiff's amended complaint argued: *(1) the Commonwealth could not license the right to keep and bear arms, (2) the Weapons Act discriminated by favoring government officials, (3) sections of said act vested uncontrolled discretion on officials, and (4) the filing requirements were unconstitutional*. In *Williams* plaintiff argued Commonwealth *could not license* a fundamental right and Superior Court had *uncontrolled discretion to issue or refuse* to grant a permit to carry. *Williams*, Civil No. 12-1218 (Opinion and Order, pg. 2-3; pg. 15-16.) Here *other* specific requirements are challenged and most of the issues in *Williams* are *not* asserted in this case. Plaintiff's Complaint *here* distinguishes from *Williams* by asserting the right to *Freely Associate* and Second Amendment infringement by *post-license restrictions* that unreasonably encroach on Fundamental rights. A distinction should be made: This case challenges section 457 of the Weapons Act which requires a weapon license holder with a *target shooting permit* to maintain *membership* in a PRSA affiliated gun club, and the shooting-clubs themselves are *required* to be PRSA affiliated to have a license. 25 L.P.R.A. §457. This constitutes *infringement* upon lawful conduct, by requiring affiliation into Commonwealth induced PRSA *governing* body, by requiring membership and a PRSA Stamp for weapon license renewal. This constitutes unlawful delegation of authority of a *public function* that is given by law to the Puerto Rico Police Department and the Sports and Recreation Department. Plaintiffs ask the Court to consider whether Commonwealth restriction on possession of firearms and ammunition without a target shooting permit and gun-club membership violates the Second Amendment to the Constitution of the United States. Plaintiffs ask the Court to consider among other things, whether gun-club prohibition of non-sport related gun-range is constitutional.

The U.S. Supreme Court essentially ruled that the Police do not have a constitutional duty to protect someone from harm. *Castle Rock v. Gonzales* 545 U.S. 748 (2005). It is therefore the duty of the individual to protect themselves. Self-defense is "*the central component*" of the Second Amendment. *District of Columbia v. Heller* 554 US 570 (2008).  To advocate for and educate self-defense in order to keep citizens form committing errors, they must have the opportunity, if they choose to do so, to train with proper tactical self-defense courses, which the PRSA will *not* allow. See **Exhibit I**, pg. 1, PRSA's letter denouncing any kind of tactical training in "its clubs". Courses taught by plaintiffs do not conform with PRSA's Second Amendment "sport-only" point of view. Courses taught by plaintiffs require extensive use of ammunition and multi-gun skills, which requires each student/member to obtain a target practice permit for his/her weapon license.  To obtain a target practice permit, each individual has to pay inscription fee ($25) to PRSA and payment of membership to a PRSA affiliated gun-club, for the term of the permit and its renewal.

This case also presents a challenge to *post-license restrictions* on *constitutional grounds*. To build a *smoke screen,* defendant argue its interpretations of the case to justify PRSA self-serving assertions, while disregarding the Complaint specified what it was *not*: It doesn't challenge the Commonwealth's authority to *regulate* who owns firearms thru its weapon licensing process. Here plaintiffs set out to make a distinction between the lawful ***regulation*** (licensing) as opposed to unlawful ***restrictions*** (post-licensing prohibitions) that do *infringe* upon the lawful exercise of the Second Amendment in the Commonwealth and encroach other Fundamental rights.  The following *restrictions* on *licensed* individuals, among others, constitute *infringement* by unreasonably (without empirical proof) burdening each individual's Second Amendment right and encroaching Fundamental or Constitutionally Protected conduct:

    I.   Firearm ownership restriction for self-defense purposes.  25 L.P.R.A.§456a(d)

    II.   Ammunition ownership restriction for self-defense. 25 L.P.R.A.§459(a)

    III.   Required gun-club and federation membership for "sport". 25 L.P.R.A.§457a

    IV.   Licensee's firearm and ammunition registration. 25 L.P.R.A.§456 / §456k

V.    $250.00 Excise Tax Stamp on Concealed Carry Permit. 25 L.P.R.A.§456d

Plaintiffs assert that post-license restrictions on lawful possession of firearms and ammunition for self-defense purposes (non-sport related) constitutes an infringement on the Second Amendment, as well as mandatory membership affiliation to PRSA's gun-club and the PRSA *sport* federation, which encroaches on plaintiffs' fundamental right to freely associate or not, for a lawful purpose.

## Plaintiff's §1983 Federal claim against defendant PRSA

The plaintiff states a claim under 42 U.S.C. §1983 against defendant PRSA, because he makes a plausible allegation that PRSA acted under color of state law.  To state a §1983 claim, Plaintiff must not only identify a right protected by the Constitution, but he must also assert the claim against a person or entity who can fairly be described as a state actor. *Estades-Negroni v. CPC Hosp. San Juan Capestrano*, 412 F.3d 1, 4 (1st Cir. 2005); Cousins, 2015 WL 3755272, at *2; 42 U.S.C. § 1983. A plaintiff claiming a §1983 violation must allege, first, that he has been deprived of "a federal constitutional or statutory right," and second, that the deprivation has been carried out by "a person or persons acting under color of state law." *Estades-Negroni v. CPC Hosp. San Juan Capestrano*, 412 F.3d 1, 4 (1st Cir. 2005). The Court is face with the *unique* circumstance where the PRSA can be viewed as state actor because of the PRSA has become a part of the Commonwealth firearm regulatory scheme. "It is '[o]nly in rare circumstances" that private parties can be viewed as state actors.'" Id. (quoting *Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir. 1992)). There are three tests used to determine whether a private party can be characterized as a state actor: the *state compulsion* test, the *nexus/joint action* test, and the *public fun*ction test. *Id*. at 4–5. All three tests are met here, defendant PRSA acted under color of state law per the nexus/joint test. The test "provides that a private party can be held to be a state actor where an examination of the totality of the circumstances reveals that the state has 'so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in [the challenged activity].'" *Id*. at 5 (quoting *Bass v. Parkwood Hosp*., 180 F.3d 234, 242 (5th Cir. 1999)).

Defendant PRSA acted in concert with the Sports and Recreation Department to inspect

(joint inspection) plaintiff's proposed gun-club facility. On September 11, 2015, a *joint inspection* of the facilities was conducted by the PRSA and the Recreation Department. PRSA vice president Gilberto Hernandez (uninvited) and Recreation Department's Dialma Ortiz (invited) conducted a *joint inspection* of plaintiff's facility and Ortiz allowed Hernandez to impose PRSA sport standard. See **Exhibit II**, pg. 2, PRSA's letter acknowledging the inspection conducted with Recreation Dpt. Plaintiff's allegations regarding involuntary affiliation to PRSA satisfy the requirement that the plaintiff allege the deprivation of a right (i.e., a freedom of association). Plaintiff satisfy the state action requirement by alleging that although defendant PRSA is a private organization, defendant was acting on behalf of the state through the process of *involuntary* affiliation (by law) of target shooting permit holders to PRSA clubs and PRSA federation.  This case meets all three tests for determining whether private action can be deemed state action: the state compulsion test, the nexus/joint action test, and the public function test. In *Estades-Negroni*, 412 F.3d at 5. the First Circuit summarized the tests as follows:

> Under the state compulsion test, a private party is fairly characterized as a state actor when the state "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the [challenged conduct] must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). The nexus/joint action test provides that a private party can be held to be a state actor where an examination of the totality of the circumstances reveals that the state has "so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in [the challenged activity]." *Bass v. Parkwood Hosp.*, 180 F.3d 234, 242 (5th Cir. 1999) (internal quotation marks omitted) (first alteration in original); see *Perkins* [*v. Londonderry Basketball Club*], 196 F.3d [13] at 21 [ (1st Cir. 1999)]. And, in accordance with the public function test, a private party is viewed as a state actor if the plaintiff establishes that, in engaging in the challenged conduct, the private party performed a public function that has been "traditionally the exclusive prerogative of the State." *Blum*, 457 U.S. at 1005 (internal quotation marks omitted). See also Ahearn v. Inland Hospital 1:16-cv-00457 (9/23/2016)

The Court should find the state compulsion test is satisfied because of the involuntary affiliation process *by law* compels or encourages involuntary affiliation into PRSA, the nexus/joint action test is satisfied based on PRSA/Sports & Recreation *joint inspection* of Kerkado's proposed gun-club and the use of *PRSA guideless* by the Commonwealth to regulate gun-clubs, particularly where the Commonwealth delegates authority to determine which gun-clubs will be allowed

*exclusively* for sports; and the public function test is satisfied because the PRSA uses the facilities of Albergue Olimpico for its activities and Casa Olimpica for it office/board meetings (which receives substantial Commonwealth funding), the PRSA letterhead bears the official logo of the Puerto Rico Olympic Committee and PRSA actively engages in official representation of Puerto Rico at International events, while financially supporting Olympic participants of the official Olympic Commonwealth team.  To remedy the situation during 2015 the plaintiff attempted to and obtained certification from the Sports and Recreation Department and had instructors certified by another entity, which Kerkado named "Puerto Rico Tactical Shooting Association, Inc.", but shortly after Kerkado's meeting with the Department's sub-secretary, who showed deference to the PRSH, certification was revoked and instructor's licenses were cancelled, at behest of PRSA. See **Exhibit III**, pg. 4, Certification, application and letter in response to cancellation by the Dpt. Contrary to Justice Department's assertion plaintiff also has §1983 claims against Commonwealth.

As indicated, the PRSA conducted the unauthorized *joint inspection* with the Sports and Recreation Department.  It is also ascribed to the Olympic Committee (COPUR) which receives financial support from the Commonwealth to operate facilities such as the Albergue Olimpico and Casa Olimpica, both facilities utilized by the PRSA. The PRSA sponsors Puerto Rico's Olympic team.  Further, PRSA actively participate in Legislative Public Hearings in support of or against proposed legislative initiatives, and dictates what the Sports and Recreation Department regulation of the *sport* and gun-clubs should be. There are *no* known *non-affiliated* (non-PRSA) gun-clubs.

When confronted with a "state action" inquiry, the Court must first decide whether there has been any "direct state action." See *Barrios-Velazquez v. Asociacion de Empleados del Estado Libre Asociado de Puerto Rico*, 84 F.3d 487, 491 (1st Cir. 1996). If there is no "*direct state action*," the next step is deciding whether there is any "*indirect state action*." The Supreme Court has "staunchly eschewed any attempt to construct a universally applicable litmus test to distinguish state action from private conduct." *Perkins*, 196 F.3d at 18. However, the First Circuit has "*employed the following three tests to determine whether a private party fairly can be*

7

*characterized as a state actor: the state compulsion test, the nexus/joint action test, and the public function test.*" *Estades-Negroni v. CPC Hosp. San Juan Capestrano*, 412 F.3d 1, 5 (1st Cir. 2005) (citing *Rockwell v. Cape Cod Hosp.*, 26 F.3d 254, 257 (1st Cir. 1994); and *Perkins*, 196 F.3d at 18–21). "*A common thread binds these pathways. Each of them, from a slightly different coign of vantage, aims at the same destination: whether 'private actors [have] aligned themselves so closely with either state action or state actors that the undertow pulls them inexorably into the grasp' of the Fourteenth Amendment.*" (alteration in original). *Perkins*, 196 F.3d at 18 (citing *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 253-54 (1st Cir. 1996)). See also *Gonzalez-Trapaga v. Mayaguez Medical Center*, 15-1342 (3/30/2016)

The First Circuit has distilled the "*indirect state action*" teachings of the Supreme Court into three distinct tests: the state compulsion, the public function, and the nexus/joint action tests. See, e.g., *Estades-Negroni*, 412 F.3d at 5. "*Under the state compulsion test, a private party is fairly characterized as a state actor when the state 'has exercised coercive power or has provided such significant encouragement, either overt or covert, that the [challenged conduct] must in law be deemed to be that of the State.*'" *Estades-Negroni*, 412 F.3d at 5 (citing *Blum*, 457 U.S. at 1004). "*[I]n accordance with the public function test, a private party is viewed as a state actor if the plaintiff establishes that, in engaging in the challenged conduct, the private party performed a public function that has been 'traditionally the exclusive prerogative of the State.*'" *Estades-Negroni*, 412 F.3d at 5 (citing *Blum*, 457 U.S. at 1005). The First Circuit's expressed the public function analysis is designed to flush out a State's attempt to evade its responsibilities by delegating them to private entities. See *Barrios-Velazquez*, 84 F.3d at 494. To prevail on such a theory, a plaintiff must show more than the mere performance of a public function by a private entity; must show that the function is one exclusively reserved to the State. See *Id.* at 493-94. See also *Perkins*, 196 F.3d at 18-19.  The First Circuit explains the goal of the nexus/joint action test:

> The nexus/joint action test provides that a private party can be held to be a state actor where an examination of the totality of the circumstances reveals that the state has "so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in [the challenged activity]." (alterations in

original). *Estades-Negroni*, 412 F.3d at 5 (citing *Bass v. Parkwood Hosp.*, 180 F.3d 234, 242 (5th Cir.1999); and *Perkins*, 196 F.3d at 21). "The requisite nexus is premised on a showing of mutual interdependence." *Santiago*, 655 F.3d at 71 (citing *Burton*, 365 U.S. at 723–25; and *Ponce*, 760 F.2d at 381).

A well-respected treatise on the subject matter masterfully classifies the case law regarding this test into three general categories: (1) "cases where the *private actor is subjected to extensive regulation by the government*," (2) "cases involving a wide range of *physical and economic contacts* between the actor and government," and (3) "cases where the *government has provided some sort of direct aid or subsidy to the private actor*." 2 R. *Rotunda & J. Nowak*, Treatise on Const. L. § 16.4. In conducting the required "totality of the circumstances" assessment, there are several factors that the First Circuit has previously identified as significant. First, *"[t]he 'most salient' factor in this determination 'is the extent to which the private entity is (or is not) independent in the conduct of its day-to-day affairs.'"* *Santiago*, 655 F.3d at 71 (citing *Perkins*, 196 F.3d at 21). Second, *"[a] private party's use of public facilities may weigh in the balance."* *Id.* (citing *Burton*, 365 U.S. at 723). Third, "*the state's sharing of profits generated from the private party's rights-depriving conduct"* may also weigh in the balance. *Id.* (citing *Barrios–Velázquez*, 84 F.3d at 494). *Perkins*, 196 F.3d at 21. Of course, "*the lack of a financial partnership is not necessarily dispositive.*" *Barrios-Velazquez*, 84 F.3d at 494 (citing *Rodríguez-García*, 904 F.2d at 98–99). This is because *"[t]he test is one of interdependence and joint participation, rather than one of financial enrichment."* *Rodriguez-Garcia*, 904 F.2d at 98. See also *Gonzalez-Trapaga v. Mayaguez Medical Center*, 15-1342 (DRD) (3/30/2016)

Section 1983 "provides a remedy for deprivations of rights secured by the Constitution and laws of the United States when that deprivation takes place under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory." *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 924, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) (internal quotations omitted). To prevail in a Section 1983 claim, the plaintiff "must allege facts sufficient to support a determination (i) that the conduct complained of has been committed under color of state law, and (ii) that [the alleged] conduct worked a denial of rights secured by the Constitution or laws of the United States."

*Cepero–Rivera v. Fagundo*, 414 F.3d 124, 129 (1st Cir.2005) (quoting *Romero–Barcelo v. Hernandez–Agosto*, 75 F.3d 23, 32 (1st Cir.1996)).  Section 1983 claims require that the plaintiff establish three elements for liability to ensue: deprivation of a right, a causal connection between the actor and the deprivation, and state action. See *Sanchez v. Pereira–Castillo*, 590 F.3d 31 (1st Cir.2009); see also 42 U.S.C. §1983. The causation element requires the plaintiff establish (1) that the actions of the defendant deprived the plaintiff of a protected right, and (2) "that the defendant's conduct was intentional, grossly negligent, or amounted to a reckless or callous indifference to the plaintiff's constitutional rights." *Concepcion v. Municipality of Gurabo*, 558 F.Supp.2d 149, 162 (D.P.R.2007). Moreover, a plaintiff must link each defendant to the alleged violation of federal rights. See *González–Piña v. Rodríguez*, 407 F.3d 425, 432 (1st Cir.2005). A plaintiff may do so by indicating any "personal action or inaction [by the defendants] within the scope of [their] responsibilities that would make [them] personally answerable in damages under Section 1983." *Pinto v. Nettleship*, 737 F.2d 130, 133 (1st Cir.1984). To survive a motion to dismiss, the plaintiff's allegations must make out a "plausible, not ... merely [a] conceivable, case for relief." *Rodriguez-Ramos*, 685 F.3d at 40 (emphasis added) (quoting *Ocasio-Hernandez*, 640 F.3d at 12).

Here there are allegations and plausible inference in the complaint that go towards showing Commonwealth "coercion" or "encouragement" of the actions taken by PRSA representatives. Puerto Rico Weapon's Act specifically defines a "shooting federation" as a federation ascribed to the Puerto Rico Olympic Committee which represents the *sport* of Olympic target shooting.  (Art. 1.02 (n)) 25 L.P.R.A. §455 Said definition *excludes* existence of non-sport shooting federations. A plausible finding of direct state action can be made, because the PRSA constitutes an arm of Commonwealth's Olympic Committee, uses the Olympic facility's marksmanship gun-range, hosts and sponsors Olympic Committee delegates to represent Puerto Rico's Olympic team, in its official capacity, and has offices located at Casa Olimpica. Further it conducted a gun-range inspection in *conjunction* with Commonwealth officials and dictates what requirements are to be

set for facility approval.  Its affiliation is mandated by the law and is a requisite for individuals to keep their target permits.

Amongst the duties of the Sports and Recreation Department *Secretary* is his/her duty to promote the *sport* of target shooting and to cooperate with the shooting federation.  (Art. 3.01 (a)) 25 L.P.R.A. §457. This requires the Police *Superintendent* to keep a record of each target permit with its corresponding Federation stamp to which each license holder belongs to. (Art. 3.01 (c)) 25 L.P.R.A. §457. Puerto Rico Weapon's Act dictates that the Puerto Rico Police will not grant a target shooting permit to an individual who is not a member of a gun-club and the federation recognized by the Department of Sports and Recreation. (Art. 3.04 (B)) 25 L.P.R.A. §457c. The target shooting permit holder is also required to keep current his club and federation affiliation, throughout the term of said permit.  Failure to keep member status, will result in said permit cancellation. (Art. 3.04 (D)) 25 L.P.R.A. §457c.  Puerto Rico Weapon's Act also dictates that gun range permits will be issued by the Police *only* to clubs dedicated exclusively to the *sport* of target shooting, and said club must provide as license requirement the shooting Federation's membership certificate. (Art. 3.02 (A)(7)) 25 L.P.R.A. §457a. Puerto Rico Weapon's Act specifically forbids the existence of sport target shooting clubs, without the corresponding license issued by Police Superintendent.  This section unlawfully prohibits the existence of non-sport related gun-clubs in the Commonwealth. (Art. 3.03) 25 L.P.R.A. §457b.

Plaintiff's claims concerning the relationship between the PRSA and the Commonwealth is conceivable and he can provide sufficient factual basis to conclude that they are plausible. The evidence he cites in the Complaint is based upon the Commonwealth's regulatory scheme which includes the Weapons Act and Agency's regulation. Further, the plaintiff gives specific facts as to PRSA joint participation with the Commonwealth in facility's inspection. Therefore, plaintiff makes a plausible allegation that defendant PRSA acted jointly with the Commonwealth to deny *required* PRSA endorsement, he states a §1983 claim against PRSA. In this case, plaintiff has alleged facts regarding defendant's involvement in the regulatory process that would support a

finding of state action under any one of the tests. In other words, Plaintiff's assertion that defendant was acting on behalf of the state through process of involuntary affiliation and violation of fundamental right is sufficient to support a finding that defendant was a state actor.  There should be no doubt that licensing inspection of gun-range facilities is, has and should be "traditionally the exclusive prerogative" of the Commonwealth. As such, Plaintiff has meet the public function test.

PRSA 2005 Financial Statement Notes, part of its filing with Puerto Rico's Department of State, confirmed the PRSA has received public funds from Commonwealth's Sports & Recreation Department, which in turn has certified exclusively the clubs authorized by the PRSA. **Exhibit IV** Puerto Rico Act No. 126 (1980), created the Sports and Recreation Department, but Article 13 mandates that any federation which seeks public funds form the Department, must do so thru the Olympic Committee and is required to show how funds were used. Act No. 32 (2015) also authorized public officials to provide services to the Olympic committee and the Federations. By way of Act 12 (1992) the Commonwealth set aside public funds that help in part, support the Olympic Committee. What is most hypocritical about the PRSA assertion with its dispositive motion, it that it now seeks to sustain the legality of the very permit which the PRSA sought to eliminate for its own athletes.  The PRSA actively lobbied to obtain a privilege for athletes in 2015, with Legislative Initiative PC2637. It recognized Act No. 404 did not allow it to grow its "membership".  **Exhibit V** PRSA Memo on PC2637.  Further the PRSH has *admitted* that it is the entity under Act No. 404, which has been entrusted to certify thru *its* gun-clubs every individual with a weapon license that completes the mandatory firearm safety course, and it is entrusted to ensure that those with a target shooting permit who are entrusted with possession of more than two firearms, are sporting *athletes* ascribe to their *Olympic principles*. This fulfills a public function and furthers the PRSA agenda. See **Exhibit VI**, pg. 2-3.

## Plaintiff's Second Amendment Case

The U.S. Supreme Court has ruled that the Second Amendment guarantees the individual right to possess and carry weapons in case of confrontation. This meaning is strongly confirmed

by the historical background of the Second Amendment, which has always been widely understood that, like the First and Fourth Amendments, it codified a *pre-existing* right. The very text of the Second Amendment implicitly recognizes the *pre-existence* of the right and declares only that it "*shall not be infringed.*" As the Court said in *United States v. Cruikshank*, 92 U.S. 542, 553, 23 L.Ed. 588 (1876), "*[t]his is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The second amendment declares that it shall not be infringed ....*" *District of Columbia v. Heller*, 554 U.S. 570 (2008).  The Court described the right protected as "'*bearing arms for a lawful purpose*'" and said that "*the people [must] look for their protection against any violation by their fellow-citizens of the rights it recognizes*" to the States' police power. 92 U.S., at 553 *United States v. Cruikshank*, 92 U.S. 542, 23 L.Ed. 588 *District of Columbia v. Heller*, 554 U.S. 570 (2008).  The inherent right of self-defense has been central to the Second Amendment right, as the First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrong-headed views. The Second Amendment is no different. *District of Columbia v. Heller*, 554 U.S. 570 (2008).

In *Heller*, the Supreme Court recognized that *self-defense* is a basic right, recognized by many legal systems from ancient times to the present day, and held that *individual self-defense* is "the central component" of the Second Amendment right. 554 U.S., at –, 128 S.Ct., at 2801–2802; see also *Id*., at –, 128 S.Ct., at 2817. *McDonald v. City of Chicago*, III, 561 U.S. 742 (2010).  The Court noted that citizens must be permitted "*to use [handguns] for the core lawful purpose of self-defense.*" *Id*., at –, 128 S.Ct., at 2818. See *McDonald v. City of Chicago*, III, 561 U.S. 742 (2010). The right to keep and bear arms was considered no less fundamental by those who drafted and ratified the Bill of Rights, and the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty. *McDonald v. City of Chicago*, III, 561 U.S. 742 (2010). A provision of the Bill of Rights that protects a right that is fundamental from an American perspective applies equally to the

Federal Government and the States. See *Duncan*, 391 U.S., at 149, and n. 14, 88 S.Ct. 1444. The Court recognized that Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*. *McDonald v. City of Chicago*, III, 561 U.S. 742 (2010).

Puerto Rico Weapon's Act specifically restricts the number of firearms a weapon license holder can possess, up to a maximum of two (2), unless he/she has a target shooting permit.  (Art. 2.02 (D)) 25 L.P.R.A. §456a. Puerto Rico Weapon's Act specifically restricts the amount of ammunition each individual can possess to a maximum of fifty (50) rounds per weapon, per year, unless he/she has a target shooting permit. (Art. 6.03) 25 L.P.R.A. §459a. The simple possession of ammunition in excess, without the corresponding target shooting permit, constitutes a misdemeanor punished with up to six months of reclusion in jail and/or a fine up to $5,000.00. Restrictions are not just placed on the number of firearms and ammunition a weapon license holder can lawfully possess, but restrictions also limit his/her ability to transport said weapons because the law dictates he/she can only transport *one* firearm at a time, without a target practice permit. (Art. 2.02 (D)4) 25 L.P.R.A. §456a.

We should point out that Puerto Rico's gun-registry unjustifiably restrict instructor's ability to teach law-abiding citizens on the safety and proper use of firearms. An instructor would have to acquire a firearm of every conceivable caliber and register each thru his/her license, in order, to have weapons and ammunition available to every student, to train on multi-gun use. This places a substantial burden on the instructor as current law makes it unlawful for an individual to possess ammunition of any caliber, which does not correspond to weapons he/she has registered. (Art. 6.02) 25 L.P.R.A. §459a.  Further, the Puerto Rico Police Firearm Registry violates existing Federal regulation governing the registration of firearm owners. Federal law prohibits the use of the National Instant Background Check System ("NICS") to create a system registration of firearms or firearm owners. 28 C.F.R. §25.9(b)(3).  The Puerto Rico Police, which also receives Federal funds, use such system to screen potential weapon license applicants and then *keeps* a record of the licensee's *purchase history*.  Keeping a record on thousands of law-abiding citizens.

The $250.00 Police Department Stamp required by law for lawfully *licensed* individuals to proceed to apply to the State Court for a concealed carry permit amounts to an *excise tax* on said lawful *activity*. Said excise tax has no empirical support, does nothing to further public safety, nor keep unlawful firearms away from unlicensed criminals, that justify infringement of individuals constitutionally protected right to exercise his/her Second Amendment right.  25 L.P.R.A.§456d. The Supreme Court has ruled that the purchase of a license to exercise a fundamental right amount to an *unconstitutional tax*.  See *Murdock v. Pennsylvania*, 319 US. 105 (1943). See also *Follett v. Town of McCormick,* 321 US 573 (1944).  While interpreting First Amendment rights, the Supreme Court ruled that a law which subjects a right to the *prior restraint* of a license, without narrow, objective and definite standards is *unconstitutional*, and the individual faced with such a law may ignore it and exercise his rights.  *Shuttlesworth v. City of Birmingham*, 394 US 147 (1969), pg. 394 US 150-151.  In this case, the excise tax on the conceal carry application process is meant to serve as prior restraint and dissuade law-abiding citizens from conceal carry for self-defense, and has no significant impact whatsoever on prohibiting the unlawful possessions of illegal firearms by felons.

During 2014 Act No. 78, amended Article 2.03 of the Weapons Act to move a substantial portion of funds obtained from the tax stamp to attend to the Commonwealth's government financial crisis.  Thus, effectively using this for cash-flow purposes, unrelated to fighting crime. During 2013-2014 $6,000,000 dollars were transferred out, between 2014-2015 $1,000,000 was taken and during 2015-2016, $1,418,754 was used to cover other governmental needs. 25 L.P.R.A. §456b. Earlier in 2013 a similar situation had occurred when Act. No. 43, amended Act No. 404 to move funds to help the government cover its budget/fiscal crisis needs for 2013-2014.

## Third-party disclosures violate individual's Right to Privacy

A claim for the invasion of privacy is actionable under Article II, §§ 1 and 8 of the Puerto Rico constitution. Section 1 states: "*The dignity of the human being is inviolable.*" Section 8 provides: "*Every person has the right to the protection of law against abusive attacks on his honor, reputation and private or family life.*" Puerto Rico Supreme Court's application of the

constitutional right to privacy has been similar to the common-law tort of invasion of privacy. The application of the right to particular factual situations is left to the "prudent discretion" of the trial courts. *Colón v. Romero Barceló*, 112 D.P.R. 573, 579 (1982).  In *Pueblo v. Figueroa Navarro*, 104 D.P.R. 721 (1976), a private investigator was found liable for invasion of privacy because of the intrusive and offensive manner in which the investigation was conducted. The Court found the detective liable because he "had a direct contact with the person under investigation." *Id*. at 726. Thus, the Court interpreted Figueroa as standing for the proposition that, "*a person does not violate the right to privacy as long as the conduct of the investigation is not 'ostensible and daring,' or unreasonably intrusive.*" *Dopp v. Fairfax Consultants, Ltd.*, 771 F.Supp. 494, 497 (D.P.R.1990) (Laffitte, J.).  See also *Mojica Escobar v. Roca*, 926 F. Supp. 30, 95-1173 (PG) (3/18/1996).  The Figueroa Court stated, "*To perform the investigation entrusted to him, petitioner did not have to act in the ostensible and daring manner he did.*" 104 D.P.R. at 726. The Court distinguish *People v. Weiler*, 179 N.Y. 46, 71 N.E. 462 (1904), a case strikingly similar. In *Weiler*, "*the detective never came in direct contact with the person under investigation and the latter did not become aware of the fact that he was being shadowed ... [until] he was informed by a third party*." 104 D.P.R. at 726. Whereas, in *Figueroa*, "[*t*]*he detective involved herein had a direct contact with the person under investigation, and with his family.*" *Id*. See also *DOPP v. Fairfax*, 771 F. Supp. 494 (1990).  The Supreme Court has also implied that the Constitution might protect in some circumstances "the individual interest in avoiding disclosure of personal matters" from government infringement. *Whalen v. Roe* 429 U.S. 589, 599, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). *But cf. National Aeronautics & Space Admin. v. Nelson*, 562 U.S. 134, 131 S.Ct. 746, 751, 178 L.Ed.2d 667 (2011) (assuming, but declining to confirm, "that the Constitution protects a privacy right of the sort mentioned in Whalen").

With regards to plaintiff's claim of invasion of privacy, the Court should find that the complaint alleged wrongful acts of invasion of privacy which are recognized by the common law, this includes *unreasonable intrusion* and *public disclosure of private facts*. See W. Prosser, The

Law of Torts, sec. 117 (5th ed. 1984). The intrusive form generally involves prying or intruding into something that is private. In this case plaintiff's relationships to third-parties and their required *consent* under oath to lawfully exercise his/her Second Amendment right. No other fundamental right requires third-party consent. Two factors of primary importance are the means used in gaining access to the private information, and the purpose for obtaining the information. *Id*. at 856. The other theory upon which plaintiff base his invasion of privacy claim, is that of public disclosure of private facts, regarding Commonwealth's *written* inquiry from third-parties for their consent. Third party individuals *must* give consent under oath, be subject to cross examination by a prosecutor, and often the Court or the prosecutor require these witnesses to produce *their* certificate of good standing. (Art. 2.02 (A)(l)) 25 L.P.R.A. §456a and (Art. 2.05) 25 L.P.R.A. §456d.  Article 2.05 of the Weapons Act authorizes a State Court to hold a public hearing, upon request by a prosecutor.

The process by which the Commonwealth investigates law abiding citizens *after* a weapon license has been issued, for granting a conceal carry permit exposes the plaintiff to disclosure of personal information *to third parties* with regards to the status of his conjugal relationship (non-violence, etc.) at home, the location where his firearms are stored within the home and obtain the consent from third parties, to lawfully carry a concealed firearm for self-defense in public.  Plaintiff properly assert a violation of his/her right to privacy under the Fourteenth Amendment. Plaintiff has a constitutional right to keep the very personal information concerning his choice to lawfully carry a *concealed* firearm for self-defense. Only government needs to know, but not third parties. Deliberate disclosures of such information to third-parties is not a reasonable government policy, and the plaintiffs can prevail because the Commonwealth infringes on a privacy interest protected by the Constitution, which amounts to the unlawful invasion of a person's privacy, because third-parties don't need to know if he/she has firearms at home (only the government). The policy to *reintroduce* witnesses as to the moral character for a conceal carry applicant, who has *already* been issued a weapon license with the corresponding moral-character witnesses, is unreasonably absurd. The Commonwealth could have adopted least restrictive means to further its interest, by adopting

a least intrusive policy that protect the individual's privacy at home and his relationships, which would not require third-party consent to exercise the fundamental right to self-defense.

## Mandatory PRSA affiliation violates Freedom of Association

In *Roberts v. United States Jaycees*, 468 U.S. 609, 622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), the Supreme Court noted that "implicit in the right to engage in activities protected by the First Amendment" is "*a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends*." This right is crucial in preventing the majority from imposing its views on groups that would rather express other, perhaps unpopular, ideas. See *ibid*. (stating that protection of the right to expressive association is "*especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority*"). Government actions that may unconstitutionally burden this freedom may take many forms, one of which is "*intrusion into the internal structure or affairs of an association*" like a "*regulation that forces the group to accept members it does not desire.*" *Id*., at 623, 104 S.Ct. 3244. Forcing a group to accept certain members may impair the ability of the group to express those views, and only those views, that it intends to express. Thus, "*[f ]reedom of association ... plainly presupposes a freedom not to associate.*" *Ibid*. The forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints. *New York State Club Assn., Inc. v. City of New York*, 487 U.S. 1, 13, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988).

To determine if a group is protected by the First Amendment's expressive associational right, the Court must determine whether the group engages in "*expressive association*." The First Amendment's protection of expressive association is not reserved for advocacy groups. But to come within its ambit, a group must engage in some form of expression, whether it be public or private. *Boy Scouts of America v. James Dale* 530 U.S. 640 (2000). Associations do not have to associate for the "purpose" of disseminating a certain message to be entitled to the protections of

18

the First Amendment. An association must merely engage in expressive activity that could be impaired to be entitled to protection. *Boy Scouts of America v. James Dale* 530 U.S. 640 (2000).

The right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read (*Martin v. City of Struthers*, 319 U.S. 141, 143, 63 S.Ct. 862, 863, 87 L.Ed. 1313) and freedom of inquiry, freedom of thought, and *freedom to teach* (see *Wieman v. Updegraff*, 344 U.S. 183, 195, 73 S.Ct. 215, 220, 97 L.Ed. 216)— indeed the freedom of the entire university community. Sweezy v. State of New Hampshire, 354 U.S. 234, 249—250, 261—263, 77 S.Ct. 1203, 1211, 1217—1218, 1 L.Ed.2d 1311; 1681 *Barenblatt v. United States*, 360 U.S. 109, 112, 79 S.Ct. 1081, 1085, 3 L.Ed.2d 1115; *Baggett v. Bullitt*, 377 U.S. 360, 369, 84 S.Ct. 1316, 1321, 12 L.Ed.2d 377. Without those peripheral rights the specific rights would be less secure. In *NAACP v. State of Alabama*, 357 U.S. 449, 462, 78 S.Ct. 1163, 1172, the U.S. Supreme Court protected the 'freedom to associate and privacy in one's associations,' noting that freedom of association was a peripheral First Amendment right. Disclosure of membership lists of a constitutionally valid association, was held invalid *'as entailing the likelihood of a substantial restraint upon the exercise by petitioner's members of their right to freedom of association.' Ibi*d. In other words, the First Amendment has a penumbra where privacy is protected from governmental intrusion. In like context, the Court has protected forms of 'association' that are not political in the customary sense but pertain to the social, legal, and economic benefit of the members. *NAACP v. Button*, 371 U.S. 415, 430—431, 83 S.Ct. 328, 336— 337. In *Schware v. Board of Bar Examiners*, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796, the Court held it not permissible to bar a lawyer from practice, because he had once been a member of the Communist Party. The man's 'association with that Party' was not shown to be 'anything more than a political faith in a political party' (id., at 244, 77 S.Ct. at 759) and was not action of a kind proving bad moral character. *Id*., at 245—246, 77 S.Ct. at 759—760.  Those cases involved more than the 'right of assembly'—a right that extends to all irrespective of their race or ideology. *De Jonge v. State of Oregon*, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278. The right of 'association,' like

the right of belief (*West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178), is more than the right to attend a meeting; it includes the right to express one's attitudes or philosophies by membership in a group or by affiliation with it or by other lawful means. Association in that context is a form of expression of opinion; and while it is not expressly included in the First Amendment its existence is necessary in making the express guarantees fully meaningful. *Griswold v. Connecticut* 381 U.S. 479 (1965).

The Supreme Court has afforded constitutional protection to freedom of association in two distinct senses. First, the Court has held the Constitution protects against unjustified government interference with an individual's choice to enter into and maintain certain intimate or private relationships. Second, the Court has upheld the freedom of individuals to associate for the purpose of engaging in protected speech or religious activities. *Board of Dirs. of Rotary Int'l v. Rotary Club*, 481 U.S. 537, 544, 107 S.Ct. 1940, 1945, 95 L.Ed.2d 474 (1987). See also *International Packing v. Padilla*, 634 F. Supp.2d 174 (2007).

The Puerto Rico Supreme Court has addressed the situation in *Rivera Shatz v. ELA*, 191 DPR 791 (2014), by interpreting Puerto Rico's Constitutional protection of citizen's *fundamental* right to freely associate for any lawful purpose.  PR Const. Art. II, Sec. 6.  Puerto Rico Supreme Court held that any restriction on the right for citizens not to associate, would only survive constitutional scrutiny when the State can show a compelling interest to place restrictions on the right to freely associate and demonstrates it had no other less restrictive way to accomplish said compelling interest. In the present case, Commonwealth has a compelling interest: public safety, however, said concerns was addressed by the Weapons Act, Act No. 404 (2000), as amended, when power was given to the *Puerto Rico Police Department* to regulate the lawful possession of firearms and together with the *Sports and Recreation Department, both* were given authority to issue licenses, inspect gun-clubs and supervise target practice. 25 L.P.R.A. §457. Given the existence of two governmental entities that have *expertise* and *resources* to adequately regulate the use of firearms for lawful purposes, compulsory PRSA affiliate gun-club membership and

PRSA Stamp amounts to the unconstitutional encroachment of the individual's right to freely associate, or in this case, not to associate with the PRSA "sport" entity.

Among PRSA's objectives are: (A) To govern the Sport of target shooting in Puerto Rico, (F) to supervise that clubs, athletes and officials comply with target shooting laws, regulation, including PRSA bylaws, and (G) collaborate with government developing public policies related to the target shooting sport, while resisting political, religious or financial influence.   PRSA Constitution, Art. 103, pg. 3-4 (Docket No. 1, *Complaint,* Exhibit IIA) It seems indisputable that an association that seeks to transmit such values engages in expressive activity. See *Roberts*, *supra*, at 636, 104 S.Ct. 3244 (O'CONNOR, J., concurring) ("*Even the training of outdoor survival skills or participation in community service might become expressive when the activity is intended to develop good morals, reverence, patriotism, and a desire for self-improvement*").

The First Amendment protects plaintiffs' method of expression by teaching and educating others about the Second Amendment, self-defense and firearm safety. As such, plaintiff has a First Amendment right to choose to send his/her message but not advocating sports or recreational shooting.  The fact that Kerkado does not trumpet the PRSA views, or that PRSA does not tolerates his dissent, does not mean that each point of view receives no First Amendment protection. The PRSA in the present action, is geared towards one point of view with regards to the Second Amendment, which it regards as a "sport", contrary to plaintiff's "self-defense" point of view. Given that the PRSA engages in expressive activity, the forced inclusion of the plaintiffs would significantly affect his/her ability to advocate public or private viewpoints, and PRSA's as well.

PRSA's proposition of "neutral" is borderline absurd, given that the topic of "gun-control" burst with controversy and the Second Amendment is permeated with many political opinions. Attached the Court will find a copy of PRSA's State Complaint filed back in 2008, on behalf of its "members", in which it recognized it had "accreditive function" under Act 404, and represented the interest of its target shooting "members" and *its* clubs. **Exhibit VII** PRSA Complaint. Said action was taken by the PRSA *without* the consent of individual PRSA members who pay a fee.

Target-practice permit holder financially support an organization, that does not allow them to vote. Currently there are approximately 20 active PRSA individuals who engage in sport-related marksmanship competitions, whereas there are approximately over sixty thousand (60,000) target practice permit holders in the Commonwealth. Therefore, less than one (1%) percent of target practice permit holders actively benefit from any PRSA sponsored event. The PRSA however, claims that it represents all target practice permit holders on the Island, yet it fails to acknowledge its "members" are *obligated* by law into PRSA affiliated gun-clubs. Proposed State Legislation PC 1162 recognized back in 2009, that there were approximately 68,779 individuals with the target practices permits in the Commonwealth, it acknowledged the PRSA certified that its sporting events did not use AR-15, AK-47 or 50 Caliber rifles, the most common weapons for tactical self-defense by both civilians and law enforcement. See **Exhibit VIII** PRSA has already recognized it is exclusively a *sports* organization (no self-defense) per its motion. Docket No.18, pg. 9.

Further, we should point to the Justice Department's incompatible position with its prior statements. In its desperate attempt to defend a law with sections that *do* infringe lawful conduct, the Justice Department "adopts" the PRSA arguments, when in fact, the Justice Department has *testified* that there is "no legal impediment" to permit that individuals and clubs *do not* associate with the existing PRSA.  See **Exhibit IX** Justice Department's Memorandum on PC2030, pg. 3. But Justice Department's hypocrisy does not end, the Puerto Rico Police *also* testified that *non-affiliation* of individuals and associations has *nothing* to do with "public safety", as affiliation is a matter of the "sport" of target shooting.  See **Exhibit X** Police Memorandum PC2030, pg. 2.

## Unlawful restriction on Interstate Travel with Firearms/Preemption

We now consider defendant's arguments against the question of whether federal law explicitly or impliedly preempts some sections of the challenged state law. The safety of each state's citizens is primarily, and historically, a matter of local concern. *Medtronic v. Lohr*, 518 U.S. 470, –, 116 S.Ct. 2240, 2245, 135 L.Ed.2d 700 (1996). The States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort

and quiet of all persons." *Id*. (internal quotation marks, citations, and alterations omitted). There is no question that the Puerto Rico Weapons Act falls within the "health and safety" realm of traditional state police powers. Nevertheless, Article VI of the United States Constitution provides that federal law "*shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.*" U.S. Const. Art. VI, cl. 2. Thus, "*any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield.*" *Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108, 112 S.Ct. 2374, 2388, 120 L.Ed.2d 73 (1992) (internal quotation marks and citations omitted).  In the case of Puerto Rico, Federal Relations Act mandates laws of the United States not locally inapplicable, shall have *the same force and effect* in Puerto Rico as in the United States. 48 USC §734.

In preemption analysis, the Supreme Court framed the crucial inquiry as follows: "*Did Congress, in enacting the Federal Statute, intend to exercise its constitutionally delegated authority to set aside the laws of a State?*" *Barnett Bank v. Nelson*, 517 U.S. 590, —, 116 S.Ct. 1103, 1107, 134 L.Ed.2d 237 (1996). To discern Congress' intent, "*we examine the explicit statutory language and the structure and purpose of the statute*." *Ingersoll–Rand Co*., 498 U.S. at 138, 111 S.Ct. at 482.  One method by which Congress may evince preemptive intent is through explicit preemption language. See *Jones v. Rath Packing Co*., 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). Although Congress need not employ express preemption language to communicate such intent, see *International Paper Co. v. Ouellette*, 479 U.S. 481, 492, 107 S.Ct. 805, 811, 93 L.Ed.2d 883 (1987), when Congress so chooses, our task in divining its intent with respect to the issue at hand may be "*an easy one*," *English v. General Elec. Co*., 496 U.S. 72, 79, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65 (1990).  "*More often, explicit pre-emption language does not appear, or does not directly answer the question. In that event, courts must consider whether the federal statute's 'structure and purpose,' or nonspecific statutory language, nonetheless reveal a clear, but implicit, pre-emptive intent.*" *Barnett Bank*, 517 U.S. at —, 116 S.Ct. at 1108 (quoting Jones, 430 U.S. at 525, 97 S.Ct. at 1309). Thus, for example, state law is impliedly preempted to

the extent it "*actually conflicts*" with federal law. See *Cipollone*, 505 U.S. at 516, 112 S.Ct. at 2617. Actual conflict occurs where compliance with both state and federal law is a "*physical impossibility,*" *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 143, 83 S.Ct. 1210, 1218, 10 L.Ed.2d 248 (1963), or where state law "*stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,*" *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). Additionally, the pervasiveness of a federal scheme, the dominance of the federal interest, or the federal goals and obligations may reasonably permit an inference that Congress intended a federal law to "occupy a field" of commerce exclusively, disallowing concurrent state operation or supplementation even where the state law does not otherwise "conflict" with federal law. See *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947).

Finally, there exists an assumption that federal law does not supersede a state's historic police powers " '*unless that [is] the clear and manifest purpose of Congress.*' " *Cipollone*, 505 U.S. at 516, 112 S.Ct. at 2617 (quoting *Rice*, 331 U.S. at 230, 67 S.Ct. at 1152); see *Hillsborough County v. Automated Medical Labs.*, 471 U.S. 707, 715, 105 S.Ct. 2371, 2376, 85 L.Ed.2d 714 (1985) (noting "*presumption that state or local regulation of matters related to health and safety is not invalidated under the Supremacy Clause*"); see also *De Buono v. NYSA–ILA Medical & Clinical Svcs. Fund*, ––– U.S. –––, –––, 117 S.Ct. 1747, 1751, 138 L.Ed.2d 21 (1997). The "*health and safety*" presumption applies in both express and implied preemption analyses. See *Greenwood Trust Co. v. Commonwealth*, 971 F.2d 818, 823 (1st Cir.1992) ( "*Even federal statutes that contain express preemption clauses must be viewed through the prism of [the] assumption.*").

The Puerto Rico Weapons Act, being an exercise of the Commonwealth's police powers to protect the safety of its citizens, benefits from the presumption against preemption. While these principles are readily enough stated, their application in practice can be rather difficult because each preemption scenario necessarily involves a unique intersection of federal and state law. See *Hines*, 312 U.S. at 67, 61 S.Ct. at 404 (explaining that, with respect to preemption analysis, there

24

is no "rigid formula or rule which can be used as a universal pattern to determine the meaning and purpose of every act of Congress"). Therefore, the Court requires the scrutiny of relevant statutory language, considering Congress' evident purpose and pertinent case law, to determine whether Congress intended to preempt state laws such as specific sections of the Puerto Rico Weapons Act. See *Phillip Morris v. Harshbarger* 122 F.3d 58 (1997).

For starters, current restrictions in the Commonwealth do not allow for the purchase of ammunition using the Internet, because (it requires that such purchase be done locally thru interstate transfer to a local FFL approved gun-dealer) each purchase (including ammunition) must be recorded into the Police Firearm registry. Article 5.12 restricts interstate commerce/travel to the commonwealth with lawfully possess firearms, by requiring sea, air and land carriers to *withhold* delivery of firearms, accessory or ammunition, from delivery until the recipient demonstrates his/her weapon license.  Airlines are also required to notify detailed information to the Puerto Rico Police Department upon arrival of any passenger carrying firearms and/or ammunition into the Commonwealth. *In the absence of a Puerto Rico weapon license by the traveler, the airline is required to withhold delivery of said items, until the Police authorizes its delivery.* Violation of said disposition constitutes a felony punishable with a fix term of twelve (12) years in prison.  25 L.P.R.A. §458k.  Act No. 404 was amended by Act No. 146 in 2014, to specifically imposed a duty on *commercial airlines* to notify the Police upon arrival to the Commonwealth of passengers with lawful firearms.  Said legislation has no empirical basis or logic, the Act recognized a person can *lawfully* transport a firearm form one state to another, as long, as it does so in accordance with Airline regulation, while its legislative intent is to curtail the use of *unlawful* firearms.  The only unlawful act is any Airline's attempt to retain the individual's lawful property, at the behest of the Police. **Exhibit XI**. TSA Regulation dictates that "[n]o common or contract carrier shall require or cause any label, tag, or other written notice to be placed on the outside of any package, luggage, or other container that such package, luggage, or other container contains a firearm." 18 USC §922(e). Airline marking of firearm cases constitutes a violation of Federal law. There are also

exceptions for law enforcement officers that allow them to travel with lawful firearms into the Commonwealth in accordance with Federal laws. *Law Enforcement Officer's Safety Act* (LEOSA) for both active (18 USC §926B) and retired (18 USC §926C) law enforcement officers. It applies to local, State and Federal law enforcement agencies.  Qualified active and retired law enforcement officers do not need a concealed carry permit or license from Puerto Rico Commonwealth, because Federal law exempts them from State laws with respect to the carrying of concealed firearms.

Further, Article 3.05 (A) of the Weapons Act restricts *provisional* target shooting permits be given exclusively for *athletes* who come into the Commonwealth to compete in *sports* related target practice. 25 L.P.R.A. §457d. Non-athletes who which to attend to advance tactical self-defense course, this includes continued education and retraining for law enforcement, are *excluded*. We should clarify that none of plaintiff's causes of action is predicated *exclusively* on preemption, as any reference made anywhere else in the Complaint, is only used as reference to show the overabundance of regulation and the clear existence of duplicity of most requirements.  Because the N.I.C.S. process conducted by Commonwealth gun-dealers, which requires a background check thru the FBI (and associated agencies NSA, CIA, etc.) this area is the subject of extensive federal regulation and the Puerto Rico gun-clubs and gun-owners must comply with.

We should address here that there are Federal restrictions on Government access to health information. Regulation 45 CFR Part 160, Subpart C; 164.512(f) among others, protect patients' privacy, and limits covered entities cooperation with government to the Department of Health and Human Services (HHS) Office for Civil Rights (OCR), to investigate complaints or otherwise ensure compliance.  Disclosure are also limited to Public Health Activities for specific instance such as child abuse or neglect, safety of products regulated by FDA, risk of spreading a disease, and workplace medical surveillance. 45 CFR 164.512(b). Gun-shot wound reporting is not one of these and law enforcement is no "public health authority" covered by the exceptions. **Exhibit XII** and **Exhibit XIII.** Both PRSA and Justice Department failed to acknowledge reporting restriction.

# Plaintiffs have standing to represent their Students and Members

Defendant's argument against plaintiffs standing on behalf of students and organization's members is without merits. The Supreme Court has recognized that organizations have standing to sue on behalf of their members when its members would otherwise have standing to sue in their own right, the interests it seeks to protect are germane to their organization's purpose and neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit. See *Hunt v. Washington State Apple Advertising Comm.* 432 U.S. 333, 343 (1977); *Warth v. Seldin*, 422 U.S. 490 (1975), pg. 342-343.

Plaintiffs have standing to bring this action in a representational capacity. The prerequisites to associational standing described in *Hunt* and *Warth* are similarly present here: (1) Lawful gun owners are restricted without a target practice permit required *by law* which involves mandatory affiliation to PRSA gun-club and pay for PRSA "Federation" stamp to obtain target-practice permit; (2) plaintiff organizations' attempt to remedy this situation is central to its purpose of properly training *self-defense* and firearm safety to citizens and law enforcement officers; and (3) neither plaintiff's constitutional claim nor the relief requested requires individualized proof.

# Arguments

The Unites States Constitution imposes constrains on Commonwealth's power to regulate the lawful possession and use of firearms for *self-defense training* purpose by law abiding citizens, and prohibits unlawful delegation of authority to PRSA thru regulatory schemes that infringe each individual member's Second Amendment right and his/her right to Freely Associate. Defendant PRSA's argument is flawed and inconsistent with federation's prior statements, and Justice seeks to dodge Second Amendment's "shall not be infringed" restriction on the Commonwealth's power. Membership *into* PRSA affiliated gun-clubs (only kind in existence) is mandated *by law*, and the PRSA "Federation" Stamp is required *by law* for each individual to lawfully purchase and practice with more than two firearms and 50 rounds of ammunition per weapon/per year.  Said restrictions *infringe* upon the exercise of lawful conduct and *contradicts* public policy, which favor lawful gun

owners to train extensively on firearm safety. Such bizarre restrictions limit a persons' ability to further his/her proficiency on self-defense skills, while giving PRSA power to regulate that which should be regulated *exclusively* by *two* government agencies.   No other sport in the Commonwealth requires every participant to affiliate to its Federation, pay dues and restrict its exercise exclusively to Federation's endorsed facilities (clubs) and its own regulation.   Without the PRSA endorsement *non-sport* related shooting clubs cannot exist and without PRSA Stamp no target-practice permits.

Kerkado has alleged the infringement of his right guaranteed by the Second Amendment, which provides that "the right of the people to keep and bear arms shall not be infringed." In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court established the Second Amendment protects the right to keep and bear arms for *self-defense*, and soon thereafter made clear that this guarantee to bear arms is fully *applicable to the States*. *McDonald v. City of Chicago*, 561 U.S. 742, 749-50 (2010). The US Supreme Court recognized the Second Amendment right to self-defense allows for the protection from both public and private violence. See *Helle*r, 554 U.S. at 594 (stating that, by the time of the founding, the right to have arms was "fundamental" and "understood to be an individual right protecting against both public and private violence."). In *Heller*, the Court also recognized that hunting and militia membership were the primary objective of the right to keep and bear arms. See *Id*. at 598.   To restrict such fundamental right by mandatory affiliation to a sport association unduly burden the Second Amendment.   PRSA now seeks to perpetuate its existence and serve as *de facto* gatekeeper thru mandated affiliation and its fees. By advocating in support of existing regulation, the PRSA now seeks to deprive law-abiding citizens from exercising their rights in least restrictive and intrusive ways, in and of itself illustrative of PRSA's bad faith, when it sought to exempt its own *athletes* from the target permit requirement.

When the Commonwealth forces you support and affiliate with a private organization, with whom you may not agree with, such action is unconstitutional burden on that person's fundamental rights. An encroachment of that individual's right to collectively express, promote, pursue or

defend *other* ideas not related to the sport.  The Court should find that mandatory membership into PRSA affiliated clubs for individuals, and gun-club affiliation to PRSA are both unconstitutional. PRSA violates firearm instructor's first amendment right by placing restrictions on the content of firearm related courses, which has constitutional protection, as well.  Plaintiffs' courses do not conform to PRSA sport-only point of view with respect to the Second Amendment. The Commonwealth will fail to demonstrate that their interest in public safety by requiring affiliation of gun-owners and gun-clubs to the Federation trumps over plaintiff's right to freely associate.

# LEGAL STANDARD

With allegations regarding sufficiency of the Complaint, the Court should turn to the Federal Rule of Civil Procedure 8(a), which enumerates minimum requirements of a Complaint:

> (1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;
> (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and
> (3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

The Supreme Court back in 1957 was called upon to evaluate the sufficiency of a complaint:

> In appraising the sufficiency of the complaint [in this case] we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. (emphasis provided). *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (overruled by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)).

To comply with Rule 8(a)(2), the Supreme Court established a complaint must state a "plausible" claim for relief, as opposed to merely stating a "possible" claim for relief. "*[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that 'the pleader is entitled to relief.'*" (emphasis provided). *Iqbal*, 556 U.S. at 679 (using the language of Fed. Rule Civ. Proc. 8(a)(2) to explain plausibility). To "*nudge [a claim] across the line from conceivable to plausible,*" the complaint must contain enough facts to support a claim for relief. (emphasis provided). *Twombly,* 550 U.S. at 570.  "*This plausibility standard has become the 'new normal' in federal civil practice.*" *Garcia-Catalan v. United States*, 734 F.3d 100, 101 (1st Cir. 2013) (citing *A.G. v. Elsevier, Inc.*, 732 F.3d

77, 78–79 (1st Cir. 2013)).  Discovery opens when a complaint has "*factual allegations [that] are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'*" *Garcia-Catalan*, 734 F.3d at 103 (citing *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678)); see also *Garcia-Catalan*, 734 F.3d at 103 ("*The circumstances in the complaint create a reasonable expectation that discovery may yield evidence of the government's allegedly tortious conduct*"; citing *Ocasio-Hernandez v. Fortuño-Burset*, 640 F.3d 1, 17 (1st Cir. 2011)). The First Circuit explained the relationship between a complaint's plausibility and discovery in more detail: ... the plausibility inquiry properly takes into account whether discovery can reasonably be expected to fill any holes in the pleader's case. See *Twombl*y, 550 U.S. at 556 (requiring, as a hallmark of plausibility, that a complaint contain "*enough fact[s] to raise a reasonable expectation that discovery will reveal evidence*"). *Garcia-Catalan*, 734 F.3d at 104-05.  Because precise knowledge of the chain of events leading to the [claim] may often be unavailable to a plaintiff at this early stage of the litigation, the Court takes to heart the Supreme Court's call to "*draw on our 'judicial experience and common sense' as we make a contextual judgment about the sufficiency of the pleadings.*" See *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 48 (1st Cir. 2009) (quoting *Iqbal*, 129 S.Ct. at 1950). See *Ocasio-Hernandez*, 640 F.3d at 16

Both the Supreme Court and the First Circuit have cautioned against equating a plausibility analysis with an analysis of a plaintiff's likely success on the merits. "*The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.*" *Iqbal*, 556 U.S. at 678; see also *Twombly*, 550 U.S. at 556 *("[A] well-pleaded complaint may proceed even if it appears that a recovery is very remote and unlikely")* (internal quotation marks omitted); *Sepúlveda-Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 30 (1st Cir. 2010) (affirming that the plausibility standard assumes properly pleaded facts to be true and are to be read in plaintiff's favor) (citing *Twombly*, 550 U.S. at 556); see also *Ocasio-Hernandez*, 640 F.3d at 12 (citing *Twombly*, 550 U.S. at 556) *("[T]he court may not disregard properly pled factual allegations, 'even if it strikes a savvy judge that actual proof of those facts*

*is improbable'* "). Instead, the First Circuit has emphasized that "*[t]he make-or-break standard ... is that the combined allegations, taken as true, must state a plausible, [but] not a merely conceivable, case for relief.*" *Sepúlveda-Villarini*, 628 F.3d at 29; see also *Iqbal*, 556 U.S. at 681 ("*To be clear, we do not reject ... bald allegations on the ground that they are unrealistic or nonsensical ... It is the conclusory nature of [the] allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth*.")

The First Circuit has mapped out the proper methodology to adequately analyze the plausibility of the claims present in a complaint: Step one: *isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements*. (emphasis provided) *Schatz v. Republican State Leadership Committee*, 669 F.3d 50, 55 (1st Cir. 2012) (citing *Ocasio-Hernandez*, 640 F.3d at 12; Iqbal, 556 U.S. 662; and *Twombly*, 550 U.S. at 555.)). "*A complaint 'must contain more than a rote recital of the elements of a cause of action,' but need not include 'detailed factual allegations.'*" *Rodriguez-Vives v. Puerto Rico Firefighters Corps of Puerto*, 743 F.3d 278, 283 (1st Cir. 2014) (citing *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 53 (1st Cir. 2013) (reiterated by *Garcia-Catalan*, 734 F.3d at 103)).  After describing step one in detail, the First Circuit continued the meticulous methodology of identifying a complaint's plausibility: Step two: *take the complaint's well-pled* (i.e., non-conclusory, non-speculative) *facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief*. *Ocasio-Hernandez*, 640 F.3d at 12 (again, discussing *Iqbal* and *Twombly*, among others); see also *S.E.C. v. Tambone*, 597 F.3d 436, 441–42 (1st Cir. 2010) (en banc). Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a "context-specific" job that compels "to draw on" "judicial experience and common sense." *Iqbal*, 556 U.S. at 679. And in performing review, consider (a) "implications from documents" attached to or fairly "incorporated into the complaint," (b) "facts" susceptible to "judicial notice," and (c) "concessions" in plaintiff's "response to the motion to dismiss." *Arturet–Vélez v. R.J. Reynolds Tobacco Co.*, 429 F.3d 10, 13 n. 2 (1st Cir. 2005); see

also *Haley v. City of Boston*, 657 F.3d 39, 44, 46 (1st Cir. 2011). (emphasis provided). *Schatz*, 669

F.3d at 55-56 (footnote omitted). Furthermore, such inferences must be at least as plausible as any

"obvious alternative explanation." *Id.* at 682 (citing *Twombly*, 550 U.S. at 567); see also *Id.* at 680

"*Specific information, even if not in the form of admissible evidence, would likely be enough at*

*[the motion to dismiss] stage; pure speculation is not.*" *Penalbert-Rosa*, 631 F.3d at 596.

When considering a motion to dismiss, the court's inquiry occurs in the two-step process

under current context-based "plausibility" standard established by *Twombly* and *Iqbal*. "*Context-*

*based*" means that a Plaintiff must allege sufficient facts that comply with the basic elements of

the cause of action. See *Iqbal*, 556 U.S. at 671-72 "*An adequate complaint must include not only*

*a plausible claim but also a plausible defendant.*" *Penalbert-Rosa*, 631 F.3d at 594. When courts

are called upon to assess a Rule 12(b)(6) motion to dismiss (or a Rule 12(c) motion for judgment

on the pleadings), the First Circuit has delineated what matters are considered a part of the

pleadings and what matters are not:

> ... in reviewing a 12(b)(6) [motion], it is well-established that in reviewing the
> complaint, we "may properly consider the relevant entirety of a document integral
> to or explicitly relied upon in the complaint, even though not attached to the
> complaint, without converting the motion into one for summary judgment." *Shaw
> v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996) (citing *Watterson v.
> Page*, 987 F.2d 1, 3-4 (1st Cir. 1993) (explaining that the main problem of looking
> to documents outside the complaint—lack of notice to plaintiff—is dissipated
> "[w]here plaintiff has actual notice ... and has relied upon these documents in
> framing the complaint")). "Were the rule otherwise, a plaintiff could maintain a
> claim ... by excising an isolated statement from a document and importing it into
> the complaint ...." *Id.*; see also *Northern Indiana Gun & Outdoor Shows, Inc. v.
> City of South Bend*, 163 F.3d 449, 454 (7th Cir. 1998) ("It is a well-settled rule that
> when a written instrument contradicts allegations in the complaint to which it is
> attached, the exhibit trumps the allegations"). (emphasis added). *Id.* at 32 (cited in
> approval in *Schatz*, 669 F.3d at 55-56).

*Gonzalez-Trapaga v. Mayaguez Medical Center*, 15-1342 (DRD) (3/30/2016) Having presented a

summary of the applicable standard under Federal Rule of Civil Procedure 12(b)(6), the Court may

address allegations contained in the complaint. To evaluate a complaint in the context of a motion

to dismiss, the Court first "*disregard[s] statements in the complaint that merely offer 'legal*

*conclusion[s] couched as ... fact[ ]' or 'threadbare recitals of the elements of a cause of action.*'"

*Rodriguez-Ramos v. Hernandez-Gregorat*, 685 F.3d 34, 40 (1st Cir. 2012) (quoting *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011)). Then, all "*remaining, non-conclusory allegations are entitled to a presumption of truth, and we draw all reasonable inferences therefrom in the pleader's favor.*" *Id*. The "*make-or-break standard*" in evaluating the complaint "*is that the combined allegations, taken as true, must state a plausible, not a merely conceivable, case for relief.*" Id. (quoting *Sepulveda-Villarini v. Dep't of Educ. of Puerto Rico*, 628 F.3d 25, 29 (1st Cir. 2010)).  When considering whether a complaint states a claim for which relief may be granted, courts must assume the truth of all well-plead facts and give the plaintiff the benefit of all reasonable inferences therefrom. *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011).

Defendant PRSA seek dismissal of Plaintiff's claims under Rule 12 (b) (6) of the Federal Rules of Civil Procedure.  In reviewing a motion to dismiss, all factual allegations must be accepted as true, and the Complaint must be construed in Plaintiff's favor to determine whether, under any reasonable reading of the Complaint, Plaintiff may be entitled to relief.  Nationwide Life Ins. Co. v. Commonwealth Loan Title Ins. Co., 579 F. 3d. 304, 307 (3rd. Cir. 2009).  Defendants' Motions to Dismiss under Rule 12 (b) (6) must be *denied* if the Complaint contains sufficient factual matter to state a claim that is plausible on its face.  Fowler v. UPMC Shadyside, 578 F. 3rd. 203, 210 (3rd. Cir. 2009) citing Ashcroft v. Iqbal, __ U.S.__, 129 S. Ct. 1937, 1949 (2009).  A plaintiff must set forth facts sufficient to meet his burden to show that defendant's conduct was the *proximate cause* of the alleged injuries. See Rubio-Gonzalez v. Bridgestone-Firestone, Inc., 2006 WL 2715152, at 2 (D.P.R. Sept. 22, 2006); Frey v. Novartis Pharma. Corp., 642 F. Supp. 2d 787, 795 (S.D. Ohio 2009).

Though Fed. R. Civ. P. 8(a) (2) states that a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief", the U.S. Supreme Court has recently made it clear that the pleading must still contain "enough heft" to give defendants fair notice of what the claim is and the grounds upon which it rests. See Bell Atlantic v. Twombly, 550

U.S. 544, 555 (2007) (wherein the Court "retired" the 50 year-old *Conley v. Gibson* standard of "any foreseeable fact" to a "plausible entitlement" one. Thus, claims are conclusory or without factual basis cannot survive on the mere theoretical chance that the claim might find support in later disclosed or discovered facts in an expensive and unnecessary discovery process. The *Twombly* standard requires the pleader to do more than "incant labels, conclusions, and the formulaic elements of a cause of action". *Id.* Rather, pleaders must show that their allegations "possess enough heft" to establish an entitlement to relief and, thus, to permit the costly process of litigation to continue. *Id.* Although the pleading standard of Rule 8(a) (2) is somewhat liberal and encourages brevity, it still demands more than an unadorned "the-defendant-unlawfully-harmed-me" type of accusation. See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (holding that the *Twombly* standard applies to all federal claims). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do". See Atlantic v. Twombly, *supra*. Nor does it suffice "if it tenders naked assertions devoid of further factual enhancement." See Ashcroft v. Iqbal, *supra*. (Emphasis added). "The pleading must contain something more than a statement of facts that merely creates a suspicion of a legally cognizable right of action". Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508, n.1 (2002). (Emphasis added).

While FRCP 12 (b) (6) provides a vehicle for defendants to request the dismissal of a case or claims for failure to state a claim upon which relief may be granted. To adjudicate a motion to dismiss, the court must accept as true all the factual allegations contained in the complaint. Erickson v. Pardus, 551 U.S. 89, 127 S.Ct. 2197, 2200 2007) (citations omitted). These allegations are viewed through the prism of Rule 8(a)(2), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a) (2). Rule 8 exists to "give the defendant fair notice of what the claim is and the grounds upon which it rests." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555(2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). To comply with Rule 8, a complaint need not include "detailed factual allegations" but it must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v.

Iqbal, ___ U.S. ___, 129 S.Ct. 1937, 1949 (2009) citing *Twombly*, 550 U.S. at 555) (additional citation omitted).  The factual allegations must "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555 (citations omitted).  Complaints that offer "labels," "conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement" fail to rise above the speculative level. Iqbal, 129 S.Ct. at 1949; Twombly, 550 U.S. at 555. To survive a motion to dismiss, a complaint must allege factual matter that states a "claim to relief that is plausible on its face." Iqbal, 129 S.Ct. at 1949 (quoting Twombly, 550 U.S. at 570).  Thus, in order to survive a motion to dismiss under Fed. R. Civ. P. 12(b) (6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face". See Ashcroft v. Iqbal, *supra*.

# CONCLUSION

Tactical self-defense is a fast-growing area of the Second Amendment's industries, which includes *education/training* by professional instructors for civilians and law enforcement officers. From the corresponding legal framework, the Court should conclude that the Commonwealth's target-shooting permit requirement, corresponding restrictions *without* and mandated membership are unconstitutional. Although the PRSA will argue to no avail, that it regulates target shooting sport for the sake of the *safety* of its members and the public. This is false, *by law* it's the duty of the Police Superintendent to cancel the target shooting permit of any competitor who demonstrate negligence or misconduct, during any shooting competition, tournament or event.  (Art. 3.06) 25 L.P.R.A. §457e.  Police Department Regulation No. 6201, which per Puerto Rico Department of State is "*active*" gives Police *exclusive* authority to certify those who give firearm safety training on the Island. See **Exhibit XIV** and **Exhibit XV** The Police have already acknowledged PRSA affiliation is a matter of the sports and not an issue of public safety. The Court may conclude that the Commonwealth improperly delegated to PRSA authority to regulate gun-clubs, and target shooting permit holders are unjustly required to affiliate and support PRSA to keep their target practice permit.  PRSA's efforts to distort this truth should be rejected. We should also point out

that government's assertion of a "privilege" is predicated on Puerto Rico Supreme Court ruling in *Pueblo de Puerto Rico v. Hector Gerardino del Rio*, 113 DPR 684 (1982), and the "privilege" point-of-view was incorporated into Act No. 404, which dates to 2000. Both the ruling and the Act predate *Heller* and *McDonald*, and this case now seeks to rectify such anachronical point of view.

The Complaint adequately alleged the defendant PRSA and Recreation Department acted wantonly, willfully and recklessly in violation of plaintiff's Fundamental right to Freedom of Association, and defendants' motions should be denied because plaintiff stated a plausible §1983 claim against defendant PRSA and Recreation Department. The Complaint also alleged a Supplemental Tort Law Claim against the PRSA. The Court has supplemental jurisdiction over plaintiff's state law claim because state law claim arises out of the same controversy as federal claim, and plaintiff states a genuine federal claim. Plaintiff's claims for damages against defendant PRSA is governed by the tort provision of Article 1802 of the Puerto Rico Civil Code, 31 L.P.R.A. sec. 5141. See *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Article 1802 of the Civil Code, 31 L. P.R.A. sec. 5141, provides:

> A person who by act or omission causes damages to another through fault or negligence shall be obliged to repair the damage so done.

To state a claim for damages plaintiff will establish three elements: 1) a negligent or wrongful act or omission; 2) proof of damages; and 3) a causal relationship between the damage and the action or omission of the defendants. *Hernandez v. Fournier*, 80 P.R.R. 94, 96–97 (1957).

We should point out that in *Paul Murphy v. Robert Guerrero*, 1:14-CV-00026, the Federal District Court for the Northern Mariana Islands recently ruled unconstitutional the registration of firearms, gun restrictions, and excise tax on firearm purchase.  The Court indicated "*laws that burden the Second Amendment right cannot survive if they: (1) lack a sound rationale (e.g. firearm registration); (2) are not supported by evidence (e.g. long gun caliber restriction and attachment ban for assault rifles); (3) completely destroy the right to armed self-defense, no matter the importance of the government's interest (e.g. public carry ban and transportation restriction); or (4) attempt to destroy the right through ordinarily legitimate means (e.g. the $1,000 excise tax).*"

The Court is now faced with a similar controversy in this case, and it may be in position to declare unconstitutional Weapon's Act section 457c and 457a, among other impractical Act schemes.

For the foregoing reasons, the Court should deny defendant PRSA's dispositive motion (Docket No. 18) and defendant Justice Department dispositive motion (Docket No. 19).

WHEREFORE, plaintiffs respectfully move the Court to *deny* both motions to dismiss.

In San Juan, Puerto Rico, on this 12th. Day of December 2016.

/S/ Humberto Cobo-Estrella, Esq.
**USDC-PR230108**

Humberto Cobo-Estrella, Esq.
PO Box 366451
San Juan, Puerto Rico 00936-6451
Tel. (787) 200-2715
Email: hcobo@hcounsel.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2016, a copy of the foregoing pleading was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.  I further certify that a copy of the foregoing pleading and the Notice of Electronic Filing has been served by ordinary U.S. mail upon all parties for whom counsel has not yet entered an appearance electronically.

/S/ Humberto Cobo-Estrella, Esq.
*Attorney for the Plaintiffs*