## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| Jose A. Cruz-Kerkado, *et al.* <br> *Plaintiffs* <br> v. <br> Commonwealth of Puerto Rico, *et al.* <br> *Defendants* | CIVIL ACTION <br><br> Case No 3:16-cv-2748 <br> Constitutional Rights |

# Plaintiff's Memorandum in Opposition
# To Defendant PRSA's Motion to Dismiss (Docket No. 18) And Defendant Justice Department's Motion to Dismiss (Docket No. 19)

**To the Honorable Court:**

**COMES NOW**, the plaintiffs represented by the undersigned counsel and pursuant to December 28, 2016, Court Order (Docket No. 27) submits this Memorandum in Opposition to defendant Puerto Rico Shooting Association's ("PRSA") motion to dismiss (Docket No.18) and the Puerto Rico Justice Department's ("Commonwealth") dispositive motion (Docket No.19).

# Introduction

Ab initio we respectfully assert Commonwealth's request for joinder in support of PRSA motion exemplifies the symbiotic relationship that appears to exist between the government and a private organization whose membership and financial support is compelled from citizens by law. Further we respectfully submit that both the Commonwealth reply to plaintiff's opposition (Docket No. 23) and PRSA's reply in support of its motion to dismiss (Docket No. 24), in response to plaintiffs' previous Opposition (Docket No. 20) unjustly accused plaintiffs of incorporating "new averments and factual allegations not included in the Complaint" and "raise new allegations for the first time in the opposition" respectively. Both defendants failed to identify which specific set of facts they referred to, and neither reply proofer documents to refute plaintiffs exhibits that exposed defendant's contradictory arguments with prior written statements. Specifically, defendant PRSA fail to proofer evidence which support its self-serving assertion that is analogous to Commonwealth's Basketball Federation. It would be foolish to compare guns with basketballs and basket courts with gun-clubs. Basketballs aren't dangerous nor highly regulated like weapons.

**PRSA Motion to Dismiss Flaws**

This case is distinguishable from cited *Ponce v. Basketball Feder. Of Com. Of Puerto Rico*, 760 F.2d 375, 377 (1st. Cir. 1985).  First, in *Ponce* a plaintiff sought to be included into an elite group of players, whereas in here plaintiffs want to be excluded from membership. Second, PRSA membership is mandated by law, whereas basketball federation affiliation is not required by law and its membership is voluntary. Third, plaintiffs are required to financially support the PRSA by purchasing Federation Stamps and affiliated gun-club memberships, regardless of whether they agree with the PRSA or not. Again, in *Ponce*, the Basketball Federation players' participation was voluntary and basketball players are not compelled to financial support the Basketball Federation. Whereas, in here gun-clubs and target-shooting permit holders are required to financially support PRSA because the corresponding license and/or individual permit is contingent upon membership. None payment of PRSA Stamp has consequences which may include revocation of their permits. We should point out that no one needs a license or permit to purchase or play with basketballs. Fourth, in *Ponce* the right to play for an elite basketball group was considered a privilege, where as in here, plaintiffs' interest is to exercise a Constitutionally guaranteed Second Amendment right. As opposed to *Ponce*, the rights asserted by plaintiffs here are fundamental and subject to rigorous government licensing scheme. Respectfully, the Court should conclude this case is distinguishable.

This case is also distinguishable from cited *Williams v. Commonwealth of Puerto Rico*, 910 F. Supp. 2d 386 (D.P.R. 2012) 12-1218 (FAB).  First, in *Williams*, a target-shooting permit scheme was not specifically challenged, as the plaintiffs do in here. In *Williams*, the plaintiffs ambitiously challenged the entire Weapon licensing scheme. Second, the rights asserted by plaintiffs here specifically challenge some restrictions on the purchase of firearms and ammunition, which were not challenged in *Williams*.  Third, plaintiffs here challenge sections of the Weapons Act which require mandatory membership into the PRSA and affiliated gun-clubs, and fourth, the $250.00 Internal Revenue Stamp Tax was challenged in *Williams* on different grounds, and now is challenged as unlawful taxation of a fundamental right.  Neither issues were brought before the

Court on these grounds, in the *Williams* case.  Finally, two distinguishing facts are that one of the plaintiffs here is a proposed non-sport gun-club and the others entities or instructors that teach firearm safety and self-defense education whose content is essential to and protected by the Second Amendment, neither one situated like *Williams* plaintiffs.  Respectfully, once again the Court should also conclude that this case is clearly distinguishable from the previous *Williams* case.

Plaintiffs have and will proffer proof that the Puerto Rico Commonwealth unlawfully delegated its authority to regulate firearm training activities to the PRSA, whose financial existence relies heavily, if not exclusively, on a Commonwealth's regulatory scheme that compels its membership. Thousands of law-abiding individuals, including plaintiffs, who do not practice sports, are required by law to support the PRSA when no other sports require a license or a permit. Contrary to PRSA assertion, it acted under color of State law when it denied plaintiff's gun-club endorsement, which is also required by the law. Plaintiffs §1983 claim against PRSA can survive.

Contrary to PRSA assertion (Docket No. 24) that an inspection is not enough to deem PRSA a state actor, plaintiff's Complaint (Docket No. 1, pg. 25) paragraph no. 54 stated Phoenix members were unlawfully denied the renewal of their Sport's issued instructor license at the behest of the PRSA. The Complaint also stated the Commonwealth had unlawfully delegated authority to PRSA, which derived economic benefit from its grant of authority (Docket No. 1, pg. 25).  The Complaint also asserted each individual was required to produce a PRSA federation stamp in order to engage in target-practice, as required by law to avoid cancellation of his/her permit. (Docket No.1, pg. 12, ¶29; pg. 23, ¶52, pg. 24, ¶53) PRSA action refusing to allow Phoenix's affiliation, which is required by law, demonstrate PRSA challenged activity is attributable to Commonwealth, because of its unique symbiotic relationship. The challenged conduct is the mandatory membership requirement imposed by law to both individuals and proposed gun-clubs, the Commonwealth is responsible for this because it requires PRSA mandatory affiliation, which was unlawfully denied. Defendant PRSA can attempt to downplay the joint inspection given to Phoenix's gun-club, but evidence proffer by plaintiffs will demonstrate: (1) At all relevant times Sports representatives

made representations to Kerkado, that decision maker and originator of gun-club license was the PRSA, whose endorsement was required by Sports prior to any attempt to certify his gun-club facility; (2) Sport representatives made representations to Kerkado that Sports had and would adopt exclusively PRSA standards; (3) that Sports inspector allowed the PRSA inspector to take over its own inspection and impose PRSA requirements; (4) Sports never got to complete its own inspection, as a result of PRSA inspectors adversarial intervention; and (5) Sports subsequent decision to cancel Phoenix instructor licenses with their proposed alternate "tactical" federation, was in fact prompted by PRSA officials. The Commonwealth therefore denied the existence of an alternate federation, equally certified by Sports, that can meet Weapons Act requirements. As such, both PRSA and Sports acted symbiotically to protect PRSA economic interests and its lavish contributions (Olympic travel expenses, etc.) to benefactor Sport officials.  PRSA derives most of its income from State compelled fees imposed on every target-shooting permit and each sports gun-club, therefore the PRSA is dependent on the Commonwealth, because its own membership is not "voluntary" in nature, as opposed to other recognized Sport federations.  The PRSA is the exception because: (1) Commonwealth compels its membership and economic support; (2) its symbiotic relation with Sports officials; and (3) the public function it performs as Commonwealth's gatekeeper to prevent non-affiliated gun-clubs and non-sports related education. The Court should find that PRSA is unique because it does not merely regulate a "sport" comprised by willing volunteers, but jointly restrict with the Commonwealth, what weapon license holders can do at existing gun-clubs and regulate proposed ones. PRSA none-membership would result on the individual's permit cancellation with its corresponding restriction on the number of firearms and ammunition each individual can lawfully purchase.  Defendant PRSA erroneously argued it is "free" to decide which applicants comply with its regulation and erroneously argued it does not perform a function exclusively reserved for the State, when in fact it does function as an "arm" of the Commonwealth firearm regulatory scheme.  Contrary to PRSA self-serving assertions, PRSA

does *not* operate with "independence" from Commonwealth because its involuntary membership is exclusively compelled by State law.

### Commonwealth's Motion to Dismiss Flaws

Commonwealth erroneously asserts plaintiffs Complaint does not arise under the Second Amendment because it originates "from the denial of a business permit for a corporation", this is false. Commonwealth also erroneously asserts plaintiff failed to state actual personal involvement of the Commonwealth.  It also erroneously asserts plaintiff failed to "include facts properly describing "…who did what to whom, when, where and why…". The Original Complaint clearly indicated Sports officials revoked instructor certification for Phoenix's association.  Complaint (Docket No. 1, pg. 25, ¶54 and its Exhibit XIV with a letter and a certificate by Sports.)  Plaintiff has proffer a set of facts in support of his claim, which would entitle to a relief.  This also included Complaint Exhibit III, Sport's regulation of target Shooting. (Docket No. 1, Exhibit III) In the instant case, the Court has jurisdiction over plaintiff's federal question claim because challenged actions arise under the U.S. Constitution. U.S. Const. Art. III §2; See *Empire Healthchoice Assur., Inc. v. McVeig*, 547 U.S. 677 (2006).  Federal question jurisdiction may be based on a civil action alleging a violation of the U.S. Constitution. *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971). Plaintiffs have alleged a substantial infringement of their Second Amendment right given by the U.S. Constitution. While plaintiffs may not have standing to represent third-parties not included in the Complaint, plaintiffs' associations do have standing to represent their members.

In this case at least one plaintiff, Cruz-Kerkado, has demonstrated how his individual Second Amendment right is infringed by having to continue to pay for a mandatory membership fee to a sports gun-clubs and the PRSA sport federation Stamp to renew his weapon license. Without the target-shooting permit, plaintiff can't lawfully possess multiple firearms for training. Plaintiffs associations have demonstrated how their individual members are harmed by having to pay an Internal Revenue Stamp Tax to the Police which amounts to a staggering 323% tax on the Conceal carry permit application with State Court, in which the Police does not participate at all.

Plaintiffs' harm is not conjectural nor hypothetical, and plaintiffs satisfy standing requirements because they represent their students/members, and the remedy sought does not require their individualized involvement in this case.

Contrary to Commonwealth's assertion about a "business permit" the use of a gun-range lies at the core of the Second Amendment. "[t]he Court has acknowledge that certain unarticulated rights are implicit in enumerated guarantees... fundamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined." *Richmond Newspapers v. Virginia*, 448 U.S. 555, 579-80 (1980). Plaintiffs right to use a gun-range is essential to the Second Amendment: '[t]he Constitution secures the right of the people to keep and bear arms. No doubt, a citizen who keeps a gun or pistol under judicious precautions, *practices in safe place the use of it, and in due time teaches his sons to do the same*, exercises his individual right." District of Columbia v. Heller, 128 S. Ct. at 2812 (citation omitted) (emphasis added). "[t]o bear arms implies something more than the mere keeping: it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use; in other words, it implies the right to meet for voluntary discipline in arms..." Heller, 128 Ct. at 2811-12 (citation omitted). A complete ban on non-sports gun-clubs and gun-ranges is doomed.

Finally, the Commonwealth has failed to demonstrate with its motion, how its public safety interest would be adversely affected by simply doing away with PRSA membership requirement, and/or a conceal carry stamp tax. If anything, the alleged "important public interest" serves as pretext to conceal local government true intention, which is to keep most of its citizens unarmed.

## The Constitutional Challenge[1]

The Commonwealth bans non-sport gun clubs and non-sports target practice by weapon license holders. The Commonwealth does not just regulate such practice, but also prohibits any lawful attempt to engage in firearm education and self-defense practice unrelated to athletic sports.

---

[1] Plaintiffs will not address with this memorandum defendant's arguments with regards to the right to privacy, federal preemption and the commerce clause, as plaintiffs have filed an Amended Complaint with a Motion to voluntarily withdraw without prejudice related cause of action One, Four and Five of the original Complaint. Plaintiff will address remaining causes of action which related to Second Amendment, Freedom to Associate and unlawful Taxation.

Without a target-shooting permit, law-abiding plaintiffs face restrictions on firearm purchase and ammunition, which restrict their ability to train on firearm safety. If permit holder does not affiliate to the federation, the individual cannot lawfully engage in target practice or belong to unaffiliated gun-clubs, which the law does not contemplate. Without membership affiliation to the federation, individuals cannot lawfully purchase and possess more than two firearms and 50 rounds of ammo per year for each one. The PRSA has become an arm of the State by serving as both gatekeeper and watchdog of weapons license holders. A PRSA membership and fees are compelled by government regulation, its private actions can be attributed to the State. See *Rendell-Baker v. Kohn*, 457 U.S. at 841, 2771; *Gerena v. Puerto Rico Legal Services, Inc.* 697 F.2d at 450. PRSA actions were influenced and compelled by Commonwealth firearm regulation.

Plaintiffs ask for a declaratory judgment that defendants' regulations which includes portions of Puerto Rico Weapons Act sections 1.02(m), 3.01(c), 3.02 (A), 3.03 (7), 3.04 (B), 3.04 (D), 3.06, 2.02 (D), 6.02, and 2.05 (A), as well as its corresponding Police and Sports regulation, infringe the Second Amendment, in as much as the target shooting permit, federation gun-club membership and Tax Stamp are unlawful requirements and unenforceable, because they infringe plaintiffs' Second Amendment right and other Fundamental Rights

Plaintiffs move the Court to deny both unsupported dispositive motions at this time.

# Legal Argument

### Plaintiffs have pled sufficient facts to establish a plausible claim for relief under 42 U.S.C. §1983 against defendant PRSA

The plaintiff states a claim under 42 U.S.C. §1983 against defendant PRSA, because he makes a plausible allegation that PRSA acted under color of state law. To state a §1983 claim, Plaintiff must not only identify a right protected by the Constitution, but he must also assert the claim against a person or entity who can fairly be described as a state actor. *Estades-Negroni v. CPC Hosp. San Juan Capestrano*, 412 F.3d 1, 4 (1st Cir. 2005); Cousins, 2015 WL 3755272, at *2; 42 U.S.C. § 1983. A plaintiff claiming a §1983 violation must allege, first, that he has been deprived of "a federal constitutional or statutory right," and second, that the deprivation has been

carried out by "a person or persons acting under color of state law." *Estades-Negroni v. CPC Hosp. San Juan Capestrano*, 412 F.3d 1, 4 (1st Cir. 2005). The Court is face with the *unique* circumstance where the PRSA can be viewed as state actor because of the PRSA has become a part of the Commonwealth firearm regulatory scheme. "It is '[o]nly in rare circumstances" that private parties can be viewed as state actors.'" Id. (quoting *Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir. 1992)). There are three tests used to determine whether a private party can be characterized as a state actor: the *state compulsion* test, the *nexus/joint action* test, and the *public fun*ction test. *Id*. at 4–5. Defendant PRSA acted under color of state law per the nexus/joint test. The test "provides that a private party can be held to be a state actor where an examination of the totality of the circumstances reveals that the state has 'so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in [the challenged activity].'" *Id*. at 5 (quoting *Bass v. Parkwood Hosp*., 180 F.3d 234, 242 (5th Cir. 1999)).

Defendant PRSA acted in concert with the Sports and Recreation Department to inspect (joint inspection) plaintiff's proposed gun-club facility. On September 11, 2015, a *joint inspection* of the facilities was conducted by the PRSA and the Recreation Department. PRSA vice president Gilberto Hernandez (uninvited) and Recreation Department's Dialma Ortiz (invited) conducted a *joint inspection* of plaintiff's facility and Ortiz allowed Hernandez to impose PRSA sport standard. Plaintiff's allegations regarding involuntary affiliation to PRSA satisfy the requirement of the deprivation of a right (i.e., a freedom of association). Plaintiff satisfy the state action requirement because defendant was acting on behalf of the state through the process of *involuntary* affiliation (by law) of individual target shooting permit holders to PRSA clubs and PRSA federation. This case meets all three tests for determining whether private action can be deemed state action: the state compulsion test, the nexus/joint action test, and the public function test. In *Estades-Negroni*, 412 F.3d at 5. the First Circuit summarized the tests as follows:

> Under the state compulsion test, a private party is fairly characterized as a state actor when the state "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the [challenged conduct] must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). The

nexus/joint action test provides that a private party can be held to be a state actor where an examination of the totality of the circumstances reveals that the state has "so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in [the challenged activity]." *Bass v. Parkwood Hosp.*, 180 F.3d 234, 242 (5th Cir. 1999) (internal quotation marks omitted) (first alteration in original); see *Perkins* [*v. Londonderry Basketball Club*], 196 F.3d [13] at 21 [ (1st Cir. 1999)]. And, in accordance with the public function test, a private party is viewed as a state actor if the plaintiff establishes that, in engaging in the challenged conduct, the private party performed a public function that has been "traditionally the exclusive prerogative of the State." *Blum*, 457 U.S. at 1005 (internal quotation marks omitted). See also Ahearn v. Inland Hospital 1:16-cv-00457 (9/23/2016)

The Court should find the state compulsion test is satisfied because of the involuntary affiliation process *by law* compels or encourages involuntary affiliation into PRSA, the nexus/joint action test is satisfied based on PRSA/Sports & Recreation *joint inspection* of Kerkado's proposed gun-club and the use of PRSA standards by the Commonwealth to regulate gun-clubs, particularly where the Commonwealth delegates authority to determine which will be allowed *exclusively* for sports; and the public function test is satisfied because PRSA uses the facilities of Albergue Olimpico for its activities and Casa Olimpica for it office/board meetings (which receives substantial Commonwealth funding), the PRSA letterhead bears the official logo of the Puerto Rico Olympic Committee and PRSA actively engages in official representation of Puerto Rico at International events, while financially supporting participants of the Olympic Commonwealth team. Further, PRSA actively participate in Legislative Public Hearings in support of or against proposed legislative initiatives, and dictates what the Sports and Recreation Department regulation of the *sport* and gun-clubs should be. There are *no* known *non-affiliated* (non-PRSA) gun-clubs.

Shortly after Kerkado's meeting with Sports Department's sub-secretary, who showed deference to PRSH, instructor certifications were revoked. Contrary to Justice Department's assertion plaintiff also has §1983 claims against the Commonwealth. When confronted with a "state action" inquiry, the Court must first decide whether there has been any "direct state action." See *Barrios-Velazquez v. Asociacion de Empleados del Estado Libre Asociado de Puerto Rico*, 84 F.3d 487, 491 (1st Cir. 1996). If there is no "*direct state action*," the next step is deciding whether there is any "*indirect state action*." The Supreme Court has "staunchly eschewed any attempt to

construct a universally applicable litmus test to distinguish state action from private conduct." *Perkins*, 196 F.3d at 18. However, the First Circuit has "*employed the following three tests to determine whether a private party fairly can be characterized as a state actor: the state compulsion test, the nexus/joint action test, and the public function test.*" *Estades-Negroni v. CPC Hosp. San Juan Capestrano*, 412 F.3d 1, 5 (1st Cir. 2005) (citing *Rockwell v. Cape Cod Hosp.*, 26 F.3d 254, 257 (1st Cir. 1994); and *Perkins*, 196 F.3d at 18–21). "*A common thread binds these pathways. Each of them, from a slightly different coign of vantage, aims at the same destination: whether 'private actors [have] aligned themselves so closely with either state action or state actors that the undertow pulls them inexorably into the grasp' of the Fourteenth Amendment.*" (alteration in original). *Perkins*, 196 F.3d at 18 (citing *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 253-54 (1st Cir. 1996)). See *Gonzalez-Trapaga v. Mayaguez Medical Center*, 15-1342 (3/30/2016)

The First Circuit has distilled the "*indirect state action*" teachings of the Supreme Court into three distinct tests: the state compulsion, the public function, and the nexus/joint action tests. See, e.g., *Estades-Negroni*, 412 F.3d at 5. "*Under the state compulsion test, a private party is fairly characterized as a state actor when the state 'has exercised coercive power or has provided such significant encouragement, either overt or covert, that the [challenged conduct] must in law be deemed to be that of the State.*'" *Estades-Negroni*, 412 F.3d at 5 (citing *Blum*, 457 U.S. at 1004). "*[I]n accordance with the public function test, a private party is viewed as a state actor if the plaintiff establishes that, in engaging in the challenged conduct, the private party performed a public function that has been 'traditionally the exclusive prerogative of the State.*'" *Estades-Negroni*, 412 F.3d at 5 (citing *Blum*, 457 U.S. at 1005). The First Circuit's expressed the public function analysis is designed to flush out a State's attempt to evade its responsibilities by delegating them to private entities. See *Barrios-Velazquez*, 84 F.3d at 494. To prevail on such a theory, a plaintiff must show more than the mere performance of a public function by a private entity; must show that the function is one exclusively reserved to the State. See *Id*. at 493-94. See also *Perkins*, 196 F.3d at 18-19.  The First Circuit explains the goal of the nexus/joint action test:

The nexus/joint action test provides that a private party can be held to be a state actor where an examination of the totality of the circumstances reveals that the state has "so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in [the challenged activity]." (alterations in original). *Estades-Negroni*, 412 F.3d at 5 (citing *Bass v. Parkwood Hosp.*, 180 F.3d 234, 242 (5th Cir.1999); and *Perkins*, 196 F.3d at 21). "The requisite nexus is premised on a showing of mutual interdependence." *Santiago*, 655 F.3d at 71 (citing *Burton*, 365 U.S. at 723–25; and *Ponce*, 760 F.2d at 381).

A well-respected treatise on the subject matter masterfully classifies the case law regarding this test into three general categories: (1) "cases where the *private actor is subjected to extensive regulation by the government*," (2) "cases involving a wide range of *physical and economic contacts* between the actor and government," and (3) "cases where the *government has provided some sort of direct aid or subsidy to the private actor*." 2 R. *Rotunda & J. Nowak*, Treatise on Const. L. § 16.4. In conducting the required "totality of the circumstances" assessment, there are several factors that the First Circuit has previously identified as significant. First, *"[t]he 'most salient' factor in this determination 'is the extent to which the private entity is (or is not) independent in the conduct of its day-to-day affairs.'"* *Santiago*, 655 F.3d at 71 (citing *Perkins*, 196 F.3d at 21). Second, *"[a] private party's use of public facilities may weigh in the balance."* *Id.* (citing *Burton*, 365 U.S. at 723). Third, "*the state's sharing of profits generated from the private party's rights-depriving conduct*" may also weigh in the balance. *Id.* (citing *Barrios–Velázquez*, 84 F.3d at 494). *Perkins*, 196 F.3d at 21. Of course, "*the lack of a financial partnership is not necessarily dispositive*." *Barrios-Velazquez*, 84 F.3d at 494 (citing *Rodríguez-García*, 904 F.2d at 98–99). This is because *"[t]he test is one of interdependence and joint participation, rather than one of financial enrichment*." *Rodriguez-Garcia*, 904 F.2d at 98. See also *Gonzalez-Trapaga v. Mayaguez Medical Center*, 15-1342 (DRD) (3/30/2016)

Section 1983 "provides a remedy for deprivations of rights secured by the Constitution and laws of the United States when that deprivation takes place under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory." *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 924, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) (internal quotations omitted). To prevail in a Section 1983 claim, the plaintiff "must allege facts sufficient to support a determination (i) that

the conduct complained of has been committed under color of state law, and (ii) that [the alleged] conduct worked a denial of rights secured by the Constitution or laws of the United States." *Cepero–Rivera v. Fagundo*, 414 F.3d 124, 129 (1st Cir.2005) (quoting *Romero–Barcelo v. Hernandez–Agosto*, 75 F.3d 23, 32 (1st Cir.1996)).  Section 1983 claims require that the plaintiff establish three elements for liability to ensue: deprivation of a right, a causal connection between the actor and the deprivation, and state action. See *Sanchez v. Pereira–Castillo*, 590 F.3d 31 (1st Cir.2009); see also 42 U.S.C. §1983. The causation element requires the plaintiff establish (1) that the actions of the defendant deprived the plaintiff of a protected right, and (2) "that the defendant's conduct was intentional, grossly negligent, or amounted to a reckless or callous indifference to the plaintiff's constitutional rights." *Concepcion v. Municipality of Gurabo*, 558 F.Supp.2d 149, 162 (D.P.R.2007). Moreover, a plaintiff must link each defendant to the alleged violation of federal rights. See *González–Piña v. Rodríguez*, 407 F.3d 425, 432 (1st Cir.2005). A plaintiff may do so by indicating any "personal action or inaction [by the defendants] within the scope of [their] responsibilities that would make [them] personally answerable in damages under Section 1983." *Pinto v. Nettleship*, 737 F.2d 130, 133 (1st Cir.1984). To survive a motion to dismiss, the plaintiff's allegations must make out a "plausible, not ... merely [a] conceivable, case for relief." *Rodriguez-Ramos*, 685 F.3d at 40 (emphasis added) (quoting *Ocasio-Hernandez*, 640 F.3d at 12).

Here there are allegations and plausible inference in the complaint that go towards showing Commonwealth "coercion" or "encouragement" of the actions taken by PRSA representatives. Puerto Rico Weapon's Act specifically defines a "shooting federation" as a federation ascribed to the Puerto Rico Olympic Committee which represents the *sport* of Olympic target shooting.  (Art. 1.02 (n)) 25 L.P.R.A. §455 Said definition *excludes* existence of non-sport shooting federations. A plausible finding of direct state action can be made, because the PRSA conducted a gun-range inspection in *conjunction* with Commonwealth officials, dictates what requirements are to be set by Sports for facility approval, pressured Sports to cancel Phoenix instructor's certifications, its affiliation is mandated by the law and a requisite for individuals to keep their target permits.

Amongst the duties of the Sports and Recreation Department *Secretary* is his/her duty to promote the *sport* of target shooting and to cooperate with the shooting federation. (Art. 3.01 (a)) 25 L.P.R.A. §457. This requires the Police *Superintendent* to keep a record of each target permit with its corresponding Federation stamp to which each license holder belongs to. (Art. 3.01 (c)) 25 L.P.R.A. §457. Puerto Rico Weapon's Act dictates that the Puerto Rico Police will not grant a target shooting permit to an individual who is not a member of a gun-club and the federation recognized by the Department of Sports and Recreation. (Art. 3.04 (B)) 25 L.P.R.A. §457c. The target shooting permit holder is also required to keep current his club and federation affiliation, throughout the term of said permit.  Failure to keep member status, will result in said permit cancellation. (Art. 3.04 (D)) 25 L.P.R.A. §457c.  Puerto Rico Weapon's Act also dictates that gun range permits will be issued by the Police *only* to clubs dedicated exclusively to the *sport* of target shooting, and said club must provide as license requirement the shooting Federation's membership certificate. (Art. 3.02 (A)(7)) 25 L.P.R.A. §457a. Puerto Rico Weapon's Act specifically forbids the existence of sport target shooting clubs, without the corresponding license issued by Police Superintendent.  This section unlawfully prohibits the existence of non-sport related gun-clubs in the Commonwealth. (Art. 3.03) 25 L.P.R.A. §457b.

Plaintiff's claims concerning the relationship between the PRSA and the Commonwealth is conceivable and he can provide sufficient factual basis to conclude that they are plausible. The evidence he cites in the Complaint is based upon the Commonwealth's regulatory scheme which includes the Weapons Act and Agency's regulation. Further, the plaintiff gives specific facts as to PRSA participation with the Commonwealth in its regulatory scheme. Therefore, plaintiff makes a plausible allegation that defendant PRSA acted jointly with the Commonwealth to deny *required* PRSA endorsement, and he states a §1983 claim against PRSA.

PRSA 2005 Financial Statement Notes, part of its filing with Puerto Rico's Department of State, confirmed the PRSA has received public funds from Commonwealth's Sports & Recreation Department, which in turn has certified exclusively the clubs authorized by the PRSA. Puerto Rico

Act No. 126 (1980), created the Sports and Recreation Department, but Article 13 mandates that any federation which seeks public funds form the Department, must do so thru the Olympic Committee and is required to show how funds were used. Act No. 32 (2015) also authorized public officials to provide services to the Olympic committee and the Federations. By way of Act 12 (1992) the Commonwealth set aside public funds that help support the Olympic Committee.

What is most hypocritical about PRSA assertions is that it seeks to sustain the legality of the permit which the PRSA sought to eliminate for its athletes. The PRSA actively lobbied to obtain a privilege for athletes in 2015, with Legislative Initiative PC2637. It recognized Act No. 404 did not allow it to grow its "membership". PRSA Memo on PC2637. Further the PRSH has also admitted it is the entity under Act No. 404, which has been entrusted to certify thru *its* gun-clubs every individual with a weapon license that completes the mandatory firearm safety course, and it is entrusted to ensure that those with a target shooting permit who are entrusted with possession of more than two firearms, are sporting *athletes* ascribe to their *Olympic principles*. This fulfills a public function and furthers the PRSA agenda.

### Plaintiffs have pled sufficient facts to state a plausible claim against Defendants for infringement of the Second Amendment

The U.S. Supreme Court has ruled that the Second Amendment guarantees the individual right to possess and carry weapons in case of confrontation. This meaning is strongly confirmed by the historical background of the Second Amendment, which has always been widely understood that, like the First and Fourth Amendments, it codified a *pre-existing* right. The very text of the Second Amendment implicitly recognizes the *pre-existence* of the right and declares only that it "*shall not be infringed*." As the Court said in *United States v. Cruikshank*, 92 U.S. 542, 553, 23 L.Ed. 588 (1876), "*[t]his is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The second amendment declares that it shall not be infringed ....*" *District of Columbia v. Heller*, 554 U.S. 570 (2008).  The Court described the right protected as "'*bearing arms for a lawful purpose*'" and said that "*the people [must] look for their protection against any violation by their fellow-citizens of the rights it recognizes*" to the

States' police power. 92 U.S., at 553 *United States v. Cruikshank*, 92 U.S. 542, 23 L.Ed. 588 *District of Columbia v. Heller*, 554 U.S. 570 (2008).  The inherent right of self-defense has been central to the Second Amendment right, as the First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrong-headed views. The Second Amendment is no different. *District of Columbia v. Heller*, 554 U.S. 570 (2008).

In *Heller*, the Supreme Court recognized that *self-defense* is a basic right, recognized by many legal systems from ancient times to the present day, and held that *individual self-defense* is "the central component" of the Second Amendment right. 554 U.S., at –, 128 S.Ct., at 2801–2802; see also *Id*., at –, 128 S.Ct., at 2817. *McDonald v. City of Chicago*, III, 561 U.S. 742 (2010).  The Court noted that citizens must be permitted "*to use [handguns] for the core lawful purpose of self-defense.*" *Id*., at –, 128 S.Ct., at 2818. See *McDonald v. City of Chicago*, III, 561 U.S. 742 (2010). The right to keep and bear arms was considered no less fundamental by those who drafted and ratified the Bill of Rights, and the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty. *McDonald v. City of Chicago*, III, 561 U.S. 742 (2010). A provision of the Bill of Rights that protects a right that is fundamental from an American perspective applies equally to the Federal Government and the States. See *Duncan*, 391 U.S., at 149, and n. 14, 88 S.Ct. 1444. The Court recognized that Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*. *McDonald v. City of Chicago*, III, 561 U.S. 742 (2010).

Puerto Rico Weapon's Act specifically restricts the number of firearms a weapon license holder can possess, up to a maximum of two (2), unless he/she has a target shooting permit.  (Art. 2.02 (D)) 25 L.P.R.A. §456a. Puerto Rico Weapon's Act specifically restricts the amount of ammunition each individual can possess to a maximum of fifty (50) rounds per weapon, per year, unless he/she has a target shooting permit. (Art. 6.03) 25 L.P.R.A. §459a. The simple possession of ammunition in excess, without the corresponding target shooting permit, constitutes a

misdemeanor punished with up to six months of reclusion in jail and/or a fine up to $5,000.00. Restrictions are not just placed on the number of firearms and ammunition a weapon license holder can lawfully possess, but restrictions also limit his/her ability to transport said weapons because the law dictates he/she can only transport *one* firearm at a time, without a target practice permit. (Art. 2.02 (D)4) 25 L.P.R.A. §456a.

The $250.00 Police Department Stamp required by law for lawfully *licensed* individuals to proceed to apply to the State Court for a concealed carry permit amounts to an *excise tax* on said lawful *activity*. Said excise tax has no empirical support, does nothing to further public safety, nor keep unlawful firearms away from unlicensed criminals, that justify infringement of individuals constitutionally protected right to exercise his/her Second Amendment right.  25 L.P.R.A.§456d. The Supreme Court has ruled that the purchase of a license to exercise a fundamental right amount to an *unconstitutional tax*.  See *Murdock v. Pennsylvania*, 319 US. 105 (1943). See also *Follett v. Town of McCormick,* 321 US 573 (1944).  While interpreting First Amendment rights, the Supreme Court ruled that a law which subjects a right to the *prior restraint* of a license, without narrow, objective and definite standards is *unconstitutional*, and the individual faced with such a law may ignore it and exercise his rights.  *Shuttlesworth v. City of Birmingham*, 394 US 147 (1969), pg. 394 US 150-151.  In this case, the excise tax on the conceal carry application process is meant to serve as prior restraint and dissuade law-abiding citizens from conceal carry for self-defense, and has no significant impact whatsoever on prohibiting the unlawful possessions of illegal firearms by felons.

During 2014 Act No. 78, amended Article 2.03 of the Weapons Act to move a substantial portion of funds obtained from the tax stamp to attend to the Commonwealth's government financial crisis.  Thus, effectively using this for cash-flow purposes, unrelated to fighting crime. During 2013-2014 $6,000,000 dollars were transferred out, between 2014-2015 $1,000,000 was taken and during 2015-2016, $1,418,754 was used to cover other governmental needs. 25 L.P.R.A. §456b. Earlier in 2013 a similar situation had occurred when Act. No. 43, amended Act No. 404 to move funds to help the government cover its budget/fiscal crisis needs for 2013-2014.

**Mandatory affiliation violates Freedom to Associate**

In *Roberts v. United States Jaycees*, 468 U.S. 609, 622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), the Supreme Court noted that "implicit in the right to engage in activities protected by the First Amendment" is "*a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.*" This right is crucial in preventing the majority from imposing its views on groups that would rather express other, perhaps unpopular, ideas. See *ibid*. (stating that protection of the right to expressive association is "*especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority*"). Government actions that may unconstitutionally burden this freedom may take many forms, one of which is "*intrusion into the internal structure or affairs of an association*" like a "*regulation that forces the group to accept members it does not desire.*" *Id.*, at 623, 104 S.Ct. 3244. Forcing a group to accept certain members may impair the ability of the group to express those views, and only those views, that it intends to express. Thus, "*[f ]reedom of association ... plainly presupposes a freedom not to associate.*" *Ibid.* The forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints. *New York State Club Assn., Inc. v. City of New York*, 487 U.S. 1, 13, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988).

To determine if a group is protected by the First Amendment's expressive associational right, the Court must determine whether the group engages in "*expressive association.*" The First Amendment's protection of expressive association is not reserved for advocacy groups. But to come within its ambit, a group must engage in some form of expression, whether it be public or private. *Boy Scouts of America v. James Dale* 530 U.S. 640 (2000). Associations do not have to associate for the "purpose" of disseminating a certain message to be entitled to the protections of the First Amendment. An association must merely engage in expressive activity that could be impaired to be entitled to protection. *Boy Scouts of America v. James Dale* 530 U.S. 640 (2000).

The right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read (*Martin v. City of Struthers*, 319 U.S. 141, 143, 63 S.Ct. 862, 863, 87 L.Ed. 1313) and freedom of inquiry, freedom of thought, and *freedom to teach* (see *Wieman v. Updegraff*, 344 U.S. 183, 195, 73 S.Ct. 215, 220, 97 L.Ed. 216)— indeed the freedom of the entire university community. Sweezy v. State of New Hampshire, 354 U.S. 234, 249—250, 261—263, 77 S.Ct. 1203, 1211, 1217—1218, 1 L.Ed.2d 1311; 1681 *Barenblatt v. United States*, 360 U.S. 109, 112, 79 S.Ct. 1081, 1085, 3 L.Ed.2d 1115; *Baggett v. Bullitt*, 377 U.S. 360, 369, 84 S.Ct. 1316, 1321, 12 L.Ed.2d 377. Without those peripheral rights the specific rights would be less secure. In *NAACP v. State of Alabama*, 357 U.S. 449, 462, 78 S.Ct. 1163, 1172, the U.S. Supreme Court protected the 'freedom to associate and privacy in one's associations,' noting that freedom of association was a peripheral First Amendment right. Disclosure of membership lists of a constitutionally valid association, was held invalid *'as entailing the likelihood of a substantial restraint upon the exercise by petitioner's members of their right to freedom of association.' Ibi*d. In other words, the First Amendment has a penumbra where privacy is protected from governmental intrusion. In like context, the Court has protected forms of 'association' that are not political in the customary sense but pertain to the social, legal, and economic benefit of the members. *NAACP v. Button*, 371 U.S. 415, 430—431, 83 S.Ct. 328, 336— 337. In *Schware v. Board of Bar Examiners*, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796, the Court held it not permissible to bar a lawyer from practice, because he had once been a member of the Communist Party. The man's 'association with that Party' was not shown to be 'anything more than a political faith in a political party' (id., at 244, 77 S.Ct. at 759) and was not action of a kind proving bad moral character. *Id*., at 245—246, 77 S.Ct. at 759—760.  Those cases involved more than the 'right of assembly'—a right that extends to all irrespective of their race or ideology. *De Jonge v. State of Oregon*, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278. The right of 'association,' like the right of belief (*West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178), is more than the right to attend a meeting; it includes the right to express one's attitudes or

philosophies by membership in a group or by affiliation with it or by other lawful means. Association in that context is a form of expression of opinion; and while it is not expressly included in the First Amendment its existence is necessary in making the express guarantees fully meaningful. *Griswold v. Connecticut* 381 U.S. 479 (1965).

The Supreme Court has afforded constitutional protection to freedom of association in two distinct senses. First, the Court has held the Constitution protects against unjustified government interference with an individual's choice to enter into and maintain certain intimate or private relationships. Second, the Court has upheld the freedom of individuals to associate for the purpose of engaging in protected speech or religious activities. *Board of Dirs. of Rotary Int'l v. Rotary Club*, 481 U.S. 537, 544, 107 S.Ct. 1940, 1945, 95 L.Ed.2d 474 (1987). See also *International Packing v. Padilla*, 634 F. Supp.2d 174 (2007). The Puerto Rico Supreme Court addressed the situation in *Rivera Shatz v. ELA*, 191 DPR 791 (2014), by interpreting Puerto Rico's Constitutional protection of citizen's *fundamental* right to freely associate for any lawful purpose.  PR Const. Art. II, Sec. 6.  Puerto Rico Supreme Court held that any restriction on the right for citizens not to associate, would only survive constitutional scrutiny when the State can show a compelling interest to place restrictions on the right to freely associate and demonstrates it had no other less restrictive way to accomplish said compelling interest.

In the present case, Commonwealth has a compelling interest: public safety, however, said concerns was addressed by the Weapons Act, Act No. 404 (2000), as amended, when power was given to the *Puerto Rico Police Department* to regulate the lawful possession of firearms and together with the *Sports and Recreation Department*, both were given authority to issue licenses, inspect gun-clubs and supervise target practice. 25 L.P.R.A. §457. Given the existence of two governmental entities that have *expertise* and *resources* to adequately regulate the use of firearms for lawful purposes, compulsory PRSA affiliate gun-club membership and PRSA Stamp amounts to the unconstitutional encroachment of the individual's right to freely associate, or in this case, not to associate with the PRSA "sport" entity.  Among PRSA's objectives are: (A) To govern the

Sport of target shooting in Puerto Rico, (F) to supervise that clubs, athletes and officials comply with target shooting laws, regulation, including PRSA bylaws, and (G) collaborate with government developing public policies related to the target shooting sport, while resisting political, religious or financial influence.  PRSA Constitution, Art. 103, pg. 3-4 (Docket No. 1, *Complaint, Exhibit IIA*) It seems indisputable that an association that seeks to transmit such values engages in expressive activity. See *Roberts*, *supra*, at 636, 104 S.Ct. 3244 (O'CONNOR, J., concurring) ("*Even the training of outdoor survival skills or participation in community service might become expressive when the activity is intended to develop good morals, reverence, patriotism, and a desire for self-improvement*").

The First Amendment protects plaintiffs' method of expression by teaching and educating others about the Second Amendment, self-defense and firearm safety. As such, plaintiff has a First Amendment right to send his/her message without advocating sports or recreational shooting.  The fact that Kerkado does not trumpet PRSA views, or PRSA does not tolerates his dissent, does not mean that each point of view receives no First Amendment protection. The PRSA is geared towards one point of view with regards to the Second Amendment, contrary to plaintiff's "self-defense" point of view. Given that the PRSA engages in expressive activity, the forced inclusion of the plaintiffs would significantly affect his/her ability to advocate public or private viewpoints, and PRSA's as well.  PRSA's proposition of "neutral" is borderline absurd, given "gun-control" bursts with controversy and the Second Amendment is permeated with political opinions.  A PRSA's State Complaint filed back in 2008, on behalf of its "members", it recognized it had "accreditive function" under Act 404, and represented the interest of its target shooting "members" and *its* clubs. Said action was taken by the PRSA without consent of individual PRSA paying members. Target-practice permit holder financially support an organization, that does not allow them to vote. Currently there are approximately 20 PRSA individuals who engage in sport-related marksmanship competitions, whereas there are approximately over sixty thousand (60,000) target practice permit holders in the Commonwealth. Therefore, less than one (1%) percent of target

practice permit holders actively benefit from any PRSA sponsored event. The PRSA however, claims that it represents all target practice permit holders on the Island, yet it fails to acknowledge its "members" are *obligated* by law into PRSA affiliated gun-clubs. Proposed State Legislation PC 1162 recognized back in 2009, that there were approximately 68,779 individuals with the target practices permits in the Commonwealth, it acknowledged the PRSA certified that its sporting events did not use AR-15, AK-47 or 50 Caliber rifles, the most common weapons for tactical self-defense by both civilians and law enforcement. PRSA has recognized it is exclusively a *sports* organization (no self-defense) per its motion. Docket No.18, pg. 9.

Further, we point to Justice Department's incompatible position with prior statements. In its attempt to defend a law with sections that *do* infringe lawful conduct, the Justice Department "adopts" the PRSA arguments, when in fact, the Justice Department has *testified* that there is "no legal impediment" to permit that individuals and clubs *do not* associate with the existing PRSA. See Justice Department's Memorandum on PC2030, pg. 3 The Puerto Rico Police *also* testified that *non-affiliation* of individuals and associations has *nothing* to do with "public safety", as affiliation is a matter of the "sport" of target shooting.  See Police Memorandum PC2030, pg. 2.

**Plaintiffs have standing to represent their Students and Members**

Defendant's argument against plaintiffs standing on behalf of students and organization's members is without merits. The Supreme Court has recognized that organizations have standing to sue on behalf of their members when its members would otherwise have standing to sue in their own right, the interests it seeks to protect are germane to their organization's purpose and neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit.  See *Hunt v. Washington State Apple Advertising Comm*. 432 U.S. 333, 343 (1977); *Warth v. Seldin*, 422 U.S. 490 (1975), pg. 342-343.

Plaintiffs have standing to bring this action in a representational capacity. The prerequisites to associational standing described in *Hunt* and *Warth* are similarly present here: (1) Lawful gun owners are restricted without a target practice permit required *by law* which involves mandatory

affiliation to PRSA gun-club and pay for PRSA "Federation" stamp to obtain target-practice permit; (2) plaintiff organizations' attempt to remedy this situation is central to its purpose of properly training *self-defense* and firearm safety to citizens and law enforcement officers; and (3) neither plaintiff's constitutional claim nor the relief requested requires individualized proof.

## Standard of Review

With allegations regarding sufficiency of the Complaint, the Court should turn to the Federal Rule of Civil Procedure 8(a), which enumerates minimum requirements of a Complaint:

> (1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;
> (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and
> (3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

The Supreme Court back in 1957 was called upon to evaluate the sufficiency of a complaint:

> In appraising the sufficiency of the complaint [in this case] we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. (emphasis provided). *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (overruled by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)).

To comply with Rule 8(a)(2), the Supreme Court established a complaint must state a "plausible" claim for relief, as opposed to merely stating a "possible" claim for relief. "*[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that 'the pleader is entitled to relief.'*" (emphasis provided). *Iqbal*, 556 U.S. at 679 (using the language of Fed. Rule Civ. Proc. 8(a)(2) to explain plausibility). To "*nudge [a claim] across the line from conceivable to plausible,*" the complaint must contain enough facts to support a claim for relief. (emphasis provided). *Twombly,* 550 U.S. at 570. "*This plausibility standard has become the 'new normal' in federal civil practice.*" *Garcia-Catalan v. United States*, 734 F.3d 100, 101 (1st Cir. 2013) (citing *A.G. v. Elsevier, Inc.*, 732 F.3d 77, 78–79 (1st Cir. 2013)). Discovery opens when a complaint has "*factual allegations [that] are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'*" *Garcia-Catalan*, 734 F.3d at 103 (citing *Haley v. City of Boston*, 657 F.3d 39, 46 (1st

Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678)); see also *Garcia-Catalan*, 734 F.3d at 103 ("*The circumstances in the complaint create a reasonable expectation that discovery may yield evidence of the government's allegedly tortious conduct*"; citing *Ocasio-Hernandez v. Fortuño-Burset*, 640 F.3d 1, 17 (1st Cir. 2011)). The First Circuit explained the relationship between a complaint's plausibility and discovery in more detail: ... the plausibility inquiry properly takes into account whether discovery can reasonably be expected to fill any holes in the pleader's case. See *Twombl*y, 550 U.S. at 556 (requiring, as a hallmark of plausibility, that a complaint contain "*enough fact[s] to raise a reasonable expectation that discovery will reveal evidence*"). *Garcia-Catalan*, 734 F.3d at 104-05.  Because precise knowledge of the chain of events leading to the [claim] may often be unavailable to a plaintiff at this early stage of the litigation, the Court takes to heart the Supreme Court's call to "*draw on our 'judicial experience and common sense' as we make a contextual judgment about the sufficiency of the pleadings*." See *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 48 (1st Cir. 2009) (quoting *Iqbal*, 129 S.Ct. at 1950). See *Ocasio-Hernandez*, 640 F.3d at 16

Both the Supreme Court and the First Circuit have cautioned against equating a plausibility analysis with an analysis of a plaintiff's likely success on the merits. "*The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.*" *Iqbal*, 556 U.S. at 678; see also *Twombly*, 550 U.S. at 556 *("[A] well-pleaded complaint may proceed even if it appears that a recovery is very remote and unlikely")* (internal quotation marks omitted); *Sepúlveda-Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 30 (1st Cir. 2010) (affirming that the plausibility standard assumes properly pleaded facts to be true and are to be read in plaintiff's favor) (citing *Twombly*, 550 U.S. at 556); see also *Ocasio-Hernandez*, 640 F.3d at 12 (citing *Twombly*, 550 U.S. at 556) *("[T]he court may not disregard properly pled factual allegations, 'even if it strikes a savvy judge that actual proof of those facts is improbable' ")*. Instead, the First Circuit has emphasized that "*[t]he make-or-break standard ... is that the combined allegations, taken as true, must state a plausible, [but] not a merely conceivable, case for relief.*" *Sepúlveda-Villarini*, 628 F.3d at 29; see also *Iqbal*, 556 U.S. at 681

("*To be clear, we do not reject ... bald allegations on the ground that they are unrealistic or nonsensical ... It is the conclusory nature of [the] allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth*.")

The First Circuit has mapped out the proper methodology to adequately analyze the plausibility of the claims present in a complaint: Step one: *isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements*. (emphasis provided) *Schatz v. Republican State Leadership Committee*, 669 F.3d 50, 55 (1st Cir. 2012) (citing *Ocasio-Hernandez*, 640 F.3d at 12; Iqbal, 556 U.S. 662; and *Twombly*, 550 U.S. at 555.)). "*A complaint 'must contain more than a rote recital of the elements of a cause of action,' but need not include 'detailed factual allegations.'*" *Rodriguez-Vives v. Puerto Rico Firefighters Corps of Puerto*, 743 F.3d 278, 283 (1st Cir. 2014) (citing *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 53 (1st Cir. 2013) (reiterated by *Garcia-Catalan*, 734 F.3d at 103)).  After describing step one in detail, the First Circuit continued the meticulous methodology of identifying a complaint's plausibility: Step two: *take the complaint's well-pled* (i.e., non-conclusory, non-speculative) *facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief*. *Ocasio-Hernandez*, 640 F.3d at 12 (again, discussing *Iqbal* and *Twombly*, among others); see also *S.E.C. v. Tambone*, 597 F.3d 436, 441–42 (1st Cir. 2010) (en banc). Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a "context-specific" job that compels "to draw on" "judicial experience and common sense." *Iqbal*, 556 U.S. at 679. And in performing review, consider (a) "implications from documents" attached to or fairly "incorporated into the complaint," (b) "facts" susceptible to "judicial notice," and (c) "concessions" in plaintiff's "response to the motion to dismiss." *Arturet–Vélez v. R.J. Reynolds Tobacco Co*., 429 F.3d 10, 13 n. 2 (1st Cir. 2005); see also *Haley v. City of Boston*, 657 F.3d 39, 44, 46 (1st Cir. 2011). (emphasis provided). *Schatz*, 669 F.3d at 55-56 (footnote omitted). Furthermore, such inferences must be at least as plausible as any "obvious alternative explanation." *Id*. at 682 (citing *Twombly*, 550 U.S. at 567); see also *Id*. at 680

"*Specific information, even if not in the form of admissible evidence, would likely be enough at [the motion to dismiss] stage; pure speculation is not.*" *Penalbert-Rosa*, 631 F.3d at 596.

When considering a motion to dismiss, the court's inquiry occurs in the two-step process under current context-based "plausibility" standard established by *Twombly* and *Iqbal*. "*Context-based*" means that a Plaintiff must allege sufficient facts that comply with the basic elements of the cause of action. See *Iqbal*, 556 U.S. at 671-72 "*An adequate complaint must include not only a plausible claim but also a plausible defendant*." *Penalbert-Rosa*, 631 F.3d at 594.  When courts are called upon to assess a Rule 12(b)(6) motion to dismiss (or a Rule 12(c) motion for judgment on the pleadings), the First Circuit has delineated what matters are considered a part of the pleadings and what matters are not:

> ... in reviewing a 12(b)(6) [motion], it is well-established that in reviewing the complaint, we "may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment." *Shaw v. Digital Equip. Corp*., 82 F.3d 1194, 1220 (1st Cir. 1996) (citing *Watterson v. Page*, 987 F.2d 1, 3-4 (1st Cir. 1993) (explaining that the main problem of looking to documents outside the complaint—lack of notice to plaintiff—is dissipated "[w]here plaintiff has actual notice ... and has relied upon these documents in framing the complaint")). "Were the rule otherwise, a plaintiff could maintain a claim ... by excising an isolated statement from a document and importing it into the complaint ...." *Id*.; see also *Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 454 (7th Cir. 1998) ("It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations"). (emphasis added). *Id*. at 32 (cited in approval in *Schatz*, 669 F.3d at 55-56).

*Gonzalez-Trapaga v. Mayaguez Medical Center*, 15-1342 (DRD) (3/30/2016) Having presented a summary of the applicable standard under Federal Rule of Civil Procedure 12(b)(6), the Court may address allegations contained in the complaint.  To evaluate a complaint in the context of a motion to dismiss, the Court first "*disregard[s] statements in the complaint that merely offer 'legal conclusion[s] couched as ... fact[ ]' or 'threadbare recitals of the elements of a cause of action.'*" *Rodriguez-Ramos v. Hernandez-Gregorat*, 685 F.3d 34, 40 (1st Cir. 2012) (quoting *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011)). Then, all "*remaining, non-conclusory allegations are entitled to a presumption of truth, and we draw all reasonable*

*inferences therefrom in the pleader's favor.*" *Id*. The "*make-or-break standard*" in evaluating the complaint "*is that the combined allegations, taken as true, must state a plausible, not a merely conceivable, case for relief.*" Id. (quoting *Sepulveda-Villarini v. Dep't of Educ. of Puerto Rico*, 628 F.3d 25, 29 (1st Cir. 2010)).  When considering whether a complaint states a claim for which relief may be granted, courts must assume the truth of all well-plead facts and give the plaintiff the benefit of all reasonable inferences therefrom. *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011).

Defendants seek dismissal under Rule 12 (b) (6) of the Federal Rules of Civil Procedure. In reviewing a motion to dismiss, all factual allegations must be accepted as true, and the Complaint must be construed in Plaintiff's favor to determine whether, under any reasonable reading of the Complaint, Plaintiff may be entitled to relief.   *Nationwide Life Ins. Co. v. Commonwealth Loan Title Ins. Co*., 579 F. 3d. 304, 307 (3rd. Cir. 2009). Defendants' Motions to Dismiss under Rule 12 (b) (6) must be *denied* if the Complaint contains sufficient factual matter to state a claim that is plausible on its face. *Fowler v. UPMC Shadyside*, 578 F. 3rd. 203, 210 (3rd. Cir. 2009) citing Ashcroft v. Iqbal, __ U.S.__, 129 S. Ct. 1937, 1949 (2009). A plaintiff must set forth facts sufficient to meet his burden to show that defendant's conduct was the *proximate cause* of the alleged injuries. *Rubio-Gonzalez v. Bridgestone-Firestone, Inc*., 2006 WL 2715152, at 2 (DPR Sept. 22, 2006); *Frey v. Novartis Pharma. Corp*., 642 F. Supp. 2d 787, 795 (S.D. Ohio 2009)

Though Fed. R. Civ. P. 8(a) (2) states that a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief', the U.S. Supreme Court has recently made it clear that the pleading must still contain "enough heft" to give defendants fair notice of what the claim is and the grounds upon which it rests. See *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007) (wherein the Court "retired" the 50 year-old *Conley v. Gibson* standard of "any foreseeable fact" to a "plausible entitlement" one. Thus, claims are conclusory or without factual basis cannot survive on the mere theoretical chance that the claim might find support in later disclosed or discovered facts in an expensive and unnecessary discovery process. The

*Twombly* standard requires the pleader to do more than "incant labels, conclusions, and the formulaic elements of a cause of action". *Id*. Rather, pleaders must show that their allegations "possess enough heft" to establish an entitlement to relief and, thus, to permit the costly process of litigation to continue. *Id*. Although the pleading standard of Rule 8(a) (2) is somewhat liberal and encourages brevity, it still demands more than an unadorned "the-defendant-unlawfully-harmed-me" type of accusation. See *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (holding that the *Twombly* standard applies to all federal claims). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do". See *Atlantic v. Twombly*, *supra*. Nor does it suffice "if it tenders naked assertions devoid of further factual enhancement." See Ashcroft v. Iqbal, *supra*. (Emphasis added). "The pleading must contain something more than a statement of facts that merely creates a suspicion of a legally cognizable right of action". *Swierkiewicz v. Sorema N.A*., 534 U.S. 506, 508, n.1 (2002). (Emphasis added).

While FRCP 12 (b) (6) provides a vehicle for defendants to request the dismissal of a case or claims for failure to state a claim upon which relief may be granted. To adjudicate a motion to dismiss, the court must accept as true all the factual allegations contained in the complaint. *Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct. 2197, 2200 2007) (citations omitted). These allegations are viewed through the prism of Rule 8(a)(2), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a) (2). Rule 8 exists to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555(2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). To comply with Rule 8, a complaint need not include "detailed factual allegations" but it must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 1937, 1949 (2009) citing *Twombly*, 550 U.S. at 555) (additional citation omitted). The factual allegations must "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555 (citations omitted). Complaints that offer "labels," "conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further

factual enhancement" fail to rise above the speculative level. *Iqbal*, 129 S.Ct. at 1949; *Twombly*, 550 U.S. at 555. To survive a motion to dismiss, a complaint must allege factual matter that states a "claim to relief that is plausible on its face." *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570).   Thus, in order to survive a motion to dismiss under Fed. R. Civ. P. 12(b) (6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face". See *Ashcroft v. Iqbal*, *supra*.

# Conclusion

The Unites States Constitution imposes constrains on Commonwealth's power to regulate the lawful possession and use of firearms for *self-defense training* purpose by law abiding citizens, and prohibits unlawful delegation of authority to PRSA thru regulatory schemes that infringe each individual member's Second Amendment right and his/her right to Freely Associate. Defendant PRSA's argument is flawed and inconsistent with federation's prior statements, and Justice seeks to dodge Second Amendment's "shall not be infringed" restriction on the Commonwealth's power. Membership *into* PRSA affiliated gun-clubs (only kind in existence) is mandated *by law*, and the PRSA "Federation" Stamp is required *by law* for each individual to lawfully purchase and practice with more than two firearms and 50 rounds of ammunition per weapon/per year.  Said restrictions *infringe* upon the exercise of lawful conduct and *contradicts* public policy, which favor lawful gun owners to train extensively on firearm safety. Such bizarre restrictions limit a persons' ability to further his/her proficiency on self-defense skills, while giving PRSA power to regulate that which should be regulated *exclusively* by *two* government agencies.  No other sport in the Commonwealth requires every participant to affiliate to its federation, pay dues and restrict its exercise exclusively to federation's endorsed facilities (clubs) and its own regulation.  Without the PRSA endorsement *non-sport* related shooting clubs cannot exist and without PRSA Stamp no target-practice permits.

Kerkado has alleged the infringement of his right guaranteed by the Second Amendment, which provides that "the right of the people to keep and bear arms shall not be infringed." In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court established the Second

Amendment protects the right to keep and bear arms for *self-defense*, and soon thereafter made clear that this guarantee to bear arms is fully applicable to the States. *McDonald v. City of Chicago*, 561 U.S. 742, 749-50 (2010). The US Supreme Court recognized the Second Amendment right to self-defense allows for the protection from both public and private violence. See *Heller*, 554 U.S. at 594 (stating that, by the time of the founding, the right to have arms was "fundamental" and "understood to be an individual right protecting against both public and private violence."). In *Heller*, the Court also recognized that hunting and militia membership were the primary objective of the right to keep and bear arms. See *Id*. at 598.

To restrict such fundamental right by mandatory affiliation to a sport association unduly burden the Second Amendment. PRSA now seeks to perpetuate its existence and serve as *de facto* gatekeeper thru mandated affiliation and its fees. By advocating in support of existing regulation, the PRSA now seeks to deprive law-abiding citizens from exercising their rights in least restrictive and intrusive ways, in and of itself illustrative of PRSA's bad faith, when it sought to exempt its own *athletes* from the target permit requirement.

When the Commonwealth forces you to support and affiliate with a private organization, with whom you may not agree with, such action is an unconstitutional burden on that person's fundamental rights. An encroachment of that individual's right to collectively express, promote, pursue or defend *other* ideas not related to the sport. The Court should find that mandatory membership into PRSA affiliated clubs for individuals, and gun-club affiliation to PRSA are both unconstitutional. PRSA violates firearm instructor's first amendment right by placing restrictions on the content of firearm related courses, which has constitutional protection, as well. Plaintiffs' courses do not conform to PRSA sport-only point of view, with respect to the Second Amendment. The Commonwealth has failed to demonstrate that interest in public safety by requiring affiliation of gun-owners and gun-clubs to the federation, trumps over plaintiff's right to freely associate.

From the corresponding legal framework, the Court should conclude that the Commonwealth's target-shooting permit requirement, corresponding restrictions and mandated

membership are unconstitutional. Although the PRSA will argue it regulates target shooting for the sake of the *safety* of its members and the public, by law it's a duty of the Police Superintendent to cancel the target shooting permit of any competitor who demonstrate negligence or misconduct, during any shooting competition, tournament or event. (Art. 3.06) 25 L.P.R.A. §457e. Police Department Regulation No. 6201, which per Puerto Rico Department of State is "*active*" gives Police *exclusive* authority to certify those who give firearm safety training on the Island. The Police have acknowledged PRSA affiliation is a matter of the sports and not an issue of public safety.

The Court may conclude the Commonwealth improperly delegated to PRSA authority to regulate gun-clubs, and target shooting permit holders are unjustly required to support PRSA, to keep the target practice permit. Government's assertion of a "privilege" is predicated on Puerto Rico Supreme Court ruling in *Pueblo de Puerto Rico v. Hector Gerardino del Rio*, 113 DPR 684 (1982), and the "privilege" point-of-view was incorporated into Act No. 404, which dates to 2000. Both the ruling and the Act predate *Heller* and *McDonald*, and the case rectifies this anachronical point of view. The Complaint adequately alleged defendant PRSA and Recreation Department acted wantonly, willfully and recklessly in violation of plaintiff's rights, and defendants' motions should be denied because plaintiff stated a plausible §1983 claim against the PRSA and Sports.

For the foregoing reasons, the Court should deny defendant PRSA's dispositive motion (Docket No. 18) and defendant Justice Department dispositive motion (Docket No. 19).

**WHEREFORE**, plaintiffs respectfully move the Court to ***deny*** both motions to dismiss.

In San Juan, Puerto Rico, on this 4th. Day of January 2017.

/S/ Humberto Cobo-Estrella, Esq.
**USDC-PR230108**
PO Box 366451
San Juan, Puerto Rico 00936-6451
Tel. (787) 200-2715
Email: *hcobo@hcounsel.com*

## CERTIFICATE OF SERVICE

I hereby certify that on January 4, 2017, a copy of the foregoing pleading was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I further certify that a copy of the foregoing pleading and the Notice of Electronic Filing has been served by ordinary U.S. mail upon all parties for whom counsel has not yet entered an appearance electronically. /S/ Humberto Cobo-Estrella, Esq., *Attorney for the Plaintiffs*