In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

Nos. 14-3312 & 14-3322

RHONDA EZELL, *et al.*,

*Plaintiffs-Appellees/*
*Cross-Appellants*,

*v.*

CITY OF CHICAGO,

*Defendant-Appellant/*
*Cross-Appellee.*

———————————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10 C 5135 — **Virginia M. Kendall**, *Judge.*

———————————

ARGUED NOVEMBER 4, 2015 — DECIDED JANUARY 18, 2017

———————————

Before KANNE, ROVNER, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge*. This case returns to us with new controversies arising from Chicago's response to *Heller* and *McDonald*,[1] the Supreme Court's Second Amendment deci-

———————————

[1] *See District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

sions. Last time we addressed an ordinance banning shooting ranges throughout the city. *See Ezell v. City of Chicago* ("*Ezell I*"), 651 F.3d 684 (7th Cir. 2011). The range ban was part of a sweeping ordinance adopted in the wake of *McDonald*, which invalidated Chicago's law prohibiting handgun possession. *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010). To replace the handgun ban, the City established a permit regime for lawful gun possession and required one hour of range training as prerequisite to a permit, but prohibited firing ranges everywhere in the city. *Ezell I*, 651 F.3d at 689–90. We held that the range ban was incompatible with the Second Amendment and instructed the district court to preliminarily enjoin it. *Id.* at 710–11.

The City responded by replacing the range ban with an elaborate scheme of regulations governing shooting ranges. Litigation resumed, prompting the City to rewrite or repeal parts of the new regime. The district judge invalidated some of the challenged regulations and upheld others. *Ezell v. City of Chicago* ("*Ezell II*"), 70 F. Supp. 3d 871, 882–92 (N.D. Ill. 2014). Three provisions currently remain in dispute: (1) a zoning restriction allowing gun ranges only as special uses in manufacturing districts; (2) a zoning restriction prohibiting gun ranges within 100 feet of another range or within 500 feet of a residential district, school, place of worship, and multiple other uses; and (3) a provision barring anyone under age 18 from entering a shooting range. The judge permanently enjoined the manufacturing-district restriction but upheld the distancing and age restrictions. Both sides appealed.

We affirm in part and reverse in part. The two zoning regulations—the manufacturing-district classification and

the distancing rule—dramatically limit the ability to site a shooting range within city limits. Under the combined effect of these two regulations, only 2.2% of the city's total acreage is even theoretically available, and the commercial viability of any of these parcels is questionable—so much so that no shooting range yet exists. This severely limits Chicagoans' Second Amendment right to maintain proficiency in firearm use via target practice at a range. To justify these barriers, the City raised only speculative claims of harm to public health and safety. That's not nearly enough to survive the heightened scrutiny that applies to burdens on Second Amendment rights.

The age restriction also flunks heightened scrutiny. We held in *Ezell I* that the Second Amendment protects the right to learn and practice firearm use in the controlled setting of a shooting range. The City insists that no person under age 18 enjoys this right. That's an extraordinarily broad claim, and the City failed to back it up. Nor did the City adequately justify barring anyone under 18 from entering a range. To the contrary, its own witness on this subject agreed that the age restriction is overbroad because teenagers can safely be taught to shoot and youth firearm instruction is both prudent and can be conducted in a safe manner.

## I. Background

In *Ezell I* we held that Chicago's ban on firing ranges could not be reconciled with the Second Amendment and ordered the district court to preliminarily enjoin its enforcement. 651 F.3d at 710–11. We assume familiarity with that opinion, though we'll repeat the key holdings as necessary here.

Chicago responded to our decision by promulgating a host of new regulations governing firing ranges, including zoning restrictions, licensing and operating rules, construction standards, and environmental requirements. (Firing ranges operated by law enforcement and private-security firms are exempt from the regulatory scheme; there are currently 11 of these located throughout the city.) The plaintiffs returned to court arguing that many of the new regulations violate the Second Amendment.[2]

In the face of this second round of litigation, the City amended the regulatory scheme four times, *Ezell II*, 70 F. Supp. 3d at 876, repealing or revising some of the new rules. The parties eventually filed cross-motions for summary judgment. Ruling on the motions, the judge invalidated some regulations and upheld others, *id.* at 884–93, leaving both sides with something to appeal. And appeal they did, though many of the judge's rulings are left unchallenged, helpfully narrowing the present scope of the dispute.

Three regulations remain contested. The first two are zoning provisions limiting where shooting ranges may locate. Section 17-5-0207 of the Chicago Municipal Code permits ranges only in manufacturing districts with a special-use permit. Section 17-9-0120 is a distancing restriction barring shooting ranges within 100 feet of another range or within 500 feet of any district that is zoned for

---

[2] The individual plaintiffs are Rhonda Ezell, Joseph Brown, and William Hespen, Chicago residents who want access to a firing range within city limits. Action Target, another plaintiff, is a leading designer and builder of gun ranges. The remaining plaintiffs are the Second Amendment Foundation and the Illinois Rifle Association, two nonprofits that advocate for Second Amendment rights.

residential use or planned residential use, or any preexisting school, day-care facility, place of worship, liquor retailer, children's activities facility, library, museum, or hospital. The third contested regulation, section 4-151-100(d), prohibits anyone under age 18 from entering a shooting range.

The judge held that the zoning restrictions severely limit where shooting ranges can be located and accordingly required the City to establish a close fit between the restrictions and the public interests they serve. *Id.* at 883. The City identified several harmful secondary effects that it claimed were associated with shooting ranges: gun theft, fire hazards, and airborne lead contamination. *Id.* at 883–84. But it produced no evidentiary support for these claims beyond the speculative testimony of three city officials—Zoning Administrator Patricia Scudiero, Police Lieutenant Kevin Johnson, and Rosemary Krimbel, the Commissioner of Business Affairs and Consumer Protection. *Id.*

We'll return to the specifics of their testimony later; for now it's enough to say that the judge found it wholly inadequate to discharge the City's burden to justify relegating shooting ranges to manufacturing districts. *Id.* Because the City failed to establish a connection between this zoning rule and the public interests it is meant to serve, the judge invalidated the manufacturing-district restriction. *Id.* at 884.

But the judge rejected the challenge to the 500-foot distancing requirement. She found this restriction "significantly less burdensome" when considered "standing alone." *Id.* She likened it "to a 'law forbidding the carrying of firearms in sensitive places such as schools and government buildings,'" which *Heller* specifically did not call into question. *Id.* (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008)).

Without further analysis, the judge upheld the 500-foot distancing restriction. She did not specifically address the additional requirement of a 100-foot buffer zone between firing ranges.

Finally, the judge upheld the age restriction, concluding that "minors are not guaranteed Second Amendment rights." *Id.* at 889. Cross-appeals followed.

## II. Analysis

The City asks us to reinstate its zoning restriction limiting firing ranges to manufacturing districts. The plaintiffs defend the judge's decision to strike that rule; they argue as well that the distancing and age restrictions fail Second Amendment scrutiny. Our review is de novo, so we give these issues a fresh look. *See Dunnet Bay Constr. Co. v. Borggren*, 799 F.3d 676, 688 (7th Cir. 2015) ("We review the district court's ruling on the cross-motions for summary judgment *de novo*, construing all reasonable inferences from the record in favor of the party against whom the motion under consideration is made.").

### A. *Ezell I*

We take as settled what was established in *Ezell I*. There we held that resolving Second Amendment cases usually entails two inquiries. The threshold question is whether the regulated activity falls within the scope of the Second Amendment. *Ezell I*, 651 F.3d at 701–02. This is a textual and historical inquiry; if the government can establish that the challenged law regulates activity falling outside the scope of the right as originally understood, then "the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review." *Id.* at 703.

"If the government cannot establish this—if the historical evidence is inconclusive or suggests that the regulated activity is *not* categorically unprotected—then there must be a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." *Id.* This requires an evaluation of "the regulatory means the government has chosen and the public-benefits end it seeks to achieve." *Id.* The rigor of this means-end review depends on "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right." *Id.* Severe burdens on the core right of armed defense require a very strong public-interest justification and a close means-end fit; lesser burdens, and burdens on activity lying closer to the margins of the right, are more easily justified. *Id.* In all cases the government bears the burden of justifying its law under a heightened standard of scrutiny; rational-basis review does not apply. *Id.* at 706.

Addressing the "scope" question in *Ezell I*, we rejected the City's argument that range training is categorically unprotected by the Second Amendment. We held that the core individual right of armed defense—as recognized in *Heller* and incorporated against the states in *McDonald*—includes a corresponding right to acquire and maintain proficiency in firearm use through target practice at a range. 651 F.3d at 704. We explained that the core right to possess firearms for protection "wouldn't mean much without the training and practice that make it effective." *Id.* We noted that *Heller* itself supports this understanding. *Id.* at 704 (citing *Heller*, 554 U.S. at 616, 619). Finally, we held that the City had failed to establish that target practice is wholly unprotected as a matter of history and legal tradition in the

founding era or when the Fourteenth Amendment was ratified. *Id.* at 704–06.

This holding and these observations control here. Range training is not categorically outside the Second Amendment. To the contrary, it lies close to the core of the individual right of armed defense.

The City also failed to carry its burden in *Ezell I* at step two of the analytical framework. We held that banishing firing ranges from the city was a severe encroachment on the right of law-abiding, responsible Chicagoans to acquire and maintain proficiency in firearm use, "an important corollary to the meaningful exercise of the core right to possess firearms for self-defense." *Id.* at 708. Accordingly, we applied a strong form of intermediate scrutiny and required the City to demonstrate "a close fit between the range ban and the actual public interests it serves, and also that the public's interests are strong enough to justify so substantial an encumbrance on individual Second Amendment rights." *Id.* at 708–09. The City did not carry this burden, so we instructed the district court to enjoin the firing-range ban. *Id.* at 709–11.

All this is established law. Resisting these settled propositions, the City now asks us to revisit and modify the analytical framework established in *Ezell I*. In its view only laws that substantially or "unduly" burden Second Amendment rights should get any form of heightened judicial scrutiny. This is an odd argument; we specifically addressed and rejected that approach in *Ezell I. Id.* at 703 n.12; *id.* at 706. Our reasoning flowed from *Heller* itself: The Supreme Court explicitly rejected rational-basis review, making it clear that burdens on Second Amendment rights are always subject to

heightened scrutiny. *Heller*, 554 U.S. at 628 n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibition on irrational laws, and would have no effect."). In *McDonald* the Court cautioned against treating the Second Amendment as a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." 561 U.S. at 780. The City's proposed "substantial burden" test as a gateway to heightened scrutiny does exactly that.

We note for good measure that most other circuits have adopted the framework articulated in *Ezell I* and require some form of heightened scrutiny when evaluating the government's justification for a law challenged on Second Amendment grounds. *See, e.g., Tyler v. Hillsdale Cty. Sheriff's Dep't*, 775 F.3d 308, 326 (6th Cir. 2014); *Jackson v. City & County of San Francisco*, 746 F.3d 953, 961 (9th Cir. 2014); *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012); *Heller v. District of Columbia*, 670 F.3d 1244, 1252 (D.C. Cir. 2011); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Reese*, 627 F.3d 792, 800–01 (10th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010). We see no reason to retreat from our settled approach and now repeat what we said in *Ezell I*: If the challenged law regulates activity protected by the Second Amendment, the government "bears the burden of justifying its action[s] under *some* heightened standard of judicial review." 651 F.3d at 706.

### B. New Regulations, New Challenges

#### 1. *Zoning restrictions*

This new round of litigation *is* somewhat different, however; this time we're reviewing a set of zoning restrictions, not an outright ban on shooting ranges throughout the city. Still, the record reflects that the zoning regulations at issue here severely limit where shooting ranges may locate. The combined effect of the manufacturing-district classification and the distancing restriction leaves only about 2.2% of the city's total acreage even theoretically available to site a shooting range (10.6% of the total acreage currently zoned for business, commercial, and manufacturing use). It's unclear how many of these parcels are commercially suitable for siting a shooting range catering to the general public.

The plaintiffs presented evidence—including the testimony of two experts—showing that in other jurisdictions shooting ranges are treated as commercial uses and are often attached to gun retailers, and that banishing them to a tiny subset of the land zoned for manufacturing reduces their commercial viability based on traffic patterns, lack of arterial roads, and other impediments. Tellingly, years after *Ezell I* no publicly accessible shooting range yet exists in Chicago. We therefore agree with the district judge that the challenged zoning regulations, though not on their face an outright prohibition of gun ranges, nonetheless severely restrict the right of Chicagoans to train in firearm use at a range.

We also agree with the judge's decision to require the City to establish a close fit between the challenged zoning regulations and the actual public benefits they serve—and to

do so with actual evidence, not just assertions. 70 F. Supp. 3d at 883. The judge's analysis went offtrack, however, when she examined the two zoning regulations separately and summarily upheld the 500-foot distancing requirement as a "sensitive place" restriction, essentially immune from challenge under *Heller*.

There are two problems with this approach. First, the manufacturing-district and distancing restrictions stand or fall together. The two zoning requirements work in tandem to limit where shooting ranges may locate. The impact of the distancing rule cannot be measured "standing alone," as the district judge thought; to meaningfully evaluate the effect of the buffer-zone requirement, we need to know which zoning districts are open to firing ranges. The manufacturing-district classification now stands enjoined, and to that extent we agree with the judge's decision, for reasons we'll explain in a moment. That puts the ball squarely in the City's court to decide which districts it will now open to firing ranges and on what terms. A different combination of zoning rules—say, a more permissive zoning classification and a less restrictive buffer-zone rule—may well be justified, if carefully drafted to serve actual public interests while at the same time making commercial firing ranges practicable in the city. But the two zoning restrictions—the manufacturing-district classification and the distancing requirement—are a single regulatory package for purposes of Second Amendment scrutiny. We can't evaluate the degree to which these zoning regulations, standing alone, encumber Second Amendment rights and are responsible for the absence of commercial shooting ranges in the city. They must be evaluated as a package.

Second, the judge summarily upheld the distancing restrictions based on the enigmatic passage in *Heller* in which the Court cautioned that its opinion should not be read as casting doubt on "longstanding prohibitions on the carrying of firearms … in sensitive places" like schools and government buildings. 554 U.S. at 626–27. The judge apparently thought this language effectively immunized the buffer-zone rule from constitutional review. *Ezell II*, 70 F. Supp. 3d at 884–85.

We're not sure that's the correct way to understand the Court's "sensitive places" passage, but we don't need to resolve the matter in order to decide this case. The distancing requirement is not a limitation on where firearms may be carried, so it doesn't fall within the ambit of this language. Moreover, any suggestion that firearms are categorically incompatible with residential areas—recall that residential districts are included in the City's buffer-zone rule—is flatly inconsistent with *Heller*, which was explicit that possession of firearms in the home for self-defense is the core Second Amendment right. *Heller*, 554 U.S. at 635–36. So the manufacturing-district classification and the distancing requirement must be reviewed together.

With that point explained, we return to the City's proffered justification for regulating firing ranges in this way. The City claims that confining firing ranges to manufacturing districts and keeping them away from other ranges, residential districts, schools, places of worship, and myriad other uses serves important public health and safety interests. Specifically, the City cites three concerns: firing ranges attract gun thieves, cause airborne lead contamination, and carry a risk of fire.

The City has provided no evidentiary support for these claims, nor has it established that limiting shooting ranges to manufacturing districts and distancing them from the multiple and various uses listed in the buffer-zone rule has any connection to reducing these risks. We certainly accept the general proposition that preventing crime, protecting the environment, and preventing fire are important public concerns. But the City continues to assume, as it did in *Ezell I*, that it can invoke these interests as a general matter and call it a day. It simply asserts, without evidence, that shooting ranges generate increased crime, cause airborne lead contamination in the adjacent neighborhood, and carry a greater risk of fire than other uses.

The City's *own witnesses* testified to the lack of evidentiary support for these assertions. They *repeatedly admitted* that they knew of no data or empirical evidence to support any of these claims. Indeed, Patricia Scudiero, the City's zoning administrator, conceded that neither she nor anyone else in her department made any effort to review how other cities zone firing ranges. She conducted no investigation, visited no firing ranges in other jurisdictions, consulted no expert, and essentially did no research at all.

To shore up its weak defense of the two zoning restrictions, the City submitted a list of 16 thefts from gun stores and shooting ranges around the country since 2010. Only two of these incidents involved thefts from shooting ranges, and no evidence suggests that these thefts caused a spike in crime in the surrounding neighborhood.

The City's assertions about environmental and fire risks are likewise unsupported by actual evidence. In its briefs the City relies on a study by the National Institute for Occupa-

tional Safety and Health explaining that improperly venti-
lated shooting ranges can release lead-contaminated air into
the surrounding environment. But the report goes on to
describe appropriate filtering techniques that prevent this
danger entirely. As for the concern about fire, the City
provided no evidence to suggest that a properly constructed
and responsibly operated commercial shooting range pre-
sents a greater risk of spontaneous combustion than other
commercial uses.

Moreover, and importantly, Chicago has promulgated a
host of regulations to guard against environmental and fire
hazards and otherwise ensure that shooting ranges will be
properly constructed, maintained, and operated. These
regulations were for the most part upheld, *Ezell II*, 70 F.
Supp. 3d at 884–93, and the judge's rulings are unchallenged
on appeal.

And if more were needed, the City concedes (as it must)
that law-enforcement and private-security ranges operate in
commercial districts throughout Chicago near schools,
churches, parks, and stores; the City acknowledges that they
operate quite safely in these locations. Common sense
suggests that law-enforcement ranges probably do not
attract many thieves, but the City's theft-protection rationale
for these zoning rules is so woefully unsupported that the
distinction between law-enforcement and commercial ranges
doesn't carry much weight. The City doesn't even try to
argue that commercial ranges create greater fire or environ-
mental risks than law-enforcement ranges.

We explained in *Ezell I* that the City cannot defend its
regulatory scheme "with shoddy data or reasoning. The
municipality's evidence must fairly support the municipali-

ty's rationale for its ordinance." 651 F.3d at 709 (quoting *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002)). To borrow from the free-speech context, "there must be *evidence*" to support the City's rationale for the challenged regulations; "lawyers' talk is insufficient." *Annex Books, Inc. v. City of Indianapolis*, 581 F.3d 460, 463 (7th Cir. 2009). Here, as in *Ezell I*, the City's defense of the challenged zoning rules rests on sheer "speculation about accidents and theft." 651 F.3d at 709. That's not nearly enough to satisfy its burden. The manufacturing-district and distancing restrictions are unconstitutional.

## 2.  *Age restriction*

The City's primary defense of the age-18 limitation is to argue that minors have no Second Amendment rights *at all*. To support this sweeping claim, the City points to some nineteenth-century state laws prohibiting firearm possession by minors and prohibiting firearm sales to minors. Laws of this nature might properly inform the question whether minors have a general right, protected by the Second Amendment, to purchase or possess firearms. But they have little relevance to the issue at hand.

The plaintiffs do not question the permissibility of regulating the purchase and possession of firearms by minors. They challenge only the extraordinary breadth of the City's age restriction. Banning *anyone* under age 18 from entering a firing range prevents older adolescents and teens from accessing adult-supervised firearm instruction in the controlled setting of a range. There's zero historical evidence that firearm training for this age group is categorically unprotected. At least the City hasn't identified any, and we've found none ourselves.

To the contrary, *Heller* itself points in precisely the opposite direction. 554 U.S. at 617–18 ("[T]o bear arms implies something more than the mere keeping; it implies the learning to handle and use them … ; it implies the right to meet for voluntary discipline in arms, observing in doing so the laws of public order." (quoting THOMAS MCINTYRE COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS 271 (1868))); *see also id.* at 619 ("No doubt, a citizen who keeps a gun or pistol under judicious precautions, practices in safe places the use of it, and in due time teaches his sons to do the same, exercises his individual right." (quoting BENJAMIN VAUGHAN ABBOTT, JUDGE AND JURY: A POPULAR EXPLANATION OF THE LEADING TOPICS IN THE LAW OF THE LAND 333 (1880))).

For the same reason, the City's reliance on contemporary caselaw is entirely misplaced. The few cases it identifies all address laws prohibiting minors from possessing, purchasing, or carrying firearms. *See, e.g., Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338 (5th Cir. 2013) (upholding a state law banning 18- to 20-year-olds from carrying handguns in public); *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185 (5th Cir. 2012) (upholding a federal law prohibiting 18- to 21-year olds from purchasing a handgun); *United States v. Rene E.*, 583 F.3d 8 (1st Cir. 2009) (upholding a federal law prohibiting juvenile handgun possession); *People v. Mosley*, 33 N.E.3d 137 (Ill. 2015) (upholding a state law banning 18- to 20-year-olds from carrying handguns outside the home); *People v. Aguilar*, 2 N.E.3d 321, 329 (Ill. 2013) (upholding a state law prohibiting those under age 18 from possessing concealable firearms); *State v. Sieyes*, 225 P.3d 995 (Wash. 2010) (upholding a state law prohibiting those under age 18 from possessing firearms).

Nor can the City find help from our decision in *Horsley v. Trame*, 808 F.3d 1126 (7th Cir. 2015). *Horsley* was not, strictly speaking, a claim about the Second Amendment rights of minors; the case addressed an Illinois law that requires 18- to 21-year-olds to provide written parental consent to obtain a so-called "FOID card," a prerequisite to lawful ownership of a firearm. *Horsley* discussed but expressly did not decide whether minors are categorically excluded from the Second Amendment right. *Id.* at 1131 ("We need not decide today whether 18-, 19-, and 20-year-olds are within the scope of the Second Amendment."). The panel opted instead to apply heightened scrutiny to the Illinois law at step two of the *Ezell I* framework and under that standard upheld the parental-consent requirement. *Id.* at 1132–34. *Horsley*, like the other cases cited by the City, does not speak to the issue before us here.

In short, no case has yet addressed a claim comparable to this one: A challenge to an age restriction that extinguishes even the right of older adolescents and teens to receive adult-supervised firearm instruction in the controlled setting of a firing range. Because the City has not met its burden to establish that *no* person under the age of 18 enjoys this right, we proceed to *Ezell I*'s second step.

The City staked most of its case on the categorical argument and made little effort to justify prohibiting older adolescents and teens from engaging in supervised target practice at a range. Its rationale rests largely on an argument from "common sense" about public safety and the safety of children. Yet even common sense does not lie with the City.

In what must have come as a surprise to the City, Commissioner Krimbel, the City's own witness on this subject,

actually agreed with the plaintiffs' attorney that banning anyone under 18 from entering a shooting range goes too far and extends beyond legitimate safety concerns. Here's a taste: "I will give you this: I believe [the age restriction] is inartfully drafted because it seem[s] clear to me that the purpose of it is to not have kids running around unsupervised." And this: "[Y]ou might want to draft that a little bit differently" because shooting ranges are a "good place" to teach a youngster "how to fire a rifle." And this: "In fact, my own son took a shooting class when he was 12, so I'm well aware of the fact it's okay to teach a young person how to shoot a gun properly." Commissioner Krimbel also conceded that the City lacked any data or empirical evidence to justify its blanket no-one-under-18 rule.

The City is left to rely on generalized assertions about the developmental immaturity of children, the risk of lead poisoning by inhalation or ingestion, and a handful of tort cases involving the negligent supervision of children who were left to their own devices with loaded firearms. No one can disagree—and we certainly do not—that firearms in the hands of young children or unsupervised youth are fraught with serious risks to safety. Nor do we question the aim of protecting children against lead poisoning. We accept as well that the presence of young children at a firing range can be a risky distraction during target practice, even for a skilled marksman.

But the City has specific regulations aimed at containing the environmental risks, as we've already noted. And the remaining public-safety interests can be addressed by a more closely tailored age restriction—one that does not *completely extinguish* the right of older adolescents and teens

in Chicago to learn how to shoot in an appropriately super-
vised setting at a firing range. As presently written, howev-
er, the City has failed to adequately justify its broad age
restriction.[3]

## III. Conclusion

As we said in *Ezell I*, Chicago has room to regulate the
construction and operation of firing ranges to address
genuine risks to public health and safety. 651 F.3d at 711.
This includes setting rules about where firing ranges may
locate and the terms on which minors may enter. But the
City has not justified the three contested regulations. Ac-
cordingly, the judge was right to enjoin the manufacturing-
district restriction, and to that extent the judgment is af-
firmed. The distancing and age restrictions are likewise
invalid; to that extent the judgment is reversed and the case
is remanded with instructions to modify the injunction
consistent with this opinion.

AFFIRMED IN PART, REVERSED
IN PART, AND REMANDED WITH
INSTRUCTIONS.

---

[3] The plaintiffs also mounted a First Amendment challenge to the age
restriction. We do not address this alternative argument.

ROVNER, *Circuit Judge*, dissenting in part and concurring in part.

It is no secret that the City of Chicago would prefer to reduce the number of guns in Chicago. The City faces enormous public and political pressure to reduce its gun violence problem (4,638 shootings in 2016)[1], while at the same time upholding the Second Amendment rights of its citizens as set forth in the case law emerging from *District of Columbia v. Heller*, 554 U.S. 579 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010). Correctly or not, the City reasoned that reducing the number of guns travelling to and from firing ranges, reducing the concentration of guns in one area, and reducing the amount of gunfire in general could help reduce crime and shootings in Chicago. In my concurrence in the first appearance of this case before this court, I expressed sympathy for the City's difficult path between this Scylla and Charybdis, but noted that the City had to "come to terms with th[e] reality" imposed by *Heller* and *McDonald*. And indeed it has. Whether it has come far enough is the subject of today's majority and my separate opinion.

The majority opinion reaches conclusions on three matters, the constitutionality of limiting firing ranges to manufacturing districts (the zoning regulation), the constitutionality of requiring firing ranges to be located more than a certain distance from other specific uses (the distancing regulation), and the constitutionality of a ban on minors at firing ranges. The majority finds all three to be unconstitutional. Although I agree that the City failed to present sufficient evidence to

---

[1] Chicago Tribune, Chicago shooting victims, http://crime.chica gotrib une.com/chicago/shootings/, Last updated Jan. 11, 2017.

support its manufacturing district requirement, I do not agree that the distancing requirement fails as well. I also write separately to note that although a total ban on minors at firing ranges does not withstand a constitutional challenge on this record, the City has a strong interest, and therefore wide latitude, to enact regulations that will protect children from, as the majority states, "serious risks to safety" from the inherent dangers of firearms.

As the majority describes, the test that this circuit has elucidated for Second Amendment cases is a means-ends test in which a court must evaluate the regulatory means the government has chosen to regulate firearms and the public-benefit end the regulation seeks to achieve. *Ezell v. City of Chicago*, 651 F.3d 684, 703 (2011) ("*Ezell I*"). It is a sliding scale test—the greater the burden, the greater the justification needed. Or, as the majority panel described more completely in *Ezell I,*

> a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end. Second, laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified. How much more easily depends on the relative severity of the burden and its proximity to the core of the right.

*Ezell I,* 651 F.3d at 708.

In *Ezell I*, the majority described the right at issue here—the right to participate in range training—as "an important corollary to the meaningful exercise of the core right to possess firearms for self-defense." *Id.* In my concurrence in *Ezell I*, I described it as "an area ancillary to a core right." *Id.* at 713 (Rovner, J., concurring). For the moment we can ignore whether there is a difference in these two descriptions and assume that the right is an important one; although not part and parcel of the core right, close to but subordinate to it. How far subordinate is yet unknown. It carried much import in *Ezell I*, in part, because the City required all gun owners to obtain training that included one hour of live-range instruction, and then banned all live ranges within the City limits. In *Ezell I*, the majority held that the outright ban on firing ranges in the City imposed a severe encroachment and required an exacting test. *Id.* at 708–09. In other words, in *Ezell I*, range training unlocked access to the core right. I conceived of the requirement as a ban on only one type of training and therefore did not believe that the regulation required as rigorous a showing as the majority required. *Id.* at 713. The majority construction prevailed, of course. In the case before us now, however, the majority and I agree, that "[t]his new round of litigation *is* somewhat different; … this time we're reviewing a set of zoning restrictions, not an outright ban on shooting ranges throughout the city." *Ante* at 10. In other words, we are reviewing the City's regulation of where, when, and how firing ranges may operate.[2] As the district court noted, "[b]ecause

---

[2] I could refer to it as a "time, place, and manner" regulation but that term is heavily loaded with attachments to a particular level of scrutiny under First Amendment jurisprudence—a quagmire better to avoid in this case. *See, e.g., U.S. v. Skoien*, 614 F.3d 638, 641–42 (7th Cir. 2010).

some of the provisions entail a greater burden on Second Amendment rights than others, [a] Court [should] not apply a uniform level of scrutiny across the board." *Ezell v. City of Chicago*, 70 F. Supp. 3d 871, 882 (N.D. Ill. 2014). I agree.

The majority opinion combines the zoning and distancing regulations together and states, without any rationale, that the manufacturing and distancing restrictions stand or fall together.[3] In this case they both fall—in my colleagues' view. I disagree. These are two separate regulations with two separate government rationales and two separate effects on the public interest of Chicago citizens. The zoning regulation makes a categorical assessment of where a particular land use belongs based on the character of the area and broad similarities and distinctions with other uses. The distancing regulation makes a much more focused determination of how close a particular use (which may have unique impacts) may be to other uses that have vulnerabilities for one reason or another. Under the sliding-scale standard, they must be evaluated separately. This is all the more true when we take into account the fact that it is our obligation to evaluate legislation, when possible, in a manner which avoids substantial constitutional questions. *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 69 (1994). There is no basis, therefore, for the two regulations to survive or falter as one.

---

[3] I adopt the vernacular of the majority and refer to M.C.C. § 17-5-0207, which relegates all firing ranges to manufacturing districts in the City, as the "zoning regulation" and M.C.C. § 17-9-0120, which requires firing ranges to be built more than 500 feet from hospitals, places of worship and places where children routinely gather; and 100 feet from other firing ranges, as the "distancing regulation."

To see why, I will briefly explore why the City failed in its proof on the means-end test vis-à-vis the zoning regulation. Then I will demonstrate the substantial differences between the means (the government regulation and its purpose) and the end (the public interest benefit it seeks to protect) in the zoning regulation versus the distancing regulation.

I turn first to the zoning regulation and its purpose. Manufacturing districts within the City of Chicago are "intended to accommodate manufacturing, warehousing, wholesale and industrial uses outside the Central Area. The district regulations are intended to: (A) promote the economic viability of manufacturing and industrial uses; (B) encourage employment growth; and (C) limit the encroachment of unplanned residential and other non-industrial development within industrial corridors." M.C.C. §17-5-0101. Residential districts, on the other hand, are "intended to create, maintain and promote a variety of housing opportunities for individual households and to maintain the desired physical character of the city's existing neighborhoods." *Id.* at 17-2-0101. Business and Commercial districts are "intended to accommodate retail, service and commercial uses and to ensure that business and commercial-zoned areas are compatible with the character of existing neighborhoods." *Id.* at § 17-3-0101. They are divided into further categories depending on the character and use of the surrounding area. *Id.* at 17-3-0100.

The City's representative testified before the district court that its purposes for the zoning regulations were as follows:

> the City imposes zoning restrictions because the transportation and use of guns and ammunition could have an impact on the health, safety, and welfare of individuals surrounding a gun range.

> (Def. 56.1 St. ¶ 16). As a result, the City consid-
> ers firing ranges to be "high impact," and re-
> stricting range locales to manufacturing dis-
> tricts offers "a distance away from the residen-
> tial communities in most areas of the city."

*Ezell*, 70 F. Supp. 3d at 877. The parties agreed that firing ranges are compatible with industrial use, but the plaintiffs argued that the ranges were compatible with commercial use as well. *Id.*

Before the district court, the City further explained that it had restricted firing ranges to manufacturing districts, as opposed to allowing them in some commercial use zoning districts, to avoid two secondary effects associated with the health, safety, and general welfare of Chicago residents—thefts targeting firearms and lead contamination. *Id.* at 883. The district court concluded that the City had not sufficiently substantiated a connection between these interests and the ordinance. *Id.* The City did not present data or other empirical evidence that the presence of a firing range would increase crime or that the problem would be diminished by limiting firing ranges to manufacturing districts. The City did provide a list of sixteen thefts (involving the theft of 482 firearms) from gun stores and firing ranges around the country since 2010, but did not provide any rationale for why locating the ranges only in manufacturing zones would reduce theft or other criminal activity. No one from the City researched zoning ordinances on firing ranges in other cities. *Id.* at 884.

Likewise, the City did not supply robust, reliable evidence to support its claim that lead contamination from the firing range with sufficient ventilation systems, as the ordinance requires, would cause environmental effects that make the

ranges suitable only for manufacturing districts. The City did supply a report from the National Institute for Occupational Safety and Health entitled "Preventing Occupational Exposures to Lead and Noise at Indoor Firing Range."[4] That document informs workers, including federal law enforcement officers, that they might be exposed to hazardous lead concentrations at firing ranges, but did not help the court evaluate what the environmental impact of lead would be in a range with the ventilation requirements imposed by the City in this ordinance.[5] Of course, it is beyond question that the City must ardently regulate any possible lead contamination of its citizens; the story of Flint, Michigan, among others, teaches us that. And the Municipal Code of Chicago is chock full of regulations pertaining to lead. *See, e.g.*, M.C.C. § 7-4-010 through 7-4-160. But as the majority notes, when laws stand to encroach upon Second Amendment rights, a rational basis for the law is no longer sufficient support for the law. The City

---

[4]  The National Institute for Occupational Safety and Health, CDC, Dept. of Health and Human Serv's., "Preventing Occupational Exposures to Lead and Noise at Indoor Firing Range." (2009). https://www.cdc.gov/niosh/docs/2009-136/pdfs/2009-136.pdf. Last visited January 16, 2017. R. 227-3, Def.'s Rule 56.1 Statement of Material Facts, Ex. 24 PageID 3731-3762.

The National Institute for Occupational Safety and Health is part of the United States Centers for Disease Control and Prevention within the Department of Health and Human Services. https://www.cdc.gov/niosh/about/default.html. Last visited January 16, 2017.

[5]  There is no doubt that lead exposure is a known and continuing issue for firing ranges. *See* Beaucham, Catherine, "Indoor Firing Ranges and Elevated Blood Lead Levels—United States, 2002–2013," Center for Disease Control, Morbidity and Mortality Weekly Report, April 25, 2014 / 63(16); 347–351.

needed more evidence that its regulations would not be sufficient to prevent lead contamination and came up short.

The district court concluded that the City's generalized propositions that firing ranges pose a danger—in terms of both crime and environmental impact—did not justify restricting them to manufacturing districts only, as opposed to other industrial zones. And, like the majority opinion, on this record, I must agree.

The distancing requirement, as I noted above, however, is different. The zoning and distancing regulations together reduced the land available in the City to about 10.6% of available parcels. The distancing rule alone has a much lesser effect. We do not know the precise number because the City's expert created its map of available parcels using the combined criteria from both regulations. *See* Def.'s Rule 56.1 Statement of Material Facts, Ex. 19, R. 227-1, PageID 3567, and attached as an exhibit to this opinion. Nevertheless, from the map it is clear that an expansion into business districts would increase the availability of sites for firing ranges appreciably. *See Id.* The distancing requirement therefore imposes a significantly lighter burden on the placement of firing ranges. And as *Ezell I*'s sliding scale dictates, a lighter burden requires a lesser justification. *Ezell I*, 651 F.3d at 708.

Although the zoning regulation is a blanket prohibition against firing ranges in all but the manufacturing areas of the City, the distancing regulation is a precise and targeted approach to protecting particular populations and activities that the City routinely singles out for protections—places where children and the sick are gathered, for example. It is the difference between a carpet bomb and a surgical strike. And the factors that enter into an evaluation of the public benefit of

prohibiting firing ranges from business and commercial districts are not the same as the factors that enter into an evaluation of the benefit of keeping shooting ranges away from schools, day care facilities, hospitals and the like. Not only do the regulations not stand or fall together, but the evaluation of the two is dissimilar on both sides of the means-end analysis.

Moreover, the distancing requirements focus on protections for a category of "sensitive places" that the Supreme Court tells us have been subject to longstanding historical protections from firearm dangers. As the Court stated in *Heller*,

> The Court's opinion should not be taken to cast doubt on **longstanding** prohibitions on the possession of firearms by felons and the mentally ill, **or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings**, or laws imposing conditions and qualifications on the commercial sale of arms.

*Heller*, 554 U.S. at 626–27 (emphasis supplied). This language could be construed as removing from Second Amendment protection prohibitions on the possession of firearms by felons and the mentally ill, in sensitive places and the like just as we have noted that "[t]he Court has long recognized that certain 'well-defined and narrowly limited classes of speech'— e.g., obscenity, defamation, fraud, incitement—are categorically 'outside the reach' of the First Amendment." *Ezell*, 651 F.3d at 702. I leave that for another day. For now, it is enough to note that if the Supreme Court has declared that the need

to protect sensitive places is an important enough need to al-
low for an outright prohibition on the carrying of firearms
within them, then it is certainly a sufficiently strong public
interest to justify regulations distancing similar places from
firing ranges. The burden here is not severe (without the zon-
ing regulation, many more parcels are available), the public
interest is great, and the rules do not implicate the heart of a
core right, but rather, at the very most, "an important corol-
lary to the meaningful exercise of the core right to possess fire-
arms for self-defense." *Ezell I*, 651 F.3d at 708.

   The majority asserts that firearms could not possibly be in-
compatible with residential uses because the main premise of
the *Heller* decision, from which the "sensitive places" lan-
guage comes, was to allow law abiding citizens to keep fire-
arms in their residences for self-defense. *Ante* at 12. But own-
ing, keeping or even carrying a firearm for self-defense poses
a substantially different risk than does creating a public ac-
commodation where large numbers of people will gather
with firearms loaded with lead-contaminated, explosive-
filled ammunition and fire them. Firing a gun poses signifi-
cantly greater risks than the mere keeping or carrying of a
gun, in terms of potential accidents, attractiveness to crimi-
nals, and environmental lead exposure. From a practical
standpoint, Illinois state law all but rules out the possibility of
legally firing a gun in a residential area of the City of Chicago.
720 ILCS §§ 5/24-1.2, 5/24-1.2-5, 5/24-1.5. And so the risks as-
sociated with legal firearm discharge will arise almost always
at firing ranges. Moreover, firing ranges can become attrac-
tive nuisances, beckoning to thieves looking for large caches
of firearms, or places where people will be coming and going
while carrying weapons. In short, the City's interests in pre-

venting gun theft and other crime, and reducing lead contamination cast a heavy weight on the public interest side of the scale.

As I noted above, the lower burden and the significant public interest decrease the City's burden to justify the regulation. The majority borrows from the free-speech context and asserts that "there must be *evidence*" to support the City's rationale for the challenged regulations. *Ante* at 15, citing *Annex Books, Inc. v. City of Indianapolis*, 581 F.3d 460, 463 (7th Cir. 2009) (emphasis in original). In the First Amendment context, however, the Supreme Court has rejected the idea that the government must always prove "with empirical data, that its ordinance will successfully lower crime." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 439, (2002). As the City points out, studies showing the effect of crime in the surrounding community are particularly helpful to the courts in First Amendment cases because it is not readily apparent that the sale of adult books and media have the ability to endanger the surrounding community. Guns, on the other hand, are inherently dangerous. *See Loitz v. Remington Arms Co.*, 563 N.E.2d 397, 404 (1990) ("Guns are inherently dangerous instrumentalities, and the mere occurrence of other explosions does not, without more, establish outrageous misconduct or some other basis sufficient to warrant the imposition of punitive damages."). The amount and type of evidence needed to demonstrate a danger, therefore, must be less. The City's evidence was sufficient to justify its rationale for the distancing regulations.

It is not at all uncommon within the Chicago municipal code to create a buffer zone between businesses that have a high impact on their surroundings and facilities that might

serve children or other vulnerable populations such as hospitals, day care facilities, schools, and churches. *See e.g.,* M.C.C. § 4-224-011 ("No machine shops shall be conducted or operated on any lot or plot of ground of which any portion shall be within 200 feet of any lot occupied by a public or parochial school, hospital or church."); M.C.C. § 4-232-120 ("No person shall construct, conduct or operate any motor vehicle salesroom within 200 feet of any building used as a hospital, church, or public or parochial school, or the grounds thereof."); M.C.C. § 15-28-900 ("It shall be unlawful for any person to store or manufacture nitrocellulose products in any building which is situated within 100 feet of any building occupied as a school building, hospital, institutional [sic], or any other place of public assembly"); M.C.C. § 17-9-0119 ("No retail food establishment that sells live poultry or other live fowl at retail, or that slaughters or causes to be slaughtered for sale live poultry or other fowl at retail, shall be located within 200 feet from any place or structure: … (2) is used for residential purposes; or (3) is used as a place of religious assembly, primary or secondary school, library, hospital, public park or public playground"); M.C.C. § 10-36-400 (b)(10) ("no person shall operate any small unmanned aircraft in city airspace: … (10) over any open air assembly unit, school, school yard, hospital, place of worship, prison or police station, without the property owner's consent, and subject to any restrictions that the property owner may place on such operation"). Of course none of these restrictions impose on Second Amendment rights, and therefore they require no more than a rational basis, but the vast number of these laws (I have singled out only a very few) support the City's argument that its purpose in passing the legislation was to protect these sensitive areas, as it does in so many other contexts.

In short, the distancing regulations do not rise or fall along with the zoning regulations. And when separated from them, given the lighter burden imposed by the distancing regulations, the strong public interest in protecting residential areas and sensitive areas from the risks associated with firing ranges, these regulations pass constitutional muster.

As for the ban on minors at firing ranges, I do not disagree with the majority that the City has failed to come forth with evidence to support the exclusion of all minors from firing ranges in all circumstances. To the extent that *McDonald* and its progeny allow for firearm ownership within the City of Chicago, the practical argument that parents who have guns within the City limits might also wish to teach gun safety to their children is not without merit. (Although, as I noted in my concurrence in *Ezell I*, "[t]here is no ban on training with a simulator and several realistic simulators are commercially available, complete with guns that mimic the recoil of firearms discharging live ammunition. It is possible that, with simulated training, technology will obviate the need for live-range training." *Ezell I*, 651 F.3d at 712 (internal citations omitted)). And the legal argument that the outright ban is unconstitutional has merit as well.

I write separately on this point to note the limited rights of minors under the Second Amendment. Importing the concepts from First Amendment jurisprudence into this Second Amendment context, as courts have come to do (*see Id.* at 706–07), it is worth noting that the First Amendment rights of minors are limited—in some contexts far more than others. Although minors do not "'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate' … the First Amendment rights of students in the public schools are

'not automatically coextensive with the rights of adults in other settings.'" *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988), citing *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). And First Amendment rights are particularly limited when the interest balanced on the other side is the health and safety of minors. *See Morse v. Frederick*, 551 U.S. 393, 407 (2007) (upholding school's discipline of student who displayed pro-drug banner noting that deterring drug use by schoolchildren is an "important—indeed, perhaps compelling interest" given the potential severe and permanent damage to the health and well-being of young people); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212 (1975) ("[i]t is well settled that a State or municipality can adopt more stringent controls on communicative materials available to youths than on those available to adults."); *Ginsberg v. State of N. Y.*, 390 U.S. 629, 637 (1968) (government can prohibit sale to minors of sexually explicit material that would be available to adults).

Outside of the First Amendment context, it goes without saying that the government may restrict the rights of minors for purposes of protecting their health and welfare. A state's interest in the welfare of its young citizens justifies a variety of protective measures. Every jurisdiction in the country protects the health, safety, and welfare of minors by prohibiting them from purchasing alcohol and cigarettes, by restricting at what age they may drive and with what limitations, when they may enlist in the military and work, when they may marry, when they may gamble, how long they must attend school, and when they can enter into binding contracts. Some of these regulations, like those surrounding marriage and pregnancy, burden fundamental rights and yet have been upheld regardless of the increased scrutiny given to such laws.

*See, e.g., Planned Parenthood of Cent. Mo. v. Danforth,* 428 U.S. 52, 74 (1976).

In addition to the general protections noted above, states and municipalities impose laws and regulations that protect the health and safety of children in myriad specific ways, many of which interfere fairly significantly with the fundamental right of parents to make decisions concerning the care, custody, and control of their children. *Troxel v. Granville*, 530 U.S. 57, 66 (2000) ("we have recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children."); *see also Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("Acting to guard the general interest in youth's well being, the state as parens patriae may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor, and in many other ways.").

For example, Illinois law requires adults to secure children under the age of eight in an approved child safety restraint while riding in vehicles. 625 ILCS § 25/4. It prohibits children under the age of fourteen from being left without supervision for "an unreasonable period of time without regard for the mental or physical health, safety, or welfare of that minor." 705 ILCS § 405/2-3. The Illinois Administrative Code even prohibits a day care facility from placing a baby to sleep in any position other than on her back, regardless of the parent's request. Ill. Admin. Code § 407.350(i)(1)-(3).

Sometimes the encroachments can be severe even when the risk is low. Parents have been charged with neglect for allowing their children to walk to a park,[6] or walk to school,[7] or play unsupervised in a back yard.[8] This is true despite the fact that the rate of occurrence of the main concern, stranger abduction, is quite low (approximately 60-100 per year) and continually declining.[9]

In short, statutes, regulations, law enforcement and social services resources are employed to protect children from harm even where the risk of harm is slight or negligible. And as the majority states, "No one can disagree—and we certainly do not—that firearms in the hands of young children or unsupervised youth are fraught with serious risks to safety." *Ante* at 18. I would add that firearms even in the hands of older children, even while they are supervised by trained instructors, can have deadly consequences. In one highly publicized incident on an Arizona shooting range, a nine-year-old girl accidentally killed her instructor, Charles Vacca, when the Uzi she was firing became too difficult for her to control,

---

[6]  http://abcnews.go.com/Lifestyle/free-range-parents-found-responsible-child-neglect-allowing/story?id=29363859. Last visited January 16, 2017.

[7]  http://www.timesfreepress.com/news/local/story/2016/apr/01/ mother-charged-neglect-making-children-walk-s/358210/. Last visited January 16, 2017.

[8]  http://insider.foxnews.com/2015/06/14/florida-parents-charged-felony-neglect-after-11-year-old-son-plays-backyard-90-minutes. Last visited January 16, 2017.

[9]  David Finkelhor, Heather Hammer, and Andrea J. Sedlak, "Nonfamily Abducted Children: National Estimates and Characteristics, " United States Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention, October 2002.

jumping out of her hand and firing a bullet into the brain of her instructor.[10] But other recent shootings by and of children on ranges have slipped by without as much attention. In many cases the accidents did not involve high powered weapons or even a child as the shooter. In some incidents, the child at the range was killed by an adult.[11]

---

[10]   http://www.cnn.com/2014/08/26/us/arizona-girl-fatal-shooting-accident/

[11]   The following are incidents of shootings at firing ranges since 2012 found through a review of news stories and may not be a complete list:

October 2016, North Dakota, 14-year-old girl killed at shooting range http://www.kbzk.com/story/33418822/north-dakota-teen-killed-in-accidental-shooting-at-gun-range. Last visited January 16, 2017.

August 2016, Iowa, 10-year-old shot at shooting range http://nbc4i.com/2016/08/19/boy-10-dies-after-being-shot-at-shooting-range/. Last visited January 16, 2017.

July 2016, Florida, Father kills 14-year-old son at shooting range http://www.cnn.com/2016/07/04/us/florida-father-shoots-son/

March, 2016, Florida, 21-year-old at shooting range misfires and hits four children ages 8, 10, 14 and 15 http://wfla.com/2016/03/12/four-children-two-adults-injured-in-gun-range-accident-in-ocala/. Last visited January 16, 2017.

February 2016, Idaho, 12-year shot at shooting range (non-fatal) http://www.foxnews.com/us/2016/02/25/girl-12-accidentally-shot-at-idaho-gun-range.html. Last visited January 16, 2017.

December 2015, Indiana, 12-year-old shot (non-fatal) at shooting range http://cbs4indy.com/2015/12/26/shooting-range-accident-injures-12-year-old/. Last visited January 16, 2017.

Nos. 14-3312 & 14-3322                                            37

---

December 2015, Arizona, 13-year-old girl shot by adult at shooting range http://www.azcentral.com/story/news/local/pinal/2015/12/01/gun-range-accident-serves-safety-reminder/76610904/. Last visited January 16, 2017.

December 2014, Ohio, 14-year-old shot by adult at shooting range http://www.wlwt.com/article/teen-wounded-in-accidental-shooting-at-gun-range/3550107. Last visited January 16, 2017.

December 2014, California, 12-year-old shoots man in leg at shooting range (non-fatal) http://www.eastcountymagazine.org/man-injured-shooting-range-accident. Last visited January 16, 2017.

August 2014, Arizona, 9-year-old kills instructor with Uzi at firing range https://www.washingtonpost.com/news/post-nation/wp/2016/08/26/two-years-after-9-year-olds-fatal-uzi-shooting-instructors-family-files-wrong-ful-death-suit/?utm_term=.7072f20994eb. Last visited January 16, 2017.

January 2014, Florida, 14-year-old shoots herself in leg at shooting range (non-fatal) http://www.wesh.com/article/girl-14-accidentally-shot-at-gun-range-in-merritt-island/4430493. Last visited January 16, 2017.

November, 2012, Tennessee, 13-year-old shot by adult at firing range http://www.wsmv.com/story/20177364/13-year-old-shot-at-gun-range-cheatham-county. Last visited January 16, 2017.

October, 30, 2012, Iowa, 8-year-old shot by 5-year-old sister at shooting range http://www.kwwl.com/story/19956702/accidental-shooting-of-8-year-old-brings-safety-reminder. Last visited January 16, 2017.

The Department of HOUSING and ECONOMIC DEVELOPMENT

**City of Chicago**
**Shooting Range Analysis**

- Business Districts "B"
- Commercial Business Districts "C"
- Manufacturing Districts "M"
- Planned Manufacturing Districts "PMDs"
- Downtown Districts "DX, DC, DS"
- Potential area for shooting range facility 3,386 acres within "M" Zoning Districts
- City of Chicago Boundary

* The area(s) shown on the map has/have been defined after deducting any prohibited areas outlined in the Chicago Municipal Code.
* For reference purposes only
*Futher detailed studies should be performed to justify whether or not a site can be used as a shooting range facility

* 2012 City of Chicago. All Rights Reserved

Author: Luis Monterrubio DHED
Date Saved: 9/28/2012 12:19:20 PM
0 4,125 8,250 16,500 Feet





